1                       UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF ARIZONA

3

4
     UNITED STATES OF AMERICA,         .
5                                      .
          Plaintiff,                   .  No. 11-CR-187-LAB
6                                      .
               v.                      .  February 4, 2011
7                                      .
     JARED LEE LOUGHNER,               .  1:30 p.m.
8                                      .
          Defendant.                   .  San Diego, California
9    . . . . . . . . . . . . . . . .   .

10

11

12
                     TRANSCRIPT OF EX PARTE MOTION HEARING
13                   BEFORE THE HONORABLE LARRY ALAN BURNS
                         UNITED STATES DISTRICT JUDGE
14

15                          (SEALED PROCEEDINGS)

16

17

18

19

20

21   Court Reporter:           Melinda S. Setterman, RPR, CRR
                               USDC Clerk's Office
22                             880 Front Street, Room 4290
                               San Diego, California, 92101
23                             melinda_setterman@casd.uscourts.gov

24

25   Reported by Stenotype, Transcribed by Computer

```
 1                              APPEARANCES

 2

 3   For the Plaintiff:
                                WALLACE KLEINDINST, ESQ.
 4                              MARYSUE FELDMYER, ESQ.
                                BEVERLY ANDERSON, ESQ.
 5                              United States Attorney's Office
                                405 W. Congress Street, Suite 4800
 6                              Tucson, Arizona 85701
     For the Defendant:
 7                              JUDY CLARE CLARKE, ESQ.
                                Clarke & Rice, APC
 8                              1010 Second Avenue, Suite 1800
                                San Diego, California 92101
 9
                                MARK FRANCIS FLEMING, ESQ.
10                              Law Office of Mark Fleming
                                1350 Columbia Street, Suite 600
11                              San Diego, California 92101

12   Also Present:

13                              DOUGLAS CURLESS, ESQ.
                                Phoenix Consolidated Legal Center
14                              for Bureau of Prisons
                                37900 North 45th Avenue
15                              Phoenix, Arizona, 85086

16                              HEATHER WILLIAMS, ESQ.
                                Federal Public Defender
17                              District of Arizona
                                407 W. Congress Street, Suite 501
18                              Tucson, Arizona 85701

19

20                                 *  *  *  *

21

22

23

24

25
```

1          SAN DIEGO, CALIFORNIA, FEBRUARY 4, 2011, 1:30 P.M.

2                              *  *  *  *

3          THE CLERK:  Number 1 on calendar, case 11-CR-187,

4    United States of America vs Jared Lee Loughner, for ex parte

01:34   5    motion hearing.

6          THE COURT:  All right.  May I have appearances of

7    counsel, please.

8          MS. CLARKE:  Yes, Your Honor.

9          MR. KLEINDINST:  Good afternoon, Your Honor.  Wallace

01:35  10    Kleindinst, United States Attorney's Office in Tucson, along

11    with my co-counsel Marysue Feldmyer and Beverly Anderson.

12          THE COURT:  Good afternoon, Mr. Kleindinst.

13          MR. KLEINDINST:  Good afternoon.

14          MR. CURLESS:  Good Afternoon, Your Honor.  Doug

01:35  15    Curless from the Phoenix Consolidated Legal Center for the

16    Federal Bureau of Prisons.

17          THE COURT:  All right.  Mr. Curless, good afternoon to

18    you.

19          And Ms. Williams.

01:35  20    MS. WILLIAMS:  Heather Williams from the Federal

21    Public Defenders Office regarding management of the CJA panel

22    that is responsible for the appointment of counsel.

23          THE COURT:  Good afternoon, Ms. Williams.

24          MS. CLARKE:  Judy Clarke and Mark Fleming are present

01:35  25    in court on behalf of Mr. Loughner.

1          THE COURT:  All right.  Good afternoon, all.  This

2   hearing was agreed to by all counsel.

3          Ms. Clarke and Mr. Fleming, I want to confirm with

4   you, we -- through the law clerk, I checked with you that you

01:35   5   were willing to waive the defendant's presence for this

6   hearing.  You confirmed that decision.

7          You are willing to go forward on these legal issues

8   without Mr. Loughner being present?

9          MS. CLARKE:  Yes, Your Honor.

01:36   10          THE COURT:  And, finally, one other procedural matter,

11   does any party have any objection to this matter proceeding in

12   a closed proceeding?  I believe that that is proper.

13          Seems to me that there are three issues before the

14   Court this afternoon.  One has to do with what I'll broadly

01:36   15   call conditions of confinement and what information should be

16   reported out to counsel for Mr. Loughner from the jail

17   facility.

18          That was the subject of an ex parte request, and there

19   is an argument, I think, that is good, that to reveal that

01:36   20   publically might reveal some defense strategies, and so I think

21   that that is properly a matter that the Court should discuss

22   with counsel without the public being present.

23          The other two matters seem to me to fall under Rule 60

24   of the Federal Rules of Criminal Procedure that have to do with

01:37   25   on-going grand jury investigation.  The second one has to do

01:37

01:37

01:37

01:38

01:38

1    with request to appoint counsel for certain witnesses.

2         Ms. Clarke, this is Ms. Williams' matter.  I know you

3    may have a position on that, but she is the one asking for the

4    appointment, and I think, again, that is a matter having to do

5    with the grand jury and as such falls under the grand jury

6    secrecy rules.

7         And then the third matter has to do with certain

8    witness subpoenas that have been issued for the grand jury and

9    that the Court believes that that squarely falls under the 6(e)

10   secrecy, so that's my preliminary ruling.

11        Does anyone have any objection to this matter

12   proceeding in closed session?

13        Ms. Clarke.

14        MS. CLARKE:  No.  In fact, we believe that it should

15   be in closed session.  Your Honor, if I may, I now have

16   received a copy of the materials regarding the Loughners and

17   the request for appointment of counsel.

18        I am very, very concerned that that information --

19   well, none of the information or this hearing, or the pleadings

20   going up to it, should be released to the public.

21        I am concerned about leaks that we've been reading

22   about in the paper about the investigation, and this I think is

23   of the utmost sensitivity, and I hope the Court will counsel

24   all counsel not to share the information and to ensure that

25   none of this information is leaked.

1          THE COURT:  I agree with that concern, Ms. Clarke.  As

2    I said, it is clear to me that the latter two issues both deal

3    with matters occurring before the grand jury, and there is a

4    strict prohibition on any dissemination of that information

01:38   5    outside of authorized channels, which at this point would be

6    the U.S. Attorney.

7          Anecdotally, I read things in the paper, as everyone

8    does.  I am a little concerned also from some of the things

9    that I read, that results of tests and investigations are being

01:38  10    leaked to the press, and I don't think that should happen.

11          Mr. Kleindinst, I know you probably share that

12    concern.  You should probably redouble your efforts to keep a

13    lid on this.  Talk to the investigating agents and make sure

14    they understand the importance of keeping information that is

01:39  15    obtained through the grand jury process secret.

16          This is -- unfortunately, this has happened before in

17    other cases, and I've been frustrated by my real inability to

18    police it.  I think in the first instance the burden is on you,

19    Mr. Kleindinst, as the case prosecutor or the lead case

01:39  20    prosecutor to emphasize to the agents that Rule 6 means what it

21    says and that there should be no dissemination of information

22    obtained through grand jury process to the public, so I agree

23    with Ms. Clarke on that.

24          Does anyone else object to the proceeding being closed

01:39  25    and private, not open to the public?

1          Mr. Kleindinst, do you have any objection to that on

2   behalf of the United States?

3          MR. KLEINDINST:  I don't.  If I could go back to that

4   earlier issue?

01:40  5          I don't want the Court to think that the Government is

6   leaking anything to the grand jury.  I can categorically avow

7   to the Court that nobody involved with the U.S. Attorney's

8   Office or the FBI or any other federal agency is leaking any

9   grand jury information whatsoever.

01:40  10          And if there is a specific leak, if counsel wants to

11  contact me and let me know, I'll track it down as to a

12  potential source, but certainly I share the same Court's

13  concern, and we don't leak.

14          THE COURT:  Don't misunderstand me, Mr. Kleindinst.

01:40  15  That wasn't an accusation against you.  My understanding is

16  you've been an assistant for quite sometime, you are an

17  experienced fellow, and you know what the rules are and you

18  endeavor to follow them.

19          And the problem has been -- and we didn't get into

01:40  20  specifics -- I think Ms. Clarke made a general statement -- but

21  the problem has been that things have begun to appear in the

22  newspaper.

23          I have no way of knowing if the material was the

24  subject of grand jury subpoenas or process.  But I saw one

01:41  25  article that talked about the results of some forensic tests on

1    a computer and released information on that, and obviously,

2    that type of information should not be released publically.

3         You know, whether it was the product of grand jury

4    investigation or whether it was just the product of, you know,

01:41   5    police work, follow-up work on this case, I think that puts in

6    peril the defendant's ability to get a fair trial under the

7    Sixth Amendment in the district where the crime was committed.

8         MR. KLEINDINST:  Absolutely, Judge.  We have a

9    concurrent jurisdiction or current interest with Pima County

01:41   10   Sheriff's Department.  We asked them not to release

11   information, but in the end, at the end of the day, we have no

12   control over what the sheriff of Pima County does, but I'll

13   share with the Court that from our end and I'll stress to the

14   county sheriff that nothing be leaked.

01:42   15        THE COURT:  Okay.  Well, for example, on this issue

16   that I raised with the computer, is the county sheriff still

17   involved in the processing of evidence or has that been turned

18   over to federal agents?

19        MR. KLEINDINST:  Could I have just a moment to check?

01:42   20        THE COURT:  Sure.

21        MR. KLEINDINST:  Judge, my case agent informs me that

22   the last time they had a conversation with the county sheriff's

23   department was two weeks ago.

24        THE COURT:  Okay.

01:42   25        MR. KLEINDINST:  Since then there have been no further

```
         1   communications, and I believe there won't be any from this
         2   point forward.
         3            THE COURT:  All right.  Well, I certainly -- you know,
         4   I don't have any permission to tell you how to run the
01:42    5   investigation, but I -- you have said and I believe you share
         6   in the concern that I have about releasing information that
         7   could potentially be prejudicial to the defendant's ability to
         8   get a fair trial anywhere, I mean, start with Tucson, but
         9   really anywhere.
01:43   10            And information of the kind I saw released -- I can't
        11   tell you exactly where I saw it -- something flipped up on the
        12   Internet, I think, but it had to do with some results, looked
        13   like forensic results from a computer search.
        14            Ms. Clarke, do you know what I am speaking of?  Did
01:43   15   you see the information too?
        16            MS. CLARKE:  I saw a reference to that, yes.
        17            THE COURT:  And I think it had to do with, you know,
        18   websites supposedly that had been visited on that computer, and
        19   I thought to myself at the time this should not be information
01:43   20   that is disseminated and if it is in control of the federal
        21   agents at this point in time that there should be -- there
        22   should be no public release of that type of information.
        23            Okay.  Well, suffice it to say that I agree with the
        24   concerns that have been expressed by defense counsel regarding
01:43   25   information getting out that could prejudice the defendant's
```

1    ability to get a fair trial in some location.

2         The Court intends to take up, first, the matter of the

3    ex parte order -- and I think that I want to go in this order,

4    Mr. Curless, because I don't think it is proper for you to be a

01:44    5    party to the discussions that go on on the grand jury stuff,

6    that you would be excluded from that too.

7         So I think in order, I would like to take your

8    concerns raised in your letter first.  Then I'll deal with the

9    issue of appointment of counsel.  And at each juncture as we

01:44    10   finish the issue, I think I would then release Mr. Curless

11   first from the discussion and then Ms. Williams from the

12   discussion.  Then we'll talk about the contested grand jury

13   material just between counsel and the Court.

14        MS. CLARKE:  May I ask, Your Honor, it doesn't seem to

01:44    15   me that the United States Attorney's Office has a role in the

16   discussion with regard to the BOP at this point.  It is matters

17   of defense strategy.  It is matters of, you know, the tent

18   around the defendant, and they shouldn't have their nose under

19   it at this point.

01:45    20        THE COURT:  Well, the only thing, Ms. Clarke, I have

21   to say about that, I suppose, is I think I read in the letter

22   that BOP had informed the U.S. Attorney's Office of what they

23   are doing.

24        MS. CLARKE:  Well -- and that is, we think, in

01:45    25   violation of one of the Court's ex parte orders.

1          THE COURT:  Well, okay.  I don't know how to do this.

2          MS. FELDMYER:  This is Marysue Feldmyer here.  We

3     cannot hear Ms. Clarke.

4          THE COURT:  Oh, okay.  She'll pull the mic up and

01:45   5     speak louder.  Ms. Clarke objects to the U.S. Attorney's Office

6     being part of the discussion about these conditions of

7     confinement and whatever information BOP disseminates.

8          You have a position on that, Mr. Kleindinst?  You have

9     a dog in the fight on that?

01:45   10         If you don't, then what I would do is probably excuse

11    you and Ms. Williams at this point, as logistically awkward as

12    that is, and we'll call you back once we cover the first

13    matter.

14         MS. FELDMYER:  Your Honor, Marysue Feldmyer, again, on

01:46   15    behalf of the Government on this issue.  We do believe that we

16    have a right and, in fact, a duty to this person who is

17    incarcerated in the Federal Bureau of Prisons.  We're in

18    essence the voice of the Bureau of Prisons if they do not agree

19    with a position being taken by the defense.

01:46   20         In other words, if the defense comes in and is making

21    requests of the Court, they are doing that on their own without

22    any check or balance.  There is nobody on BOP's side short of

23    being able to write letters to the Court to address some of

24    these concerns.

01:46   25         And at the first hearing we already had discussions

1   with the Bureau of Prisons how we'll obtain records and this

2   idea of a joint disclosure came up, and I broached it with the

3   defense.

4           At this point they are not comfortable with that due

01:47   5   to the nature of some of the records, and I think some of the

6   records could be parsed out, and I think a joint disclosure

7   order would be appropriate in this case as to 99 percent of the

8   stuff that is being produced out of the Bureau of Prisons.

9           THE COURT:  Let me step back for a minute.

01:47   10          Ms. Clarke, I think when the order was first -- the

11   original order was first presented to me, it was presented by

12   Mr. Cahn, and I raised questions at the time as to the mail.  I

13   said, look, these other things do appear to me to be Bureau of

14   Prisons records.

01:47   15          The mail stuff is not, and they have no -- they have

16   no control over whom might send mail to the defendant or

17   whether he might send mail out, and I told Mr. Cahn that I

18   didn't want to sign it with that provision in there.

19          And he asked me for time, and he said that you had a

01:47   20   cooperative working relationship with Mr. Curless and he was

21   going to get back to him and then let me know whether there was

22   any objection to that being in.

23          My recollection is Mr. Cahn called me back and said we

24   worked it out and he is comfortable with the order, and at that

01:48   25   point then I signed it, but it appears now that Bureau of

1    Prisons at least objects to the mail portion of it, the mail

2    cover stuff and having to take precautions or follow special

3    procedures that are not indicated with mail generally for

4    people being held in the Bureau of Prisons facilities.

01:48   5          MS. CLARKE:  Right.  I think what the Court has said

6    is the history.  The issue before the Court today is the mail

7    issue, not the records issue.  Ms. Feldmyer seems to be

8    conflating the two.  The issue of the records I think will be

9    raised by the United States Attorney's Office in due course.

01:48   10          They've advised us that when they attempt to obtain

11   the records, it will be by whatever means that will allow us to

12   voice our objections, so that is another issue at this point in

13   time.  Today's issue, from Doug Curless' letter, appears to be

14   the mail.

01:48   15          THE COURT:  Do you have any objection to the U.S.

16   Attorney being present then if we limit it to that?

17          MS. CLARKE:  I do.  I do, Your Honor, because of

18   conversations that will relate to our client.

19          THE COURT:  Well, okay.  Ms. Feldmyer, understanding

01:49   20   then that you preserve your right to make application for

21   information from the Bureau of Prisons having to do with other

22   BOP maintained records affecting Mr. Loughner but not with

23   respect to this mail, which is the only issue that is going to

24   be discussed today, do you feel that you should have input on

01:49   25   this issue about how the mail is handled?

01:49

        MS. FELDMYER:  I do, Your Honor.  I think that it is

what is -- in essence, the Bureau of Prisons has always looked

to the United States Attorney as their voice in court when

conditions of confinement are being raised as to a defendant

that the U.S. Attorney obviously has an interest in.

        And in this case I don't think there is anything

particularly secretive or sensitive.  This is mail that is

coming to and entering the prison.  And this defendant -- the

Government's very strong position is that this defendant should

01:50

be treated as all other defendants.

        If counsel wants a copy of the mail, it can be sent

out.  I can just -- if the Court is more comfortable speaking

outside of our presence, that is fine, as long as I can make

our position known, which is that he should be treated like

01:50

every other inmate and the Government is entitled to receive

photocopies of all of the letters that arrive for him and all

the ones he sends out, with the exception for the ones marked

"confidential" as set forth through the various exhaustive

procedures that Mr. Curless has laid out in the letter.

01:50

        I don't think that we'll be discussing anything

particularly private.  If there is some special reason that

this defendant needs to be treated differently than other

defendants, I guess I feel that the Government has a voice in

that and should be heard.

01:50

        THE COURT:  Ms. Clarke, in the past -- and I haven't

01:51

1   dealt with it often.  I dealt with it in a couple of instances.

2   It was an issue in Arellano-Felix case, conditions of

3   confinement.  We had a number of hearings here.  And as

4   Ms. Feldmyer says, the Government lawyers, the U.S. Attorneys,

5   really were the spokespersons for the Bureau of Prisons

6   respecting conditions of confinement.

7         They argued one thing against requests that these

8   people were being, you know, single celled and held 23 hours

9   without exercise, and so we went through the whole litany of

10  things.

11        But my experience and recollection was that it was the

12  U.S. Attorney, not some lawyer for the Bureau of Prisons that

13  was arguing that.  The lawyer for the Bureau of Prisons was

14  here, as I recall during that, but the Government took the lead

15  in arguing, you know, what was appropriate and what was

16  inappropriate.

17        Is there a way that you think you can talk in broad

18  strokes, you know, without disclosing attorney-client

19  information and we can still vet this issue on how the mail is

20  to be handled?

21        MS. CLARKE:  Two things, one is the BOP lawyer is the

22  one that raised the issue with the Court, not the U.S.

23  Attorney's Office, and it appears that he was in contact with

24  the U.S. Attorney's Office about the issue, and they didn't

25  raise the issue.  He did.

1           And the second thing is, you know, the information

2     regarding our client's waiver is in the letter, which I

3     objected to Mr. Curless after I saw the letter having put in

4     there at all.  I just think it is highly inappropriate, because

01:52   5     it goes to matters of defense strategy for the prosecuting

6     authority to be involved.

7           If the U.S. Attorney's Office wants to stake out their

8     position, which they've done already, that Mr. Loughner should

9     be treated in accordance with BOP policy, they don't need to be

01:52   10    involved in any further discussion regarding that.

11          THE COURT:  Mr. Curless, have you in the past -- do

12    you have experience in asserting the position of the Bureau of

13    Prisons on your own without having the U.S. Attorney speak for

14    the Bureau of Prisons in criminal matters?

01:52   15          MR. CURLESS:  No, Your Honor.  The U.S. Attorney's

16    Office is effectively our counsel.  I have, you know, been

17    second chair, and I have been present during hearings and

18    occasionally the Court will call on agency counsel to talk

19    about agency-specific matters, but the U.S. Attorney -- we at

01:53   20    the Bureau of Prisons aren't authorized to contact the Court's

21    directly.  This letter was somewhat of a very -- well, a unique

22    experience in my career.

23          THE COURT:  Okay.  Did you consult or collaborate with

24    the U.S. Attorney before you sent the letter to the Court?

01:53   25          MR. CURLESS:  Your Honor, I had a conversation with

1    the prosecution indicating we had some serious issues with the

2    mail issue, and the U.S. Attorney's Office advised us that we

3    should write the Court directly with our concerns.

4        THE COURT:  All right.  Ms. Clarke, here's what I am

01:53    5    going to do, I am going to ask you to keep the comments at a

6    general level that doesn't give up the ghost or disclose any

7    defense strategies.  I think on reflection that the lawyer for

8    the Government in this case is the U.S. Attorney and that

9    includes issues having to do with conditions of confinement.

01:54   10        I credit what Mr. Curless has said, that in the past

11    he has been present as second chair at hearings having to do

12    with conditions of confinement or issues like we're dealing

13    with, but he has deferred in the past to the United States

14    Attorney, so I think it is appropriate that they are here and

01:54   15    that they have a say in this.

16        That said, I think we can handle the issue of how the

17    mail is to be processed in a general way without revealing any

18    strategies.  I was uncomfortable with this, as I said, when I

19    first saw it, because I just don't think that mail being sent

01:54   20    by someone who is in custody of Bureau of Prisons or being

21    received is something that the Bureau of Prisons has control

22    over like other record-keeping functions.

23        And, you know, while I understood the application with

24    respect to other things, it wasn't clear to me that this was an

01:54   25    appropriate order.  And as I said, I trusted the representation

1   that this had been the product of cooperative discussions

2   between Mr. Cahn and Bureau of Prisons' counsel, and that's why

3   I signed the thing, but I have to tell you I had misgivings

4   about it then, and they were renewed when I read the letter.

01:55   5        What is it that you think should happen here with

6   respect to mail?

7        MS. CLARKE:  Well, our conversations with

8   Mr. Curless --

9        THE COURT:  Pull the mic real close and keep your

01:55   10  voice up.

11       MS. CLARKE:  The objections that the BOP raises, I

12  believe we had addressed, and I suppose that BOP simply wanted

13  to get some Court involvement in it.  There was some concern

14  about screening mail coming into Mr. Loughner, which we advised

01:55   15  Mr. Curless we did not object to, that the mail could be

16  screened.  We, like anyone else, didn't want to receive

17  anything illegal.

18       And any in-coming mail from the media, in-coming

19  publications and on-going general correspondence is covered by

01:56   20  Mr. Loughner's express signed waiver, which was suggested to us

21  by BOP counsel that we obtain that waiver and that it actually

22  be witnessed by a staff signature, which we accommodated and

23  did.

24       THE COURT:  And tell me, the effect of the waiver is

01:56   25  that he says you don't have to turn these things over to me if

1    they come in?

2          MS. CLARKE:  All of my mail going out, I want it going

3    to my lawyer, and all of my mail coming in, I want it to go to

4    my lawyer.

01:56    5          THE COURT:  Okay.

6          MS. CLARKE:  In that way we're able to review it with

7    him, going out and coming in.  We didn't want to, you know,

8    have a problem with the BOP in terms of whatever their process

9    was, but Mr. Loughner himself has signed something saying you

01:56   10   get what I am going to send out and you get what is coming in

11   to me, and then it is our relationship that will accommodate

12   what happens to the mail thereafter.

13         But we didn't -- and I think Mr. Curless will

14   acknowledge that we said there could be screening.  We could

01:57   15   comply with all of the rules and regulations.  It is just that

16   Mr. Loughner put us in his stead.

17         THE COURT:  Mr. Curless, is it true -- I mean, is that

18   something that the BOP objects to or is different?  It seems to

19   me that this waiver procedure was something that had been

01:57   20   recognized and used in other cases.

21         MR. CURLESS:  Your Honor, we did have cooperative

22   discussions.  I was discussing the matter with the Marshals

23   Service, and they seemed to be happy with the waiver, but upon

24   further discussions with my staff and with our attorneys, we

01:57   25   did become very uncomfortable with the situation.

1        And the reason is that the defendant in this case

2   executed a Bureau of Prisons document when he initially arrived

3   saying that he wanted to have his mail delivered to him.  It

4   would be screened then it would be delivered to him.

01:58   5        Subsequently counsel -- and again, we were in

6   discussions and the subject of the waiver came up.  He executed

7   a waiver.  We have concerns subsequent to the waiver being

8   executed, but we have -- we can't have inmates executing

9   waivers on behalf of their clients basically to use that to

01:58   10  violate the policy.

11       There is a potential exposure to BOP staff for

12  interfering with constitutional rights of individuals.  That

13  would be a First Amendment right to communication, and so it

14  causes us great concern in that regard.

01:58   15       And then, of course, as I articulated there are the

16  security concerns that were present for us.  And then the

17  outgoing mail also is somewhat problematic, again, because

18  we're diverting mail.

19       THE COURT:  Here's what I don't understand, if he

01:59   20  executes a waiver saying, look, I understand I have a right to

21  receive this mail after it is screened according to Bureau of

22  Prisons' procedures and, you know, I have a right to directly

23  send my mail out, also subject to screening, but I give that

24  right up, and I am going to defer to my counsel on anything

01:59   25  in-coming to me or I send out, I want it to go through them

1    first, what particular problem does that pose for Bureau of

2    Prisons if he executes such a waiver?

3              MR. CURLESS:  I think we have problems with inmates,

4    not just Mr. Loughner, but other inmates executing other types

01:59  5    of waivers to basically personalize the service of mail for the

6    individuals.  I would like to have my mail diverted to my

7    mother or to my wife or to a family member.

8              And the Bureau of Prisons' policy is basically we

9    either screen it and deliver it to you or you have an option to

02:00  10    reject the mail.  We don't have to deliver it at all.

11              THE COURT:  What happens when an inmate chooses to

12    reject mail?

13              MR. CURLESS:  There is -- the form that Mr. Loughner

14    filled out has two parts.  The first part is that I reject the

02:00  15    mail, and we tell the inmate that the mail goes back to the

16    Postal Service.  It would come in, we have a notice that the

17    inmate rejected our screening, and we would send it back to the

18    Postal Service.

19              The inmate does get an opportunity to, when he is

02:00  20    changing institutions, he can do mail forwarding to a third

21    party.

22              Then there is the other option, though, that if the

23    mail is coming into the institution and he wants to receive it,

24    we will screen it and, you know, check it for objectionable

02:00  25    materials and then deliver it to the inmate.  But what the

1    inmate does with it after that, if he wants to forward it to

2    counsel, put it in legal mail which we would not be inspecting,

3    outgoing legal mail, that is his choice.

4         THE COURT:  Ms. Clarke, is the option of Mr. Loughner

02:01   5    just rejecting the in-coming mail one that is acceptable to

6    you?

7         MS. CLARKE:  Well --

8         THE COURT:  I understand the concern, but it seems to

9    me, if he doesn't want to receive mail directly, just reject

02:01   10   it.

11        Mr. Curless, would there be -- I don't know.

12        Are you -- do you correspond at all with him or is all

13   the communications in person?

14        MS. CLARKE:  All in person.

02:01   15        THE COURT:  Was there an exemption -- Mr. Curless, if

16   counsel wanted to send legal mail back toward Mr. Loughner's

17   way, is there an exemption to the -- to the outright rejection

18   of all in-coming mail that would identify mail from counsel and

19   get that to him?

02:02   20        MR. CURLESS:  I believe there is for special mail and

21   for legal mail.

22        THE COURT:  Okay.

23        MR. CURLESS:  We would -- when there is in-coming

24   legal mail or special mail, if opened in the presence of the

02:02   25   inmate -- there are some special buzz words that have to go on

1    the envelope.

2           THE COURT:  What is the difference between legal mail

3    and special mail?

4           MR. CURLESS:  Legal mail is between the individual's

02:02   5    counsel or possibly representatives of the counsel, paralegals,

6    those types of folks.  Special mail would come from members of

7    Congress, the President, the Vice President.  Sometimes it is

8    done in pardon types of scenarios.

9           THE COURT:  I don't think he is going to get any of

02:02  10    those.

11           Ms. Clarke, how about that, understanding that there

12    is an exemption if there is a need for you to send him

13    something as legal mail, he would still get that but just

14    reject any other mail?

02:02  15           MS. CLARKE:  Well, Judge, I don't know that that -- I

16    suppose that is an option that no one has discussed that with

17    us so far that we could evaluate that --

18           THE COURT:  Here is where my reluctance comes, I am

19    reluctant to create special rules for him.  First of all, I

02:03  20    don't think it is right or it is proper for me to single out

21    Mr. Loughner for special treatment that no one else gets.

22           I understand the concern.  I understand that you want

23    to see what is coming in and that maybe there is some specter

24    that he might be harassed and things like that, but it seems to

02:03  25    me the way to deal with that is to reject in-coming mail except

1   from his counsel.

2          MS. CLARKE:  That would be a story in itself, that

3   mail goes back.  It could eclipse potentially significant

4   information that the defense would like to hear about by having

02:03   5   it rejected.

6          Mr. Loughner is already being treated specially.  I

7   mean, to argue that other inmates are going to decide to do

8   this, I think, is stretching the envelope.

9          THE COURT:  Mr. Curless, walk me through the other

02:03   10   option again.  If Mr. Loughner says, okay, look, I want all my

11   mail to be delivered but I don't want -- I don't want to

12   actually read it; I want you to turn it over to my counsel; I

13   am going to defer on what to do with this --

14          MR. CURLESS:  We would deliver the mail to

02:04   15   Mr. Loughner, and Mr. Loughner would need to put that material

16   in an envelope and then put it -- there is a legal mailbox for

17   outgoing legal mail, and he would seal up the materials and

18   address it to Ms. Clarke or one of her attorneys, and with the

19   proper postage it would get processed and then be sent out

02:04   20   to --

21          THE COURT:  To Ms. Clarke.

22          MR. CURLESS:  Yes.

23          THE COURT:  How about that option, Ms. Clarke?  If he

24   wants to receive it or if you want to screen it, just instruct

02:04   25   him that once it is screened and delivered to him to put it in

1    an envelope.  You can supply him with prepaid envelopes, and he

2    can periodically just send what comes in to him, what, if

3    anything, on to you.

4           MS. CLARKE:  Your Honor, I would rather have that

02:04   5    conversation with you without other parties involved.

6           Another offer that we made to the BOP that perhaps the

7    Court could consider is that all mail coming in to Mr. Loughner

8    would be delivered to him during one of our visits, and we're

9    there regularly.

02:05   10          THE COURT:  How about that, Mr. Curless?  That

11   seems -- how regularly are you there, Ms. Clarke?

12          MS. CLARKE:  Regularly.

13          THE COURT:  Okay.  Like once a week?

14          MS. CLARKE:  Oh, more than that.

02:05   15          THE COURT:  Okay.  How about that, Mr. Curless?  Could

16   they time the delivery of the screened mail such that it

17   occurred only when his counsel is there?  That seems like a

18   reasonable accommodation.

19          MR. CURLESS:  I would need to speak with my staff.  We

02:05   20   have a very creative captain.  That may be something that we

21   could accommodate.

22          THE COURT:  Okay.

23          MS. WILLIAMS:  Your Honor, may I be heard?

24          THE COURT:  Yes, sure.

02:05   25          MS. WILLIAMS:  One of my concerns is exactly what this

 1    Court has already said, is treating Mr. Loughner differently.

 2    Yes, he is treated differently in some other conditions of

 3    confinement, but mainly because we have a private institution

 4    that is not set up for pretrial detainees.  And so we have to

 5    segregate him out and do some other things just to put him on

 6    equal footing with what a normal pretrial detainee would do.

 7            But I am very concerned about the suggestion of

 8    everything having to be, regarding all of the mail, always

 9    having to be done in front of counsel, and again, we are

10    specially accommodating him over other inmates.

11            And I would direct the Court's attention to paragraph

12    two of the second page of Mr. Curless' letter which indicates

13    that the detainee keeps requesting the custodial staff for his

14    mail.

15            And I don't think that -- it seems like there is being

16    special accommodations made for special handling of this inmate

17    for obviously reasons that Ms. Clarke doesn't want to share

18    with the prosecution team, but until those reasons are made in

19    court, I just don't see any reason that he should be treated

20    different as it were and have Bureau of Prisons jumping through

21    hoops having to do special mail deliveries to him when BOP has

22    to deal with him 24-7 and he is constantly asking for his mail.

23            THE COURT:  Ms. Feldmyer, here is my concern, I would

24    agree if this was the run-of-the-mill case they shouldn't jump

25    through hoops and make special accommodations, but the reality

1   here is that there has been a lot of public attention, a lot of

2   publicity on this case.

3           I have no way of knowing whether that in turn would

4   cause people to try to communicate with Mr. Loughner directly.

02:07   5   But I think that might be likely in a case like this.  It has

6   had a lot of public attention, so I can understand counsel's

7   concern that, you know, that he not respond to correspond from

8   people, you know, making inquiries of him and that they would

9   want to see him and be able to counsel him.

02:07   10          This case has special concerns that aren't present in

11  the other cases, and that is why I am trying to accommodate

12  those.  If they are there -- if counsel is there on a weekly

13  basis, it seems to me to be reasonable that they would hold the

14  mail and deliver it at such a point that counsel is there with

02:08   15  Mr. Loughner.  That is a very small accommodation.

16          And to the extent it is a deviation of BOP policy at

17  all, it is just a very minor one.  It just has to do with the

18  timing of delivery.

19          Now, obviously, they would be free, if this were the

02:08   20  accommodation made, to ignore any requests he makes to get mail

21  at other times.  I mean, his lawyers will go back presumably

22  and say don't -- quit asking for mail; it will only come when

23  we're here; understand that.

24          So they won't be besieged with requesting mail at all

02:08   25  times.  It would be done on a periodic schedule that will be

1    convenient for BOP and for his counsel.

2           But I think this case is little bit different and that

3    it presents some concerns that I think we can prospectively

4    address and avoid problems in the future, and that is why I am

02:08    5    taking the time to try to discuss this and work it out.

6           Mr. Curless, you said that you need to go back to

7    discuss this with, what, other Bureau of Prisons personnel

8    before you can make a commitment that mail will be delivered

9    only when his counsel are there visiting with him?

02:09   10           MR. CURLESS:  Yes, Your Honor.  I would have to

11    coordinate with the captain because of the security and the

12    movements.

13           THE COURT:  All right.  I would ask that you do that.

14           That is an acceptable accommodation, Ms. Clarke, to

02:09   15    you on this issue of in-coming mail?

16           MS. CLARKE:  In-coming and outgoing, seems it should

17    happen at the same time.

18           THE COURT:  Okay.  You are going to have to police Mr.

19    Loughner then.  Tell him don't hand mail over to Bureau of

02:09   20    Prisons to send out unless we're here and hold off until we're

21    here to make the delivery to Bureau of Prisons personnel.

22           MS. CLARKE:  If the mail goes from him -- if he is at

23    some point not able to do that, if the mail goes from him to

24    the -- to whoever picks it up to screen it to send it out,

02:09   25    assuming it is not legal mail, that it is not screened --

1                THE COURT:  Right.

2                MS. CLARKE:  -- then it can come to the same visit

3       place when the in-coming mail is coming.

4                THE COURT:  Okay.  Mr. Curless, if you will look into

02:10   5       that.

6                For the time being, I am going to strike from the

7       order that I previously issued any special handling with regard

8       to mail.  You are to follow the regular procedures until this

9       matter is worked out.

02:10   10               As I said, I signed that, predicated on an

11      understanding that there was an agreement between the Bureau of

12      Prisons and defense counsel as to how the mail would be

13      screened and I wouldn't interfere with that, but because there

14      is an objection, you may follow your normal procedures.

02:10   15               My request is that -- I think that the request that

16      defense counsel has made is a reasonable accommodation to just

17      let the mail deliveries take place when they are there,

18      particularly given the representation that they are there

19      often, at least once a week.

02:10   20               I mean I don't think there is anything Herculean about

21      holding his mail until his counsel is there and then letting

22      them look over what goes out and what is coming in.  So if you

23      could can talk to your superiors about that, I would favor that

24      procedure, and we'll leave to another day the final resolution

02:11   25      of this.

1       If it can be worked out cooperatively between you and

2  defense counsel, then I would urge that.  If you need a final

3  order from me, then we'll put this back on.

4       MS. CLARKE:  Your Honor, could we have an

02:11   5  understanding that there will be status quo until this is

6  worked out?

7       THE COURT:  Well, I don't want to -- see, the problem

8  is I issued an order that they objected to, and I didn't think

9  there was an objection, at least respecting the mail.

02:11  10       The other things we'll leave for another day, Ms.

11  Clarke.  I understand that the Government may have some

12  position that they are entitled to some of those records at

13  some point.  We'll litigate it at some point if it needs to be

14  litigated.

02:11  15       But I am reluctant to say "follow a special procedure"

16  now when it is not agreed to.

17       MS. CLARKE:  Except it is just we're trying to work

18  out a procedure that will be agreed to.  The status quo -- I am

19  not talking about the records.  I am talking about the mail.

02:12  20  The status quo of the mail it is being held pending the

21  resolution here.

22       THE COURT:  Okay.  Mr. Curless, do you have any

23  problem with continuing to hold the mail?

24       MR. CURLESS:  We have no problem with holding it.

02:12  25       THE COURT:  Do that then.  Just hold it until this

1    gets worked out.  If you can't reach an agreement, then come

2    back and I'll resolve it once and for all.  It seems to me, as

3    I said, that it is a reasonable accommodation, given that

4    counsel is there very, very often just the delivery of mail

02:12    5    when counsel is there.

6              You have to go through screening to get in to see him,

7    right?

8              MS. CLARKE:  Yes.

9              THE COURT:  There is the usual screening procedures?

02:12    10             MS. CLARKE:  Yes.

11             THE COURT:  All right.  Mr. Curless, I appreciate your

12   participation in this, and I'll have you follow-up with

13   Ms. Clarke and with the U.S. Attorney.  As I said, if a

14   disagreement persists, then put the matter back on, and I'll

02:12    15   make a definitive ruling.

16             MR. CURLESS:  Yes, Your Honor.  Thank you.

17             THE COURT:  Okay.  Mr. Curless, you are excused from

18   the conference call then.

19             MR. CURLESS:  Thank you very much, Your Honor.

02:12    20             THE COURT:  Thank you.

21        (Proceedings without Mr. Curless telephonically present.)

22             THE COURT:  All right.  For the record, Ms. Clarke and

23   Mr. Fleming are present in court.  On the phone are counsel for

24   the Government and Ms. Williams.  And the only other people

02:13    25   present are court staff.  The Court is closed and locked at

1    this point.  This is not a public proceeding.

2              Ms. Williams, I got your request, and I am struggling

3    with it a little bit.  I read the letter that was attached.

4    3006(a) doesn't provide generally for the appointment of

02:13    5    counsel for witnesses.  Now, I understand that you raised a

6    concern for the attachment.  Let me take a close look at it

7    again.  I can't remember the lawyer's name.  It wasn't Udall,

8    was it?

9              MS. WILLIAMS:  It is.  It is Laura Udall.

02:13   10              THE COURT:  Yes.  I read Ms. Udall's letter and,

11    frankly, I don't see it, and maybe I need to ask the prosecutor

12    some questions here, but she raises the specter of misprision

13    of a felony and, what, accessory after the fact.  I don't know.

14    I think that is kind of stretching it.

02:14   15              It just seems like a very hypothetical, speculative

16    concern that they might have some exposure to criminal charges

17    themselves.

18              Mr. Kleindinst, do you foresee any possibility that

19    any of the witnesses whose subpoenas are at issue here would

02:14   20    be, particularly Mr. Loughner's parents or his aunt or uncle,

21    do you -- is there any scenario that you see where they might

22    have some criminal exposure?

23              MR. KLEINDINST:  Absolutely not, Your Honor.

24              THE COURT:  In fact, have you considered any

02:14   25    possibility of misprision of a felony or accessory after a fact

1    as to either the parents or the aunt and uncle?

2           MR. KLEINDINST:  Absolutely not.  And I don't think,

3    quite frankly, factually -- well, absolutely not.  And with

4    respect to misprision of a felony, the events were so fast

02:15    5    moving on that morning that even if they knew what their son

6    was going to do -- I don't believe they knew that -- they

7    wouldn't have the opportunity to contact law enforcement

8    authorities.

9           Furthermore, there is no evidence that they in any way

02:15   10    since the crimes were committed have obstructed justice.  There

11    is absolutely no evidence that they would -- are a target or

12    might even be possibly be subject to prosecution, as far as I

13    know, and I'll vow to the Court that they are fact witnesses.

14           THE COURT:  Let me correct myself.  I said "accessory

02:15   15    after the fact."  What Ms. Udall fears and according to her

16    one-paragraph letter is they might be prosecuted for

17    obstructing justice or misprision of a felony.

18           MR. KLEINDINST:  Right.

19           THE COURT:  You probably have in mind what questions

02:16   20    are going to put to them.  Do any of the questions -- would any

21    of the questions, in your judgment and experience, implicate

22    any Fifth Amendment privilege any of these witnesses might

23    have?

24           MR. KLEINDINST:  Not at all, Your Honor.

02:16   25           THE COURT:  All right.  Well, Ms. Williams, I am

struggling with this, as I told you when you first contacted

me.  There is no provision -- general provision for the

appointment of counsel for witnesses who are not targets and

where, you know, I don't have at least some prospect --

reasonable prospect that their Fifth Amendment privileges --

their personal Fifth Amendment privileges may be implicated.  I

don't see it here.

MS. WILLIAMS:  Your Honor, and the role of the Public

Defender in this case is just to pass information on when we do

get these requests, not to necessarily advocate one way or the

other.

I would just go ahead and point out to the Court also

that Ms. Udall included in the letter that neither of the

parents wishes to testify and should they refuse to testify

that could subject them to civil or criminal contempt

proceedings.

THE COURT:  You are right.  It could.  But that in and

itself doesn't justify appointment of counsel at this point,

otherwise everyone who said, well, I am going to resist the

subpoena would be entitled to court appointed counsel, and of

course, 3006(a) doesn't provide for that.

The thing that does concern me -- and I understand

that this is not an enforceable right, Mr. Kleindinst, is --

there something, isn't there, in the U.S. Attorney's manual

about calling close relatives and, you know, actually, you

1   know, putting some thought into that before you pit ones

2   parents against him in a criminal action?

3           MR. KLEINDINST:  Well, our intention is certainly not

4   to pit the parents against Mr. Loughner.  There is a provision

02:17   5   in the U.S. Attorney's manual, but these are not just family

6   members.  If the Government decides to put them before the

7   grand jury, these are people who are parents who are

8   precipitant witnesses to relevant facts, and because of that --

9   their role as witnesses, not just parents, that it is not

02:18   10   improper in the U.S. Attorney's manual to call them to testify.

11           THE COURT:  I am assuming that you considered -- and

12   it has been represented in, I think, the defendant's papers

13   that they had consented to be interviewed and have been

14   interviewed several times by law enforcement agents, the

02:18   15   parents of Mr. Loughner.

16           MR. KLEINDINST:  As far as I know, Judge, they've only

17   been interviewed once.

18           THE COURT:  Okay.  And I am assuming you've considered

19   the possibility of putting whatever information was gleaned in

02:18   20   that interview on through the agent who interviewed them,

21   rather than calling them directly?

22           MR. KLEINDINST:  No.  That has not been my

23   consideration because I believe that they should be questioned

24   in addition by the U.S. Attorney.  There is -- there are a

02:18   25   number of different reasons that their statement itself isn't

1    sufficient, Your Honor.

2           THE COURT:  All right.  Well, I don't want to bleed

3    into the next issue just yet, but Ms. Williams, I appreciate

4    your obligation to pass on a request.

02:19    5           I have considered the letter of Ms. Udall.  Frankly, I

6    think it is very, very speculative.  And in light of the

7    assurance that I have from the lead prosecutor on the case that

8    no criminal charges are contemplated and he can envision no

9    scenario where criminal charges would be brought against any of

02:19   10    the subpoenaed witnesses, I find no authority under 3006(a) to

11    provide counsel for them at taxpayer expense.

12           So they are, of course, free to hire counsel if they

13    want, including Ms. Udall, but I deny the motion to appoint

14    counsel for them.

02:19   15           MS. WILLIAMS:  I'll pass that on.

16           THE COURT:  Ms. Williams, thank you for joining us.  I

17    appreciate your input on this.  You are excused at this time.

18           MS. WILLIAMS:  Thank you.

19           THE COURT:  Thank you.

02:19   20    (Proceedings without Ms. Williams telephonically present.)

21           THE COURT:  Okay.  For the record now it is just

22    counsel for the Government, counsel for Mr. Loughner here to

23    discuss the grand jury matter.  I read the papers on this.

24           Ms. Clarke, I believe that of all the cases cited and

02:20   25    I read all of them -- I actually have gone back and tried to

 1   acquaint myself with the underlying facts, but I am guided most

 2   by the *R. Enterprises* case, and my belief is in this scenario

 3   that there is -- what the Supreme Court calls a presumption of

 4   regularity, which means I am to assume that the Government

02:20   5   lawyers are operating according to the rules and that the grand

 6   jury is operating according to the rules and that the burden is

 7   on the defendant to show some deviation from that before I

 8   would intervene.

 9         I couldn't find a case, to be honest with you, where a

02:20   10   Court had prospectively intervened, maybe one District Court

11   case out of Virginia.  It wasn't clear to me that that

12   happened.  But I saw, for example, in a case in Los Angeles --

13   in fact I think you were counsel in that case, weren't you,

14   *Furrow*, was that his name?

02:21   15         MS. CLARKE:  That's correct.

16         THE COURT:  That there had been an application made,

17   and this -- I am kind of reading between the lines -- the

18   emergency application, like the one made here, was made to

19   Judge Paez who was a District Judge, I am assuming, up in LA,

02:21   20   and it appeared that he denied it because he could not find

21   enough information to rebut the presumption of regularity.

22         And then it came down to a motion after the fact

23   before Judge Monella after the transcripts had been revealed to

24   say, look, this questioning went too far, and we're entitled to

02:21   25   a remedy.  That seemed to me to be the context in which *Furrow*

1   was decided.

2        So, I guess my first question to you is, Is there any

3   case where a Court has intervened before the witnesses had been

4   questioned to kind of stake out a position to tell the

02:21   5   Government what they could and couldn't ask?

6        MS. CLARKE:  Well, Your Honor, I am not aware of one,

7   if there is.  In *Furrow* -- and I have to acknowledge that is

8   about 11 or 12 years ago, so I don't know about this Court's

9   memory, but mine is not as clear.

02:22   10       But in the opinion itself, the Fed Sup opinion that

11   the parties have cited, it does indicate that defense counsel

12   didn't know the identity of the witnesses at the time, so we

13   were in a little bit different shape.

14       My recollection was that there were witnesses that we

02:22   15   were aware of at the time, but I can't untangle in my head the

16   procedural history, but it did come to fruition where there was

17   an abuse of grand jury process motion after the fact.

18       THE COURT:  Look, I can readily envision how the

19   process could be abused.  I can see somebody, for example, with

02:22   20   an indictment going back trying to get discovery information

21   that never itself leads to an indictment.

22       But if I have our procedural posture correct in my

23   mind, the Government has indicted on three charges, two

24   attempted murder charges, and this attempted assassination of a

02:23   25   Congressperson.

1          And I think kind of reading between the lines and even

2     reading directly, what is contemplated is that they are asking

3     the grand jury to consider now murder charges, additional

4     charges that will be the subject of a superseding indictment.

02:23  5          So I can distinguish this situation from one where

6     everything is done as far as the charging decision and then the

7     grand jury is being misused to gather more information that

8     will be presented at trial.  That is not the situation that we

9     are in.

02:23 10          It seems to me that -- you say discussions with the

11     Government has lead you to believe that what is being presented

12     to the grand jury now is evidence to support these additional

13     murder charges.

14          MS. CLARKE:  That is what it sounds like.  We haven't

02:23 15     had any discussions about it.

16          THE COURT:  So here is where I am at, the lynchpin to

17     you know proper questioning in front of the grand jury is is

18     this relevant in a very broad sense to the grand jury's

19     investigation?

02:24 20          And if they are contemplating murder charges that

21     involve elements such as malice, premeditation, willfulness, I

22     mean, it would seem to me that inquiry into people that were

23     exposed to the defendant leading up to the time of the alleged

24     crime would be relevant.

02:24 25          It may, as you say, bleed into other things, and it,

02:24

02:25

02:25

02:25

02:25

02:25

     1    you know, would be a matter, I suppose, of just exactly what

     2    questions were being asked.

     3           I agree with your point that if this is being done to

     4    try to brace for mitigation evidence, if there is a penalty

     5    phase in this case, that that would not be a proper function.

     6    I agree with you, and my reading of the cases tells me that.

     7           But I would have to find, I think, in order to squelch

     8    this or quash the subpoenas as you requested, that is the

     9    dominant purpose.  As I look at this in context, I can't say

    10    that, particularly given that they have to prove these elements

    11    at a guilt phase.

    12           And then there is even some authority -- I've seen

    13    this Fourth Circuit case that says that even the indictment has

    14    to have language in it that meets the intent factors for the

    15    penalty phase as well.

    16           Isn't there a case to that effect from the Fourth

    17    Circuit that says the indictment has to give some notice that

    18    *Aprendi* has some application to how the -- how the charging

    19    paper reads?

    20           MR. KLEINDINST:  Yes, Your Honor.

    21           MS. CLARKE:  It has been the Government's position

    22    that across the country that they need to indict so-called

    23    special findings.  That is a subject of debate that hasn't been

    24    resolved by the Supreme Court.

    25           THE COURT:  Right.  I -- frankly, and if you disagree

02:26
1  with that, I am sort of with you.  I mean, I read that opinion,

2  and I -- you know, look, I respect that three circuit judges in

3  the Fourth Circuit saw it that way, but it seemed to me that it

4  took a Sixth Amendment issue that has to do with jury findings

5  before somebody could be found accountable and then morphed

6  that into what the charging paper has to say.

7           There is all kinds of instances where you and I can

8  point to where they do it by information, and the defendant

9  gets the same notice that he is entitled to, and then the

02:26
10  *Aprendi* issues have to do with what the jury has to find, and

11  the defendant's sentencing -- before the defendant is exposed,

12  you know, to sentencing.

13           But, you know, I have to recognize that that case is

14  out there, and the Government recognizes that it is out there.

02:26
15  They certainly have to comply with it in the Fourth Circuit.  I

16  am not aware of any law in the Ninth Circuit that is imported

17  that *Aprendi* requirement to the pleading phase, are you?

18           MS. CLARKE:  There's only been one Ninth Circuit

19  federal death penalty case decided in the Ninth Circuit,

02:26
20  *Mitchell*, and I don't recall whether it addressed that or not.

21           It is an issue that is going to percolate at some

22  point to the Supreme Court, and the question is whether the

23  federal statutes charge death-eligible crimes because they

24  don't charge all of the elements that make them capital

02:27
25  eligible, but that is not for today, I don't think.

1          THE COURT:  Okay.

2          MS. CLARKE:  Your Honor, and I certainly appreciate

3    what the Court is saying, and I know the Court's experience

4    with grand juries and grand jury work, and the *R. Enterprises*

02:27   5    case and the relevance standard, but the language is pretty

6    good in *R. Enterprises* and *Williams* and *Branzburg* and all the

7    cases, the Supreme Court cases, that talk about the function of

8    the grand jury, and it is to determine probable cause.

9          And I know that there's been litigation in this

02:27   10   district over grand jury instructions and those issues, but it

11   is a determination of probably cause whether a crime has been

12   committed.

13         The Government cites the language that they have --

14   they are obligated to run down the clues but the rest of that

02:27   15   sentence is "in order to establish that a crime has been

16   committed."

17         So I guess the question is, At what point does the

18   Government have to stop?  And at what point do they get

19   probable cause and keep going because they are interested in

02:28   20   discovery or in discovering, you know, affirmative defenses or

21   discovering what the defense, you know, ultimately will try to

22   present as a case in mitigation?

23         So I suppose the line is -- the question is, When does

24   it stop?  And when does it become, you know, the inference be

02:28   25   that they are abusing the process?

1          THE COURT:  How do I fashion a prospective order

2      though?  That is the difficulty I am having.  I have already

3      identified to you that if this was to confront an expected

4      defense -- maybe it is.  Maybe the Government takes a different

02:28   5      position on that.

6          But my reading of the cases that you cited would

7      suggest that is not an appropriate matter for the grand jury.

8      But how do I tell them, look, this question is okay because

9      this goes to intent, malice, premeditation, and maybe the

02:28  10      special intent factors that you have to plead in a capital

11      murder indictment, but this question is not okay because this

12      really goes to blunting mitigation evidence?

13          It would be very, very difficult for us to figure out,

14      you know, where those lines are in advance and for me to issue

02:29  15      an order that doesn't have the affect of chilling the

16      Government in performing a function that is incumbent upon

17      them.

18          MS. CLARKE:  Well, I mean, certainly the Court could

19      quash, and we've asked, and that takes the issue off the table

02:29  20      because the parents -- the reality is they don't need the

21      parents to give them the elements of the offenses that they are

22      investigating.  They don't need the parents or the aunt and

23      uncle or the cousin to give them any of the *Ring* factors as

24      they are saying it.

02:29  25          So the question is, When does it stop?  And at what

1    point does it become abuse to haul these family member in who

2    are clearly distraught and don't want to in any way hurt their

3    community or hurt their son, and that's the tough call.

4         And it seems to me that the Government has pushed it

02:30   5    beyond the line in this case in particular, and that's why

6    we've come to you to ask for some relief.

7         THE COURT:  Do you have any idea - and if you do, it

8    is not in the papers -- but have you had discussions with the

9    prosecutor?  You have some idea of what questions will be put

02:30   10   to these people that give you particular concern that this is

11   going to be an abuse of the grand jury process?

12        MS. CLARKE:  No, but I would be happy to have

13   conversations with the prosecutor.  They haven't offered that

14   up.

02:30   15        THE COURT:  See, the problem I am having is if there

16   is a presumption of regularity and acknowledging that I am a

17   dealing with an experienced lead counsel and probably

18   experienced other counsel for the Government who know what the

19   rules are, who I presume will act in good faith, I just don't

02:30   20   see anything here that rebuts this presumption of regularity

21   and would cause me to -- certainly wouldn't cause me to quash

22   the subpoenas.

23        I see relevance in subpoenaing these witnesses.  I

24   agree with you.  There is no evidence that they were there,

02:31   25   that they are actual fact witnesses as to what happened at the

1    Safeway that day, but that is a small part of this.  Whenever

2    there is special mens rea involved, people that know the

3    defendant and can say here's how he appeared a day before, a

4    week before, a month before, that is, I think, very potentially

02:31    5    very relevant evidence in a case with special mens rea.

6            So -- and I don't think it would be an abuse of

7    process at all for them to make inquiry of that and to people

8    who had exposure to the defendant and knowledge of those

9    things.

02:31    10           I am -- I am a little queazy about this, I have to

11    tell you, because I am a parent myself, and I would hate to be

12    in a position of being pitted against my own kids.  I would.

13           I had a nephew once who was in trouble, and my brother

14    called and tried to put -- I said don't put him on the phone.

02:31    15    I don't want to have to be a witness.  If he talks to me

16    directly, then potentially somebody could call me as a witness

17    to this thing.

18           So I am sensitive to that concern, but, you know, the

19    stakes are high here, and I am really reluctant and loathed to

02:32    20    import, you know, whatever my personal sense of things is to

21    the Government and saying this the law because it is not.  It

22    is just personal sentiment that I have to be in that position.

23    Any parent would hate to be in that position.

24           So I get that part of it.  I understand that part of

02:32    25    the concern.  I am very sympathetic to the parents and aunt and

1    uncle that they are in this situation now that they are faced

2    with this awful dilemma, but I don't see that I have any legal

3    authority to stop it in its tracks.

4              Mr. Kleindinst, do you want to speak to the issue?

02:32   5       MR. KLEINDINST:  Judge, one of the least desirable

6    parts of my job in my career as an AUSA is having to talk to

7    parents of children who are being investigated.  I share the

8    Court's sentiments exactly.  I don't relish it.  I try to avoid

9    it.  In this case it can't be avoid, but in any event, though,

02:33   10   that isn't a reason anyway to quash the subpoenas.

11             I think the Court is right on.  There is a presumption

12   of regularity.  There are, obviously, issues that as to mens

13   rea or premeditation that transcend the events on the morning

14   of January 8th that took place before them.

02:33   15             I don't believe that the Government has to justify to

16   the Court why we want to bring witnesses before the grand jury

17   and/or give the Court a script that will be asked.  The

18   Government is well aware of our professional responsibilities,

19   and we'll do everything to make sure that what ever is done

02:33   20   with these people will be done correctly, appropriately, and

21   humanely.

22             THE COURT:  Mr. Kleindinst, was it your intention --

23   you told me that you were essentially treating this -- and,

24   again, I hasten to say I am using the term loosely -- you are

02:34   25   treating this as an open discovery type case where you are

1  giving witness statements in advance.

2       Is it your intention that if a superseding indictment

3  is returned you are going to give over the transcript of the

4  grand jury proceeding to counsel?

02:34  5       MR. KLEINDINST:  At some point after an indictment,

6  yes, Your Honor.

7       THE COURT:  All right.  Anything else on this issue,

8  Ms. Clarke?

9       MS. CLARKE:  The alternative suggestion that we had in

02:34  10  the pleadings, Your Honor, was a protective order to direct

11  that the Government limit their questions of the family members

12  to the specific probable cause related links in the chain kind

13  of evidence, and I think that might be appropriate because, you

14  know, this issue is probably going to come back.

02:34  15       THE COURT:  Well, okay.  I am reluctant to do that

16  because I do think that its unwarranted Court interference at

17  this point with an executive branch function.  I don't find

18  that I have any evidence that suggests to me that the

19  presumption of regularity or the good faith presumption that I

02:35  20  would apply to the Government in conducting grand jury

21  investigations has been rebutted.

22       So I am going to assume, and I've been assured to some

23  extent by Mr. Kleindinst that they are well aware of what their

24  responsibilities are and they don't intend to breach those, so

02:35  25  I find no justification for me to issue even a warning to the

1    prosecutors at this point.

2         The reason I asked the last question, Ms. Clarke, is

3    that there will be an opportunity to verify at some point

4    exactly what was said, and if you are right and it strayed

02:35    5    beyond the proper function of the grand jury, then you and the

6    defendant will have a remedy.

7         The grand jury transcripts will be turned over to you

8    at some point, so you'll be able to look at the questions that

9    were asked, and I think at this point that is the only remedy

02:36    10   that the Court can offer.

11        Again, as I said, I found the best and most direct

12   guidance from the *R. Enterprises*.  Justice O'Connor writes

13   that, "The function of the grand jury is to inquire into all

14   information that might possibly bear on its investigation until

02:36    15   it has identified an offense or satisfied itself that none has

16   occurred."

17        She writes that "the grand jury paints with a broad

18   brush."  "A grand jury investigation is not fully carried out

19   until every available clue has been run down and all witnesses

02:36    20   examined in every proper way to find out if a crime has been

21   committed."

22        She cautions also against the fear of -- or the

23   specter of mini-trials, a Court getting involved prior to the

24   return of indictment, and at page 298, 299 of the opinion, she

02:37    25   quotes from Dionisio, which is at 410 U.S. 1, that, "Any

1    holding that would saddle a grand jury with mini-trials and

2    preliminary showings would assuredly impede its investigation

3    and frustrate the public's interest in the fair and expeditious

4    administration of the criminal laws."

02:37    5          I've been guided by those statements and general

6    characterizations of the function of the grand jury, and

7    Ms. Clarke knows and acknowledges that I have substantial

8    experience in running grand jury investigations as well.

9          I agree with Ms. Clarke that there is a point where

02:37   10    questions of parents, you know, of potentially or of relatives

11    of the defendant could go overboard and could be more designed

12    to try to offset the anticipated defense, and I wouldn't think

13    that that is a proper function.

14          But having said that, I have no belief that that is

02:37   15    what is going to occur here.  Instead, focusing on the

16    anticipated murder charges, I think there are special mens rea

17    involved in those that the Government must establish by

18    probable cause that the grand jury must find before those

19    charges are returned.

02:38   20          I also find at this point that the Government out of

21    an abundance of caution is trying to comply with what the

22    Circuit courts have said the requirements are for a capital

23    case indictment and the notice provisions of that indictment.

24          Whether I agree with it or not, I think it is smart

02:38   25    practice for the Government to say, look, there is cases out

1    there that suggest that we have to do this.  It doesn't hurt if

2    we have it in there, even if it turns out to be surplusage, so

3    we're going to attempt to comply with what we think the case

4    law is in the United States for respecting this kind of charge

02:38    5    and this kind of indictment.

6           All of those factors, the presence of the special mens

7    rea, the need to try to comply with Court decisions, importing

8    *Aprendi* principles to the indictment, and then just the general

9    function of the grand jury, which is to look very broadly at

02:39    10    all relevant evidence that might support a charge dictates the

11    conclusion here that the motion to quash must be denied, and

12    the Court does deny it.

13           Again, I point out that there will be recourse.  If

14    there has been any impropriety, you certainly, Ms. Clarke and

02:39    15    Mr. Fleming, be able to study the transcripts at some point and

16    bring to the Court's attention if you think the grand jury has

17    been abused and ask for appropriate remedy in the future.  So

18    the Court denies the motion to quash the subpoenas at this

19    point.

02:39    20           Mr. Kleindinst, you may reissue them if you choose.  I

21    am not directing any particular action other than to say that

22    the temporary suspension of enforcement of those subpoenas is

23    now lifted as of today.

24           So I think that is it.  Is there other issues that we

02:39    25    should discuss respecting the grand jury, Ms. Clarke?

02:40   1          MS. CLARKE:  May I raise one question?  The Court

2    reminded me when the Court mentioned that this is an open file

3    discovery.  That was my understanding of what I heard in court

4    when we were at the arraignment as well.

02:40   5          Your Honor, we have not received the reports of the

6    interviews of the parents or the cousin or any of the family

7    members that have been subpoenaed.  If the Court could direct

8    that we receive those immediately, that would --

9          THE COURT:  Mr. Kleindinst, do you intend to turn

02:40  10    those over?

11          MR. KLEINDINST:  I believe, Your Honor, that we turned

12    over the first batch of discovery at the arraignment that was

13    provided to counsel with a disk that has tape recordings of

14    interviews of the witnesses so far, and I believe that in that

02:40  15    disk are the recorded interviews of Mr. Loughner's parents.

16          MS. CLARKE:  No.  They are not listed.

17          THE COURT:  She says they are not listed.  Here's the

18    point, you are willing to turn those over if you have them.  If

19    it is an oversight that they haven't been, you'll turn them

02:41  20    over?

21          MR. KLEINDINST:  Oh, as part of Rule 16 discovery,

22    yes.

23          THE COURT:  Pardon me?

24          MR. KLEINDINST:  As part of Rule 16 discovery, yes.

02:41  25          THE COURT:  Well, no, it is more than that.  Look, I

1    understand that we got this thing called a Jencks Act, and I

2    don't know how it is in Arizona.  Here it is not used very

3    often because it is so different from what the state practice

4    is which requires the turn over of everything.

02:41   5        Now, I have no authority -- and I checked on the

6    cases.  I understand I have no authority to order you to do

7    that, but I can encourage you to exercise your discretion.  You

8    have discretion whether to strictly follow that, whether to

9    turn that information over.

02:41   10       Here is my slant to you on that, Mr. Kleindinst, this

11   is an important case, and I would encourage you to turn

12   everything over, you know, as soon as it is available, not hold

13   back things.

14       I can understand in a given case that there might be

02:41   15   concerns for witness safety.  They don't appear to me to be

16   present in this case.  I can understand that it might

17   compromise another on-going investigation, other than, you

18   know, the present matter before the grand jury.  I can't see in

19   this that there is any other investigation going on that would

02:42   20   be compromised.

21       So the usual good rules for holding stuff back, I just

22   don't see here, and as I said --

23       MR. KLEINDINST:  Your Honor, I don't intend to hold it

24   back.

02:42   25       THE COURT:  Okay.

1   MR. KLEINDINST:  And I don't intend to act under

2   Jencks.  There is no written interview report of the parents.

3   My recollection -- my understanding is that they were

4   interviewed and it was tape recorded.  And my recollection --

02:42   5   and I can verify it with my case agents -- is that those tape

6   recordings have already been turned over.

7   THE COURT:  Okay.  If you'll verify that.  Ms. Clarke

8   says she has listened and they are not listed and she hasn't

9   heard those.

02:42   10   MS. CLARKE:  I looked at the list.  There is far too

11   many for me to have listened to by now, but I looked at the

12   list of names, and their names were not on the list.

13   THE COURT:  Were you able to hear her?  There is a

14   listing of the names of witnesses that correspond to the DVDs,

02:43   15   and Mr. Loughner's parents names aren't on that list.

16   MR. KLEINDINST:  Judge, I'll seek to determine what

17   the situation is, and if they have not been turned over, I

18   will.

19   THE COURT:  Okay.

02:43   20   MR. KLEINDINST:  Okay.

21   THE COURT:  Anything else?

22   MR. KLEINDINST:  That's all, Your Honor.  Thank you so

23   much.

24   THE COURT:  Hold on.  Anything else on behalf of

02:43   25   defense?

1          MS. CLARKE:  No, Your Honor.

2          THE COURT:  We're in recess.  I'll see you back on

3     March 9th.

4          If other -- let me add this:  If any other emergency

02:43    5     type issues arise, particularly with respect to discovery, set

6     up a conference call and bring it to my attention.  There is no

7     need to wait until the 9th.

8          I want to keep the ball rolling here, and I commend

9     and compliment you, Mr. Kleindinst, for turning the information

02:43   10     over, you know, as you have up to this point.  I would

11     encourage you to continue to do that.

12          MR. KLEINDINST:  I will.

13          THE COURT:  Okay.  We're in recess.

14          MS. CLARKE:   Thank you.

02:44   15          THE COURT:  This is to be a sealed transcript unless

16     there is further order of the Court.

17          (Recess at 2:44 p.m.)

18                              ---oOo---

19

20

21

22

23

24

25

1                         C-E-R-T-I-F-I-C-A-T-I-O-N

2

3           I hereby certify that I am a duly appointed, qualified

4    and acting official Court Reporter for the United States

5    District Court; that the foregoing is a true and correct

6    transcript of the proceedings had in the aforementioned cause;

7    that said transcript is a true and correct transcription of my

8    stenographic notes; and that the format used herein complies

9    with the rules and requirements of the United States Judicial

10   Conference.

11           DATED:  February 12, 2011, at San Diego, California.

12
                                    /s/ Melinda S. Setterman
13                                  _____
                                    Melinda S. Setterman,
14                                  Registered Professional Reporter
                                    Certified Realtime Reporter
15

16

17

18

19

20

21

22

23

24

25