STEPTOE & JOHNSON LLP
Collier Center
201 East Washington Street, Suite. 1600
Phoenix, Arizona 85004-2382
Telephone: (602) 257-5200
Facsimile:  (602) 257-5299

David J. Bodney (06065)
dbodney@steptoe.com
Peter S. Kozinets (019856)
pkozinets@steptoe.com

Attorneys for Phoenix Newspapers, Inc.
and KPNX Broadcasting Co.

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR11-0187-TUC-LAB |
| Plaintiff, | **INTERVENORS' RENEWED MOTION TO UNSEAL SEARCH WARRANT RECORDS** |
| vs. | |
| JARED LEE LOUGHNER, | (Oral Argument Requested) |
| Defendant. | Hearing Date: March 9, 2011<br>Hearing Time: 1:30 p.m. |

Pursuant to leave of Court granted at the February 18, 2011 motion hearing [Hr'g Tr. at 40:1-2], Intervenors Phoenix Newspapers, Inc., which publishes *The Arizona Republic* ("PNI"), and KPNX Broadcasting Company, which broadcasts "12 News" in Phoenix ("KPNX") (collectively, "Intervenors"), respectfully renew their Motion to Unseal Search Warrant Records. This Renewed Motion is supported by Intervenors' prior filings, the transcript of the February 18 hearing, the March 3, 2011 Superseding Indictment, and the following Memorandum.

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

On March 3, 2011, the grand jury issued its long-anticipated Superseding Indictment of Defendant Jared Lee Loughner, marking the end of the pre-indictment phase of this matter [ECF No. 129]. Now that the charges that will guide the direction of this case have been crystallized and the pre-indictment investigation completed, there is no longer any reason to delay unsealing the search warrants, affidavits and returns/inventories (the "Search Warrant Records" or "Records"). For three reasons, the Records should be unsealed and released to Intervenors without further delay.

First, both the First Amendment and federal common law provide a strong presumptive right of public access to the Records at this stage. As the Court observed at the February 18 motion hearing, the Ninth Circuit underscored in *Times Mirror Co. v. United States*, 873 F.2d 1210, 1215-1216 (9th Cir. 1989), that its holding was dependent on two facts: (1) that a pre-indictment investigation was ongoing, and (2) that no indictment had been returned. [Feb. 18, 2011 Hr'g Tr. at 18:25 – 19:8] It is now abundantly clear that these facts do not apply here, and *Times Mirror* does not prohibit release of the Records.

In view of the recent experience of many states, including Arizona, in support of public access to search warrant materials, and the strong logical basis for public access, the First Amendment compels release of the Records at this juncture unless the Government or the Defendant can overcome the heavy constitutional presumption in

favor of openness.  Moreover, given that *Times Mirror* no longer applies, the press and the public also have a strong presumptive right of access under federal common law.

Yet neither the Government nor the Defendant has established any compelling interest in keeping the Records under seal.  While the parties have made generic references to the Defendant's Sixth Amendment right to a fair trial, and the Government has alluded to privacy concerns, no showing has been made that releasing any information in the Records will jeopardize either interest.

Second, the Government and the Defendant have failed to show that closure of the Records is narrowly tailored to avert any such harms, or that less restrictive alternatives to closure are insufficient.  The Supreme Court and the Ninth Circuit have recognized several constitutionally-preferable alternatives to secrecy, including "searching questioning of prospective jurors," "clear and emphatic" jury instructions and, if necessary, sequestration of jurors. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 563-64 (1976); *Associated Press v. Dist. Ct.*, 705 F.2d 1143, 1146 (9th Cir. 1983).  The Supreme Court recently reaffirmed that *voir dire* has been more than sufficient to guarantee fair trials in cases involving substantial public attention, including Enron, Watergate and Abscam. *Skilling v. United* States, 130 S. Ct. 2896, 2921 n.28 (2010).

Third, Intervenors understand from prior briefing and the Court's comments at the February 18 hearing that the parties' proposed redactions are impermissibly overbroad.  For example, while the Government has suggested that full disclosure of the inventory of items seized might somehow impinge upon Defendant's privacy [ECF No. 96 at 6-7], Defendant's privacy interests in suppressing access to the Records are minimal at best and cannot overcome the strong public interest in access.  The Government's proposed "complete withholding of the inventory" is untethered to any compelling interest. In these circumstances, the Records should be unsealed promptly.

Argument

I. THE FIRST AMENDMENT AND FEDERAL COMMON LAW PROVIDE A STRONG RIGHT OF ACCESS TO THE RECORDS.

A. The First Amendment Right of Access Applies at this Stage.

None of bases for the holding in *Times Mirror* applies here, and that case does not foreclose the public's First Amendment and common law rights of access to the Records. First, *Times Mirror* did *not* preclude access to warrant materials where (a) "an investigation has been terminated," *or* (b) "an investigation is still ongoing, but *an indictment* has been returned." 873 F.2d at 1221 (emphasis added). In view of the superseding indictment, and the facts of this case, both conditions have been met here. Second, while *Times Mirror* deferred to the government's "concern about disclosing the nature and scope of an ongoing criminal investigation," 873 F.2d at 1211 n.6, the Government cannot argue here that disclosure will harm an ongoing investigation. Third, there is zero risk that suspects "might destroy evidence, coordinate their stories before testifying, or even flee the jurisdiction." *Id*. at 1215. Loughner has been in custody since being arrested at the scene and poses no such risks.

In this post-investigation, post-indictment context, considerations of both experience and logic strongly militate in favor of a First Amendment right of access to the Records. *See Press-Enterprise Co. v. Super. Ct.*, 478 U.S. 1, 8-9 (1986) ("*Press-Enterprise II*") (describing the "experience" and "logic" considerations). Intervenors moved to unseal the Records *after* the warrants had been executed, returned and filed with the state court that issued them. Moreover, the Government has "acknowledge[d]" that the public has a common law right of access to the Records [ECF No. 96 at 2], and that right supports a finding of a history of openness under the "experience" prong of the First Amendment test. *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 92 (2d Cir. 2004) ("The courts that have undertaken this type of inquiry have generally invoked the common law right of access to judicial documents in support of finding a history of openness."); *In re Application of N.Y. Times Co.*, 585 F. Supp. 2d 83, 89 (D.D.C. 2008)

1 ("[T]he fact that there is a common law tradition of access to warrant materials – which is acknowledged by the government in this case – weighs strongly in favor of a First Amendment qualified right of access to warrant materials.").

Furthermore, as the Court is aware, many states now recognize a public right of access to search warrants and related records once a warrant has been executed or returned, or charges have been filed. *See, e.g.*, Alaska R. Crim. P. 37(e)(2) (open after charges filed); A.R.S. § 13-3918(A) (open after execution); Ark. R. Crim. P. 13.4 (public notice determined by court upon filing of return); Ariz. R. Stat. § 13-3918(A) (open after return); Cal. Penal Code § 1534 (open after execution); Del. Ct. R., Admin. Directive No. 2000-5 (Apr. 3, 2000) (open after return); N.H. Rev. Stat. § 595-A:4 (open after return); N.C. Gen. Stat. § 132-1.4(k) (open after return). [*See also* ECF No. 81 at 9-10; Feb. 18 Hr'g Tr. at 16:4 – 17:14][1] These statutes are consistent with other sunshine laws, which gained traction in the wake of Watergate, have been amplified by state laws and rules throughout the country in recent years, and embody a strong public policy in favor of open government and an informed citizenry. *See, e.g.,* Ariz. Sup. Ct. R. 123(c) ("Historically, this state has always favored open government and an informed citizenry. In the tradition, the records in all courts and administrative offices of the Judicial Department of the State of Arizona are presumed to be open to any member of the public for inspection or to obtain copies at all times during regular business hours."); *In the Matter of Public Access to Court Records*, Ariz. Sup. Ct. Adm. Order No. 95-35 (adopting a policy of open court records "because it promotes accountability of the courts to an informed public"; recognizing that the Arizona Supreme Court "has long been cognizant of the value of an informed public as a restraint upon government, and of the value of the press as a vital source of public information.").[2]

---

[1] Intervenors do not contend that Arizona law is controlling [*cf*. ECF No. 95 n.1], but cite Arizona law to show that the Records are subject to a history of openness.

[2] At the February 18 hearing, the Court also noted that the Ninth Circuit, in *United States v. Kott*, 135 Fed. Appx. 69, 2005 WL 1400288, at *1 (9th Cir. June 15, 2005) (unpublished), concluded that a common law right of access applies to search warrant materials. [Feb. 18 Hr'g Tr. at 17:15 – 18:9]

In addition to these consideration of experience, logic also supports application of the First Amendment right of access because access furthers several significant public interests.  First, "[p]ublic access to warrant materials serves as a check on the judiciary because the public can ensure that judges are not merely serving as a rubber stamp for the police." *Application of N.Y. Times Co.*, 585 F. Supp. 2d at 90.  Here, the public is entitled to know, at a minimum, the scope of the searches described in the warrant materials.  Access to such information will enable the public to evaluate for itself whether the government's searches went too far – or did not go far enough.  More broadly, such access will shed further light on the conduct of government officials and their response to the events of January 8, including the extent and nature of federal-state cooperation in the investigation, and the scope and nature of the investigation.  Full disclosure is particularly appropriate where, as here, the Government has selectively revealed many details about the search, but steadfastly refuses to disclose others.  Releasing the remainder of the Records will enhance public trust in the integrity and legitimacy of the investigation and prosecution.  *See, e.g., Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980) ("People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing.").[3]

Second, access to the Records – including the inventories and returns – will enhance the public's understanding of the Defendant's background, competency and possible motives.  A description of the items seized and searched will also provide the public with further information about a host of issues about Loughner, including his mental state, the ease with which he was able to purchase guns and munitions, possible influences and beliefs that might illuminate his recent actions, and his prior interactions

---

[3] Additional information about the Records was provided to the press in early February. *See, e.g.*, Joseph Goldstein and Marc Lacey, *Even if Loughner Doesn't Testify, Jurors Could See Videos, Officials Say*, N.Y. Times, Feb. 9, 2011, http://www.nytimes.com/2011/02/10/us/10giffords.html?_r=1&scp=1&sq=loughner&st=cse (disclosing contents of videos recovered from Defendant's personal computer).

with law enforcement and other authorities – all matters of acute public interest. Third, at the most basic level, access promotes public trust in the government's conduct. *See Globe Newspaper Co. v. Super. Ct.,* 457 U.S. 596, 606 (1982) (public scrutiny "enhances the quality and safeguards the integrity" of the proceedings, "heighten[s] public respect" and "permits the public to participate in and serve as a check upon the judicial process – an essential component in our structure of self-government"). For all of these reasons, the First Amendment applies here.

As the Court discussed at the February 18 hearing, the holding of *United States v. Inzunza*, 303 F. Supp. 2d 1041 (S.D. Cal. 2004), is inconsistent with these basic First Amendment principles and is unpersuasive. [Feb. 18 Hr'g Tr. at 15:25 – 18:14, 22:23 – 24:10] Under *Inzunza*, search warrant materials would not become subject to the constitutional right of access unless and until the parties litigate a suppression motion relating to evidence seized pursuant to the warrants. Under this logic, the records could remain secret forever if the searches are never challenged or the evidence never subject to objection. This approach would empower the Government and the Defense to block public access indefinitely, based on their own agreement or Defendant's decision not to make any such challenges or objections. [*See* Feb. 18 Hr'g Tr. at 23:18-20 (THE COURT: "What if there is no suppression motion brought? Then these things never see the light of day.")] By making public access conditional on such conduct, *Inzunza* undermines the entire notion of a public *right* of access. By *Inzunza*'s own logic, the public would not be allowed to inspect any judicial records until after they became the subject of briefing, argument and decision. By the same token, the public would not be allowed to see a criminal complaint until after trial, or to see an appellate brief until after issuance of a decision. That is not, and cannot be, the law.

Rather, the positive public benefits of providing more information to the public about the response of the criminal justice system to events like the January 8 mass shootings exist now, and access should not postponed indefinitely merely because the parties prefer delay. As another court has observed:

> [Defendant] may argue that [the public's interests in access] will be met by releasing the information after his trial has concluded. . . . However, in the context of closure of pretrial proceedings, . . . **a "minimal delay" of access "unduly minimizes, if it does not entirely overlook, the value of 'openness' itself, a value which is threatened whenever immediate access to ongoing proceedings is denied**, whatever provision is made for later public disclosure." . . . Openness is a value in itself that the trial judge must consider even when the participants in the trial may wish otherwise.

*In the Matter of the Application and Affidavit for a Search Warrant (Wash. Post Co. v. Hughes)*, 923 F.2d 324, 331 (4th Cir. 1991) (emphasis added) (ordering pretrial release of search warrant materials under common law). The Supreme Court has recognized that similar denials of First Amendment rights – even for short periods – causes irreparable harm. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)). *See also In re Charlotte Observer*, 882 F.2d 850, 856 (4th Cir. 1989) (holding that even "minimal delay" is fundamentally at odds with the First Amendment right of access).

For all of these reasons, the First Amendment right of access to the Records has attached, and the Records may be withheld only if (1) closure is necessary to further a compelling governmental interest, (2) closure is narrowly tailored to serve that interest, and (3) no less restrictive means exists. *Press-Enterprise II*, 478 U.S. at 13-14 (1986). *See also United States v. Brooklier*, 685 F.2d 1162, 1168-69 (9th Cir. 1982) (proponent of closure must also show a substantial probability that closure "will be effective in protecting against the perceived harm"); *Oregonian Publ'g Co. v. Dist. Ct.*, 920 F.2d 1462, 1465 (9th Cir. 1990) (recognizing that "[u]nder the first amendment, the press and the public have a presumed right of access to court proceedings and documents").

    B.    <u>Federal Common Law Provides a Strong Presumptive Right of Access.</u>

The press and the public also have a strong common law right of access to the Records. The Ninth Circuit has long recognized "*a strong presumption* in favor of the common law right to inspect and copy judicial records." *Phoenix Newspapers, Inc. v.*

*Dist. Ct.*, 156 F.3d 940, 946 (9th Cir. 1998) (emphasis added). That right has been recognized by courts in the United States "for well over a century." *Application of N.Y. Times Co.*, 585 F. Supp. 2d at 89. Here, the Government has acknowledged that Intervenors have a common law right of access to the Records. [ECF No. 96 at 2] Under the common law, the Government and Defendant must show that the need for secrecy outweighs the public's right of access. *United States v. Kaczynski*, 154 F.3d 930, 931 (9th Cir. 1998).

Under the First Amendment or common law, neither party has presented evidence capable of justifying continued secrecy, and the Records should be released. While the parties have made generic references to the Defendant's Sixth Amendment right to a fair trial, and the Government has alluded to the privacy interests of non-parties, no showing has been made by the Government or the Defense that releasing any information in the Records will jeopardize the either interest.

II.   THE SUPREME COURT AND NINTH CIRCUIT HAVE REPEATEDLY HELD THAT *VOIR DIRE* AND OTHER ALTERNATIVES TO CLOSURE ADEQUATELY PROTECT SIXTH AMENDMENT RIGHTS.

The only interest in closure identified by Defendant is his Sixth Amendment right to a fair trial. [ECF No. 95 at 1] Yet Defendant has made no evidentiary showing to support his assertion that release of the Records poses a substantial threat of tainting the large metropolitan Tucson jury pool, which consists of more than a half-million eligible jurors.[4] As the Supreme Court noted in *Press-Enterprise II*, *voir dire* is more than sufficient to prevent any conceivable prejudice:

> [T]his risk of prejudice [to the jury selection process] does not automatically justify refusing public access. . . Through voir dire, cumbersome as it is in some circumstances, a court can identify those jurors whose prior knowledge of a case would disable them from rendering an impartial verdict.

---

[4] The jury pool in this Division consists of active registered voters in five counties: Cochise, Graham, Greenlee, Pima and Santa Cruz. *In the Matter of Jury Selection Plan*, General Order 09-17 (D. Ariz. Oct. 1, 2009). As of January 1, these voters totaled 530,787. State of Arizona Registration Report (Jan. 21, 2011), http://www.azsos.gov/election/voterreg/2011-01-01.pdf.

- 8 -

478 U.S. at 15. Indeed, the Ninth Circuit has observed that impartial jurors easily can be found in "a large metropolitan area," and has ruled that the dissemination of information from the DeLorean criminal trial should not be curtailed based on vague assertions of potential jury bias. *Associated Press*, 705 F.2d at 1146 (noting that impartial juries were empanelled in the Watergate and Abscam cases, which involved extensive publicity); *CBS v. Dist. Ct.*, 729 F.2d 1174, 1181 (9th Cir. 1984) ("the courts have long held that in a large metropolitan area, prejudicial publicity is less likely to endanger the defendant's right to a fair trial").

Even if individuals selected as jurors are exposed to pretrial publicity, such exposure rarely rises to the level of material prejudice. *See, e.g., Mu'Min v. Virginia*, 500 U.S. 415, 417, 431 (1991) (extensive news coverage concerning murder case, including disclosure of several items of prejudicial information inadmissible at trial, did not even rise to a level requiring individual questioning of jurors regarding the content of publicity to which they had been exposed). The Supreme Court recently reaffirmed that fair trial rights have been preserved through *voir dire* in numerous cases involving widespread press coverage. *Skilling*, 130 S. Ct. at 2925 n.34 (recognizing that "[n]ews coverage of civil and criminal trials of public interest conveys to society at large how our justice system operates."). *See also Hughes*, 923 F.2d at 329 ("The reason fair trials can coexist with media coverage is because there are ways to minimize prejudice to defendants without withholding information from public view."); *United States v. Blowers*, 2005 WL 3830634, *2 (W.D.N.C. Oct. 17, 2005) (ordering pretrial release of search warrant affidavit "[g]iven that the common law presumption favors public access to judicial documents" and any negative publicity "can be adequately addressed through the voir dire process").

In sum, Defendant's Sixth Amendment rights can be accommodated by less restrictive alternatives, and neither party can overcome the strong "presumption of openness" by alluding generally to the Defendant's fair trial right. *Press-Enterprise Co. v. Super. Ct.*, 464 U.S. 501, 510 (1984).

III. THE PROPOSED REDACTIONS ARE IMPERMISSIBLY OVERBROAD.

While Intervenors have not seen the proposed redactions, the Government's last brief on the issue and the discussion at the February 18 hearing indicate that both parties' proposed redactions are unconstitutionally overbroad and untied to any particularized showing of specific harm. For its part, the Government has proposed redacting material "that has not already been made public by the United States" – but offers *no* justification for such redactions. [ECF No. 96 at 6] It also proposed the "complete withholding of the inventory of items seized," but again offered no justification for why any particular items must be redacted. As the Court has recognized, the parties must establish a substantial probability that the proposed redactions are "strictly and inescapably necessary in order to protect the fair trial guarantee," that alternatives "will not protect adequately the defendant's right to a fair trial," and that "closure will be effective in protecting the perceived harm." [Feb. 18 Hr'g Tr. at 20:14 – 21:8]; *see also Press-Enterprise II*, 478 U.S. at 13-14; *Brooklier*, 685 F.2d at 1169. The proposed redactions must be narrowly tailored to prevent harm to the compelling interest identified by the party seeking the redactions; generalized assertions of harm and blanket requests for secrecy are impermissible.

Indeed, as the Supreme Court has explained, any proposed closure must meet these exacting standards:

> Here, however, the State's proffer was not specific as to whose privacy interests might be infringed, how they would be infringed, what portions of the tapes might infringe them, and what portion of the evidence consisted of the tapes. As a result, the trial court's findings were broad and general, and did not purport to justify closure of the entire hearing. The court did not consider alternatives to immediate closure of the entire hearing: directing the government to provide more detail about its need for closure, in camera if necessary, and closing only those parts of the hearing that jeopardized the interests advanced. As it turned out, of course, the closure was far more extensive than necessary.

*Waller v. Georgia*, 467 U.S. 39, 49 (1984). If the parties believe that any redactions are warranted here, they must make a far more specific case for redaction than anything that

has been advanced to date. [*See* Hr'g Tr. at 26:19 – 27:2 (proposed redactions must be "a more particularized argument than just wholesale")]

Finally, while the Government has referred vaguely to Defendant's privacy [*id*. at 6-7], it ignores the extremely limited privacy interests that Loughner might still have. Federal and state courts have long recognized that the privacy rights of those accused of newsworthy criminal activity are substantially diminished. *See, e.g.*, *Cinel v. Connick*, 15 F.3d 1338, 1345-46 and n.8 (5th Cir. 1994) (release of materials related to criminal charges against priest for possession of child pornography involved matters of legitimate public concern, including the priest's criminal guilt or innocence, the performance of the elected district attorney, and the Catholic Church's response to the priest's activities; privacy claim dismissed); *Ramsey v. Georgia Gazette Publ'g Co.*, 297 S.E.2d 94, 96 (Ga. Ct. App. 1982) (murder suspect lacked privacy claim). Arizona follows the *Restatement (Second) of Torts*, and Arizona courts have warned that "privacy rights are absent or limited where the information would be of public benefit." *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 343, 783 P.2d 781, 789 (1989). Under the *Restatement*, Loughner has lost most, if not all, of his privacy by thrusting himself violently into the public eye. *Restatement* § 652D, cmt. f.

Since the January 8 shootings, nearly every aspect of Defendant's private life has been made public, including his social, psychological, educational, employment, family and criminal histories. For example, *The Arizona Republic* has published articles discussing Loughner's mental health, family, Internet postings, educational travails and favorite books (including *Animal Farm* and *Mein Kampf*).[5] The *New York Times*'

---

[5] *See, e.g.*, Robert Anglen, *Jared Lee Loughner, suspect in Gabrielle Giffords shooting, had college run-ins*, Ariz. Republic, Jan. 9, 2011, http://www.azcentral.com/news/articles/2011/01/09/20110109jared-lee-loughner-gabrielle-giffords-arizona-shooting.html; Mary K. Reinhart, *Arizona tragedy: Little could have been done before shooting, experts say*, Ariz. Republic, Jan. 14, 2011, http://www.azcentral.com/news/articles/2011/01/13/20110113arizona-shooting-jared-loughner-mental-health-issues.html; Robert Anglen, *Portrait of Jared Loughner's parents emerges*, Ariz. Republic, Jan. 22, 2011, http://www.azcentral.com/news/articles/2011/01/22/20110122gabrielle-giffords-jared-loughner-parents.html; Robert Anglen, *Pima Community College was on alert for Jared Loughner*, Ariz. Republic,

- 11 -

1  January 15 profile similarly discusses Defendant's recreational drug use, interest in jazz,
2  online social-media postings, rejection by the U.S. Army, expulsion from Pima
3  Community College and job troubles.[6]  Given the information that the government and
4  others have already chosen to reveal about this Defendant, any risk to his privacy rights
5  is substantially outweighed by the public benefits of inspecting these *official* records.

## Conclusion

For the foregoing reasons, the Records should be unsealed and provided to Intervenors promptly.

RESPECTFULLY SUBMITTED this 4th day of March, 2011.

                        STEPTOE & JOHNSON LLP

                        /s/ David J. Bodney
                        David J. Bodney
                        Peter S. Kozinets
                        Collier Center
                        201 East Washington Street, Suite 1600
                        Phoenix, Arizona 85004

                        Attorneys for Phoenix Newspapers, Inc. and
                        KPNX Broadcasting Co

---

Feb. 15, 2011, http://www.azcentral.com/arizonarepublic/news/articles/2011/02/15/20110215gabrielle-giffords-tucson-college-aware-of-jared-loughner-threat.html.

[6] Dan Barry *et al.*, *Arizona Shooting: Looking Behind the Mug-Shot Grin*, N.Y. Times, Jan. 15, 2011, http://www.nytimes.com/2011/01/16/us/16loughner.html?scp=7&sq=loughner%20officials%20say&st=cse. *See also, e.g.,* Amy Gardner, *Friends, teachers tell of Loughner's descent into world of fantasy*, Wash. Post, Jan. 13, 2011, http://www.washingtonpost.com/wp-dyn/content/article/2011/01/12/AR2011011206630.html; Jenna Wortham, *In an Online Gaming World, Tucson Suspect Gave Hints of Problems*, N.Y. Times, Jan. 15, 2011, http://www.nytimes.com/2011/01/17/us/17gaming.html?scp=26&sq=loughner&st=cse.

# CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2011, I caused the attached document to be electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF Registrants:

Wallace H. Kleindienst
Wallace.Kleindienst@usdoj.gov
Beverly K. Anderson
Bev.Anderson@usdoj.gov
Christina M. Cabanillas
Christina.Cabanillas@usdoj.gov
Mary Sue Feldmeier
Mary.Sue.Feldmeier@usdoj.gov
Attorneys for Plaintiff

Judy C. Clarke
judyclarke@jcsrlaw.net
Reuben Camper Cahn
Reuben_Cahn@fd.org
Mark Francis Fleming
mfflaw@cox.net
Attorneys for Defendant

I hereby certify that on March 4, 2011, I caused the attached document to be mailed to the following:

The Honorable Larry Alan Burns
United States District Court
Southern District of California
940 Front Street, Suite 2190
San Diego, CA 92101

/s/ Monica Medlin
Legal Secretary