UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　　　　　　　　Plaintiff,<br>vs.<br><br>Jared Lee Loughner,<br><br>　　　　　　　　　　　　Defendant. | CASE NO. 11cr0187 TUC LAB<br><br>**ORDER GRANTING MOTION TO UNSEAL SEARCH WARRANT MATERIALS** [Doc. 131] |

**INTRODUCTION**

Two Arizona media outlets have petitioned the Court to release search warrant materials in this case. The materials consist of two search warrants, attached affidavits that recount basic facts about the suspected offenses and provide probable cause for the issuance of the warrants, and a property inventory of the things seized. The motion is opposed by the United States and by the Defendant. They argue the media outlets have no right to see the warrant materials at this stage in the proceedings, and that release of the materials will imperil the fair trial rights of the Defendant and violate the privacy interests of third parties. The Court has reviewed the warrant materials *in camera* and has considered the legal arguments, and finds the matter is ripe for decision.

**BACKGROUND**

On January 8, 2011, a mass shooting occurred in Tucson, Arizona during a political event at a shopping center. Nineteen people were wounded, six of them fatally. Among the victims were a United States Congresswoman, members of her staff, and a United States District Judge. Defendant Jared Loughner was arrested at the scene, and initially indicted

on three federal charges including attempted assassination of a member of Congress. That charge gave federal prosecutors priority in pursuing a criminal prosecution. *See* 18 U.S.C. § 351(f).

In the course of the criminal investigation following the shootings, law enforcement agents obtained two search warrants from the Arizona Superior Court authorizing a search of the Defendant's house and property. After the warrants were executed, the agents lodged them with the state court, and the warrant materials were ordered sealed by a state court judge on January 11, 2011.

On January 20, 2011, two Arizona media outlets, Phoenix Newspapers, Inc. and KPNX Broadcasting Co., filed a motion in the Arizona Superior Court seeking the unsealing and public release of the warrant materials. They relied chiefly on Arizona law, which provides that search warrants shall generally be open to the public after they are served. *See* Arizona Rev. Stat. § 13-398(A); *Phoenix Newspapers, Inc. v. Superior Court,* 180 Ariz. 159, 162, 882 P.2d 1285, 1288 (Ariz. Ct. App. 1994) (search warrants are subject to a presumption of public access). They also asserted a qualified right under the First Amendment to inspect the warrant materials. The United States Attorney, who by then had obtained a federal indictment against the Defendant, removed to this Court the media outlets' motion to unseal. The Court then permitted the media outlets to intervene in this case for the limited purpose of pursuing the motion to unseal the search warrants.

The Court held an initial hearing on the motion to unseal on February 19, 2011. At the hearing, the United States prosecutor represented that an active investigation of the Tucson shootings was ongoing, and that she expected new, additional criminal charges would be filed. Guided by *Times Mirror Co. v. United States,* 873 F.2d 1210 (9th Cir. 1989), the Court denied the motion to unseal, ruling there was no First Amendment or common law right of public or media access to the warrant materials at that time. The Court emphasized its ruling was based on the current state of the case, and that it would reconsider the motion to unseal at the next hearing on March 9, 2011.  By that date, it was expected the active criminal investigation of the case would be concluded and final charges would be filed.

On March 3, 2011, the grand jury returned a superseding indictment charging the Defendant with forty-nine federal offenses. The indictment included special findings that, if found to be true, could support imposition of the death penalty. The United States prosecutor represents that the government's active investigation of the case has now concluded, and that no additional federal charges are expected.

## DISCUSSION

In *Richmond Newspapers v. Virginia,* Chief Justice Burger observed:

> When a shocking crime occurs, a community reaction of outrage and public protest often follows. Thereafter, the open processes of justice serve an important prophylactic purpose, providing for the outlet of community concern, hostility, and emotion. Without an awareness that society's responses to criminal conduct are underway, natural human reactions of outrage and protest are frustrated and may manifest themselves in some form of vengeful "self-help," as indeed they did regularly in the activities of vigilante "committees" on our frontiers. The accusation and conviction or acquittal, as much perhaps as the execution of punishment, operate to restore the imbalance which was created by the offense or public charge, to reaffirm the temporarily lost feeling of security and, perhaps, to satisfy that latent urge to punish.
>
> Civilized societies withdraw both from the victim and the vigilante the enforcement of criminal laws, but they cannot erase from people's consciousness the fundamental, natural yearning to see justice done – or even the urge for retribution.  The crucial prophylactic aspects of the administration of justice cannot function in the dark; no community catharsis can occur if justice is done in the corner or in any covert manner.  It is not enough to say that results alone will satiate the natural community desire for "satisfaction." A result considered untoward may undermine public confidence, and where the trial has been concealed from public view an unexpected outcome can cause a reaction that the system at best has failed and at worst has been corrupted.  To work effectively, it is important that society's criminal process satisfy the appearance of justice, and the appearance of justice can best be provided by allowing people to observe it.

448 U.S. 555, 570-72 (1980) (citations, quotations and alterations omitted).

The concerns expressed by Chief Justice Burger in 1980 resonate even louder in today's digital age.  Courts today play a major role in defining rights and liberties and in shaping public opinion. Because of this, access to court proceedings has grown increasingly important and there has been a corresponding expansion of rights on the part of the general public and the media under the First Amendment to attend almost all criminal proceedings. These stages in the criminal process are now generally presumed to be open – meaning that

1  there must be overriding reasons to exclude the public and press from attending them: bail
2  and pretrial release proceedings, *Seattle Times Co. v. U.S. Dist. Court*, 845 F.2d 1513, 1517
3  (9th Cir. 1988); preliminary hearings, *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1
4  (1986) ("*Press- Enterprise II*"); pretrial suppression hearings, *United States v. Brooklier*, 685
5  F.2d 1162, 1171 (9th Cir. 1982); change of venue hearings, *In Re Charlotte Observer,* 882
6  F.2d 850, 852 (4th Cir. 1989); change of plea hearings, *In Re Washington Post Co.,* 807 F.2d
7  383, 389 (4th Cir. 1986); voir dire, *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510-
8  11 (1984) ("*Press-Enterprise I*"); criminal trials generally, *Globe Newspaper Co. v. Superior*
9  *Court*, 457 U.S. 596, 605-06 (1982); and sentencings, *United States v. Alcantyara,* 396 F.3d
10 189, 197-98 (2nd Cir. 2005).

11  This trend of increased openness in criminal proceedings also encompasses a qualified First Amendment right to inspect and copy public records and documents, including judicial documents and records. *Oregonian Publ'g. Co. v. U.S. Dist. Court,* 920 F.2d 1462, 1466 (9th Cir. 1990) (recognizing First Amendment right of access to plea agreements). "[C]ourts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Communications,* 435 U.S. 589, 597 (1978).  The right derives from common law, and creates "a strong presumption" in favor of general public access to records. *Phoenix Newspapers v. U.S. Dist. Court,* 156 F.3d 940, 946 (9th Cir. 1998).  Regardless of its origin, however, the right of access is not absolute; it is a qualified right. Public access can be denied if there are compelling countervailing reasons for keeping records sealed. *Press-Enterprise I,* 464 U.S. at 510.

23  Whether the public has a First Amendment right to inspect search warrants at any particular stage in the criminal process turns on considerations of "historical experience" and "logic." *Press-Enterprise II,* 478 U.S. at 8. Under the experience factor, courts ask whether there has been a tradition or history of access to the particular proceeding or record. *Id.* Under the logic factor, courts consider whether public access would benefit the proceedings, *id.,* in other words "whether public access . . . would serve as a curb on prosecutorial or

judicial misconduct or would further the public's interest in understanding the criminal justice system." *Phoenix Newspapers*, 156 F.3d at 948-49. Even without historical tradition or experience, the Ninth Circuit has held that logic alone may be enough to establish a qualified right of access to court documents. *In Re Copley Press,* 518 F.3d 1022, 1026 (9th Cir. 2008) (citing *Seattle Times,* 845 F.2d at 1516-17).

At the initial hearing on the motion to unseal the warrant materials, the Court was bound by *Times Mirror,* which after analyzing the *Press-Enterprise II* factors held that members of the public have neither a common law nor a First Amendment right to obtain warrant materials while a criminal investigation is ongoing and before indictments have been returned. The circumstances have changed since the initial hearing, however. As the Government acknowledges, the active investigation has now concluded and a final indictment has issued. There is no real danger at this point that disclosure of the warrant materials will jeopardize the investigation or hamper the ability of the grand jury to determine the appropriate charges — two critical concerns that lead the *Times Mirror* court to deny pre-indictment access to search warrants.

While the Government and the Defendant continue to invoke *Times Mirror* as a bar to releasing the search warrant materials, the Court finds that the changed circumstances have rendered that case inapposite. *See United States v. Kott,* 380 F.Supp.2d 1122, 1124-25 (C.D. Cal. 2004) (justification for maintaining search warrant materials under seal falls away once pre-indictment investigation is completed and indictment has issued); *cf. Phoenix Newspapers,* 156 F.2d at 947 (holding that "transcripts of public proceedings must be released when factors militating in favor of closure no longer exist"). Because *Times Mirror* was predicated on the need for secrecy during an investigation and before a final indictment is returned, that decision no longer guides the outcome here.

Even with *Times Mirror* out of the way, the Court must analyze whether experience and logic favor recognizing a qualified First Amendment right of access to search warrants at *this* stage of the criminal process, *i.e.*, post-investigation and post-indictment, but pretrial. On the "historical experience" issue, the case law on access to search warrants at this stage

is thin. While the process of obtaining a warrant has historically been closed to the public, search warrants are routinely open to the public after they are served. *Times Mirror,* 873 F.2d at 1215. Most of the general case law involves the pre-indictment stage, which doesn't resolve whether there is a history of openness after the investigation is complete and a final indictment has issued. Though the federal case law on this point is also sparse, both the Defendant and the media Interveners have identified individual cases that support their respective positions.

The Defendant relies on *United States v. Inzunza,* 303 F.Supp.2d 1041 (S.D. Cal. 2004), which found there was no historical tradition of public access to search warrant affidavits even after an indictment is returned. In *Inzunza*, a newspaper sought access to search warrant affidavits after the defendants had been indicted, but before a motion to suppress had been filed. The court stated it could find "no authority permitting access to sealed search warrant affidavits . . . prior to a suppression or evidentiary related motion," *id.* at 1046, and accordingly concluded "historical experience cautions against a finding of public access at this point in time." *Id.* at 1047.

*Inzunza* was decided in 2004, and despite the court's statement that it "could find no authority" for public access to warrant materials at the post-indictment stage, there is plenty. To start with, in the aftermath of Watergate, numerous states enacted "sunshine laws" codifying the requirement that documents maintained by public entities must be available for public inspection. Many state statutes applied the requirement to search warrant materials, specifying that warrants must be open to the public either after they are served or after criminal charges are filed. *See, e.g.*, Alaska R. Crim. P. 37(e)(2) (search warrant "shall be open to public" after charges filed); Ariz. Rev. Stat. Ann. § 13-3918 (search warrant "shall be open to the public" after execution); Cal. Penal Code § 1534 (search warrants "shall be open to the public" ten days after execution); Del. Ct. R., Admin. Directive No 2000-5 (April 3, 2000) (search warrant shall be open after return); N.H. R. Stat. § 595-A:4 (executed search warrant open after return); N.C. Gen. Stat. § 132-1.4(k) (search warrants open after return); S.D. Codified Laws § 23A-35-4.1 (2010) (search warrant open after investigation

terminated or indictment issues); Tex. Code Crim. Pro. Ann. Art. 18.011 (West 2007) (search warrant open no later than 60 days after filing); Va. Code Ann. § 19.2-54 (2010) (search warrant open subject to temporary sealing); s*ee also* U.S. Dist. Ct. R., E.D. Ark., Order 22 (search warrant open 7 working days after return). In addition, at least one state court has found a right of public access to search warrants under its state constitution. *Associated Press v. Montana,* 820 P.2d 421, 423 (Mont. 1991) (right of public to inspect affidavits in support of warrants guaranteed by Article II, section 9 of Montana constitution).  And, while most of the federal cases focus on access issues during the investigatory or pre-indictment phase, one federal court of appeals has held a qualified First Amendment right to inspect search warrants is triggered once the warrant is executed. *See In Re Search Warrant for Secretarial Area Outside Office of Gunn,* 855 F.2d 569, 573 (8th Cir. 1988).[1]

The media Interveners point to a case decided in 2008, *In re Application of New York Times Co. for Access to Certain Sealed Court Records,* 585 F.Supp. 2d 83 (D.D.C. 2008). There, the New York Times sought access to search warrants relating to the 2001 anthrax attacks in and around Washington, D.C. after an investigation into those crimes had concluded and the sole suspect had committed suicide. *Id.* at 86-87. The court found "there is an historic common law right of access to judicial records and documents that has been recognized in the United States for well over a century." *Id.* at 89 (citing *Nixon,* 435 U.S. at 597, n.7, n.8). The common law right of access, the court said, supported a finding of a history of openness under the "experience" prong of the First Amendment test. *Id.*

The situation here is different from that in *Application of New York Times.* While both cases involve post-indictment media efforts to unseal warrants, in that case there was no pending criminal action, and really no occasion for the court to evaluate the historical experience factor in the context of the post-indictment, pretrial stage.

---

[1] Two other federal appellate courts have held that search warrants should be open to the public once the warrant is executed and the need for secrecy is over. *See In re Application and Affidavit for a Search Warrant*, 923 F.2d 324, 331 (4th Cir. 1991) (affirming order unsealing search warrant at post-indictment, pretrial stage); *Application of Newsday, Inc.*, 895 F.2d 74, 79 (2nd Cir. 1990) (refusing to extend *Times Mirror,* and finding common law right of access to search warrant once plea agreement reached and government admits need for secrecy is over).

These authorities establish that there is as much historical basis for disclosure of search warrants at this stage as there is for non-disclosure, with the more recent authority recognizing a right of access once the investigation has concluded and the indictment has issued. Given the critical importance of the public's right to be fully informed in high profile case like this one, as well as the need for robust protection of a fress press, this Court opts to be guided by the more recent authority. The Court is persuaded by the clear trend among the states during the past 30 years that experience supports finding a qualified First Amendment right of access to search warrant materials once the investigation has concluded and a final indictment has issued.

Logic also supports openness and disclosure at this stage. When there is no danger of corrupting the investigation or interfering with grand jury proceedings, opening search warrant materials to public inspection can play a significant positive role in the functioning of the criminal justice system. Search warrants are a ubiquitous part of the criminal investigatory process, and ordinary citizens are well aware of their prevalent use. The raw power implicated by the authority to conduct a search is enormous. Armed with a search warrant, an officer possesses the imprimatur of the law to forcibly enter homes, roust the occupants, and rummage through drawers and other private places. Even though search warrants are judicially authorized and the scope of the search is defined, as a practical matter, most citizens know the search can be as intense and intrusive as the officer chooses to make it.

A person whose home or property is searched pursuant to a search warrant has an obvious interest in knowing that proper procedures have been followed. The general public shares that interest. Public scrutiny of the search warrant process — even after the fact — can shed light on how and why a warrant was obtained, and thereby further the public's interest in understanding the justice system. *Phoenix Newspapers*, 156 F.3d at 949. Public access to search warrants may also serve to deter unreasonable warrant practices, either by the police or the courts. *Id.*; *Application of New York Times*, 585 F.Supp.2d at 90 ("Public

/ / /

access to warrant materials serves as a check on the judiciary because the public can ensure that judges are not merely serving as a rubber stamp for the police.").

In this case, the media Interveners point out that public inspection of the search warrants "will enable the public to evaluate for itself whether the government's searches went too far — or did not go far enough." (Interveners' Renewed Motion to Unseal Search Warrant Records, at 5.) More broadly speaking, society has a valid and understandable interest in the law enforcement system and how well it works. Permitting inspection of the search warrants, the accompanying affidavits, and the property inventory will further public understanding of the response of government officials to the Tucson shootings, and allow the public to judge whether law enforcement functioned properly and effectively under the hectic circumstances of that day. *See Press-Enterprise I,* 464 U.S. at 508 (opening the judicial process and allowing public access to court documents "gives assurances that established procedures are being followed and that deviations will become known" and corrected).

The Defendant argues that a public interest in these matters should not be recognized until such time as he challenges the legality of the warrants or the methods used during the searches. This was the holding in *Inzunza,* which concluded that the "logic" factor had to be tethered to and evaluated in the context of a discrete stage of the proceedings, such as a suppression hearing. 303 F.Supp. 2d at 1048-49. But this seems too narrow.[2]  What if no

---

[2] *Inzunza* based its conclusion on the statement in *Press-Enterprise II* that the gist of the logic test is "whether public access plays a significant role in the functioning of the *particular process in question*." *Inzunza*, 303 F.Supp. 2d at 1048 (citing *Press-Enterprise II*, 478 U.S. at 8 (italics supplied)). It is noteworthy, though, that *Press-Enterprise II* referred to "process" and not to "proceeding."  While public access to search warrants may be especially important in a proceeding to suppress evidence, public interest in the *process* of how and why a warrant was obtained — *e.g.,* what the police knew, what they told the judge, what they were searching for, what they seized, etc. — may be great regardless, as this case proves. *See In re Application and Affidavit for a Search Warrant*, 923 F.2d at 331 ("The public has legitimate concerns about methods and techniques of police investigation: for example, whether they are outmoded or effective, and whether they are unnecessarily brutal or instead cognizant of suspects' rights."). Moreover, the historical justifications for open hearings and for the right to inspect court documents strongly suggest that the phrase "the particular process in question" should be broadly construed to encompass the post-investigation, post-indictment stage of the criminal process, not just a particular hearing in a particular case.

1  motion to suppress is filed? Or, what if the defendant pleads guilty before the motion is
2  heard and decided? Either of these common, everyday occurrences would mean the "logic"
3  factor could never be satisfied, and the important public benefits of openness would never
4  be realized.

5  Irrespective of whether disclosure is associated with a discrete criminal proceeding
6  such as a suppression hearing, post-investigation, post-indictment public access to search
7  warrants fulfills important societal objectives and benefits the criminal *process*. To reiterate
8  the point made by *Richmond Newspapers,* the benefits include: providing awareness that
9  society, through its law enforcement function, has responded appropriately to a matter of
10  great public concern; avoiding public suspicion of the criminal justice system; and
11  demonstrating the appearance of justice. All of these considerations are implicated in this
12  case, and underscore the logic of granting public access to the search warrant materials at
13  this point.

14  Accordingly, applying the test of *Press-Enterprise II,* the Court finds that there is a
15  qualified First Amendment right of access to the warrant materials in this case at this stage.

16  With a qualified First Amendment right of access established, the burden to justify
17  non-disclosure shifts to the Government and the Defendant. They must show that
18  non-disclosure "is strictly and inescapably necessary" in order to protect the Defendant's fair
19  trial guarantee or some other compelling interest. *Brooklier,* 685 F.2d at 1167 (quoting
20  *Gannett,* 443 U.S. at 441). This is a high bar, surmountable only by establishing a substantial
21  probability that: (1) disclosure will cause irreparable harm to the Defendant's fair trial rights
22  or some other compelling interest; (2) there is no alternative to continued secrecy that will
23  adequately protect the right or interest; and (3) non-disclosure will effectively protect against
24  the perceived harm. *Oregonian Publ'g. Co.*, 920 F.2d at 1466. *See also United States v.*
25  *Kaczynski*, 154 F.3d 930, 932 (9th Cir. 1998) (overcoming qualified right of access under the
26  First Amendment requires compelling showing beyond that necessary to overcome common
27  law right of access) (Reinhardt, J., concurring).
28  / / /

Factors 1 and 3 tend to merge in this case. As pointed out during the initial hearing on the motion to unseal, much of the information in the warrant materials has already been reported by the media and is known to the public. Among the details that have been widely reported are: the Defendant's home was searched; a computer and two hard drives were seized from the Defendant's room; an envelope containing the words "Giffords" and "I planned ahead" and "my assassination" was found in a safe in the Defendant's home, as was a letter addressed to the Defendant on Congresswoman Giffords's congressional stationery; and, agents interviewed the Defendant's parents after breaking down a door to gain entry into their house. *See, e.g.*, *FBI Agents Visit Jared Loughner's Family Home,* CBS NEWS.COM (January 10, 2011), http://www.cbsnews.com/stories/2011/01/10/national/main7232017.shtml; Rebecca Kelly, *Envelope found in shooter's house shows premeditation (Listen to 911 Call),* EXAMINER.COM (January 9, 2011, 7:17 PM), http://www.examiner.com/people-the-news-in-national/envelope-found-shooters-house-shows-premeditation-listen-to-911-call; Billy House, *Jared Loughner Formally Charged by Federal Prosecutors,* NATIONAL JOURNAL (January 11, 2011, 5:54 PM), http://nationaljournal.com/congress/jared-loughner-formally-charged-by-federal-prosecutors-20110109; David Nakamura, *Videos show details of Tucson shooting,* THE WASHINGTON POST (January 19, 2011 12:00 AM) http://www.washingtonpost.com/wp-dyn/content/article/2011/01/18/AR2011011801155.html.

The Defendant and the Government fear that disclosure of the warrant materials at this point will make it more difficult to empanel an impartial jury. They are also concerned that releasing the information will violate the privacy interests of people whose names are mentioned in the affidavits, and may damage their reputations. Although both concerns are legitimate and the Court has carefully weighed them, neither creates a substantial probability that irreparable harm will result from the release of the warrant materials.

First, neither party has made a convincing case that preventing the possible republication of information that has already become a matter of public knowledge is "strictly and inescapably necessary" to protect a compelling interest. *See Virginia Dep't of State*

*Police v. Washington Post*, 386 F.3d 567, 579 (4th Cir. 2004) (interest in protecting integrity of ongoing murder investigation was insufficiently compelling to overcome qualified First Amendment right of access when bulk of information under seal was already public knowledge); *In re Charlotte Observer*, 921 F.2d 47, 50 (4th Cir. 1990) (vacating injunction prohibiting disclosure because "[o]nce announced to the world, the information lost its secret characteristic"). Second, privacy and reputational concerns typically don't provide sufficient reason to overcome a qualified First Amendment right of access. *In re Application of New York Times Co.*, 585 F.Supp. 2d at 93 n.14 (citing *In re McClatchy Newspapers, Inc.*, 288 F.3d 369, 374 (9th Cir. 2002) ("injury to official reputation is an insufficient reason for repressing speech that would otherwise be free") (citation and internal quotations omitted)). That is particularly true here, where the only third parties mentioned in the warrant materials are law enforcement agents and citizen witnesses who are not, and have never been, suspects in the case.[3] With the bulk of the information already in the public domain, and no legitimate risk to privacy or reputation at stake, unsealing the warrants now is unlikely to cause irreparable harm to anyone.

The Court has also considered whether there are alternatives that will adequately protect the rights and interests of the parties, and has determined there are several. To begin with, the trial of this case is not expected to begin for months. Experience teaches that the passage of time tends to dim memories and dampen community reaction to a shocking event. That will likely occur here. Next, with the assistance of counsel, the Court intends to develop a comprehensive jury questionnaire, which will help identify the extent of exposure prospective jurors may have had to news coverage about this case and assist counsel in ferreting out people with fixed opinions. Also, although not usual in federal court, the Court will permit counsel to personally and extensively voir dire prospective jurors. This, too, will

---

[3] The situation here is very different from one in which the warrant affidavit implicates an uncharged third party in crime or other wrongdoing, thereby potentially damaging his reputation and violating his privacy. *Compare Times Mirror*, 873 F.2d at 1216-17 (persons named in warrant papers have no forum to exonerate themselves if warrant materials are made public before indictment or no charges are filed). In this case, neither the citizen witnesses nor the officers are likely to suffer reputational harm if their names become known.

help ensure that an impartial jury is selected, and help protect the parties' right to a fair trial. The Court will also consider granting additional peremptory challenges to each side, if voir dire establishes that is necessary.

As a final precaution, in addition to the intended measures outlined above, the Court has redacted a minimum of information from the property inventory and one of the affidavits. The Tucson shootings have generated a media frenzy — an almost unceasing stream of news coverage about the circumstances, the victims, the accused, and the reactions of public officials to the tragedy. Widespread interest in this event, as well public reaction to it, is understandable. Ultimately, however, the criminal accusations against the Defendant must be judged not on news accounts or according to general public sentiment, but on competent, tested evidence in a courtroom. It is this Court's responsibility to ensure that. Accordingly, guided by the First Amendment standards outlined above, the Court has determined that there is a compelling need to maintain under seal limited portions of the property inventory and one of the affidavits that are likely to be inflammatory and difficult to forget, or inadmissible at trial. The redacted information will be unsealed as soon as it becomes appropriate.

## CONCLUSION AND ORDER

The media outlets have a qualified First Amendment right to inspect the search warrant materials in this case, and that right is not outweighed by privacy or fair trial concerns. The motion to unseal the search warrants is **GRANTED**. The Clerk of the Court shall immediately make available for inspection and copying by the media Interveners and the general public the redacted version of the search warrant materials that has been approved by the Court.

**IT IS SO ORDERED.**

DATED this 9th day of March, 2011.

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge