DENNIS K. BURKE
United States Attorney
District of Arizona

WALLACE H. KLEINDIENST
BEVERLY K. ANDERSON
CHRISTINA M. CABANILLAS
MARY SUE FELDMEIER
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
(520) 620-7300
Wallace.Kleindienst@usdoj.gov
Bev.Anderson@usdoj.gov
Christina.Cabanillas@usdoj.gov
Mary.Sue.Feldmeier@usdoj.gov

DOMINIC LANZA
Assistant U.S. Attorney
California State Bar No. 225989
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004
(602) 514-7500
Dominic.Lanza@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| United States of America, | CR 11-0187-TUC-LAB |
|---|---|
| Plaintiff, | **UNITED STATES' MOTION FOR A PROTECTIVE ORDER** |
| v. | |
| Jared Lee Loughner, | |
| Defendant. | |

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The United States, through undersigned counsel, respectfully moves this Court for a protective order prohibiting the Pima County Sheriff's Office ("PCSO") from releasing its investigative files concerning defendant Loughner—which have not been filed in this proceeding and are not part of any court record—to The Washington Post ("The Post") or any other media or private requestor until the trial in this matter is complete.

This is the third time in less than two months in which judicial intervention has been sought to resolve demands by media organizations for documents filed in, or concerning, this

case. Initially, in January 2011, two Arizona media organizations sought access to search warrants issued by a judge of the Pima County Superior Court, along with the related applications, affidavits, and inventories. This Court accepted the removal of the dispute to federal court (R. 85), denied relief while the grand jury was pursuing superseding charges (R. 111), and, following the return of superseding charges, released a redacted version of the warrant package for public and press consumption, pursuant to a federal right of access to judicial materials. (R. 150). Next, in late February 2011, based on a concern that the Pima County Medical Examiner would release certain autopsy reports, the United States sought an order restraining the release of the reports. (R. 115). This Court, while noting that the right of access to autopsy reports is not absolute, denied relief on the ground the request was premature. (R. 123, 139.) The Medical Examiner released the records several days later.

Now, The Post has made a seemingly-limitless public records request to the PCSO, demanding that the PCSO turn over "all records" and "anything else pertaining to the investigation of Jared Loughner and the events that led up to the shooting." *See* Exhibit 1. The Sheriff, through counsel, has informed the United States that although he believes the best interests of the State outweigh any disclosure obligations under Arizona's public-records law, he will nonetheless begin preparations to comply with the request unless the United States seeks a protective order from this Court by close of business on Wednesday, March 16, 2011. *See* Exhibit 2.

As explained below, the Court should issue a protective order barring the PCSO from complying with The Post's records demand. A protective order is warranted because pretrial disclosure of the PCSO's investigative file would create a "substantial likelihood" of "material prejudice" to this proceeding and trial rights of the parties; would undermine the privacy interests of witnesses and victims; and would contravene the Court's affirmative duty to avoid prejudicial or inflammatory publicity. Although the Post may argue it is entitled to the PCSO's records under Arizona law, that claim is incorrect and irrelevant to boot: this Court's power to control the ongoing criminal proceedings trumps any state-law disclosure rights.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. <u>The PCSO And FBI Jointly Investigate The Crime And Compile Duplicative Investigative Files.</u>

The Superseding Indictment alleges that, on January 8, 2011, defendant Loughner killed and attempted to kill participants at a "Congress on your Corner" event in Tucson, Arizona. (R. 129.) Special Agents from the Federal Bureau of Investigation ("FBI") arrived at the scene after the shooting, as did other law enforcement officers, including deputies from the PCSO. Law enforcement personnel from both agencies began to process the crime scene and to investigate. In addition, a detective with the PCSO and an FBI agent were co-affiants on a search warrant presented to a judge of the Pima County Superior Court. (R. 73.)

Federal and county law enforcement officials continued to investigate the case jointly, and each agency authored reports and interview summaries which were shared with the other agency. Notwithstanding the joint nature of the investigation, the United States charged defendant Loughner via criminal complaint on January 9, 2011. The complaint (R. 2) charged one count of 18 U.S.C. § 351 for the attempted assassination of Gabrielle D. Giffords, a Member of Congress, in addition to four other counts as to other victims.

B. <u>Pima County Agrees To Postpone Any State Prosecution Of Loughner Pending The Resolution Of The Federal Charges.</u>

Since his first court appearance via video teleconference on January 9, 2011, Loughner has been held exclusively in federal custody, and the federal charges remain the only charges against Loughner for his actions on January 8, 2011. The Pima County Attorney's Office has agreed to defer any charges of its own during the pendency of the federal criminal case.

On January 21, 2011, U.S. Attorney Dennis Burke wrote a letter to Pima County Sheriff Clarence Dupnik expressing his appreciation of the PCSO's efforts in the Loughner investigation. *See* Exhibit 3. In that letter, U.S. Attorney Burke also requested that the Sheriff take into account the distinctions between state and federal law in responding to any press inquiries, in consultation with the Pima County Attorney and the U.S. Attorney. *Id.*

C.  The Post Requests That The PCSO Turn Over "All" Records In Its Investigative File Pursuant To Arizona's Public Records Law.

On March 4, 2011, The Post wrote a letter to the PCSO demanding that the PCSO produce "all records from the Jan. 8, 2011 shooting incident," including "all statements, reports, after-action reports and anything else pertaining to the investigation of Jared Loughner and the events that led up to the shooting." *See* Exhibit 1 at 1.[1] The letter asserted that The Post was entitled to these documents under A.R.S. § 39-121.01, the Arizona public-records law.

In response to this letter, the PCSO has now identified the following inventory of records and other matters that may be responsive to The Post's broad and general request: 250 audio recordings of witness interviews; 1,630 pages of transcriptions of these interviews; 403 pages of PCSO reports; 100-200 crime scene photographs; 241 pages of evidence control forms; 63 pages of computer-assisted dispatch ("CAD") reports; 7 pages of property release forms; 13 pages of notes; and 5 pages of tow truck requests. (Each category of records is addressed in additional detail in Part A.2 *infra*.) Sheriff Dupnik has further acknowledged that (1) the above records "were created and are maintained [by his office] in the course of a joint investigation with federal law enforcement authorities" and (2) he and his office "voluntarily participated in the joint investigation with knowledge that it would result in a federal criminal prosecution." *See* Exhibit 2 at 1-2. Moreover, Sheriff Dupnik agrees that "preserving the confidentiality of the records in the inventory is in the best interests of the State and outweighs the policy in favor of disclosure." *Id.* at 2.

**AUTHORITY AND JURISDICTION**

As a threshold matter, the Court possesses authority to issue the requested protective order. First, such authority arises from Rule 57.2 of the District of Arizona's Local Rules of Criminal Procedure. That rule not only bars lawyers in all criminal cases from releasing "information or opinion" that might "interfere with a fair trial or otherwise prejudice the due

---

[1] The Post and the PCSO exchanged a previous round of correspondence on this issue in late January 2011.

administration of justice," *see* L.R. Crim. 57.2,[2] but specifically authorizes district courts, in "widely publicized or sensational criminal case[s]" such as this case, to "issue a special order governing such matters as extrajudicial statements by parties and witnesses likely to interfere with the rights of the accused to a fair trial by an impartial jury . . . and any other matters which the Court may deem appropriate for inclusion in such order." *See* L.R. Crim. 57.2(f).

The Court also possesses authority to issue the requested order under Federal Rule of Criminal Procedure 16(d). That rule, which is entitled "Protective and Modifying Orders," vests courts with the authority, "[a]t any time" and upon a showing of "good cause," to "deny, restrict, or defer discovery or inspection, or grant other appropriate relief." As discussed below, Rule 16(d) goes further than Local Rule 57.2(f) in some respects and authorizes the issuance of protective orders not only to protect the trial rights of the parties, but also to protect the privacy interests of non-party victims and witnesses. *United States v. Patkar*, 2008 WL 233062 (D. Hawaii Jan. 28, 2008); *United States v. Carriles*, 654 F. Supp. 2d 557 (W.D. Tex. 2009).

Finally, the Court also possesses inherent authority to issue the requested order. District courts possess "broad inherent powers" enabling them "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *United States v. Kent*, __ F.3d __, 2011 WL 383977, *3 (9th Cir. Feb. 8, 2011) (citations omitted). These powers include the authority "'to adopt reasonable measures to avoid injury to the parties by reason of prejudicial or inflammatory publicity,'" which measures may include "plac[ing] restrictions on parties, jurors, lawyers, and others involved with the proceeding." *United States v. Gurney*, 558 F.2d 1202, 1209-10 (11th Cir. 1977) (citations omitted). *Cf. United States v. Schnitzer*, 567 F.2d 536, 538 (2d Cir. 1977) ("A court, sitting in criminal prosecution, has ancillary jurisdiction to issue protective orders regarding dissemination of arrest records.").

---

[2] As noted, Local Rule 57.2 forbids an attorney from releasing material when there is a "reasonable likelihood" that such dissemination would interfere with a fair trial or otherwise prejudice the due administration of justice. In *United States v. Sutton*, 2007 WL 2572348 (D. Ariz. 2007), Judge Jorgenson modified that standard to comport with Supreme Court opinions respecting the rights of free speech. Judge Jorgenson's opinion prohibits attorney disclosures only in the case of a "substantial likelihood" of "material prejudice" to the proceeding. *Id.* at *2.

5

Before turning to the merits, it also should be noted that the United States' request for relief is ripe for adjudication. Earlier this month, the Court denied without prejudice the United States' motion to restrain the Medical Examiner from releasing certain documents (R. 115), holding the motion was "premature" because the Court lacked any "indication that the release of the autopsy reports is imminent or inevitable." (R. 123.) Instead, the Court stated the United States should wait until the Medical Examiner was sued by the requesting party in Arizona court, at which point the United States could intervene and seek removal under 18 U.S.C. § 351(f). *Id.* Here, in contrast, disclosure *is* imminent. The PCSO has stated that, absent intervention by this Court, it will comply with The Post's demand, even though it believes The Post is not entitled to the documents under Arizona law, because it does not wish to risk being sued in state court. *See* Exhibit 2 at 3-4 ("[W]e are prepared to give you a very short period of time to seek an order, but we cannot wait indefinitely. Unless we receive notice that such an order has been sought by 5:00 pm, Wednesday, March 16, 2011, I will advise Sheriff Dupnik to begin preparations to comply with the request from The Washington Post."). Thus, the United States cannot wait for the PCSO to be sued in state court and then seek removal under section 351(f).

**ARGUMENT**

A. <u>The Court Should Issue A Protective Order Barring The PCSO From Disclosing Its Investigative File</u>.

   1. **A Protective Order Is Warranted Because Disclosure Of The PCSO's Investigative File Would Impair The Parties' Trial Rights And The Privacy Rights Of Victims And Witnesses.**

As noted, the Court possesses authority under Local Rule 57.2(f) and Rule 16(d), as well as the inherent authority, to issue a protective order barring the PCSO from disclosing its investigative file to The Post. Relief is warranted on all three bases.

At the outset, it should be emphasized that The Post is not seeking access to judicial records or documents that are otherwise located in the court's files (such as the search warrant materials that were previously unsealed by the Court). Rather, The Post is demanding the

production of an array of documents—including witness statements, investigative reports, audio recordings, and photographs—that are part of the PCSO's (and FBI's) investigative file. Although it may be true that "the press and the public have a presumed right of access to court proceedings and documents," *Oregonian Publ'g Co. v. U.S. Dist. Court*, 920 F.2d 1462, 1465 (9th Cir. 1990), no such presumptive right of access applies to the non-judicial materials at issue here. To the contrary, these materials are most accurately characterized as potential discovery that may be disclosed to the defense—and "[d]iscovery is neither a public process nor typically a matter of public record. Historically, discovery materials were not available to the public or press . . . [and] documents collected during discovery are not 'judicial records.' Discovery, whether civil or criminal, is essentially a private process . . . ." *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986). *See generally Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984) ("[R]estraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information.").

*United States v. McVeigh*, 931 F. Supp. 756 (D. Colo. 1996), powerfully supports the issuance of a protective order under these circumstances. *McVeigh,* of course, was the prosecution stemming from the Oklahoma City bombing, a "shocking event [that generated] intense public interest and widespread news coverage." *Id.* at 758. Before trial, news stories began to include references to interview reports and other discovery materials that were not part of the judicial record. *Id.* at 757-59. Fearing "prejudicial pretrial publicity," the district court issued a protective order that significantly restricted the parties' ability to make extrajudicial statements or release investigative materials. *Id.* at 759-60. As relevant here, the order included a clause barring the "releasing [of] any *documents that are not part of the public record* and that are reasonably expected to be publicly disseminated which would be likely to materially prejudice the fairness of this criminal proceeding" by "*all persons who have been or are now participants in or associated with the investigation[] conducted by the prosecution.*" *Id.* at 760 (emphases added).

1    The same considerations apply here.  The Post is seeking access to investigative
2 materials, including witness statements and specific attributions to particular witnesses, that
3 have not previously been released to the public and that appear in the files of a state agency that
4 participated in the federal investigation.  The pretrial dissemination of these materials would
5 raise a very particular and specific concern—that is, that witnesses, who observed the events
6 of January 8 from different perspectives, would read press accounts and conform their
7 memories to those of other witnesses.  This would create both uncertainty as to witness
8 testimony and the potential for impeachment against those witnesses.

9    This concern is not merely hypothetical.  As this Court has observed, "[t]he Tucson
10 shootings have generated a media frenzy—an almost unceasing stream of news coverage about
11 the circumstances, the victims, the accused, and the reactions of public officials to the tragedy."
12 (R. 150 at 13.)  Rampant speculation as to witnesses, witness statements, and other observations
13 does not serve the interests of justice and poses a substantial risk of material prejudice to the
14 trial rights of the parties.  *See* L.R. Crim. 57(f).

15    In addition to prejudicing the parties, the wholesale dissemination of the PCSO's
16 investigative file also would undermine the privacy rights of the victims and witnesses whose
17 statements would be subject to disclosure.  Public disclosure of witnesses' identities and
18 transcripts of their interviews will subject witnesses to interview requests by multiple news
19 organizations, pressure from members of the community to recount events they witnessed, and
20 possibly even intimidation from third parties to convince the witnesses to shape or change their
21 testimony in the upcoming proceedings because of the third parties' interests in the proceedings.

22    Courts have not hesitated to deny media requests for witness-related materials under
23 these circumstances.  In *Application of Am. Broadcasting Cos., Inc.*, 537 F. Supp. 1168 (D.D.C.
24 1982), several media organizations sought to obtain a copy of a videotape containing the
25 deposition testimony of Jodie Foster.  *Id.* at 1170-72.  The videotape, which had been created
26 for use in the trial of John Hinckley for the attempted assassination of President Reagan, was
27 being stored, under seal, by the court.  *Id.*  Even though the videotape qualified as a "judicial

28

record[]"—unlike the materials here—the district court declined to make the tape available because Foster "was not a defendant but a witness who was unwittingly ensnared in a third party's alleged attempt to assassinate" a public figure. *Id.* at 1172. Disclosure, the court held, would impermissibly undermine Foster's "right to privacy and with her personal safety." *Id.*

Since the Hinckley trial, the rights of a victim "to be treated with fairness and with respect for the victim's dignity and privacy" have been formally codified in the Crime Victims' Rights Act ("CVRA"). *See* 18 U.S.C. § 3771(a)(8). Courts have specifically identified this statute as providing "good cause" for the issuance of a protective order under Rule 16(d).

For example, in *United States v. Patkar*, 2008 WL 233062 (D. Hawaii Jan. 28, 2008), the government obtained a Rule 16(d) protective order that precluded the defendant in an extortion case from disseminating certain discovery materials pertaining to the victim, on the ground that disclosure of those materials would injure the victim's reputation. *Id.* at *1-2. The defendant eventually pleaded guilty to the charges and the discovery materials were never made part of the court record. *Id.* at *4. ("[The] documents have not been filed with the court or otherwise incorporated into the court's proceeding, and are therefore not judicial records."). The Associated Press nevertheless moved to intervene so it could challenge the protective order. *Id.* at *2. The district court upheld the protective order on the merits, holding that the victim's statutory rights under the CVRA "'to be treated with fairness and with respect for [his] dignity and privacy' . . . fully supports a finding of good cause." *Id.* at *5. In reaching this result, the district court quoted extensively from the floor debates on the CVRA, including the statements of its main sponsor, Senator Kyl of Arizona:

> The broad rights articulated in this section are meant to be rights themselves and are not intended to just be aspirational. One of these rights is the right to be treated with fairness. Of course, fairness includes the notion of due process. . . . This provision is intended to direct government agencies and employees, whether they are in executive or judicial branches, to treat victims of crime with the respect they deserve and to afford them due process.

*Id.* at * 5 (citation omitted).

Similarly, *United States v. Carriles*, 654 F. Supp. 2d 557 (W.D. Tex. 2009), involved a prosecution that "has received and continues to receive widespread media attention." *Id.* at 562. As a result, the government moved for a Rule 16(d) protective order barring the dissemination of certain "sensitive discovery materials to the media under any circumstances." *Id.* Several media organizations intervened to oppose this motion, *id.* at 562-63, and the district court conducted an *in camera* examination of the materials in question. *Id.* at 563. Afterward, the court granted the motion in relevant part, holding the government has met its burden of demonstrating "good cause" because the materials (an interview report and medical records) implicated the economic and privacy interests of non-parties. *Id.* at 567-68. The court emphasized: "The [good cause] showing need not be limited to the Government's own interests: '[a] protective order may be issued upon a showing . . . by a party advocating the privacy interests of nonparties.'" *Id.* at 566 (citation omitted). Finally, the court also rejected the media organizations' First Amendment challenge, explaining that "if the party seeking a protective order shows good cause, the Court has the discretion to restrict the dissemination of discovery materials and any such restriction does not implicate the litigants' or the Press's First Amendment rights." *Id.* at 573.

In sum, a protective order is warranted here because the disclosure of the PCSO's investigative file to The Post, before trial, would create a "substantial likelihood" of "material prejudice" to this proceeding and trial rights of the parties, *see* L.R. Crim. 57(f)(2); would undermine the privacy interests of witnesses and victims, the avoidance of which constitutes additional "good cause" under Rule 16(d); and would contravene the Court's affirmative duty, under its inherent powers, "'to adopt reasonable measures to avoid injury to the parties by reason of prejudicial or inflammatory publicity.'" *Gurney*, 558 F.2d at 1209-10.

2. **The United States Is Working, In Good Faith, To Narrow The Universe Of Covered Materials And Will Submit Those Materials To The Court For *In Camera* Review.**

Finally, the United States is aware that the requested order would cover a broad range of materials. Although the privacy, fair-trial right, and publicity concerns discussed above

undoubtedly apply to a great number of the materials at issue, the United States acknowledges that some of the materials in the PCSO's investigative file will not trigger these concerns. Unfortunately, due to the short time frame for preparing this motion—as noted, the PSCO stated it would begin complying with The Post's records request unless this motion was filed by 5:00 p.m. on March 16—it was not possible to review all of the responsive materials before filing.

The United States intends to diligently review the contents of the PCSO's file in the coming weeks to determine which materials may be excluded from coverage under the protective order and disclosed to The Post. For example, the United States anticipates that the CAD reports, property release forms, and tow trucks forms likely do not raise privacy and fair-trial concerns. If this suspicion is confirmed after further review, the United States would be willing to disclose those materials (after redaction to exclude personal information such as social security numbers) to The Post without the need for judicial intervention.

Conversely, the core law enforcement materials contained in the PCSO's file—approximately 250 audio recordings of victim and witness interviews; 1,630 pages of written transcripts of those interviews; 403 pages of investigative reports that make reference to those interviews; and 100-200 photographs that may depict victims—are much more likely to be sensitive. Although the United States will diligently review those records to determine whether any individual recordings and reports may be disclosed to The Post, it is likely that the United States will seek coverage under the protective order for the great majority of those materials. Thus, once the government's review is complete, the United States would propose submitting the materials at issue to the Court for *in camera* review. (Such submission can occur by April 6, the same date on which the United States has proposed its reply brief should be due.) This approach will narrow the issues in dispute and provide the Court with a concrete basis for evaluating the need for a protective order. *Carriles*, 654 F. Supp. at 565 ("Of course, '[i]n a case with thousands of documents,' a document-by-document approach to protective orders 'might impose an excessive burden on the district judge . . . .' Nevertheless, blanket protective orders are disfavored.") (citation omitted).

B.   <u>The Post's Reliance On Arizona's Public Records Law Is Misplaced And Does Not Provide A Basis For Overcoming The Protective Order.</u>

As noted, this dispute arises from The Post's assertion that it is entitled to the contents of the PCSO's investigative file under Arizona public records law. The Court should reject this assertion for three independent reasons. *First*, it is irrelevant that the Post believes it is entitled to the PCSO's file under Arizona law. This Court has the duty and authority, under federal law, to issue protective orders to manage its docket and maintain the integrity of this proceeding. This authority trumps any competing claim for disclosure under state law. This is especially true because this case involves a prosecution under 18 U.S.C. § 351, a unique statute that vests the Court with exclusive jurisdiction over all related matters. *Second*, The Post's claim also fails because, to the extent any public-records law is applicable here, it is the federal Freedom of Information Act ("FOIA"). The materials at issue were generated during a federal criminal investigation concerning the attempted murder of a member of Congress and identical copies of these materials are being maintained by the FBI. It would contravene the intent and spirit of section 351(f) to permit application of state law under these circumstances. Under the FOIA, The Post's claim fails both procedurally and on the merits. *Third*, even under Arizona's public records law, The Post's claim fails because—as the PCSO itself has stated—the State's interest in maintaining confidentiality outweighs the usual Arizona policy in favor of disclosure.

1.   **The Federal Need For A Protective Order Trumps Any State-Law Disclosure Claim**.

Although The Post contends it has a valid claim of access to the PCSO's investigative file under Arizona law, the issuance of a protective order is necessary here to effectuate several important federal interests. *See* Part A.1 *supra*. To the extent those considerations may conflict, federal law prevails.

The Second Circuit's decision in *City of Hartford v. Chase*, 942 F.2d 130 (2d Cir. 1991), illustrates this principle. There, a federal court issued a confidentiality order that barred the City of Hartford from disclosing certain documents. *Id.* at 132. Soon afterward, a newspaper intervened in the federal case to challenge the confidentiality order and also instituted a separate

12

proceeding in state court seeking access to the documents under Connecticut's public records law. *Id.* at 132-33. The Second Circuit rejected the newspaper's claims, holding that "a federal court's power to seal documents takes precedence over FOIA rules that would otherwise allow those documents to be disclosed" and that "the Confidentiality Order provides a valid defense to disclosure of the documents in the state FOIC proceeding." *Id.* at 135, 137. *See also GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*, 445 U.S. 375, 376-77 (1980) (information may not "be obtained under the [federal] Freedom of Information Act . . . when the agency holding the material has been enjoined from disclosing it by a federal district court").[3]

Finally, the case for elevating federal concerns is particularly strong here because this case involves a prosecution under 18 U.S.C. § 351. Section 351 is a unique statute that, as discussed in additional detail below, provides for exclusive federal jurisdiction over related proceedings. *See* 18 U.S.C. § 351(f) ("If Federal investigative or prosecutive jurisdiction is asserted for a violation of this section, such assertion shall suspend the exercise of jurisdiction by a State or local authority, under any applicable State or local law, until Federal action is terminated."). It would be inconsistent with this statute to undermine the integrity of the federal prosecution concerning the attempted murder of a member of Congress out of deference to a state-law disclosure claim.

---

[3] *See also* Janice Toran, *Secrecy Orders & Government Litigants: "A Northwest Passage Around The Freedom Of Information Act?"* 27 GA. L. REV. 121, 171 (1992) ("Where the [protective] order was issued during discovery in the federal case, it would appear that state public records disclosure may thwart the progress of the ongoing federal case by revealing information that must be kept confidential in order for the case to go forward. If this is true, the state court must refrain from enforcing its disclosure order so as not to interfere with or limit the exercise of federal jurisdiction."). The United States acknowledges that, in *Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir. 1994), the Third Circuit suggested that district courts should apply a "strong presumption" against protective orders that apply to documents otherwise subject to disclosure under state freedom-of-information laws. *Id.* at 791. However, the Ninth Circuit has never adopted this rule, and the Toran article suggests a different balance is appropriate when, as here, the protective order applies to an ongoing federal case.

### 2. Under The Unique Circumstances Of This Case, The FOIA Would Govern Any Public-Records Demand.

Under the unique facts of this case, the United States respectfully submits that, to the extent the materials at issue may be subject to disclosure under any public-records law, the federal FOIA (not Arizona law) provides the applicable source of authority.

Although The Post has requested material directly from the PCSO, the PCSO obtained this material while acting as an agent of the FBI in a joint investigation concerning a crime of exclusive federal concern. *United States v. Cerna*, 633 F.Supp. 2d 1053, 1059 (N.D. Cal. 2009) ("When federal and state agencies cooperate extensively on a joint investigative task force, the state agencies may be deemed to be 'agents' of the federal government such that their knowledge of exculpatory information should be imputed to federal prosecutors."). Indeed, the FBI has copies of the material contained in the PCSO inventory, and The Post could not obtain those records directly from the federal government without adhering to the procedures of the FOIA. *Church of Scientology of Calif. v. U.S. Dep't of Justice*, 612 F.2d 417, 420, (9th Cir. 1979) ("[S]tate and local law enforcement agencies . . . would refuse to cooperate with federal agencies if they could not be assured of confidentiality in instances where they thought it was necessary."); *Kidder v. FBI*, 517 F. Supp. 2d 17, 29 (D.D.C. 2007) ("[I]nherent in this cooperative effort is the mutual understanding that information provided to the FBI by those agencies will not be prematurely released."). The Post should not be able to thwart the purposes of the FOIA simply by demanding the same materials from a different custodian.

Although agency for one purpose does not necessarily equate to agency for all purposes, this case, and the lead statute on which it is premised, further militates in favor of finding that the PCSO shares an agency relationship with the FBI for the purpose of any public-records request. As noted, Loughner is charged with the attempted assassination of a member of Congress under 18 U.S.C. § 351. This statute contains a specific investigation and prosecution protocol. In particular, subsection (g) declares the to be the lead investigatory agency (which

strengthens the conclusion that the PCSO has acted as the FBI's agent), and subsection (f) provides for exclusive federal jurisdiction over related proceedings.

The Court should interpret section 351(f) to require the application of federal law to any public-records request for documents arising from an investigation into the attempted murder of a member of Congress. (The Court previously found that section 351(f) compels the *removal*, to federal court, of a state-court proceeding seeking access to judicial documents, but did not have occasion to decide whether the statute also compels the application of substantive federal law.) Although the text of section 351(f) is admittedly cryptic on this issue, the statute's legislative history strongly supports the view that Congress would have intended this result.

Section 351 is based on an analogous statute providing enhanced penalties and the same investigative protocol for the assassination or attempted assassination of the President or Vice-President. 18 U.S.C. § 1751. Section 1751 was enacted as part of Public Law 89-141 in 1965, as a result of the assassination of President John F. Kennedy, and section 351 was adopted as part of Public Law 91-644 in 1971 as a result of the assassination of Senator Robert F. Kennedy. (S. Rep. No. 498, 1965 U.S.C.C.A.N. 2866, 2867; Cong. Rec. S17518 (daily ed. October 8, 1970) (statement of Sen. Byrd). The original law was designed:

> to insure clear Federal jurisdiction in the investigation and prosecution of Presidential assailants by providing for unimpeded Federal jurisdiction to the extent necessary. However, *suspension does not imply that the States cannot cooperate with the Federal authorities during the course of any investigation pursuant to this legislation*. . . . Clear Federal jurisdiction in this area would minimize the conflict and confusion growing out of concurrent jurisdiction of Federal and State agencies. Enactment of this bill would mean that investigation of the acts covered and of any possibility of a future attempt would be conducted by Federal law enforcement officials. . . . *A further value of such legislation would be that suspects would be protected by Federal practices and procedures in their trial and prosecution.*

S. Rep. No. 498, 1965 U.S.C.C.A.N. at 2867-68 (emphases added). The followup bill to protect members of Congress continued the assertion of federal jurisdiction to protect the process, by noting the importance "that the law protecting Members of Congress be uniform throughout the Nation." Cong. Rec. S17518 (daily ed. October 8, 1970). It would obviously undermine Congress's stated intent to apply "uniform" "Federal practices and procedures" in

all prosecutions under these statutes to force district courts to apply a patchwork of state public-records laws whenever state agencies happen to cooperate in the investigation.

If The Post's disclosure demand is governed by the FOIA, the demand necessarily fails. Not only has The Post failed to provide any federal agency with an opportunity to consider its records request—which is a procedural prerequisite under the FOIA, *see U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989)—but disclosure is not warranted under the FOIA on the merits. For example, section 552(b)(7)(A) exempts the production of records that could reasonably be expected to "interfere with enforcement proceedings." *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 235-36 (1978). In the instant case, the pending trial is the proceeding, and, as set forth in Part A.1 above, disclosure would jeopardize the government's interest in ensuring that percipient witnesses testify as to their own observations, as opposed to observations modified by media reports as to other witnesses.

Section 552(b)(7)(B) exempts more specifically the production of records that would "deprive a person of a right to a fair trial or an impartial adjudication." *Wash. Post Co. v. Dep't of Justice*, 863 F.2d 96, 102 (D.C. Cir. 1988). In *Washington Post*, the press sought an internal report of a drug company that had been obtained by the Department prior to the initiation of a grand jury investigation. Because it was not clear whether litigation was truly imminent, the court remanded the issue. Here, of course, proceedings are actually pending, and the harm to the fair trial rights of the parties encompasses both the general possibility of harm due to the speculation inherent in a "media frenzy" as well as the witness issues identified elsewhere.

Finally, section 552(b)(7)(C) exempts the production of records that could reasonably be expected to constitute an "unwarranted invasion of personal privacy." *Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 771 (1989). In *Reporters Committee*, the Court found that the production of rap sheets of non-parties categorically constitutes an unwarranted invasion of privacy. *Id.* at 780. In the instant case, the substantive protections of the Crime Victims' Rights Act, as discussed in Part A.1 above, similarly make the production of victim statements and reports memorializing those statements unwarranted.

**C.    Even under the Arizona public records law, reasonable grounds exist to prohibit disclosure.**

Arizona has enacted a broad public records law providing that "[p]ublic records and other matters in the custody of any officer shall be open to inspection by any person at all times during office hours." A.R.S. § 39-121. Although this law "creates a presumption of disclosure," "this presumption can be outweighed by other public interests. A public official can withhold inspection by showing that non-disclosure serves 'confidentiality, privacy or the best interests of the state . . . .' This 'best interests of the state' standard is not confined to the narrow interest of either the official who holds the records or the agency he or she serves. It includes the overall interests of the government and the people." *Phoenix Newspapers, Inc. v. Keegan*, 35 P.3d 105, 109-110 (Ariz. Ct. App. 2001) (citation omitted).

Here, as a threshold matter, it appears clear that the contents of the PCSO's investigative file would qualify as "public records" under Arizona law. "Although Arizona statutes do not define the term 'public record,'" the Arizona courts have adopted a functional definition of the term, holding that "[o]nly documents with a 'substantial nexus' to government activities qualify as public records, and the nature and purpose of a document determine whether it is a public record." *Lake v. City of Phoenix*, 218 P.3d 1004, 1006 (Ariz. 2009). *See also* A.R.S. § 41-1350 (defining the term "records" under Arizona law). Applying this standard, Arizona courts have concluded that police and interview reports qualify as public records subject to a presumption of disclosure. *Cox Arizona Publications, Inc. v. Collins*, 852 P.2d 1194, 1198 (Ariz. 1993) ("ongoing police investigations generally are not exempt from our public records law"); *Mitchell v. Superior Court*, 690 P.2d 51, 53 & n.3 (Ariz. 1984) (presentence reports constitute public records under Arizona law); *Carlson v. Pima County,* 687 P.2d 1242, 1246 (Ariz. 1984) ("the 'offense report' was a public record for purposes of § 39-121"); *Church of Scientology v. City of Phoenix Police Dept.*, 594 P.2d 1034, 1036 (Ariz. Ct. App. 1979) ("There is no specific Arizona statutory exemption from inspection for investigative materials.").

17

Nevertheless, this presumption is not absolute and may be overcome "based on concerns of privacy, confidentiality, or the best interests of the state." *Lake,* 218 P.3d at 1008. For the reasons stated throughout this brief, the Court should find that the presumption has been overcome here. This case is chock full of victim- and witness-privacy concerns, and the PCSO itself agrees that, due to "concerns regarding unnecessary pre-trial publicity" and "premature disclosure of evidence to be presented at trial," "[w]e agree that preserving the confidentiality of the records is in the best interests of the State and outweighs the policy in favor of disclosure." *See* Exhibit 2 at 2. Arizona courts have repeatedly "recognize[d] that an unlimited right of inspection might lead to substantial and irreparable private or public harm" and that an "officer or custodian may refuse inspection" "where the countervailing interests of confidentiality, privacy or the best interests of the state [are] appropriately invoked." *Carlson*, 687 P.2d at 1246. Those principles ring true here. *See also Church of Scientology*, 594 P.2d at 1036 (authorizing disclosure of 20-year-old investigative files but noting that result might be different if files contained "materials of a highly contemporary nature" or if "[d]isclosure would have resulted in . . . invasion of privacy").

At a minimum, the Court should conduct an *in camera* inspection of the documents—to determine the appropriate balance between disclosure, privacy, and the state's interests—before resolving The Post's demand for access under Arizona state law. *Mitchell*, 690 P.2d at 53 ("[W]here the court's discretion has been properly invoked, [we] have asked trial courts to make *in camera* inspections of the relevant documents and balance the rights of the parties . . . ."). *See also Cox*, 852 P.2d at 1199 (faulting county attorney for failing to request *in camera* inspection when opposing disclosure request).

18

**CONCLUSION**

For the foregoing reasons, the Court should issue a protective order barring the PCSO from disclosing the records at issue.

In an abundance of caution, the United States has not only served a copy of this motion on the defendant, but has also served (via Federal Express and electronic mail) both the PCSO and The Post. Although the United States does not concede that The Post would have a right to intervene in this matter to oppose this motion, that is presumably what The Post will attempt to do. Thus, in order to permit the defendant and other interested parties an opportunity to respond, the United States recommends to the Court the following briefing schedule:

1. An optional response by defendant, the PCSO, and/or The Post by Wednesday, March 30, 2011; and

2. A reply by the United States to any responses on or before Wednesday, April 6, 2011 (at which time the United States will also submit, for *in camera* review, the materials over which coverage is sought).

Respectfully submitted this 16th day of March, 2011.

DENNIS K. BURKE
United States Attorney
District of Arizona

*s/Wallace Kleindienst*

WALLACE H. KLEINDIENST
Assistant U.S. Attorney

*s/Dominic Lanza*

DOMINIC LANZA
Assistant U.S. Attorney

CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and service of an electronic copy to:

**Counsel for Defendant Loughner**

Judy C. Clarke
Mark Francis Fleming
Reuben Camper Cahn

I further certify that on this date, I served copies via electronic mail and Federal Express on the following parties:

**Counsel for Pima County Sheriff Clarence Dupnik**

Richard M. Rollman
Gabroy, Rollman & Bossé, P.C.
3507 N. Campbell Avenue, Suite 111
Tucson, Arizona 85719
RMROLLMA@gabroylaw.com

**Counsel for The Washington Post**

James A. McLaughlin
Associate Counsel
The Washington Post
1150 15th Street, NW
Washington, DC 20071
mclaughlinj@washpost.com