# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | | CASE NO. 11cr0187 TUC LAB |
| | Plaintiff, | **ORDER GRANTING PROTECTIVE ORDER** |
| vs. | | |
| Jared Lee Loughner, | | |
| | Defendant. | |

The Government has filed a motion for a protective order to prohibit Clarence Dupnik, the Pima County Sheriff, from releasing records relating to a joint federal-state criminal investigation of the January 8, 2011 mass shooting in Tucson.  The motion comes in response to a blanket request for the records made by The Washington Post. Really, though, the impetus for the Government's motion is that the Sheriff apparently refuses to deny the Post's request, even though his lawyers have advised that denial is authorized under Arizona's public records law.

This is not how the Court prefers to become involved in disputes over public access to information about this case. In fact, the Court was initially inclined to deny the Government's motion, and let the Sheriff, relying on the advice of his lawyers, refuse the Post's request.  Were the Post to then file a lawsuit under the Arizona public records law to force disclosure, it could be removed to this Court under 18 U.S.C. § 351(f).  Indeed, there

/ / /

/ / /

1   is already precedent in this case for the Court's assumption of jurisdiction under section

2   351(f) over disputes involving media requests for information. (See Doc. Nos. 67,77[1]).

3          But the hitch here is that the Sheriff is apparently unwilling to take a stand and be

4   sued, despite his lawyer's advice that it would be righteous to deny public access to the

5   investigatory materials under the circumstances of this case.  The Sheriff's inaction forces

6   the Court to act; dodging the Government's motion at this point would just invite a follow-up,

7   emergency motion asserting that irreparable harm will follow if the Sheriff gives the Post

8   what it wants. The Government says as much its motion, pointing out that  given the Sheriff's

9   unwillingness to litigate, "the United States cannot wait for the PCSO to be sued in state

10  court and then seek removal . . . ."  This imminent dilemma justifies not putting the

11  Government to trouble of renewing its motion within a few days.  The Court finds the motion

12  is ripe for a definitive ruling now.

13         The Post seeks "access to and copies of all records from the Jan. 8, 2011 shooting

14  incident that killed federal Judge John Roll and wounded Congresswoman Gabrielle

15  Giffords, among other casualties."  The records include "all statements, reports, after-action

16  reports and anything else pertaining to the investigation of Jared Loughner and the events

17  that led up to the shooting."  The Sheriff's inventory of responsive materials includes: 250

18  audio recordings of witness interviews; 1,630 pages of transcriptions of these interviews; 403

19  pages of PCSO reports; 100-200 crime scene photographs; 241 pages of evidence control

20  forms; 63 pages of computer-assisted dispatch reports; 7 pages of property release forms;

21  13 pages of notes; and 5 pages of tow truck requests.

22         These materials are not judicial records, which means there is no presumptive right

23  of public access to them.  *See Oregonian Publ'g Co. v. U.S. Dist. Court*, 920 F.2d 1462,

24  1465 (9th Cir. 1990).  *See also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984)

25  ("[R]estraints placed on discovered, but not yet admitted, information are not a restriction on

26

27  [1] To be fair, Phoenix Newspapers consented to the removal of its motion to unseal
    search warrant records only after the Pima County Attorney announced the federal
    government would prosecute Loughner first.  It still took the position that "18 U.S.C. § 351
28  says nothing about 'removal,' and does not preclude concurrent state jurisdiction over the
    January 8 shootings . . . ."  (Doc. No. 77, p. 2.)

1  a traditionally public source of information."); *United States v. Anderson*, 799 F.2d 1438,

2  1441 (11th Cir. 1986) ("Discovery, whether civil or criminal, is essentially a private process

3  because the litigants and the courts assume that the sole purpose of discovery is to assist

4  trial preparation.").  The Post likely knows this, because the sole basis for its request is

5  Arizona's public records law.

6  That law, A.R.S. § 39-121, requires that "[p]ublic records and other matters in the

7  custody of any officer shall be open to inspection by any person at all times during office

8  hours." More to the point, "records of ongoing police investigations are not generally exempt

9  from [the] public records law." *Cox Arizona Publications, Inc. v. Collins*, 852 P.2d 1194, 1198

10 (Ariz. 1993).  But the seemingly broad sweep of the public records law isn't the end of the

11 analysis.  Although the presumptive right of inspection of public records under Arizona law

12 is unqualified, "a common law limitation on disclosure exists." *Phoenix Newspapers, Inc. v.*

13 *Keegan,* 35 P.3d 105,109 (Ariz. Ct. App. 2001).  This means that information may be

14 withheld when non-disclosure serves confidentiality, privacy, or the best interests of the

15 state. *Id.* (citing *Carlson v. Pima County*, 687 P.2d 1242 (Ariz. 1984)).[2]

16 The prosecution of Mr. Loughner on federal criminal charges is well under way, and

17 this Court has an ongoing and indubitable obligation under the Sixth Amendment to ensure

18 that he receives a fair trial. This obligation surely gives the Court the authority to take

19 whatever precautionary measures are necessary to protect his fair trial rights.  In addition

20 to the constitutional authority for issuing a protective order, the District of Arizona has a Local

21 Criminal Rule, Rule 57.2, that authorizes the Court, "[i]n a widely publicized or sensational

22 criminal case," to "issue a special order governing such matters as extrajudicial statements

23 by parties and witnesses likely to interfere with the rights of the accused to a fair trial by an

24 impartial jury."  This is such a case.  Even to the extent that Arizona's  public  records law

25 / / /

26

27 [2] In a letter from the Sheriff's counsel to the United States Attorney in Tucson, the Sheriff's lawyer said, "We agree that preserving the confidentiality of the records is in the best interests of the State and outweighs the policy in favor of disclosure."  Curiously,

28 however, the Sheriff won't say that to the Post and is unwilling to defend that position in court.

1   might authorize disclosure of investigative materials in this case, Mr. Loughner's Sixth

2   Amendment fair trial rights, and the Local Rule, clearly trump the Arizona law.

3         The Court finds ample reason to grant the government's motion.  As it has already

4   observed, "[t]he Tucson shootings have generated a media frenzy — an almost unceasing

5   stream of news coverage about the circumstances, the victims, the accused, and the

6   reactions of public officials to the tragedy." (Doc. No. 150 at 13.)  This stream would quickly

7   turn to a flash flood were the Sheriff to release the records of the entire investigation to the

8   public.   The public vetting of crime scene photos, witness accounts, investigatory

9   conclusions, and other raw evidence would invite trial of this case in the press rather than

10   in court.  This prospect poses a substantial threat to the defendant's constitutional right to

11   be tried fairly by an impartial jury.  The Court therefore finds it has both legal authority, and

12   good cause, to issue the protective order that the Government seeks.  *See, e.g.*, *United*

13   *States v. McVeigh*, 931 F.Supp. 756, 760 (D.Colo. 1996) (entering order in Oklahoma City

14   bombing case "to prevent all persons who have been or are now participants in or associated

15   with the [criminal] investigation . . . from . . . releasing any documents that are not in the

16   public record and that are reasonably expected to be publicly disseminated which would be

17   likely to materially prejudice the fairness of the criminal proceeding").

18         The Post is likely aware that there is no federal analog to Arizona's public records law,

19   and that a sweeping request for undisclosed investigative reports and raw evidence is a non-

20   starter under federal law.  This explains its representation, in a letter to the Sheriff, that its

21   request "seeks records compiled by the Sheriff's Department in the course of its *own*

22   investigation of the shooting." Here, however, there was no such thing  as the Sheriff's "*own*

23   investigation."  From the outset, the investigation of the Tucson shootings was a joint effort

24   between federal and state authorities.  The joint nature of the investigation has been widely

25   reported, and is borne out by the earlier release of search warrants that were issued in this

26   case to federal and state law enforcement.  Thus, the records the Post seeks are just as

27   much within the domain and control of the federal government as they are the Pima County

28   Sheriff.

        11cr0187-TUC LAB

1    The Government's motion for a protective order is **GRANTED**.  The Pima County

2 Sheriff shall not publicly release any investigative reports, files or materials relating to the

3 investigation of this case at this time.

4    **IT IS SO ORDERED.**

5

6    DATED this 22nd day of March, 2011.

7

8    _____

**HONORABLE LARRY ALAN BURNS**

9    United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28