1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| United States of America, | CASE NO. 11cr0187 TUC LAB |
|---|---|
| Plaintiff, | **\*\*\*\*AMENDED\*\* ORDER RE: MODIFICATION OF PROTECTIVE ORDER** |
| vs. | |
| Jared Lee Loughner, | |
| Defendant. | |

Following a request by The Washington Post that the Pima County Sheriff release all records relating to the investigation of the January 8, 2011 shooting in Tucson, and the apparent refusal of the Sheriff to deny the request, the Court entered a protective order on March 23 that directed the Sheriff not to release "any investigative reports, files or materials relating to the investigation of this case." (Doc. No. 169.)  Now before the Court is a request by The Washington Post, joined by Phoenix Newspapers, Inc. and KPNX Broadcasting, to modify that protective order.  The news organizations take the position that the protective order is overbroad, and that under Arizona's own public records law the Sheriff's investigation materials should be open to inspection by press and public.  As a fallback position, the news organizations request redacted copies of the materials, holding back only such parts as privacy and confidentiality concerns warrant.

The news organizations' request presents two questions.  The first is whether they have the right, to begin with, to intervene in this case to seek the modification of the

//

1   protective order. Assuming they do, which the Government contests, the second question

2   is whether any modification of the existing protective order is warranted.

3   **I.    Right of Intervention**

4          This isn't the first time the press has attempted to intervene in this case. In particular,

5   PNI and KPNX aren't strangers to the Court. In January, they sought to intervene in the *state*

6   case against the defendant for the purpose of unsealing search warrant materials. That

7   motion to intervene was removed to this Court by the Government, and on February 9, 2011

8   the Court granted PNI and KPNX leave to intervene for the limited purpose of seeking access

9   to the search warrant materials.[1] (Doc. No. 85.) That matter was subsequently resolved on

10  the merits, first against the interveners without prejudice, and later in their favor. (Doc. Nos.

11  111, 150.) Still later, the Court allowed PNI to intervene to seek a proper accounting of

12  sealed entries in the case docket. (Doc. Nos. 132, 148.) In none of these earlier-adjudicated

13  disputes did the Government object to the press's motions to intervene.

14         This time, however, the Government does object. Its basic argument is that

15  intervention is only warranted when, as with the search warrant materials and the docket

16  entries, the press is seeking access to materials that are judicial records, and to which there

17  is a presumptive right of access. *See Nixon v. Warner Commc'ns*, 435 U.S. 589, 597 (1978)

18  ("[C]ourts of this country recognize a general right to inspect and copy public records and

19  documents, including judicial records and documents."); *United States v. Kaczynski*, 154

20  F.3d 930, 931 (9th Cir. 1998) ("We have long recognized the public's and the media's

21  common-law right to inspect and copy judicial records and documents."). In contrast to

22  search warrants and other filed or lodged pleadings, the Government argues that the records

23  of the PCSO's investigation are not judicial records. They have neither been filed nor lodged

24  with the Court for any purpose, and indeed, the Court has not even seen them.

25  //

26

27  _____

28         [1] Neither the Government nor the defendant objected to the intervention of PNI and KPNX on this occasion, although the Government did "reserve[ ] its position as to intervention by a nonparty in any matter removed to federal court." (Doc. No. 73 at 1 n. 1.)

1    There is some facial merit to the Government's position.  While the Federal Rules of

2  *Civil* Procedure explicitly allow for intervention, the Federal Rules of *Criminal* Procedure

3  contain no analogous provision.  *See* Fed. R. Civ. P. 24; *United States v. Aref*, 533 F.3d 72,

4  81 (2d Cir. 2008) ("The Federal Rules of Criminal Procedure make no reference to a motion

5  to intervene in a criminal case."); *United States v. Blagojevich*, 612 F.3d 558, 559 (7th Cir.

6  2010) (same).  Equally as telling, the Government argues, is that intervention is typically

7  sought to gain access court documents and records, and the right to intervene is often yoked

8  to the public's presumptive right of access to them.  *See, e.g.*, *In re Associated Press*, 162

9  F.3d 503, 507 (7th Cir. 1998); *Alef*, 533 F.3d at 81; *Stephens Media, LLC v. Eighth Judicial*

10 *Dist. Ct.*, 221 P.3d 1240, 1247 (Nev. 2009) ("[S]everal federal jurisdictions have held that

11 because the First Amendment implicitly guarantees the right to access criminal trials, motions

12 to intervene are procedurally proper when the public or press seeks to intervene for the

13 limited purpose of accessing a criminal proceeding or court documents.").  If the news

14 organizations want the investigation materials, it's the Government position that they should

15 file a writ of mandamus with the Court of Appeals, which would constitute a separate civil

16 action against the Court.  *See, e.g.*, *Associated Press v. U.S. Dist. Court for Cent. Dist. of*

17 *California*, 705 F.2d 1143 (9th Cir. 1983).[2]

18 //

19

20    [2] Actually, the district court in *Associated Press*, after ordering that all documents in
   a high-profile criminal case be initially filed under seal, *allowed* the press to seek
21 reconsideration or a stay at a hearing.  It was only after the court denied the press's request
   to stay, two months later, that the press petitioned the Ninth Circuit for a writ of mandamus.
22 705 F.2d at 1144–45.  The Seventh Circuit has noted this practice: "The Ninth Circuit,
   although not disagreeing on the right of the press to seek a timely ruling on the issue of
23 access, has held that review of that ruling is appropriate through mandamus."  *In re
   Associated Press*, 162 F.3d 503, 508 n. 6 (7th Cir. 1998).  This actually implies a right of
24 intervention on the part of the press to obtain sealed or otherwise unavailable records;
   otherwise, there'd be no ruling to challenge with a mandamus petition.  *See Oregonian Pub.
25 Co. v. U.S. Dist. Court for Dist. of Oregon*, 920 F.2d 1462, 1464–65 (9th Cir. 1990)
   (publishing company granted leave to intervene to oppose sealing of a plea agreement, and
26 filed mandamus petition once the document was sealed over its objections); *Seattle Times
   Co. v. United States Dist. Court for the Western Dist. of Washington*, 845 F.2d 1513,
27 1514–15 (9th Cir. 1988) (news organizations filed petition for writ of mandamus after district
   court denied motion to unseal court documents); *Sacramento Bee v. U.S. Dist. Court for the
28 Eastern Dist. of California*, 656 F.2d 477, 480 (9th Cir. 1981) (newspaper sought writ of
   mandamus after district court closed criminal proceedings over its repeated objections).

What's clear, based on the Court's survey of the case law, is that the seminal cases addressing the interests of the public and the press in a criminal case involve disputes over *court* records and proceedings. *See Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1, 3–4 (1986) (closure of preliminary hearing in criminal prosecution); *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 503 (1984) (closure of *voir dire* proceedings); *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596, 599 (1982) (closure of criminal trial to general public and press); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) (exclusion of public and press from criminal trial); *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368 (1979) (exclusion of public and press from pretrial suppression hearing in a murder case); *Nixon*, 435 U.S. at 591 (release of tape recordings admitted into evidence); *In re Copley Press, Inc.*, 518 F.3d 1022 (9th Cir. 2008) (sealing of plea agreement and plea colloquy transcript); *Phoenix Newspapers, Inc. v. U.S. Dist. Court for Dist. of Arizona*, 156 F.3d 940, 943–44 (9th Cir. 1998) (closure of, and sealing transcripts of, hearing conducted during jury deliberations concerning threats to jurors); *Oregonian*, 920 F.2d at 1463 (sealing of plea agreement); *Times Mirror Co. v. United States*, 873 F.2d 1210, 1211 (9th Cir. 1989) (sealing of search warrants, supporting affidavits, and inventories); *Seattle Times*, 845 F.2d at 1514 (access to documents filed under seal in criminal case); *United States v. Brooklier*, 685 F.2d 1162, 1166 (9th Cir. 1982) (closure of voir dire proceedings and evidentiary hearing); *Sacramento Bee*, 656 F.2d at 479 (exclusion of press from criminal trial). To the extent these cases imply, or even recognize, a right on the part of the press to intervene in a case, they can be read, collectively, to support a limited right that only attaches when court proceedings, and materials that are either filed or lodged with the court, are at issue.

The news organizations rely on *United States v. Wecht* to assert a right of intervention for purposes other than obtaining court records, but a close reading of that case actually hurts their cause. 484 F.3d 194 (3d Cir. 2007). The district court in *Wecht*, at the behest of the press, unsealed the personnel files of an FBI investigator-witness after the prosecution sought the court's guidance on whether it was obligated to produce them to the defense

1    under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150

2    (1972).  The Court of Appeals upheld the unsealing order, but did so on the ground that the

3    materials had been filed with the district court and integrated into its proceedings, and were

4    therefore judicial records.  *Wecht*, 484 F.3d  at 208–209.  The Court of Appeals even offered

5    the clarification, "We certainly do not suggest that the common law right [of access] attaches

6    when district courts determine that the government need not disclose [discovery] materials."

7    *Id.* at 211.  The materials at issue in *Wecht* are not analogous to the investigation materials

8    here, which, as noted, have been neither filed nor lodged with the Court.  A right to intervene

9    in this case, therefore, simply can't be staked on *Wecht*.[3]  Likewise, the Court isn't moved

10   by the holding in *Blagojevich* that the press has a right to intervene in a criminal case to seek

11   the names of jurors, because regardless of whether a court orders jurors' names publicly

12   withheld, juror identity information is known to the court and therefore can be classified as

13   a judicial record.

14          Notwithstanding the above analysis, the Court will assume in this instance that the

15   news organizations have a right to intervene.  The Court indulges this assumption for two

16   reasons.  First, the view that intervention is only permissible when the press seeks access

17   to judicial records or proceedings is, at best, an inference to be drawn from the case law.

18   As the Government notes, "the law is admittedly less than fully developed in this area . . . ."

19   (Doc. No. 201 at 5.)  Absent clear authority that the press's right of intervention in a criminal

20   case is circumscribed by the nature of what it seeks, the Court is hesitant to infer such a rule

21   and cut the news organizations off from even *seeking* relief.  Second, even if the Government

22   is right about intervention, the procedural question whether the news organizations have a

23   right to intervene ultimately calls for the same factual analysis as the substantive question

24   whether they are entitled to what they seek — namely, whether the investigation materials

25

26          [3] Ironically, the news organizations cite *Wecht* for the very different proposition that
     the press has standing to challenge a district court's gag orders, the point of which is that a
27   right of intervention isn't limited to the seeking of judicial records, or access to judicial
     proceedings.  *See Wecht*, 484 F.3d at 202–03.  That's a fair argument, but the discussion
28   in *Wecht* concerning the FBI investigator's personnel files cuts in the other direction.  One
     reasonable inference to draw from that discussion is that intervention is appropriate only
     when judicial records, or materials that are arguably judicial records, are being sought.

are *judicial* records with respect to which there is presumption of transparency and access. That's the irony of the Government's position. If the Court is to consider whether the press is seeking judicial records in denying the right to *intervene*, it is already reaching, at least in part, the substantive issue of *access* that is the basis for the attempted intervention.

**II. Right of Access**

The news organizations first argue that they are entitled to the investigation materials, or some portion of them, because the Government promised as much in its original motion for a protective order. This isn't a frivolous argument, but it does miss the point. The Government did avow an intent in its motion "to diligently review the contents of the PCSO's file . . . to determine which materials may be excluded from coverage under the protective order and disclosed to the Post." (Doc. No. 157 at 11.) Behind this intent was the recognition that "some of the materials in the PCSO's investigative file will not trigger [privacy, fair-trial right, and publicity] concerns." (Doc. No. 157 at 10–11.) The Government proposed reviewing the records and then "submitting the materials at issue to the Court for *in camera* review." (Doc. No. 157 at 11.)

The Court found, however, that the news organizations had no enforceable right to access the investigation materials because they are not judicial records, and the protective order it entered absolved the Government of any obligation to make good on this offer. In blanket fashion, the order directed that "[t]he Pima County Sheriff shall not publicly release any investigative reports, files, or materials relating to the investigation of this case . . . ." (Doc. No. 169 at 5.) Once the protective order was entered, The Washington Post contacted the Government to request that it review and redact the records, and the Government reasonably took the position that the Court's order relieved it of its promise to do so. Thus, the news organizations' grievance is with the Court's protective order, not the Government.

The news organizations' second, and main, argument is that the protective order is overbroad because it constitutes a blanket prohibition on access in violation of Arizona's public records law. The Court is well aware of the requirement in Arizona that "[p]ublic records and other matters in the custody of any officer shall be open to inspection by any

1  person at all times during office hours." A.R.S. § 39-121.  It is also aware that "reports of

2  ongoing police investigations are not generally exempt from [the] public records law . . . ."

3  *Cox Arizona Publications, Inc. v. Collins*, 852 P.2d 1194, 1198 (Ariz. 1993).  The Court didn't

4  develop the point fully in its protective order, but the problem with this argument is that a

5  district court presiding over a federal criminal case isn't bound by a state's public records law

6  — especially when, as the Court will explain, the records at issue are the product of a *joint*

7  federal-state investigation.[4]

8      Two points are fundamental.  First, this is a federal case over which this Court has

9  exclusive jurisdiction.  The defendant has been charged by the United States Attorney for the

10  District of Arizona with, among other things, the attempted assassination of a Member of

11  Congress under 18 U.S.C. § 351(c).  (Superseding Indictment, Count 1.)  That charge

12  contains a mandate, enforceable through the Supremacy Clause, that state and local

13  authorities "shall suspend the exercise of jurisdiction . . . under any applicable State or local

14  law, until Federal action is terminated." 18 U.S.C. § 351(f).  This is a point moreover that PNI

15  and KPNX can't reasonably challenge, because they already acquiesced to it when the

16  Government removed to this Court their earlier application to unseal search warrant records.[5]

17  (*See* Doc. No. 77 at 2.)

18      Second, as noted, the investigation materials at issue aren't *judicial* records under

19  federal law, and the public has no presumptive right of access to them.  *See Oregonian*, 920

20  F.2d at 1465.  *See also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984) ("[R]estraints

21  _____

22  [4] In the protective order, the Court noted that the materials are not considered public
   under federal law, but rather than stop there it went on to find that *even if* the Arizona public

23  records law were to apply, there are still countervailing grounds, under the Sixth Amendment,
   Arizona's local rules, and case law, to prohibit the public disclosure of the investigation

24  materials.  (Doc. No. 169 at 3–4.)

25  [5] To be fair, while PNI and KPNX assented to the removal of their application, they
   maintained that "18 U.S.C. § 351 says nothing about 'removal,' and does not preclude

26  concurrent state jurisdiction over the January 8 shootings in which 19 Arizona residents were
   killed or wounded." (Doc. No. 77 at 2.)  Their assent was motivated less by federal law and

27  more by the announcement of the Pima County Attorney that state charges would not be filed
   against the defendant until the federal prosecution is complete.  Still, the Court is perplexed

28  as to how § 351 doesn't preclude concurrent state jurisdiction over this case when it explicitly
   says that the assertion of federal investigative or prosecutive jurisdiction "shall suspend the
   exercise of jurisdiction by a State or local authority."  18 U.S.C. § 351(f).

placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information."); *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986) ("Discovery, whether civil or criminal, is essentially a private process because the litigants and the courts assume that the sole purpose of discovery is to assist trial preparation."). This is where the news organizations' invocation of Arizona's public records law, A.R.S. § 39-121, comes in. Their rebuttal is, essentially, that federal law is irrelevant. They seek records compiled by the Sheriff's Department in the course of *its own* investigation of the January 8, 2011 shooting, and under § 39-121, they are entitled to them. (Doc. No. 157-1; Doc. No. 179 at 5–6.)

But there are a lot of problems with that rebuttal. The biggest one is that there is no such thing, in the first instance, as the Sheriff Department's *own* investigation; from the beginning, the investigation of the January 8 Tucson shootings was a joint effort of the Sheriff's Department, the Federal Bureau of Investigation, and other federal law enforcement agencies. Highlighting the federal government's preeminent involvement in the investigation is the mandate of 18 U.S.C. § 351 that investigations of the attempted murder of a Member of Congress "shall be investigated by the Federal Bureau of Investigation. Assistance may be requested from any Federal, State, or local agency . . . ." 18 U.S.C. § 351(g). Counsel for the Sheriff's Department, in an earlier letter to the United States Attorney in Phoenix, acknowledged this:

> Sheriff Dupnik acknowledges that those records were created and are maintained in the course of a joint investigation with federal law enforcement authorities and the U.S. Attorney's Office. Sheriff Dupnik further acknowledges that he and his department voluntarily participated in the joint investigation with knowledge that it would result in a federal criminal prosecution brought in the U.S. District Court, and that the records maintained by PCSD are being used in the federal criminal prosecution of Mr. Loughner.

(Doc. No. 157, Ex. 2.) Thus, while the news organizations label their request as one for *state* records, it is more accurately characterized as a request for records pertaining to a *federal* investigation. "When federal and state agencies cooperate extensively on a joint investigative task force, the state agencies may be deemed to be 'agents' of the federal

government . . . ." *United States v. Cerna*, 633 F.Supp.2d 1053, 1059 (N.D. Cal. 2009).  As the Government sensibly argues, it would thwart the jurisdictional license of § 351, threaten the uniformity of federal practice and procedure, and pose a burden to the work of district courts in cases of this nature, if the availability of investigation materials were to hinge on a state's public records law in every case in which state officials are cooperating with the federal government.  The Court concedes that Arizona's public records law supports the news organizations' side, but also finds that it is not in any way bound by that law.

The news organizations' entire argument rests on an assumption to the contrary, and apart from one footnote in which they suggest that§ 351(f) is a *jurisdictional* provision rather than a *choice-of-law* provision, the news organizations offer no argument or authority for the assumption.  (Doc. No. 179 at 8 n. 2 ("[The statute] does not preclude this Court from analyzing The Post's request under the Arizona Public Records Law . . . .").)  The district court presiding over Timothy McVeigh's prosecution for his role in the Oklahoma City bombing entered a protective order "to prevent all persons who have been or are now participants in or associated with the [criminal] investigation . . . from  . . . releasing any documents that are not in the public record and that are reasonably expected to be publicly disseminated which would be likely to materially prejudice the fairness of this criminal proceeding."  *United States v. McVeigh*, 931 F.Supp. 756, 760 (D. Colo. 1996).  The protective order the news organizations now challenge was issued in an identical spirit.[6]  The news organizations try to distinguish *McVeigh* by arguing that the records at issue here *are* public records, but that again assumes, in circular fashion, that the question whether the investigation materials at issue are *public* records is a question of state law.[7]  The Court does

---

[6] The news organizations suggest that the order in *McVeigh* was merely a "prospective gag order on the extrajudicial statements of counsel . . . . and the court's support staff."  (Doc. No. 179 at 13.)  It may have been that, too, but the court was clearly concerned about the public disclosure of *documents*, such as those arising out of or relating to a criminal investigation, that would compromise the fair trial right of a criminal defendant.

[7] Similarly, the news organizations' reliance on *Pansy v. Borough of Stroudsberg* is misplaced.  23 F.3d 772 (3d Cir. 1994).  The court in *Pansy* did hold that there is a "strong presumption . . . against granting or maintaining an order of confidentiality," but only "where it is likely that information is accessible under a relevant freedom of information law."  *Id.* at

not believe it is.

If there is no presumptive right of access to the investigation materials, other than under a state law that has no force in this federal proceeding, then the analysis needn't go much further.  But even if the Court is obligated to treat the investigation materials as public records under Arizona law, it would *still* find that  the protective order is justified under Local Rule 57.2(f)[8] out of consideration for the defendant's Sixth Amendment right to a fair trial.  As the Court explained in the original protective order:

> This stream [of news coverage] would quickly turn to a flash flood were the Sheriff to release the records of the entire investigation to the public.  The public vetting of crime scene photos, witness accounts, investigatory conclusions, and other raw evidence would invite the trial of this case in the press rather than in court.  This prospect poses a substantial threat to the defendant's constitutional right to be tried fairly by an impartial jury.

(Doc. No. 169 at 4.)  The Court finds that these concerns trump the asserted interest in disclosure under Arizona's public records law, or any other law that favors disclosure.  *See City of Hartford v. Chase*, 942 F.2d 130, 135 (2d Cir. 1991) ("a federal court's power to seal documents takes precedence over FOIA rules that would otherwise allow those documents to be disclosed").

## III.    Conclusion

The news organizations' application to modify the March 23, 2011 protective order is **DENIED**.  The investigation materials are not judicial records in the first instance, at least in this federal criminal case, and if they must be treated as such then the Court finds that the defendant's Sixth Amendment right to a fair trial weighs against their disclosure anyway.  The

---

791.  There is no freedom of information law that is relevant to the investigation materials the news organizations seek.

[8] "In a widely publicized or sensational criminal case, the Court on motion of either party or on its own motion, may issue a special order governing such matters as extrajudicial statements by parties and witnesses likely to interfere with the rights of the accused to a fair trial by an impartial jury . . . and *any other matters which the Court may deem appropriate for inclusion in such order*."  LRCrim 57.2(f).  The rule goes on to contemplate that a court may seal "pretrial motion papers and pleadings," to which, as public records, there is a presumptive right of access.  If even these are subject to sealing under the Rule, then certainly the investigation materials are.

11cr0187-TUC LAB

protective order is, however, **MODIFIED**, in the following way.  Whereas the protective order directs that the Sheriff "*shall not* publicly release any investigative reports, files or materials," the Court finds that, pursuant to the Government's initial offer to The Washington Post, it *may* if it chooses release those reports, files or materials that do not implicate the privacy, fair-trial rights, and publicity concerns that the Court has identified.  (Doc. No. 157 at 10–11.)  If the Government elects to release any of the investigation materials to the press or public, it must first lodge copies of the materials it proposes to release with the Court and serve them on the defense.  The Court will entertain any objections to the proposed release the defense has before authorizing disclosure.  The Government has no obligation to submit for *in camera* review any of the materials that it believes are sensitive, nor is it obligated to inventory those materials in order to facilitate a challenge to their non-disclosure by the news organizations.

**IT IS SO ORDERED.**

DATED:  May 25, 2011

**HONORABLE LARRY ALAN BURNS**
United States District Judge