1   Judy Clarke
    Clarke and Rice, APC
2   1010 2nd Avenue, Suite 1800
    San Diego, CA 92101
3   (619) 308-8484

4   Mark Fleming
    Law Office of Mark Fleming
5   1350 Columbia Street, #600
    San Diego, CA 92101
6   (619) 794-0220

7   Reuben Camper Cahn
    Ellis M. Johnston III
8   Janet Tung
    Federal Defenders of San Diego, Inc.
9   225 Broadway, Suite 900
    San Diego, CA 92101
10  (619) 234-8467

11  Attorneys for Defendant Jared Lee Loughner

12              UNITED STATES DISTRICT COURT

13                 DISTRICT OF ARIZONA

14  UNITED STATES OF AMERICA,      )    Case No. CR 11-0187-TUC LAB
                                    )
15          Plaintiff,              )
                                    )
16  v.                             )    **DEFENDANT'S MOTION TO DENY**
                                    )    **EXTENSION OF COMMITMENT**
17  JARED LEE LOUGHNER,            )    **UNDER § 4241(d)(2)(A),**
                                    )    **ALTERNATIVELY TO CONDUCT AN**
18          Defendant.             )    **EVIDENTIARY HEARING,**
                                    )    **AND FOR DISCOVERY**
19  _____)

20                      **MOTION**

21          Counsel for Mr. Loughner request that the Court deny the four-month extension of

22  Mr. Loughner's "restoration commitment" and find that the government has failed to establish

23  by clear and convincing evidence that there is a substantial probability that Mr. Loughner's

24  mental condition can be improved such that the trial may proceed.  Alternatively, counsel object

25  to the extension, and seek an evidentiary hearing to determine the legal and factual sufficiency

26  of the request to extend Mr. Loughner's commitment. Counsel further request discovery

27  concerning the bases for the prison's conclusion that Mr. Loughner will likely "be competent in

28  the near future."

# I.

## __INTRODUCTION__

The Bureau of Prisons acknowledges that Jared Loughner remains not competent to stand trial but asserts that his condition has improved – he has "slowly responded to the medication" – and seeks a four-month extension of his commitment pursuant to 18 U.S.C. §4241(d)(2)(A). The conclusion that Mr. Loughner's condition has actually improved is contradicted by the daily records maintained by the prison, which reflect the observations of numerous staff. His presentation may be different today compared to when BOP initiated forced medication – he is severely depressed and on suicide watch – but he is not better. He is on a host of psychotropic medications, all administered against his will, that cause multiple side effects which dramatically affect his functioning, including sedation, restlessness, agitation, pacing, dizziness, thick tongue, and constipation. In addition, the most common "suicide watch assessments" by staff, including those in the days leading up to the September 7, 2011 report's conclusion of "marked changes," describe him as rarely making eye contact and having flat affect, bland or depressed mood, and poor or fair hygiene. He is noted to be either laying in his bed, or pacing, and often crying, and is so disabled that he has been on suicide watch since early July. And, even after some 60 contiguous days of anti-psychotic medications, he continues to be psychotic. Thus, rather than just being psychotic – Mr. Loughner's mental state at the end of May 2011 – he is now also severely depressed, tearful, restless, agitated, *and* psychotic. The 60 days of involuntary psychotropic medication may have affected one positive symptom of Mr. Loughner's schizophrenia, reportedly lessening his hallucinations (and thus his apparent response to internal stimuli). However, it has done nothing to affect his delusions or the very prominent cognitive deficits, severe thought disorder or negative symptoms which are the hallmarks of Mr. Loughner's schizophrenia and all of which directly affect his ability to stand trial.

In the face of Mr. Loughner's extraordinarily severe and disabling mental illness, the prison asks for a four-month extension, during which it presumably will continue the involuntary medication regime of the last 60 days. At the same time, the BOP has offered nothing to this Court that would support the conclusion that additional time on the involuntary medication

1   regime will add any further benefit, or result in a substantial probability that Mr. Loughner will

2   attain the capacity to permit the proceedings to go forward.  Indeed, the prescribing psychiatrist,

3   Dr. Sarrazin, has not weighed in at all to advise the Court about the effects of the medication on

4   Mr. Loughner's future capacity to proceed, the time to peak efficacy of the drugs, or the

5   treatment plan during the requested extension.  In fact, no one from  BOP has  provided a

6   treatment plan or any objective criteria upon which this Court can make the required findings.

7          On the basis of the record before it, this Court should deny the requested extension and

8   subject Mr. Loughner to the provisions of 18 U.S.C. § 4246.  Alternatively, the Court should

9   hold an evidentiary hearing to determine the credibility and reliability of the prison's assertion

10  that an additional four months will be sufficient for Mr. Loughner to attain the capacity to permit

11  the proceedings to go forward.[1]  In advance of the hearing, the Court should order the production

12  of discovery as requested herein.

## II.

## STATEMENT OF FACTS

15         On May 2, 2011, Dr. Christina Pietz, Mr. Loughner's treating psychologist at MCFP

16  Springfield, prepared a report concluding that Mr. Loughner's mental illness, schizophrenia,

17  rendered him incompetent to proceed to trial, not only because he was incapable of assisting his

18  attorneys in the preparation of his defense but because he didn't even have a rational and factual

19  understanding of the charges against him or the legal process.  *See* Competency Report at 47-51.

20  In Dr. Pietz's opinion, "the most significant barrier to Mr. Loughner's ability to assist in his own

21  defense is that his delusions prevent him from rationally considering a variety of legal

22  strategies."  *Id*. at 51.

---

[1]  Counsel for Mr. Loughner agree to waive his presence at this hearing and agree to have it held in San Diego.  Moments ago, the government filed a notice requesting the presence of Mr. Loughner at the hearing saying "The government believes, pursuant to 18 U.S.C. § 4247(d), that the defendant must be present at the hearing and presence cannot be waived by his counsel." DE 310.  Nothing in section 4247(d) suggests that the defendant's presence cannot be waived. The government fails to appreciate that Mr. Loughner has been found to be gravely disabled and remains on suicide watch, under close observation, to prevent him from doing harm to himself.

As for Mr. Loughner's prognosis, Dr. Pietz concluded that schizophrenia "often improves with the administration of anti-psychotic medication." *Id.* at 52.   But, she continued, "Unfortunately, the best predictor of how a psychotic individual will respond to medications is how the individual has responded to them in the past." *Id.*  Because Mr. Loughner had never been prescribed such drugs, Dr. Pietz concluded that "his prognosis is difficult to predict." *Id.* Nevertheless, Dr. Pietz asserted without any other support that Mr. Loughner "will likely be restored to competency" with medication.  *Id.*

On the basis of Dr. Pietz's report and another  report, prepared by an independent court-appointed psychiatrist, Dr. Matthew Carroll, which confirmed the severity and disabling nature of Mr. Loughner's mental illness, the Court committed him to the custody of the Bureau of Prisons pursuant to 18 U.S.C. § 4241(d)(1) which allows up to four months to determine "whether there is a substantial probability that in the foreseeable future [Mr. Loughner] will attain the capacity to permit the proceedings to go forward." *See* DE 221 (5/25/11 Commitment Order).  Mr. Loughner arrived at MCFP Springfield on May 27.   Since his commitment, Mr. Loughner has been forcibly medicated with pyschotropic drugs continuously since July 18–nearly nine weeks. *See* DE 278 at 2-4.

On August 26, 2011, the Court received a letter from the warden of MCFP Springfield requesting an extension of Mr. Loughner's commitment. *See* Exhibit A (letter from warden and attached report).  As the Court found, there appeared to be "tension" between the warden's letter and the attached report by Dr. Christina Pietz as to the basis for the requested extension. *See* DE 309 at 2 (9/1/11 Order).  Therefore, the Court ordered the prison to submit a new request that "must be accompanied by evidence that the defendant's restoration is substantially probable, as well as evidence that an additional four months are necessary to restore him." *Id.*

The prison forwarded to the parties on September 12 a new report from the BOP authored by Dr. Pietz, dated September 7, 2011. *See* Exhibit B (Pietz report).  According to the report, Mr. Loughner "remains psychotic," *id.* at 1, and "not competent to stand trial," *id.* at 3. Mr. Loughner currently receives 6 milligrams of Risperidone daily; up to 12 milligrams daily

1  of Lorazepam–an anxiolytic; 300 milligrams of Wellbutrin–an antidepressant; and 2 milligrams

2  of benztropine–a drug designed to counter side effects of the antipsychotics.  *Id.* at 2.  Dr. Pietz

3  claims that Mr. Loughner "has responded slowly to the medication."  *Id.* at 4.

4      The September 7 report  asserts that Mr. Loughner's condition has improved during the

5  "last few weeks."  *Id.* This claim is made despite an August 22 report that states Mr. Loughner's

6  psychotic symptoms had only "slightly diminished," Exhibit A at 5, and despite the fact that

7  testimony by Dr. Pietz on August 26 indicates that Mr. Loughner can't even understand basic

8  legal rights, *See* Pietz testimony regarding videotaping her clinical assessments ("If I told him

9  this was to protect his rights, I'm not sure he would get that.")  R.T. 8/26/11 at p. 105.

10      The second report cites five areas of "change" that lead BOP  to the conclusion that

11  Mr. Loughner's condition has improved, none of which address the delusions that Dr. Pietz

12  previously found in May to be critical to his incompetence, and most of which address symptoms

13  that arose only in late June and early July.  The report essentially claims that he is (1) eating

14  more, thus gaining weight; (2) sleeping more, thus being able to concentrate more during her

15  interviews with him; (3) not pacing as much, thus being able to maintain lengthier conversations

16  and sleep; (4) digressing less, thus sustaining attention for longer periods of time; and finally (5)

17  not responding to internal stimuli and having more rational and organized thoughts. Exhibit B

18  at 2-3.[2]  As to this last factor, there is no further elaboration on the extent to which Mr. Loughner

19  is able to converse rationally or what topics any such conversations cover.

20      Despite the paucity and limited extent of these "improvements," the BOP report opines

21  that Mr. Loughner "will likely be competent in the near future." *Id.* at 4. And BOP requests four

22  additional months asserting that "[h]istorically, most defendants reach competency within 8

23  months of their commitment."  *Id.* at 3.  The report provides no authority for this assertion,

24  doesn't describe the type or extent of mental illness or treatment plan for "most defendants," or

25

26

27  [2]  The lack of sleep, pacing resulting in an infected foot, and loss of weight were key
symptoms that resulted in placing him on suicide watch (where he remains) and the involuntary

28  medication (which continues).

1   explain whether Mr. Loughner–suffering from a long-term, untreated, debilitating, and very

2   severe form of schizophrenia–fits within this category of "most defendants."  Moreover, the

3   assertion that Mr. Loughner will "likely" regain competency conflicts with Dr. Pietz' statement

4   that she "cannot predict, with any degree of certainty when Mr. Loughner will reach

5   competency."  *Id.*

## III.

### THIS COURT MUST INDEPENDENTLY MAKE THE LEGAL DETERMINATION BY CLEAR AND CONVINCING EVIDENCE THAT THERE IS A SUBSTANTIAL PROBABILITY  THAT WITHIN THE FOUR ADDITIONAL MONTHS REQUESTED BY THE GOVERNMENT THAT MR. LOUGHNER WILL NOT ONLY BECOME COMPETENT BUT THAT A TRIAL MAY PROCEED.

10       As this Court has already stated, it will only authorize an extension of Mr. Loughner's

11  commitment to Springfield if it finds that the prison has satisfied the requirements of 18 U.S.C.

12  § 4241(d)(2)(A). *See* DE 309 at 2. Section 4241(d)(2)(A) permits a court to extend a defendant's

13  commitment for a reasonable period of time only "if the court finds that there is a substantial

14  probability that with such additional period of time [the defendant] will attain the capacity to

15  permit the proceedings to go forward."  Thus, there are two prongs to the substantial probability

16  requirement.  First, the court must find that there is a substantial probability the defendant will

17  attain the capacity to permit the proceedings to go forward.  Second, it must determine that there

18  is substantial probability of this happening within an additional reasonable period of time: here,

19  the four months requested by the prison.

20       To be clear, while language in *Washington v. Harper* suggests that the views of doctors

21  are of paramount importance when considering the treatment of a convicted inmate, *see* 494 U.S.

22  210, 231 (1990), no such principle applies here. The determinations at issue here, determinations

23  concerning trial capacity and commitment, are squarely for the Court to independently

24  determine.  Doctors must supply evidence to inform the decision, but the determination whether

25  Mr. Loughner attains, or in this case, is substantially likely to attain, the capacity to proceed, is

26  one that rests squarely with the Court because it is both a factual and legal determination.  *See*

27

28

1   *Drope v. Missouri*, 420 U.S. 162, 175 (1975) (it is "incumbent upon [the court] to analyze the

2   facts in order that the appropriate enforcement of [fair trial rights] be assured").

3   **A.   THE COURT MUST FIND THAT THERE IS A SUBSTANTIAL PROBABILITY**
    **THAT MR. LOUGHNER WILL ATTAIN THE CAPACITY FOR THE TRIAL TO**
4   **PROCEED.**

5        With respect to the first prong, it is not enough that a court find the defendant will become

6   legally competent. Elsewhere in 4241, the statute describes the need for the court to make only

7   competency findings. *See* 18 U.S.C. § 4241(d) (directing the court to find whether "the

8   defendant is presently suffering from a mental disease or defect rendering him mentally

9   incompetent"). But § 4241(d)(2)(A) permits a court to extend the commitment only if it finds

10  a substantial probability that the defendant "will attain the capacity to permit the proceedings to

11  go forward." Congress could have required only a substantial probability that the defendant

12  would become competent. It required more; it required a substantial probability that "capacity

13  to proceed" would be attained. "Capacity to proceed" requires not only that Mr. Loughner have

14  a rational and factual understanding of the proceedings and that he be able to assist his counsel,[3]

15  but also that medications he is forced to take not interfere with his ability to obtain a fair trial.

16  *See Sell v. United States*, 539 U.S. 166, 181 (2003)(Court must find that "administration of drugs

17  is substantially likely to render the defendant competent to stand trial . . . [and] substantially

18  unlikely to have side effects that will interfere significantly with the defendant's ability to assist

19  counsel in conducting a trial defense) (citing Justice Kennedy's concurrence in *Riggins v.*

20  *Nevada*, 504 U.S. 127, 142-45 (1992)).

21       Indeed, as Justice Kennedy explained, the defendant's *capacity* to permit the trial to

22  proceed is something greater than competence to stand trial:

23

24

25

_____

26       [3] And any such determination must acknowledge that trial competency "does not consist
    merely of passively observing the proceedings. Rather, it requires the mental acuity to see, hear
27  and digest the evidence, and the ability to communicate with counsel in helping prepare an
    effective defense," *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001).

28

> In my view elementary protections against state intrusion require the State in every case to make a showing that there is no significant risk that the medication will impair or alter in any material way the defendant's *capacity* or willingness to react to the testimony at trial or to assist his counsel.

*Id.* at 141 (Kennedy, J., concurring) (emphasis added).  Thus, the court must engage in a predictive analysis not unlike that developed in *Sell* and its progeny, in which the court must not only assess the substantial likelihood of competency restoration but also consider the potential side effects caused by the drugs used to restore competency.  *See, e.g., United States v. Ruiz-Gaxiola*, 623 F.3d 684, 695 (9th Cir. 2010).

**B.    THE COURT MUST FIND A SUBSTANTIAL PROBABILITY THAT CAPACITY TO PROCEED WILL BE ATTAINED WITHIN THE SPECIFIED TIME PERIOD.**

As to the second prong, the court must find that there is a substantial probability that the defendant will attain the capacity to permit the proceeding to go forward within the specific "additional period of time" contemplated as reasonable under 4241(d)(2)(A).  This requirement stands in contrast to the commitment standard of 4241(d)(1).  Under subsection (d)(1), a defendant may be committed up to four months to determine whether "in the foreseeable future" the defendant will attain capacity to permit the proceedings to go forward.  But "foreseeable" or, to use Dr. Pietz's words in her most recent report, "near future," is not a permissible finding to extend the commitment under (d)(2)(A).  Rather, under the statute's plain language, the court must find a substantial probability that Mr. Loughner's capacity to proceed will be restored within the specified "additional period of time."

**C.    A SUBSTANTIAL PROBABILITY IS MORE THAN A MERE LIKELIHOOD; IT IS A HIGH LIKELIHOOD OF SUCCESS.**

As for what constitutes a substantial probability, it is more than a mere likelihood of success.  Substantial probability means "*highly* likely to occur." *City of Carter Lake v. Aetna*, 604 F.2d 1052, 1058-59 (8th Cir. 1979) (emphasis added); *see also In re Commitment of Laxton*, 254 Wis.2d 185, 206-07 (2002) ("A substantial probability means *much more* likely than not.") (emphasis added).  Congress, itself, in choosing "substantial probability" clearly intended this term to mean more than a likelihood.  *Compare* 29 U.S.C. § 654 (employers must maintain

1   conditions free from hazards "likely" to cause death or serious bodily injury) *with* 29 U.S.C. §
2   666 (employer engages in a "serious" violation of § 654, mandating a non-discretionary penalty,
3   if it maintains conditions that present a "substantial probability" of death or serious bodily
4   injury). Indeed, in the analogous *Sell* context, "a chance that is only 'more likely than not' does
5   not meet [the substantial likelihood] standard." *United States v. Reynolds*, 553 F.Supp.2d 788,
6   796-97 (S.D. Tex 2008).

7   **D.   THE COURT'S FINDINGS MUST BE SUPPORTED BY CLEAR AND**
         **CONVINCING EVIDENCE.**
8

9       Finally, the court must make any findings of substantial probability upon a showing of
10  clear and convincing evidence. *See Riggins*, 504 U.S. at 135 (contemplating application of a
11  clear and convincing standard before antipsychotic medication may be forcibly administered)
12  (citing *Addington v. Texas*, 441 U.S. 418 (1979) (due process allows civil commitment of
13  individuals shown by clear and convincing evidence to be mentally ill and dangerous); *Riggins*,
14  504 U.S. at 139 (Kennedy, J., concurring) (government must make an "extraordinary showing"
15  before antipsychotic medication may be forcibly administered); *Ruiz-Gaxiola*, 623 F.3d at 691-
16  92 (applying a clear and convincing standard to forced medication used to restore competency);
17  *see also United States v. Weston*, 211 F.Supp.2d 182, 183 (D.D.C. 2002) (applying same
18  standard to request for extension under § 4241(d)(2)(A)).

19                                          **IV.**

20  **ON ITS FACE, THE PRISON REPORTS FAIL TO SATISFY THE STATUTE'S**
        **"SUBSTANTIAL PROBABILITY" REQUIREMENTS.**
21

22      Even taking the prison's tenuous conclusions about improvement as true, which are
23  contradicted by the BOP records, *see infra*, the reports standing alone fail to satisfy any of
24  section 4241(d)(2)(A)'s requirements for extending Mr. Loughner's commitment.

25  **A.   FIRST PRONG.**

26      The prison's conclusion that Mr. Loughner "will likely be competent in the near future"
27  fails, in several ways, to establish the first prong of the substantial probability requirement. First,
28  neither the August 22 nor September 7, 2011 reports tell the Court or provide support for the

proposition that there is a *substantial* probability that Mr. Loughner will attain the capacity to permit the proceedings to go forward.  While the law requires a showing of substantial probability, i.e., a showing that success is "highly likely" or "much more likely than not," *see supra*, the most optimistic statement the prison could make is that it was merely "likely" that Mr. Loughner would be restored to competency.  And even this conclusion is undercut by the admission that any prognosis for Mr. Loughner's illness is unpredictable.  *See* Exhibit B at 3 (Dr. Pietz stating that she "*cannot predict, with any degree of certainty* when Mr. Loughner will reach competency") (emphasis added).  Before the Court can extend Mr. Loughner's commitment, it is required to make a prediction--a prediction with a high degree of certainty, specifically, a substantial probability--a degree of certainty that the prison reports do not provide.

Second, as discussed above, subsection (d)(2)(A) requires a predictive finding, not just of competency, but of a substantial probability that the defendant "will attain the capacity to permit the proceedings to go forward."  Even when a defendant is presumed competent to be tried, the powerful side effects of forcibly administered psychotropics can prevent trial from proceeding because of the defendant's incapacity.  *See Riggins*, 504 U.S. at 137 (reversing conviction where it was assumed the defendant was competent but it was also "clearly possible that [] side effects had an impact upon not just Riggins' outward appearance, but also the content of his testimony on direct or cross examination, his ability to follow the proceedings, or the substance of his communication with counsel").  Because section 4241(d)(2)(A) expressly requires the court to make a predictive finding about a defendant's capacity to permit the "trial to proceed," rather than merely one concerning competency to stand trial, the court must determine whether the potential side effects of the prison treatment interfere with this capacity.  Because neither the government nor the prison have provided the court with any information whatsoever on this point, they cannot establish by clear and convincing evidence or any other standard that Mr. Loughner's commitment should be extended.

The third problem on the first prong is that even if the analysis was limited to competency and the claims of "improvement" are taken to be true, the prison has not established anything close to a record supporting a finding that the continued treatment of Mr. Loughner with

psychotropic drugs creates a substantial probability of him being restored.  Though the reports apparently attribute the alleged improvements to the administration of psychotropic medication, they  contain no information, much less predictive evidence, from the prescribing psychiatrist.[4] The prison is currently administering Mr. Loughner Risperidone, a second-generation antipsychotic, and has been doing so continuously for 60 days--nearly nine weeks--since July 18. Scientific literature indicates that the median time to clinical improvement on Risperidone is 26 days for first-episode patients (such as Mr. Loughner--who has been on Risperidone for more than *twice* that period).  *See* Nina Schooler et al., *Risperidone and Haloperidol in First-Episode Psychosis: A Long-Term Randomized Trial*, 162 Am J. Psychiatry 947, 949 (2005).  And the same study found that less than two percent of these patients being treated with Risperidone who did not show signs of improvement after three months made any progress even when treated with this drug for two years or more.  *See id.*

The import of this data is that Mr. Loughner is beyond the window in which the medication should have reached its ultimate effect on the symptoms of his illness that have rendered him unable to even understand the nature of the proceedings against him, much less assist counsel in his defense.  Dr. Pietz has identified his delusions as the critical core of Mr. Loughner's incompetency.  *See* Competency Report at 51.[5] Yet none of the descriptions of

---

[4]  Of course, the prison's position is that it is not medicating Mr. Loughner to restore him to competency, but rather to mitigate any danger he poses to himself or to alleviate his grave disability.  This gives rise to a conundrum: at the point Mr. Loughner is no longer a danger to himself or gravely disabled, the prison will need to cease medicating him, whether or not he has been restored to competency.  Perhaps, the treating psychiatrist is flummoxed by the difficulty of predicting whether safety or competency will be attained first.

[5]  Dr. Pietz's original competency report focused on the "positive symptoms" of Mr. Loughner's schizophrenia including hallucinations and delusions.  Relatively little attention was given to the negative symptoms of Mr. Loughner's disease and how these affect his capacity to proceed to trial.  However, as the Federal Bureau of Prison's *Clinical Practice Guidelines: Pharmacological Management of Schizophrenia* recognize:  "Negative symptoms are more difficult to diagnose and far less responsive to medications.  They are often very disabling . . ." *Id* at 3 (attached as Exhibit C). Negative symptoms include affective flattening, alogia, avolition, anhedonia and amotivation.  "Negative symptoms are remarkably similar to–and sometimes indistinguishable from–symptoms of depression and certain antipsychotic medication side

the supposed improvements of Mr. Loughner's condition  address this core road block to competency.   Rather, the reports detail improvements in what most charitably can be characterized as "activities of daily living," eating, sleeping, cleaning oneself.  Again, most of the asserted improvements are relative to changes in presentation during late June and early July. And even if the drugs have tampered down the hallucinations and internal stimuli , the delusions, negative symptoms, thought disorder, and cognitive impairments  remain.  The prognosis is bleak that a continuation of this treatment regime  will make restoration of competency substantially probable given the very limited improvement Mr. Loughner may have achieved. Even if continuation of the medication regime may lead to continued improvement, or provide a less-than-two percent chance of improvement, *see* Schooler at 949, such low probability of improvement in the core symptoms of Mr. Loughner's illness cannot justify an extension of Mr. Loughner's commitment under section 4241(d)(2)(A).

**B.    SECOND PRONG.**

The prison's conclusions also fail the second prong of 4241(d)(2)(A), the time period requirement.  The September 7, 2011 report explicitly states that Dr. Pietz "cannot predict, with any degree of certainty when Mr. Loughner will reach competency," yet requests a four-month extension from the Court, concluding that Mr. Loughner will "likely be competent in the near future." Exhibit B at 3-4.  This is insufficient for purposes of extending the commitment.  While the initial period of commitment under subsection (d)(1) permits up to four months of commitment for purposes of  determining whether a defendant will attain the capacity for trial to proceed "in the foreseeable future," a conclusion that seems to mirror the prison's "near future" prediction, subsection (d)(2)(A) permits no such undefined predictions.

---

effects." *Id.*

In addition, perhaps because Mr. Loughner's psychosis made testing impossible, Dr. Pietz's original report did not explore the cognitive impairments caused by his schizophrenia. However, such impairments are "an integral part of chronic psychotic disorders, especially schizophrenia." *Id.*  "The cognitive symptoms are the most disabling and misunderstood of all the symptom complexes associated with psychotic disorders." *Id.*

To extend a commitment under 4241(d)(2)(A), the court must find that within a specific "additional reasonable period of time," there is a substantial probability that the defendant will attain the capacity to permit proceedings to go forward:

> (2) for an additional reasonable period of time until—
>
> > (A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that *within such additional period of time* he will attain the capacity to permit the proceedings to go forward

(emphasis added). A prediction that Mr. Loughner will attain the capacity to proceed in the "near future" or "foreseeable future" is plainly insufficient.  Nor does the prison's assertion that "[h]istorically, most defendants reach competency within 8 months of their commitment," Exhibit B at 3, satisfy the statute's requirements.  The claim is made without any support whatsoever.  Moreover, there is a failure to logically connect this claim to Mr. Loughner's condition: Who are "most defendants"?  What is their condition?  What is their treatment plan?  What makes Mr. Loughner or his condition fit him into the "most defendants" category?  There is not even a suggestion  that Mr. Loughner and the severity of the symptom picture of his mental illness are like most defendants.

General propositions about "most defendants" are insufficient alone to meet the government's burden.   Adopting the use of such generalized syllogisms "would be to find [that] the government necessarily meets its burden in every case it wishes to use atypical anti-psychotic medications."  *United States v. Evans*, 404 F.3d 227, 241 (4th Cir. 2005).   And when "government experts rely on generalities and fail to apply their views to [the defendant's] condition with specificity," the government has not met its burden by clear and convincing evidence.  *Ruiz-Gaxiola*, 623 F.3d at 700-01 (citing *Evans*).  Here, the error is even worse insofar as there has been no connection of  Mr. Loughner to "most defendants."  Regardless, reliance on this bare, unsupported proposition fails the second prong of the extended commitment analysis.

//

//

//

**V.**

## THE PRISON'S CLAIMS OF "IMPROVEMENT" ARE CONTRADICTED AND UNDERCUT BY PRISON RECORDS.

The prison reports identify five areas of alleged improvement in Mr. Loughner's condition in support of its claim that four more months of commitment at Springfield is substantially probable to render Mr. Loughner competent. These are: (1) improved appetite and weight gain; (2) a newfound ability to focus on and sustain a rational conversation; (3) development of the ability to sustain extended eye contact; (4) a meaningful reduction in motor agitation, manifested most prominently through pacing around his cell; and (5) achieving the ability to engage in normal sleep patterns. There exists, of course, no evidence presently before the Court that improvement in these areas—assuming it exists—establishes that Mr. Loughner is on the road to trial competency, let alone trial capacity, as opposed to simply experiencing some relief of clinical symptoms that will not ultimately correct the particular deficiencies that render him incompetent.

But there is an even more fundamental problem for the prison's bid to lengthen Mr. Loughner's commitment: total lack of factual support. The prison offers no more than conclusory assertions in its reports—but those reports are devoid of factual evidence, as this Court recognized in its September 9 order. *See* Order (admonishing the prison, after receiving the August 22 report, that any request for a § 4214 (d)(2)(A) extension of commitment "must be accompanied by *evidence* that the defendant's restoration is substantially probable, as well as *evidence* that an additional four months are necessary to restore him") (emphases added).

In truth, the assertions in the prison's reports are actually *contradicted* by the prison's own records. Each claimed area of improvement is addressed in turn below.

### A.     APPETITE AND WEIGHT GAIN.

The prison's most recent report asserts that Mr. Loughner's "appetite has been restored." Exhibit B at 2. This, the report claims, is an improvement attributable to the psychotropic medication forcibly administered for the past two months. This improvement is illustrated by the stark contrast between Mr. Loughner's pre-medication appetite, when "he was eating less

14

than 50% of his meals" and the present state of affairs, where, the prison claims, "[s]ince being medicated, he is now eating *almost 100%* of his meals." *Id.* at 3 (emphasis added).

The evidence, however, does not support these claims. First, the claim—in the September 7 supplemental report—that Mr. Loughner has gained back his appetite, is directly contradicted by the August 22 report which concluded that: "His appetite remains poor." *See* Exhibit A at 5.

Second, and far more damning, is the fact that the prison's own records conclusively refute the  claim that Mr. Loughner now eats almost all of his meals.  Observations by prison staff establish that, in the few weeks before the "eating almost 100% of his meals" claim—made on September 7—Mr. Loughner refused meals or left them mostly uneaten nearly *every single day*.  For example:

- On September 5, Mr. Loughner refused his breakfast[6]

- On September 4, Mr. Loughner refused his breakfast and said that "he does not have much appetite this morning"[7]

- On September 3, Mr. Loughner ate 15% of his lunch and 10% of dinner and complained of "no appetite"[8]

- On September 2, Mr. Loughner complained of having "no appetite"[9]

- On September 1, Mr. Loughner refused his breakfast and informed prison staff that "he has not been eating all of his meals because he doesn't feel hungry."[10]

- On August 31, Mr. Loughner ate only 30% of his lunch and refused his nutritional supplement with breakfast.[11]

---

[6] Exhibit D at 1.

[7] Exhibit D at 2.

[8] Exhibit D at 3,4.

[9] Exhibit D at 5.

[10] Exhibit D at 6.

[11] Exhibit D at 7,8.

- On August 30, Mr. Loughner ate only 20% of his lunch, and refused milk and his nutritional supplement.[12]

- On August 28, Mr. Loughner refused breakfast and ate only 25% of his lunch.[13]

- On August 27, Mr. Loughner ate only 50% of his lunch, 35% of his dinner, and refused his nutritional supplements.[14]

- On August 26, Mr. Loughner ate only 20% of his lunch.[15]

- On August 25, Mr. Loughner ate only 30% of his lunch.[16]

- On August 24, Mr. Loughner refused breakfast entirely.[17]

- On August 23, Mr. Loughner refused breakfast, left part of his dinner uneaten, and complained that "his appetite is poor."[18]

- On August 22, Mr. Loughner ate only 25% of his lunch and 10% of his dinner.[19]

Not a single one of these entries supports the notion advanced by the prison on September 7 that Mr. Loughner is eating all or nearly all of his meals.

The September 7 report's claims about Mr. Loughner's weight gain are likewise unsupported by evidence. The report states that Mr. Loughner lost nine pounds between his most recent admission to Springfield and July 18, when medication resumed—a trend that *is* supported by the data: he weighed 141 pounds on May 31 and had dropped to 132.6 on July 18.[20] But the report goes a step further. It suggests that the psychotropic medication entirely reversed

---

[12] Exhibit D at 9,10.

[13] Exhibit D at 11, 12.

[14] Exhibit D at 13.

[15] Exhibit D at 14.

[16] Exhibit D at 15.

[17] Exhibit D at 16, 17.

[18] Exhibit D at 18-19.

[19] Exhibit D at 20.

[20] Exhibit D at 21, 22.

16

the weight loss and thus cured the problem: "Prior to administration of medication, Mr. Loughner . . . lost nine pounds. . . . Since being medicated, he . . . has gained back nine pounds." This notion—that the medications cured Mr. Loughner's weight loss—is contradicted by the evidence.

Far from a steady increase to his normal weight, the records suggest that Mr. Loughner suffers from dramatic fluctuations in weight. Just six days before the September 7 report announced that Mr. Loughner had "gained back nine pounds," Exhibit B at 3, Mr. Loughner tipped the scales on September 1 at 135.2 pounds, a "loss . . . of nearly 5 lbs since last week."[21] Indeed, the day after the report's weight-gain pronouncement, Mr. Loughner's weight dipped to 131.8 pounds, below that on July 18 when the involuntary medication began and reflecting *a total loss* of the claimed "nine pound" gain.[22] Using data available from the BOP records, the following chart illustrates the course of Mr. Loughner's body weight over the relevant time period:



---

[21] Exhibit D at 23-24.

[22] Exhibit D at 25.

1   As is evident from the chart, any suggestion by the prison that medication has meaningfully

2   corrected Mr. Loughner's weight loss problem is squarely refuted by the data.

3   **B.    ABILITY TO ENGAGE IN RATIONAL CONVERSATION**

4       According to the September 7 report, Mr. Loughner can now "converse in an organized,

5   rational manner"—a skill he has exhibited "[o]ver the past few weeks."  Exhibit B at 2.  This,

6   according to the report, is a marked improvement from "the months of July and August," during

7   which "it was impossible to have a meaningful conversation with Mr. Loughner because of his

8   irrational and disorganized thinking."  Id.

9       This assessment of Mr. Loughner—as presently possessing the ability to converse

10  rationally with others—is contradicted by numerous prison staff accounts of his *inability* to

11  engage in rational conversation.  These records paint a very different picture.  For example:

12  •    On September 6, a nurse noted that "When questions [are] asked, inmate turns around and
       walks away.  Appeared initially to say something but inaudible, even when repeated."[23]

13
14  •    On August 29, a nurse noted that: "When asked how he was feeling this morning, inmate
       speaking so softly and [in such a] low tone that I could not make out what he was saying.
       He was instructed a couple of times by myself and [the officer in charge] to speak up,
15     however inmate continued in same manner."[24]

16  •    On August 26, a nurse note that Mr. Loughner "refused to speak."[25]

17  •    On August 24, Mr. Loughner was described as "not talkative" and was observed to
       "remain in bed when asked questions and gave short, one word answers."[26]  He also
18     refused to answer questions that morning and was "withdrawn."[27]

19  •    On August 23, Mr. Loughner was apparently too tired to answer basic questions and was
       "attempting to respond to questions before [the nurse was] finished asking the
20     question."[28]

21

22  ────────────────

23      [23]  Exhibit D at  26.

24      [24]  Exhibit D at 27.

25      [25]  Exhibit D at 28.

26      [26]  Exhibit D at 29.

27      [27]  Exhibit D at 30.

28      [28]  Exhibit D at 31.

- The same day, Dr. Pietz herself noted that Mr. Loughner "presented as despondent," "cried and paced during the entire interview," and was "unable to sit for more than a few seconds."[29]

- On August 22, a nurse noted that Mr. Loughner "refused to answer questions or respond in any way, other than raising his head."[30]

- On August 21, a nurse noted that: "This writer knocked on his door and asked how he was feeling. The inmate raised his head, looked at door, said nothing and laid his head back down. Inmate refused to respond to any questions."[31]

## C.   EYE CONTACT

Eye contact is another area where the September 7 report makes factual claims that are contradicted by the evidence. According to the report, Mr. Loughner "more readily establishes and maintains eye contact for extended periods of time." Exhibit B at 2.

Prison records, however, reveal numerous instances where Mr. Loughner's inability to make eye contact was prominent enough to be recorded by staff members. For example:

- On September 3, a nurse reported that Mr. Loughner's "[a]ffect remains very bland - walks w/eyes downcast, minimal eye contact."[32]

- On August 31, Mr. Loughner was observed to have exhibited "[p]oor eye contact at pill line."[33]

- On August 29, a nurse wrote: "Poor hygiene, flat mood, bland affect, avoiding eye contact."[34]

- On August 28, a nurse indicated that Mr. Loughner "makes no eye contact."[35]

- On August 24, a nurse wrote: "Poor hygiene, withdrawn, flat affect, no eye contact."[36]

---

[29]  Exhibit D at 32.

[30]  Exhibit D at 33.

[31]  Exhibit D at 34.

[32]  Exhibit D at 4.

[33]  Exhibit D at 35.

[34]  Exhibit D at 36.

[35]  Exhibit D at 37.

[36]  Exhibit D at 30.

1    Again, these observations undermine the notion that Mr. Loughner's ability to maintain

2    eye contact has improved during the period he has been forcibly medicated.

3    **D.    PACING**

4    The next claim, that "[u]ntil recently, Mr. Loughner was quite agitated" and that he is

5    now "significantly more calm and able to maintain a more lengthy conversation without pacing,"

6    Exhibit B at 3, is also not supported by the records.  The records show that Mr. Loughner

7    continues to suffer from agitation and is frequently observed to be pacing.  For example:

8    •    On September 6, Dr. Pietz wrote: "Mr. Loughner was unable to get up and talk to me.
         He reported he was very tired.  Correctional staff noted he did not sleep well during the
9        night, and he was up pacing a few times."[37]

10   •    On September 5, a nurse noted: "flat affect, pacing . . . . Inmate pacing in circle while
         drinking Ensure"[38]

11

12   •    On September 5, a nurse observed at 2 p.m. that Mr. Loughner "appears very anxious"[39]

13   •    On September 4, a psychologist, Dr. R. Frederick, noted at 9:05 a.m.: "Inmate agitated
         in cell, pacing back and forth.  Looks like akathisia."[40]

14   •    On September 2, Dr. Pietz wrote: "After a few moments, he came to the door, paced and
         talked a few moments."[41]

15

16   •    On August 31, Dr. Pietz wrote: "He was pacing in his room when I approached his
         housing area.  He barely sat on his bed to talk to me, but then rose from his bed and paced
         most of the conversation."[42]

17

18   [37]  Exhibit D at 38.

19   [38]  Exhibit D at 1.

20

21   [39]  Exhibit D at 1.  Akathisia is described by the prison's own clinical practice guidelines
     as: "internal sense of restlessness and is a common, early-onset *extrapyramidal side effect* of
22   dopamine-blocking medications.  Outward manifestations may include motor agitation, pacing,
     shifting of weight in a rhythmic manner, rocking, or other purposeless movements.  Internally,
23   the person may experience anxiety, agitation, and dysphoria.  Akathisia is under-recognized and
     under-treated.  Patients do not accommodate to this side effect with continued exposure to the
24   medication, and anticholinergic medications are generally ineffective in managing the
     symptoms."  *See* Exhibit C.
25

26   [40]  Exhibit D at 39.

27   [41]  Exhibit D at 40.

28   [42]  Exhibit D at 7.

20

- On August 29, Mr. Loughner was observed by one nurse to be "pacing, rocking";[43] the same day, Dr. Pietz wrote: "He paced. When I instructed him to sit, he rocked back and forth. Eventually he would stand and say, 'I can't sit.'"[44]

- On August 25, Mr. Loughner was described as: "fair hygiene, depressed, bland affect, pacing, crying. . . . Inmate began to weep when he came to the door to answer questions."[45]

- At an administrative forcible medication hearing on August 25, the hearing officer observed: "During the hearing, Mr. Loughner appeared dejected, anxious, and paced from one side of the door of the cell to the other."[46]

- Earlier that morning, Dr. Pietz observed that "[h]e paced during the entire interview."[47]

- On August 24, a nurse observed him "crying, pacing then lying down."[48]

- On August 23, the afternoon nurse wrote: "Inmate pacing in his room."[49]

- In the morning of the same day, Dr. Pietz wrote: "Mr. Loughner presented as despondent. He cried and paced during the entire interview. I asked him several times to sit down; he was unable to sit for more than a few seconds."[50]

- On August 22, during a visit by Drs. Sarrazin and Pietz, Mr. Loughner "rocked back and forth or paced while talking to us."[51]

- On August 21, a nurse observed him "pacing in cell" and prison psychologist R. DeMier concluded that Mr. Loughner's "[p]sychomotor agitation remains prominent."[52]

---

[43]  Exhibit D at 41.

[44]  Exhibit D at 42.

[45]  Exhibit D at 43.

[46]  Exhibit E (August 25 Hearing Report) at 5.

[47]  Exhibit D at 44.

[48]  Exhibit D at 45.

[49]  Exhibit D at 46.

[50]  Exhibit D at 47.

[51]  Exhibit D at 48.

[52]  Exhibit D at 49, 50.

1   •   On August 20, Dr. DeMier noted his "dysphoric presentation" and "psychomotor
2       agitation [constant pacing]."[53]

3   And so on.  In short, there is little (if anything) in the prison records to suggest that

4   Mr. Loughner has "recently" experienced a reduction in agitation and pacing.

5   **E.   SLEEP**

6          The final factual assertion of questionable accuracy is the September 7 report's suggestion

7   that the medications have cured Mr. Loughner's sleep problems.  <u>See</u> Exhibit B at 2 (claiming

8   that "[s]ince being medicated, Mr. Loughner is sleeping 8 to 10 hours each day").  In fact, this

9   claim is contradicted by the  August 22 report, which stated: "he continues to exhibit difficulty

10  sleeping."  Exhibit A at 5.  The records tend to support the August 22 assessment.  For example:

11  •   On September 6, the day before telling this Court that Mr. Loughner was "sleeping 8 to
12      10 hours each day," Dr. Pietz herself wrote: "Mr. Loughner was unable to get up and talk
        to me.  He reported he was very tired.  Correctional staff noted he did not sleep well
13      during the night, and he was up pacing a few times."[54]

    •   On August 25, the administrative hearing officer stated that continued forcible medication
14      was necessary in part because Mr. Loughner had been "experiencing . . . marked agitation
        [and] sleeplessness."[55]
15
    •   On August 24, a nurse noted: "When asked if he slept good during the night, he shakes
16      his head no, however, he was lying in bed covered up most of the night."[56]

17  •   This observation was corroborated by Dr. Pietz's observation later that morning that
        "Mr. Loughner was somewhat groggy when I talked to him"[57]
18
    •   On August 23, Mr. Loughner told a nurse "I'm very tired" and "express[ed[ that he is
19      tired and needs to go to bed."[58]

20  In contrast to the well-documented evidence of difficulty sleeping, it is unclear what evidence

21  supports the notion that Mr. Loughner is now sleeping "8 to 10 hours a day."  *See* Exhibit B at

22  _____

23      [53]  Exhibit D at 51.

24      [54]  Exhibit D at 52.

25      [55]  Exhibit E (August 25 hearing report) at 4.

26      [56]  Exhibit D at 30.

27      [57]  Exhibit D at 30.

28      [58]  Exhibit D at 31.

1    2.  It may be that this claim is based on observations of Mr. Loughner lying in bed with his head

2    under the covers—a condition that may or may not indicate actual sleeping.  In any event, the

3    claims are  unreliable based on the BOP's own records.

4    **F.    DELUSIONS**

5          Finally, the report is most notable for the areas in which it does *not* claim to observe any

6    improvement in Mr. Loughner's condition—his delusions.   This is important because

7    Mr. Loughner's delusions were, in Dr. Pietz's own words, "the most significant barrier to

8    Mr. Loughner's ability to assist in his own defense."  Without any observed abatement of this

9    "most significant barrier" to competence, it is impossible for this Court to conclude that the

10   course of medications being forced on Mr. Loughner is actually making any headway towards

11   trial competence.  The Court is not asked to evaluate Mr. Loughner's clinical status, where, as

12   here, the clinical picture fluctuates with marginal improvements and decrements over time;

13   rather, the Court is required to assess whether the government has proven the substantial

14   probability of restoration of the functional abilities required for capacity to stand trial. *See supra*,

15   Pt. III.  Failing to address one of the core symptoms that  affects Mr. Loughner's capacity

16   provides the Court with no factual basis upon which to grant the extension requested.[59]

17         Even so, the prison records indicate that the delusions persist.  For example, records from

18   a September 2 interview with Dr. Pietz reveal that the delusions persist.  Dr. Pietz's notes state:

19         He returned to talking about the "re-enactment of the video."  He explained the
           video was "made up" and "that's not what really happened."
20

21    Exhibit D at 53.  Consistent with steady persistence of delusional symptoms, prison psychiatrist

22   Dr. Sarrazin noted on August 8 that Mr. Loughner "[r]emains delusional."  *Id.* at 54.  The

23   prison's silence on the status of the delusions  undermines its claim that Mr. Loughner will be

24   restored in the "near future," and provides the Court with no basis for a finding that within the

25   requested four months, there is a substantial probability that Mr. Loughner will attain the

26

27         [59]   As noted, the medication has also done nothing to the very prominent cognitive
     deficits, severe thought disorder, or negative symptoms which are hallmarks of Mr. Loughner's
28   schizophrenia and all of which directly affect his ability to stand trial.

1   capacity to permit the proceedings to go forward. In other words, if, after two months of forcible

2   medication, there has been *no progress* made on the "most significant barrier" to competence,

3   this Court lacks the evidentiary basis to support a finding that four more months will suddenly

4   bring about the necessary change.

5                                               **VI.**

6   **THE PRISON'S CLAIM OF RESTORABILITY WITHIN FOUR MONTHS IS**
    **BASED ON AN EXPERT OPINION THAT FAILS TO SATISFY THE RELIABILITY**
7                    **REQUIREMENTS OF DUE PROCESS**

8           The sole basis offered by the prison to support the prediction necessary under

9   § 4142(d)(2)(A)—that is, the prediction that Mr. Loughner will be restored to capacity in four

10  months—is the opinion of Dr. Pietz set forth in the September 7 report. The report states:

11          . . . I cannot predict with any degree of certainty when Mr. Loughner will reach
            competency. Historically, most defendants reach competency within 8 months of
12          their commitment. I recommend Mr. Loughner's restoration commitment be
            extended for four months from September 21, 2011. Given his positive response
13          to medication, he will likely be competent in the near future.

14  Exhibit B at 3-4. This opinion cannot support a § 4241(d)(2)(A) commitment extension. It is

15  unreliable under Federal Rules of Evidence Rule 702, *Daubert v. Merrell Dow Pharmaceuticals,*

16  *Inc.*, 509 U.S. 579 (1993), and the Due Process Clause. It should be excluded from evidence;

17  alternatively, the defense is entitled to discovery of the bases of this factual assertion reasonably

18  in advance of an evidentiary hearing on the issue. *See United States v. Rivera-Guerrero*, 426

19  F.3d 1130, 1138 (9th Cir. 2005) (defendant is entitled to an opportunity to challenge the prison

20  doctor's evaluation and present his or her own evidence in response).

21  **A.   THE PRISON'S PREDICTION OF RESTORATION IN FOUR MONTHS IS**
    **UNRELIABLE AND INADMISSIBLE EXPERT OPINION.**
22

23          The opinion that Mr. Loughner "will likely be competent" in the next four months is

24  apparently based on the unsupported assertion that "[h]istorically, most defendants reach

25  competency within 8 months of their commitment." The lynchpin of any analysis of expert

26  testimony is whether there is factual basis and the opinion is reliable. Thus, the Court must

27  reject the information proffered unless it finds the information reliable. The proper analysis

28  for reliability of expert testimony is provided by Rule 702 and *Daubert*.

*Daubert* and Rule 702 require a court to act as a gatekeeper, keeping unreliable expert testimony out of the universe of evidence under consideration.  Rule 702 prohibits admission of expert testimony unless it is (1) "based upon sufficient facts or data" and (2) "the product of reliable principles and methods" that are (3) "applied . . . reliably to the facts of the case." *Daubert* specifies that reliability of the applicable theory method should be considered in light of (1) "whether it can be (and has been) tested"; (2) whether it "has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) its degree of acceptance within the community.  *Daubert*, 509 U.S. at 593-95.

The conclusory opinion offered in the September 7 report fails to meet these tests.  First, it is not "based upon sufficient facts or data."  Fed. R. Evid. 702.  As the evidence stands, the claimed "8-month" restoration of "most defendants" is entirely unsupported by *any* "facts" or "data."  It is a bald assertion made without reference to any scientific source, study, or any other form of authority.

Second, the opinion is not the "product of reliable principles and methods."  To predict restoration for Mr. Loughner, who suffers from schizophrenia so severe it impairs his ability to rationally understand the proceedings, on the basis of "most defendants" is a generalization that is appallingly devoid of principle and methodology.  There is no evidence that "most defendants" are afflicted with schizophrenia, let alone as severe a case as Mr. Loughner's.  There is no evidence what course of treatment was administered to "most defendants," if such treatment involved medication, the duration of any such course of medication, what medication was administered to "most defendants," what progress such defendants made after the two-month course forced upon Mr. Loughner, and so on.  *See Ruiz-Gaxiola*, 623 F.3d at 700-01 ( where the "government experts did not base their opinion as to the substantial likelihood of involuntary medication restoring [the defendant] to competency on the characteristics of *his particular mental illness* or on *scientific data* obtained through randomized clinical trials," their "generalized statements and unsupported assertions" were "plainly insufficient to establish by clear and convincing evidence that the proposed regime of involuntary medication is substantially likely to restore [the defendant] to competency") (emphases added).

Third, even if the "most defendants" opinion somehow can be characterized as reliable, there certainly exists no indication that it is being "applied . . . reliably to the facts of the case." As stated above, there is no evidence that the offered prediction is applicable to a case like Mr. Loughner's. Moreover, it is impossible to conclude that the opinion is reliably applied here where the Court has not been advised of a treatment plan to be implemented during the requested four-month extension. At the very least, there must be some consideration of the specific treatment plan and medical prognosis for Mr. Loughner. *See Rivera-Guerrero*, 426 F.3d at 139 & n.5 (defense expert needed continuance after hearing because information about "which specific drugs would be used in the course of treatment" was not revealed by prison doctors until the hearing itself). Specificity here is just as critical as it would be in a *Sell* hearing; only by knowing the identity of the drugs to be administered can the likelihood of restoration be meaningfully evaluated. *See id.* at 1140 ("Specificity as to the medications to be administered is critical . . . . We have held that fairness requires that adequate notice be given the defense to check the findings and conclusions of the government's experts.").

Fourth, there is no evidence that the report's prediction can be or has been tested. It seems highly unlikely that a prediction based on an unspecified, unsupported claim of the past experience of "most defendants" and without specification of the proposed course of treatment could possibly survive scientific testing, or be found reliable.

Fifth, the methodology employed by Dr. Pietz—predicting an individual defendant's restoration based on nothing more than what happens to "most defendants"—likewise could not possibly survive scientific peer review.

Sixth, consideration of the known or potential rate of error of Dr. Pietz's methodology is illuminating. Under the proffered rationale, *every single defendant* up for a § 4241(d)(2)(A) extension should automatically be forced to endure further commitment up to a total of eight months. In essence, Dr. Pietz's formulation is a simple syllogism:

> Most defendants are restored after 8 months of commitment. Therefore, this defendant—whoever it is—will be restored after 8 months of commitment.

The flaw to such reasoning is obvious: it applies to everyone. Accepting such a blanket generalization would render the role of the Court in the § 4241(d)(2)(A) determination to a mere rubber stamp. Indeed, the Ninth Circuit has rejected this very sort of reasoning. *See Ruiz-Gaxiola*, 623 F.3d at 700-01.

Seventh, there is no indication that such a blanket generalization has any acceptance in the scientific community.

In sum, it is clear that, as currently presented, the sole basis the prison has offered in support of its "substantial probability" prediction fails every aspect of the Rule 702 and *Daubert* tests. These opinions should be rejected by the Court as failing to set forth even a prima facie case for further commitment. The prison's request for a § 4241(d)(2)(A) extension should be denied.

**B.     THE DEFENSE SHOULD BE PROVIDED DISCOVERY OF THE BASES FOR THE PRISON'S POSITION AND AN EVIDENTIARY HEARING**.

In the alternative, if the Court is inclined to again allow the prison to supplement the two deficient reports it has already provided, the defense is entitled to discovery of the bases of Dr. Pietz's claims. Specifically, the defense requests discovery of the basis for the claimed "8 month" restoration of "most defendants," including the following:

• data indicating the nature of each defendant's incompetence, including the specific diagnosis of mental illness, and the basis of the incompetence finding;

• the course of treatment administered to each defendant, including the specific identity and dosage of any and all medications administered;

• the length of untreated psychosis and/or other manifestations of mental illness prior to the claimed 8-month restoration for each defendant;

• the length and nature of any and all prior treatments and/or hospitalizations of each person;

• the precise number of defendants restored within 8 months and precise number of total defendants included in the study;

• the definition of "restoration" used by the study;

• the duration the "restoration" lasted for each individual claimed to be "restored."

1    Discovery should be provided sufficiently in advance of an evidentiary hearing to permit

2    the defense to review and consult with its experts. *See Rivera-Guerrero*, 426 F.3d at 1139 ("the

3    expert would have needed additional time to review the specific course of treatment

4    recommended by the FMC's doctors . . . [because they] were not disclosed prior to the hearing").

5                                   **CONCLUSION**

6        For reasons set forth above, counsel for Mr. Loughner request that the Court deny the

7    four-month extension of Mr. Loughner's "restoration commitment" and find that the government

8    has failed to establish by clear and convincing evidence that there is a substantial probability that

9    Mr. Loughner's mental condition can be improved such that the trial may proceed.

10   Alternatively, counsel object to the extension, and seek an evidentiary hearing to determine the

11   legal and factual sufficiency of the request to extend Mr. Loughner's commitment. Counsel

12   further request discovery concerning the bases for the prison's conclusion that Mr. Loughner will

13   likely "be competent in the near future."

14                                       Respectfully submitted,

15

16   DATED: September 16, 2011         */s/ Judy Clarke*
                                       _____
17                                     JUDY CLARKE
                                       MARK FLEMING
                                       REUBEN CAMPER CAHN
18                                     ELLIS M. JOHNSTON III
                                       JANET C. TUNG
19
                                       Attorneys for Jared Lee Loughner
20

21

22

23

24

25

26

27   Copies of the foregoing served electronically to:
     Wallace H. Kleindienst, Beverly K. Anderson
28   Christina M. Cabanillas, Mary Sue Feldmeier

                                          28