1  Judy Clarke
   Clarke and Rice, APC
2  1010 2nd Avenue, Suite 1800
   San Diego, CA 92101
3  (619) 308-8484

4  Mark Fleming
   Law Office of Mark Fleming
5  1350 Columbia Street, #600
   San Diego, CA 92101
6  (619) 794-0220

7  Reuben Camper Cahn
   Ellis M. Johnston III
8  Janet Tung
   Federal Defenders of San Diego, Inc.
9  225 Broadway, Suite 900
   San Diego, CA 92101
10 (619) 234-8467

11 Attorneys for Defendant Jared Lee Loughner

12                  UNITED STATES DISTRICT COURT

13                     DISTRICT OF ARIZONA

14 UNITED STATES OF AMERICA,        )   Case No. CR 11-0187-TUC LAB
                                     )
15         Plaintiff,                )
                                     )   **DEFENDANT'S EMERGENCY**
16 v.                                )   **MOTION TO STAY INVOLUNTARY**
                                     )   **MEDICATION**
17 JARED LEE LOUGHNER,               )
                                     )
18         Defendant.                )
                                     )
19 _____  )

20                         **MOTION**

21         Defendant Jared Loughner, by and through his counsel, hereby seeks an emergency stay

22 of the regimen of psychotropic drugs presently being forced upon Mr. Loughner.  The prison

23 should be directed to immediately cease medication (which may requiring tapering) unless and

24 until it obtains legally valid authorization for forcible medication.  This motion is based on the

25 Due Process Clause of the United States Constitution, 28 C.F.R. § 549.46, any and all applicable

26 provisions of the federal constitution and statutes, all files and records in this case, and any

27 further evidence as may be adduced at the hearing on this motion.

28 //

# I.

## **INTRODUCTION**

There is presently no legal basis—under any rationale—to forcibly medicate Mr. Loughner.  Involuntary medication is unauthorized under any of the four possible bases for such action: (1) danger to others; (2) emergency;[1] (3) danger to self/grave disability; or (4) restoration to competency under *Sell*.  Each of these potential justifications is currently unavailable to the Bureau of Prisons due to the following circumstances: the existence of an operative injunctive order issued by the Ninth Circuit; the admitted absence of any actual emergency; failure to satisfy regulatory prerequisites to medication; and lack of authorization under *Sell*.

This has been the state of affairs since at least mid-August, when prison records indicate that the medical emergency justifying forcible medication on July 18 had dissipated.  Yet the prison staff has treated the absence of legal authorization as a non-event.  It has simply continued along its existing course of action, forcing Mr. Loughner to take a four-drug cocktail on a daily basis.  Although it has twice tried to secure regulatory authorization to medicate Mr. Loughner on a non-emergency, danger to self/grave disability ground, both these attempts have failed.  The first such attempt, an August 25 administrative hearing under 28 C.F.R. § 549.46, failed when the associate warden at MCFP Springfield granted Mr. Loughner's appeal on September 6.

The second such attempt, administrative proceedings initiated on September 15, also failed because they did not provide the basis required by § 549.46—a finding that involuntary administration of psychiatric medication is "necessary" either to mitigate the danger Mr. Loughner poses to himself or because he is "gravely disabled (manifested by extreme deterioration in personal functioning)."  Thus, in persisting in forcibly medicating Mr. Loughner

---

[1] An emergency is not a separate substantive basis for involuntary medication.  Rather, it is a state of affairs that allows the government to act to deprive an individual of liberty and provide process only afterwards, if the deprivation is to continue.  The only case where an emergency might justify a continued deprivation without prompt provision of a hearing is where the "emergency" persists: that is, if Mr. Loughner remained so gravely disabled that it would make it impossible to provide him with a meaningful hearing.

without justification, the prison's actions are unlawful and *ultra vires*; they are being undertaken without authorization, even under its own regulations.

In any event, as the defense has argued in its previous two challenges the prison's forcible medication of Mr. Loughner, even if the September 15 proceedings are sound under the regulations, they do not suffice under the Constitution to justify forcible medication of a pretrial detainee. Due process permits such action only upon a finding by clear and convincing evidence made by a court of law following an adversarial hearing at which the detainee is entitled to representation of counsel. The prison should be ordered to immediately cease forcing its current regimen of medication on Mr. Loughner unless and until it receives legally valid authorization to do so.

## II.

## STATEMENT OF FACTS

Since Mr. Loughner's return to MCFP Springfield on May 27, 2011, for a competency restoration determination under 18 U.S.C. § 4241(d), prison staff have tried to get him to take psychotropic drugs—first by trying unsuccessfully to obtain his consent, and thereafter by force. It has twice initiated forcible medication, each time operating under color of its regulations.

**A.     Round One: Medication due to dangerousness to others and property**

The first round of forced medication commenced on June 22. This followed an administrative hearing held by the prison under 28 C.F.R. § 549.43 (the precursor to § 549.46) and denial on June 21 of Mr. Loughner's administrative appeal. The grounds for medicating, according to the prison, were to mitigate the risk of danger to others and property.

After learning of the prison's actions, defense counsel applied first to the district court and then to the Ninth Circuit for a stay of medication, arguing *inter alia* that the forced medication was impermissible under the Due Process Clause in the absence of judicial authorization. On July 1, the Ninth Circuit granted the defense motion for a temporary stay of medication. After oral argument on the stay motion, the Ninth Circuit issued a second order on July 12 extending the stay pending appeal. That stay remains in effect.

**B.     Round Two: Emergency medication due to immediate threat to self**

Initially, the prison abided by the Ninth Circuit's order.  It stopped forcing Mr. Loughner to take psychotropic drugs on July 2.  On July 18, however, it began medicating him again, this time on the grounds that he presented an emergency threat to himself that justified immediate administration of medication.  This assessment was made in a report consisting of the opinion of BOP Psychiatrist Robert Sarrazin, along with the concurring opinion of BOP psychiatrist James Wolfson.[2]  According to the report, the emergency nature of Mr. Loughner's mental and physical state arose from his extreme difficulty sleeping (resulting in his staying awake for up to 50 hours at a time), inability to stop pacing (causing swelling in his leg), and weight loss.  *Id.* (Report at 870-71); *see also* Report at 873-74 ("He is at risk from existing infection, malnutrition, and exhaustion" and "ongoing serious risk of suicide").  The report concluded that "Mr. Loughner has deterioration of his status and grave disability with an extreme deterioration in his personal functioning, secondary to his mental illness.  Emergency medication is justified." *Id.* (Report at 872).

These findings, from the prison's point of view, authorized emergency forcible medication under its regulations.  *See* 28 C.F.R. § 549.43(b) (amended and renumbered to § 549.46 on August 12, 2011) (permitting forcible medication without a hearing when "a person is suffering from a mental illness which creates an immediate threat of bodily harm to self or others, serious destruction of property, or extreme deterioration of functioning secondary to psychiatric illness").

This course of medication was challenged by the defense as impermissible due to the lack of a post-deprivation judicial hearing justifying ongoing medication.  *See* DE 278.  The defense motion was denied by the district court and is currently pending on appeal.

---

[2] The report is filed under seal as Exhibit C to Defendant's August 11, 2011, Emergency Motion for Post-Deprivation Hearing (DE 278).

**C.     Round Three: Dissipation of the emergency and the August 25 administrative hearing**

At the time the prison began forcible medication on the emergency basis on July 18, it was unclear how long it would claim the emergency to persist—and thus how long it would continue forcibly medicating before either discontinuing the medication or seeking a non-emergency authorization to medicate.   Neither occurred by the time the defense filed its Emergency Motion for a Post-Deprivation Hearing on August 11, which this Court set for a hearing on August 26.

On August 25, the day before the August 26 hearing before this Court, defense counsel learned that an administrative hearing under 28 C.F.R. § 549.46 had taken place earlier that day. One of the members of the defense team was contacted by Dr. Tomellieri, a psychiatrist at the prison, and was informed that Mr. Loughner had requested her as a witness at the hearing, but the hearing had already concluded.[3]  On August 26, defense counsel informed the Court of these events.   The Court indicated that "[i]f it's true that Mr. Loughner asked for a witness in the second proceeding and that was denied, then that's a problem, I think," TR at 40, 50-51, but ultimately ruled that the propriety of the administrative proceeding was not properly before it. TR 67.

On September 6, a week and a half after the Court expressed its doubt about the administrative proceeding, the associate warden at Springfield granted an appeal filed on Mr. Loughner's behalf by the staff representative. *See* Exhibit A (Involuntary Medication Hearing Appeal Response) (2-MCFP 1798); Exhibit B (Appeal of Involuntary Medical Decision) (2-MCFP 1799).  In his decision, the associate warden wrote:

> It is my opinion that obtaining the witness statement should have been completed prior to the hearing.  Calling Ms. Chapman after the hearing had taken place and after the decision was made to 'authorize continuing treatment with medication' does not allow for the witness to provide a statement that can be used in the decision making process. . . . The appeal is therefore granted pending a new Due Process Hearing.

_____

[3] The administrative hearing report is filed under seal as Exhibit E to the Defendant's September 16 Motion to Deny Extension of the Commitment (DE 311).

Exhibit A.

Nothing in the appeal response or the August 25 authorization claimed to authorize medication on an emergency basis.  According to the hearing officer, Mr. Loughner was "[a]ctively engaging, or [was] likely to engage, in conduct which is either intended or reasonably likely to cause physical harm to self or cause significant property damage," was "in danger of serious physical harm to self by failing to provide for his own essential human needs of health and/or safety," and "manifests, or will soon manifest, severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his actions." August 25 Involuntary Medication Report at 3.  The hearing officer found that "[d]iscontinuation of current medications is virtually certain to result in an exacerbation of Mr. Loughner's illness" in a way that would prove "debilitating and would make him susceptible to physical trauma, infection and metabolic disturbances" but stopped short of suggesting that these consequences would be so immediate and severe as to create another emergency. *See id.* at 5.

At around the same time, Mr. Loughner's treating psychiatrist indicated in reports to the Court that the mental and physical states that had given rise to the emergency—sleep deprivation, excessive pacing, and weight loss—had "dissipated" and "improved."  Specifically, in her August 22, 2011 Progress Report, Dr. Pietz stated that "[o]ver the past month, Mr. Loughner's appetite and sleep have improved," he had "gained back most of the weight he lost," and he was pacing "less frequently."  August 22 Report at 5.[4]  On September 7, Dr. Pietz reported nearly complete recovery from these afflictions.  Mr. Loughner's weight loss had been completely reversed; "he is now eating almost 100% of his meals and has gained back the nine pounds" he had lost.  September 7 Progress Report at 3.[5]  His sleep had also completely recovered: "Since being medicated, Mr. Loughner is sleeping 8-10 hours a day." *Id.* at 5.  And

---

[4] The August 22, 2011 Progress Report is filed under seal as Exhibit A to the Defendant's Motion to Deny Extension of Commitment (DE 311).

[5] The September 7, 2011 Progress Report is filed under seal as Exhibit B to the Defendant's Motion to Deny Extension of Commitment (DE 311).

the pacing had also improved; Dr. Pietz informed the Court that Mr. Loughner's excessive pacing arose from his agitation, which he suffered from "[u]ntil recently." While that agitation caused him to "pace[] for extended periods of time," he had become "significantly more calm and able to maintain a more lengthy conversation without pacing." *Id.* at 2-3.

Dr. Pietz repeated her assessment of Mr. Loughner's improvement at a hearing before the Court on September 19, 2011. On that date, she told the Court that Mr. Loughner had been "pac[ing] less the past couple of weeks" and "[i]n the past week he has been able to sit on the bed and actually converse with us without pacing back and forth," in contrast to the period of "time when every conversation you had with him he paced consistently." RT 9/19/11 at 24.

**D.   Round Four: the continued forcible medication and September 15 administrative hearing**

Despite the warden's September 6 reversal of the § 549.46 authorization to medicate on danger-to-self/grave disability grounds, and dissipation of the emergency, the prison nonetheless continued forcing Mr. Loughner to take a host of psychotropic medications. It is unclear what legal basis, if any, justifies the prison's actions.

Subsequently, on September 15, 2011, the prison held another administrative hearing under 28 C.F.R. § 549.46. It again authorized forcible medication on danger-to-self/grave disability grounds, relying on the findings that "[p]sychotropic medication is the treatment of choice for conditions such as Mr. Loughner is experiencing" and "[d]iscontinuation of current medications is virtually certain to result in an exacerbation of Mr. Loughner's illness as it did when medication was discontinued in July." *See* Exhibit C at 6 (September 15, 2011 Involuntary Medication Report). The report also indicated that Mr. Loughner was a danger to himself and that "[i]nvoluntary medication is approved in the patient's best medical interest." *Id.* at 3. Nowhere in the report did the hearing officer indicate that he had found forcible medication to be "*necessary*" because Mr. Loughner was a danger to himself or gravely disabled, as manifested by extreme deterioration in personal functioning.

On administrative appeal, an associate warden approved the decision to involuntarily medicate, relying on the finding of the hearing officer that "involuntary medication [is] in your

best medical interest." *See* Exhibit D at 1 (September 21, 2011 Due Process Hearing Appeal Response). The associate warden added his belief that "[w]ithout medication for your mental illness, you are 'actively engaging, or [] likely to engage, in conduct which is either intended or reasonably likely to cause physical harm to self' and 'grave disability (the patient is in danger of serious physical harm to self by failing to provide for his own essential human needs of health and/or safety).'" *Id.* These conclusions appear to be based on circumstances from July, over two months prior to the decision.

## III.

### THE PRISON LACKS AUTHORIZATION UNDER ITS REGULATIONS (OR ANY OTHER LEGAL AUTHORITY) TO FORCIBLY MEDICATE MR. LOUGHNER

At the present time, the prison has no authority to forcibly medicate Mr. Loughner. None of the bases it has invoked to justify forcible medication under its regulations remains applicable. This is true of all possible bases for forcible medication: (1) danger to others; (2) emergency medication; (3) danger to self/grave disability; and (4) restoration to competency under *Sell*.

**A.    The prison may not forcibly medicate for danger to others**

First, the initial basis for medication, mitigation of risk of danger to others, is under an operative temporary stay by the Ninth Circuit.

**B.    There is no psychiatric emergency**

Second, the emergency that justified forcible medication on July 18 has now dissipated. A psychiatric emergency exists only "when a person suffering from a mental illness or disorder creates an *immediate threat* of . . . bodily harm to self . . . or . . . extreme deterioration in personal functioning secondary to the mental illness or disorder." 28 C.F.R. § 549.46(b)(1)(ii) (emphasis added). In other words, the "emergency" nature of someone who poses some danger to himself is measured by a temporal yardstick—is that risk "immediate" in nature?

There is no indication that the extreme and emergent risk Mr. Loughner posed to himself in mid-July, due to excessive pacing, sleep deprivation, and weight loss, has persisted. In fact, his treating psychologist, Dr. Pietz, has reported to this Court that most of these symptoms have substantially abated, if not completely reversed and that some of the symptoms of his mental

illness "have dissipated." August 22 Report at 6. According to Dr. Pietz, weight loss is no longer an issue at all. He has completely recovered the nine pounds he lost, and "he is now eating almost 100% of his meals." September 7 Report at 3. Sleep deprivation has also ceased being a problem according to Dr. Pietz, as "Mr. Loughner is sleeping 8 to 10 hours each day," *id.*, unlike the 50-hour stints he was awake during the time of the emergency. The continual pacing, which had caused a sore on his foot and serious infection in his leg, is also much improved. As Dr. Pietz reports, "Although he continues to exhibit some agitation, he is significantly more calm and able to maintain a more lengthy conversation without pacing," *id.* at 3.

Additionally, the August 25 administrative hearing, which was held under 28 C.F.R. § 549.46, provides further evidence of the prison's view that the emergency has dissipated. Section 549.46 provides that "[i]f psychiatric medication is still recommended after the psychiatric emergency, *and the emergency criteria no longer exist*, it may only be administered after following the procedures in §§ 549.44 or 549.46 of this subpart." 28 C.F.R. § 549.46(b)(1)(i) (emphasis added). The involuntary medication report and appeal response confirm the view that the prison regards that "emergency criteria [as] no longer exist[ing]." Both indicate the belief that Mr. Loughner remains a danger to himself/grave disability but do not claim that his condition is so exacerbated as to amount to an emergency.

As the great weight of evidence shows, although Mr. Loughner may continue to pose some risk of harm to himself, he certainly no longer presents an "*immediate* threat" of such harm. *See* 29 C.F.R. § 549.46(b)(1)(ii).

**C.    There is no valid non-emergency basis to medicate for danger to self/grave disability**

Third, the prison lacks authority under its own regulations to forcibly medicate on a non-emergency danger-to-self basis. There are two possible events that potentially could serve as regulatory authorization on this basis—the August 25 administrative proceedings and the September 15 administrative proceedings—but neither of them are valid.

As a threshold matter, it is clear that the prison's actions were blatantly unlawful between at least August 25 to September 21. This is true because, by the terms of the regulations, the

holding of the August 25 hearing established that the emergency had abated.  *See* 28 C.F.R. § 549.46(b)(1)(i).  At that time, no authorization existed to continue with forcible medication because an administrative hearing result does not become operative unless and until it is affirmed on appeal.  *See id.* at § 549.46(a)(9) (medication "must not be administered before the administrator issues a decision on the appeal...").  In fact, the decision was never affirmed on appeal.  The decision was reversed by the warden on September 6, thus rendering the initial authorization void.  *See* Exhibit A.  Yet the prison had no qualms about simply continuing to force Mr. Loughner to take psychotropic drugs, legal authority or not.

Its second attempt to lend some validity to its actions also failed.  The proceeding held on September 15, 2011, did not afford the prison authority to medicate under its own regulations because it failed to make the requisite finding under § 549.46(a)(7) that involuntary administration of psychiatric medication is "necessary" to ameliorate Mr. Loughner's danger to himself and/or grave disability.  That subsection provides that:

> The psychiatrist conducting the hearing must determine whether involuntary administration of psychiatric medication is *necessary* because, as a result of the mental illness of disorder, the inmate is dangerous to self or others, . . . or is gravely disabled (manifested by extreme deterioration in personal functioning).

28 C.F.R. § 549.46(a)(7) (emphasis added).  The hearing report, however, contains no such finding of necessity.  What it does conclude is that involuntary medication—presumably the current course of drugs reached after a series of alterations in dosages and medications—is in Mr. Loughner's "best medical interest."  Exhibit C at 3; *see also id.* at 6 ("Psychotropic medication is the treatment of choice for conditions such as Mr. Loughner is experiencing.").  But "best medical interest" and "treatment of choice" do not speak to whether the medication is "necessary."  It is often the case that some treatment is in one's best medical interest—regular intake of vitamins, for example—but not *necessary* to forestall or ameliorate some harm.[6]

---

[6] "Best medical interest" goes to the "medical appropriateness" prong of *Harper*, *Riggins*, and *Sell*; it does not establish the separate and independent constitutional requirement that forcible medication be necessary or "essential" to mitigate dangerousness.

Neither does the hearing report's claim that "[d]iscontinuation of current medications is virtually certain to result in an exacerbation of Mr. Loughner's illness as it did when medication was discontinued in July" satisfy § 549.46's "necessity" requirement. *See* Exhibit C at 6. Even accepting this statement at face value, it predicts only "an exacerbation of mental illness"—a future state that falls short of establishing that medication is presently "necessary because . . . [Mr. Loughner] *is* dangerous to [him]self." 28 C.F.R. § 549.46(a)(7) (emphasis added). Nor does the prospect of exacerbation establish that Mr. Loughner currently "is . . . gravely disabled," which the regulation defines as "manifested by extreme deterioration in personal functioning." *Id.* The results of the September 15 hearing are thus deficient on their face to justify involuntary medication under the regulations; their failure to establish necessity likewise violated the constitutional requirements of *Riggins v. Nevada*, 504 U.S. 127, 135 (1992).

Additionally, the proceedings were also defective because Mr. Loughner's staff representative failed to provide him with any meaningful representation and he was denied the opportunity to have his legal counsel actively participate in the proceedings. This is amply demonstrated throughout the course of all the § 549 administrative proceedings held since June. In all three of these proceedings—hearings held on June 14, August 25, and September 25—Mr. Loughner was assigned the same "staff representative," John Getchell. The documents reflect that Mr. Getchell took no active role in "representing" Mr. Loughner at any of these hearings. There is no indication that he "presented an evidence on behalf of [Mr. Louhgner] or that he presented his reasons for objecting to the medication" to the hearing officer at the September 15 hearing, or any of the other hearings. *See United States v. Humphreys*, 148 F. Supp. 2d 949, 953, 955 (D.S.D. 2001) (remanding for a new § 549.43 hearing where the staff representative failed to meaningfully advocate for the defendant, and ordering BOP to refrain from forcible medication "until the BOP receives approval from this Court"). Neither did the "staff representative" make any effort to communicate with Mr. Loughner's legal counsel at any time prior to the September 15 hearing or any other hearing. *See id.* (ordering that "the lay advocate should be provided with an adequate opportunity to communicate with Defendant's attorney . . . before the next section 549.43 hearing").

1    Mr. Getchell appears to have done little more than be physically present at the hearings

2    and relay paperwork between Mr. Loughner and the prison administration.  The failure in

3    meaningful advocacy is perhaps best illustrated by the "appeal" he filed on Mr. Loughner's

4    behalf on September 6.  In it, the only reason for appeal he offered was: "Patient declined to

5    complete the appeal form."  *See* Exhibit B.  This is striking because there was plainly at least one

6    substantial basis for appealing the decision—the fact that the hearing officer had deprived

7    Mr. Loughner his requested witness.  The associate warden reversed the medication decision,

8    granting the "appeal" on this ground, even though Mr. Getchell had made no effort at all to

9    advance this basis of reversal.  *See* Exhibit A.  This total lack of advocacy violates both due

10   process and the spirit of the regulations.  This basis alone requires vacating the prison's decision.

11   *See Humphreys*, 148 F. Supp. 2d at 955 (vacating § 549.43 decision and remanding to BOP due

12   to failure of staff representative to meaningfully advocate on behalf of defendant).

13   **D.    The prison has no authority to forcibly medicate for competency restoration**

14       Finally, the prison obviously has no authority to restore for competency.  No *Sell* hearing

15   has been held.

16   **E.    The prison may not continue on its present course of involuntary medication**

17       In sum, there exists no legal basis—even accepting *arguendo* the premise that only

18   regulatory authority (not judicial authorization, as the defense has argued in its past challenges

19   and here to medication) is needed to authorize forcible medication of Mr. Loughner.  The prison

20   should be ordered to cease its current medication regimen forthwith and commence tapering

21   Mr. Loughner off the unauthorized, involuntary psychotropic medications.

22                                                   **IV.**

23   **AUTHORIZATION TO FORCIBLY MEDICATE A PRETRIAL DETAINEE MAY
     NOT BE MADE ON THE BASIS OF ADMINISTRATIVE PROCEEDINGS**

24       The facts, as defense counsel understands them, make clear that the prison has violated

25   its own regulations and is continuing to act unlawfully by forcibly medicating Mr. Loughner

26   without even colorable authority.  But even though prison has already completed the appellate

27

28

process in its effort initiated on September 15, forcible medication is nonetheless unlawful because it violates the Due Process Clause.

As Mr. Loughner has previously argued in the context of his previous two motions concerning forcible medication (DE 239, 278), due process permits forcible administration of psychiatric medications to a pretrial detainee only upon a showing, by clear and convincing evidence, that such medication is "essential" to the government's objectives following consideration of "less intrusive" alternatives and is medically appropriate.  *See Riggins v. Nevada*, 504 U.S. 127, 135 (1992).   Such a finding may only be made by a court of law following an adversarial hearing at which a defendant is entitled to representation by counsel.

Moreover, a defendant must be afforded a meaningful opportunity at the hearing to contest the specific drug or drugs, maximum dosages, and duration of proposed medication. *See United States v. Hernandez-Vasquez*, 513 F.3d 908 (9th Cir. 2008); *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1138 (9th Cir. 2005); *United States v. Williams*, 356 F.3d 1045, 1056 (9th Cir. 2004).  Because § 549.46 permits such a decision to be made without even specifying the proposed treatment plan, or identifying the drugs under consideration and their maximum dosages, and results in blanket authorizations of "medication," it is facially unconstitutional. *See Williams*, 356 F.3d at 1056 (involuntary antipsychotic medication condition of supervised release may "occur only on a medically-informed record" developed "*before* [the . . . ] conditions are imposed").  Any decision issued under that regulation is thus invalid.

**A.    The Forcible Medication Decision Must Be Made By a Court Following an Adversarial Hearing.[7]**

Due process requires that any forcible medication hearing be conducted by a court. Procedural adequacy is weighed under the *Mathews* test, which balances the following:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function

---

[7]This argument is in all important respects identical to the argument Mr. Loughner has previously made and which is currently pending in the Ninth Circuit, Case No. 11-10339.

1    involved and the fiscal and administrative burdens that the additional or
2    substitute procedural requirement would entail.

3    *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

4    In this case—involving ongoing forced medication justified on danger-to-self/grave

5    disability grounds in the pretrial context—the interests at stake are different than they were in

6    *Washington v. Harper*, 494 U.S. 210, 221 (1990), which addressed the issue in the post-

7    conviction, correctional setting.  This is something that both the Ninth Circuit and the Supreme

8    Court have recognized.  *See Riggins*, 504 U.S. at 135 (specifying that *Harper*'s holding

9    addressed forcibly medicating "a *convicted* prisoner" and explaining that its analysis concerned

10   "the unique circumstances of *penal* confinement") (emphases added); *see also* July 12 Ninth

11   Circuit Order (Exhibit B) ("Because Loughner has not been convicted of a crime, he is

12   presumptively innocent and is therefore entitled to greater constitutional protections than a

13   convicted inmate, as in *Harper*.") (citing *Riggins* and *Demery v. Arpaio*, 378 F.3d 1020, 1032

14   (9th Cir. 2004)).  Correctly balancing the competing *pretrial* interests establishes that judicial

15   consideration, not just administrative procedures, are necessary to justify the prolonged

16   administration of "emergency"-based forcible medication.

### 1.    The private liberty interests at stake

18   Mr. Loughner's interests in avoiding undesired administration of psychotropic

19   medications are substantial and differ in marked ways from those of the inmate in *Harper*.

20   These interests fall into four categories: the fundamental liberty interests in avoiding (1) the

21   undesired brain-altering effects psychotropic drugs are designed to induce; (2) side effects of the

22   drugs that are universally recognized as harmful; (3) other effects of the drugs that pose a threat

23   to Mr. Loughner's right to a fair trial; and (4) the even more fundamental interest in avoiding the

24   death penalty, the government's potential ultimate objective in this case (an interest it might

25   advance through administration of the medications).

### a.    Freedom from unwanted brain-altering chemicals

Only the first two of these interests were addressed in *Harper*, and *Harper* found these interests to be "substantial" even for convicted prisoners.  Addressing the first interest, *Harper* recognized that:

> The forcible injection of medication into a nonconsenting person's body represents a *substantial interference* with that person's liberty. . . . The purpose of the drugs is to alter the chemical balance in a person's brain, leading to changes . . . in his or her cognitive processes.

*See* 494 U.S. at 229 (citations omitted; emphasis added); *see also United States v. Ruiz-Gaxiola*, 623 F.3d 684, 691 (9th Cir. 2010) ("Antipsychotic medications are designed to cause a personality change that, if unwanted, interferes with a person's self-autonomy, and can impair his or her ability to function in particular contexts.") (quotation marks omitted).

Here the interest is even stronger.  After *Harper*, the Supreme Court twice considered the strength of that interest when the subject of the forced medication is a pretrial detainee like Mr. Loughner, rather than a convicted prisoner.  In *Riggins* and *Sell*—both cases involving medication of pretrial detainees—the Supreme Court concluded the interest is so significant in the pretrial context that it can only be substantively overcome by an "'essential' or 'overriding' state interest."  *Sell*, 539 U.S. at 179 (citing *Riggins*, 504 U.S. at 134).

*Harper,* addressing the case of a convicted inmate, did not require a showing that medication was "essential" or that the state's interest in medication was "overriding."  It required only a lesser showing of a "legitimate" governmental interest and a "valid, rational connection" to that interest.  494 U.S. at 224-25.  Moreover, *Riggins*  makes clear that it is the *pretrial* setting—not some other factor—that places a thumb on the due process scale in favor of the individual's interest.  In discussing *Harper*, *Riggins* takes care to distinguish the "unique circumstances of *penal* confinement" at issue there from "the trial or pretrial settings."  504 U.S. at 134-35 (emphasis added).  Indeed, *Riggins* makes clear that the due process question "in the trial or pretrial settings" was not answered by *Harper.  Id.* at 135.

Thus, the heightened due process liberty interest articulated by *Riggins* and *Sell* necessarily emerges from the Supreme Court's recognition that a pretrial detainee has a stronger

liberty interest in being free from unwanted medication than a convicted inmate. This distinction derives from either one of two important differences between the convicted inmate and the pretrial detainee.  The first is that the pre-trial detainee is, in fact, awaiting trial and has fair trial rights (discussed below) that may be adversely affected by, and thus weigh against, forcible medication.  The second is that the state, in convicting an individual, has extinguished his liberty interest in avoiding correction or treatment.  These are legitimate aims of a criminal sentence that may be imposed as punishment upon conviction of a crime.  *See* 18 U.S.C. §§ 3553(a)(2)(D) & 3563(b)(9).  But "[t]he Fourteenth Amendment prohibits punishment of pretrial detainees." *Demery v. Arpaio*, 378 F.3d 1020, 1023 (2004) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)); *see also* July 12 Order at 2 (Exhibit B) ("Because Loughner has not been convicted of a crime, he is presumptively innocent and is therefore entitled to greater constitutional protections than a convicted inmate, as in *Harper*.") (citing *Riggins*, 504 U.S. at 137, and *Demery*, 378 F.3d at 1032). Regardless of which distinction is more important, *Riggins* and *Sell* establish that an "essential" or "overriding" government purpose is needed to forcibly medicate a pretrial detainee, though *Harper* required less to subject a convicted inmate to this same deprivation.  This demonstrates that the pretrial detainee's liberty interest in avoiding unwanted medication is greater than that of the convicted inmate.

### b.      **Freedom from harmful side effects**.

The second interest that must be considered, freedom from side effects, has also been expressly recognized by both the Ninth Circuit and the Supreme Court, which have found this to be a serious matter:

> [A]ntipsychotic drugs . . . can have serious, even fatal, side effects.  One such side effect . . . is acute dystonia, a severe involuntary spasm of the upper body, tongue, throat, or eyes. . . . Other side effects include akathesia (motor restlessness, often characterized by an inability to sit still); neuroleptic malignant syndrome (a relatively rare condition which can lead to death from cardiac dysfunction); and tardive dyskinesia. . . . Tardive dyskinesia is a neurological disorder, irreversible in some cases, that is characterized by muscles, involuntary, uncontrollable movements of various muscles, especially around the face. . . . [T]he proportion of patients treated with antipsychotic drugs who exhibit the symptoms of tardive dyskinesia ranges from 10% to 25%.

*Harper*, 494 U.S. at 229-30; *see also Riggins*, 504 U.S. at 134 (characterizing risk of the same side effects as a "particularly severe" interference with personal liberty).

The risk of enduring such side effects—particularly when the possibility looms of developing an *irreversible* neurological disorder—has led the Ninth Circuit to characterize forcible psychotropic medication in the pretrial context as an "especially grave infringement of liberty" which the Court "has refused to permit . . . except in highly-specific factual and medical circumstances." *Ruiz-Gaxiola*, 623 F.3d at 691-92; *see also id.* at 692 (the importance of the defendant's liberty interest is colored by the "powerful and permanent effects" of antipsychotics and the their adverse "side-effects"). Like Mr. Loughner's interest in freedom from the unwanted *intended* effects of the medication, his interest in avoiding their serious side effects is heightened by his status as a pretrial detainee. Both weigh heavily in his favor.

### c.    Right to a fair trial

The third interest, the right to a fair trial, is one that was not considered in *Harper* because the convicted inmate there no longer had a fair trial right to assert. This interest is a crucial part of the inquiry that it is "error" to ignore. *See Riggins*, 504 U.S. at 137 ("The court did not acknowledge the defendant's liberty interest in freedom from unwanted antipsychotic drugs. . . . This error may well have impaired the constitutionally protected trial rights Riggins invokes."); *see also Sell*, 539 U.S. at 177 (holding that the defendant's legal right to avoid medication "because medication may make a trial unfair" is cognizable pretrial and before actual administration of the drugs).

Being forced to take psychotropic drugs poses a severe threat to Mr. Loughner's ability to receive a fair trial should he ever be restored to competency. Specifically, antipsychotics can "sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, . . . diminish the ability to express emotions," *Sell*, 539 U.S. at 185, cause "drowsiness," "confusion," as well as "affect thought processes," "outward appearance," "the content of . . . testimony . . . [and the] ability to follow the proceedings or the substance of his communication with counsel," *Riggins*, 504 U.S. at 137. This is a particularly important concern in light of the long-term nature of the prescription authorized by prison—which extends through

September 28—and the lack of any indication that the BOP foresees a termination point to the emergency.

The "powerful and permanent effects" of antipsychotics also pose a threat of permanently depriving Mr. Loughner of an opportunity to communicate with his attorneys and develop potential mental-state defenses because, as the Supreme Court has acknowledged, their very purpose is to "alter the chemical balance in a person's brain" and change "his or her cognitive processes." *Harper*, 494 U.S. at 229; *Ruiz-Gaxiola*, 623 F.3d at 692.  This is, in essence, not only a fair-trial issue but also an evidence-tampering problem.  Justice Kennedy put it most succinctly in his  concurrence in *Riggins*:

> When the State commands medication during the pretrial and trial phases of the case for the avowed purpose of changing the defendant's behavior, the concerns are much the same as if it were alleged that the prosecution had manipulated material evidence.

504 U.S. at 139 (Kennedy, J., concurring); *see also id.* at 144 ("The side effects of antipsychotic drugs can hamper the attorney-client relationship, preventing effective communication and rendering the defendant less able or willing to take part in his defense.").  In short, "involuntary medication with antipsychotic drugs poses a serious threat to a defendant's right to a fair trial." *Id.* at 138 (Kennedy, J., concurring); *accord Ruiz-Gaxiola*, 623 F.3d at 692 (noting "the strong possibility that a defendant's trial will be adversely affected by a drugs's side-effects").

### d. The interest in not being sentenced to death

Finally, on the "individual interests" side of the scale, Mr. Loughner has an exceptionally strong interest in not being executed.  The government's ultimate objective in this case is to obtain a conviction and sentence against Mr. Loughner, and it is no secret that the government may seek the death penalty.  This interest is implicated now because the medication regime the government has applied here in the name of mitigating an emergency is the same it would apply in an effort to restore Mr. Loughner to trial competency.  The prison has admitted as much. *See* Exhibit A at 3 (ruling out less intrusive alternatives such as minor tranquilizers because they would not "impact the underlying psychotic illness").

In short, the forced-medication road taken by the government here is one that potentially leads to Mr. Loughner's death.  To paraphrase lay commentators, the government's position here raises the specter of "medicating him to execute him."  And obviously, individuals have a strong interest—the paramount interest recognized by the Due Process Clause—in remaining alive.  Thus, so long as the death penalty remains on the table, it is clear that this interest sharply tips the balance in favor of the individual.

### 2.    The governmental interests involved

Weighed against these private interests is the government's interest "including the function involved and the fiscal and administrative burdens the additional or substitute procedural requirement would entail."  *Mathews*, 424 U.S. at 335.  Insofar as the governmental interest is considered, *Mathews* is concerned only with procedures, so what is weighed is the damage to governmental interests resulting from increased procedural protections.  Here, the administrative and fiscal burden of additional procedural protections in the pretrial context is minimal in comparison with the private interests at stake.  Requiring judicial proceedings to authorize forced medication poses a much lesser administrative burden in the pretrial context because the detention staff is already necessarily charged with participation in judicial proceedings—the competency proceedings conducted under 18 U.S.C. § 4241(d).  *See Harper*, 494 U.S. at 232 (by contrast, importing judicial proceedings into the post-conviction context poses a new burden on the prison's "money and the staff's time").

In contrast to *Harper*, the governmental interests involved here are much weaker than those it holds when addressing a convicted inmate who poses a danger.  And they are particularly weak in comparison to the exceptionally weighty interests asserted by Mr. Loughner.  To begin, it is important to recognize that the governmental interests at stake in the pretrial, temporary-detention setting are quite different from its long-term *correctional* interests after a conviction is obtained.  As discussed above, treatment and correction are legitimate aims of a criminal sentence imposed as punishment for a crime.  *See, e.g., Harper*, 494 U.S. at 225 (state's interests "encompass[] an interest in providing him with medical treatment for his illness").  But such punishment may not be imposed at all on a pre-trial detainee.  *Bell*, 441 U.S. at 530; *accord*

*Demery*, 378 F.3d at 1032 (holding that an "otherwise valid" governmental interest did not justify violating the rights of pretrial detainees); July 12 Order at 3 (Exhibit C) (same; citing *Demery*).

Unlike post-conviction incarceration, the government has only two legitimate interests in pretrial detention: (1) "assur[ing] the detainees' presence at trial" and (2) "maintain[ing] the security and order of the detention facility and otherwise manag[ing] the detention facility." *Demery*, 378 F.3d at 1031 (citing *Halvorsen v. Baird*, 146 F.3d 680, 689 (9th Cir. 1998)). This is a comprehensive list; it is limited by binding caselaw and "[a]ncient principles." *Halvorsen*, 146 F.3d at 689 ("Ancient principles limit conditions of detention without conviction of a crime. Blackstone explained that detention prior to conviction 'is only for safe custody, and not for punishment: therefore, in this dubious interval between the commitment and trial, a prisoner ought to be used with the utmost humanity; and neither be loaded with needless fetters, or subjected to other hardships than such are absolutely requisite for the purpose of confinement only. . . .'") (quoting IV William Blackstone, Commentaries on the Laws of England 297 (1769)).

Though substantial, the governmental interests are limited. They stand in marked contrast to the broad range of interests it has in penal confinement. After a defendant has been convicted and sentenced, the state may assert not only general administrative and security interests, but also interests that are "correctional" in nature. *See Harper*, 494 U.S. at 235. These "correctional" interests include punishment, deterrence, promoting respect for the law, protecting the public from future crimes by the defendant, and providing "needed educational or vocational training, medical care, or other correctional treatment." *See* 18 U.S.C. § 3553(a)(2) (listing federal sentencing goals). Moreover, prisons (as opposed to pretrial detention facilities) are charged with providing long-term care, treatment, and rehabilitation. *See, e.g.*, 18 U.S.C. § 3621 (providing for substance-abuse and sex-offender treatment programs in federal prisons for convicted inmates). A prison therefore has a legitimate interest in maintaining resources for such long-term care—an interest that weighed heavily in the Supreme Court's decision in *Harper*. *See* 494

U.S. at 232 (expressing concern that added procedural protections would "divert scarce prison resources . . . from the care and treatment of mentally ill inmates").

This interest is absent in the pretrial context. A detention facility has no responsibility to provide long-term "care and treatment" to mentally ill inmates. Indeed, to the extent the government has *any* direct interest in involuntary "treatment" of a pretrial detainee's mental illness, it is limited to the *competency restoration* context. *See* 18 U.S.C. § 4241(d) (authorizing hospitalization "for treatment" during the period permitted for a restorability determination). And taking this interest into account moves the inquiry into the purview of *Sell*.

In sum, the governmental interests in the pretrial setting are much narrower than in the post-conviction, correctional setting. *Accord Riggins*, 504 U.S. at 135 (recognizing that *Harper* addressed the "unique circumstances of penal confinement" and observing that "Fourteenth Amendment affords *at least* as much protection to persons the State detains for trial") (emphasis added). Moreover, a primary pretrial detention interest—assuring the detainee's physical presence at trial—is irrelevant here. Forced medication is entirely unrelated to trial-presence.

### 3.    The added value of procedural safeguards

A judicial hearing would significantly protect the individual interests at stake without unduly increasing the administrative burden. Involvement of a court is not nearly as burdensome as it was in the post-conviction context in *Harper* because here, the judicial process is already in place. A judge and lawyers are already involved, and judicial proceedings in the non-emergency context would not prevent the prison from acting immediately in response to an emergency.

In *Harper*, it was possible to conclude that "a judicial hearing will not be as effective, as continuous, or as probing as administrative review using medical decisionmakers." *Harper*, 494 U.S. at 233. But due to the different circumstances here, the same cannot be said. This is true for four reasons: (1) the prison doctors are charged with conflicting goals; (2) experience demonstrates that administrative review is not very "probing" at all; (3) there exists no continuity problem because judicial proceedings are ongoing; and (4) medical expertise is actually

advanced by permitting the defense to present additional scientific evidence in the form of its own experts' opinions.

First, the prison doctors here are, by necessity, burdened by competing responsibilities. Mr. Loughner is committed for a competency restorability determination under § 4241(d). That statute requires the prison not only to determine the likelihood that he will be restored to competency, but also to actually "provide treatment" to that end. 18 U.S.C. § 4241(d)(2)(A) (defendant to be hospitalized "for treatment" until "his mental condition is so improved that trial may proceed"). In other words, in this context, the prison's medical staff is *statutorily charged* with trying to restore Mr. Loughner to competency. This responsibility poses an objective source of structural conflict for the prison staff where the detainee refuses to take psychotropic medications. On the one hand, the medical staff desires to restore Mr. Loughner to competency—not necessarily because of any nefarious desire, but simply because it is what Congress says they should do. On the other hand, the "medical decisionmakers" at an administrative hearing are supposed to render an independent decision about whether the medicate on different grounds—an emergency due to dangerousness to oneself. This poses a distinct conflict of interest such that it cannot be said that the administrative decisionmakers possess the necessary "independence" to make an unbiased decision. *Cf. Harper*, 494 U.S. at 233 (in the penal context, which lacks the statutory duty of restoration, there was no evidence of lack of "independence of the decisionmaker"). Independence of the decisionmaker is an absolutely essential element of procedural due process. *Cf. Caperton v. A.T. Massey Coal Co., Inc.*, 129 S. Ct. 2252, 2259 (2009) ("It is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process" (quotations and citation omitted)).

Second, it appears on the basis of the previous administrative hearings in Mr. Loughner's case that whatever administrative process exists is not very "probing," unlike in *Harper*. None of the previous hearings made any inquiry in the identity or maximum dosage of the drugs proposed. In two of the three previous hearings, Mr. Loughner's right to call witnesses of his choice was violated—in the most recent hearing, the violation was so blatant that the associate warden reversed the decision on appeal.

Third, the continuity problem identified in *Harper* is absent here.  For convicted inmates like Harper, judicial proceedings have ended.  Harper had long ago been sentenced and his criminal case was closed by the time the forced medication issue arose.  Circumstances are the opposite for pretrial detainees like Mr. Loughner.  By definition, a pretrial detainee is in the midst of pending judicial proceedings—that is, the criminal proceedings he is in detention for.  Thus, a court of law is necessarily already convened and all relevant parties are engaged in active litigation.  Moreover, the involvement of the MCFP Springfield detention facility staff here is a direct result of the pending judicial proceedings.  Springfield's authority over Mr. Loughner arises solely out of his court-ordered temporary commitment there pursuant to § 4241(d).  The added administrative burden and delay inherent to starting *new* judicial litigation—as would be necessary for inmates such as Harper—is absent in the pretrial context.

Fourth, also absent here is *Harper*'s concern that a judicial decisionmaker would actually be at a disadvantage to medical doctors in terms of access to information and expertise.  *See* 494 U.S. at 233.  Again, it is the pretrial context that makes all the difference.  A pretrial detainee, unlike a convicted inmate, is constitutionally entitled to counsel and access to his own medical experts to assist in his defense.  This distinction dramatically changes the contours of a judicial proceeding.  Such a proceeding for a pretrial detainee would actually present the presiding judge with *more* medical information and expertise—the opinions and testimony of defense experts in addition to the government's experts.  By contrast, a judge presiding over a proceeding convened for a convicted prisoner would likely face a one-sided presentation of expert information from the government and would have little beyond what an administrative officer could offer.

### 4.    Under *Mathews*, due process requires a judicial hearing

It is thus clear that, applying the *Mathews* balancing test, the additional  procedural protections for pretrial detainees like Mr. Loughner add substantial value to the reliability of the proceedings, are necessary to vindicate the heightened individual interests at stake, and come at minimal additional cost or administrative burden because a pretrial detainee already has a lawyer, a judge, and access to medical expertise.  A judicial determination (and accompanying

procedures) is necessary to authorize forcible administration of psychotropic medications to Mr. Loughner on dangerousness grounds.

This is not a surprising result. Both the Ninth Circuit and the Supreme Court have, in published opinions, contemplated that a court, not a prison administrator, would be the decisionmaker in the pretrial context. *See Sell*, 539 U.S. at 182-83 (discussing forced medication of a pretrial detainee); *Hernandez-Vasquez*, 513 F.3d at 914, 919 (same). Specifically, in the course of discussing the advantages of starting with a dangerousness evaluation, *Sell* refers to "a court" as the decision maker in this context no less than four times. *See id.* at 182 ("There are often strong reasons for *a court* to determine whether forced administration of drugs can be justified on these alternative grounds [of dangerousness] before turning to the trial competence question.") (emphasis altered); *id.* (discussing how "courts" frequently consider dangerousness-based forced medication issues in civil proceedings); *id.* at 183 ("If *a court* authorizes medication on these alternative grounds. . . .") (emphasis added); *id.* ("Even if *a court* decides medication not to be authorized on the alternative [dangerousness] grounds . . . .") (emphasis added).

*Sell*'s express invocation of a "court" was not accidental. Likewise, in *Hernandez-Vasquez*, the Ninth Circuit stated that a judicial determination of involuntary medication of a pretrial detainee is the law:

> As we have held previously, the Supreme Court clearly intends *courts* to explore other procedures, such as *Harper* hearings (which are to be employed in the case of dangerousness) before considering involuntary medication orders under *Sell*.

513 F.3d at 914 (emphasis added; quotation marks omitted). Indeed, *Hernandez-Vasquez* urged "*the district court*" to "examin[e] dangerousness" as a basis for medication as a precursor to deciding whether restoration for competency alone justifies forced medication. *Id.* (emphasis added). Under *Hernandez-Vasquez*, it is clear that the district court, not a prison administrator, must decide the question. If it were otherwise, there would be no explaining that decision's command that "*a district court* should make a specific determination on the record" regarding medication for dangerousness. *Id.* (emphasis added); *see also id.* at 919 (admonishing district courts to "take care to separate the *Sell* inquiry from the *Harper* dangerousness inquiry and not

allow the inquiries to collapse into each other," a precaution that would be superfluous unless the district court is the decisionmaker for both issues).

**B.    The medication decision under § 549.46 is unlawful because the regulation is unconstitutional**

Finally, regardless of the necessity of holding a judicial hearing, any administrative decision to forcibly medicate Mr. Loughner is invalid because § 549.46 is unconstitutional. Section 549.46 fails to satisfy the requirement that forcible medication be "medically appropriate" under *Harper*, *Sell*, and *United States v. Hernandez-Vasquez*, and *United States v. Williams*.  Under the regulation, prison administrators may authorize "medication" without even knowing what drugs are to be administered, how much of drugs are to be administered, and how long the medication regimen will last.  There are two problems with this.

First, such an authorization cannot possibly satisfy the "medical appropriateness" prong mandated by the Supreme Court in *Harper* and *Sell*.  *See Hernandez-Vasquez,* 513 F.3d at 916-17; *Williams*, 356 F.3d at 1056 (the record supporting a forcible medication decision must be "medically-informed" to allow the defendant to "challenge medical evidence").  Specifically, *Williams* and *Hernandez-Vasquez* require any authorization to forcibly medicate be made only *after* consideration of "the type of drugs proposed, their dosage, and the expected duration of a person's exposure, as well as an opportunity for the [defendant] to challenge the evaluation and offer his or her own medical evidence in response."  *E.g.*, *Williams*, 356 F.3d at 1056.  As a result, and as observed in this case, § 549.46 hearings routinely yield open-ended, blanket medication authorizations.   Medical personnel at Springfield have, in fact, taken these authorizations as carte blanche to tinker with the medications forced upon Mr. Loughner, apparently with no enforceable limit on maximum quantity, type, or duration.  No specifics concerning these characteristics have been offered at any of the three administrative hearings held to justify forcing medications—whichever ones doctors may choose after the fact—on Mr. Loughner.

Because § 549.46 hearings do not require the prison to specify its proposed treatment plan, they deprive the defendant of any real ability to explore and contest the medical

appropriateness of the psychiatric medications at any time *before* those medications are actually forced upon him.  *See, e.g.*, *Rivera-Guerrero*, 426 F.3d at 1138.  The one-line acknowledgment in the September 15 hearing report that "[t]here is a documented treatment plan on patient's chart" totally fails to ameliorate this deficiency.  *See* Exhibit D at 6.  This observation is simply one of fact.  It does not even purport to establish actual consideration of the medical appropriateness of the drug regimen; nor does it purport to place limitations on prospective tinkering with the pharmaceutical cocktail forced upon Mr. Loughner by the prison personnel.  This is plainly a violation of the due process right to a meaningful hearing.

**V.**

**MR. LOUGHNER WILL BE IRREPARABLY HARMED UNLESS THE PRISON IS IMMEDIATELY ORDERED TO CEASE ITS PRESENT MEDICATION REGIMEN**

The emergency motion should be granted because administration of forcible medication has begun and Mr. Loughner will suffer irreparable harm unless the government is required to justify its forced medication regime.  Psychotropic drugs "alter the chemical balance in a patient's brain," and "can have serious, even fatal, side effects" including "acute dystonia, a severe involuntary spasm of the upper body, tongue, throat, or eyes," "akathisia (motor restlessness, often characterized by an inability to sit still); neuroleptic malignant syndrome (a relatively rare condition which can lead to death from cardiac dysfunction); and tardive dyskinesia, . . . . a neurological disorder . . . that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face."  *Harper*, 494 U.S. at 230.  Tardive dyskinesia is "irreversible in some cases."  *Id.*  Evidence in the record suggests that Mr. Loughner is in fact suffering from akathisia.

Moreover, the fact that antipsychotic medications are currently being administered to Mr. Loughner creates an evidence-preservation issue.  The "powerful and permanent effects" of anti-psychotics pose a threat of permanently depriving Mr. Loughner and his counsel of access to mental-state evidence necessary to evaluate and develop potential mental-state defenses to the charged crimes.  As the Supreme Court has acknowledged, the very purpose of anti-psychotics is to "alter the chemical balance in a person's brain" and change "his or her cognitive

1   processes." *Washington v. Harper*, 494 U.S. 210, 229 (1990); *Ruiz-Gaxiola*, 623 F.3d at 692.

2   This is both a fair-trial issue and an evidence-tampering problem.  Justice Kennedy put it most

3   succinctly in his concurrence in *Riggins v. Nevada*:

> When the State commands medication during the pretrial and trial phases of the
> case for the avowed purpose of changing the defendant's behavior, the concerns
> are much the same as if it were alleged that the prosecution had manipulated
> material evidence.

7   504 U.S. 127, 139 (1992) (Kennedy, J., concurring); *see also id.* at 144 ("The side effects of

8   antipsychotic drugs can hamper the attorney-client relationship, preventing effective

9   communication and rendering the defendant less able or willing to take part in his defense.").

10  In short, "involuntary medication with antipsychotic drugs poses a serious threat to a defendant's

11  right to a fair trial."  *Id.* at 138 (Kennedy, J., concurring).  *Accord Ruiz-Gaxiola*, 623 F.3d at 692

12  (noting "the strong possibility that a defendant's trial will be adversely affected by a drugs's

13  side-effects").

14        The government will not be prejudiced by the issuance of an emergency stay.  If forcible

15  medication turns out to be appropriate, it will undoubtedly resume administering psychotropic

16  drugs to Mr. Loughner.  The balance of hardships thus tilts sharply in Mr. Loughner's favor.

17        Finally, the public interest will be served by prompt judicial review of the prison's

18  actions.  Permitting the government to go forward without sufficient review poses not just the

19  risk of irreversible physical harm to Mr. Loughner, but the prospect of depriving the Court of

20  the ability to fashion an appropriate remedy.

**CONCLUSION**

For reasons set forth above, counsel for Mr. Loughner request that the Court find the prison's ongoing forcible medication of Mr. Loughner unlawful and order the prison to cease its present medication regimen forthwith and begin tapering him off the four-drug cocktail it is currently forcing on him.

Respectfully submitted,

DATED: September 23, 2011

*/s/ Judy Clarke*
_____
JUDY CLARKE
MARK FLEMING
REUBEN CAMPER CAHN
ELLIS M. JOHNSTON III
JANET C. TUNG

Attorneys for Jared Lee Loughner

Copies of the foregoing served electronically to:
Wallace H. Kleindienst, Beverly K. Anderson
Christina M. Cabanillas, Mary Sue Feldmeier