1  Judy Clarke
   Clarke and Rice, APC
2  1010 2nd Avenue, Suite 1800
   San Diego, CA 92101
3  (619) 308-8484

4  Mark Fleming
   Law Office of Mark Fleming
5  1350 Columbia Street, #600
   San Diego, CA 92101
6  (619) 794-0220

7  Reuben Camper Cahn
   Ellis M. Johnston III
8  Janet Tung
   Federal Defenders of San Diego, Inc.
9  225 Broadway, Suite 900
   San Diego, CA 92101
10 (619) 234-8467

11 Attorneys for Defendant Jared Lee Loughner

12              UNITED STATES DISTRICT COURT

13                  DISTRICT OF ARIZONA

14 UNITED STATES OF AMERICA,        )   Case No. CR 11-0187-TUC LAB
                                    )
15          Plaintiff,              )
                                    )
16 v.                               )   **DEFENDANT'S EMERGENCY**
                                    )   **MOTION FOR STAY OF § 4241(d)**
17 JARED LEE LOUGHNER,              )   **COMMITMENT PENDING APPEAL**
                                    )
18          Defendant.              )
   _____)

19

20                       **MOTION**

21      Counsel for Mr. Loughner request that the Court grant a stay pending appeal of its

22 September 28, 2011, ruling and September 30 ordering commitment for restoration under

23 § 4241(d)(2).

24 //

25 //

26 //

27 //

28 //

# I.

## **INTRODUCTION**

The defense seeks a stay pending appeal of this Court's September 28, 2011, ruling and September 30 commitment order. (DE 343). Specifically, in the interest of preserving the status quo and preventing irreparable harm to Mr. Loughner, the defense requests that this Court order Mr. Loughner's transportation and commitment back to the Springfield facility to be temporarily stayed. Mr. Loughner continues to be medicated while he is in custody in Tucson.

A stay would not prejudice the government in any way and would serve the public interest by permitting the legal issues to be resolved by the Ninth Circuit without risk of mooting the appeal. As this Court has indicated, it has been placed in a conundrum by the government's decision to go forward with restoration commitment without seeking a *Sell* hearing. A temporary stay would permit this situation to be resolved by the Court of Appeals. Finally, emergency action is needed because Mr. Loughner is scheduled to be transported as early as next Tuesday.

# II.

## **STATEMENT OF FACTS**

At issue here is the Court's September 28, 2011, ruling committing Mr. Loughner to the custody of the Attorney General for restoration of competency under 18 U.S.C. § 4241(d)(2).

**A.     First Commitment to Attorney General's Custody at MCFP Springfield**

Mr. Loughner was first committed to the Attorney General's custody at MCFP Springfield upon the government's motion to determine whether he was competent to stand trial. On March 21, 2011, this Court ordered him committed there under 18 U.S.C. §§ 4241(b) & 4247(b). Mr. Loughner arrived at Springfield on March 23, where he remained for evaluation until April 28. He was then brought back to pretrial custody in Tucson, Arizona.

**B.     Second Commitment to Attorney General's Custody at MCFP Springfield**

On May 25, 2011, the Court found Mr. Loughner incompetent to stand trial. It ordered him committed to Springfield for a second time, this time under subsection (d)(1) of § 4241, to determine whether he could be restored to competency. Mr. Loughner arrived at Springfield on

1  May 27 and remained there for four months, the maximum time allowable under the statute.  On

2  September 26, he was brought back to Tucson, where he presently remains.

3        During Mr. Loughner's second commitment, the BOP began forcing him to take

4  psychotropic medications against his will.  Initially, it justified its actions as necessary to prevent

5  him from posing a danger to others; later, after the Ninth Circuit ordered medication stayed

6  pending appeal, the BOP switched courses and resumed forcibly medicating Mr. Loughner on

7  the basis that he posed a danger to himself and was gravely disabled.  Litigation of the

8  involuntary medication is currently pending on appeal in the Ninth Circuit in Case No. 11-10339

9  (oral argument held on August 30, 2011, before Berzon, Bybee, and Wallace, JJ.) and Case No.

10  11-10432 (not yet briefed).

11        Although the details of that litigation are beyond the scope of this motion, pertinent here

12  is the fact that Mr. Loughner has been continuously medicated since July 18, 2011.  His present

13  course of medication includes 6 mg of risperidone per day (and antipsychotic); 300 mg of

14  buproprion per day (an antidepressant); 3mg of clonazepam per day (an anti-anxiety drug);

15  lorazepam as needed (another anti-anxiety drug); and 1mg of benztropine per day (an

16  anticholinergic drug used to treat side effects generated by the other drugs).  Defense counsel

17  has been informed that the federal facility in Tucson where he is presently housed is continuing

18  with his medication regimen.

19  **C.    The Request for a Third Commitment for Restoration Under § 4241(d)(2)**

20        On August 26, 2011, while Mr. Loughner was still at Springfield during his § 4241(d)(1)

21  commitment (for determination of restorability), the warden submitted to the Court a request to

22  extend Mr. Loughner's commitment there.  To his request, he attached a progress report by BOP

23  Psychologist Christina Pietz, dated August 22, opining that Mr. Loughner could be restored to

24  competency after some undefined addition period of time at Springfield.  The Court construed

25  the warden's letter as a request for commitment under § 4241(d)(2) (for actual restoration to

26  competency), but found it inadequate to support such authorization.

27        In an order issued on September 1, 2011, the Court informed the government that its

28  extension request "must be accompanied by evidence" that restoration is substantially probable,

"as well as evidence" that the requested four-month period would be sufficient to accomplish this. *See* September 1, 2011 Order at 2 (DE 309). It allowed the BOP another opportunity to "submit . . . additional documentation" to shore up its request. *Id.* at 3. BOP subsequently submitted a supplementary report by Dr. Pietz, dated September 7, 2011.

In the same order, the Court indicated its discomfort with the prospect of authorizing commitment for the purpose of competency restoration where psychotropic medication is the only claimed means of such restoration—although Mr. Loughner has never agreed to take such medication and forcible medication has never been authorized for *this purpose*. Its order directed the parties to state their positions regarding "the necessity of scheduling a *Sell* hearing if the BOP contemplates accomplishing restoration of the defendant's competency by involuntarily medicating him." *Id.* at 3.[1]

The Court scheduled a date to hear the extension issues, but indicated that, despite its discomfort with committing for restoration purposes while medication was being administered only for the purpose of mitigating danger to self, it nonetheless viewed the two issues as discrete. It limited "the scope of the hearing . . . to the question of whether an additional period of time should be granted to actually restore the defendant to competency." *Id.* at 3.

**D.   The Court's Preliminary Views on the Nature and Scope of the § 4241(d)(2) Restoration Extension Hearing**

Concerned about the scope of the hearing and commitment considerations contemplated by the Court, defense counsel filed a motion on September 16, 2011, to deny the extension, laying out substantially the arguments anticipated in this appeal.[2] *See* September 16 Motion to Deny Extension of Commitment (DE 311). In it, defense counsel raised, *inter alia*, the following arguments:

---

[1] The "*Sell* hearing" refers a hearing to determine whether the government may forcibly administer psychotropic medications to restore competency for the purpose of proceeding to trial, under *Sell v. United States*, 549 U.S. 166 (2003).

[2] Nothing in this motion is meant to limit the arguments to be raised in the opening brief on appeal.

- • **"Capacity" to proceed to trial:** that any decision to commit under § 4241(d)(2), which permits commitment until the defendant's "mental condition is so improved that trial may proceed" only upon a finding that he "will attain the capacity to permit the proceedings to go forward," *must* take into account not only the traditional "competency" criteria (understanding of the proceedings and ability to assist in defense), but also whether the proposed treatment during commitment—psychotropic drugs—will infringe on the defendant's fair trial rights, and thus prevent "trial [from] proceed[ing]" in the manner contemplated by Justice Kennedy's concurrence in *Riggins v. Nevada*, 504 U.S. 127, 137 (1992);[3]

- • **Lack of authorized treatment plan**: that it is impossible for a district court to find that there exists "a substantial probability" of restoration when the government has failed to state with any specificity *how* it intends to accomplish that restoration (other than making the generalized claim that "medication" will achieve that goal) and where it lacks authorization to proceed with *any* course of medication for the purpose of restoring competency (because it has never received such authorization under *Sell*—and indeed refuses to seek such authorization);[4]

- • **Failure to establish probability of restoration "within" the requested extension period**: that the plain text of the statute requires any commitment authorization under § 4241(d)(2) to be supported by a finding of substantial probability of restoration not just in some abstract sense, but "within [the requested] additional period of time."[5]

On September 19, a few days after receiving this pleading, the Court again expressed its concerns about extending commitment without addressing the concerns required under *Sell v. United States*—which would include consideration of the first two issues identified above, fair trial rights[6] and medication for competency purposes pursuant to a treatment plan identifying drug dosage, quantity, and duration with specificity.[7] It said:

> [A]ny extension would be for the purpose of restoration. Now, that leads to some other concerns on my part. If now the purpose of the . . . extended commitment is restoration at Springfield, then I think that directly implicates *Sell*. . . .
>
> If I . . . am going to extend the time that Mr. Loughner remains at Springfield and the purpose is to restore him, then if he is being involuntarily medicated, I feel differently about the application that the defense has made at this point. Then all of a sudden the Court is ordering an extension knowing that he is being

---

[3]  *See* Motion at 10.

[4]  *See* Motion at 3, 13, 26.

[5]  *See* Motion at 12-13.

[6]  *See Sell*, 549 U.S. at 181 (citing Justice Kennedy's concurrence in *Riggins*, 504 U.S. at 142-45)).

[7]  *See, e.g.*, *United States v. Hernandez-Vasquez*, 513 F.3d 908, 916-17 (9th Cir. 2008).

involuntarily medicated, I think it's incumbent upon me to conduct a *Sell* hearing.

. . . I think it is a game changer and a significant event that if I do extend him, the purpose for the extension is for restoration.

9/19/11 Transcript at 6-7.  Later during that hearing, the Court again expressed its view of the prospect of granting a request to extend commitment for the purpose of restoration without any authority to medicate for restoration as a conundrum.

The purpose of the extension would be to restore him  and I think it is probably too much to say that we can go forward much beyond next week without a *Sell* hearing if I grant the extension.

. . . So the question, I suppose, on the horizon is [whether] the other considerations get any play or is that the extent of the inquiry under *Sell*.

. . . So I am contemplating that we would have a *Sell* hearing if I grant the motion for the extension.

*Id.* at 30.  But instead of resolving the matter by requiring the *Sell*-type questions to be resolved at the time of the § 4241(d)(2) hearing—as the defense had requested— the Court took a different turn.  It suggested that it could simply authorize the extension first and address the legal problems later (by holding what it termed a "*Sell* hearing").[8]  It said:

The first issue for me, as I read the statute, is can the government establish a substantial probability that he is likely to be restored.  *If* I find that, yes, they can establish that, *then* I think we are right at the door at *Sell* at that point because then circumstances have sufficiently changed.

*Id.* at 32-33 (emphasis added).  Although the Court again referred to the competency-restoration purpose of a § 4241(d)(2) commitment as a "game changer," it persisted in its view that it could postpone undertaking *Sell*-type considerations until *after* authorizing such a commitment.  *See id.* at 33.  The Court did not explain what logical or legal purpose such a *post hoc* "*Sell*" hearing might serve under its contemplated circumstances—where both commitment and involuntary

---

[8]  To be clear, the defense has never requested a *Sell* hearing as such—that is, a hearing seeking permission for the government to forcibly medicate Mr. Loughner for the purpose of competency restoration.  What the defense has argued is that certain requirements set forth in *Sell* must be met before commitment can be authorized—as relevant here, these requirements include consideration of fair trial rights and the precise nature of proposed treatment identified with specificity.

1  medication (albeit for a different purpose) would already be authorized under its own rulings.

2  *Accord* Gov. Response to Motion to Deny Extension at 11-14 (DE 324) (arguing that "if the

3  defendant's time in Springfield is [already] extended under § 4241(d)(2)," the results of a *Sell*

4  hearing would "make[] no difference").

5  **E.     The September 28 Hearing on the § 4241(d)(2) Commitment for Restoration**

6           When it subsequently held the actual § 4241(d)(2) commitment hearing on September 28,

7  the Court remained on this tack. At the hearing, the Court heard the testimony of two witnesses,

8  Dr. Christina Pietz, the primary psychologist assigned to Mr. Loughner at Springfield, and

9  Dr. James C. Ballenger, a psychiatrist retained by the government who had never met

10 Mr. Loughner and had not conducted any comprehensive review of his BOP treatment records.

11 In contrast to her earlier assessment and request for a four-month extension in her September 7

12 report, Dr. Pietz opined at the hearing that it would take eight more months to restore

13 Mr. Loughner to competency. That opinion, she explained, was based on her experience

14 working as a psychologist for the BOP for 21 years, communications with colleagues, and

15 unspecified portions of scholarly articles, not on any review of actual data.[9] Dr. Pietz made clear

16 that medication was the sole means of accomplishing Mr. Loughner's restoration.

17          Dr. Ballenger offered his views that second generation antipsychotic medications (such

18 as the Risperidone prescribed to Mr. Loughner) were "miraculous" in their ability to "cure"

19 schizophrenia by wiping away the illness and leaving behind the real person, with "vanishingly

20 rare" instances of side effects.[10] Admitting that his experience with competency proceedings

21 was "almost none," Dr. Ballenger opined that Mr. Loughner could be restored to competency

22 through medication. His opinion, he explained, was based in part on information provided by

23 Dr. Pietz and Dr. Sarrazin, the treating psychiatrist at Springfield, and in part on analogizing to

24 schizophrenia treatment in the non-competency context, where the goal is often to achieve a

25  _____

26      [9] The transcript for the September 28 hearing has been ordered but not yet received. The
    recitation here is based upon defense counsel's memory and contemporaneous notes.

27

28      [10] Defense counsel's cross examination of Dr. Ballenger's claims relating to side effects
    was prematurely terminated by the Court.

1   basic level of life functioning.  Dr. Ballenger also testified that the antipsychotic medication
2   being administered to Mr. Loughner would have the effect of totally changing his outward
3   demeanor and appearance so that he would appear normal, not psychotic, to a jury.

4        No evidence was offered about what treatment plan was proposed for Mr. Loughner.
5   Neither of the government's witnesses explained with any specificity what course of medication
6   or what dosage levels their opinions about Mr. Loughner's restoration prospects were predicated
7   on.  The government affirmatively took the position that any treatment plan was beyond the
8   scope of the hearing, objecting successfully to defense counsel's cross examination questions
9   on this basis.

10       In an oral ruling, the Court granted the government's commitment request in part,
11  authorizing commitment for four months instead of the eight months requested by the
12  government.  It found that "measurable progress toward restoration" had been made, and relied
13  in particular on Dr. Pietz's personal "barometer" to credit her prediction.  It also accepted the
14  notion advanced by Dr.  Ballenger that achieving "functioning" through voluntary medication
15  of non-incarcerated individuals could be equated with restoration of competency of a pretrial
16  detainee like Mr. Loughner.  The Court did not, however, find it substantially probable that
17  Mr. Loughner could be restored "within" any particular time period.  *See* 18 U.S.C. § 4241(d)(2).
18  It divorced its substantial probability finding from the four-month commitment period it chose,
19  which it described as a "reasonable period" to extend commitment in accord with "convention."
20  The   Court   did   not   take   into   consideration   the   fair   trial   concerns   raised   by
21  Mr. Loughner—specifically, whether the restoration efforts during the commitment would not,
22  in fact, enable him to "attain the capacity to permit the proceedings to go forward" to trial, 18
23  U.S.C. § 4241(d)(2), because of the medication's evidence-destruction/tampering effect of
24  interfering with Mr. Loughner's "behavior and demeanor"[11] and therefore with the ability to
25  present a trial defense, including at a potential penalty phase.

26       The defense is appealing this ruling.

27

28       _____

[11] *See Sell*, 549 U.S. at 179 (citing *Riggins*, 504 U.S. at 145 (Kennedy, J., concurring)).

## II.

## THE COURT SHOULD GRANT A STAY PENDING APPELLATE REVIEW

When deciding whether to issue a stay pending appeal, the Court considers the following factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 850 (9th Cir. 2009). In this Circuit, a sliding scale approach is applied to the first and third elements. That is, in lieu of showing a "likelihood of success on the merits" and lack of substantial injury to other interested parties, the party is entitled to a stay if "serious questions going to the merits were raised" and "the balance of hardships tips sharply in the [moving party's] favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011) (defining likelihood of success as a showing of a "fair prospect" of success or "a substantial case for relief on the merits").

A stay pending appeal should be granted here because Mr. Loughner can satisfy either formulation of the preliminary injunction standard. Specifically, this Court should order Mr. Loughner's return to Springfield to be stayed until this appeal is resolved on the merits. Mr. Loughner is likely to succeed on the merits of his appellate arguments (and/or has at least raised serious questions going to the merits), will suffer irreparable harm without such a stay, and the public interest lies in his favor. The government, by contrast, will not be prejudiced because it will be free to commit Mr. Loughner for restoration at Springfield should it ultimately prevail on appeal or remand (for much the same reasons, the balance of hardships tips sharply in Mr. Loughner's favor).  Mr. Loughner continues to be forcibly medicated while he is in Tucson. Applying the "serious questions" standard, Mr. Loughner easily meets the requirements for an injunction to issue. The arguments he raises are substantial, warrant deliberate consideration, and the balance of hardships tips sharply in his favor.

1    In addition, the requested stay of commitment is necessary to preserve the status quo

2    (Mr. Loughner is currently in pretrial detention at the federal facility in Tucson, Arizona, where

3    he is being continued on the present course of psychotropic medication).

4    **A.    Appellate Jurisdiction**

5    As a threshold matter, the Ninth Circuit has jurisdiction over this appeal under the

6    collateral order doctrine.  A collateral order can be reviewed prior to entry of final judgment

7    resolving the underlying litigation.  *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546-

8    47, 109 S. Ct. 1221 (1949).  An order is considered an appealable collateral order when it

9        (1) conclusively determines the disputed question, (2) resolves an important issue
     completely separate from the merits of the action, and (3) is effectively
10       unreviewable on appeal from a final judgment.

11   *United States v. Godinez-Ortiz*, 563 F.3d 1022, 1026 (9th Cir. 2009) (citing *Sell v. United States*,

12   539 U.S. 166, 123 S. Ct. 2174, 2183 (2003), and *Coopers & Lybrand v. Livesay*, 437 U.S. 463,

13   468 (1978)) (quotation marks and alterations omitted).  The Court's September 28 order satisfies

14   all three prongs of the *Cohen* test.

15   First, the Order "conclusively determines the disputed question[s]" because, "absent relief

16   from a higher court, [Mr. Loughner] will be sent to [MRC Springfield] and subjected to a

17   [§ 4241(d)(2)] restoration commitment," the lawfulness of which is precisely what he is

18   challenging on appeal.  *See Godinez-Ortiz*, 563 F.3d at 1027-28 (holding that commitment order

19   under 18 U.S.C. § 4246 was the proper subject of interlocutory appeal).  This would be "the very

20   result he is attempting to prevent with this appeal."  *Id.* at 1027; *see also United States v. Gold*,

21   790 F.2d 235, 239 (2d Cir. 1986) (commitment order under § 4241(d)(1) was appealable under

22   collateral order doctrine).

23   Second, the Order "resolves an important issue completely separate from the merits of

24   the action" because whether or not Mr. Loughner can be committed to MRC Springfield for

25   restoration "has no bearing on whether" he is guilty of the 49 counts in the indictment arising

26   out of the January 8, 2011 shootings. *Godinez-Ortiz*, 563 F.3d at 1027 (holding that "whether

27   or not [a defendant] can be committed to FMC-Butner for a dangerousness evaluation" is

28   completely separate from the merits of the underlying criminal action).

1    Finally, the order is effectively unreviewable on appeal from the final judgment.  Like the

2  defendant in *Godinez-Ortiz*, Mr. Loughner "can never regain the time he will be forced to travel

3  to and from [MRC Springfield]" and, if the four-month restoration he is challenging as unlawful

4  is allowed to go forward, "it cannot be unperformed."  *Id.* at 1027-28 ("[A] commitment order

5  is analogous to an order denying bail and requiring pretrial detention, which the Supreme Court

6  has found to be effectively unreviewable upon final judgment, and therefore immediately

7  appealable as a collateral order.") (citing *United States v. Friedman*, 366 F.3d 975, 979 (9th Cir.

8  2004)); *see also United States v. Weissberger*, 951 F.2d 392, 396 (D.C. Cir. 1992) (holding that

9  a commitment order under §§ 4241 and 4247, like the one here, "would be complete and

10 effectively unreviewable by the time of final judgment").

11 **B.    The Appeal Is Likely to Succeed And/or Raises Serious Questions on the Merits**

12    To make a showing of likely success, a party "need not demonstrate that it is more likely

13 than not that they will win on the merits." *Leiva-Perez*, 640 F.3d at 966.  This prong is met so

14 long as Mr. Loughner can show a "fair prospect" of success or "that []he has a substantial case

15 for relief on the merits."  *Id.* at 967-68. This element is easily satisfied here.

16    The Court's ruling was erroneous on all grounds presented.  Three aspects of the

17 commitment order are particularly problematic: (1) the Court's refusal to consider whether the

18 demeanor-changing side effects of the medications would defeat any likelihood that the

19 restoration commitment would result in Mr. Loughner "attain[ing] the capacity to permit the

20 proceedings to go forward" to trial, 18 U.S.C. 4241(d)(2), by infringing on his fair trial rights

21 in the manner described at length by Justice Kennedy's concurrence in *Riggins* and the majority

22 opinion in *Sell*; (2) whether § 4241(d)(2)'s requirement that there exist a "substantial

23 probability" of restoration permits such a finding to be made in the absence of any specifics

24 about what treatment will be administered to that end, and where the government is not

25 authorized to forcibly medicate for the purpose of restoration; and (3) whether the Court violated

26 § 4241(d)(2)'s requirement that it find restoration substantially probable "within" the period of

27 time it authorizes commitment because it misinterpreted the statute as permitting a finding of

28 restorability untethered to the four-month period of extension it ordered.

1         **1.        Capacity to go forward to trial**

First, it was legal error for the Court to refuse to consider the impact of the restoration commitment on Mr. Loughner's "capacity" to go forward to trial—specifically, whether the medication administered during the commitment would infringe on his fair trial rights by changing his demeanor, rendering him unable to participate meaningfully in his defense, and prevent defense counsel from accessing and presenting to a jury information relevant to the defense of this potential capital case. Although the Court suggested that it would reach these questions at a later date, the proper analysis requires that they be considered before Mr. Loughner is deprived of liberty interest in avoiding restoration commitment under § 4241(d). *See* 9/30/11 at 2 n.1 (agreeing, in essence, with the defense position that a proper competency inquiry includes "a defendant's ability to assist in his defense, and a defendant who is, for example, extremely sedated by anti-psychotic drugs can hardly be said to be in a position to assists his lawyers" but postponing any such inquiry).

While the Court acknowledges that it will be required at some point to determine whether medication has interfered with the defendant's fair trial rights, *see* 9/30/11 Order at 2 n.1, the Due Process Clause requires that a predictive determination be made before he is deprived of liberty by being recommitted for forced treatment.[12] Consideration of these concerns before a defendant is recommitted, a further deprivation of liberty, *Vitek v. Jones*, 445 U.S. 480, 491-92 (1980) ("involuntary commitment is more than a loss of freedom from confinement"), is required by the plain language of the statute, the Due Process Clause, and the Supreme Court's decision in *Sell*. Section 4241(d)(2)(A) permits a court to extend a defendant's commitment for a reasonable period of time so that "trial may proceed" only "if the court finds that there is a substantial probability" that within such additional period of time the defendant "will attain the capacity to permit the proceedings to go forward." 18 U.S.C. § 4241(d)(2). Thus, as the statute makes clear, commitment is only permissible if it advances the goal of going forward with

---

[12] Of course, if the defendant is restored to competency, the court must revisit its prediction and determine whether medication has actually negatively affected the defendant's capacity to stand trial.

"*trial*"—this is why the statute ties the commitment purpose to a defendants "capacity to permit the proceedings to go forward." *Id.* (emphasis added).

It is therefore not enough that a court find the defendant will become competent to understand the proceedings. He must also become competent in a way where he can meaningfully assist counsel in presenting his defense. This trial-related aspect of competency encompasses fair trial rights considerations, which are especially prominent in cases where mental state and mitigation are at issue. These include the "restoration" treatment's effect on the defendant's "behavior and demeanor," *Sell*, 539 U.S. at 179 (citing *Riggins*, 504 U.S. at 145) (Kennedy, J. concurring))—specifically, his "facial expressions, . . . emotional responses, or their absence," which "combine to make an overall impression on the trier of fact," an impression that can have a powerful influence on the outcome of the trial" and "have great bearing on his credibility, persuasiveness, and on the degree to which he evokes sympathy." *Riggins*, 504 U.S. at 142 (Kennedy, J., concurring). These concerns are encompassed in the Sixth Amendment fair trial right to be tried only if one possesses the "capacity or willingness to react to the testimony at trial" and "assist counsel" in his defense. *Riggins*, 504 U.S. at 141 (Kennedy, J., concurring). As Justice Kennedy took care to explain:

> The avowed purpose of the medication [used for restoration] is *not functional competence*, but competence to *stand trial*.

*Id.* at 141 (emphases added). Justice Kennedy's view is now the law of the land; *Sell* embraced his concerns and forbade forcible restoration to competency unless it is "substantially unlikely to have side effects that may undermine the fairness of the trial." 539 U.S. at 179.

In § 4241(d)(2), Congress expressly ties the restoration purpose of commitment to competency to *stand trial*. This is why it chose to phrase the targeted goal in terms of the defendant's "capacity to permit the proceedings to go forward." *See* 18 U.S.C. § 4241(d)(2); *see also id.* (commitment period limited by the time it takes for mental condition to improve in a way that "trial may proceed"). Indeed, the "capacity" language in § 4241(d)(2) mirrors the phrasing used by Justice Kennedy to emphasize that the real "competency"/"capacity" question includes fair trial rights concerns. *See Riggins*, 504 U.S. at 141 (Kennedy, J., concurring) (state must

"make a showing that there is no significant risk that the medication will impair or alter in any material way the defendant's *capacity* or willingness to react to the testimony at trial or assist his counsel") (emphasis added).  Therefore, the plain language of § 4241(d)(2) requires that the commitment decision take into account the potential effects of the proposed restoration treatment on these fair trial interests—that is, its likely effects on behavior, demeanor, facial and emotion responses, etc. *See Sell*, 539 U.S. at 179; *Riggins*, 504 U.S. at 141-45 (Kennedy, J., concurring).

The centrality of the fair-trial-rights concerns in the § 4241(d)(2) context is underscored by Congress' choice in that subsection to phrase its goal in terms of "capacity to permit the proceedings to go forward."  Elsewhere in § 4241, the statute describes the need for the court to make only "competency" findings.  *See* 18 U.S.C. § 4241(a) (using the term "mental competency").  Were it less concerned with the ultimate purpose of restoration—allowing "trial [to] proceed," *id.* at § 4241(d)(2)—  Congress could have used such generalized "mental competency" language.  But it did not.  It required more; it required a substantial probability that "capacity to proceed" would be attained.  "Capacity to proceed" thus plainly requires not only that Mr. Loughner have a rational and  factual understanding of the proceedings and that he be able to assist his counsel,[13] but also that medications he is forced to take not interfere with his ability to obtain a fair trial.  *See Sell*, 539 U.S. at 181 (a court must find that "administration of drugs is substantially likely to render the defendant competent to stand trial . . . [and] substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense) (citing Justice Kennedy's concurrence in *Riggins*, 504 U.S. at 142-45 (1992)).  Thus, a court considering whether to authorize § 4241(d)(2) commitment must engage in a predictive analysis like that developed in *Sell* and its progeny, in which it assesses the substantial likelihood of competency restoration in a way

---

[13] And any such determination must acknowledge that trial competency "does not consist merely of passively observing the proceedings.  Rather, it requires the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense," *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001).

1   that includes consideration of the potential side effects caused by the drugs used to restore

2   competency.  *See, e.g., United States v. Ruiz-Gaxiola*, 623 F.3d 684, 695 (9th Cir. 2010).

3          The Court failed to engage in any such analysis.  It rejected the defense argument on this

4   point that was presented in briefing submitted prior to the September 28 hearing, and it

5   prevented the defense from cross-examining the government's witnesses to establish the effect

6   of these medications on the Mr. Loughner's capacity to proceed.  *See* Motion at 10.  This was

7   legal error requiring reversal.  Thus, this argument is likely to succeed on the merits (and

8   certainly raises at least a serious question on the merits).

9          **2.    Lack of treatment plan**

10         Second, and related to the first ground of error, is the Court's failure to make its

11  restorability finding in reference to any *specific* plan of action.  As explained above, in order to

12  authorize commitment for restoration, the Court must find that the "treatment" to be given to the

13  defendant "will" allow him be restored in a way that (1) enables him to understand what is going

14  on and assist counsel and (2) does not violate his fair trial rights.  *See* 18 U.S.C. § 4241(d)(2).

15  This is a predictive analysis.  It requires the Court to ask the questions:

16         •      Will the treatment during the commitment period result in the defendant becoming
                  competent?
17
        and
18
           •      Will the treatment during the commitment period interfere with the ability of trial
19                to go forward because of negative effects on communication and ability to emote,
                  sedation, and changes in demeanor?[14]
20
    In order to answer these questions, the court must know what the planned "treatment" actually
21
    is.  *See* 18 U.S.C. § 4241(d) (commitment results in the defendant being "hospitalized[] . . . for
22
    *treatment*" in a suitable facility) (emphasis added).  Yet the Court here did not—and it made no
23
    effort to find out.  This is reversible error.
24

25

26

27
    ──────────────
28
           [14]*See Sell*, 539 U.S. at 185 (citing *Riggins*, 504 U.S. at 142-45 (Kennedy, J., concurring)).

1

### a. A treatment plan is necessary to discern whether there exists a "substantial probability" of restoration

2

3    To make any prediction of success, a Court must know what the intended future course

4  of restoration is.  Evidence of what treatment has been administered, or even what is currently

5  being administered, does not answer the question of whether *future* treatment will achieve

6  restoration unless the specific course of future treatment is known.  None of the witnesses called

7  by the government were able to confirm whether the current course of treatment would continue,

8  whether the efficacy of the current treatment would drop off or plateau, or whether a change in

9  medications would be necessary at any point during the extended commitment period.  Defense

10  counsel's efforts to inquire into these areas were objected to by the government, and the

11  government's objections were sustained by the Court.  The defense was thus prevented from any

12  meaningful opportunity to probe into the actual probabilities of success.

13    In addition, the lack of any specific treatment plan undermines the reliability of Court's

14  substantial probability determination.  How can one predict that a future result is substantially

15  probable to occur without even knowing what action will be taken to achieve that result?

16    Both the Ninth Circuit and the Supreme Court have recognized that when the government

17  seeks to subjugate a defendant's liberty interest to its desire to restore competency for trial, the

18  law requires the government to state with specificity what its restoration plan is.  As the Ninth

19  Circuit put it in *United States v. Rivera-Guerrero*, "[s]pecificity as to the medications to be

20  administered is critical" to a meaningful consideration of what side effects and intended results

21  the restoration is likely to have.  426 F.3d 1130, 1140 (9th Cir. 2005) (citing *Sell*, 539 U.S. at

22  181).  If the government fails to identify the treatment plan with specificity, the defendant has

23  no meaningful opportunity to "check the findings and conclusions of the government experts"

24  and thus present "an adequate rebuttal."  *Id.*  This presents a due process problem in addition to

25  violating the statute.  *Id.* (reversing and remanding a *Sell* order for forcible medication where the

26  government provided only "a non-specific and unhelpful general listing of available

27  medications" before the hearing).

28

**b.    The absence of treatment plan makes it impossible to properly conduct an analysis of the treatment's efficacy and impact on fair trial rights.**

The failure to state with specificity what medication regimen is under consideration before authorizing a deprivation of liberty is an error that the Ninth Circuit has corrected three times in the past eight years alone. *See id.*; *United States v. Hernandez-Vasquez*, 513 F.3d 908, 916-17 (9th Cir. 2008); *United States v. Williams*, 623 F.3d 684, 1056-57 (9th Cir. 2004); *see also Sell*, 539 U.S. at 181 ("The specific kinds of drug at issue may matter here as elsewhere. Different kinds of anti-psychotic drugs may produce different side effects and enjoy different levels of success."). Obviously, such specificity was particularly important here, where one of the areas of inquiry is the effect of the planned treatment on Mr. Loughner's demeanor, facial expressions, ability to react to information and communicate, and behavior at trial. In other words, it makes a difference to the fair-trial-rights question (which is a necessary part of the § 4241(d)(2) inquiry) what particular drugs and quantities the BOP's "treatment" will entail. As the Supreme Court put it:

> Whether a *particular* drug will tend to sedate a defendant, interfere with communication, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore to competency.

*Rivera-Guerrero*, 426 F.3d at 1140 (quoting *Sell*, 539 U.S. at 185).

Of course, the error here was far more aggravated than in *Rivera-Guerrero*, where the government actually specified its treatment plan—just not until the hearing itself. Here, the government has *never* identified with specificity what drugs and what dosages it intends to administer to Mr. Loughner to achieve his "restoration" during this extended period. Moreover, it has actively taken the position that the treatment plan is *irrelevant* to the § 4241(d)(2) predictive determination.

The government is likely to contend that the *Sell*/*Rivera-Guerrero*/*Hernandez-Vasquez* line of cases is somehow inapposite because they concern a liberty deprivation that is slightly different in nature—forced medication instead of involuntary commitment for psychiatric treatment. This is, of course, a distinction without a difference. It is also a contrivance of the

17

1   government's own creation.  In the ordinary course, the specific treatment plan would *already*
2   *be known* at the time of the § 4241(d)(2) determination because the government would have
3   requested a *Sell* hearing and received authorization to forcibly medicate.  Thus, the treatment
4   plan to be applied during the course of the § 4241(d)(2) commitment would be controlled by the
5   Court's *Sell* order.  Here, the government has chosen a very different path.  It has deliberately
6   avoided *Sell*—and judicial scrutiny of its forcible medication—by refusing to request
7   authorization to medicate for the purpose of competency restoration.  Instead, it has relied on a
8   series of administrative proceedings, at which Mr. Loughner appeared without counsel, in which
9   his "staff representative" said nothing on his behalf, and which were disclosed to the outside
10  world only after the decision to forcibly medicate had been made.  In each case, those
11  proceedings resulted in blanket authorizations to administer psychotropic medications without
12  limitation or oversight.[15]  In this context, the government's insistence that it has no accountability
13  for its in treatment decisions within the § 4241(d)(2) commitment period is not only
14  unpersuasive but also Kafkaesque.

15          **3.       The temporal limitation on restoration commitment**

16          Third, the Court erred by arbitrarily choosing a four-month time period  for additional
17  commitment without finding that such time period was sufficient to permit Mr. Loughner's
18  restoration. *See* Order at 4.  This violates the plain language of § 4241(d)(2), which permits only
19  "*an* additional reasonable time period" of extended commitment if the court finds that there is
20  a substantial probability of restoration "*within* such additional time period."   18 U.S.C.
21  § 4241(d)(2) (emphasis added).

22          While the initial period of commitment under subsection (d)(1) permits up to four months
23  of commitment for purposes of determining whether a defendant will attain the capacity for trial
24  to proceed "in the foreseeable future," a conclusion that seems to mirror the prison's "near
25  future" prediction, subsection (d)(2)(A) permits no such undefined predictions.

26

27
    _____
28          [15]The legality of these actions are at issue in pending appeals, not here.

                                              18

To extend a commitment under 4241(d)(2)(A), the court must find that within a specific "additional reasonable period of time," there is a substantial probability that the defendant will attain the capacity to permit proceedings to go forward:

> (2) for an additional reasonable period of time until—
>
>> (A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that *within such additional period of time* he will attain the capacity to permit the proceedings to go forward

(emphasis added). The Court failed to make such a finding. It did not find that Mr. Loughner is substantially likely to be restored within four months. It found instead that Mr. Loughner was substantially likely to be restored—but without saying how long it would take—and then pronounced four months to be a "reasonable" period.

This is exactly what the statute does not allow. The plain text of § 4241(d)(2) requires the Court to tie its extension period to the substantial probability finding. By imposing this requirement and allowing only for "an" additional commitment period, Congress plainly intended to hold prison evaluators accountable for their predictions and create a reasonableness limitation on the total amount of time a defendant can be subjected to restoration commitment. The time period requirement accomplishes this end by requiring the government to ask for the total amount of time it seeks at the outset, and then holding it to that request. It is meant to foreclose exactly what the Court did here—grant an extension for an arbitrarily chosen period of time with the intention of continually granting additional extensions, which could quickly add up to a total time period that would never pass the "reasonableness" test had it been properly applied at the outset.

In any event, there is no support in the record for a finding that Mr. Loughner will be restored in four months. The government's evidence boils down to an assertion that "[h]istorically, most defendants reach competency within 8 months of their commitment." Pietz's September 7, 2011 Report at 3. The claim is made without any connection to Mr. Loughner's actual condition: Who are "most defendants"? What is their condition? What is their treatment plan? What makes Mr. Loughner or his condition fit him into the "most defendants" category? General propositions about "most defendants" are insufficient to meet

the government's burden.   Adopting the use of such generalized syllogisms "would be to find [that] the government necessarily meets its burden in every case it wishes to use atypical anti-psychotic medications." *United States v. Evans*, 404 F.3d 227, 241 (4th Cir. 2005).  And when "government experts rely on generalities and fail to apply their views to [the defendant's] condition with specificity," the government has not met its burden. *Ruiz-Gaxiola*, 623 F.3d at 700-01 (citing *Evans*).

In sum, the issues highlighted here all demonstrate likelihood of success on the merits, and, at the very least, present serious legal questions going to the merits of the appeal.

**C.    All Factors Weigh in Favor of Granting the Stay**

Finally, it is clear that the balance of hardships tips sharply in favor of issuance of the stay pending appeal.  Mr. Loughner will suffer the irreparable harm of being committed to the custody of the Attorney General for hospitalization and psychiatric treatment in violation of his liberty interests unless the stay issues.     A stay would advance the interest of preserving the status quo and poses no risk of harm to the government.  If the order is ultimately upheld, its provisions can simply be implemented at that time.  Mr. Loughner is in pretrial custody in Tucson and continues to be medicated there.  The government will suffer no prejudice from a temporary stay.

Moreover, issuance of the stay is in the public interest because it permits deliberative appellate review and orderly administration of justice.  Without a stay, Mr. Loughner's appeal could become moot should he complete the four-month commitment before a decision is rendered, thus depriving the Ninth Circuit of appellate jurisdiction.  Thus, the stay is also necessary to preserve the Court's interest in maintaining jurisdiction where proper.  All four prongs of the preliminary injunction standard are met here. The temporary stay should issue. *See Alliance for the Wild Rockies*, 632 F.3d at 1135-38.

## IV.

## CONCLUSION

For the reasons stated above, the Court should grant a temporary stay pending appeal of the September 28, 2011, commitment order.

Respectfully submitted,

*/s/ Judy Clarke*

DATED: September 30, 2011

JUDY CLARKE
MARK FLEMING
REUBEN CAMPER CAHN
ELLIS M. JOHNSTON III
JANET C. TUNG

Attorneys for Jared Lee Loughner

Copies of the foregoing served electronically to:
Wallace H. Kleindienst, Beverly K. Anderson
Christina M. Cabanillas, Mary Sue Feldmeier