```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF ARIZONA
 2              HONORABLE LARRY ALAN BURNS, JUDGE PRESIDING

 3    UNITED STATES OF AMERICA,       )
                                      )
 4                   PLAINTIFF,       )   CASE NO: 4:11CR00187-LAB
                VS.                   )
 5                                    )   TUCSON, ARIZONA
      JARED LEE LOUGHNER,             )   SEPTEMBER 28, 2011
 6                                    )   11:00 A.M.
                     DEFENDANT.       )
 7    _____ )

 8                       REPORTER'S TRANSCRIPT
                            STATUS HEARING
 9    APPEARANCES:
      FOR THE GOVERNMENT:          ANN BIRMINGHAM SCHEEL, ESQ.
10                                 ACTING UNITED STATES ATTORNEY
                                   BY:  WALLACE KLEINDIENST, ESQ.
11                                      MARY SUE FELDMEIER, ESQ.
                                        BEVERLY ANDERSON, ESQ.
12                                      CHRISTINA CABANILLAS, ESQ.
                                   ASSISTANT U.S. ATTORNEYS
13                                 405 W. CONGRESS ST., STE. 4800
                                   TUCSON, ARIZONA 85701
14
      FOR THE DEFENDANT:           CLARKE & RICE, APC
15                                 BY:  JUDY C. CLARKE, ESQ.
                                   1010 SECOND AVENUE, STE. 1800
16                                 SAN DIEGO, CA 92101
                                            -AND-
17                                 FEDERAL DEFENDERS, INC.
                                   BY:  REUBEN C. CAHN, ESQ.
18                                      JANET TUNG, ESQ.
                                        ELLIS JOHNSTON, ESQ.
19                                 225 BROADWAY, STE. 900
                                   SAN DIEGO, CA 92101
20                                          -AND-
                                   LAW OFFICE OF MARK FLEMING
21                                 BY:  MARK F. FLEMING, ESQ.
                                   1350 COLUMBIA STREET, STE. 600
22                                 SAN DIEGO, CA 92101

23    COURT REPORTER:              EVA OEMICK
                                   OFFICIAL COURT REPORTER
24                                 UNITED STATES COURTHOUSE
                                   940 FRONT STREET, STE. 2190
25                                 SAN DIEGO, CA 92101
                                   TEL: (619) 615-3103
```

2

<h1 style="text-align:center"><u>INDEX</u></h1>

**EXAMINATION**

**WITNESS NAME**                                                      **PAGE**

DR. CHRISTINA PIETZ
    DIRECT BY MS. FELDMEIER ......................................... 9
    CROSS BY MS. CLARKE ............................................. 56
    CROSS BY MS. CLARKE (CONTINUED) ................................ 89
    CROSS BY MS. CLARKE (CONINTUED) ............................... 177
    RE-DIRECT BY MS. FELDMEIER .................................... 181
DR. JAMES BALLENGER
    DIRECT BY MR. KLEINDIENST ..................................... 183
    CROSS BY MR. CAHN ............................................. 224

**EXHIBITS**

**EXHIBIT**                                                          **PAGE**

1 ENTERED INTO EVIDENCE                                             12
2 THROUGH 4 ENTERED INTO EVIDENCE                                   41
6 ENTERED INTO EVIDENCE                                             185
5 ENTERED INTO EVIDENCE                                             186

1  **SAN DIEGO, CALIFORNIA-WEDNESDAY, SEPTEMBER 28, 2011-11:00 A.M.**

2  THE CLERK:  CALLING NO. 1 ON THE CALENDAR, 11CR187,

3  UNITED STATES OF AMERICA VERSUS JARED LEE LOUGHNER, ON FOR

4  STATUS CONFERENCE.

5  IF COUNSEL COULD PLEASE STATE THEIR APPEARANCES FOR

6  THE RECORD.

7  MR. KLEINDIENST:  WALLACE KLEINDIENST, MARY SUE

8  FELDMEIER, CHRISTINA CABANILLAS, AND BEVERLY ANDERSON FOR THE

9  GOVERNMENT.

10  MS. CLARKE:  JUDY CLARKE, MARK FLEMING, ELLIS

11  JOHNSTON, AND REUBEN CAHN FOR MR. LOUGHNER, WHO IS NOW IN THE

12  COURTROOM.

13  MR. KLEINDIENST:  I ALSO WANT TO RECOGNIZE THAT

14  KELLY LUTHER, WHO'S AN ATTORNEY WHO REPRESENTS THE VICTIMS IN

15  THIS CASE, THE DORUSHKAS AND MR. BADGER, IS ALSO PRESENT HERE

16  ON THEIR BEHALF.

17  THE COURT:  GOOD MORNING.

18  GOOD MORNING, MR. CAHN.

19  MR. CAHN:  GOOD MORNING, JUDGE.

20  THE COURT:  WE HAVE SEVERAL MATTERS ON FOR HEARING

21  THIS MORNING.  THE FEDERAL MEDICAL CENTER THROUGH ITS

22  REPRESENTATIVES, DR. PIETZ AND THE WARDEN, HAVE RECOMMENDED AN

23  EXTENSION OF MR. LOUGHNER'S STAY AT THE INSTITUTION.

24  THE PAPERWORK THAT'S BEEN FILED WITH THE COURT

25  INDICATES THEIR BELIEF THAT IF MORE TIME IS GIVEN,

4

1    MR. LOUGHNER CAN BE RESTORED TO COMPETENCY SUCH THAT HE CAN

2    STAND TRIAL IN THIS MATTER.  THEY HAVE OPINED THAT HE IS NOT

3    PRESENTLY COMPETENT, BUT THEY BELIEVE SOME ADDITIONAL AMOUNT

4    OF TIME WILL ENABLE THEM TO HELP RESTORE HIM TO COMPETENCY.

5           THE DEFENSE OPPOSES ANY EXTENSION IN SPRINGFIELD.

6    THE LEGAL STANDARD IS SET FORTH UNDER THE STATUTE.  THE COURT

7    HAS TO FIND THERE'S A SUBSTANTIAL PROBABILITY THAT RESTORATION

8    IN THE FORESEEABLE FUTURE IS POSSIBLE.

9           MY UNDERSTANDING LEADING INTO THIS HEARING IS THE

10   GOVERNMENT INTENDS TO PRESENT DR. PIETZ AND POSSIBLY ANOTHER

11   WITNESS IN SUPPORT OF THE REQUEST TO EXTEND THE TIME

12   MR. LOUGHNER IS IN SPRINGFIELD.

13          MR. KLEINDIENST:  THAT'S CORRECT, YOUR HONOR.

14          I'VE LOST THE OTHER LAWYERS AND DR. PIETZ, BUT I'M

15   SURE THEY'LL BE WALKING IN ANY MINUTE, JUDGE.

16          THE COURT:  I KNOW THERE ARE OTHER MATTERS,

17   MS. CLARKE, BUT I WOULD PROPOSE SINCE THIS MATTER CONTEMPLATES

18   AN EVIDENTIARY HEARING AND TESTIMONY FROM WITNESSES, THAT WE

19   TAKE THIS FIRST.

20          YOU HAVE NO OBJECTION TO THAT?

21          MS. CLARKE:  NO.  THAT'S FINE, YOUR HONOR.

22               (PAUSE IN PROCEEDINGS)

23          MR. KLEINDIENST:  THANK YOU FOR YOUR INDULGENCE,

24   YOUR HONOR.

25          THE COURT:  GOOD MORNING, MS. FELDMEIER.

1          MS. FELDMEIER:  GOOD MORNING, SIR.

2          THE COURT:  MY BELIEF AND UNDERSTANDING IS THAT THE

3    GOVERNMENT INTENDS TO PRESENT WITNESSES IN SUPPORT OF THE

4    APPLICATION TO EXTEND MR. LOUGHNER'S COMMITMENT IN

5    SPRINGFIELD.

6          ARE YOU PREPARED TO CALL THOSE WITNESSES?

7          MS. FELDMEIER:  WE ARE, YOUR HONOR.

8          PRIOR TO CALLING THE WITNESS, HOWEVER, WE DO HAVE --

9    I KNOW THE DEFENSE FILED A MOTION TO CLARIFY THE B.O.P. ORDER

10   RELATING TO DISCLOSURE.  I WAS GOING TO SEGUE OUT OF THAT

11   ARGUMENT TO A POINT THAT I NEED TO RAISE WITH THE COURT PRIOR

12   TO DR. PIETZ TAKING THE STAND.

13         DR. PIETZ HAS COMMUNICATED TO US THAT SHE IS VERY

14   CONCERNED ABOUT THE EX PARTE ORDER PERHAPS BINDING HER ABILITY

15   TO TALK FREELY ABOUT CERTAIN MATTERS THAT MR. LOUGHNER TALKS

16   TO HER ABOUT.

17         SO WHAT I WANTED TO CLARIFY IS THAT THIS ORDER,

18   THERE IS NO LEGAL PRIVILEGE -- AND I APOLOGIZE FOR BEING OUT

19   OF BREATH.  THERE IS NO LEGAL PRIVILEGE FOR ANYTHING THAT THE

20   DEFENDANT TELLS A B.O.P. STAFF MEMBER OR TELLS A VISITOR WHO'S

21   NOT ON THE DEFENSE TEAM.  NOW, IF HE HAS A PRIVATE MEETING

22   WITH HIS DEFENSE TEAM, CLEARLY THAT'S PRIVILEGED.  BUT WHAT HE

23   TELLS DR. PIETZ IS NOT PRIVILEGED.

24         SHE FEELS VERY CONSTRAINED BY THE EX PARTE ORDER, AS

25   DO MANY MEMBERS OF THE STAFF, WE'VE BEEN TOLD, TO RECOUNT

1    ANYTHING HE MENTIONS ABOUT HIS DEFENSE TEAM, ANYTHING HE

2    MENTIONS HOW -- IF HE'S HAPPY TO SEE THEM OR THINGS LIKE THAT.

3    THEY DO BEAR ON THE ISSUE OF COMPETENCY.

4            SO WE WOULD ASK THIS COURT TO CLARIFY THAT ORDER

5    THAT ANYTHING THAT IS NOT PRIVILEGED UNDER THE LAW TELLING

6    B.O.P. STAFF MEMBERS OR VISITORS CAN BE REPORTED IN PROGRESS

7    NOTES AND CAN BE DISCLOSED DURING INTERVIEWS AND CAN BE

8    DISCLOSED DURING COURT TESTIMONY.

9            THE COURT:  MS. CLARKE?

10           MS. CLARKE:  JUDGE, I DON'T HAVE THE EX PARTE ORDER

11   IN FRONT OF ME.  IT WAS AN ORDER TO NOT IDENTIFY THE DEFENSE

12   TEAM, I THINK, AT THE BEGINNING.  PERHAPS MS. FELDMEIER HAS

13   IT.  SHE DIDN'T MENTION IT TO ME.

14           THE COURT:  IT WAS AN ORDER I ENTERED ABOUT

15   NINE MONTHS AGO, I THINK, AT THE VERY INCEPTION.  ESSENTIALLY

16   WHAT IT SAID IS IF THE DEFENSE COMES TO SEE MR. LOUGHNER,

17   THERE SHOULD BE NO REPORTING ON THAT TO THE GOVERNMENT, THAT

18   THEY SHOULD FEEL FREE TO MEET WITH HIM ON SUCH OCCASIONS THAT

19   THEY THINK ARE APPROPRIATE AND THAT THAT MATERIAL SHOULD NOT

20   BE IMMEDIATELY TURNED OVER TO THE UNITED STATES.

21           THIS IS SOMETHING DIFFERENT, THOUGH.  I DON'T THINK

22   DR. PIETZ SHOULD FEEL CONSTRAINED TO THE EXTENT IT DEALS WITH

23   HER OPINION ABOUT WHY AN EXTENSION IS INDICATED IN THIS CASE.

24           THAT'S PROBABLY AN EASY GUIDELINE TO KEEP IN MIND

25   FOR THE PURPOSES OF THIS HEARING.  BEYOND THAT, THE ORDER

1    REMAINS IN PLACE.  THAT'S HOW --

2              MS. CLARKE:  I THINK THAT'S RIGHT.

3              THE COURT:  SO YOU HAVE NOTHING TO ADD, THEN?

4              MS. CLARKE:  MY UNDERSTANDING, YOUR HONOR, IS THAT

5    ALL STATEMENTS MADE -- AND THE COURT'S MADE THIS STATEMENT IN

6    ORDER -- THAT STATEMENTS MADE DURING THIS PROCESS ARE NOT TO

7    BE USED IN ANY WAY.  SO THERE IS THAT LEVEL OF PROTECTION.

8              THE COURT:  HE HAS THAT PROTECTION AT SUCH POINT

9    THERE'S AN ADVERSARIAL PROCEEDING WHERE HIS INTERESTS TO

10   DEFEND AGAINST THE CHARGES ARE -- I'VE SAID THAT.  THE RECORD

11   IS CLEAR ON THAT IN THE ORDERS THAT I'VE ISSUED.

12             THIS IS SOMETHING DIFFERENT.  IF I CONTEXTUALIZE

13   THIS, I THINK SHE MIGHT SAY -- I DON'T KNOW.  I'M SPECULATING.

14   BUT I THINK, "HE SEEMS TO BE GETTING BETTER BECAUSE OF THIS

15   INTERACTION WITH HIS COUNSEL" OR, "HE SEEMS TO BE BETTER AT

16   INTERACTING WITH HIS COUNSEL."  AND THAT INFORMS MY DECISION

17   ON WHETHER WHAT WE'RE DOING IS DOWN THE RIGHT PATH AND SHOULD

18   CONTINUE.

19             IS THAT THE GIST OF IT, SOMETHING TO THAT EFFECT?

20             MS. FELDMEIER:  EXACTLY, YOUR HONOR.

21             THE COURT:  I THINK FOR PURPOSES OF THIS HEARING,

22   THAT'S RELEVANT AND WOULD NOT BE PROHIBITED BY THE ORDER THAT

23   OTHERWISE KEEPS HIM FROM MONITORING DEFENSE ACTIVITIES AND

24   REPORTING BACK TO THE GOVERNMENT.

25             MS. CLARKE:  YOUR HONOR, WE KNOW WE HAVE FILED A

8

1   MOTION TO ACTUALLY ASK THAT THE COURT CLARIFY TO DR. PIETZ
2   THAT THE COURT DID NOT INTEND FOR DR. PIETZ NOT TO REVEAL
3   PERTINENT INFORMATION IN THE PROGRESS NOTES.
4              THE COURT:  WE'LL GET TO THAT.  I AGREE WITH YOU ON
5   THAT.
6              THIS IS WHAT CAME UP AT THE END OF THE LAST
7   TELEPHONIC HEARING?
8              MS. CLARKE:  YES.
9              THE COURT:  YEAH.  I AGREE WITH YOU ON THAT.  I
10  THINK WHAT WAS CONFUSING IS THAT DR. PIETZ IN THE PRISON WAS
11  DIRECTED IN THE FIRST INSTANCE TO SEND REPORTS TO ME, AND THEN
12  I WOULD DISSEMINATE THEM.  I THINK SHE JUST DIDN'T WANT TO
13  VIOLATE WHAT SHE BELIEVED TO BE AN EXPLICIT ORDER.  BUT WE'LL
14  GET TO THAT.  I THINK YOU'RE ENTITLED TO ALL THE INFORMATION
15  THAT'S BEING GENERATED WITH RESPECT TO MR. LOUGHNER.
16             MS. CLARKE:  THANK YOU, YOUR HONOR.
17             THE COURT:  THOSE THINGS SAID, YOU MAY CALL
18  DR. PIETZ.
19             MS. FELDMEIER:  YOUR HONOR, MAY I -- LET ME JUST
20  CLARIFY WITH HER THAT SHE'S COMFORTABLE WITH THE COURT'S ORDER
21  AND UNDERSTANDS.
22                      (PAUSE IN PROCEEDINGS)
23             MS. FELDMEIER:  THE GOVERNMENT CALLS CHRISTINA PIETZ
24  TO THE STAND.
25  //

1                        **DR. CHRISTINA PIETZ**

2   WAS CALLED AS A WITNESS AND, AFTER HAVING BEEN DULY SWORN,

3   TESTIFIED AS FOLLOWS:

4              THE CLERK:  PLEASE STATE AND SPELL YOUR FIRST AND

5   LAST NAME FOR THE RECORD.

6              THE WITNESS:  CHRISTINA PIETZ, P-, AS IN PAUL,

7   I-E-T-, AS IN TOM, Z.

8              THE CLERK:  AND YOUR FIRST NAME, PLEASE.

9              THE WITNESS:  CHRISTINA, C-H-R-I-S-T-I-N-A.

10             THE COURT:  GOOD MORNING, DR. PIETZ.

11             THE WITNESS:  GOOD MORNING.

12                     **DIRECT EXAMINATION**

13  **BY MS. FELDMEIER:**

14  Q.   DR. PIETZ, ARE YOU EMPLOYED?

15  A.   YES.

16  Q.   WHERE?

17  A.   THE UNITED STATES MEDICAL CENTER FOR FEDERAL PRISONERS.

18  Q.   AND WHAT IS YOUR TITLE?

19  A.   I'M A PSYCHOLOGIST.

20  Q.   AND WHERE ARE YOU CURRENTLY WORKING?

21  A.   SPRINGFIELD, MISSOURI.  UNITED STATES MEDICAL CENTER.

22  Q.   AND CAN YOU BRIEFLY DESCRIBE FOR US, WHAT IS A

23  PENITENTIARY THAT IS A MEDICAL CENTER?

24  A.   UNITED STATES MEDICAL CENTER IS ACTUALLY AN

25  ADMINISTRATIVE FACILITY, WHICH MEANS THAT WE ACCEPT PATIENTS

1    OF ALL SECURITY LEVELS.  THE PRISON IS ACTUALLY THREE PRISONS

2    IN ONE.

3            WE HAVE APPROXIMATELY 300 INMATES THAT ARE CADRE

4    INMATES THEY'RE ACTUALLY SENTENCED TO SERVE THEIR TIME THERE.

5            WE HAVE A MEDICAL HOSPITAL.  WE HAVE INMATES THAT

6    ARE SENT THERE USUALLY FROM OTHER BUREAU FACILITIES FOR

7    MEDICAL REASONS.

8            THEN WE HAVE A MENTAL HEALTH UNIT.

9    Q.   AND YOU'RE, I TAKE IT, PART OF THE MENTAL HEALTH TEAM?

10   A.   YES.

11   Q.   WHAT OTHER TYPES OF EMPLOYEES ARE PART OF THE MENTAL

12   HEALTH TEAM?

13   A.   WE HAVE SEVERAL PSYCHIATRISTS THAT ARE ON STAFF.  WE ALSO

14   HAVE NURSES THAT ARE ON STAFF.  CORRECTIONAL OFFICERS.  THEY

15   AREN'T ACTUALLY TRAINED IN MENTAL HEALTH ISSUES.  THEY ROTATE

16   EVERY THREE MONTHS TO DIFFERENT UNITS THROUGHOUT THE FACILITY.

17   WE HAVE SOCIAL WORKERS THAT ARE ON STAFF.  WE HAVE UNIT

18   MANAGERS, CASE MANAGERS, AND ALL OF THEM ARE PART OF THE

19   MENTAL HEALTH TEAM.

20   Q.   AND, OF COURSE, THEY INCLUDE PSYCHOLOGISTS LIKE

21   YOURSELF?

22   A.   YES.

23   Q.   AND IF YOU KNOW, APPROXIMATELY HOW MANY PATIENTS DO YOU

24   CARRY ON YOUR CASELOAD AT ANY GIVEN TIME?

25   A.   IT DEPENDS.  TYPICALLY, I CARRY APPROXIMATELY 15 TO

1    20 PATIENTS.

2    Q.   HOW LONG HAVE YOU BEEN EMPLOYED WITH THE BUREAU OF

3    PRISONS AS A PSYCHOLOGIST?

4    A.   FOR 21 YEARS.

5            MS. FELDMEIER:  YOUR HONOR, MAY I APPROACH THE

6    WITNESS?

7            THE COURT:  SURE.

8            MS. FELDMEIER:  I'M HANDING THE WITNESS WHAT'S BEEN

9    MARKED AS EXHIBIT 1 FOR IDENTIFICATION.

10   BY MS. FELDMEIER:

11   Q.   DR. PIETZ, DO YOU RECOGNIZE WHAT EXHIBIT 1 IS?

12   A.   YES.

13   Q.   WHAT IS IT?

14   A.   THIS IS MY CURRICULUM VITAE.

15   Q.   AND WHO PREPARED THAT?

16   A.   I DID.

17   Q.   WHAT DOES A CURRICULUM VITAE CONTAIN, EXHIBIT 1 IN

18   PARTICULAR?

19   A.   IT DELINEATES MY PROFESSIONAL CAREER, THE DIFFERENT

20   DEGREES THAT I HAVE, PUBLICATIONS, PRESENTATIONS, DIFFERENT

21   OFFICES THAT I HOLD.

22   Q.   AND DOES THAT ACCURATELY AND TRULY REFLECT THE RANGE OF

23   YOUR EXPERIENCE AND EDUCATION?

24   A.   YES.

25           MS. FELDMEIER:  YOUR HONOR, AT THIS TIME, I'D MOVE

1    TO ADMIT INTO THE RECORD EXHIBIT 1, DR. PIETZ'S CURRICULUM

2    VITAE.

3              THE COURT:  ANY OBJECTION?

4              MS. CLARKE:  NO.

5              THE COURT:  1 IS ADMITTED.

6              (EXHIBIT NO. 1 RECEIVED INTO EVIDENCE)

7    BY MS. FELDMEIER:

8    Q.   DR. PIETZ, COULD YOU HIGHLIGHT FOR THE COURT SOME OF YOUR

9    EXPERIENCES AND EDUCATION.  YOU DON'T HAVE TO READ THE WHOLE

10   RESUMé.

11   A.   I HAVE A BACHELOR'S DEGREE FROM CREIGHTON UNIVERSITY,

12   WHICH I RECEIVED IN 1982.

13             I HAVE A MASTER'S DEGREE THAT I RECEIVED FROM

14   HOUSTON STATE UNIVERSITY IN 1984.  BOTH OF THOSE ARE IN

15   PSYCHOLOGY.

16             I HAVE A DOCTORAL DEGREE FROM TEXAS A&M UNIVERSITY.

17   I RECEIVED THAT 1989 IN THE AREA OF PSYCHOLOGY.

18             I COMPLETED AN INTERNSHIP AND A POST-DOCTORAL

19   FELLOWSHIP AT THE UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER,

20   WHICH IS IN HOUSTON, TEXAS.

21             I'VE WORKED AS A FORENSIC PSYCHOLOGIST FOR 21 YEARS

22   AT THE UNITED STATES MEDICAL CENTER.

23             I ALSO HAVE A PRIVATE PRACTICE, AND I TEACH.

24             I CAN EXPLAIN ALL THAT IF YOU NEED FOR ME TO DO

25   THAT.

1            CURRENTLY, I'M THE INTERIM REVIEW OFFICER FOR THE

2    AMERICAN BOARD OF FORENSIC PSYCHOLOGY AND ALSO THE

3    PRESIDENT-ELECT.

4    Q.   HAVE YOU EVER BEEN QUALIFIED IN A COURT AS AN EXPERT IN

5    THE FIELD OF FORENSIC PSYCHOLOGY?

6    A.   YES.

7    Q.   WHAT TYPES OF COURTS?

8    A.   FEDERAL COURT, STATE COURT, AND MILITARY COURT.

9    Q.   AND APPROXIMATELY HOW MANY TIMES HAVE YOU BEEN QUALIFIED

10   AS AN EXPERT IN THIS FIELD?

11   A.   OVER 200 TIMES.

12            MS. FELDMEIER:  AT THIS TIME, I'D MOVE TO HAVE THE

13   COURT RECOGNIZE DR. PIETZ AS AN EXPERT IN THE FIELD OF

14   FORENSIC PSYCHOLOGY.

15            THE COURT:  DO YOU WANT TO VOIR DIRE DR. PIETZ ON

16   HER BACKGROUND AND HER CREDENTIALS AND HER ABILITY TO OPINE ON

17   EXPERT MATTERS?

18            MS. CLARKE:  NO.

19            THE COURT:  GO AHEAD, MS. FELDMEIER.

20   BY MS. FELDMEIER:

21   Q.   DR. PIETZ, IN THE COURSE OF YOUR WORK AT FMC SPRINGFIELD,

22   DID YOU BECOME FAMILIAR WITH AN INDIVIDUAL NAMED JARED LEE

23   LOUGHNER?

24   A.   YES.

25   Q.   AND IS MR. LOUGHNER IN COURT TODAY?

1    A.   YES.

2    Q.   COULD YOU PLEASE IDENTIFY HIM.

3    A.   HE'S SITTING AT THE DEFENSE TABLE.  I DON'T SEE WHAT

4    COLOR PANTS HE HAS ON, BUT IT LOOKS LIKE HE HAS A WHITE

5    T-SHIRT ON AND BROWN HAIR.

6            THE COURT:  SHE'S IDENTIFIED MR. LOUGHNER FOR THE

7    RECORD.

8    BY MS. FELDMEIER:

9    Q.   WHEN DID YOU FIRST MEET WITH MR. LOUGHNER?

10   A.   I FIRST MET HIM ON MARCH 23RD, 2011.

11   Q.   AND WHAT WERE THE CIRCUMSTANCES OF THAT MEETING AND WHY

12   DID YOU MEET HIM?

13   A.   HE WAS REFERRED TO THE UNITED STATES MEDICAL FACILITY FOR

14   FEDERAL PRISONERS BY THIS COURT FOR A COMPETENCY EVALUATION.

15   I WAS ASSIGNED TO COMPLETE THAT EVALUATION.

16   Q.   HOW LONG DID MR. LOUGHNER STAY AT SPRINGFIELD DURING THAT

17   FIRST PERIOD?

18   A.   ALMOST 40 DAYS.  I BELIEVE HE LEFT OUR FACILITY AROUND

19   APRIL 28TH, SOMETHING LIKE THAT.

20   Q.   AND DURING THAT TIME, THEN, BETWEEN APPROXIMATELY

21   MARCH 23RD AND APRIL 28TH, HOW OFTEN DID YOU HAVE CONTACT WITH

22   THE DEFENDANT?

23   A.   I SAW HIM EVERY DAY EXCEPT FOR MAYBE A COUPLE OF DAYS,

24   AND THAT WOULD INCLUDE SATURDAYS AND SUNDAYS.

25   Q.   WHAT WERE THE LENGTH OF THESE MEETINGS?

1    A.   IT WOULD DEPEND.  THERE WOULD BE TIMES WHERE IT WOULD

2    RANGE FROM TEN MINUTES WHERE HE WOULD REFUSE TO SPEAK TO ME.

3    AND DESPITE MY ENCOURAGEMENT, HE WAS UNWILLING TO SPEAK WITH

4    ME.  THERE WERE TIMES WHEN I SPOKE WITH HIM FOR WELL OVER AN

5    HOUR.

6    Q.   AND WHERE WOULD YOU MEET WITH MR. LOUGHNER?

7    A.   MR. LOUGHNER IS ACTUALLY HOUSED IN A SECURE UNIT.  HE'S

8    ISOLATED FROM OTHER INMATES THAT ARE ASSIGNED TO OUR FACILITY.

9    HE HAS HIS OWN ROOM, HIS OWN SHOWER, HIS OWN BATHROOM, OWN

10   RECREATION AREA.

11        AND I WOULD CONDUCT THE INTERVIEWS -- THERE'S

12   SOMETHING LIKE A HALLWAY OUTSIDE OF HIS CELL, AND I WOULD

13   ACTUALLY SIT -- HE'D ACTUALLY BE IN THIS ROOM.  HE WOULD BE

14   UNRESTRAINED WHEN I INTERVIEWED HIM, BUT THERE WOULD BE A

15   GRILL BETWEEN US.  SO HE WASN'T ALLOWED TO HAVE PHYSICAL

16   CONTACT WITH ME.  I CONDUCTED MY INTERVIEWS IN THE HALLWAY.  I

17   WOULD BE SITTING ACROSS FROM HIM.  THE GRILL WOULD BE IN

18   BETWEEN US.

19   Q.   WHEN YOU SAY A GRILL, IS THIS SOMETHING WHERE IT'S LIKE A

20   SCREEN WHERE YOU CAN'T READ HIS EXPRESSIONS OR IS IT OPEN?

21   A.   THEY'RE ACTUALLY METAL RODS THAT CREATE THE GRILL, AND

22   THEY'RE FAIRLY WIDE.  IT'S EASY TO SEE HIS EXPRESSIONS.

23   Q.   SO DURING THAT FIRST 35 TO 40 DAYS, DID YOU CONDUCT AN

24   EVALUATION ON MR. LOUGHNER'S COMPETENCY TO STAND TRIAL?

25   A.   YES.

1    Q.    AND DID YOU MAKE A REPORT ON THAT MATTER?

2    A.    YES.

3          MS. FELDMEIER:  MAY I APPROACH THE WITNESS, YOUR

4    HONOR?

5          THE COURT:  YOU MAY.

6    BY MS. FELDMEIER:

7    Q.    DR. PIETZ, I'M SHOWING YOU WHAT'S BEEN MARKED AS

8    EXHIBIT 2 FOR IDENTIFICATION.  PLEASE TAKE A LOOK AT THAT.

9          DO YOU RECOGNIZE IT?

10   A.    YES.

11   Q.    WHAT IS IT?

12   A.    THIS IS THE FORENSIC REPORT THAT I SUBMITTED TO DISTRICT

13   COURT -- OR TO THIS COURT.  THE REPORT'S DATED MAY 2ND, 2011

14   ADDRESSING HIS COMPETENCY TO STAND TRIAL.

15   Q.    AND DID YOU FORM AN OPINION THAT YOU REPORTED IN THAT

16   REPORT REGARDING COMPETENCY?

17   A.    YES.

18   Q.    WHAT WAS THAT OPINION?

19   A.    THAT HE WAS NOT COMPETENT TO STAND TRIAL.

20   Q.    AND ARE THERE TWO PRONGS THAT YOU LOOK AT WHEN YOU'RE

21   DETERMINING COMPETENCY?

22   A.    THERE ARE TWO PRONGS, BUT ONE OF THEM IS ACTUALLY DIVIDED

23   INTO TWO ISSUES.

24   Q.    AND COULD YOU TELL US WHY, AT THE TIME YOU WROTE THAT

25   REPORT, YOU THOUGHT THERE WAS AN ISSUE AS TO COMPETENCY.

1    A.    THERE WAS CERTAIN CONCERNS I HAD.  THE PRONGS -- JUST TO

2    HELP UNDERSTAND WHAT MY OPINION WAS, THE FIRST PRONG IS THAT

3    HE HAS -- IN ORDER TO BE COMPETENT, HE HAS TO HAVE A FACTUAL

4    UNDERSTANDING OF THE PROCEEDINGS AGAINST HIM, WHICH MEANS THAT

5    HE HAS TO UNDERSTAND THE ROLES OF THE COURTROOM PARTICIPANTS.

6    HE HAS TO UNDERSTAND DIFFERENT PLEAS THAT ARE AVAILABLE TO

7    HIM.

8         THE SECOND PRONG, WHICH SOME PEOPLE ACTUALLY INCLUDE

9    WITH THE FIRST PRONG, IS THAT HE HAS TO HAVE A RATIONAL

10   UNDERSTANDING.  HE HAS TO BE ABLE TO APPLY THAT INFORMATION.

11   HE HAS TO UNDERSTAND WHAT THE JUDGE'S ROLE WAS, HOW THAT --

12   HOW THE JUDGE WOULD -- HOW THE JUDGE WOULD APPLY HIS

13   PARTICULAR CASE.

14   Q.    SO IN LOOKING AT YOUR EVALUATION DURING THAT TIME, WHAT

15   DID YOU SEE AS ROADBLOCKS?

16   A.    THE THIRD PRONG IS THAT HE HAS TO BE ABLE TO ASSIST HIS

17   ATTORNEY.

18         IT WAS MY OPINION THAT MR. LOUGHNER SUFFERS FROM

19   UNDIFFERENTIATED SCHIZOPHRENIA.  BECAUSE OF THAT, THERE ARE

20   SEVERAL SYMPTOMS THAT HE EXHIBITS THAT I FELT WOULD IMPACT HIS

21   ABILITY TO DO THOSE THINGS.

22         I FELT LIKE I MADE CLEAR IN MY REPORT.  I WASN'T

23   CERTAIN THAT HE DID OR DIDN'T HAVE A FACTUAL UNDERSTANDING OF

24   THE PROCEEDINGS BECAUSE WHEN I WOULD INTERVIEW HIM, HE WOULD

25   OFTEN GIVE NONSENSICAL RESPONSES, WHICH IS ACTUALLY A SYMPTOM

1    OF SCHIZOPHRENIA.  IT'S DISORGANIZED THINKING.

2           WHEN I ASKED HIM, FOR EXAMPLE, WHAT THE JUDGE DOES,

3    HE WOULD UNDERSTAND -- HE WOULD HAVE A SIMPLE UNDERSTANDING OF

4    IT, BUT THEN HE WOULD BEGIN TALKING ABOUT THING THAT WERE NOT

5    RELATED TO THE SPECIFIC QUESTION.

6           SO I WAS CONCERNED HE MAY NOT HAVE A FACTUAL

7    UNDERSTANDING.  MY MAJOR CONCERNS WERE HIS ABILITY TO HAVE A

8    RATIONAL UNDERSTANDING, BE ABLE TO ASSIST HIS ATTORNEYS.  HE

9    BELIEVED THAT HIS ATTORNEYS WERE BLACKMAILING HIM OR EXTORTING

10   HIM FOR MONEY, WERE INVOLVED IN A CONSPIRACY AGAINST HIM.

11   CONSEQUENTLY, THERE WERE MANY TIMES HE WAS UNWILLING TO GO SEE

12   THEM BECAUSE HE DID NOT TRUST THEM.

13          REGARDING A RATIONAL UNDERSTANDING, IT WAS DIFFICULT

14   TO GATHER ANY INFORMATION FROM HIM.  ONE OF THE MAIN SYMPTOMS

15   OF SCHIZOPHRENIA, THE BEST WAY TO DESCRIBE IT IS IT'S A

16   POVERTY OF SPEECH.  IT'S WHEN YOU DON'T RESPOND AT ALL.  OR

17   WHEN YOU DO RESPOND, YOU DON'T GET MUCH FROM THE PERSON.

18          AND THERE WERE MANY TIMES WHEN HE WOULD SOMETHING TO

19   ME, AND I WOULD SAY, "MR. LOUGHNER, I DON'T UNDERSTAND WHAT

20   YOU'RE TELLING ME."  IT'S A SYMPTOM OF HIS SCHIZOPHRENIA.  HE

21   IS ATTENDING TO AUDITORY HALLUCINATIONS.

22   Q.   WHAT DOES THAT MEAN?

23   A.   IT'S INTERNAL STIMULI.  IT'S ATTENDING AND RESPONDING TO

24   SOMETHING THAT DOESN'T EXIST.  IF YOU LOOK AT HIS RECORDS,

25   PRETTY CONSISTENTLY HE -- PEOPLE WERE -- HAD DOCUMENTED THAT

1    THEY OBSERVED HIM -- YOU COULD TELL HE WAS ACTUALLY ATTENDING

2    TO SOMETHING THAT WASN'T THERE, WHICH MADE IT DIFFICULT TO

3    HAVE A CONVERSATION WITH HIM.

4    Q.   IN LAY SPEAK, WOULD THAT BE WHAT COMMONLY WE REFER TO AS

5    A HALLUCINATION, THAT I'M TALKING TO SOMEBODY WHO JUST ISN'T

6    THERE?

7    A.   IT'S AN AUDITORY HALLUCINATION, YES.

8         MY SUSPICION IS THAT HE ALSO MAY HAVE ATTENDED

9    VISUAL HALLUCINATIONS.  HE'S TALKED ABOUT HAVING IMAGINARY

10   FRIENDS.  AND IT'S POSSIBLE THAT THAT WAS ACTUALLY A VISUAL

11   HALLUCINATION THAT HE WAS EXPERIENCING.

12        BUT THE OTHER DELUSIONS THAT HE EXHIBITED, HE WOULD

13   SPONTANEOUSLY TELL ME THAT CONGRESSWOMAN GIFFORDS WAS STILL

14   ALIVE -- OR WAS DEAD DESPITE EVIDENCE THAT I WOULD PRESENT TO

15   HIM THAT SUGGESTED THAT SHE ACTUALLY WAS ALIVE.

16   Q.   DID HE TRULY SEEM TO BELIEVE THAT AT THE TIME?

17   A.   IN MY OPINION, HE DID.

18        HE WOULD TALK ABOUT THE REENACTMENT OF A VIDEO.  HE

19   HAD SEEN A VIDEO OF THE INCIDENT, AND HE BELIEVED THAT IT

20   HAD -- IN MY OPINION, IT WAS A DELUSION OF PARANOIA.  HE

21   BELIEVED THAT THE GOVERNMENT, POSSIBLY HIS ATTORNEYS, POSSIBLY

22   LAW ENFORCEMENT HAD ACTUALLY EDITED THE VERSION OF THE VIDEO.

23        AND AGAIN, HE WOULD SPONTANEOUSLY MAKE THESE

24   STATEMENTS.  WE MIGHT BE TALKING ABOUT SOMETHING UNRELATED,

25   AND HE WOULD JUST SHARE THAT INFORMATION WITH ME.  HE ALSO --

1  Q.   IS THAT INDICATIVE OF OBSESSIVE BEHAVIOR?

2  A.   I THINK THAT IT CAN BE.  HE WAS DEFINITELY CONSUMED WITH

3  HIS DELUSIONS, AND THEY ENTERED MOST CONVERSATIONS THAT HE HAD

4  WITH ME.  AND IF YOU LOOK THROUGH THE NOTES, HE OFTEN SAID IT

5  TO OTHER PEOPLE THAT WERE TALKING TO HIM, THE NURSES OR

6  PSYCHOLOGISTS THAT MIGHT HAVE BEEN COVERING FOR ME OR

7  PSYCHIATRISTS THAT MIGHT BE COVERING.

8       HE ALSO MADE COMMENTS ABOUT THE WITNESS TO THE

9  TREASON, REFERRING TO ONE OF THE VICTIMS; THAT SHE WAS

10 ACTUALLY A WITNESS TO THE TREASON THAT HAD OCCURRED.  AGAIN, I

11 BELIEVE THAT WAS PART OF HIS DELUSIONAL THINKING.

12 Q.   WHAT ABOUT -- YOU MENTIONED THE BLACKMAILING -- HIS

13 LAWYER WAS BLACKMAILING HIM.  WHAT EXACTLY -- THAT DOESN'T

14 MAKE A LOT OF SENSE TO ME.  WHAT WAS THE DELUSION THERE?

15 A.   THE DELUSION WAS THAT HE WAS PARANOID OF THEM.  IT'S A

16 DELUSION OF PERSECUTION, THAT HE COULDN'T TRUST THEM TO SHARE

17 INFORMATION AND BELIEVED THAT THEY WERE WORKING AGAINST HIM OR

18 USING HIM IN SOME WAY.

19 Q.   WHAT ABOUT THE DEFENDANT'S APPEARANCE AT THIS POINT?

20 A.   ONE OF THE INTERESTING THINGS ABOUT HIM, WHICH MOST

21 PEOPLE PERCEIVE, IS HE HAS A VERY INAPPROPRIATE SMILE ON HIS

22 FACE.  IT'S AN INAPPROPRIATE AFFECT.  HE WOULD SMILE.  AND

23 AGAIN, THAT'S A SYMPTOM OF PSYCHOSIS.  HE WOULD SMILE AT

24 THINGS THAT YOU SHOULDN'T SMILE ABOUT.

25       THERE WERE TIMES WHEN HE WOULD ALSO POSSIBLY CRY.

1    WE WOULD BE TALKING ABOUT SOMETHING THAT WASN'T NECESSARILY

2    SAD, BUT IT WOULD CREATE THE SORT OF REACTION THAT HE MIGHT

3    JUST CRY, BUT IT WOULD BE A VERY BRIEF SORT OF RESPONSE.  AND

4    THEN HE'D BEGIN TALKING ABOUT WHATEVER IT WAS WE WERE TALKING

5    ABOUT AT THAT PARTICULAR TIME.  SO HE HAD AN INAPPROPRIATE

6    AFFECT.

7    Q.   COULD YOU TALK TO US A LITTLE BIT ABOUT EYE CONTACT

8    DURING THAT TIME PERIOD BEFORE THE PART --

9    A.   DURING MY INITIAL INTERVIEWS WITH HIM, HE RARELY

10   ESTABLISHED EYE CONTACT WITH MYSELF OR ANY OF THE OTHER STAFF.

11   WHAT HE ACTUALLY DID IS HE WOULD HAVE HIS HEAD TURNED AND LOOK

12   AT YOU OUT OF THE CORNER OF HIS EYE IF HE DID HAVE EYE

13   CONTACT.

14   Q.   COULD YOU DEMONSTRATE FOR ME HOW THAT WOULD BE?

15   A.   HE WOULD LOOK AT YOU LIKE THIS.

16        MS. FELDMEIER:  THE WITNESS IS TURNING HER HEAD OVER

17   HER RIGHT SHOULDER AND LOOKING AWAY FROM THE SPEAKER.

18        THE WITNESS:  WHICH, AGAIN, IS A SYMPTOM OF

19   SCHIZOPHRENIA.  SOME INDIVIDUALS, THEY DON'T ESTABLISH EYE

20   CONTACT.  THAT WAS -- THERE WERE TIMES WHEN I DID INTERVIEWS

21   WITH HIM THAT HE'D ACTUALLY ENGAGE IN THAT.  THERE WERE OTHER

22   TIMES THAT HE WOULD SIT ON THE BED AND TALK TO ME OR SIT IN

23   THE CHAIR AND TALK TO ME AND LOOK DOWN AT THE GROUND OR HIS

24   GAZE WOULD DIVERT ONE WAY OR THE OTHER.  IT WAS VERY DIFFICULT

25   FOR HIM -- AS I'M MAKING EYE CONTACT WITH YOU, IT'S VERY

1    DIFFICULT FROM HIM TO DO THAT.  IN MY OPINION, THAT WAS

2    BECAUSE OF HIS PSYCHOTIC CONDITION.

3    Q.    WHAT ABOUT HIS AGITATION AT THIS STAGE?

4    A.    I WOULDN'T SAY HE WAS OVERLY AGITATED AT THIS POINT.

5    THERE WERE A COUPLE OF INCIDENTS OF TEMPER DURING THIS TIME.

6    I WOULDN'T DESCRIBE THOSE AS AGITATION.  I WOULD DESCRIBE

7    THOSE AS ANGRY.  HE REACTED VERY QUICKLY AND COMPOSED HIMSELF

8    AND WAS ABLE TO CONTINUE THE INTERVIEW OR WHATEVER HE WAS

9    DOING AT THAT PARTICULAR POINT.

10   Q.    AND DURING THIS TIME PERIOD AS WELL, THEN, DID HE ENGAGE

11   IN ANY PHYSICAL ACTIVITY THAT WAS INAPPROPRIATE AS FAR AS

12   THROWING THINGS OR LUNGING OR ANY OF THOSE TYPES OF THINGS?

13   A.    DURING MY INTERVIEW WITH HIM, HE BECAME VERY ANGRY.  BUT

14   I WAS ACTUALLY VIDEOTAPING, AND HE -- THIS IS MY

15   INTERPRETATION OF WHAT HAPPENED.  IT SEEMED THAT HE WAS

16   TALKING TO WHOEVER HE THOUGHT WAS WATCHING THAT VIDEO.  AND

17   WITHOUT PROVOCATION, HE JUMPED UP AND HE THREW THE CHAIR AT

18   THE GRILL SEVERAL TIMES.

19          HE THEN WENT OVER -- HE HAS A SINK IN HIS CELL.  I

20   WASN'T EXACTLY SURE WHAT HE WAS DOING, BUT I LATER LEARNED

21   THAT WHAT HE DID IS HE WET TOILET PAPER AND HE BEGAN THROWING

22   IT AT THE CAMERA.  AND THEN HE GOT THE CHAIR AND THREW IT A

23   COUPLE MORE TIMES AT THE GRILL.

24   Q.    AND THEN WHAT HAPPENED?

25   A.    I ASKED HIM IF HE WAS OKAY.

1          HE SAID, "YES."

2          I SAID, "CAN WE CONTINUE?"

3          HE SAID, "YES."

4          AND I SAID, "IS THAT DIRECTED AT THE CAMERA?"  OR I

5     THINK I SAID, "IS THAT DIRECTED AT YOUR ATTORNEYS?"

6          HE SAID, "YES."

7          AND WE CONTINUED WITH THE INTERVIEW.

8          THERE WAS ANOTHER INCIDENT WHERE HE WAS VISITING

9     WITH ONE OF HIS ATTORNEYS AND LUNGED AT HER.  THIS WAS AN

10    ATTORNEY-CLIENT VISIT.  I WAS ACTUALLY NOT IN THE AREA.  AND

11    HE SPIT IN HER DIRECTION.

12    Q.   AND AS A PSYCHOLOGIST, WOULD YOU CONSIDER THAT TO BE

13    APPROPRIATE AND SYMPTOMATIC OF THE MENTAL ISSUES THAT THIS

14    DEFENDANT SUFFERS FROM?

15    A.   SOME INMATES DO THAT TO US THAT AREN'T MENTALLY ILL.

16    Q.   BUT IN HIS CASE --

17    A.   I DON'T THINK HE TRUSTED HIS ATTORNEY.  LET ME JUST ADD,

18    HE WAS UNWILLING TO VISIT HIS ATTORNEYS.  THAT PARTICULAR

19    VISIT, SEVERAL OF US WENT BACK THERE AND STRONGLY ENCOURAGED

20    HIM TO ATTEND THIS VISIT.  WE WERE CONCERNED ABOUT HOW IT

21    WOULD BE CONSTRUED IF HE CONTINUED TO REFUSE VISITS.

22          IT HAPPENED AFTER THAT, AFTER WE HAD STRONGLY

23    ENCOURAGED HIM TO PARTICIPATE IN THE VISIT.  AND AGAIN, MY

24    INTERPRETATION IS HE DIDN'T TRUST THEM, HE DIDN'T WANT TO TALK

25    WITH THEM, AND IT WAS A MESSAGE THAT HE DIDN'T WANT TO BE AT

24

1    THAT VISIT.

2    Q.    IN FACT, DURING THIS TIME PERIOD LEADING INTO THE

3    BEGINNING OF THIS NEXT COMMITMENT, DID THE DEFENDANT EVEN

4    CLAIM HE WANTED TO GET OF HIS ATTORNEYS, HIS PARANOIA WENT

5    THAT FAR?

6    A.    THERE WAS ACTUALLY AN INCIDENT -- I THINK I INCLUDED THIS

7    IN MY FIRST REPORT -- THAT HE HAD PLANNED TO COME BACK TO

8    COURT AND TELL THE JUDGE THAT HE WAS GOING TO FIRE HIS

9    ATTORNEYS.

10   Q.    THEN -- SO NOW WE'RE AT THE END OF APRIL, APRIL 28TH, IS

11   THE END OF HIS FIRST COMMITMENT THERE AT SPRINGFIELD;

12   CORRECT?

13   A.    THAT'S CORRECT.

14   Q.    SO DID THE DEFENDANT THEN TRAVEL BACK TO TUCSON AND LEAVE

15   THE INSTITUTION THAT YOU WORKED AT?

16   A.    YES.

17   Q.    WHEN HE CAME BACK HERE TO COURT, IS IT TRUE THAT BOTH

18   PARTIES STIPULATED TO YOUR QUALIFICATIONS AND CONCLUSIONS AND

19   THE DEFENDANT WAS FOUND INCOMPETENT AT THAT TIME?

20   A.    IT'S MY UNDERSTANDING.  I WASN'T HERE, PRESENT, FOR THAT

21   HEARING.  IT'S MY UNDERSTANDING THAT'S WHAT HAPPENED.

22   Q.    SO DID MR. LOUGHNER THEN COME BACK TO YOU AT FMC

23   SPRINGFIELD APPROXIMATELY MAY 27TH?

24   A.    YES.

25   Q.    DID HE STAY THERE AT SPRINGFIELD THEN UNDER YOUR CARE FOR

1   ABOUT 120 DAYS TILL JUST THIS PAST MONDAY, SEPTEMBER 26TH?

2   A.   YES.

3   Q.   AND DURING THAT TIME, WHAT WAS THE FREQUENCY OF YOUR

4   MEETINGS WITH MR. LOUGHNER AND THE LENGTH OF TIME EACH MEETING

5   WOULD TAKE PLACE?

6   A.   HE ARRIVED ON MAY 27TH, WHICH WAS A FRIDAY.  I ACTUALLY

7   SAW HIM ON SATURDAY, WHICH WAS MAY 28TH.  I SEE HIM EVERY DAY

8   THAT I'M IN THE INSTITUTION.  I DON'T SEE HIM ON SATURDAYS AND

9   SUNDAYS AS I DID BEFORE, BUT THERE HAVE BEEN A COUPLE OF TIMES

10  THAT I'VE ACTUALLY BEEN ON CALL AND HAD TO GO IN AND SEE HIM

11  ON SATURDAY AND SUNDAY.

12          THERE WAS ONE INSTANCE WHERE IT WAS A SUNDAY AND HE

13  HAD A FAIRLY BAD DAY.  THEY ACTUALLY CALLED ME TO COME IN TO

14  SEE HIM THAT DAY.  BUT FOR THE MOST PART, MY VISITS WITH HIM

15  WERE BETWEEN MONDAY AND FRIDAY UNLESS I WAS ON CALL.

16  Q.   AND HOW LONG WOULD THESE VISITS LAST, ANYWHERE FROM --

17  WHAT'S THE RANGE?

18  A.   THERE ARE TIMES WHEN POSSIBLY DUE TO MY SCHEDULING,

19  POSSIBLY DUE TO HIS SCHEDULING, OR POSSIBLY DUE TO HIS

20  DEMEANOR, HE DOESN'T WANT TO SEE ME.  IT MAY ONLY LAST 10 TO

21  15 MINUTES.

22          THERE ARE OTHER TIMES THAT I MIGHT HAVE VISITED WITH

23  HIM FOR UP TO AN HOUR.

24          THERE HAVE BEEN A COUPLE OF TIMES THAT I'VE SEEN HIM

25  TWICE IN ONE DAY.  HE MIGHT ASK THE OFFICERS IF HE CAN SEE ME

1  IN THE EARLY AFTERNOON.  I WOULD GO OVER IN THE -- BEFORE I'D

2  LEAVE FOR THE DAY AND GO VISIT WITH HIM.  THERE WERE A COUPLE

3  TIMES WHEN I SAW HIM TWICE A DAY.

4  Q.  DID THERE COME A TIME DURING THIS SECOND COMMITMENT WHERE

5  YOU TOLD THE DEFENDANT FOR THE FIRST TIME THAT HE WAS MENTALLY

6  ILL?

7  A.  YES.

8  Q.  COULD YOU TELL US ABOUT THAT.

9  A.  HE WAS DEVASTATED.  HE DIDN'T WANT TO BE MENTALLY ILL,

10  BUT HE ALSO THOUGHT -- THAT'S ACTUALLY A WORD THAT HE USED AT

11  ONE TIME, THAT MAYBE HE HAD BEEN MENTALLY ILL FOR SOME TIME.

12  BUT THIS WAS A DIFFICULT CONVERSATION FOR HIM TO HEAR AS IT

13  WOULD BE FOR ANYBODY WHEN THEY HEAR THEY HAVE A DEBILITATING

14  ILLNESS.

15  Q.  SO YOU AS HIS TREATING PSYCHOLOGIST, DID YOU DISCUSS A

16  TREATMENT PLAN WITH HIM?

17  A.  YES.

18  Q.  WHO DID YOU CONSULT WITH ON THIS TREATMENT PLAN BEFORE

19  YOU MET WITH THE DEFENDANT TO DISCUSS IT?

20  A.  WELL, TYPICALLY WHEN I'VE BEEN ASKED TO RESTORE SOMEONE

21  TO COMPETENCY -- THE PSYCHIATRIST THAT I WORK WITH IS

22  DR. SARRAZIN.  AND THERE WOULD BE NO REASON FOR HIM NOT TO

23  MEDICATE HIM.  SO THAT WE -- WE KNEW IF HE WERE FOUND

24  INCOMPETENT, THAT DR. SARRAZIN WOULD BE THE TREATING

25  PSYCHIATRIST.  SO THAT'S ACTUALLY WHO I TALKED WITH ABOUT THE

1    MEDICATION REGIMEN.

2    Q.   SO AS THOUGH I'M MR. LOUGHNER, EXPLAIN WHAT YOU WOULD

3    HAVE EXPLAINED TO HIM AS TO WHAT HIS TREATMENT OPTIONS WERE IF

4    HE WANTED TO OVERCOME THIS.

5    A.   I DON'T KNOW THESE WERE MY EXACT WORDS, BUT IT WENT

6    SOMETHING LIKE, "YOU HAVE A MENTAL ILLNESS.  YOU SUFFER FROM

7    SCHIZOPHRENIA.  BASED ON MY" -- HE KNEW, BUT -- HE KNEW THE

8    FIRST TIME WHAT RECORDS I HAD REVIEWED, BUT I ACTUALLY SHARED

9    WITH HIM THAT I HAD READ HIS WRITINGS, LOOKED AT DIFFERENT

10   INTERVIEWS OF INDIVIDUALS, FRIENDS, FAMILY, THAT SORT OF

11   THING.

12        I EXPLAINED TO HIM THAT HE PROBABLY HAD SUFFERED

13   FROM SCHIZOPHRENIA FOR SEVERAL YEARS BASED ON WHAT I HAD READ

14   AND BASED ON WHAT I LEARNED ABOUT HIM.  AND THAT GIVEN MY

15   EXPERIENCE, THAT THE ONLY OPTION THAT HE HAD WAS TO BE

16   PRESCRIBED SOME ANTIPSYCHOTIC MEDICATION.

17        I ALSO SHARED WITH HIM I THOUGHT THAT HE WAS

18   DEPRESSED AND PROBABLY HAD BEEN DEPRESSED FOR MANY YEARS AND

19   AT SOME POINT HE WOULD PROBABLY HAVE TO BE PRESCRIBED

20   ANTIDEPRESSANT MEDICATION.

21        REGARDING THE ACTUAL MEDICATION AT THAT TIME, I

22   DIDN'T DISCUSS IT WITH HIM BECAUSE THAT'S OUT OF MY AREA OF

23   EXPERTISE.  I DON'T PRESCRIBE MEDICATION.  SO I DIDN'T SHARE

24   WITH HIM THAT HE WOULD PROBABLY BE PRESCRIBED THIS

25   ANTIDEPRESSANT, THIS ONE WORKS BEST.

1          I EXPLAINED TO HIM THAT IT WOULD TAKE SOME TIME ONCE

2     HE STARTED RECEIVING THAT, THAT HE WOULDN'T FEEL BETTER FOR

3     POSSIBLY SEVERAL MONTHS, MAYBE LONGER BECAUSE ANTIDEPRESSANTS

4     SEEM TO TAKE LONGER TO TAKE EFFECT.

5          SO THE CONVERSATION WE HAD WAS SOMETHING ALONG THOSE

6     LINES.

7     Q.   SO IS THE NEXT STEP TO ASK HIM IF HE CONSENTS TO THIS

8     TREATMENT THAT YOU'RE PROPOSING?

9     A.   YES.  I ASKED HIM SEVERAL TIMES IF HE WOULD BE WILLING TO

10    VOLUNTARILY TAKE THE MEDICATION.

11    Q.   AND WHAT WAS HIS RESPONSE?

12    A.   CONSISTENTLY, HE SAID, "NO."

13    Q.   SO UNDER BUREAU POLICY, DID YOU HOLD A DUE PROCESS

14    HEARING?  NOT YOU PERSONALLY, BUT DID ANOTHER INDEPENDENT

15    PSYCHIATRIST HOLD A DUE PROCESS HEARING?

16    A.   YES.

17    Q.   AND AS A RESULT OF THAT DUE PROCESS HEARING, THE

18    DEFENDANT WAS FOUND TO BE A DANGER TO OTHERS; IS THAT

19    CORRECT?

20    A.   THAT'S CORRECT.

21    Q.   MEDICATION WAS ORDERED; IS THAT CORRECT?

22    A.   THAT'S CORRECT.

23    Q.   DID THOSE MEDICATIONS START ON JUNE 27TH OF 2011?

24    A.   LET ME JUST REVIEW MY NOTES TO MAKE SURE.

25          YES, THE MEDICATIONS STARTED ON JUNE 21ST.

1    Q.    AND DID THE MEDICATION INCLUDE AN ANTIPSYCHOTIC?

2    A.    YES.

3    Q.    WAS THERE ONLY ON ANTIPSYCHOTIC OR WERE THERE MORE?

4              THE COURT:  HOLD ON ONE SECOND.  THERE WAS A

5    DISCREPANCY.  I NEED THE DATE.

6              DID YOU ASK WHETHER IT BEGAN ON THE 27TH OF JUNE?

7              MS. FELDMEIER:  JUNE 21ST.

8              THE COURT:  THAT'S WHAT YOU TESTIFIED TO?  JUNE 21ST

9    IS WHEN THE MEDICATION BEGAN?

10             THE WITNESS:  ACTUALLY, YOU DID ASK ME JUNE 27TH.

11             MS. FELDMEIER:  I DID.  I APOLOGIZE.

12             THE WITNESS:  AND IT WAS JUNE 21ST.  THAT'S WHY I

13   WENT IN TO CHECK MY RECORDS, BECAUSE I THOUGHT IT WAS JUNE --

14   IT WAS JUNE 21ST THAT THEY STARTED HIM ON MEDICATIONS.

15   BY MS. FELDMEIER:

16   Q.    AND THAT'S WHAT I HAVE WRITTEN HERE.  THANK GOD I GOT

17   THAT STRAIGHT.

18             SO THE RECORD IS CLEAR IT WAS JUNE 21ST, 2011;

19   CORRECT?

20   A.    YES.

21   Q.    AND THAT PARTICULAR MEDICATION THAT WAS BEGUN WAS AN

22   ANTIPSYCHOTIC?

23   A.    YES.

24   Q.    WERE THERE ANY OTHER ANTIPSYCHOTIC MEDICATIONS WITH THAT?

25   A.    NO, NOT TO MY KNOWLEDGE.

1    Q.    TO YOUR KNOWLEDGE, DURING ANY POINT OF TREATMENT OF THIS

2    DEFENDANT, WAS THERE EVER MORE THAN ONE ANTIPSYCHOTIC AT A

3    TIME BEING ADMINISTERED?

4    A.    NO.

5    Q.    SO FROM JUNE 21ST, HE REMAINED ON MEDICATION UNTIL

6    APPROXIMATELY JULY 1ST, 2011; IS THAT CORRECT?

7    A.    THAT'S CORRECT.

8    Q.    AND THE COURTS HAD ORDERED THE MEDICATION TO STOP AS OF

9    JULY 1ST, 2011; CORRECT?

10   A.    THAT'S CORRECT.

11   Q.    SO LET'S TALK ABOUT THAT TIME PERIOD WHEN HE FIRST STARTS

12   TAKING THE MEDICATION BETWEEN JUNE 21ST AND JULY 1ST.

13          CAN YOU DESCRIBE FOR US IF YOU NOTICED ANY CHANGES?

14   A.    THERE WERE SLIGHT CHANGES.  NOTHING SIGNIFICANT.  ONE OF

15   THE CHANGES PRIOR -- AT THE END OF HIS FIRST COMPETENCY

16   EVALUATION, HE WAS, FOR THE MOST PART, UNWILLING TO TALK TO

17   ME.  HE WOULD LAY IN HIS BED AND OFTEN HAD HIS ENTIRE HEAD

18   COVERED.  HE MIGHT CONVERSE WITH ME WHILE HE WAS LAYING IN HIS

19   BED, BUT HE WASN'T WILLING TO GET UP.

20          AND THERE'S ACTUALLY A CHAIR IN HIS ROOM.  I WOULD

21   ASK HIM TO SIT IN HIS CHAIR, AND HE WASN'T WILLING TO DO THAT.

22   WHEN HE CAME BACK, HE STARTED -- HE WAS LESS WILLING TO VISIT

23   WITH ME.  AND AFTER HE WAS MEDICATED, HE WAS MORE WILLING TO

24   COME UP TO THE DOOR.  HE STILL REFUSED -- THERE WERE TIMES

25   WHEN HE REFUSED TO TALK TO ME.

1          WE HAD TALKED ABOUT MEETING WITH ADMINISTRATION TO

2    TALK ABOUT PLACING A TELEVISION IN HIS ROOM.  HE HAD A RADIO

3    IN TUCSON, BUT IT DIDN'T COME WITH HIM WHEN HE CAME BACK -- IT

4    DIDN'T COME WITH HIM WHEN HE CAME TO SPRINGFIELD, SO HE DIDN'T

5    HAVE ANY SORT OF RADIO OR TELEVISION OR ANYTHING LIKE THAT.

6    SO WE HAD TALKED ABOUT HIM CONVINCING THE WARDEN TO LET HIM

7    HAVE A TELEVISION.

8    Q.   WHY FROM A PSYCHOLOGIST'S STANDPOINT?

9    A.   HE NEEDS STIMULATION.  HE DOESN'T HAVE THE LUXURY OF

10   HAVING INTERACTIONS WITH OTHER INMATES.  HE ACTUALLY IS IN OUR

11   MENTAL HEALTH AREA, SO HE'S HAD LIMITATIONS.  HIS INTERACTION

12   IS MYSELF AND THEN THE NURSING STUFF AND WHOEVER THE ON-CALL

13   PEOPLE ARE.

14          WE PUT THINGS IN HIS ROOM.  HE ASKED FOR A NUMBER OF

15   EDUCATIONAL MATERIALS.  SO I PLACED EDUCATIONAL MATERIALS IN

16   HIS CELL.  BEFORE HE LEFT, I TALKED ABOUT IF HE CAME BACK,

17   THAT I WOULD CONVINCE THE WARDEN TO LET HIM HAVE A TELEVISION

18   IN HIS ROOM.

19          SO AFTER HE WAS MEDICATED -- AND I DON'T RECALL

20   EXACTLY -- ACTUALLY, I DO HAVE IT IN MY NOTES.  ON JUNE 23RD,

21   HE SAID, "I WOULD LIKE TO HAVE A TV IN MY ROOM."  SO I ASKED

22   THE OFFICERS IF THEY WOULD BE WILLING TO PUT IT IN HIS ROOM.

23   HE ONLY LEFT THE TELEVISION IN HIS ROOM FOR ABOUT 30 MINUTES.

24   IT MADE HIM UNCOMFORTABLE.  ONE OF MY COLLEAGUES INDICATED

25   THAT HE HAD TOLD HER THAT HE WAS RECEIVING MESSAGES FROM IT.

1    SO THE OFFICERS HAD TO GO IN THERE AND REMOVE THE TV FROM HIS

2    ROOM.

3              THE OTHER CHANGE, AND I DON'T CONSIDER THIS A

4    POSITIVE CHANGE, IS THAT THE CORRECTIONAL STAFF REPORTED HE

5    SEEMED MORE IRRITABLE AFTER THEY STARTED MEDICATING HIM.

6    THERE WERE A COUPLE OF INSTANCES OF HIM THROWING CHAIRS

7    AGAINST THE WALL WHEN HE WAS TALKING TO THE CHIEF OF

8    PSYCHOLOGY.

9              SO THERE WERE SLIGHT CHANGES, NOTHING SIGNIFICANT.

10   HE WAS MEDICATED FOR ALMOST NINE DAYS BEFORE WE HAD TO STOP

11   THE MEDICATION.

12   Q.   NOT ASKING YOU THIS AS A MEDICAL DOCTOR, BUT IN YOUR

13   21 YEARS OF EXPERIENCE WORKING WITH PATIENTS WHO TAKE

14   MEDICATIONS, DOES THE ANTIPSYCHOTIC NORMALLY TAKE EFFECT THAT

15   QUICKLY?

16   A.   IF IT'S AN INJECTABLE ANTIPSYCHOTIC, IT CAN.  BUT WITH

17   ANTIPSYCHOTICS LIKE THIS, YOU'RE NOT GOING TO EXPECT

18   MONUMENTAL CHANGES IN THAT PERIOD OF TIME.

19   Q.   WAS MR. LOUGHNER AT ANY TIME DURING HIS INCARCERATION OR

20   HIS TREATMENT AT THE HOSPITAL EVER INJECTED WITH AN

21   ANTIPSYCHOTIC?

22   A.   NOT WITH AN ANTIPSYCHOTIC.

23   Q.   JUST AGAIN ON THAT ISSUE, WERE FIRST-GENERATION

24   ANTIPSYCHOTICS EVER USED WITH MR. LOUGHNER?

25   A.   NO.

1    Q.    SO ON JULY 1ST, THE MEDICATION IS CEASED.

2            AND FOR THE RECORD, IT STARTS UP AGAIN ON JULY THE

3    18TH OF 2011; IS THAT CORRECT?

4    A.    THAT'S CORRECT.

5    Q.    SO LET'S TALK ABOUT THAT TIME PERIOD FROM JULY 1ST TO

6    JULY 18TH.

7            ONCE THE DEFENDANT IS TAKEN OFF THE MEDICATION, WHAT

8    HAPPENS?

9    A.    HE VERY QUICKLY DECOMPENSATED.  WHAT I MEAN BY

10   "DECOMPENSATED," HIS CONDITION PHYSICALLY AND MENTALLY BECAME

11   VERY -- IT WAS SIGNIFICANTLY WORSE.

12   Q.    DID IT JUST GO BACK TO WHAT IT WAS PRIOR TO THE

13   MEDICATIONS OR DID IT GET WORSE?

14   A.    IT WAS MUCH WORSE THAN WHAT IT WAS LIKE PRIOR TO HIM

15   TAKING THE MEDICATIONS.

16   Q.    COULD YOU DESCRIBE FOR US WHAT WAS GOING ON.

17   A.    HE WAS PACING FOR HOURS IN HIS ROOM, PACING IN CIRCLES.

18   THERE WAS ONE PERIOD OF TIME WHERE HE DIDN'T SLEEP FOR CLOSE

19   TO 50 HOURS.  THERE WERE OTHER TIMES WHERE HE DIDN'T SLEEP FOR

20   SIGNIFICANT PERIODS.  HE PACED SO MUCH THAT HE CREATED A

21   BLISTER ON THIS FOOT.  THE BLISTER BECAME INFECTED.  THE

22   INFECTION ACTUALLY MOVED UP HIS LEG.

23            THE BEST WAY TO DESCRIBE IT IS IT LOOKED LIKE

24   SOMEONE HAD WORN A TIGHT SOCK AROUND THEIR LEG, AND THE

25   REDNESS WAS ACTUALLY MOVING UP TOWARD HIS KNEE.  SO WE KNEW

34

1    THERE WAS AN INFECTION.  WE TRIED TO ENCOURAGE HIM TO TAKE AN

2    ANTIBIOTIC BY MOUTH.  HE REFUSED TO TAKE IT INITIALLY.  HE WAS

3    GIVEN ANTIBIOTIC MEDICATION TO CONTROL THE INFECTION.

4    Q.   ATTENDANT WITH THAT INFECTION, WAS THERE ALSO SOME POOR

5    HYGIENE GOING ON THAT YOU WERE CONCERNED COULD EXACERBATE THIS

6    INFECTION?

7    A.   OUR CONCERN WAS THAT -- THERE WAS POOR HYGIENE.  OUR

8    CONCERN WAS THAT HE BEGAN DIGITALLY PENETRATING HIS ANUS.

9    THERE WAS ALSO AN INCIDENT WHERE HE STUCK -- IT'S CALLED A

10   SPORK, WHICH IS ACTUALLY A SPOON/FORK, PLASTIC, COMBINATION,

11   AND THREW FECES ON HIS BED AND ON HIS CLOTHES.

12        THE OFFICERS WOULD GO INTO HIS ROOM WITH NURSING

13   STAFF AND CLEAN HIS ROOM, GIVE HIM NEW BEDDING.  AND WITHIN

14   NOT TOO LONG AFTER THAT, THERE WOULD BE FECES AGAIN IN HIS

15   ROOM.  WE WERE CONCERNED THAT THE FECES WOULD GET IN HIS FOOT

16   AND CREATE AN EVEN MORE SERIOUS INFECTION.

17        DURING THAT TIME, HE WAS SOBBING UNCONTROLLABLY.  HE

18   WAS TELLING STAFF THAT HE WANTED TO DIE, THAT HE WANTED TO

19   COMMIT SUICIDE.  HIS APPETITE SIGNIFICANTLY DECREASED DURING

20   THAT TIME.

21        AND CONSEQUENTLY, A DECISION ON JULY 18TH WAS MADE

22   THAT WE NEEDED TO EMERGENCY MEDICATE HIM.

23   Q.   STARTING THAT ON JULY 18TH, WHAT WAS THE ANTIPSYCHOTIC

24   THAT WAS USED?

25   A.   IT WAS THE SAME THAT WAS USED BEFORE.  IT WAS RISPERDAL.

1   Q.   HOW WAS THE RISPERDAL ADMINISTERED TO THE DEFENDANT?

2   A.   IT'S ACTUALLY A LIQUID, AND IT'S PLACED IN A MEDICATION

3   CUP WITH A KOOL-AID, AND HE DRINKS IT.

4   Q.   IS THAT FOLLOWED UP WITH A GLASS OF WATER TO MAKE SURE

5   THE MEDICINE GOES DOWN?

6   A.   YES.

7   Q.   ONCE MR. LOUGHNER WAS TOLD THAT HE HAD TO TAKE THE

8   MEDICATION THAT WAS BEING ORDERED BY THE WARDEN, WAS HE

9   COOPERATIVE THEN IN TAKING IT?

10   A.   IT WASN'T ACTUALLY THE WARDEN.

11   Q.   WELL --

12   A.   YOU KNOW, THE BEST WAY TO DESCRIBE IT IS HE WAS PASSIVELY

13   COOPERATIVE.  HE DOESN'T WANT TO TAKE THE MEDICATION.

14   DR. SARRAZIN HAD ACTUALLY ORDERED WHAT WE CALL AN I.M. BACKUP,

15   WHICH IS AN INTRAMUSCULAR INJECTION.  HE NEVER HAD TO USE IT.

16   WE'VE NEVER HAD TO IN ANY WAY FORCE HIM TO TAKE THE

17   MEDICATION.  HE CERTAINLY VOICES HIS COMPLAINTS ABOUT TAKING

18   THE MEDICATION, BUT HE DOES TAKE IT.

19   Q.   SO IT'S INVOLUNTARY IN TERMS OF CONSENT, BUT HE IS BEING

20   BEGRUDGINGLY COOPERATIVE IN TAKING IT?

21   A.   I DON'T KNOW IF IT'S BEGRUDGINGLY.  HE COMES UP TO THE

22   GRILL AND HE TAKES THE MEDICATION.  I'VE BEEN IN THERE

23   NUMEROUS TIMES WHEN HE'S TAKEN IT.  AGAIN, HE'S JUST PASSIVELY

24   UNCOOPERATIVE.

25   Q.   DID YOU HAVE A CHANCE TO DOUBLE-CHECK SOME RECORDS TODAY

1    AND TALK TO DR. SARRAZIN AND -- AND CAN YOU TELL THE COURT

2    EXACTLY WHAT MR. LOUGHNER IS TAKING?

3    A.    YES.

4            DR. SARRAZIN CHANGED HIS MEDICINE A LITTLE BIT OVER

5    THE PAST COUPLE OF DAYS.  AND I WAS NOT AT WORK FRIDAY,

6    SATURDAY, OR SUNDAY.  I ACTUALLY CALLED HIM TO FIND OUT

7    EXACTLY HOW HE HAD CHANGED IT.

8            CURRENTLY, HE IS ON RISPERDAL.  HE TAKES

9    2 MILLIGRAMS IN THE MORNING AND 4 MILLIGRAMS IN THE EVENING.

10   PART OF THE REASON, HE CHANGED THE DOSE SUCH THAT HE'S ON A

11   LARGER DOSE IN THE EVENING TO REDUCE THE SEDATIVE EFFECTS.  SO

12   WHEN HE ACTUALLY SHOULD BE SLEEPING, HE'S ACTUALLY GETTING

13   MORE OF THE MEDICATION.

14           THE WELLBUTRIN, THE ANTIDEPRESSANT MEDICATION, HE'S

15   TAKING 300 MILLIGRAMS ONCE A DAY.

16           THE KLONOPIN IS MORE OF AN ANTIANXIETY MEDICATION.

17           SHOULD I BE SPELLING THESE?

18           THE REPORTER:  THAT WOULD BE NICE.

19           THE COURT:  I APOLOGIZE.  WELLBUTRIN IS

20   W-E-L-L-B-U-T-R-I-N.

21           RISPERDAL IS R-I-S-P-E-R-D-A-L.

22           AND THE KLONOPIN IS K-L-O-N-O-P-I-N.

23           AND HE'S ON HALF A MILLIGRAM, .5, ON THE KLONOPIN

24   TWICE A DAY.  HE GETS THE LARGER DOSE AT BEDTIME SO WE CAN

25   MAKE SURE THAT HE'S ABLE TO SLEEP.

COMPUTER-AIDED TRANSCRIPTION

1          THE ATIVAN, A-T-I-V-A-N, HE ACTUALLY TAKES -- IT'S

2     -- ON THE RECORD, IT'S PRN, WHICH MEANS AS NEEDED.  SO IF HE

3     APPEARS OVERLY AGITATED, THE STAFF CAN ASK HIM IF HE WANTS HIS

4     ATIVAN.  HE CAN ACTUALLY REQUEST IT.

5          THEN HE'S ON COGENTIN, WHICH IS C-O-G-E-N-T-I-N,

6     WHICH IS A MEDICATION YOU COMMONLY GIVE WHEN YOU GIVE

7     ANTIPSYCHOTIC MEDICATION FOR SIDE AFFECTS ASSOCIATED WITH THE

8     MEDICATION.  HE TAKES 1 MILLIGRAM EVERY DAY, AND HE TAKES

9     1 MILLIGRAM FOUR HOURS AS NEEDED -- EVERY FOUR HOURS AS

10    NEEDED.

11    Q.   SO SOME DAYS HE COULD JUST NEVER GET THAT EXTRA

12    COGENTIN?

13    A.   CORRECT.

14    Q.   AND TO MAKE THIS CLEAR, THE ONLY ONE THAT'S AN

15    ANTIPSYCHOTIC AGAIN IS RISPERDAL?

16    A.   CORRECT.

17    Q.   AND WHEN THE DOCTORS PRESCRIBE THE COGENTIN FOR POTENTIAL

18    SIDE EFFECTS, IS IT FOR POTENTIAL SIDE EFFECTS OR IS IT TO

19    TREAT SIDE EFFECTS THAT THEY ALREADY SEE?

20    A.   IT COULD BE EITHER.  IT COULD BE FOR POTENTIAL SIDE

21    EFFECTS OR IT COULD BE TO TREAT SIDE EFFECTS THAT ARE ALREADY

22    SEEN.

23    Q.   IN MR. LOUGHNER'S CASE, WHY WAS IT BEING GIVEN?

24    A.   I DON'T RECALL EXACTLY.  I KNOW THERE WAS A TIME WHEN HE

25    HAD THICKENING OF THE TONGUE.  THERE WAS A CONCERN THAT MIGHT

1    BE A SIDE EFFECT ASSOCIATED WITH THE MEDICATION.

2            THE AKATHISIA, WHICH IS THE PACING, COULD HAVE BEEN

3    A SIDE EFFECT.  IT WAS DR. SARRAZIN'S OPINION THAT IT WAS NOT.

4    THE PACING AND THE AGITATION WAS NOT CONNECTED TO THE

5    MEDICATION.

6            REGARDING THE TONGUE, WHAT LATER HAPPENED IS HE

7    DEVELOPED THRUSH, WHICH -- IT CAN BE CAUSED BY DEHYDRATION.

8    HE WAS TREATED FOR THAT WITH THE MEDICATION, AND IT ACTUALLY

9    WENT AWAY.

10           THE BEST WAY TO DESCRIBE IT IS IT'S LIKE A BLOOD

11   BLISTER THAT'S ON YOUR TONGUE.  AND ONCE HE STARTED TAKING THE

12   MEDICATION, THAT THRUSH ACTUALLY RESOLVED.

13   Q.   SO THE THRUSH RESOLVED ITSELF, AND THE AKATHISIA --

14           CAN YOU SPELL THAT WORD?

15   A.   I CAN'T SPELL IT.  A-K-I-S-T-H-U-S-I-A (SIC).  YOU'LL

16   HAVE TO DO A SPELLCHECK ON THAT.  I'M NOT POSITIVE.

17   Q.   AND I KNOW THERE'S A DR. FREDERICKSON WHO AT ONE POINT IN

18   A PROGRESS NOTE NOTED THAT THAT POTENTIAL SYMPTOM EXISTED WITH

19   THE DEFENDANT.

20           ARE YOU FAMILIAR WITH THAT PROGRESS NOTE?

21   A.   IT'S DR. FREDERICK.

22   Q.   FREDERICK?

23   A.   YES.

24           AND I AM FAMILIAR WITH IT.

25   Q.   DR. FREDERICK -- HOW OFTEN DOES DR. FREDERICK SEE

1    MR. LOUGHNER?

2    A.   HE WAS THE ON-CALL PSYCHOLOGIST FOR THAT WEEKEND.  SO HE

3    PROBABLY SAW HIM SATURDAY AND SUNDAY.

4    Q.   AND THEN DOES HE HAVE DAILY CONTACT WITH MR. LOUGHNER THE

5    WAY YOU DO?

6    A.   NO.

7    Q.   AND YOU DISCUSSED THIS SIDE EFFECT WITH DR. SARRAZIN;

8    CORRECT?

9    A.   YES.

10   Q.   AND IN BOTH OF YOUR OPINIONS HAVING HAD CONTACT WITH THIS

11   DEFENDANT OVER AN EXTENDED PERIOD OF TIME, ARE YOU OF THE

12   OPINION THAT THAT SIDE EFFECT IS BEING EXHIBITED IN

13   MR. LOUGHNER?

14   A.   NO.

15   Q.   SO BASICALLY, THEN, WOULD IT BE SAFE TO SAY THAT

16   MR. LOUGHNER HAS NOT EXHIBITED ANY SIDE EFFECTS FROM THE

17   MEDICATION?

18   A.   IN MY OPINION, BASED ON MY CONSULTATION WITH

19   DR. SARRAZIN, HE HAS NOT.

20   Q.   LET'S TALK ABOUT THIS TIME PERIOD NOW WHEN MEDICATION

21   STARTS THROUGH THE PRESENT TIME.  IT'S APPROXIMATELY

22   NINE WEEKS.

23        NOW, I'D LIKE TO TALK ABOUT WHAT IMPROVEMENTS YOU'RE

24   SEEING IN MR. LOUGHNER BECAUSE OF THE MEDICATION, WHAT

25   PROGRESS YOU ARE MAKING TOWARD THE GOAL OF COMPETENCY HERE.

1          YOU HAD TESTIFIED EARLIER ABOUT THE REASONS FOR

2   COMPETENCY WAS THIS DELUSIONAL PROBLEM THAT HE HAD.  SO IF WE

3   COULD TALK FIRST ABOUT DELUSIONS.

4   A.   REFERRING BACK TO MY MOST RECENT REPORT THAT I SENT TO

5   THE COURT, I ACTUALLY PUT THE CHANGES THAT I'VE SEEN IN HIM

6   FROM WHAT I CONSIDER THE MOST IMPORTANT TO THE LEAST

7   IMPORTANT.  AND THE DELUSIONS, IN MY OPINION, ARE MOST

8   IMPORTANT BECAUSE THEY GO TO HIS ABILITY TO ASSIST HIS

9   ATTORNEY, AND THEY GO TO HIS ABILITY TO HAVE RATIONAL

10  CONVERSATIONS WITH HIS ATTORNEY AND MAKE RATIONAL DECISIONS

11  ABOUT HIS CASE.

12  Q.   WOULD IT BE HELPFUL TO YOU TO BE ABLE TO REFER TO YOUR

13  REPORTS DURING THIS PORTION OF YOUR TESTIMONY?

14  A.   I ACTUALLY HAVE A COPY.

15          MS. FELDMEIER:  COULD I APPROACH THE WITNESS, THEN,

16  WITH MARKED EXHIBITS SO SHE CAN REFER TO THOSE?

17          THE COURT:  SURE.

18          MS. FELDMEIER:  I'M HANDING THE WITNESS EXHIBIT

19  NO. 3 AND EXHIBIT NO. 4.

20  BY MS. FELDMEIER:

21  Q.   DR. PIETZ, COULD YOU TELL US WHAT EXHIBIT 3 IS.

22  A.   EXHIBIT 3 IS THE PROGRESS REPORT, WHICH IS DATED

23  AUGUST 22ND, 2011.  AND THIS IS THE REPORT TO THE COURT

24  INDICATING -- REQUESTING AN EXTENSION FOR THE COMPETENCY

25  RESTORATION.

1          THEN I WAS ASKED TO EXPAND ON THAT.  AND SO I

2     ENTERED ANOTHER REPORT, WHICH I ENTITLED "FORENSIC ADDENDUM."

3     IT'S DATED SEPTEMBER 7TH, 2011.

4     Q.    BOTH OF THESE WERE PREPARED BY YOU?

5     A.    CORRECT.

6     Q.    JUST LIKE EXHIBIT NO. 2, WHICH WAS THE COMPETENCY REPORT;

7     RIGHT?

8     A.    YES.

9          MS. FELDMEIER:  THE GOVERNMENT WOULD MOVE

10    EXHIBITS 2, 3, AND 4 INTO EVIDENCE.

11          THE COURT:  ANY OBJECTION?

12          MS. CLARKE:  NO.

13          THE COURT:  ALL ARE RECEIVED.

14          (EXHIBIT NOS. 2 THROUGH 4 RECEIVED INTO EVIDENCE)

15    BY MS. FELDMEIER:

16    Q.    LET'S GO AHEAD NOW AND WE'RE GOING TO -- I THINK

17    DELUSIONS IS WHAT WE WERE ON.  IF YOU COULD DISCUSS WITH US

18    ANY PROGRESS THE DEFENDANT HAS MADE REGARDING DELUSIONS.

19    A.    LET ME START BY SAYING IN MY OPINION, HE'S STILL

20    DELUSIONAL.  HE'S STILL GOT THAT PSYCHOTIC SYMPTOM.  THAT

21    HASN'T RESOLVED COMPLETELY.

22          THERE ARE SEVERAL THINGS THAT HAVE IMPROVED.  FIRST,

23    REGARDING HIS ATTORNEYS, I DON'T KNOW -- I'M NOT POSITIVE

24    ABOUT THIS, BUT I DON'T THINK THAT HE'S MISSED A VISIT WITH

25    THEM SINCE HE'S BEEN MEDICATED.  THERE MAY BE ONE OR TWO WHEN

42

1    I WASN'T AT THE INSTITUTION, BUT HE'S CONSISTENTLY GONE TO SEE

2    THEM, WHEREAS PREVIOUSLY IT WAS VERY DIFFICULT TO GET HIM TO

3    GO AND VISIT HIS ATTORNEYS, AND OFTEN HE DID NOT.  AT LEAST

4    HE -- THERE'S AN APPEARANCE THAT HE TRUSTS THEM AND HE'S

5    WILLING TO GO CONVERSE WITH THEM.

6    Q.   IS HE STILL MAKING ANY OF THE SPONTANEOUS STATEMENTS HE

7    USED TO MAKE ABOUT HIS ATTORNEYS; THE BLACKMAILING, FOR

8    EXAMPLE?

9    A.   HE HAS NOT MADE ANY SPONTANEOUS STATEMENT THAT HE DOESN'T

10   TRUST THEM, THAT THEY'RE BLACKMAILING HIM, THAT THEY ARE

11   EXTORTING HIM FOR MONEY.

12            AND, YOU KNOW, THIS IS MY CONCERN THAT WE HAD

13   ADDRESSED THE COURT EARLIER ABOUT.  I THINK HE ENJOYS VISITING

14   WITH THEM.  HE LOOKS FORWARD TO IT.  THERE WERE TIMES WHEN HE

15   WILL TELL ME, "I HAVE A VISIT TODAY."  OR IF I'M VISITING WITH

16   HIM, HE MIGHT SAY -- THERE'S A CLOCK ACTUALLY RIGHT BEHIND ME

17   THAT HE CAN SEE.  HE MIGHT SAY, "MY ATTORNEY VISIT IS COMING

18   UP IN 15, 20 MINUTES" OR WHATEVER.  SO HE ENJOYS IT, WHICH IS

19   A DIFFERENCE FOR HIM.

20            THE STATEMENTS THAT HE MADE REGARDING THE

21   CONGRESSWOMAN, HE NOW BELIEVES THAT SHE IS ALIVE.  I GUESS WE

22   CAN SAY THAT HE KNOWS THAT SHE'S ALIVE.  HE'S LESS OBSESSED

23   WITH THAT.

24            HE UNDERSTANDS THAT HE'S MURDERED PEOPLE.  HE TALKS

25   ABOUT THAT.  HE TALKS ABOUT HOW REMORSEFUL HE IS FOR THAT.  HE

1    UNDERSTANDS THE IMPLICATIONS OF WHAT HE DID, THE IMPACT OF

2    WHAT HE DID.  AGAIN, THAT GOES TO HIS DELUSIONAL THINKING.

3         THE OTHER THING -- THIS IS ACTUALLY -- NOT ONLY GOES

4    TO THE DELUSIONAL COMPONENT OF IT, BUT IT'S ALSO ONE OF THE

5    COGNITIVE SYMPTOMS OF SCHIZOPHRENIA.  HE HAD VERY DISORGANIZED

6    THINKING.  I REMEMBER I MADE A COMMENT -- THERE ARE TIMES WHEN

7    I WOULD SAY TO HIM, "I DON'T KNOW WHAT YOU'RE TELLING ME,"

8    WHEREAS NOW I DON'T RECALL THAT I'VE SAID THAT AT ALL SINCE

9    HE'S BEEN MEDICATED.

10        HE'S ABLE TO CONVERSE WITH ME.  AGAIN, HE'S NOT

11   WHERE HE SHOULD BE.  HE'S NOT ABLE TO CONVERSE LIKE YOU AND I

12   ARE NOW.  HE'S NOT AT THAT LEVEL YET.  BUT THERE'S CERTAINLY

13   IMPROVEMENT AND ORGANIZATION IN HIS THINKING AND ORGANIZATION

14   IN HIS ABILITY TO COMMUNICATE AND ARTICULATE THINGS.

15   Q.   YOU MENTIONED THAT HE CAN TRACK TIME, HE IS PAYING

16   ATTENTION THAT "MY LAWYER'S GOING TO BE COMING.  I WANT TO

17   GO."

18        CAN HE ALSO TRACK HIS COURT HEARINGS?

19   A.   HE KNEW THERE WAS A HEARING SEPTEMBER 21ST.  HE HAD ASKED

20   ME SEVERAL TIMES IF HE WOULD BE ATTENDING THAT HEARING.

21        MY CONVERSATION WITH HIM MONDAY, WHICH WAS VERY

22   SHORT, WENT SOMETHING LIKE THIS:  I WENT TO VISIT HIM.  I

23   WANTED TO LET HIM KNOW THAT I WOULD BE TESTIFYING FOR THE

24   PROSECUTION AND THAT WOULD FEEL UNCOMFORTABLE FOR HIM.  AND I

25   EXPLAINED TO HIM A LITTLE BIT ABOUT WHAT MY TESTIMONY MIGHT BE

1    ABOUT.

2                AND HE ASKED IF HE WAS LEAVING FOR TUCSON THAT DAY.

3    I EXPLAINED TO HIM THAT BY BUREAU POLICY, I'M FORBIDDEN FROM

4    TELLING INMATES WHEN THEY'RE LEAVING THE INSTITUTION.

5                HIS RESPONSE WAS, "THEY TOLD ME LAST TIME EXACTLY

6    WHEN I WAS LEAVING."

7    Q.   THAT SHOWS MEMORY.

8    A.   HE ALSO TOLD ME HE WAS VISITING HIS MOM AND DAD ON

9    TUESDAY.  SO HE DOES SHOW MEMORY.  HE DOES SHOW THAT HE WAS

10   ABLE TO -- HE KNEW IT WAS MONDAY.  HE KNEW IT WAS TUESDAY.  HE

11   WAS ABLE TO MAKE THE CONNECTION HE OUGHT TO BE LEAVING SOON SO

12   THAT HE WOULD BE ABLE TO DO THOSE TWO THINGS, ATTEND THE

13   HEARING AND VISIT HIS PARENTS.

14               I WOULD ALSO SAY THAT I HAVE NOT OBSERVED HIM ATTEND

15   TO THE INTERNAL STIMULI FOR MANY WEEKS SINCE HE'S BEEN

16   MEDICATED.

17   Q.   AND AGAIN, IN LAYMAN'S SPEAK, THAT'S --

18   A.   AUDITORY HALLUCINATIONS, VOICES THAT AREN'T THERE, WHICH

19   IS ANOTHER POSITIVE SYMPTOM.  THERE ARE TWO POSITIVE SYMPTOMS:

20   ONE IS THE HALLUCINATIONS.  THE SECOND WOULD BE THE DELUSIONS.

21               NOW, I HAVE ASKED HIM, "ARE YOU STILL ATTENDING TO

22   VOICES?"  HE'S TOLD ME "NO."

23               BUT I'VE ALSO ASKED HIM IF HE'S SUICIDAL, AND HE'S

24   TOLD ME, "NO."

25               SO HE COULD STILL BE ATTENDING TO THEM.  HE'S JUST

1    NOT OVERTLY DOING IT SUCH THAT STAFF ARE SEEING HIM AS WE DID

2    PREVIOUSLY.

3    Q.   AND BACK TO THE DELUSIONS, COULD YOU TELL ME ABOUT THE

4    TV.

5         GO AHEAD AND HAVE A DRINK OF WATER.

6    A.   I PLACED A TV BACK IN HIS ROOM.  I DON'T KNOW THE EXACT

7    DATE.  HE AND I TALKED ABOUT IT.  I ASKED HIM IF HE WANTED TV

8    BACK IN HIS ROOM.  HE INDICATED THAT HE DID.

9         IF YOU'LL RECALL, WHEN I HAD PUT A TV IN THE FIRST

10   TIME, IT WAS UPSETTING TO HIM, IN MY OPINION, BECAUSE OF THE

11   PSYCHOSIS.  THE WORD HE USES, I FEEL "UNCOMFORTABLE" WITH A TV

12   BEING IN HERE.  AND HE POSSIBLY WAS RECEIVING MESSAGES.

13        SO WITH THAT, I SAID, "IF YOU HAVE PROBLEMS WITH IT,

14   LET ME KNOW.  WE'LL HAVE THE OFFICERS TAKE IT OUT."  THE TV'S

15   BEEN IN HIS ROOM SINCE I RE-PLACED IT IN HIS ROOM.

16   Q.   HE HASN'T EXPRESSED ANY UNUSUAL CONCERNS ABOUT IT?

17   A.   NO.

18   Q.   AND IS THE DEFENDANT ABLE TO HAVE MEANINGFUL

19   CONVERSATIONS WITH YOU ABOUT OUTSIDE THINGS?  INSTEAD OF JUST

20   OBSESSING ON THE OFFENSE ITSELF, IS HE ABLE TO TALK TO YOU

21   ABOUT, FOR EXAMPLE, PETS, HIS FAMILY PETS AND SUCH?

22   A.   HE IS.  AGAIN, THAT'S -- IN MY OPINION, THAT'S A SIGN OF

23   IMPROVEMENT.  HE'S ABLE TO SHARE WITH ME -- HIS BIRTHDAY WAS

24   RECENTLY.  HE TALKED ABOUT HIS BIRTHDAY.  HE TALKED ABOUT

25   GETTING SOME PICTURES THAT HE WAS ABLE TO LOOK AT OF HIS DOGS

1   AND HIS TURTLES.  WE ACTUALLY TALKED FOR QUITE SOME TIME ABOUT

2   HIS TURTLES AND HIS DOGS.  I THINK HE'S PARTICULARLY CLOSE TO

3   ONE PARTICULAR DOG.

4           SO HE'S ALSO ABLE TO ASK -- HE WILL ASK ME PERSONAL

5   THINGS, WHICH YOU HAVE TO BE CAREFUL OF WHEN YOU'RE IN A

6   PATIENT/THERAPIST RELATIONSHIP.  I TRY TO MAINTAIN THE

7   BOUNDARY THAT WE CAN TALK PROFESSIONAL THINGS.  HE'S ASKED ME

8   WHERE I WENT TO SCHOOL.  HE'S ASKED ME HOW LONG I'VE WORKED AT

9   SPRINGFIELD.

10          AGAIN, I THINK THAT'S A POSITIVE SIGN THAT HE'S

11  RESPONDING TO MEDICATION.  HE'S ASKED OTHER STAFF -- DURING

12  ONE OF THE DUE PROCESS HEARINGS, HE ASKED DR. TOMELLERI WHERE

13  HE WENT TO SCHOOL.  HE'S ASKED DR. SARRAZIN WHERE HE WENT TO

14  SCHOOL.  I THINK IT'S HIS WAY OF WANTING TO CONNECT WITH US.

15  Q.   SO PREVIOUSLY, PRIOR TO MEDICATION, THERE WAS NO ATTEMPT

16  TO CONNECT WITH OTHER PEOPLE?

17  A.   NOT AT ALL.  I THINK THAT'S ONE OF THE COGNITIVE SYMPTOMS

18  OF SCHIZOPHRENIA, IS THAT DIFFICULTY RELATING TO OTHERS AND

19  SYMPATHIZING WITH OTHERS.  THERE WAS ONE DAY THAT I HAD A

20  BRACE ON MY HAND, AND HE NOTICED IT AND ASKED ME WHAT HAD

21  HAPPENED.  I EXPLAINED TO HIM IT WAS AN INJURY.  HE SAID, "I

22  HOPE THAT YOU'RE OKAY."

23  Q.   THAT'S AN APPROPRIATE RESPONSE, IN YOUR OPINION?

24  A.   IT IS AN APPROPRIATE RESPONSE.

25  Q.   THAT'S NOT SOMETHING YOU WOULD HAVE EXPECTED FROM HIM

47

1    PREVIOUS TO THE MEDICATION?

2    A.    NO.

3    Q.    LET'S GO THROUGH SOME OF THE COGNITIVE CHANGES.

4          THE FIRST ONE IS DISORGANIZED THINKING.  AND YOU'VE

5    TESTIFIED A LITTLE BIT ABOUT THAT.

6          HAVE YOU SEEN POSITIVE CHANGES, PROGRESS TOWARD

7    RESOLVING THAT?

8    A.    AGAIN, I DON'T THINK THAT HIS THINKING IS ORGANIZED

9    ENOUGH THAT HE'S REACHED COMPETENCY, BUT IT'S BETTER

10   ORGANIZED.  BEFORE -- YOU KNOW, THE BEST WAY TO DESCRIBE THIS

11   IS AN OLD PSYCHOLOGY TERM THAT'S USED TO DESCRIBE IT, "WORD

12   SALAD," WHERE IT'S JUST THROWING WORDS TOGETHER THAT DON'T

13   MAKE ANY SENSE.  HE FREQUENTLY DID THAT.

14         I HAVEN'T OBSERVED THAT AT ALL IN MY INTERACTION

15   SINCE HE'S BEEN MEDICATED.  WE DON'T HAVE IN-DEPTH

16   CONVERSATIONS, BUT WE'RE ABLE TO HAVE MEANINGFUL

17   CONVERSATIONS.  HE'S ABLE TO SHARE WITH ME CONCERNS HE HAS,

18   THINGS HE WANTS.

19         ALONG WITH THE COGNITIVE SYMPTOM -- OR ACTUALLY,

20   IT'S ONE OF THE SYMPTOMS, IS THE POVERTY OF SPEECH, WHICH, IN

21   MY OPINION, HE STILL EXHIBITS.  WHAT THAT MEANS IS HE

22   DOESN'T -- HE MIGHT STOP MID-SENTENCE.  HE MIGHT START TALKING

23   TO ME ABOUT SOMETHING, AND IT'S ALMOST LIKE HE LOSES HIS TRAIN

24   OF THOUGHT.  HE STRUGGLES TO GIVE YOU COMPLETE DETAILS ABOUT

25   THINGS.  BUT IT'S IMPROVED SINCE HE'S BEEN MEDICATED.

1    Q.   WHAT ABOUT THINKING, SLOW THINKING?

2    A.   HE'S STILL -- THERE ARE TWO CONCERNS ON THAT:  ONE, HE'S

3    VERY DEPRESSED.  AND INDIVIDUALS THAT ARE DEPRESSED -- I DON'T

4    KNOW IF YOU'VE EVER BEEN DEPRESSED.  WHEN YOU'RE DEPRESSED,

5    YOU DON'T HAVE ENERGY.  YOU STRUGGLE.  YOU DON'T THINK AS

6    QUICKLY.  HE'S VERY DEPRESSED.

7              AND SOME OF HIS SLOW THINKING IS ATTRIBUTABLE TO HIS

8    DEPRESSION.  SOME OF IT COULD BE -- THAT'S A COGNITIVE SYMPTOM

9    OF SCHIZOPHRENIA THAT MIGHT TAKE A LITTLE BIT MORE TIME TO

10   RESOLVE.

11   Q.   HOW ABOUT DIFFICULTY UNDERSTANDING?

12   A.   HE STILL STRUGGLES WITH THAT.  AGAIN, THAT'S A COGNITIVE

13   SYMPTOM OF SCHIZOPHRENIA.  HE'S BETTER ABLE TO.  HE

14   UNDERSTOOD, IN MY OPINION, WHAT THE PURPOSE OF THIS HEARING

15   WAS.  IT'S SOMETHING THAT WE TALKED ABOUT ON THURSDAY.  WE

16   TALKED ABOUT IT.  HE REMINDED ME ON MONDAY THAT THAT'S WHAT HE

17   WAS GOING TO TUCSON FOR.  I WOULDN'T SAY THAT HE HAS AN

18   IN-DEPTH UNDERSTANDING YET.  THERE'S STILL ROOM FOR

19   IMPROVEMENT.

20   Q.   POOR CONCENTRATION?

21   A.   HE'S BETTER ABLE TO CONCENTRATE, ALTHOUGH HIS

22   CONCENTRATION'S STILL A PROBLEM AREA.  THERE ARE THINGS THAT

23   I'VE GIVEN HIM, LIKE PUZZLES AND THINGS LIKE THAT.  HE'S

24   REQUESTED A BOOK.  BUT HE'S BEEN UNABLE TO DO THOSE SORTS OF

25   THINGS BECAUSE HE SAYS HE'S UNABLE TO CONCENTRATE.  AGAIN,

1    THAT COULD BE DUE TO HIS DEPRESSION.  PEOPLE THAT ARE

2    DEPRESSED ARE UNABLE TO CONCENTRATE.

3    Q.    POOR MEMORY?

4    A.    HIS MEMORY IS BETTER.  AS I TESTIFIED EARLIER, HE

5    REMEMBERED THE SEPTEMBER 21ST HEARING, WHICH I DON'T KNOW IF

6    HIS ATTORNEY SHARED THAT WITH HIM OR IF HE REMEMBERED IT FROM

7    BEING AT THE HEARING PREVIOUSLY.  HE AND I TALKED ABOUT IT

8    BEFORE.  HE WAS ABLE TO REMIND ME.

9             I ALSO PUT A CALENDAR IN HIS ROOM.  I FELT IT WAS

10   IMPORTANT THAT HE BE ABLE TO KNOW TODAY IS WEDNESDAY, IT'S

11   THIS DAY, IT'S THIS YEAR.  THAT'S HELPED HIM TO REMEMBER DATES

12   AND REMEMBER TO KEEP UP WITH THINGS.

13   Q.    HOW ABOUT THE DIFFICULTY IN EXPRESSING HIS THOUGHTS THAT

14   HE HAS?

15   A.    AGAIN, THAT'S A COGNITIVE SYMPTOM OF SCHIZOPHRENIA.  HE

16   HAS ROOM FOR IMPROVEMENT.  HE'S ABLE TO SHARE -- HE AND I

17   TALKED ABOUT HIM COMING TO TUCSON.  HE WANTED TO SEE HIS MOM

18   AND DAD.  THAT WAS IMPORTANT TO HIM.  HE WAS ABLE TO SHARE

19   THAT WITH ME.

20            HE AND I HAD A CONVERSATION ABOUT COMING TO THIS

21   HEARING, WHAT THE RAMIFICATIONS WERE.  WE TALKED ABOUT

22   VISITING WITH HIS MOM AND DAD, HOW THAT WOULD BE DIFFICULT FOR

23   HIM TO DO.  SO HE'S ABLE TO EXPRESS HIS CONCERNS.  HE'S ABLE

24   TO ACTUALLY DESCRIBE SOME OF THE FEELINGS HE HAD PRIOR TO HIS

25   VISIT.

1    Q.    SO IS THIS AN IMPROVEMENT SINCE HE'S BEEN ON MEDICATION?

2    A.    IN MY OPINION, IT IS.

3    Q.    IF WE COULD TALK A LITTLE BIT ABOUT MR. LOUGHNER'S

4    HYGIENE.

5           OVER THE COURSE OF THE TREATMENT WITH THE

6    MEDICATION, IS HE BECOMING MORE AWARE OF HOW OTHERS PERCEIVE

7    HIM?

8    A.    YES.

9    Q.    COULD YOU EXPLAIN TO US HOW YOU KNOW THIS.

10   A.    HE ACTUALLY REQUESTED TO GET A HAIRCUT SOMETIME BACK

11   IN  -- THAT WAS -- I HAD TO GO THROUGH THE WARDEN IN ORDER FOR

12   HIM TO GET A HAIRCUT.  THE WARDEN WAS RESISTANT TO THAT FOR

13   SOME TIME.  I FINALLY -- AND FAIRLY ROUTINELY -- I THINK THIS

14   IS DOCUMENTED IN MY NOTES -- HE ASKED ME, "AM I GOING TO BE

15   GETTING A HAIRCUT?"  IT'S IMPORTANT TO HIM THAT HE BE ABLE TO

16   DO THAT SORT OF THING.

17           WE EVENTUALLY WERE ABLE TO DO THAT LAST THURSDAY, HE

18   ASKED ME -- OR I ASKED HIM IF HE WANTED TO GET A HAIRCUT

19   BEFORE HE CAME TO COURT.  HE SAID, "NO."  ON FRIDAY, I WASN'T

20   AT WORK.  AND WHEN ONE OF THE NURSES DID ROUNDS, HE ASKED IF

21   HE COULD GET A HAIRCUT.  HE ALSO ASKED IF HE COULD GET HIS

22   FINGERNAILS TRIMMED, WHICH I THINK SHE DID.  SHE ACTUALLY DID

23   THAT AND HE USUALLY ISN'T OVERLY CONCERNED ABOUT ME SEEING HIM

24   IN HIS UNDERWEAR, HIS T-SHIRT, OR WITHOUT UNDERWEAR ON.  WHEN

25   HE WAS VERY SICK PRIOR TO EMERGENCY MEDICATING HIM, HE WOULD

1    OFTEN HAVE HIS UNDERWEAR WELL BELOW HIS BUTTOCKS AND WOULD

2    SHOWER -- IF THE OFFICERS OFFERED HIM A SHOWER AND I WAS BACK

3    THERE, HE WOULD JUST STRIP DOWN AND GET IN THE SHOWER.

4             ON FRIDAY, HE ACTUALLY ASKED THE NURSE SUPERVISORS

5    IF SHE WOULD LEAVE WHILE HE SHOWERED.  SO HE'S BECOMING MORE

6    AWARE OF THOSE SORT OF THINGS.

7    Q.   WAS THERE ALSO -- I GUESS THE TERM IS HYPERSEXED ACTIVITY

8    PRIOR TO MEDICATION.  IS THAT ABATED?

9    A.   IT'S ABATED.  HE STILL TALKS ABOUT SEXUAL THINGS.  HE

10   REGRETS THAT HE -- HE HAS SOME CONCERNS ABOUT SEXUAL THINGS.

11   HE'S MUCH LESS HYPERSEXUAL.  I THINK SOME OF THE DIGITAL

12   PENETRATION WAS HYPERSEXUAL.  HE HAS NOT DONE THAT SINCE BEING

13   MEDICATED.

14   Q.   AND INAPPROPRIATE -- I GUESS KIND OF TYING IN TO WHAT YOU

15   SAID ABOUT THE CLOTHING AND BEING MORE MODEST NOW, HE ALSO,

16   PRIOR TO MEDICATION, WAS EXHIBITING THAT WITH EVERYBODY, WHERE

17   HE DIDN'T CARE IF THE NURSES SAW HIM HALF-UNDRESSED OR

18   UNDRESSED?

19   A.   YES.

20   Q.   I'D LIKE TO ADDRESS A COUPLE -- SO OVERALL, WOULD YOU BE

21   OF THE OPINION THAT HE'S STAYED THE SAME OR IS IMPROVING OR

22   HAS GOTTEN WORSE SINCE BEING ON MEDICATION?

23   A.   I THINK HE'S IMPROVED.

24   Q.   LET'S ADDRESS OF COUPLE ISSUES.  DEPRESSION.  YOU'VE

25   MENTIONED DEPRESSION A COUPLE TIMES.

1          WOULD YOUR DIAGNOSIS BE THAT THE DEPRESSION HAS BEEN

2     CAUSED RECENTLY OR IS IT SOMETHING THAT'S BEEN PREEXISTING?

3     A.    THE DEPRESSION, BASED ON MY REVIEW OF THE RECORDS, WAS

4     PREEXISTING.

5     Q.    NOW, HAND IN HAND WITH THIS DEPRESSION, IS THERE CONCERNS

6     ABOUT SUICIDE?

7     A.    YES.

8     Q.    COULD YOU EXPLAIN THOSE FOR US.

9     A.    MR. LOUGHNER HAS BEEN ON SUICIDE WATCH I THINK SINCE -- I

10    WANT TO SAY JULY 8TH.  WHAT THAT MEANS -- FIRST OF ALL, LET ME

11    ADD, I WASN'T THE ONE WHO PLACED HIM ON SUICIDE WATCH.  IT WAS

12    ACTUALLY ONE OF MY COLLEAGUES IN MY ABSENCE.  WHAT SUICIDE

13    WATCH MEANS IS THAT INITIALLY EVERY ITEM THAT HE HAD WAS TAKEN

14    AWAY FROM HIM BECAUSE WE WERE CONCERNED THAT HE'D USE IT TO

15    TRY TO HANG HIMSELF OR HARM HIMSELF IN SOME WAY.

16          BECAUSE OF HIS -- HE'S CONSIDERED A HIGH-PROFILE

17    INMATE.  HE ALWAYS HAS SOMEONE WATCHING HIM 24 HOURS A DAY,

18    BUT WE CHANGED THAT IN THAT -- FROM PRIOR TO SUICIDE WATCH, WE

19    ACTUALLY HAD AN OFFICER THAT WATCHED HIM 16 HOURS A DAY, WHICH

20    HE HAS A PEEPHOLE.  THE OFFICER, HE OR SHE, HAS A DIRECT VIEW

21    OF HIM VIA A WINDOW IN CASE HE DOES SOMETHING.  AND THE LAST

22    EIGHT HOURS, WHICH I COULD BE WRONG ON THE TIMES, THEY

23    ACTUALLY WATCH HIM VIA CAMERA.  ONCE HE WAS PLACED ON SUICIDE

24    WATCH, THE OFFICER WAS THERE 24 HOURS A DAY.

25          OVER THE LAST COUPLE OF MONTHS, WHAT I HAD DONE IS

1    SLOWLY GIVEN HIM ITEMS BACK IN HOPE OF PROVIDING SOME STIMULUS

2    AND GIVING HIM AN OPPORTUNITY TO HAVE THINGS TO DO.  LIKE, FOR

3    EXAMPLE, HE DIDN'T HAVE TOOTHPASTE.  HE DIDN'T HAVE SOAP.  HE

4    DIDN'T HAVE A WASHCLOTH.  WE WERE CONCERNED ABOUT HIS FOOD

5    INTAKE.  WE ACTUALLY WANTED TO MEASURE HIS URINE OUTPUT.  HE

6    COULDN'T HAVE A PLASTIC URINAL IN THERE.  SO EVERYTHING HE HAS

7    RIGHT NOW IS BECAUSE OF AN ORDER THAT I'VE WRITTEN TO ALLOW

8    HIM TO HAVE THAT.

9            DURING THIS TIME, HE HAS CLEARLY SAID HE WANTS TO

10   COMMIT SUICIDE.  HE HAS WRITTEN A NOTE INDICATING TO HIS

11   FATHER.  HE CALLED HIS FATHER AND OUR SPECIAL INVESTIGATIVE

12   SERVICES, AND WE HAD TO MONITOR ALL PHONE CALLS.  THEY CALLED

13   ME AND SAID, "YOU NEED TO LISTEN TO HIS PHONE CALLS CLEARLY TO

14   HIS FATHER."  BUT HE WANTED TO COMMIT SUICIDE.  HE WANTED TO

15   SEE HIM ONE LAST TIME, THEN HE WOULD KILL HIMSELF.

16           THERE WERE TIMES WHEN HE -- YOU CAN SEE IN THE NOTES

17   ONE OF THE CRITERIA IS HE HAS TO -- IT'S CREDIBLE DENIAL OF

18   SUICIDE.  HE HAS TO INDICATE WHY HE WAS PLACED IN SPECIAL

19   TREATMENT PROCEDURES.  HE HAS TO DENY SUICIDE.  AND IN MY

20   OPINION, HE DOESN'T HAVE CREDIBLE DENIAL OF SUICIDE BECAUSE OF

21   CONVERSATIONS ABOUT -- HE'LL SAY TO ME, "THERE'S NOTHING IN

22   THIS ROOM I CAN KILL MYSELF WITH," WHICH CAUSES ME TO THINK

23   HE'S CONTEMPLATED IT.  "HOW COULD I DO THIS?"

24           IN MY OPINION, THE NOTES -- OTHER PEOPLE MIGHT

25   INTERPRET IT DIFFERENTLY.  I THINK HE'S CLEARLY SAYING THAT

1     HE'S GOING TO TRY TO HANG HIMSELF.

2          CONSEQUENTLY, HE HAS REMAINED ON SUICIDE WATCH,

3     WHICH HAS TO BE RENEWED EVERY 24 HOURS SINCE JULY 8TH.  NOW,

4     CURRENTLY, I THINK HE HAS TO JUSTIFY EVERY ITEM THAT HE COULD

5     HAVE, EXCEPT HE DOESN'T HAVE A REGULAR BLANKET.  IT'S CALLED A

6     SUICIDE BLANKET.  THE SHOWER CURTAIN HAS BEEN REMOVED.

7          IF HE WERE ACTUALLY IN THE SHOWER AREA HE CLOSED THE

8     CURTAIN, WE WOULDN'T BE ABLE TO SEE HIM TO GET IN THERE TO

9     TAKE PRECAUTIONS, IF NECESSARY.

10    Q.   YOU'VE JUST DESCRIBED SOMEONE WHO SEEMS TO BE IN DIRE

11    STRAITS ON THE DEPRESSION SCALE; IS THAT CORRECT?

12    A.   YES.

13    Q.   BUT OVERALL, DO YOU HAVE AN OPINION BASED ON YOUR

14    KNOWLEDGE, YOUR EXPERIENCE, AND YOUR INTERACTIONS WITH

15    MR. LOUGHNER AND THE INFORMATION THAT YOU HAVE TODAY AND AS

16    MR. LOUGHNER'S TREATING PSYCHOLOGIST WHETHER OR NOT HE CAN BE

17    RESTORED TO COMPETENCY?

18    A.   IN MY OPINION, HE CAN.

19    Q.   AND BASED ON YOUR KNOWLEDGE, EXPERIENCE, AND YOUR

20    INTERACTIONS WITH ALL THE THINGS THAT YOU JUST TESTIFIED TO

21    AND BASED ON WHAT YOU KNOW TODAY, DO YOU HAVE AN OPINION ON

22    HOW LONG IT WILL TAKE FOR HIM TO BE RESTORED?

23    A.   YES.

24    Q.   WHAT IS THAT OPINION?

25    A.   IN MY OPINION, EIGHT MONTHS.  EIGHT MORE MONTHS.

1    Q.   AND IF, FOR ANY REASON, HE WERE TO BE RESTORED -- IF THE

2    COURT WERE TO ORDER THE EIGHT MONTHS, IF HE WERE TO BE

3    RESTORED, IN YOUR OPINION, WITHIN SIX MONTHS, WHAT WOULD YOU

4    DO?

5    A.   I WOULD WRITE A REPORT AND SEND IT TO THE JUDGE AND LET

6    THE JUDGE KNOW THAT HE'S BEEN RESTORED TO COMPETENCY.

7    Q.   SO HAVE YOU EVER DONE THAT, WHERE YOU HAVEN'T HELD THE

8    PERSON TO THE END OF RESTORATION?

9    A.   YES.

10              MS. FELDMEIER:  MAY I HAVE A MOMENT, YOUR HONOR?

11              THE COURT:  YES.

12                      (PAUSE IN PROCEEDINGS)

13   BY MS. FELDMEIER:

14   Q.   ONE LAST SUMMARY QUESTION, DOCTOR.

15              WHY DO YOU THINK THAT THE DEFENDANT CAN BE

16   RESTORED?

17   A.   BECAUSE HE'S ALREADY MADE IMPROVEMENTS, AND HE'S ONLY

18   BEEN ON MEDICATION FOR 60 DAYS.  THE IMPROVEMENTS THAT HE'S

19   MADE TOWARD RESOLVING SOME OF THE NEGATIVE SYMPTOMS OF THE

20   SCHIZOPHRENIA.  IT APPEARS THAT HE'S NO LONGER ATTENDING TO

21   AUDITORY HALLUCINATIONS.  SO THAT POSITIVE SYMPTOM SEEMS TO

22   BE, IF NOT RESOLVED, CLOSE TO RESOLUTION.

23              GIVEN THE PROGRESS THAT HE'S MADE TO DATE, I HAVE NO

24   REASON TO BELIEVE THAT HE'S NOT GOING TO CONTINUE TO MAKE

25   PROGRESS.

1  Q.  AND JUST FROM AN OUTSIDE LOOKING IN AT MR. LOUGHNER, DO

2  YOU NOTICE PHYSICAL CHANGES ABOUT MR. LOUGHNER, POSITIVE

3  PHYSICAL CHANGES, WHILE HE'S BEEN ON MEDICATION?

4  A.  YES.

5  Q.  COULD YOU TELL US WHAT THOSE ARE FOR THE RECORD?

6  A.  NUMBER ONE, HE'S ABLE TO MAKE EYE CONTACT.  NUMBER TWO,

7  HE DOESN'T HAVE THE INAPPROPRIATE AFFECT THAT YOU SAW BEFORE

8  WITH THE GRIN THAT HE NORMALLY HAD.  HIS DEMEANOR IN COURT

9  TODAY IS DIFFERENT PHYSICALLY.  HE'S ABLE TO SIT IN THE

10  COURTROOM AND NOT MAKE COMMENTS ABOUT DIFFERENT THINGS.

11        MS. FELDMEIER:  I HAVE NO OTHER QUESTIONS AT THIS

12  TIME, YOUR HONOR.

13        THE COURT:  MS. CLARKE?

14        MS. CLARKE:  THANK YOU, YOUR HONOR.

15        I THINK THERE'S A TECHNICAL SWITCH THAT HAS TO

16  HAPPEN JUST IN CASE WE USE --

17                    **CROSS-EXAMINATION**

18  **BY MS. CLARKE:**

19  Q.  GOOD AFTERNOON.

20  A.  GOOD AFTERNOON.

21  Q.  DR. PIETZ, I THINK YOU NOTED THAT HE'S ABLE TO SIT IN

22  COURT AND NOT SAY ANYTHING.

23        WOULD YOU HELP US DESCRIBE FOR THE RECORD

24  MR. LOUGHNER'S AFFECT RIGHT NOW AND WHAT IT HAS BEEN WHILE

25  YOU'VE BEEN TESTIFYING.

1   A.    I THINK HE'S DEPRESSED.

2          DID YOU SAY WHAT IT'S BEEN FOR THE PAST MONTH?

3   Q.    NO.  WHILE YOU'VE TESTIFIED SITTING HERE IN COURT.

4   A.    HE'S DEPRESSED.

5   Q.    COULD YOU DESCRIBE HIS PHYSICAL APPEARANCE.

6   A.    HE DOESN'T HAVE A SMILE ON HIS FACE.  HIS HAIR HAS BEEN

7   CUT.  HE HAS HAD LITTLE FACIAL EXPRESSION OR FLAT AFFECT.

8   HE'S PROBABLY MORE DEPRESSED.

9   Q.    WOULD IT BE FAIR TO SAY THERE'S NO FACIAL EXPRESSION?

10  A.    YES.

11  Q.    YOU CALL THAT THE DEPRESSION?

12  A.    IN MY OPINION, IT'S DEPRESSION, YES.

13  Q.    COULD IT ALSO BE A FLAT AFFECT SYMPTOM OF

14  SCHIZOPHRENIA?

15  A.    YES, IT COULD BE.

16  Q.    THAT IS A SYMPTOM OF THE DISEASE; RIGHT?

17  A.    YES.

18  Q.    IF I COULD GET THESE SERIES OF QUESTIONS OUT OF THE WAY

19  BECAUSE I'VE VERY CONCERNED.  I EXPLAINED TO YOU LAST NIGHT,

20  ACTUALLY, WHEN WE MET THAT YOU SOMETIMES HAVE DESCRIBED AN

21  INDIVIDUAL THAT WE HAVEN'T MET.  SO I'M WONDERING WHERE SOME

22  OF THESE NOTES GO.  I WANTED TO ASK YOU A FEW QUESTIONS ABOUT

23  THAT.

24          COULD YOU TELL US WHAT FILES ARE KEPT BY THE B.O.P.

25  STAFF?

1    A.   WELL, THERE'S ACTUALLY SEVERAL WAYS THAT WE RECORD

2    THINGS.  ONE WOULD BE THE PROGRESS NOTES, WHICH IS IN HIS

3    MEDICAL CHART.  THE SECOND IS -- IT'S BMR, WHICH IS AN

4    ELECTRONIC MEDICAL RECORD.  I DON'T KNOW WHAT THE B STANDS

5    FOR.  ANY RECORDS REGARDING MEDICATION.

6    Q.   IS THAT A MEDICAL RECORD?

7    A.   NO.  IN THE MEDICAL RECORD -- WHEN YOU VIEW THE RECORD,

8    THERE'S PROGRESS NOTES AND MY ORDERS.  THAT'S THE MEDICAL

9    RECORD.

10             WHEN YOU REVIEW THE RECORDS THAT SHOW HIS WEIGHT,

11   HIS HEIGHT, THE MEDICATIONS, THAT'S BMR.

12             THERE ARE SEVERAL LOGS THAT ARE KEPT.  THERE IS A

13   SUICIDE LOG.  SO WHEN YOU SEE THINGS LIKE LAYING IN BED,

14   RETRACING IN, RETRACING OUT, THAT'S THE SUICIDE LOG.

15             THERE'S A LOG OF -- EVERY TIME SOMEONE GOES BACK TO

16   VISIT HIM, THEY HAVE TO SIGN IN.  SO YOU'LL SEE A SIGNATURE

17   AND A DATE.

18             THE NURSES ALSO HAVE ANOTHER MEDICAL RECORD.  I

19   DON'T KNOW WHAT THAT'S CALLED.  THEY WILL SOMETIMES MAKE

20   NOTES, AND THAT RECORD IS NOT BMR.  IT'S NOT THE MEDICAL

21   RECORD.  IT'S IN ANOTHER ELECTRONIC RECORD.  SO YOU'LL SEE

22   NURSING NOTES, LIKE SOMEONE SAYING RN.  THAT'S PROBABLY THAT

23   RECORD.

24             WE HAVE A BUREAU OF PRISONS RECORD, WHICH I THINK

25   YOU ALSO SEE THOSE.  THAT WOULD BE THINGS LIKE IF HE HAS

1    INMATES HE CAN'T BE AROUND DUE TO HIS STATUS OR HIS SECURITY

2    LEVELS, THAT SORT OF THING.  IF HE WERE TO RECEIVE AN INCIDENT

3    REPORT, THAT WOULD BE IN THE RECORD.  THAT'S THE BUREAU OF

4    PRISONS RECORD.

5    Q.    IS THAT SOMETIMES CALLED THE CENTRAL FILE?

6    A.    YES.

7    Q.    ARE THERE ANY OTHER RECORDS?

8    A.    AS I STATED BEFORE DURING MY FIRST EVALUATION, I HAD

9    PERSONAL NOTES.  I HAVE NOT TAKEN ANY PERSONAL NOTES DURING

10   THIS EVALUATION.

11   Q.    EVERYTHING THAT YOU'VE WRITTEN DOWN ARE IN ONE OF THE

12   RECORDS YOU JUST DESCRIBED?

13   A.    THEY'D BE IN THE PROGRESS NOTES.

14   Q.    SO YOU HAVE NOTES FROM THE MARCH, APRIL, AND MAY TIME

15   WITH HIM?

16   A.    YES.

17   Q.    DO YOU HAVE THOSE WITH YOU?

18   A.    I DO.

19          MS. CLARKE:  WOULD THE COURT ORDER THOSE TO BE

20   INTRODUCED AT SOME POINT?

21          MS. FELDMEIER:  IF WE CAN JUST DEVELOP THROUGH

22   EXAMINATION WHY SHE DID NOT TURN THOSE OVER INITIALLY.

23          THE COURT:  DO YOU HAVE AN OBJECTION TO MAKING

24   COPIES OF THOSE FOR THE DEFENSE TO REVIEW?

25          THE WITNESS:  I DON'T.

COMPUTER-AIDED TRANSCRIPTION

1          MAY I EXPLAIN WHY I DIDN'T?

2          THE COURT:  SURE.

3          THE WITNESS:  WHEN I INITIALLY RECEIVE A COURT ORDER

4    ASKING US TO PRODUCE ALL RECORDS, THERE'S A QUESTION ABOUT

5    PERSONAL NOTES.  I ACTUALLY CALLED AND ASKED YOU IF I NEEDED

6    TO PRODUCE PERSONAL NOTES.  YOU SAID, "NO."  YOU ACTUALLY

7    SAID, "YOUR PERSONAL NOTES ARE YOUR PERSONAL NOTES.  YOU DON'T

8    NEED TO TURN THOSE OVER."

9          THE COURT:  OKAY.  BUT IF YOU HAVE NO OBJECTION TO

10   MAKING COPIES AND TURNING THEM OVER --

11         MS. FELDMEIER:  MY ONLY OBJECTION, YOUR HONOR, WOULD

12   BE THAT IT'S NOT REALLY RELEVANT AT THIS STAGE.  IT MAY BE

13   RELEVANT FOR A COMPETENCY HEARING DOWN THE ROAD SINCE ALL THE

14   NOTES HAVE BEEN TURNED OVER AT THIS STAGE.

15         THE COURT:  ALL THAT MAY BE TRUE.  THIS CASE HAS

16   BEEN TREATED FROM THE INCEPTION, I THINK, WITH THE CONSENT OF

17   MR. KLEINDIENST HESITATE TO USE OPEN DISCOVERY CASE AND NOT

18   KEEPING ANYTHING THAT MIGHT BEAR ON ANY OF THE ISSUES FROM THE

19   DEFENSE.  IF DR. PIETZ IS WILLING TO SHARE THOSE NOTES --

20         YOU ARE?

21         THE WITNESS:  YES.

22         THE COURT:  THEN I'LL ORDER THEM PRESERVED AND

23   PRODUCED.  A COPY WILL BE MADE.

24         MS. FELDMEIER:  WE'LL ASK THAT THEY BE -- THEY'LL BE

25   SENT THROUGH B.O.P.

1          THE COURT:  DO YOU HAVE A COPY?

2          MS. FELDMEIER:  WE DO NOT.

3          THE COURT:  YOU CAN GIVE THEM TO BOTH SIDES, THEN,

4    DR. PIETZ.

5          THE WITNESS:  PARDON?

6          THE COURT:  YOU MAY PRODUCE THEM TO BOTH SIDES.

7    BY MS. CLARKE:

8    Q.   DR. PIETZ, CAN YOU HELP ME UNDERSTAND, YOU KEPT PERSONAL

9    NOTES FOR THE FIRST EVALUATION -- I'LL CALL THAT THE FIRST

10   COMMITMENT -- AND DID NOT KEEP PERSONAL NOTES FOR THE SECOND

11   COMMITMENT?

12   A.   CORRECT.

13   Q.   IS THERE A REASON?

14   A.   WELL, THAT'S WHAT I'VE DONE FOR 21 YEARS.  WHEN I DO AN

15   INITIAL COMPETENCY EVALUATION, I ASK A LOT OF QUESTIONS ABOUT

16   SOCIAL HISTORY.  I TAKE NOTES ON ALL OF THAT.  IT'S ALSO ALL

17   ON VIDEO.  YOU ACTUALLY -- EVERYTHING THAT'S ON MY NOTES IS

18   ACTUALLY ON THE VIDEOS THAT YOU ALREADY HAVE.

19          THE REASON WHY I DON'T DO IT THE SECOND TIME IS

20   USUALLY ALL OF THAT SOCIAL HISTORY -- IF I HAVE TO DO A SOCIAL

21   HISTORY -- IN THIS CASE, I WOULD NOT BECAUSE I ALREADY HAVE --

22   I WOULD TAKE NOTES ON THAT.

23          AT SOME POINT, WHEN -- AND I THINK I EXPLAINED THIS

24   TO YOU LAST NIGHT.  WHEN IT'S MY OPINION THAT HE'S CLOSE TO

25   COMPETENCY, I WOULD DO A FORMAL COMPETENCY INTERVIEW AND I

1    WOULD TAKE NOTES AT THAT TIME.  I WOULD BE WILLING TO PRODUCE

2    THOSE NOTES IF THE COURT ORDERS ME TO DO SO.

3            AT THIS POINT, IT'S RESTORATION.  I'M SIMPLY -- HE'S

4    BEING MEDICATED.  I'M SITTING THERE MEETING WITH HIM.  I'M NOT

5    DOING A FORMAL COMPETENCY INTERVIEW AT THIS POINT.

6    Q.   THERE ARE CERTAIN THINGS THAT YOU SIMPLY DON'T WRITE

7    DOWN; AM I CORRECT?

8    A.   THAT'S CORRECT.

9    Q.   THAT HE MAY SAY TO YOU; RIGHT?

10   A.   THAT'S CORRECT.

11   Q.   OR THAT YOU MAY SAY TO HIM?

12   A.   THAT'S CORRECT.

13   Q.   SO WE HAVE, AT THIS POINT IN TIME, NO WAY TO GET TO THAT

14   INFORMATION OTHER THAN YOUR MEMORY; CORRECT?

15   A.   IN TERMS OF IF IT'S DOCUMENTED -- IT IS NOT DOCUMENTED.

16   BUT AT ANY TIME, YOU'RE MORE THAN WILLING (SIC) TO TALK WITH

17   ME AND ASK ME HOW HE'S DOING OR WHAT WE TALKED ABOUT.  I'M

18   MORE THAN WILLING TO SHARE THAT WITH YOU.

19   Q.   BUT MY QUESTION IS YOU HAVE -- THERE ARE CERTAIN THINGS

20   THAT YOU SIMPLY DON'T WRITE DOWN?

21   A.   THAT'S ABSOLUTELY CORRECT.

22   Q.   WHICH INCLUDE HIS COMMENTS TO YOU; CORRECT?

23   A.   CORRECT.

24   Q.   AND YOUR COMMENTS TO HIM?

25   A.   THAT'S CORRECT.

1    Q.   SO THE NATURE AND CONTENT OF THE CONVERSATIONS COULD BE

2    OMITTED FROM THE WRITTEN RECORD; CORRECT?

3    A.   I DO NOT WRITE EVERY SINGLE THING THAT HE SAYS TO ME OR

4    EVERYTHING THAT I SAY TO HIM.  I DO NOT WRITE EVERYTHING DOWN.

5    Q.   SO WE'RE LEFT TO YOUR MEMORY AT THIS POINT?

6    A.   THAT'S CORRECT.

7    Q.   I WANTED TO ASK YOU, WE HAD A TELEPHONIC HEARING -- I

8    THINK WE'VE HAD A COUPLE WITH YOU -- ON THE 19TH OF SEPTEMBER.

9    AND I WANTED TO JUST SHOW YOU A PORTION OF THAT HEARING AND

10   LET YOU HELP WALK US THROUGH WHERE THAT INFORMATION CAME FROM.

11           MS. CLARKE:  IT'S 1A.  IT'S THE 19TH AT PAGE 10 OF

12   THE TRANSCRIPT, YOUR HONOR.  I THINK THAT'S GOING TO COME UP

13   IN FRONT OF SOME OF US.

14   BY MS. CLARKE:

15   Q.   I POINT YOU TO THE MIDDLE OF THE PAGE, LINE 12.

16           THIS IS MR. KLEINDIENST SPEAKING TO THE COURT.

17           THE COURT:  HOLD ON ONE SECOND.

18               (PAUSE IN PROCEEDINGS)

19   BY MS. CLARKE:

20   Q.   DO YOU SEE LINE 12?

21   A.   YES.

22   Q.   IT'S A TRANSCRIPT, MR. KLEINDIENST.

23           "HE HAS TOLD DR. PIETZ REPEATEDLY WHEN THE HEARING

24   IS GOING TO BE HELD, 'ARE YOU GOING BACK TO THE HEARING?'  HE

25   HAS TOLD HER HE WANTS TO BE PRESENT AT THE HEARING.  HE HAS

1    TOLD HER THAT HE WANTS TO BE PRESENT WHEN THINGS ARE DISCUSSED

2    ABOUT HIM BECAUSE HE IS HEARING IT SECONDHAND.  AND HE

3    UNDERSTANDS WHAT THE HEARING IS ABOUT, AND HE HAS UNDERSTOOD

4    FOR THE LAST COUPLE OF WEEKS WHAT THE HEARING IS ABOUT."

5              DO YOU FOLLOW ME?

6    A.   YES.

7    Q.   I WANT TO ASK YOU A LITTLE BIT ABOUT THAT REPRESENTATION

8    BY THE PROSECUTOR.

9              DID MR. LOUGHNER ASK YOU IF YOU WERE COMING BACK FOR

10   A HEARING?

11   A.   YES.

12   Q.   WHEN DID HE DO THAT?

13   A.   I DON'T KNOW.  HE'S ACTUALLY ASKED ME A COUPLE OF TIMES.

14   I DON'T KNOW EXACTLY WHEN HE ASKED ME.  I'D HAVE TO GO BACK

15   AND SEE IF THAT'S IN MY NOTES.

16   Q.   WHAT IF I TOLD YOU IT'S NOT IN YOUR NOTES?

17   A.   THAT'S A POSSIBILITY.

18   Q.   WHY WOULD THAT NOT BE IN YOUR NOTES?

19   A.   WELL, I DON'T KNOW WHAT IT'S RELEVANT TO.

20             WHAT RELEVANCY IS IT TO MY CONVERSATION WITH HIM AT

21   THAT PARTICULAR TIME?

22   Q.   WELL, IT HAS TO DO WITH HIS UNDERSTANDING OF COURT

23   PROCEEDINGS, THAT THERE'S A HEARING GOING ON, THAT THERE'S

24   SOMETHING TO HAPPEN IN COURT.

25   A.   IF I UNDERSTAND THE QUESTION CORRECTLY, YOU ASKED ME WHY

1    I DIDN'T DOCUMENT THAT HE ASKED ME IF I WAS GOING TO TUCSON.

2    Q.   YES.

3    A.   I DIDN'T DOCUMENT THAT BECAUSE I DIDN'T THINK IT WAS

4    RELEVANT.

5    Q.   TO ANYTHING?

6    A.   CORRECT.

7    Q.   WHETHER OR NOT HIS TREATING PSYCHOLOGIST IS COMING TO A

8    HEARING AND HIS INTEREST IN THAT WOULD NOT BE RELEVANT TO

9    ANYTHING?

10   A.   IT'S RELEVANT THAT HE KNOWS THERE'S A HEARING ON

11   SEPTEMBER 21ST.

12   Q.   DO YOU RECALL DOCUMENTING THAT, THAT HE KNOWS THERE'S A

13   HEARING ON SEPTEMBER 21ST?

14   A.   I WOULD HAVE TO LOOK AT MY NOTES.

15   Q.   DO YOU WANT TO DO THAT?

16   A.   SURE.

17        WELL, I KNOW FROM MEMORY -- AND I TRUST MY MEMORY ON

18   THIS -- THAT THE NOTE THAT I DOCUMENTED IT ON WAS MONDAY,

19   WHICH I THINK THAT YOU'VE RECEIVED.  WHAT I ACTUALLY TESTIFIED

20   TO IN COURT IS EXACTLY IN THE NOTE.

21   Q.   BUT THAT'S MONDAY THE 26TH OF SEPTEMBER; CORRECT?

22   A.   CORRECT.

23   Q.   THE HEARING THAT I'M READING THE PORTIONS OF THE

24   TRANSCRIPT TO YOU FROM IS ON THE 19TH OF SEPTEMBER; CORRECT?

25        LET ME GO ON AS YOU'RE LOOKING FOR THAT.

66

1           THE COURT:  DO YOU UNDERSTAND WHAT SHE'S ASKING?

2           THE WITNESS:  I DO.  YOU'RE ASKING ME WHERE I

3    DOCUMENTED THAT CONVERSATION OF HIM KNOWING I WAS GOING TO

4    TUCSON.

5    BY MS. CLARKE:

6    Q.   RIGHT.

7           HOW ABOUT SEPTEMBER THE 19TH, 10:00 A.M.?

8           MS. CLARKE:  MAY I APPROACH?

9           THE COURT:  SURE.

10   BY MS. CLARKE:

11   Q.   DR. PIETZ, I'VE BEEN HANDED A SET OF THE B.O.P. RECORDS

12   THAT HAVE NOT BEEN PRODUCED TO THE DEFENSE, APPARENTLY WERE

13   PRODUCED THIS MORNING.

14          MS. CLARKE:  CAN I APPROACH AND --

15          THE COURT:  OF COURSE.

16          THE WITNESS:  I WAS ACTUALLY LOOKING TO SEE IF I HAD

17   DOCUMENTED IT PRIOR TO THE 19TH.

18                    (PAUSE IN PROCEEDINGS)

19          THE WITNESS:  THIS IS ACTUALLY OUT OF ORDER OR I'M

20   MISSING PART OF THIS.

21                    (PAUSE IN PROCEEDINGS)

22   BY MS. CLARKE:

23   Q.   I'LL SHOW YOU THE ENTRY IN THE PROGRESS NOTES 9/19 AT

24   10:00 A.M.

25   A.   OKAY.  "MR. LOUGHNER BRIEFLY SAT UP ON HIS BED AND TALKED

1    TO ME.  WITHIN A FEW MINUTES, HE SAID, 'AM I GOING TO TUCSON?'

2    WHEN I REPLIED, 'NO,' HE SAID, 'I DON'T WANT TO TALK ANYMORE.'

3    I ATTEMPTED TO ENGAGE HIM IN CONVERSATION, BUT HE REFUSED.

4    AFTER A FEW MOMENTS, HE LAID DOWN AND COVERED HIS HEAD WITH A

5    BLANKET.  GIVEN HIS LETHARGIC PRESENTATION, HE SHOULD REMAIN

6    ON HIS SUICIDE WATCH."

7              THE REPORTER:  CAN YOU PLEASE SLOW DOWN A BIT?

8              THE WITNESS:  I'M SORRY.

9              "MR. LOUGHNER BRIEFLY SAT UP ON HIS BED AND TALKED

10   TO ME.  WITHIN A FEW MINUTES, HE SAID, 'AM I GOING TO TUCSON?'

11   WHEN I REPLIED, 'NO,' HE SAID, 'I DON'T WANT TO TALK ANYMORE.'

12   I ATTEMPTED TO ENGAGE HIM IN CONVERSATION, BUT HE REFUSED.

13   AFTER A FEW MOMENTS, HE LAID DOWN AND COVERED HIS HEAD WITH

14   THE BLANKET.  GIVEN HIS LETHARGIC PRESENTATION, HE SHOULD

15   REMAIN ON SUICIDE WATCH."

16             THIS IS ACTUALLY DATED SEPTEMBER 19TH, 2011 AT

17   10:00.

18   BY MS. CLARKE:

19   Q.   AT 10:00 A.M.?

20   A.   CORRECT.

21   Q.   THAT WOULD BE CENTRAL TIME?

22   A.   CORRECT.

23   Q.   SO THAT'S THE NOTATION IN THE RECORD OF THE CONVERSATION

24   ABOUT GOING TO TUCSON?

25   A.   RIGHT.

1    Q.    THAT'S THAT HE'S NOT GOING TO TUCSON?

2    A.    THERE'S ACTUALLY ANOTHER ENTRY ON SEPTEMBER 20TH.

3          SHALL I READ THAT?

4    Q.    SURE.

5    A.    "I INFORMED MR. LOUGHNER THAT HE WOULD BE ATTENDING HIS

6    COURT HEARING.  HE RESPONDED BY CRYING.  HE STATED, 'I'M GLAD.

7    I WANTED TO GO.'  WHEN ASKED WHY, HE RESPONDED, 'IT'S MY CASE.

8    IT'S ABOUT ME.  I SHOULD BE THERE.'  ALTHOUGH I HAD PREVIOUSLY

9    EXPLAINED THE PURPOSE OF THE HEARING, HE COULD NOT RECALL THE

10   PURPOSE.  AT ONE POINT, HE MENTIONED IT WAS 'HIS TRIAL.'"

11   THAT'S A DIRECT QUOTE.  "I EXPLAINED AGAIN THE PURPOSE OF

12   HEARING, AND HE RESPONDED, 'OH, I REMEMBER NOW.'  HE WAS NOT

13   VERY TALKATIVE.  HE SAT ON THE END OF HIS BED DURING OUR

14   CONVERSATION.

15          "YESTERDAY CORRECTIONAL STAFF FOUND A NOTE IN HIS

16   ROOM INDICATING A DESIRE TO DIE.  I ASKED HIM ABOUT THIS NOTE

17   AS WELL AS HIS INTENT TO COMMIT SUICIDE.  HE REPORTED NO

18   MEMORY OF WRITING THE NOTE.  HE DENIED CURRENT THOUGHTS OF

19   SELF-HARM, BUT STATED" -- AND THIS IS A DIRECT QUOTE -- "'I

20   MAY HAVE HAD THOSE THOUGHTS WHEN I WROTE THE NOTE,'" END OF

21   THE QUOTE.

22          "I ASKED ABOUT HIS UNWILLINGNESS TO TALK TO ME, AND

23   HE STATED, 'I JUST FEEL APATHETIC,'" END OF QUOTE.  "GIVEN THE

24   ABOVE, HE SHOULD REMAIN ON SUICIDE WATCH AT THIS TIME."  AND

25   THAT'S ACTUALLY DATED SEPTEMBER 20TH, AT 0945 CENTRAL TIME.

1    Q.   SO THOSE ARE THE TWO NOTES OF THE DOCUMENTED RECORD OF

2    YOUR CONVERSATIONS WITH HIM ABOUT GOING TO TUCSON?

3    A.   YES.

4    Q.   SO THOSE WERE ON THE 19TH AND 20TH OF SEPTEMBER?

5    A.   YES.

6    Q.   THE HEARING THAT I'M SHOWING YOU THE PORTION OF THE

7    TRANSCRIPT OF IS ON THE 19TH OF SEPTEMBER.

8    A.   YES.

9    Q.   AND THE PROSECUTOR REPRESENTS THAT "HE HAS TOLD HER -- HE

10   HAS TOLD DR. PIETZ REPEATEDLY WHEN THE HEARING IS GOING TO BE

11   HELD AND 'ARE YOU GOING BACK TO THE HEARING?'  HE HAS TOLD HER

12   HE WANTS TO BE PRESENT AT THE HEARING.'"

13             SO -- BUT THE NOTES THAT REFLECT THAT ARE ON THAT

14   DATE AND FORWARD, NOT BEFORE THAT DATE; CORRECT?

15   A.   THAT'S CORRECT.

16   Q.   SO THERE'S NO DOCUMENTATION OF THOSE DISCUSSIONS WITH YOU

17   WITH MR. LOUGHNER IN YOUR WRITTEN RECORD?

18   A.   RIGHT.

19   Q.   SO WE'RE RELYING ON YOUR MEMORY AT THAT POINT?  THAT'S

20   THE ONLY POINT I'M TRYING TO GET FOR US.

21   A.   MAY I EXPLAIN?

22   Q.   SURE.

23   A.   YOU ARE RELYING ON MY MEMORY.  THIS IS ONE OF THE

24   DIFFICULTIES:  I DIDN'T KNOW IF THERE WAS GOING TO BE A

25   HEARING.  AND ONE OF THE THINGS THAT I'VE TRIED TO DO WITH HIM

1   IS NOT TELL HIM THINGS UNLESS I'M CERTAIN THAT IT'S GOING TO

2   HAPPEN.

3           I ALSO DIDN'T KNOW IF HE WAS GOING TO THE HEARING.

4   SO IT WASN'T UNTIL CLOSE TO THE SEPTEMBER 21ST HEARING WHEN I

5   ACTUALLY THOUGHT I WAS GOING, WHICH WOULD HAVE BEEN PROBABLY

6   THE 19TH.  IF I RECALL, THE 19TH WAS A MONDAY.  I THINK UP

7   UNTIL FRIDAY, I DID NOT MAKE MY PLANE RESERVATIONS UNTIL

8   SEPTEMBER 19TH, AND THEN IT WAS CANCELLED.  SO THAT'S THE

9   FIRST TIME I ACTUALLY WAS EVEN CERTAIN THAT I MIGHT OR MIGHT

10  NOT BE GOING.

11  Q.   THAT'S A BIT IN CONFLICT, IS IT NOT, WITH "MR. LOUGHNER

12  HAS TOLD DR. PIETZ REPEATEDLY WHEN THE HEARING IS GOING TO BE

13  HELD, 'ARE YOU GOING BACK TO THE HEARING?' HE HAS TOLD HER HE

14  WANTS TO BE PRESENT AT THE HEARING"?

15  A.   I DON'T RECALL USING THE WORD "REPEATEDLY."

16  Q.   TO THE PROSECUTOR?

17  A.   YES.

18  Q.   AND DO YOU RECALL WHEN YOU TOLD THE PROSECUTOR THIS

19  INFORMATION?

20  A.   I DO NOT.

21  Q.   WHEN YOU WERE ON THE PHONE WITH US ON THE 19TH, THAT WAS

22  A MONDAY.

23  A.   IT WAS A MONDAY.

24  Q.   THAT'S NOT A TEST.

25  A.   I'M ASKING YOU, WAS I ON THE PHONE WITH YOU ON MONDAY,

1   THE 19TH?

2   Q.   YES.   THERE WAS A HEARING --

3   A.   OH, YOU'RE TALKING ABOUT THE HEARING.   OKAY.

4   Q.   SOUNDS LIKE YOU WERE ON THE PHONE WITH THE PROSECUTORS,

5   NOT ME; RIGHT?

6   A.   I WAS ON THE PHONE WITH THE PROSECUTORS.

7   Q.   ON THAT DAY?

8   A.   I CAN'T SAY WITH ABSOLUTE CERTAINTY.   IT'S POSSIBLE I DID

9   TALK TO HIM ON THE 19TH.   I ACTUALLY TALKED TO HIM SEVERAL

10  TIMES BEFORE THE 19TH BECAUSE I HAD A SUBPOENA.   AND I TALKED

11  TO THEM NUMEROUS TIMES BECAUSE I HAD TO REARRANGE MY SCHEDULE

12  TO COME HERE.

13          SO I CAN'T TELL YOU WITH ABSOLUTE CERTAINTY WHEN I

14  TALKED TO THEM OR WHEN I DID NOT TALK TO THEM.   THERE WAS A

15  DECISION SOMETIME FRIDAY AROUND 4:00 P.M. MY TIME, BECAUSE I

16  STAYED AT WORK UNTIL 4:00 OR 4:30 ON THAT FRIDAY TRYING TO

17  DETERMINE IF I NEEDED TO MAKE PLANE RESERVATIONS TO FLY OUT

18  MONDAY OR TUESDAY THE FOLLOWING WEEK.   AND WHEN I LEFT THE

19  OFFICE ON FRIDAY, I STILL DID NOT KNOW IF I WAS COMING TO

20  TUCSON ON MONDAY OR TUESDAY OF THE FOLLOWING WEEK.

21          SO, YES, I HAD NUMEROUS CONVERSATIONS WITH THEM

22  ABOUT HOTEL ARRANGEMENTS, DID I NEED TO COME, WHEN DID I NEED

23  TO COME.

24  Q.   YOU DON'T HAVE TO BE DEFENSIVE ABOUT IT.   I WAS JUST

25  TRYING TO GET SOME NATURE OF THE CONVERSATIONS OUT.

72

1          YOU DIDN'T KNOW ON FRIDAY THE 16TH WHETHER YOU WERE

2    COMING TO THE HEARING; CORRECT?

3    A.   I DID NOT KNOW FRIDAY THE 16TH IF I WAS COMING TO THE

4    HEARING OR NOT.  I HAD A SUBPOENA, BUT IT WAS -- HAD NOT BEEN

5    RESOLVED IF I WAS COMING OR NOT.

6    Q.   ON FRIDAY?

7    A.   CORRECT.

8    Q.   DURING OUR HEARING ON THE 19TH --

9          1C, MARK.

10   BY MS. CLARKE:

11   Q.   -- YOU INDICATED THAT ON FRIDAY THE 16TH, YOU CALLED --

12   YOU ASKED DR. BRANDT TO GO TELL MR. LOUGHNER THAT HE WAS GOING

13   TO TUCSON?

14   A.   THAT'S CORRECT.

15   Q.   YOU DIDN'T KNOW WHETHER YOU WERE COMING TO TUCSON, BUT HE

16   WAS COMING TO TUCSON?

17   A.   YES.  IT SOUNDS CONFUSING.  BUT WHEN I LEFT ON FRIDAY, IT

18   WAS MY UNDERSTANDING THAT THERE WAS GOING TO BE A HEARING ON

19   SEPTEMBER 21ST.  AND HE WAS COMING, AND I WAS COMING.

20          HOWEVER, I WAS ALSO TOLD, "THIS COULD BE CANCELLED.

21   DON'T MAKE FLIGHT ARRANGEMENTS."  SO I DID NOT.  BUT I

22   WANTED -- MR. LOUGHNER HAD ASKED ME ABOUT THE HEARING.  SO

23   DR. BRANDT WAS THE ON-CALL PSYCHOLOGIST.  I ASKED HIM TO

24   INFORM HIM, YES, HE IS GOING.

25   Q.   YOU HAD ALREADY LEFT THE PRISON, SO YOU COULDN'T GO TELL

COMPUTER-AIDED TRANSCRIPTION

1    MR. LOUGHNER YOURSELF?

2    A.   NO, ACTUALLY, I HADN'T LEFT THE PRISON.  WE -- HE

3    ACTUALLY DID IT ON SATURDAY IF YOU LOOK AT THOSE NOTES.  I

4    WASN'T ON CALL AND I DID NOT GO BACK TO TELL HIM ON FRIDAY.

5    Q.   DID SOMETHING HAPPEN BETWEEN THE TIME YOU LEFT THE PRISON

6    AND THE TIME YOU CALLED DR. BRANDT TO ADVISE YOU THAT BOTH YOU

7    AND MR. LOUGHNER WERE GOING BACK?

8    A.   IT'S POSSIBLE THAT AT THAT POINT THE MARSHALS NOTIFIED US

9    THAT THEY WERE TRANSPORTING HIM.  THAT WOULD BE THE REASON WHY

10   WE MADE THAT DECISION.

11   Q.   WHEN DID YOU BECOME AWARE THAT THERE WAS GOING TO BE A

12   HEARING ON THE 19TH ABOUT WHETHER OR NOT MR. LOUGHNER WOULD

13   ACTUALLY COME TO THIS HEARING?

14   A.   WHEN -- THE 19TH, THE MONDAY HEARING?

15   Q.   YES.

16   A.   WHEN I WAS SITTING AT MY DESK AND GOT A PHONE CALL FROM

17   THE JUDGE TO TESTIFY.

18   Q.   LET ME JUST CUT TO THE CHASE HERE.

19        ON FRIDAY THE 16TH, YOU TOLD DR. BRANDT, "PLEASE

20   TELL MR. LOUGHNER HE'S COMING TO TUCSON"?

21   A.   CORRECT.

22   Q.   AND THEN ON THE 19TH, YOU TOLD MR. LOUGHNER HE WASN'T

23   COMING TO TUCSON?

24   A.   YES.

25   Q.   WHAT HAPPENS?

74

1    A.   I WAS TOLD THERE WASN'T GOING TO BE A HEARING ON

2    SEPTEMBER 21ST.

3    Q.   WHEN?

4    A.   SOMETIME ON THE 19TH.  I DON'T HAVE THE EXACT TIMES THAT

5    WE HAD THESE CONVERSATIONS.  I DON'T HAVE THEM.  I APOLOGIZE

6    FOR THAT.  I CAN'T TELL YOU EXACTLY AT WHAT TIME I LEARNED I

7    WASN'T GOING TO TUCSON.

8    Q.   WELL, AND THAT'S MY CONCERN ABOUT YOU AND CONCERN ABOUT

9    THE KIND OF INFORMATION THAT GOES IN AND OUT TO MR. LOUGHNER

10   THAT YOU'RE ABLE TO TELL US ABOUT WHEN IT'S NOT WRITTEN DOWN.

11         MY UNDERSTANDING IS ON FRIDAY THE 16TH, YOU CALLED

12   DR. BRANDT AND SAID, "WILL YOU GO TELL MR. LOUGHNER HE IS

13   COMING TO TUCSON"?

14   A.   ACTUALLY, THAT CONVERSATION OCCURRED IN OUR OFFICE.

15   DR. BRANDT WAS IN MY OFFICE, AND HE WAS ON CALL.  I DIDN'T

16   CALL HIM.

17   Q.   SO YOU TOLD -- YOU ASKED HIM TO TELL MR. LOUGHNER HE WAS

18   COMING TO TUCSON?

19   A.   CORRECT.

20   Q.   ON FRIDAY THE 19TH (SIC)?

21   A.   CORRECT.

22   Q.   I MEAN THE 16TH.

23         AND THEN ON MONDAY THE 19TH, YOU ACTUALLY WENT TO

24   MR. LOUGHNER BEFORE THE HEARING THAT WE HAD AND SAID, "WE ARE

25   NOT GOING TO TUCSON"?

1    A.   CORRECT.

2    Q.   I'M JUST TRYING TO FIGURE OUT WHAT HAPPENED TO CHANGE THE

3    INFORMATION THAT YOU HAD.

4    A.   I DON'T REMEMBER EXACTLY WHO TOLD ME THAT I WAS NOT GOING

5    TO BE IN TUCSON ON THE 21ST.  MY GUESS IS IT WAS THE

6    PROSECUTORS CALLED ME AND SAID, "WE'RE NOT HAVING A HEARING ON

7    THE 21ST."  SO I CANCELLED MY FLIGHT ARRANGEMENTS AND WENT

8    BACK AND TOLD MR. LOUGHNER HE WAS NOT GOING.

9    Q.   TO TUCSON ON THE 21ST?

10   A.   CORRECT.

11   Q.   DO YOU NOTE THESE CONVERSATIONS WITH THE PROSECUTORS OR

12   HAVE AN EMAIL EXCHANGE?

13   A.   I DON'T NOTE MY CONVERSATIONS WITH YOU, AND I DON'T NOTE

14   MY CONVERSATIONS WITH THE PROSECUTORS.

15   Q.   DO YOU HAVE ANY EMAIL EXCHANGE WHEN THEY'RE TELLING YOU

16   THERE'S GOING TO BE A HEARING OR THERE ISN'T GOING TO BE A

17   HEARING?

18   A.   I HAVE RECEIVED EMAILS FROM THEM, YES.

19   Q.   WHEN YOU TALKED TO MR. LOUGHNER ABOUT THE HEARING, YOU

20   DIDN'T -- I THINK YOU TOLD THE COURT THAT HE UNDERSTANDS THE

21   NATURE OF THE HEARING; RIGHT?

22   A.   I DON'T RECALL SAYING "NATURE."

23   Q.   HE UNDERSTANDS THE PURPOSE OF THE HEARING?  HOW ABOUT 1B?

24   LET'S SEE IF I CAN FIND IT.

25   A.   "HE UNDERSTANDS THAT THE HEARING IS SEPTEMBER 21ST.  IT'S

1    TO DECIDE IF HIS EVALUATION CAN BE EXTENDED."

2    Q.   WHEN YOU SAY THAT TO US, WHAT DID MR. LOUGHNER SAY TO YOU

3    TO MAKE YOU THINK HE UNDERSTOOD THE PURPOSE OF THE HEARING?

4    A.   EXACTLY WHAT I SAID.  HE INDICATED THAT HE UNDERSTANDS

5    THE HEARING IS TO DECIDE IF HIS EVALUATION CAN BE EXTENDED.

6    Q.   AND DID YOU PROBE WITH HIM, "DO YOU KNOW WHAT THAT MEANS?

7    HOW DO YOU FEEL ABOUT THAT?  WHAT DO YOU UNDERSTAND ABOUT

8    THAT?"  DID YOU PROBE ANY MORE?

9    A.   I DID NOT.

10   Q.   HOW COME?

11   A.   I JUST DIDN'T.

12   Q.   WELL, I'M SURE YOU UNDERSTAND AS THE PSYCHOLOGIST THAT

13   YOU'VE BEEN FOR 21 YEARS SOMETIMES PEOPLE SUFFERING FROM A

14   SERIOUS MENTAL DEFECT CAN GIVE AN ANSWER, BUT THE DEPTH OF

15   THAT ANSWER GOES OFF RAILS; RIGHT?

16   A.   I UNDERSTAND THAT.  AND AS I TESTIFIED EARLIER, IT'S MY

17   OPINION HE'S NOT COMPETENT TO STAND TRIAL YET.  AND I ACTUALLY

18   DON'T ASK THOSE IN-DEPTH CONVERSATIONS UNTIL I'M CLOSER TO

19   OPINING THAT HE IS COMPETENT TO STAND TRIAL.  ABSOLUTELY

20   THAT'S A QUESTION YOU WOULD WANT TO ASK HIM IF IT WAS MY

21   OPINION THAT HE WAS CLOSER TO BEING COMPETENT.  IT'S NOT MY

22   OPINION THAT HE IS.

23   Q.   HOW FAR AWAY FROM BEING COMPETENT IS HE, IN YOUR

24   OPINION?

25   A.   I HAVE NO IDEA HOW TO ANSWER THAT QUESTION.

1    Q.   AT WHAT POINT IN TIME WILL YOU HAVE ANY SENSE OF WHEN YOU

2    PROBE THE DEPTH OF HIS UNDERSTANDING?

3    A.   WELL, IF HE WERE BETTER ABLE TO HAVE LONG CONVERSATIONS

4    WITH US, LONG, MEANINGFUL CONVERSATIONS WITH US.  IF -- I

5    THINK ONE OF THE THINGS I TOLD YOU LAST NIGHT THAT I WANT TO

6    DO WITH HIM IS GO OVER THE VIDEOTAPE.  HE STILL BELIEVES THAT

7    IT'S A REENACTMENT.  I WANT TO GO OVER THE VIDEO AND ALLOW HIM

8    TO HELP ME UNDERSTAND WHAT HIS THINKING IS ABOUT THAT VIDEO.

9    WHEN HE'S BETTER ABLE TO DO THOSE SORTS OF THINGS, I WILL DO A

10   STRUCTURED COMPETENCY INTERVIEW.

11   Q.   WELL, IT SEEMS TO ME WHEN YOU'RE TELLING THE COURT THAT

12   MR. LOUGHNER UNDERSTANDS THE PURPOSE OF THE HEARING, THAT

13   THAT'S NOT NECESSARILY TRUE BECAUSE YOU DON'T KNOW WHETHER HE

14   UNDERSTANDS THE PURPOSE OF THE HEARING; RIGHT?

15   A.   IN MY OPINION, YOU'RE PUTTING WORDS IN MY MOUTH.  I

16   DIDN'T SAY, "PURPOSE."  I SAID HE UNDERSTANDS THAT THE HEARING

17   ON SEPTEMBER 21ST IS TO DECIDE IF HIS EVALUATION CAN BE

18   EXTENDED.

19   Q.   THE MEANING OF THAT PLAIN LANGUAGE IS THAT HE UNDERSTANDS

20   WHAT THE HEARING IS ABOUT; RIGHT?

21   A.   NOT IN MY OPINION.  IT'S MY UNDERSTANDING THIS HEARING IS

22   MORE COMPLICATED THAN JUST MAKING THAT DECISION.

23   Q.   WHAT IS YOUR UNDERSTANDING?

24   A.   IT'S MY UNDERSTANDING THAT THERE ARE A COUPLE ISSUES THAT

25   YOU ALL ARE ADDRESSING TODAY.

1              THE HARPER ISSUE, WHICH I HAVE NOT TALKED WITH HIM

2       ABOUT AT ALL; AND YOU'RE MAKING A DETERMINATION IF HE WILL BE

3       RESTORED TO COMPETENCY, IF THERE'S A LIKELIHOOD; AND THE JUDGE

4       WILL MAKE A DETERMINATION IF HE CAN BE EXTENDED FOR A CERTAIN

5       AMOUNT OF TIME.

6       Q.   DID YOU EXPLAIN THOSE THINGS TO MR. LOUGHNER?

7       A.   NO.

8       Q.   WHY NOT?

9       A.   IT'S THE SAME --

10      Q.   BECAUSE YOU DON'T THINK HE WOULD GET IT?  IS THAT THE

11      BOTTOM LINE?

12      A.   DO YOU WANT ME TO ANSWER THE QUESTION?

13      Q.   SURE.

14      A.   THE ISSUE ABOUT THE HARPER HEARING, I JUST LEARNED ABOUT

15      THAT YESTERDAY.  SO IT WOULD HAVE BEEN IMPOSSIBLE FOR ME TO

16      HAVE THAT DISCUSSION WITH HIM.

17              REGARDING THE DECISION IF HE'S COMPETENT OR NOT, I

18      JUST ELECTED NOT TO HAVE THAT CONVERSATION WITH HIM.  PART OF

19      THAT IS IT WAS MY UNDERSTANDING THAT WE WERE -- THAT I WAS

20      COMING HERE TO MAKE -- TO TESTIFY AS TO WHAT MY OPINION WAS

21      REGARDING EXTENDING HIS EVALUATION.  I THOUGHT THAT'S WHAT MY

22      TESTIMONY WAS ABOUT.  I DIDN'T KNOW THERE WERE OTHER THINGS

23      BEING DECIDED TODAY, SO I DIDN'T HAVE THAT CONVERSATION WITH

24      HIM OBVIOUSLY.

25      Q.   I GUESS ONE OF MY QUESTIONS REALLY IS IF IT'S YOUR

1    TESTIMONY THAT MR. LOUGHNER SAID TO YOU HE UNDERSTANDS THE

2    HEARING ON THE 21ST IS TO DECIDE IF HIS EVALUATION CAN BE

3    EXTENDED, YOU ACCEPTED THAT STATEMENT, HOWEVER HE SAID IT, AT

4    FACE VALUE; RIGHT?

5    A.   I DID.

6    Q.   WITHOUT PROBING THE UNDERSTANDING?

7    A.   THAT'S CORRECT.

8    Q.   AND THAT'S BECAUSE, IF I'M HEARING YOU CORRECTLY --

9    PLEASE CORRECT THIS -- BECAUSE YOU DON'T THINK HE NECESSARILY

10   WOULD BE ABLE TO EXPRESS AN UNDERSTANDING BECAUSE HE REMAINS

11   INCOMPETENT?

12   A.   THAT'S CORRECT.

13   Q.   WOULD IT HELP YOU IN EVALUATING HIM IN THE ROLE THAT

14   YOU'VE HAD WITH HIM TO BE ASKING ALONG THE WAY WHAT HIS

15   UNDERSTANDING OF THINGS ARE TO SEE IF IT WOULD CHANGE?

16   A.   WELL, I KNOW THAT YOU'VE READ MY NOTES.  IF YOU LOOK IN

17   MY NOTES, WE HAVE HAD THOSE DISCUSSIONS.  I HAVE ASKED HIM

18   THOSE QUESTIONS ALONG THE WAY.

19   Q.   BUT NOT ABOUT THE PURPOSE OF THE COURT HEARING, THIS

20   PARTICULAR COURT HEARING?

21   A.   EXACTLY.

22   Q.   LET'S GO BACK TO DR. BRANDT FOR JUST A SECOND.

23        YOU ASKED DR. BRANDT TO GO AND TALK TO MR. LOUGHNER.

24   I'D LIKE TO PULL THAT NOTE UP.  IT'S 2A.

25        CAN YOU SEE DR. BRANDT'S -- DR. BRANDT ACTUALLY

1    WRITES MUCH BETTER THAN YOU DO.

2    A.   YOU'VE SAID THAT BEFORE.  I APOLOGIZE.

3    Q.   THAT'S GOING TO BE OUR NEXT MOTION, IS TO HAVE YOU TYPE

4    YOUR PROGRESS REPORTS.  I'M SURE THE COURT WOULD APPRECIATE IT

5    AS WELL.

6           NOW, THIS IS DR. BRANDT'S NOTES?

7    A.   WOULD YOU SCROLL DOWN TO THE BOTTOM.  IT LOOKS LIKE HIS

8    HANDWRITING, BUT I WANT TO MAKE SURE THAT HE SIGNED IT.

9    Q.   I THINK IT'S ON THE NEXT PAGE.

10   A.   IT'S ON THE NEXT PAGE.

11   Q.   IT WOULD BE 2B, I THINK.

12   A.   YES, THAT'S HIS NOTE.

13   Q.   LET'S GO BACK TO 1891.

14           THIS IS DR. BRANDT'S NOTE OF THAT DATE.

15           DID YOU SEE THE DATE?

16   A.   I DIDN'T.

17   Q.   ON THE 19TH?

18   A.   WAS IT SEPTEMBER 17TH?

19   Q.   IT SHOULD BE THE 17TH.

20           MS. CLARKE:  COULD WE GO BACK TO FULL PAGE?

21           THE WITNESS:  YES.

22   BY MS. CLARKE:

23   Q.   AT 8:10 IN THE MORNING?

24   A.   YES.

25   Q.   SO WE COULD BRING THE NOTE BACK UP.

1          THE NOTE ACTUALLY SAID WHEN DR. BRANDT GOT TO

2    MR. LOUGHNER, IT WAS CONTACT ON SUICIDE WATCH; RIGHT?  I WANT

3    TO QUOTE.  "HE WAS SLEEPING WHEN I CAME TO THE CELL.  HE

4    STARTED TO SIT UP AND SAID," QUOTE, "'I CAN'T SEE ANYTHING,'"

5    END QUOTE.  "I POINTED OUT HIS EYES ARE CLOSED, AND HE OPENED

6    THEM"; IS THAT CORRECT?

7    A.    THAT'S CORRECT.

8    Q.    SO HE DIDN'T KNOW HE COULDN'T SEE BECAUSE HIS EYES WERE

9    CLOSED; IS THAT CORRECT?

10   A.    THAT'S WHAT DR. BRANDT WROTE.

11   Q.    DR. BRANDT GOES ON TO SAY, "HE REMAINED GROGGY AND SAID

12   THAT HE WOULD TALK WHILE SITTING ON THE BED"; RIGHT?

13   A.    CORRECT, RATHER THAN COMING TO THE DOOR.

14   Q.    RIGHT.

15         "I PASSED" -- DOWN AT THE BOTTOM.  "I PASSED ONTO

16   HIM A MESSAGE FROM DR. PIETZ THAT HE HAD BEEN SCHEDULED TO

17   RETURN FOR A COURT HEARING IN THE NEAR FUTURE.  HE WAS GLAD

18   ABOUT THAT"; CORRECT?

19   A.    CORRECT.

20   Q.    NEXT PAGE, "I ASKED IF HE KNEW WHY HE WAS GOING BACK TO

21   COURT.  HE SAID, 'NO.'"

22         THIS IS ON THE 17TH AFTER YOU HAD TOLD HIM ON THE

23   16TH; RIGHT?

24   A.    CORRECT.

25   Q.    THAT HE WAS GOING?

1    A.    I DIDN'T TELL HIM ON THE 16TH HE WAS GOING.

2    Q.    "I EXPLAINED DR. PIETZ HAS REQUESTED AN EXTENSION ON THE

3    COMPETENCY RESTORATION EVALUATION.  HE SAID, 'OH, YEAH.  I

4    KNOW.  I UNDERSTAND THAT'"; RIGHT?

5    A.    CORRECT.

6    Q.    "I ASKED IF HE RECALLED MY NAME.  HE SAID 'BRANDT' AND

7    SPELLED IT"; CORRECT?

8    A.    CORRECT.

9    Q.    HAVE YOU SEEN THAT OUT OF HIM A LOT EVEN BACK IN MARCH,

10   APRIL, MAY, WHERE HE CAN RECALL THE NAMES AND EVEN SPELL THE

11   NAMES?

12   A.    I DON'T KNOW THAT HE'S EVER SPELLED THE NAMES.  I DO

13   RECALL -- YOU'RE TALKING ABOUT THE FIRST COMPETENCE

14   EVALUATION.  I ASKED HIM THE NAMES OF HIS ATTORNEYS, AND HE

15   WAS ABLE TO TELL ME THE NAMES OF HIS ATTORNEYS.

16   Q.    HAVE YOU ASKED HIM THE NAMES OF ALL HIS TEACHERS?

17   A.    NO.

18   Q.    DO YOU KNOW IF HE'S ABLE TO DO THAT?

19   A.    NO.

20   Q.    YOU DIDN'T DO THAT IN SOCIAL HISTORY?

21   A.    ASKING THE NAMES OF HIS TEACHERS?

22   Q.    NO.  IF HE COULD REMEMBER --

23   A.    I DID NOT.

24   Q.    ONE MORE THING THAT I WANT TO GET.  THIS IS THE GUY

25   THAT'S CONVERSING.

1          IN THE MIDDLE, "AFTER A BRIEF INTERVIEW, HE LAID

2     BACK DOWN, COVERED HIMSELF, AND SAID, 'I'M GOING TO IGNORE YOU

3     NOW'"?

4     A.   YES.

5     Q.   IS THAT COMMON?

6     A.   FOR HIM TO DO THAT?  YES.

7     Q.   JUST TO NOT CONTINUE WITH THE CONVERSATION?

8     A.   LET ME JUST ADD THIS:  HE DOES DO THINGS.  HE'LL SAY,

9     "I'M DONE TALKING TO YOU.  I'M GOING TO IGNORE YOU NOW."  HE

10    DOES THAT IF IT'S EARLY IN THE MORNING.  HE WILL OFTEN DO THAT

11    BECAUSE WE'RE WAKING HIM UP.

12          IF YOU DON'T LEAVE THE AREA, IF YOU TELL HIM "I WANT

13    YOU TO COME HERE AND TALK TO ME," ENCOURAGE HIM TO TALK WITH

14    YOU, NOT ALWAYS, BUT HE OFTEN -- LET ME JUST SAY HE LIKES

15    DR. BRANDT.  HE'S ONE OF THE PSYCHOLOGISTS THAT -- THE ON-CALL

16    PSYCHOLOGISTS THAT HE SEEMS TO BE CONNECTED TO.

17    Q.   I THINK YOU'VE ALREADY TOLD US YOU DON'T TAKE VERBATIM

18    NOTES OF WHAT HE SAYS TO YOU OR YOU SAY TO HIM?

19    A.   YES.

20    Q.   SO MANY TIMES OTHER PEOPLE IN THE INSTITUTION DO ACTUALLY

21    TAKE CLOSE TO VERBATIM NOTES, MORE THOROUGH NOTES.

22          COULD I SAY THAT?  IS THAT FAIR?

23    A.   I DON'T THINK IT'S FAIR.  I SEE HIM EVERY DAY.  IF YOU

24    LOOK AT SOME OF MY NOTES, THEY'RE VERY THOROUGH.  THERE ARE

25    NOTES WHERE I MAY ONLY TALK TO HIM FOR 10 MINUTES.  WE MAY NOT

1    HAVE A LOT TO TALK ABOUT.

2              IF YOU'RE SUGGESTING THAT THEY DOCUMENT EVERYTHING

3    HE SAYS, I DON'T THINK THAT'S THE CASE.  BECAUSE I'VE TALKED

4    TO THEM WHENEVER THEY'RE ON CALL.  I CONSULT WITH WHOEVER IS

5    ON CALL TO FIND OUT HOW HE'S DONE.  THEY DON'T DOCUMENT

6    EVERYTHING VERBATIM.

7    Q.   DID YOU DOCUMENT IN YOUR PROGRESS NOTES THE CONVERSATION

8    ABOUT TELLING MR. LOUGHNER THAT HE WAS MENTALLY ILL AND THAT

9    HE NEEDED TO BE ON MEDICATION?

10   A.   I'D HAVE TO GO BACK AND LOOK.

11             DO YOU WANT ME TO DO THAT?

12   Q.   YES.

13                   (PAUSE IN PROCEEDINGS)

14             THE WITNESS:  I DON'T SEE THAT I DOCUMENTED THAT.

15   I'M LOOKING THROUGH ALL OF THESE.  I'M LOOKING FOR WHEN HE

16   FIRST CAME BACK.

17   BY MS. CLARKE:

18   Q.   ABOUT YOU SAID, I THINK, THE 28TH?

19   A.   MAY 28TH, AND I ALSO HAVE WHERE I NOTIFIED HIM OF THE DUE

20   PROCESS HEARING.  THAT WOULD HAVE BEEN WHEN I WOULD HAVE

21   NOTIFIED HIM THAT HE HAD A MENTAL ILLNESS AND WE WERE HAVING A

22   HEARING TO DECIDE IF WE COULD INVOLUNTARILY MEDICATE HIM.

23   Q.   THAT WAS AROUND THE MIDDLE OF JUNE?

24   A.   NO.  IT WAS ACTUALLY -- LOOKS LIKE IT WAS JUNE 2ND.  THE

25   NOTE PRIOR TO THAT -- THE NOTE AFTER THAT IS JUNE 3RD WHERE I

1     NOTIFIED HIM THAT WE WERE HAVING A DUE PROCESS HEARING TO

2     DETERMINE IF HE NEEDS INVOLUNTARY MEDICATION.  I EXPLAINED TO

3     HIM -- HE WAS ASKED IF HE DESIRED WITNESSES OR HAD A

4     PREFERENCE FOR A STAFF REP.

5     Q.   I THOUGHT YOU TESTIFIED EARLIER ABOUT TALKING WITH HIM

6     ABOUT YOUR BELIEF THAT HE WAS MENTALLY ILL AND HIS REACTION TO

7     THAT.

8     A.   YES.

9     Q.   THAT'S NOT NOTED IN THE RECORD; IS THAT RIGHT?

10    A.   NO.

11    Q.   WOULD THAT BE SOMETHING THAT WOULD BE IMPORTANT TO NOTE,

12    WHAT HE'S SAYING ABOUT THAT AND THAT HE'S BEING TALKED TO

13    ABOUT THAT?  WOULDN'T THAT BE IMPORTANT FOR THE RECORDS TO

14    NOTE?

15    A.   THAT I INFORMED HIM HE WAS MENTALLY ILL?

16    Q.   RIGHT, AND HIS REACTION TO THAT.

17    A.   IT COULD BE IMPORTANT.  THE BOTTOM LINE IS IT WOULD BE

18    IMPOSSIBLE FOR ME TO HAVE A 60-MINUTE INTERVIEW AND DOCUMENT

19    EVERYTHING HE SAID.

20    Q.   BUT THE PURPOSE, AS I UNDERSTAND, OF THAT PARTICULAR

21    CONVERSATION WITH HIM OR INTERVIEW OR HOWEVER YOU WANT TO

22    PHRASE IT WAS SO THAT YOU COULD TELL HIM, "YOU'RE BACK FOR

23    RESTORATION OF COMPETENCY.  I BELIEVE THAT YOU'RE MENTALLY

24    ILL."

25              THAT WAS THE PURPOSE OF THAT CONVERSATION; RIGHT?

1    A.   THE ACTUAL FIRST INTERVIEW THAT I HAD WITH HIM, THAT WAS

2    THE PURPOSE OF THAT INTERVIEW, WAS TO EXPLAIN THE PURPOSE OF

3    THE EVALUATION.  I ACTUALLY DIDN'T DELINEATE EXACTLY WHAT I

4    SAID TO HIM, BUT I EXPLAINED TO HIM THAT THE JUDGE HAD FOUND

5    HIM INCOMPETENT AND THAT HE'S MENTALLY ILL.  THAT'S DATED MAY

6    28TH.  "MR. LOUGHNER WAS INFORMED ABOUT THE PURPOSE OF THE

7    COMPETENCY."

8    Q.   "HE QUICKLY CAME TO THE CHAIR AND BEGAN ANSWERING

9    QUESTIONS"; RIGHT?

10   A.   CORRECT.

11   Q.   "ONCE AGAIN, HE TALKED OPENLY ABOUT THE INCIDENT AND THE

12   VIDEO WAS TAMPERED WITH AND A SECOND WITNESS"; RIGHT?

13   A.   YES.

14   Q.   BUT NOTHING IN THAT PROGRESS NOTE OR YOUR NOTATION TO THE

15   RECORD INDICATES THAT THAT WAS WHEN YOU TOLD HIM YOU THOUGHT

16   HE WAS MENTALLY ILL AND NEEDED MEDICATION?

17   A.   THAT'S CORRECT.

18   Q.   SO WE'RE RELYING ON YOUR MEMORY, ESSENTIALLY?

19   A.   THAT'S CORRECT.

20   Q.   I THINK YOU ALSO TESTIFIED THAT YOU PUT THE TV INTO HIS

21   ROOM THINKING THAT THAT COULD BE SOME STIMULATION FOR HIM;

22   RIGHT?

23   A.   IT'S SOMETHING TO DO.

24   Q.   AND HE ASKED THAT IT BE REMOVED FROM THE ROOM?

25   A.   THAT'S CORRECT.

1  Q.   AND CAN YOU TELL US AGAIN WHAT IT WAS HE SAID FROM YOUR

2  MEMORY?

3  A.   HE SAID HE WAS UNCOMFORTABLE WITH IT BEING IN HIS ROOM.

4  Q.   I THOUGHT YOU ALSO SAID IT WAS TALKING TO HIM.

5  A.   I ACTUALLY HEARD THAT FROM ONE OF MY COLLEAGUES, THAT HE

6  WAS RECEIVING MESSAGES FROM THE TV.  I DIDN'T SAY THAT.  HE

7  DIDN'T SAY THAT TO ME.

8  Q.   AND YOUR COLLEAGUES, WOULD THEY HAVE NOTED THAT IN THE

9  RECORD?

10  A.   I DON'T KNOW.  I CAN LOOK.  IT'S DR. PRESTON THAT TOLD ME

11  THAT.

12  Q.   SO YOU REMOVED THE TV?

13  A.   THE OFFICERS REMOVED THE TV.

14  Q.   ACTUALLY, WASN'T IT THE RADIO THAT WAS INSERTING THOUGHTS

15  INTO HIS HEAD?

16  A.   THAT WAS ALSO OCCURRING.

17  Q.   NOW, THAT'S NOTED IN THE RECORD; RIGHT?

18  A.   YES.

19  Q.   THAT'S IN THE RECORDS, BUT WE DON'T THINK DR. PRESTON'S

20  COMMENT IS OR CAN YOU FIND IT?  IT WOULD BE AROUND THE 28TH,

21  WOULDN'T IT?

22  A.   NO.

23  Q.   JUNE 28TH.

24  A.   IT COULD HAVE BEEN --

25  Q.   YOUR NOTE ABOUT REMOVING THE TV IS JUNE 28TH.

88

1    A.   I THINK IT'S MAY.

2         THE TELEVISION WAS PLACED IN HIS ROOM ON JUNE 23RD.

3    THAT'S WHAT MY NOTE SAYS.

4         THERE SHOULD BE A NOTE WITH A DIRECT QUOTE FROM HIM.

5    Q.   THAT'S JUNE 28TH, YOUR NOTE.

6         DO YOU SEE YOUR NOTE OF JUNE 28TH AT 2:30 P.M.?

7    A.   ACTUALLY, YOU MAY HAVE A DIFFERENT NOTE.  MY NOTE SAYS

8    JUNE 23RD, 2011, "MR. LOUGHNER IMMEDIATELY CAME TO THE DOOR

9    AND TALKED TO ME.  I TALKED TO HIM HE WAS PROVIDED WITH A

10   TELEVISION TODAY."  THAT'S THE FIRST NOTE.

11   Q.   THE SECOND ONE THAT MENTIONS THE TV AT ALL IS THE 28TH AT

12   2:30 P.M.?

13   A.   THE NOTE WITH THE DIRECT QUOTE FROM HIM, HE'S

14   UNCOMFORTABLE BEING IN THE ROOM, IS DATED JUNE 28TH.

15   Q.   AT 2:30 P.M.; RIGHT?

16   A.   MY NOTES ARE REALLY BLURRY.  IT LOOKS LIKE IT'S 1430,

17   WHICH IS 2:30.

18   Q.   SO SOMEWHERE BETWEEN THE 23RD AND THE 28TH, HE WOULD HAVE

19   TOLD DR. PRESTON THAT THE TV WAS INSERTING THOUGHTS INTO HIS

20   HEAD?

21   A.   I DON'T THINK HE SAID IT AT THAT TIME.  IT WAS WHEN SHE

22   WAS COVERING FOR ME WHEN SHE PLACED HIM ON SUICIDE WATCH,

23   WHICH WAS -- SHE PLACED HIM ON SUICIDE WATCH JULY 8TH.

24         THE COURT:  MS. CLARKE, IS THIS A CONVENIENT TIME

25   FOR US TO TAKE A BRIEF RECESS?  WE'VE BEEN GOING A LITTLE OVER

1   TWO HOURS.  IT'S 1:03.

2                  1:15?

3              MS. CLARKE:  THAT WOULD BE FINE.

4              THE COURT:  WE'RE IN RECESS UNTIL 1:15.

5                      (RECESS)

6              THE COURT:  WE'RE BACK ON THE RECORD IN THE MATTER

7   OF UNITED STATES VERSUS LOUGHNER.  DR. PIETZ IS STILL ON THE

8   WITNESS STAND.  MR. LOUGHNER IS PRESENT.  ALL COUNSEL ARE

9   PRESENT.

10             MS. CLARKE, YOU MAY CONTINUE.

11                 **CROSS EXAMINATION (CONTINUED)**

12  **BY MS. CLARKE:**

13  Q.   I THINK WE WERE TALKING ABOUT DR. PRESTON HAVING TALKED

14  TO MR. LOUGHNER ABOUT THE TELEVISION INSERTING THOUGHTS INTO

15  HIS HEAD; CORRECT?

16  A.   THAT'S CORRECT.

17  Q.   DID YOU EVER FIND A NOTE TO THAT EFFECT?

18  A.   THERE'S A NOTE ABOUT THE RADIO.  THAT WAS THE

19  CONVERSATION THAT WE HAD WHEN I TOLD HER THAT HE WANTED THE TV

20  TAKEN OUT OF HIS ROOM.

21  Q.   AND THAT'S JUST NOT NOTED IN THE RECORD?

22  A.   RIGHT.

23  Q.   BUT THE RADIO INSERTING THOUGHTS IS NOTED IN THE

24  RECORDS?

25  A.   YES.

1  Q.   SO IS THERE ANY REASON THAT THE TV INSERTING THOUGHTS

2  WOULD NOT BE NOTED?

3  A.   NO, I CAN'T GIVE YOU A REASON FOR THAT.

4  Q.   BUT THAT MIGHT BE SOMETHING IMPORTANT TO KNOW; RIGHT?

5  A.   AGAIN, I DISAGREE WITH YOU.  THE FACT THAT HE EXPERIENCES

6  THOUGHT INSERTION, IT'S IRRELEVANT IF IT'S A RADIO OR TV.  HE

7  TOLD ME HE WAS UNCOMFORTABLE WITH THE TV BEING IN HIS ROOM,

8  WHICH ACTUALLY WAS AFTER THE -- I THINK THE TV WAS IN HIS ROOM

9  ON JULY 23RD.  HE MADE THAT COMMENT TO ME AFTER HE HAD MADE

10  COMMENTS ABOUT THE THOUGHT INSERTION REGARDING THE RADIO.

11  Q.   THE RADIO REMAINED IN THE ROOM; CORRECT?

12  A.   THAT'S CORRECT.

13  Q.   THE RADIO THAT WAS INSERTING THOUGHTS REMAINED IN THE

14  ROOM; RIGHT?

15  A.   YES.

16  Q.   THE TV THAT WAS INSERTING THOUGHTS WAS TAKEN OUT OF THE

17  ROOM?

18  A.   YES.

19  Q.   AND THE TV THAT WAS INSERTING THOUGHTS SIMPLY DIDN'T MAKE

20  IT TO THE DOCUMENTARY RECORD?

21  A.   YES.

22  Q.   SO AGAIN, WE'RE RELYING ON YOUR MEMORY AT THAT POINT?

23  A.   WELL, NO.  ACTUALLY, YOU'RE RELYING ON THE NOTE THAT I

24  MADE THAT SAID HE WAS UNCOMFORTABLE WITH THE TV BEING IN HIS

25  ROOM.

1    Q.   THAT'S NOT THE REASON WHY; RIGHT?

2    A.   I THINK THE REASON IS HE WAS UNCOMFORTABLE WITH IT.  HE

3    NEVER SAID TO ME, "THE TV IS INSERTING THOUGHTS IN MY HEAD."

4    HE SAID, "I'M UNCOMFORTABLE WITH IT BEING IN MY ROOM."

5    Q.   YOUR NOTE WAS, ON THE 28TH OF JUNE, "HE WOULD NOT

6    ELABORATE ON THIS COMMENT"?

7    A.   CORRECT.

8    Q.   MY POINT IS WE DON'T HAVE ANYWHERE IN THE DOCUMENTARY

9    RECORD ABOUT THE CONVERSATION WITH DR. PRESTON ABOUT THOUGHT

10   INSERTION FROM THE TV?

11   A.   CORRECT.

12   Q.   LET ME GO BACK TO YOUR -- YOU TALKED TO THE PROSECUTOR

13   ABOUT THE REPORT YOU WROTE IN MAY WHEN YOU -- IT WAS YOUR

14   OPINION THAT MR. LOUGHNER WAS INCOMPETENT ON BOTH PRONGS, BUT

15   YOU SORT OF MADE THEM INTO THREE PRONGS; IS THAT RIGHT?

16   A.   THE RECORD DATED MAY 2ND?

17   Q.   YES.

18   A.   YES.

19   Q.   NOW, YOU TOLD US TODAY AND YOU TOLD US IN THAT REPORT

20   THAT, IN YOUR OPINION, BECAUSE OF A SEVERE MENTAL DISEASE OR A

21   DEFECT, SCHIZOPHRENIA, UNDIFFERENTIATED SCHIZOPHRENIA,

22   MR. LOUGHNER WAS UNABLE TO HAVE A FACTUAL UNDERSTANDING OF THE

23   PROCEEDINGS; CORRECT?

24   A.   WHAT I ACTUALLY PUT IN MY REPORT IS THAT IT'S DIFFICULT

25   FOR ME TO ASCERTAIN IF HE HAD A FACTUAL UNDERSTANDING.

1    Q.    YOU WEREN'T SURE ABOUT THE FACTUAL UNDERSTANDING?

2    A.    CORRECT.

3    Q.    TODAY YOU'RE STILL NOT SURE ABOUT THE FACTUAL

4    UNDERSTANDING?

5    A.    CORRECT.

6    Q.    AND HE DID NOT HAVE A RATIONAL UNDERSTANDING OF THE

7    PROCEEDINGS; CORRECT?

8    A.    CORRECT.

9    Q.    BACK IN MAY; RIGHT?

10    A.    CORRECT.

11    Q.    OR TODAY?

12    A.    CORRECT.

13    Q.    AND THAT HE WAS -- BECAUSE OF THIS MENTAL DISEASE OR

14    DEFECT, SCHIZOPHRENIA, THAT HE WAS UNABLE TO ASSIST HIS

15    COUNSEL; RIGHT?

16    A.    CORRECT.

17    Q.    YOUR DETERMINATION WAS THAT HE WAS DIAGNOSED AS

18    SCHIZOPHRENIA, UNDIFFERENTIATED TYPE; CORRECT?

19    A.    YES.

20    Q.    AND PART OF WHAT YOU PUT IN YOUR REPORT -- ACTUALLY, IT'S

21    THE LAST PARAGRAPH OF PAGE 51.  I THINK THAT'S 3A1 IF YOU WANT

22    TO SEE IT.

23          YOU DESCRIBED THAT HE HAD DISORGANIZED THINKING.  I

24    BELIEVE IT'S AT THE BOTTOM PARAGRAPH.  I DON'T WANT TO MISLEAD

25    YOU.

1          DO YOU SEE THE BOTTOM PARAGRAPH ON PAGE 51?

2    A.   I ACTUALLY HAVE THE REPORT IN FRONT OF ME.

3          "AS A RESULT OF HIS CONDITION, MR. LOUGHNER

4    DEMONSTRATED DISORGANIZED THINKING AND PROMINENT DELUSIONS."

5    Q.   RIGHT.

6          FIRST YOU SAID HE SUFFERS FROM MENTAL DISEASE,

7    SCHIZOPHRENIA UNDIFFERENTIATED TYPE; CORRECT?

8    A.   YES.

9    Q.   "AS A RESULT OF THIS CONDITION, MR. LOUGHNER DEMONSTRATES

10   DISORGANIZED THINKING AND PROMINENT DELUSIONS."

11        NOW, CAN YOU DESCRIBE FOR US AND FOR THE JUDGE WHAT

12   THE DISORGANIZED THINKING WAS.

13   A.   WELL, AS I SAID EARLIER, WHEN -- IT'S SORT OF A WORD

14   SALAD COMMUNICATION STYLE.  HE WOULD RUN WORDS TOGETHER THAT

15   WERE NONSENSICAL.  THERE WERE TIMES WHEN I WOULD SAY TO HIM,

16   "MR. LOUGHNER, I DON'T KNOW WHAT YOU'RE TELLING ME."

17        I THINK THAT'S DEMONSTRATED IN THE VIDEO AND SOME OF

18   THE VIDEO RECORDINGS THAT I MADE, SOME OF THE INTERVIEWS I DID

19   WITH HIM.  THERE WERE TIMES WHEN YOU SIMPLY JUST COULD NOT

20   UNDERSTAND WHAT HE WAS TRYING TO TELL YOU.  THAT'S AN EXAMPLE

21   OF DISORGANIZED THINKING.

22   Q.   HE WAS ABLE TO GIVE YOU A FAIRLY LENGTHY SOCIAL HISTORY;

23   RIGHT?

24   A.   HE WAS.

25   Q.   IN A NOT SO DISORGANIZED WAY?

1    A.    AT TIMES, YES.

2    Q.    IS THERE A TOPIC AROUND WHICH HE WOULD DISORGANIZE?

3    A.    THE FIRST TIME THAT I INTERVIEWED HIM, IT WOULD HAVE TO

4    DO WITH WHENEVER WE TALKED ABOUT THE ACTUAL OFFENSE.  BUT

5    THERE WAS ALSO TIMES WHEN WE WOULD TALK ABOUT HIS PERSONAL

6    HISTORY WHERE HE WOULD TELL ME THE STORY -- FOR EXAMPLE, WHEN

7    HE TALKED ABOUT HIS EMPLOYMENT AT EDDIE BAUER AND SOME OF THE

8    INCIDENTS THAT HAPPENED THERE, IT JUST DIDN'T MAKE SENSE WHAT

9    HE WAS TRYING TO TELL ME ABOUT HIS EMPLOYMENT THERE.

10   Q.    WHAT WAS THAT?

11   A.    SPECIFICALLY?

12   Q.    YES.

13   A.    I WOULD HAVE TO REFER TO MY NOTES.

14   Q.    OKAY.

15   A.    WELL, I GAVE MY NOTES UP TO BE COPIED.

16   Q.    IS IT IN YOUR REPORT?

17   A.    IT COULD BE.

18          MS. FELDMEIER:  YOUR HONOR, IF I MAY, I'M PRODUCING

19   THE COURT NOTES OF DR. PIETZ.

20          THE WITNESS:  THESE ARE MY PERSONAL NOTES?

21          MS. FELDMEIER:  YES.

22          I'M SORRY TO STEP ON THE DEFENSE'S CASE, BUT MAYBE

23   WE SHOULD MARK THESE AS AN EXHIBIT SINCE THEY'RE BEING

24   REFERRED TO.

25          WE'LL MARK THEM AS EXHIBIT 9.

1          THE WITNESS:  SO, FOR EXAMPLE, UNFORTUNATELY, THESE

2     AREN'T NUMBERED.  ON MARCH 29TH WHEN HE TOLD ME ABOUT HIS --

3     HIS JOB INTERVIEW WITH EDDIE BAUER, "MY DRESS WAS DRESS SHOES,

4     BLACK PANTS, AND A COLLARED SHIRT AND TIE.  MY HAIR WAS CUT

5     REALLY SHORT."

6          HE GOES ON TO TALK ABOUT WHY HE -- BEING EXCITED

7     ABOUT GETTING THE JOB, WHICH TO ME THAT'S NOT AN EXAMPLE OF

8     THE SORT OF THING -- HE SAID, "I DID GET THE JOB --

9     BY MS. CLARKE:

10    Q.   COULD I JUST APPROACH SO I KNOW WHERE WE ARE?

11         DR. PIETZ, I'D LIKE TO COMPLIMENT YOU ON YOUR

12    HANDWRITING.  IN YOUR PERSONAL NOTES, IT'S A LOT BETTER THAN

13    YOUR HANDWRITING IN YOUR PROGRESS NOTES.  WE COULD HAVE YOU

14    IMPROVE IN THAT AREA.

15    A.   SO AT THE END WHEN -- THIS WAS WHY HE LOST THE JOB.

16    "WHEN I SIGNED THE SHEET AT THE BEGINNING OF MY EMPLOYMENT,

17    THERE WAS A NOTATION AT-WILL."  THEN I HAVE NO IDEA WHAT HE

18    SAID.  EVEN -- I ACTUALLY REVIEWED THE TAPE AND HAD NO IDEA

19    WHAT HE WAS SAYING.

20         "DESCRIBED CHILDREN POSSIBLY SHOPLIFTING, THEN

21    STATED HE WAS LET GO BECAUSE HE SUSPECTED A SHOPLIFTER AND DID

22    NOT HAVE ENOUGH FRIENDS TO PURCHASE ITEMS FOR AN EVENT."

23    Q.   THAT DIDN'T MAKE ANY SENSE TO YOU?

24    A.   NO.

25    Q.   SO YOU SAW THAT AS EVIDENCE OF HIS DISORGANIZED THINKING?

1    A.   YES.

2    Q.   AND A SYMPTOM OF THE SCHIZOPHRENIA?

3    A.   CORRECT.

4    Q.   NOW, HE'S ALSO PERIODICALLY TALKED ABOUT THE PIMA

5    COLLEGE, RIGHT, AND HIS CONCERNS ABOUT WHAT HAPPENED TO HIM AT

6    PIMA COLLEGE?

7    A.   YES.

8    Q.   WOULD YOU ALSO DESCRIBE HIS DESCRIPTIONS OF WHAT HAPPENED

9    AT PIMA COLLEGE AS DISORGANIZED THINKING?

10   A.   THERE ARE TIMES WHEN IT'S AN EXAMPLE OF DISTORTED

11   THINKING, AND THERE ARE TIMES WHEN IT, I THINK, REPRESENTS A

12   MISUNDERSTANDING OF WHAT HAS HAPPENED.

13   Q.   SO IT'S DIFFERENT TO BE -- NOT UNDERSTANDING WHAT HE'S

14   SAYING ABOUT EDDIE BAUER, BUT THEN WHAT HE'S SAYING ABOUT PIMA

15   COLLEGE IS DIFFERENT TO YOU?

16   A.   AGAIN, THERE WERE TIMES WHEN HE DESCRIBES WHAT HAPPENED

17   AT PIMA COMMUNITY COLLEGE WHERE IT REPRESENTED THE SORT OF

18   THING -- THERE WERE TIMES WHEN HIS UNDERSTANDING OF WHAT

19   OCCURRED WAS DIFFERENT THAN WHAT ACTUALLY OCCURRED.

20        WHAT I'M SAYING IS IT MAKES SENSE TO ME.  HIS

21   EXPLANATION OF WHAT HAPPENED MADE SENSE TO ME.  IT JUST WASN'T

22   INACCURATE.

23   Q.   IS IT BECAUSE MAYBE YOU'VE HEARD IT SO MANY TIMES?

24   A.   THAT'S A POSSIBILITY.  IT'S ALSO POSSIBLE THAT HE'S

25   BETTER ABLE TO DESCRIBE THE INCIDENT.

1    Q.    THE DISORGANIZED THINKING THAT YOU DESCRIBED IN MAY

2    RANGED FROM WORD SALAD -- CAN YOU TELL US WHAT WORD SALAD IS?

3              THAT'S WHEN NOTHING, BASICALLY -- NO WORDS CONNECT;

4    CORRECT?

5    A.    RIGHT.  AS I EXPLAINED EARLIER, YOU JUST GO TOSS WORDS

6    TOGETHER.  THEY DON'T MAKE SENSE.  THERE'S NO CONNECTION, AND

7    YOU LEAVE THE CONVERSATION THINKING "I DON'T KNOW WHAT HE JUST

8    SAID TO ME."

9    Q.    SO YOU WERE SITTING IN THE ROOM WITH HIM AND HE -- AFTER

10   SOME SILENCE SAID, "ELECTRIC SOCKET, TELEVISION, BLINDS,

11   CHAIR."

12             WOULD THAT BE WORD SALAD?

13   A.    THAT COULD BE AN EXAMPLE.  USUALLY IT'S IN RESPONSE TO A

14   QUESTION.

15   Q.    IF THERE'S NO QUESTION PENDING AND THAT KIND OF

16   CONVERSATION CAME OUT OF HIM, THAT WOULD BE WHAT YOU'D SAY IS

17   WORD SALAD?

18   A.    IT COULD BE.

19   Q.    IT WOULD BE DISORGANIZED THINKING?

20   A.    YES.

21   Q.    MAYBE NOT RISING TO WORD SALAD, BUT IT WOULD AT LEAST

22   FALL IN THE CATEGORY OF DISORGANIZED THINKING?

23   A.    YES.

24   Q.    SO DISORGANIZED THINKING, IS THAT A PRIMARY SYMPTOM OF

25   SCHIZOPHRENIA?  IS IT COGNITIVE IMPAIRMENT?  WHAT IS IT?

98

1   A.   IT'S A COGNITIVE SYMPTOM OF SCHIZOPHRENIA.  IT CAN ALSO

2   BE ONE OF THE CRITERIA FOR UNDIFFERENTIATED SCHIZOPHRENIA.

3   Q.   THE DISORGANIZED THINKING?

4   A.   YES.

5   Q.   YOU ALSO DESCRIBED THAT HE HAD -- WELL, LET ME ASK YOU

6   THIS:  THE DISORGANIZED THINKING, YOU SAID, STILL EXISTS

7   TODAY?

8   A.   YES.

9   Q.   YOU ALSO DESCRIBED IN MAY THAT HE HAD PROMINENT DELUSIONS

10  WHICH YOU FOUND TO BE A SIGNIFICANT BARRIER.  THAT'S ON THAT

11  SAME PAGE.

12  A.   YES.

13  Q.   IS THAT CORRECT?

14  A.   YES.

15  Q.   AND THE DELUSIONS EXIST TODAY?

16  A.   YES.

17  Q.   YOU ALSO TOLD US EARLIER TODAY AND I THINK IN YOUR MAY

18  REPORT THAT THERE WAS VERY STRONG LIKELIHOOD DURING THE FIRST

19  EVALUATION THAT HE WAS RESPONDING TO INTERNAL STIMULI?

20  A.   YES.

21  Q.   YOU DESCRIBED IT TO THE PROSECUTOR AS HEARING VOICES OR

22  SEEING PEOPLE OR IMAGINARY FRIENDS THAT AREN'T THERE;

23  CORRECT?

24  A.   THE IMAGINARY FRIENDS MIGHT BE ADDITIONAL HALLUCINATIONS

25  AS WELL.

1    Q.   SO THAT WOULDN'T BE INTERNAL STIMULI?

2    A.   IT CAN STILL BE INTERNAL STIMULI.

3    Q.   THAT'S WHAT YOU REFER TO WHEN YOU SAY ATTENDING TO

4    INTERNAL STIMULI?  EITHER HE'S SEEING SOMETHING THAT'S NOT

5    THERE OR HE'S HEARING SOMETHING THAT'S NOT THERE?

6    A.   YES.

7    Q.   AND DO YOU BELIEVE THAT'S GONE TODAY?

8    A.   AS I TESTIFIED EARLIER, NO ONE HAS OBSERVED HIM ATTENDING

9    TO INTERNAL STIMULI.  I'VE ASKED HIM IF HE'S HEARING VOICES,

10   AND HE'S RESPONDED, "NO."  BUT I DON'T KNOW IF THAT'S

11   CREDIBLE.

12          WHAT I DO KNOW IS PRIOR TO MEDICATION, PEOPLE

13   CONSISTENTLY OBSERVED HIM ATTENDING TO INTERNAL STIMULI.

14   SINCE BEING MEDICATED, IT'S NOT BEING OBSERVED.

15   Q.   SINCE BEING MEDICATED, HE MOST OFTEN LOOKS AS HE LOOKS IN

16   THE COURTROOM TODAY?

17   A.   WELL, THERE HAVE BEEN TIMES WHEN HE'S SMILED.  THERE HAVE

18   BEEN TIMES WHEN HE'S LAUGHED.  HE OFTEN APPEARS DEPRESSED, BUT

19   HE DOESN'T ALWAYS APPEAR DEPRESSED.

20   Q.   MOST OF THE TIME EXPRESSIONLESS?

21   A.   YES.

22   Q.   NOW, THE MEDICATIONS THEMSELVES DO THAT; RIGHT?

23   A.   THEY CAN SEDATE HIM, YES.

24   Q.   AND RENDER YOU EXPRESSIONLESS?

25   A.   THEY CAN.

1    Q.    AND RENDER YOU JUST SORT OF INERT?

2    A.    I DON'T KNOW THAT THEY WOULD DO THAT.  SOME OF THE

3    MEDICATIONS CAN ACTUALLY SEDATE YOU, AND THAT'S A CONCERN WE

4    HAD A COUPLE WEEKS AGO, WHICH IS WHY DR. SARRAZIN CHANGED HIS

5    MEDICATIONS A BIT.  THAT MIGHT GIVE THE APPEARANCE THAT YOU'RE

6    SEEING.

7    Q.    SO IT WOULD BE HARD TO SAY WHAT HE'S ATTENDING TO BECAUSE

8    HE DOESN'T APPEAR TO BE HERE, PRESENT?

9    A.    WITHOUT TALKING TO HIM, I WOULDN'T KNOW THAT.  I DON'T

10   KNOW THE ANSWER TO THAT QUESTION.

11   Q.    YOU CAN'T TELL FROM A FACIAL EXPRESSION?

12   A.    NO.

13   Q.    IT WAS A FACIAL EXPRESSION THAT ALERTED YOU TO ATTENDING

14   TO VOICES OR HALLUCINATIONS?

15   A.    NO, IT WASN'T A FACIAL EXPRESSION.  IT WAS ACTUALLY A

16   BEHAVIOR.  HE WOULD LOOK UP, LAUGH.

17   Q.    AND SAY SOMETHING?

18   A.    SOMETIMES SAY SOMETHING, YES.

19   Q.    OR TALK ABOUT HAVING IMAGINARY FRIENDS?

20   A.    YES.

21   Q.    NOW, THERE WAS WHAT YOU REFER TO AS A HARPER HEARING ON

22   SEPTEMBER 15TH OR SOMEWHERE AROUND IN THERE; IS THAT RIGHT?

23   A.    THERE HAVE BEEN THREE HARPER HEARINGS.

24         SO WOULD THAT HAVE BEEN THE LAST ONE?

25   Q.    YES.  LET ME JUST PULL UP THE RELEVANT PART.  I THINK

1    IT'S 50A, THE REPORT DATED THE 21ST OF SEPTEMBER.

2           DO YOU HAVE THAT?

3    A.   IS THAT DR. TOMELLERI'S RECENT REPORT?

4    Q.   YES.

5    A.   I DO NOT HAVE A COPY OF HIS REPORT.

6    Q.   I'M GOING TO SHOW YOU ON THE SCREEN ONE OF THE PAGES OF

7    THAT REPORT OF THE 21ST OF SEPTEMBER.

8           AT THE TOP OF THE PAGE, HE SPOKE -- IT'S ABOUT

9    FOUR LINES -- THREE LINES DOWN.  HE SPOKE ABOUT NOT DREAMING.

10   DO YOU SEE THAT?

11   A.   YES.

12   Q.   THIS IS ON THE 15TH OF SEPTEMBER; RIGHT?

13   A.   YES.

14           MS. CLARKE:  DO YOU WANT TO ENLARGE THAT, MARK.

15   BY MS. CLARKE:

16   Q.   HE SPOKE ABOUT NOT DREAMING AND ABOUT HAVING IMAGINARY

17   FRIENDS WITH WHOM HE MAINTAINS DIALOGUES; RIGHT?

18   A.   CORRECT.

19   Q.   THAT WAS AT THE HARPER HEARING ON SEPTEMBER THE 15TH?

20   A.   I DON'T KNOW IF THAT'S THE EXACT DATE, BUT IT WAS AT THE

21   HARPER HEARING, YES.

22   Q.   THIS LAST HARPER, THE THIRD ONE, THAT GAVE RISE TO THE

23   SEPTEMBER 21ST REPORT?

24   A.   YES.

25   Q.   HE DID NOT GO INTO DETAIL ABOUT THE CONTENT OF SUCH

1    DIALOGUES; CORRECT?

2    A.   YES.

3    Q.   SO AS OF THE MIDDLE OF SEPTEMBER, HE WAS TALKING ABOUT

4    HIS IMAGINARY FRIENDS; RIGHT?

5    A.   YES.

6    Q.   THAT WOULD INDICATE CONTINUING TO HAVE THIS INTERNAL

7    STIMULI; RIGHT?

8    A.   IT WOULD INDICATE THAT IT COULD BE VISUAL HALLUCINATIONS

9    AND AUDITORY HALLUCINATIONS.

10   Q.   CONTINUING?

11   A.   YES.

12            MS. CLARKE:  WERE YOU ABLE TO FIND 1717?

13            I'LL COME BACK TO IT.

14   BY MS. CLARKE:

15   Q.   THERE'S ANOTHER NOTE -- MAYBE YOU HAVE IT -- ON THE 4TH

16   OF SEPTEMBER.  IT'S ONE OF THE LOGS THAT NOTES THE TIME EVERY

17   15 MINUTES.

18   A.   THE SUICIDE LOG?

19   Q.   I BELIEVE THAT'S WHAT IT WOULD BE.

20   A.   I ACTUALLY DON'T HAVE A COPY OF THE SUICIDE LOG.

21   Q.   MAYBE I'LL COME BACK TO THAT WHEN WE'VE HAD A CHANCE TO

22   FIND THAT.

23            BACK IN MAY, THEN, YOU FOUND THIS DISORGANIZED

24   THINKING, WHICH WAS A COGNITIVE DISORDER, PART OF THE

25   SCHIZOPHRENIA; RIGHT?

1    A.    YES.

2    Q.    THE SYMPTOM THAT HE HAD THEN THAT HE STILL HAS; RIGHT?

3    A.    YES.

4    Q.    AND YOU FOUND PROMINENT DELUSIONS THEN, AND HE STILL HAS

5    THEM NOW; RIGHT?

6    A.    YES.

7    Q.    AND YOU FOUND THEN THAT THERE WAS A STRONG LIKELIHOOD OF

8    ATTENDING TO INTERNAL STIMULI.

9           AND IT LOOKS LIKE HE SAYS IN THE MIDDLE OF

10   SEPTEMBER, HE'S STILL ATTENDING TO SOME KIND OF INTERNAL

11   STIMULI; CORRECT?

12   A.    HE SAID HE STILL COULD BE ATTENDING TO THEM, YES.

13   Q.    AND THE PACKAGE OF ALL THOSE SYMPTOMS THAT EXISTED THEN

14   PREVENTED HIS MEANINGFUL COMMUNICATION WITH COUNSEL; RIGHT?

15   A.    YES.

16   Q.    PREVENTED HIS RATIONAL UNDERSTANDING OF THE

17   PROCEEDINGS?

18   A.    YES.

19   Q.    LIKELY AFFECTED HIS FACTUAL UNDERSTANDING OF THE

20   PROCEEDINGS?

21   A.    YES.

22   Q.    I THINK BACK THEN WHEN YOU FOUND HIM INCOMPETENT, YOUR

23   OPINION WAS RENDERED TO THE JUDGE BECAUSE THE JUDGE MAKES THE

24   FINDINGS THAT HE WAS INCOMPETENT TO STAND TRIAL.

25          YOU ALSO FOUND THAT HE WAS NOT COMPETENT TO

1    UNDERSTAND THE DISCIPLINARY PROCEEDINGS THAT HAD BEEN ENGAGED

2    AGAINST HIM AND NOT RESPONSIBLE FOR HIS ACTIONS.

3              DO YOU RECALL THAT?

4    A.   YES.

5    Q.   AND THAT WAS THE INCIDENT, THE SPITTING INCIDENT, THAT

6    YOU REFERRED TO?

7    A.   YES.

8    Q.   SO BACK IN APRIL, I GUESS IT WAS, EARLY APRIL, I THINK

9    THAT HAPPENED, HE WAS NOT ONLY NOT COMPETENT TO UNDERSTAND THE

10   DISCIPLINARY PROCEEDINGS, BUT NOT RESPONSIBLE FOR HIS ACTIONS;

11   CORRECT?

12   A.   YES.

13   Q.   WHEN YOU WERE FINDING HIM INCOMPETENT TO STAND TRIAL ON

14   THE LARGER PICTURE, NOT THE DISCIPLINARY PICTURE, DO YOU

15   BELIEVE THAT ALSO HE WAS NOT RESPONSIBLE FOR ACTIONS THAT

16   OCCURRED SINCE HE'S HAD THIS SCHIZOPHRENIA AND THESE

17   SYMPTOMS?

18             MS. FELDMEIER:  OBJECTION, YOUR HONOR.  WELL BEYOND

19   THE SCOPE.

20             THE COURT:  SUSTAINED.

21   BY MS. CLARKE:

22   Q.   TO RESTORE HIS COMPETENCY TO STAND TRIAL, YOU'D HAVE

23   TO -- THESE SYMPTOMS WOULD HAVE TO ABATE; RIGHT?

24   A.   NOT NECESSARILY.  THERE ARE INDIVIDUALS THAT CAN BE

25   DELUSIONAL, THERE ARE INDIVIDUALS THAT CAN BE DEPRESSED AND

1    CAN STILL BE COMPETENT TO STAND TRIAL.  AND THERE ARE

2    INDIVIDUALS THAT CAN STILL BE ACTIVELY PSYCHOTIC AND BE

3    COMPETENT TO STAND TRIAL.

4    Q.    SO INDIVIDUALS THAT HAVE DISORGANIZED THINKING ON A SCALE

5    OF HIS DISORGANIZED THINKING AND PROMINENT DELUSIONS AND

6    ATTENDANCE TO INTERNAL STIMULI YOU BELIEVE COULD STILL BE

7    COMPETENT TO STAND TRIAL?

8    A.    I DO NOT BELIEVE HE'S COMPETENT TO STAND TRIAL TODAY.

9    Q.    IN ORDER FOR HIM TO BE FOUND COMPETENT TO STAND TRIAL, IN

10   YOUR OPINION, THOSE SYMPTOMS WOULD JUST HAVE TO GO AWAY A

11   LITTLE BIT OR ABATE?

12   A.    THAT'S A DIFFICULT QUESTION.  THE QUESTION GOES TO, FOR

13   EXAMPLE, DELUSIONS.  HOW DO THE DELUSIONS IMPACT HIS RATIONAL

14   UNDERSTANDING?  AND THERE HAVE BEEN INDIVIDUALS THAT, IN MY

15   OPINION, CONTINUE TO BE DELUSIONAL THAT I HAVE FOUND COMPETENT

16   TO STAND TRIAL, AND COURTS HAVE AGREED WITH MY OPINION,

17   BECAUSE THEY'RE ABLE TO REFRAIN FROM TALKING ABOUT THEIR

18   DELUSIONS TO IMPACT THAT PRONG OF COMPETENCY.

19         HIS PARTICULAR DELUSION ABOUT NOT TRUSTING HIS

20   ATTORNEYS, IN MY OPINION, HAS IMPROVED.  THE MERE FACT THAT HE

21   GOES AND VISITS WITH YOU ALL INDICATES THAT THAT'S IMPROVED.

22   PREVIOUSLY WHEN HE WAS UNWILLING TO GO IS BECAUSE HE WAS

23   PARANOID.

24   Q.    YOU HAVE NO IDEA WHAT THE CONTENT OF OUR COMMUNICATIONS

25   BEFORE MARCH THE 23RD WERE WITH HIM, THE CONTENT OF OUR

1    COMMUNICATIONS WITH HIM SINCE HE'S BEEN BACK?

2    A.    I'M NOT PRIVY TO THAT.

3    Q.    SO YOU DON'T KNOW WHETHER WE LEARNED THAT THERE ARE

4    CERTAIN THINGS YOU CANNOT TALK TO HIM ABOUT OR NOT?

5    A.    I DO NOT KNOW ANY OF THAT.

6    Q.    IF HIS THINKING CONTINUED TO BE AS DISORGANIZED AROUND

7    TOPICS THAT ARE HOT FOR HIM, WOULD HE BE ABLE TO RESTORE TO

8    COMPETENCY?

9    A.    DID YOU SAY, "HOT"?

10   Q.    YES, EMOTIONAL TOPICS.  TOPICS THAT ARE EMOTIONALLY LADEN

11   FOR HIM.

12   A.    CAN YOU REPEAT THE QUESTION.

13   Q.    IF HIS THINKING REMAINS AS DISORGANIZED AS IT CURRENTLY

14   IS AND EVEN WAS IN MAY IT WAS WORSE, RIGHT, WOULD HE BE ABLE

15   TO BE RESTORED TO COMPETENCY?

16   A.    IN MY OPINION, HE CAN BE RESTORED TO COMPETENCY.

17   Q.    IF HIS THINKING REMAINS AS DISORGANIZED AS IT IS?

18   A.    TODAY, HE'S NOT COMPETENT.  IF HE REMAINS HOW HE IS

19   TODAY, HE WILL NOT BE COMPETENT TO STAND TRIAL.

20   Q.    WHAT I'M TRYING TO DO IS TEASE OUT WHAT PARTS OF HOW HE

21   REMAINS TODAY, IN YOUR OPINION, AFFECT HIS COMPETENCE.

22             IF HE REMAINS AS DISORGANIZED IN HIS THINKING AS HE

23   IS TODAY --

24   A.    HE WOULD NOT BE COMPETENT.

25   Q.    WITH OR WITHOUT THE DELUSIONAL PROBLEMS?

1    A.   AGAIN, THE DELUSIONAL ISSUE GOES TO HOW DOES THAT IMPACT

2    HIS RATIONAL UNDERSTANDING AND PERCEIVING?  HOW DOES IT IMPACT

3    HIS ABILITY TO ASSIST COUNSEL?

4    Q.   I'M WITH YOU.  I UNDERSTAND WHAT YOU'RE SAYING.  I'M

5    TRYING TO DISTINGUISH OUT.

6             THE DISORGANIZED THINKING BY ITSELF, IF IT REMAINS

7    AS IT IS, IT WOULD RENDER HIM INCOMPETENT IN YOUR OPINION?

8    A.   YES.

9    Q.   REGARDLESS OF WHAT HAPPENS TO THE DELUSIONAL MATERIAL;

10   RIGHT?

11   A.   YES.

12   Q.   AND IF HE REMAINS DELUSIONAL, LET'S SAY, ABOUT THE VIDEO,

13   THE REENACTMENT OF THE VIDEO --

14             THAT'S THE PHRASE YOU USED; RIGHT?

15   A.   YES.

16   Q.   IF HE REMAINS DELUSIONAL ABOUT THAT VIDEO, DOES THAT

17   RENDER HIM INCOMPETENT TO STAND TRIAL?

18             MS. FELDMEIER:  OBJECTION, YOUR HONOR.

19             THE COURT:  OVERRULED.

20             DO YOU UNDERSTAND THE QUESTION?

21             THE WITNESS:  YES.

22             I'M GOING TO GIVE YOU A TYPICAL PSYCHOLOGY RESPONSE.

23             I THINK IT DEPENDS.  AGAIN, I DON'T KNOW WHAT HE

24   MEANS BY "REENACTMENT OF THE VIDEO."  UNTIL I UNDERSTAND WHAT

25   HE MEANS BY THAT, I CAN'T REALLY ANSWER THAT QUESTION.  THE

1    ONLY WAY I CAN UNDERSTAND THAT IS ACTUALLY TO SIT DOWN WITH

2    HIM AND HAVE HIM EXPLAIN, "WHAT ARE YOU SEEING WHEN YOU SEE

3    VIDEO?  HOW IS IT DIFFERENT FROM WHAT YOU THINK HAPPENED?"

4    BY MS. CLARKE:

5    Q.   WHAT WAS IT ABOUT THE REENACTMENT OF THE VIDEO BACK IN

6    MAY THAT MADE YOU INCLUDE THAT IN YOUR BELIEF THAT HE'S

7    INCOMPETENT?

8    A.   BECAUSE HE INDICATED THAT HIS ATTORNEYS HAD EDITED THE

9    VIDEO, THAT LAW ENFORCEMENT HAD EDITED THE VIDEO, THAT

10   POTENTIALLY THE PROSECUTING ATTORNEYS HAD EDITED THE VIDEO.

11             THE COURT:  I'M ON THE SAME PAGE AS YOU AND

12   MS. CLARKE.  I HAVEN'T SEEN THE VIDEO THAT'S BEING REFERRED

13   TO.

14             MY UNDERSTANDING IS THERE'S APPARENTLY A VIDEO THAT

15   WAS TAKEN BY ONE OF THE SECURITY CAMERAS AT THE SAFEWAY OF THE

16   INCIDENT ITSELF?

17             THE WITNESS:  YES.

18             THE COURT:  SO YOUR CONVERSATIONS WITH MR. LOUGHNER

19   IN REGARD TO THAT, HE HAD SEEN THAT VIDEO AT SOME POINT?

20   SOMEBODY HAD SHOWN IT TO HIM?

21             THE WITNESS:  LET ME JUST OFFER THIS CAVEAT:  I KNOW

22   HE'S SEEN VIDEO FOOTAGE.  I DON'T KNOW WHAT HE'S SEEN.

23             THE COURT:  WHEN YOU SAY "REENACTMENT," IS HE

24   TELLING YOU THAT THAT'S A REENACTMENT?  THAT'S NOT REALLY WHAT

25   HAPPENED?

1            THE WITNESS:  YES.

2            THE COURT:  THAT'S WHAT YOU SAY IS THE DELUSIONAL

3     THINKING?

4            THE WITNESS:  YES.

5            THE COURT:  THANK YOU.

6            MS. CLARKE.

7            MS. CLARKE:  THANK YOU, YOUR HONOR.

8            THE WITNESS:  I DIDN'T DO A VERY GOOD JOB OF

9     EXPLAINING THAT.

10            ACTUALLY, WHAT I THINK THE DELUSION IS IS THAT HE

11     BELIEVES -- HE'S PARANOID.  HE BELIEVES THAT LAW ENFORCEMENT

12     AND POTENTIALLY HIS ATTORNEYS HAVE ACTUALLY EDITED THE VIDEO

13     AND CHANGED THE FOOTAGE.

14            THE COURT:  HE BELIEVES -- OR HE'S EXPRESSED TO YOU

15     AT TIMES HE BELIEVES THE VIDEO IS NOT ACCURATE AND IT DOESN'T

16     DEPICT WHAT ACTUALLY OCCURRED AND SOMEBODY HAS DOCTORED IT?

17            THE WITNESS:  CORRECT.

18            THE COURT:  YOU REGARD THAT AS PART OF HIS

19     DELUSIONAL THINKING?

20            THE WITNESS:  YES.

21            THE COURT:  THANK YOU.

22     BY MS. CLARKE:

23     Q.   IF THAT DELUSION CONTINUES, THAT WILL CONTINUE, IN YOUR

24     OPINION, TO RENDER HIM INCOMPETENT TO STAND TRIAL?

25     A.   IF HE CONTINUES TO BELIEVE THAT PEOPLE HAVE EDITED THE

1    VIDEO, YES.

2    Q.    THAT IT'S A REENACTMENT AS OPPOSED TO AN ACTUAL --

3    A.    AGAIN, I DON'T KNOW WHAT HE MEANS BY "REENACTMENT."  I

4    WOULD HAVE TO CLARIFY THAT WITH HIM.  I DON'T KNOW.  I THINK

5    THIS IS ACTUALLY IN MY PROGRESS NOTE THAT WE HAD PLANNED TO

6    SIT DOWN TOGETHER AND WATCH THE VIDEO, THE COPY THAT I HAVE OF

7    THE VIDEO, AND HAVE HIM WALK ME THROUGH, "WHAT'S DIFFERENT?

8    WHAT DO YOU THINK HAS BEEN CHANGED IN THE VIDEO?"  I HAVEN'T

9    DONE THAT, SO I CAN'T ANSWER SOME OF YOUR QUESTIONS.

10   Q.    I'M WITH YOU.

11         I CALL IT BACK IN MAY, BUT IT WAS REALLY MARCH,

12   APRIL, AND MAY, YOU HAD CONVERSATIONS WITH HIM ABOUT WHAT HE

13   WOULD REFER TO AS THE REENACTMENT OF THE VIDEO.

14         I'M USING THE RIGHT PHRASE; RIGHT?

15   A.    YES.

16   Q.    REENACTMENT OF THE VIDEO?

17   A.    YES.

18   Q.    YOU NOTE THAT THROUGHOUT YOUR PROGRESS NOTES, REENACTMENT

19   OF THE VIDEO, AS SHORTHAND; RIGHT?

20   A.    YES.

21   Q.    THAT WAS THE CONVERSATION ABOUT THAT?

22   A.    YES.

23   Q.    THERE WERE CONVERSATIONS ABOUT THAT BACK IN MARCH, APRIL,

24   AND MAY; RIGHT?

25   A.    YES.

111

1    Q.    THE FIRST COMMITMENT.

2              AND YOU WERE NEVER ABLE TO PIN DOWN WHAT REENACTMENT

3    OF THE VIDEO WAS, WHETHER THE TAPE WAS 100 PERCENT FAKE AND

4    FAKED BY OTHER FORCES ESSENTIALLY; CORRECT?

5    A.    CORRECT.

6    Q.    AND SO WHAT YOU'RE TELLING US TODAY IS THAT YOU HAVEN'T

7    EXPLORED THAT ANY FURTHER THIS TIME?

8    A.    CORRECT.

9    Q.    MR. LOUGHNER IS STILL TALKING TO YOU -- OR HE BRINGS UP

10   THE REENACTMENT OF THE VIDEO; CORRECT?

11   A.    CORRECT.

12   Q.    EVEN AS LATE AS EARLY SEPTEMBER, HE WAS TALKING TO YOU

13   ABOUT THE REENACTMENT OF THE VIDEO; CORRECT?

14   A.    CORRECT.

15   Q.    THAT TO YOU IS A DELUSION; RIGHT?

16   A.    AGAIN, WHEN WE TALKED ABOUT THE REENACTMENT OF THE VIDEO,

17   HE DID NOT EXPRESS THE SECOND COMPONENT, WHICH IS IT WAS

18   EDITED BY LAW ENFORCEMENT.  AND IF YOU RECALL FROM OUR

19   PROGRESS NOTE, I INDICATED -- I ASKED HIM, "CAN WE WATCH THIS

20   VIDEO TOGETHER?"

21              HE SAID, "YES, AND I'LL DRAW YOU A PICTURE OF IT SO

22   YOU'LL UNDERSTAND IT."  HE DIDN'T ADD A SECOND PART OF IT.

23   Q.    DID YOU ASK?

24   A.    I DID ASK.  HE SAID, "I'LL DRAW A PICTURE OF IT FOR YOU."

25   Q.    TO HELP YOU UNDERSTAND?

1    A.    TO HELP ME UNDERSTAND IT.

2    Q.    TO YOU MEANING THAT IT WAS STILL FAKE?

3    A.    THAT'S -- THAT'S WHAT REENACTMENT MEANS.  I DON'T KNOW IF

4    THAT'S WHAT IT MEANS TO HIM.

5    Q.    YOU JUST HAVEN'T EXPLORED THAT YET?

6    A.    CORRECT.

7    Q.    BUT HE KEEPS TALKING TO YOU ABOUT THE REENACTMENT OF THE

8    VIDEO?

9    A.    HE'S MENTIONED IT A COUPLE OF TIMES.  WHEN HE'S MENTIONED

10   IT, I'VE DOCUMENTED IT IN MY NOTES.  I CAN'T SAY WITH ABSOLUTE

11   CERTAINTY HOW MANY TIMES HE'S ACTUALLY MENTIONED IT.

12   Q.    THERE ARE TIMES THAT HE'S MENTIONED IT THAT YOU HAVE NOT

13   DOCUMENTED IT?

14   A.    NO.

15   Q.    IN REACHING YOUR CONCLUSIONS BACK IN MAY, IF I COULD JUST

16   STAY THERE FOR ONE MORE MOMENT, YOU CONSIDERED HIS HISTORY;

17   CORRECT?

18   A.    CORRECT.

19   Q.    YOU CONSIDERED A WHOLE BUNCH OF REPORTS FROM PEERS AND

20   TEACHERS AND OTHERS THAT KNEW HIM; CORRECT?

21   A.    CORRECT.

22   Q.    AND YOU READ NUMEROUS WRITINGS AND DREAM JOURNALS?

23   A.    YES.

24   Q.    AND WATCHED VIDEOS THAT HE HAD MADE THAT I THINK WERE

25   PRODUCED TO YOU BY THE UNITED STATES; CORRECT?

1   A.   YES.

2   Q.   WE MAY HAVE ALSO SENT YOU COPIES OF THOSE TO LOOK AT.

3   A.   YES.

4   Q.   ONE OF THOSE VIDEOS IS THE ONE THAT'S BEEN ON YOUTUBE.

5          THE CONTENT IS ABOUT THE GENOCIDE OF STUDENTS AT

6   PIMA COLLEGE?

7   A.   THE ONE THAT HE TOOK AT PIMA COMMUNITY COLLEGE, YES.

8   Q.   AND BASED ON ALL OF THAT INFORMATION AND YOUR

9   INTERACTIONS WITH HIM, YOU CONCLUDED THAT HE HAD HAD ODD

10  BEHAVIOR AND THINKING SINCE HE WAS AN ADOLESCENT?

11  A.   YES.

12  Q.   THAT HE HAD GOTTEN INCREASINGLY ODD OVER THE LAST

13  TWO YEARS, INCLUDING DELUSIONS OF PERSECUTION BY 2009;

14  RIGHT?

15  A.   YES.

16  Q.   AND HE HAD REPORTED HEARING VOICES AS EARLY AS 2008?

17  A.   YES.

18  Q.   THAT BY LATE 2010, IT WAS DIFFICULT TO MAINTAIN ANY

19  CONVERSATION WITH HIM; CORRECT?

20  A.   CORRECT.

21  Q.   THAT THE DEPRESSION HAD BEEN NOTICED AS A SYMPTOM IN

22  2006?

23  A.   YES.

24  Q.   SOME FIVE YEARS EARLIER.

25          THAT OVERALL, THERE HAD BEEN SEVERE -- I THINK YOUR

1    WORDS WERE SEVERE DECLINE IN HIS FUNCTIONING OVER THE LAST

2    FOUR YEARS?

3    A.    YES.

4    Q.    WITH AN ULTIMATE CONCLUSION BEING THAT THERE WERE SIGNS

5    OF SCHIZOPHRENIA SINCE AT LEAST 2008?

6    A.    YES.

7    Q.    AND I THINK I TOLD YOU IT SAID POSSIBLY BEFORE THAT

8    TIME?

9    A.    YES.

10   Q.    BY THE TIME THAT YOU SAW MR. LOUGHNER IN MARCH OF 2011,

11   HE HAD BEEN SUFFERING FROM A DEBILITATING MENTAL ILLNESS,

12   SCHIZOPHRENIA, PROBABLY FOR THREE YEARS?

13   A.    IN MY OPINION, YES.

14   Q.    IF NOT LONGER?

15   A.    YES.

16   Q.    WITH THE SYMPTOMS THAT YOU HAVE DESCRIBED FOR US; THE

17   DISORGANIZED THINKING, THE HALLUCINATIONS, THE VOICES,

18   INTERNAL STIMULI; RIGHT?

19   A.    YES.

20   Q.    AND YET DURING THE FIRST COMMITMENT -- THAT'S THE MAY

21   TIME FRAME, APRIL, MAY TIME FRAME -- AT TIMES YOU NOTED THAT

22   HE COMMUNICATED IN A COHERENT FASHION; RIGHT?

23   A.    DURING HIS FIRST EVALUATION?

24   Q.    YES.

25   A.    YES.

1   Q.   NOW, YOU SAY FIRST EVALUATION.

2        THAT WAS THE COMMITMENT?

3   A.   THE 4241 COMPETENCY EVALUATION.

4   Q.   AND YOU SAID THAT SOMETIMES HE DIDN'T ANSWER QUESTIONS,

5   BUT ALMOST ALWAYS HE WOULD ANSWER THEM LATER IN THE

6   CONVERSATIONS; RIGHT?

7   A.   MOST OF THE QUESTIONS I ASKED HIM, HE WOULD DO THAT.

8   Q.   YOU CALLED SOME OF HIS RESPONSES UNUSUAL; RIGHT?

9   A.   YES.

10  Q.   AND IS UNUSUAL DIFFERENT FROM DELUSION?

11  A.   YES.

12  Q.   HOW DO YOU DIFFERENTIATE?

13  A.   ANOTHER WORD I GUESS YOU COULD USE IS ECCENTRIC.  HE

14  SOMETIMES GAVE ECCENTRIC RESPONSES TO THINGS.  AND I THINK

15  THERE WERE TIMES -- I CAN'T THINK OF AN EXAMPLE OFF THE TOP OF

16  MY HEAD -- WHERE HE WOULD TALK LIKE AN ADOLESCENT.

17  ADOLESCENTS, WHEN YOU TALK TO THEM, SOMETIMES THEY USE WORDS

18  THAT THEY KNOW WHAT THEY MEAN, BUT I DON'T KNOW WHAT THEY

19  MEAN.

20  Q.   LIKE?

21  A.   LIKE TEXT MESSAGES, THE LOL, I DIDN'T KNOW -- WASN'T SURE

22  WHAT THAT MEANT UNTIL I HAD TO CALL MY NIECE AND ASK HER,

23  "WHAT DO YOU MEAN, LOL?"

24  Q.   YOU COULD PERHAPS WRITE THAT DOWN FOR ME AS WELL.

25  A.   HE WOULD DO THAT SOMETIMES.  HE WOULD JUST GIVE -- I

1    THINK IN MY NOTES --

2    Q.    YOU CALLED THAT UNUSUAL?

3    A.    NO, I DON'T THINK THAT'S UNUSUAL.  HE HAD -- SOMETIMES

4    HAD A LANGUAGE WITH HIS FRIENDS WHERE THEY TALKED -- THEY

5    UNDERSTOOD EACH OTHER.  IT WAS UNUSUAL TO ME.  IT WAS ATYPICAL

6    FOR ME, BUT NOT ATYPICAL FOR THEM.

7    Q.    I DON'T THINK YOU DESCRIBED HIM AS ATYPICAL OR

8    TEENAGE-LIKE.  YOU DESCRIBED HIM AS UNUSUAL.

9    A.    UNUSUAL, YES.

10   Q.    UNUSUAL FOR A 22-YEAR-OLD OR UNUSUAL FOR --

11   A.    LET ME SEE IF I CAN FIND AN EXAMPLE NOW THAT I HAVE MY

12   NOTES IN FRONT OF ME.

13             OKAY.  SO WHEN HE WAS EXPLAINING HIS HIGH SCHOOL

14   YEARS, HE SAID, "I THINK THERE'S CHILD ABUSE."  I DON'T THINK

15   THAT'S DELUSIONAL.  IT DOESN'T MEET THE CRITERIA OF WHAT MY

16   UNDERSTANDING OF DELUSIONAL IS.  THAT'S AN UNUSUAL COMMENT FOR

17   SOMEONE TO MAKE, "I THINK THERE'S CHILD ABUSE."  ON

18   MARCH 28TH, ON THE THIRD PAGE.

19             BUT THEN HE GOES ON -- WHEN I ASKED HIM TO IDENTIFY

20   THAT, HE GOES ON, AND THERE'S SOME DISTURBED THINKING GOING

21   ON.  AGAIN, I'M NOT SURE WHAT HE SAID AFTER THAT.  I HAVE TO

22   MENTION THIS BECAUSE IT'S INCLUDED IN MY HIGH SCHOOL

23   EDUCATION.  WHILE I WAS SITTING HERE, I WAS A CHILD SLAVE."

24             I DON'T THINK THAT'S DELUSIONAL.  IT'S AN UNUSUAL

25   WAY OF DESCRIBING YOUR HIGH SCHOOL EXPERIENCE.

1    Q.    SO YOU WEREN'T SURE WHETHER REFERRING TO HIS HIGH SCHOOL

2    AS CHILD ABUSE OR CHILD SLAVE -- WHETHER THAT WAS WHAT A

3    TEENAGER WOULD REFER TO HIGH SCHOOL NOWADAYS?

4    A.    I COULD BE -- I FIND IT AN UNUSUAL WAY TO EXPLAIN THE

5    HIGH SCHOOL EXPERIENCE.  THERE'S ACTUALLY AN ENTIRE

6    PARAGRAPH -- AN ENTIRE PARAGRAPH OF QUOTES THAT HE GAVE ME

7    REGARDING CHILD ABUSE AND BEING A CHILD SLAVE.

8    Q.    AND YOU THOUGHT THAT THAT WAS UNUSUAL, BUT NOT

9    DELUSIONAL?

10   A.    YES.

11   Q.    WHERE DO YOU CROSS THE LINE BETWEEN UNUSUAL AND

12   DELUSIONAL AGAIN?

13   A.    DELUSIONAL IS A FALSE BELIEF.

14   Q.    RIGHT.

15   A.    I DON'T KNOW THAT BEING A CHILD SLAVE IS A FALSE BELIEF.

16   IF YOU GO ON TO HOW I EXPLAINED THIS, HE FELT LIKE BECAUSE HE

17   COULDN'T LEAVE SCHOOL WITHOUT PERMISSION, THAT HE WAS A SLAVE.

18   THAT'S NOT A FALSE BELIEF.  THAT'S TRUE.  IT'S TRUE.  YOU

19   CAN'T LEAVE SCHOOL.  IF YOU DO, YOU GET IN TROUBLE.

20          BUT IT'S AN UNUSUAL WAY TO DESCRIBE YOUR EXPERIENCE

21   IN HIGH SCHOOL.  IT DOESN'T REACH THE THRESHOLD OF BEING FALSE

22   BELIEF, WHICH IS THE DEFINITION OF A DELUSION.

23   Q.    YOU WENT ON TO CONCLUDE THAT THERE WAS COGNITIVE

24   SLIPPAGE.

25          DO YOU RECALL THAT?

1    A.    YES.

2    Q.    AND THAT THERE WAS DISORGANIZED THOUGHTS AND BIZARRE

3    STATEMENTS IN HIS WRITINGS AND VIDEOS; RIGHT?

4    A.    YES.

5    Q.    COULD YOU TELL US WHAT COGNITIVE SLIPPAGE IS.

6    A.    IT'S MOVING FROM ONE TOPIC TO ANOTHER AND THERE'S NO

7    TRANSITION.  IT MEANS SLIPPING INTO SOMETHING THAT'S NOT

8    RELATED TO WHAT HE WAS TALKING ABOUT BEFORE.  I THOUGHT HIS

9    WRITINGS REFLECTED THAT, WHERE HE'D SLIP INTO SOMETHING THAT

10   DIDN'T MAKE SENSE.

11   Q.    THAT'S COGNITIVE SLIPPAGE?

12   A.    IT'S COGNITIVE SLIPPAGE, AND IT CAN ALSO REPRESENT

13   DISORGANIZED THINKING.

14   Q.    SO IT COULD BE BOTH?

15   A.    YES.

16   Q.    IT COULD BE A COGNITIVE IMPAIRMENT?

17   A.    WELL, IT'S A COGNITIVE SYMPTOM.

18   Q.    IS IT A COGNITIVE IMPAIRMENT?

19   A.    WELL, THE COGNITIVE IMPAIRMENT, AS I UNDERSTAND IT, WOULD

20   BE SOMETHING LIKE MENTAL RETARDATION OR MENTAL DEFECT,

21   BORDERLINE INTELLECTUAL FUNCTIONINGS.  THE COGNITIVE SYMPTOM

22   OF SCHIZOPHRENIA IS --

23   Q.    THAN A COGNITIVE IMPAIRMENT?

24   A.    CORRECT.

25   Q.    IT'S A SYMPTOM BECAUSE SCHIZOPHRENICS HAVE IT?

1    NOT ALL SCHIZOPHRENICS HAVE IT.  IT GOES TO THEIR ABILITY TO

2    COMMUNICATE.  A COGNITIVE SYMPTOM OF SCHIZOPHRENIA, IF PERSONS

3    ARE -- EXHIBIT THOSE, IT'S USUALLY GOING TO IMPACT MEMORY.

4    IT'S GOING TO IMPACT CONCENTRATION.  IT'S GOING TO IMPACT HOW

5    THEY COMMUNICATE WITH AN INDIVIDUAL.

6    Q.   IT'S PROCESSING, RETRIEVING, JUDGMENT, AND MEMORY,

7    ESSENTIALLY?

8    A.   WHICH IS KIND OF WHAT I JUST SAID, YES.

9    Q.   SO COGNITIVE IMPAIRMENT ARE IMPAIRMENTS IN THOSE AREAS;

10   RIGHT.

11   A.   YES.

12   Q.   AND YOU SEE THEM BY THE COGNITIVE SYMPTOMS OF

13   SCHIZOPHRENIA?

14   A.   CORRECT.

15   Q.   SO THE BOTTOM LINE IS THE COGNITIVE SYMPTOMS THAT YOU

16   DESCRIBED ARE COGNITIVE IMPAIRMENTS; CORRECT?

17   A.   BUT THEY'RE NOT COGNITIVE DEFICITS.  THEY'RE COGNITIVE

18   IMPAIRMENTS CAUSED BY --

19   Q.   THE SCHIZOPHRENIA.

20   A.   RIGHT.

21   Q.   WE CALL THEM COGNITIVE IMPAIRMENTS; RIGHT?

22   A.   YES.

23   Q.   LET ME BRING UP 4A.  THIS IS AN ACTUAL B.O.P. MANUAL

24   CALLED "PHARMACOLOGICAL MANAGEMENT OF SCHIZOPHRENIA, THE

25   FEDERAL BUREAU OF PRISONS CLINICAL PRACTICE GUIDELINES, JUNE

1    2010."

2              ARE YOU FAMILIAR WITH THOSE?

3    A.   YES.

4    Q.   I BELIEVE THEY WERE ATTACHED TO A DECLARATION

5    DR. SARRAZIN FILED IN THIS CASE.

6              I WANT TO TURN OUR ATTENTION TO A PAGE OF THAT BOOK.

7    WE HAVE IT AS PAGE 17.

8              DO YOU SEE THAT AT THE TOP?

9    A.   YES.

10             MS. CLARKE:   MARK, IF COULD BLOW UP THE COGNITIVE

11   IMPAIRMENT.

12   BY MS. CLARKE:

13   Q.   "COGNITIVE IMPAIRMENTS APPEAR TO BE AN INTEGRAL PART OF

14   CHRONIC PSYCHOTIC DISORDERS, ESPECIALLY SCHIZOPHRENIA."

15             WOULD YOU AGREE?

16   A.   YES.

17   Q.   "THESE IMPAIRMENTS INCLUDE PROBLEMS WITH ATTENTION,

18   MEMORY, EXECUTIVE FUNCTION."  AND IT DESCRIBES "I.E.

19   DISTRACTION, PROBLEM-SOLVING INSIDE A COGNITIVE FLEXIBILITY."

20             DO YOU AGREE WITH THAT?

21   A.   YES.

22   Q.   "COGNITIVE IMPAIRMENTS HAVE BEEN FOUND IN INDIVIDUALS

23   PRIOR TO THEIR DEVELOPING PSYCHOTIC SYMPTOMS AS WELL AS

24   RELATIVE TO INDIVIDUALS WITH SCHIZOPHRENIA."

25             DO YOU AGREE WITH THAT?

1    A.   YES.

2    Q.   "IT IS UNCLEAR IF ANY PHARMACOLOGICAL TREATMENT HAS A

3    SIGNIFICANT IMPACT ON THE SYMPTOMS."

4            WOULD YOU AGREE WITH THAT?

5    A.   I DON'T TOTALLY AGREE WITH THAT.

6    Q.   YOU AGREE WITH WHAT THEY SAID IN THE FIRST FEW SENTENCES,

7    BUT YOU RESIST THAT; CORRECT?

8    A.   IN MY EXPERIENCE, THERE HAVE BEEN TIMES WHEN MEDICATION

9    HAS HAD A SIGNIFICANT IMPACT ON THOSE SYMPTOMS.

10   Q.   ON THE COGNITIVE IMPAIRMENTS?

11   A.   YES.

12   Q.   WOULD YOU USE ALSO THE WORDS "COGNITIVE SYMPTOMS"?

13   A.   YES.

14   Q.   BUT JUST TO BE CLEAR, WE'RE TALKING ABOUT THE SAME THING,

15   COGNITIVE IMPAIRMENTS AND COGNITIVE SYMPTOMS?

16   A.   YES.

17   Q.   IN FACT, WE WENT THROUGH A LONG LIST OF COGNITIVE

18   SYMPTOMS WITH MS. FELDMEIER; RIGHT?

19   A.   YES.

20   Q.   THOSE ARE COGNITIVE IMPAIRMENTS IN THE B.O.P. MANUAL;

21   CORRECT?

22   A.   YES.

23            MS. CLARKE:  LET'S GO DOWN TO THE BOTTOM PARAGRAPH

24   WHERE THEY REFER TO COGNITIVE SYMPTOMS, MARK.

25   //

1    BY MS. CLARKE:

2    Q.   I'M GOING TO ASK YOU IF YOU AGREE WITH THIS:  "THE

3    COGNITIVE SYMPTOMS ARE THE MOST DISABLING AND MISUNDERSTOOD OF

4    ALL THE SYMPTOM COMPLEXES ASSOCIATED WITH PSYCHOTIC

5    DISORDERS"; IS THAT CORRECT?

6    A.   I THINK THEY CAN, YES.

7    Q.   DO YOU AGREE WITH THAT?

8    A.   YES.

9    Q.   SO THE LIST OF COGNITIVE SYMPTOMS AND COGNITIVE

10   IMPAIRMENTS THAT YOU DESCRIBED THAT MR. LOUGHNER HAS ARE THE

11   MOST DISABLING?

12   A.   THEY CAN BE, YES.

13   Q.   AND THE B.O.P. MANUAL CONCLUDES, YOU DISAGREE, THAT IT'S

14   UNCLEAR WHETHER DRUGS HAVE AN IMPACT ON THOSE SYMPTOMS; RIGHT?

15   A.   I'M NOT SURE WHAT YOUR QUESTION IS.  I DISAGREE WITH

16   THAT.  I DO THINK THAT MEDICATION CAN BE HELPFUL IN IMPROVING

17   THOSE AND RESOLVING THOSE.

18   Q.   ALSO IN YOUR REPORT IN MAY, YOU TALKED ABOUT NEGATIVE

19   SYMPTOMS.

20        DO YOU RECALL THAT?

21   A.   YES.

22   Q.   CAN YOU TELL US WHAT NEGATIVE SYMPTOMS ARE?

23   A.   THE BEST WAY TO DESCRIBE NEGATIVE SYMPTOMS IS THAT

24   THEY'RE SYMPTOMS THAT AREN'T THERE THAT SHOULD BE.  FOR

25   EXAMPLE, ONE OF THE -- AVOLITION IS ONE OF THE NEGATIVE

1    SYMPTOMS.  THAT'S LIKE A DISINTEREST IN DOING THINGS.  MAYBE

2    THE PERSON ISOLATES THEMSELVES.  THE PERSON SHOULDN'T BE DOING

3    THOSE THINGS, BUT THEY'RE ACTUALLY DOING THOSE THINGS.

4    Q.   YOU CALL THAT AVOLITION?

5    A.   YES.

6    Q.   A-V-O-L-I-T-I-O-N; RIGHT?

7    A.   CORRECT.  ANOTHER WAY TO --

8    Q.   DID YOU IDENTIFY THAT NEGATIVE SYMPTOM?

9    A.   IF YOU RECALL FROM MY FIRST REPORT, I TALK ABOUT NEGATIVE

10   SYMPTOMS.  AND ONE OF THE CONCERNS I HAD REGARDING THE

11   NEGATIVE SYMPTOMS IS THAT I WASN'T CERTAIN THAT HE WAS

12   EXHIBITING THOSE BECAUSE OF THE PSYCHOSIS OR BECAUSE OF THE

13   DEPRESSION.

14        IF ANYTHING, IN THE DIAGNOSTIC SECTION OF MY REPORT,

15   I ACTUALLY REFERENCE WHAT I THOUGHT ABOUT THE NEGATIVE

16   SYMPTOMS.  ONCE HE WAS MEDICATED, THE MEDICATION WOULD HELP

17   RESOLVE THAT.

18   Q.   NOW, YOU IDENTIFIED IN YOUR REPORT SEVERAL POTENTIAL

19   NEGATIVE SYMPTOMS, THEN; CORRECT?  THE FROZEN SMILE; RIGHT?

20   A.   WHICH IS -- THAT'S A FLATTENING AFFECT, THAT PARTICULAR

21   ONE.  I DID IDENTIFY THAT.

22        ANOTHER ONE -- A THIRD ONE IS POVERTY OF SPEECH

23   WHERE THERE'S ACTUALLY A COUPLE THINGS THAT COULD BE GOING ON.

24   ONE, THE PERSON'S NOT TALKING AT ALL.  AND THE OTHER COULD BE

25   THAT THE INDIVIDUAL -- WHEN THEY SPEAK, THERE'S SOMETHING

1    MISSING.  THEY DON'T FINISH SENTENCES.  THEY DON'T FINISH

2    THOUGHTS.  IT'S POVERTY OF SPEECH.

3    Q.   YOU IDENTIFY POVERTY OF SPEECH AS A NEGATIVE SYMPTOM?

4    A.   YES.

5    Q.   OF SCHIZOPHRENIA?

6    A.   YES.

7    Q.   THAT'S WHERE YOU DON'T SPEAK MUCH, LOTS OF SILENCE?

8    A.   THAT'S A VERY SEVERE FORM OF IT.  YOU MIGHT ALSO HAVE A

9    SITUATION WHERE THE PERSON -- THEY SPEAK TO YOU, BUT IT

10   DOESN'T SEEM LIKE THERE'S MUCH THERE.  THERE'S AN ABSENCE IN

11   THE --

12   Q.   OF CONTENT?

13   A.   YES.

14   Q.   WE'VE GOT POVERTY OF SPEECH AS A NEGATIVE SYMPTOM.  WE'VE

15   NOT AFFECTED FLATTENING AS A NEGATIVE SYMPTOM.

16             DID YOU SEE AFFECTED FLATTENING?

17   A.   YES.

18   Q.   AND YOU'RE NOT SURE WHETHER WHAT YOU SEE TODAY, WHETHER

19   THAT'S AFFECTED FLATTENING OR DEPRESSION?

20   A.   CORRECT.  IN MY OPINION, MR. LOUGHNER IS DEPRESSED, AND

21   WHAT I'M SEEING TODAY IS A PERSON THAT'S DEPRESSED.

22   Q.   SO YOU'RE NOT ABLE STILL TO DETERMINE WHETHER THERE ARE

23   PROMINENT NEGATIVE SYMPTOMS OR SYMPTOMS OF DEPRESSION?

24   A.   I DO THINK THAT HE HAS SOME OF THE NEGATIVE SYMPTOMS NOW.

25   I BELIEVE HE HAS POVERTY OF SPEECH.  I BELIEVE THE MEDICATION

1    HAS HELPED THAT.  REGARDING THE FLATTENING AFFECT, I HAVE

2    NOTICED A DIFFERENCE IN HIS AFFECT SINCE HE'S BEEN MEDICATED.

3            ONE OF THE THINGS I TALKED ABOUT WAS THE

4    INAPPROPRIATENESS OF HIS AFFECT.  HE NOW WILL SMILE.  HE'LL

5    LAUGH.  IT'S NOT AN INAPPROPRIATE SMILE OR AN INAPPROPRIATE

6    LAUGHING AS IT WAS BEFORE.  HE WILL CRY.  IT'S NOT AN

7    INAPPROPRIATE CRYING.  IT'S APPROPRIATE TO THE SITUATION.

8    IT'S APPROPRIATE TO WHAT WE'RE DISCUSSING.

9            MS. CLARKE:  CAN I HAVE JUST ONE MOMENT, YOUR HONOR?

10                   (PAUSE IN PROCEEDINGS)

11   BY MS. CLARKE:

12   Q.   DR. PIETZ, MY UNDERSTANDING WAS THAT BOTH COGNITIVE

13   IMPAIRMENTS AND NEGATIVE SYMPTOMS ARE TWO OF THE SYMPTOM

14   PICTURES OF SCHIZOPHRENIA THAT ARE RESISTANT TO MEDICATION.

15            IS THAT SORT OF GENERALIZED IN THE FIELD AND YOU

16   JUST DISAGREE?

17   A.   WELL, THAT'S NOT ACTUALLY WHAT YOU ASKED ME WHEN WE READ

18   THIS.  YOU INDICATED THAT IT WAS UNCLEAR IF MEDICATION IS

19   HELPFUL.  I THINK THE MEDICATION CAN BE HELPFUL.

20   Q.   IS IT A COMMON BELIEF AMONG PSYCHIATRISTS AND MEDICAL

21   PROFESSIONALS IN THE MENTAL HEALTH FIELD THAT BOTH COGNITIVE

22   IMPAIRMENTS AND NEGATIVE SYMPTOMS ARE RESISTANT TO

23   MEDICATION?

24   A.   I DON'T THINK IT'S COMMON BELIEF THEY'RE RESISTANT TO

25   MEDICATION.  THEY MAY BE MORE DIFFICULT TO TREAT, BUT THEY'RE

1  NOT NECESSARILY RESISTANT.  I WOULD ARGUE THAT GIVING THE

2  APPROPRIATE MEDICATION REGIMEN, THEY CAN BE RESOLVED.

3  Q.  THE NEGATIVE SYMPTOMS AND COGNITIVE IMPAIRMENTS?

4  A.  YES.

5  Q.  IT'S MY UNDERSTANDING THAT THE MEDICATION TYPICALLY

6  ADDRESSES HALLUCINATIONS, THE MORE PROMINENT POSITIVE SYMPTOMS

7  OF SCHIZOPHRENIA.

8        DO YOU AGREE WITH THAT?

9  A.  I DON'T AGREE WITH THAT.

10  Q.  YOU BELIEVE THAT MEDICATION ACTUALLY ADDRESSES ALL OF THE

11  SYMPTOMS OF SCHIZOPHRENIA?

12  A.  I DO.  AND I ALSO THINK WELLBUTRIN, WHICH IS THE

13  ANTIDEPRESSANT, IS GOING TO ADDRESS SOME OF THOSE SYMPTOMS AS

14  WELL.

15  Q.  ONE OF YOUR CONCERNS RIGHT NOW IS YOU STILL HAVEN'T BEEN

16  ABLE TO, IN YOUR OWN MIND, UNTANGLE HIS DEPRESSION FROM THE

17  NEGATIVE SYMPTOMS OF SCHIZOPHRENIA?

18  A.  YES.

19  Q.  I THINK THEY JUST FOUND FOR ME THE LINE I WAS LOOKING FOR

20  IN THE B.O.P. REPORT.  IT'S ON THAT SAME PAGE AS THE COGNITIVE

21  IMPAIRMENTS.

22  A.  YES.

23  Q.  AND IT SAYS, "NEGATIVE SYMPTOMS, SEE THE TABLE BELOW" --

24  AND THE TABLE SETS OUT THE SYMPTOMS -- "ARE MORE DIFFICULT TO

25  DIAGNOSE AND FAR LESS RESPONSIVE TO MEDICATIONS."

1           SO THAT'S THE B.O.P. POSITION?

2    A.   YES.

3    Q.   YOU DISAGREE?

4    A.   "FAR LESS RESPONSIVE" TO ME IS DIFFERENT THAN RESISTANT.

5    THEY ARE DIFFICULT TO RESPOND TO MEDICATION, BUT I DON'T THINK

6    IT'S IMPOSSIBLE.

7    Q.   LET ME JUST GET CLEAR FOR THE SAKE OF WHERE WE ARE.

8           THE MEDICATIONS ARE MORE LIKELY TO ADDRESS

9    HALLUCINATIONS, RIGHT, AND LESS LIKELY TO ADDRESS COGNITIVE

10   IMPAIRMENTS AND NEGATIVE SYMPTOMS?

11   A.   I DON'T NECESSARILY AGREE WITH THAT.  I THINK THE

12   MEDICATION CAN ADDRESS BOTH.  WHAT WE KNOW ABOUT MR. LOUGHNER

13   IS THAT THE OBVIOUS ATTENTION TO THE AUDITORY HALLUCINATIONS

14   HAS RESOLVED, WHICH IS A POSITIVE SYMPTOM.  HE MAY STILL BE

15   ATTENDING TO THEM, BUT HE'S NOT OBVIOUSLY ATTENDING TO THEM.

16          SOME OF THE DELUSIONAL THINKING HAS RESOLVED WITH

17   THE MEDICATION.  I ALSO BELIEVE THAT SOME OF THE NEGATIVE

18   SYMPTOMS HAVE RESOLVED WITH THE MEDICATION.

19   Q.   WHICH WERE THOSE NEGATIVE SYMPTOMS?

20   A.   DO I THINK THEY HAVE RESOLVED?  HIS THINKING IS A LITTLE

21   LESS DISORGANIZED.

22   Q.   YOU MAKE THAT INTO A NEGATIVE SYMPTOM?

23   A.   YES.

24          I THINK THAT HIS CONCENTRATION AND HIS MEMORY HAS

25   SLIGHTLY IMPROVED.

1          THE ABILITY TO COMMUNICATE WITH ANOTHER PERSON AND

2     INTERACT WITH ANOTHER PERSON HAS SLIGHTLY IMPROVED.

3          AGAIN, HE'S ONLY BEEN TAKING THE MEDICATION FOR

4     60 DAYS.

5          I GAVE YOU SOME EXAMPLES OF HE ASKS QUESTIONS ABOUT

6     US.  HE TRIES TO MAKE A CONNECTION TO US, "US" MEANING HE'S

7     ASKING PERSONAL QUESTIONS.  HE'S ASKED DR. TOMELLERI

8     QUESTIONS.  HE'S ASKED DR. SARRAZIN QUESTIONS.

9          I THINK THOSE ARE NEGATIVE SYMPTOMS THAT

10     PRE-MEDICATION HE WASN'T ABLE TO DO THAT.

11     Q.   YOU THINK HIS INTEREST IN SOMEONE ELSE'S LIFE IS A

12     NEGATIVE SYMPTOM?

13     A.   ABSOLUTELY.

14     Q.   LET ME JUST -- BECAUSE WE MAY BE USING --

15     A.   I'M SORRY.  IT'S A COGNITIVE SYMPTOM.  THE COGNITIVE

16     SYMPTOMS HAVE IMPROVED.

17          MS. CLARKE:  JUST FOR THE SAKE OF BEING ON THE SAME

18     PAGE WITH THE LANGUAGE, ENLARGE THE MIDDLE OF PAGE 17, WHICH

19     IDENTIFIES POSITIVE AND NEGATIVE SYMPTOMS.

20     BY MS. CLARKE:

21     Q.   DO YOU SEE THAT?

22     A.   YES.

23     Q.   THIS IS AGAIN FROM THE B.O.P.'S MANUAL; CORRECT?

24     A.   YES.

25     Q.   IT IDENTIFIES SOME POSITIVE SYMPTOMS AS HALLUCINATIONS?

1    A.    YES.

2    Q.    DELUSIONS; RIGHT?

3    A.    YES.

4    Q.    DISORGANIZED BEHAVIOR?

5    A.    I DON'T BELIEVE THAT HE ENGAGES IN DISORGANIZED BEHAVIOR.

6    Q.    LET'S JUST TALK TERMS RIGHT NOW.

7          DISORGANIZED BEHAVIOR IS A POSITIVE SYMPTOM OF

8    SCHIZOPHRENIA?

9    A.    YES.

10   Q.    AND DISTURBED LANGUAGE?

11   A.    YES.

12   Q.    YOU PUT THAT AS A NEGATIVE SYMPTOM?

13   A.    ACTUALLY, THE DISTURBED LANGUAGE, WHAT I'M REFERENCING IS

14   HIS ABILITY TO COMMUNICATE -- I SAID IT'S A COGNITIVE SYMPTOM.

15   I PUT THAT AS A COGNITIVE SYMPTOM, YES.

16          WHAT I MEAN BY THAT IS WHEN HE'S CONVERSING, HE'S

17   INTEGRATING THOUGHTS AND FEELINGS, BEING ABLE TO NOT JUST

18   INITIATE IT ON HIS OWN AND COMMUNICATE THAT, BUT ALSO TO

19   ENGAGE WITH ANOTHER PERSON AND ASK THEM QUESTIONS ABOUT THEIR

20   THOUGHTS AND FEELINGS.

21   Q.    THAT'S A COGNITIVE IMPROVEMENT IN YOUR MIND?

22   A.    I THINK -- I DON'T THINK IT'S TOTALLY RESOLVED.  BUT YES,

23   I ABSOLUTELY THINK IT'S BETTER.

24   Q.    I DIDN'T SAY BETTER.  I SAID COGNITIVE.

25          YOU BELIEVE THAT THAT INTEREST IN ANOTHER PERSON IS

1    A COGNITIVE SYMPTOM?

2    A.    YES.

3    Q.    YOU'VE MENTIONED A COUPLE OF TIMES YOU THINK THE

4    MEDICATION IS GOING TO HELP THE NEGATIVE SYMPTOM PICTURE

5    AND/OR THE DEPRESSION; RIGHT?

6    A.    THE WELLBUTRIN, YES.

7    Q.    AND WHAT YOU WANTED IN MAY WAS YOU WANTED TO BE ABLE TO

8    MEDICATE FOR DEPRESSION SO YOU COULD DETERMINE WHETHER THE

9    SYMPTOM WAS DEPRESSION OR NEGATIVE SYMPTOMS?

10   A.    I DON'T THINK THAT'S AT ALL WHAT I SAID.

11   Q.    WHAT DID YOU SAY?

12   A.    YOU'RE TALKING ABOUT MY OPINION?

13   Q.    YES.

14   A.    IT'S MY OPINION, IF YOU LOOK AT THE PROGNOSIS SECTION,

15   THAT HE SHOULD BE MEDICATED FOR DEPRESSION WITH MEDICATION.

16   Q.    WHAT I'M ASKING YOU ABOUT IS YOU WERE A LITTLE BIT

17   CONFUSED IN YOUR OWN MIND IN MAY WHETHER OR NOT WHAT YOU WERE

18   SEEING COULD BE NEGATIVE SYMPTOMS OR DEPRESSION; RIGHT?

19   A.    YES.

20   Q.    YOU WANTED TO MEDICATE FOR DEPRESSION IN ORDER TO

21   DETERMINE WHETHER THE NEGATIVE SYMPTOMS WERE ACTUALLY THERE?

22   A.    THAT'S CORRECT.

23   Q.    EVEN THOUGH YOU BELIEVED THAT THERE WERE SOME NEGATIVE

24   SYMPTOMS, IT WAS, IN YOUR OPINION, MASKED BY THE DEPRESSION?

25   A.    CORRECT.

1    Q.   NOW, YOU THOUGHT THAT ANTIDEPRESSANT MEDICATION, THE

2    WELLBUTRIN HE WAS ON WOULD ADDRESS THAT DEPRESSION AND ALLOW

3    YOU TO DETERMINE WHETHER THE NEGATIVE SYMPTOMS STILL REMAINED;

4    CORRECT?

5    A.   CORRECT.

6    Q.   HE'S BEEN ON WELLBUTRIN FOR HOW LONG?

7    A.   60 PLUS DAYS.

8    Q.   AND WHAT'S THE NORMAL TURNAROUND TIME ON WELLBUTRIN AT

9    THE DOSAGE LEVEL HE'S AT AFFECTING DEPRESSION?

10   A.   I'M GOING TO DEFER THAT QUESTION.  I'M NOT A MEDICAL

11   DOCTOR.  IT'S A QUESTION THAT YOU NEED TO ASK A MEDICAL DOCTOR

12   OR HIS PRESCRIBING PSYCHIATRIST.

13   Q.   DO YOU HAVE EXPERIENCE WITH PATIENTS ON WELLBUTRIN?

14   A.   I DO HAVE EXPERIENCE WITH PATIENTS ON WELLBUTRIN.  I

15   CAN'T ANSWER YOUR EXACT QUESTION.

16   Q.   IS 60 DAYS IN THE BALLPARK?

17   A.   IN MY OPINION, NO.

18   Q.   HOW LONG, IN YOUR OPINION?

19   A.   THERE ARE A NUMBER OF VARIABLES.  THIS IS BASED ON MY

20   EXPERIENCE AND ALSO IN MY PRIVATE PRACTICE.  THERE ARE A

21   NUMBER OF VARIABLES.

22          ONE OF THE VARIABLES IS HOW THE PERSON IS GOING TO

23   METABOLIZE THE MEDICATION.  HAS THE PERSON BEEN ON MEDICATION

24   BEFORE?  HE ALSO HAS -- MR. LOUGHNER ALSO SUFFERS PSYCHOSIS,

25   WHICH MIGHT IMPACT ON HOW HE'S GOING TO RESPOND TO THE

132

1    WELLBUTRIN.

2              THERE ARE SOME INDIVIDUALS THAT TAKE UP TO SEVERAL

3    MONTHS TO RESPOND TO ANY KIND OF MEDICATION.  WHAT I TELL

4    PEOPLE IN MY PRIVATE PRACTICE WHEN THEY START TAKING AN

5    ANTIDEPRESSANT IS, "DON'T EXPECT MIRACLES QUICKLY BECAUSE

6    THEY'RE NOT GOING TO HAPPEN.  IT'S GOING TO TAKE SOME TIME FOR

7    YOU TO RESPOND AT ALL TO A MEDICATION," WHICH, IN MY OPINION,

8    HE HAS RESPONDED TO THE WELLBUTRIN.

9              YES, HE'S STILL DEPRESSED.  IT MIGHT BE THAT

10   DR. SARRAZIN IS GOING TO HAVE TO CHANGE THAT ANTIDEPRESSANT OR

11   ADD MORE.  THAT'S SOMETHING THAT THE MEDICAL DOCTOR WILL HAVE

12   TO ANSWER.

13   Q.   I THINK HE'S BEEN ON THE WELLBUTRIN CLOSE TO TEN WEEKS

14   NOW.

15             WOULD THAT BE -- I THINK YOU'VE TOLD ME SIX TO

16   EIGHT WEEKS?

17   A.   TO NOTICE A DIFFERENCE.  IT'S SIX TO EIGHT WEEKS FOR

18   THERE TO BE ANY CHANGE.  IT DOESN'T MEAN IN SIX TO EIGHT

19   WEEKS, THE PERSON IS NO LONGER GOING TO BE DEPRESSED.  SOME

20   INDIVIDUALS CAN BE ON ANTIDEPRESSANTS FOR MONTHS BEFORE THEY

21   ACTUALLY NO LONGER FEEL DEPRESSED.

22   Q.   WHEN WAS THE SUICIDE NOTE THAT YOU MENTIONED EARLIER IF

23   MR. LOUGHNER HAD WRITTEN?

24   A.   THERE'S NO DATE ON THE SUICIDE NOTE.

25   Q.   WHEN WAS IT FOUND?

133

1                    (PAUSE IN PROCEEDINGS)

2            THE WITNESS:  THIS IS GOING TO TAKE ME A WHILE TO

3    SIFT THROUGH THE NOTES.

4    BY MS. CLARKE:

5    Q.   IN THE LAST PRODUCTION WE GOT, IT WASN'T IN THERE.

6    A.   IT WOULD HAVE BEEN.

7            MS. CLARKE:  MAY I APPROACH, YOUR HONOR?

8            THE COURT:  YES.

9    BY MS. CLARKE:

10   Q.   THIS IS THE MOST RECENT PRODUCTION.

11   A.   I HAVE A NOTE.  IT'S NOT DATED, THOUGH.

12                   (PAUSE IN PROCEEDINGS)

13           THE WITNESS:  I DON'T THINK IT'S IN THIS PRODUCTION.

14   I THINK IT'S GOING TO BE BACK, LIKE, MID-SEPTEMBER.

15                   (PAUSE IN PROCEEDINGS)

16           MS. CLARKE:  I DON'T SEE IT IN HERE, BUT IT WAS

17   WITHIN -- THERE ARE TWO THINGS THAT ARE SIGNIFICANT ABOUT THE

18   NOTE.  I TALKED TO HIM ABOUT IT AND TOLD HIM I FOUND THE NOTE.

19   AT THE VERY END OF THE NOTE, IT SAYS THAT I HAD TO PREMATURELY

20   TERMINATE THE INTERVIEW BECAUSE HE HAD VISITORS.

21   BY MS. CLARKE:

22   Q.   WAS THAT SOMETIME IN MID- TO LATE SEPTEMBER?

23   A.   YES.

24   Q.   AND YOU THINK THE WELLBUTRIN IS HAVING ITS DESIRED

25   EFFECT?

1    A.    I DO.

2    Q.    EVEN THOUGH AFTER TEN WEEKS ON IT HE'S WRITING SUICIDE

3    NOTES?

4    A.    MAY I EXPLAIN MY ANSWER?

5    Q.    SURE.

6    A.    IN MY OPINION, PART OF THE REASON WHY HE FEELS SO

7    DEPRESSED, HE'S USED THE WORD "REMORSEFUL."  HE FEELS GUILTY.

8    AND THAT -- I'M NOT SURE THAT MEDICATION IS GOING TO HELP HIM

9    WITH THAT.

10          SO YES, HE'S IMPROVED.  YES, THERE ARE -- PART OF

11   WHAT I THINK HAS HAPPENED WITH ANTIPSYCHOTIC MEDICATION IS

12   IT'S HELPED HIS THOUGHTS BECOME MORE RATIONAL.

13   Q.    WE'RE TALKING ABOUT THE ANTIDEPRESSANT.

14   A.    I UNDERSTAND.  CONSEQUENTLY, HE FEELS GUILTY AND

15   REMORSEFUL.  AND THAT'S -- I'M NOT SURE THE ANTIDEPRESSANT

16   MEDICATION IS GOING TO HELP HIM WITH THOSE PARTICULAR ISSUES.

17   Q.    SO YOU'RE NOT SURE WHETHER YOU'RE EVER GOING TO RESOLVE

18   THE DEPRESSION?

19   A.    HE MAY ALWAYS BE DEPRESSED BECAUSE OF THAT, BUT THAT

20   DOESN'T MEAN HE CAN'T BE COMPETENT.

21   Q.    WILL THE DEPRESSION IN ANY WAY AFFECT COMPETENCY?

22   A.    IT CAN IN TERMS OF HIS MOTIVATION TO ASSIST HIMSELF.

23   BASED ON MY EXPERIENCE, THERE ARE VERY FEW INDIVIDUALS THAT

24   SUFFER SOLELY ON DEPRESSION THAT THEY'RE FOUND NOT COMPETENT

25   TO STAND TRIAL.

1    Q.    THE DEPRESSION THAT HE SUFFERS FROM SEEMS PRETTY

2    PROFOUND; RIGHT?

3    A.    IT IS SIGNIFICANT, YES.

4    Q.    AND IF THAT DEPRESSION CONTINUES, IS THAT AN INDEPENDENT

5    BASIS FOR AN OPINION BY YOU THAT HE IS INCOMPETENT TO STAND

6    TRIAL?

7    A.    I'M NOT SURE I'M UNDERSTANDING YOUR QUESTION.

8    Q.    THE DEPRESSION ALONE, THE LEVEL OF DEPRESSION THAT HE

9    SUFFERS FROM, IS THAT A BASIS BY ITSELF FOR HIM BEING

10   INCOMPETENT TO STAND TRIAL NOW?

11   A.    AGAIN, IT'S RARE THAT A PERSON WHO SUFFERS FROM

12   DEPRESSION IS FOUND NOT COMPETENT.

13          SO MY ANSWER TO THAT QUESTION IS IF HE REMAINS

14   DEPRESSED, IF HIS PSYCHOTIC SYMPTOMS ARE RESOLVED, HE COULD BE

15   COMPETENT TO STAND TRIAL.

16   Q.    I'M NOT TALKING ABOUT A PERSON.

17   A.    I'M ANSWERING IN REFERENCE TO HIM.  REGARDING HIM, IF HIS

18   PSYCHOTIC SYMPTOMS ARE RESOLVED, IF HE REMAINS DEPRESSED, YES,

19   HE COULD BE COMPETENT TO STAND TRIAL.

20   Q.    AT THIS LEVEL OF DEPRESSION?

21   A.    THAT'S A POSSIBILITY, YES.  AGAIN, IT GOES TO HOW DOES

22   THAT DEPRESSION IMPACT THE PRONGS OF THE COMPETENCY TEST?

23   Q.    HOW DO YOU THINK IT'S IMPACTING THE PRONG OF THE

24   COMPETENCY TEST NOW, TODAY?

25   A.    I THINK HE LACKS MOTIVATION TO DEFEND HIMSELF.  HE LACKS

1    MOTIVATION.  HE WANTS TO MOVE FORWARD WITH THIS.  HE LACKS

2    MOTIVATION TO RESOLVE THE ISSUE.  HE WANTS IT JUST TO BE OVER.

3    Q.   SO IF THE DEPRESSION CONTINUES WITH THAT LEVEL OF IMPACT

4    ON HIM, THAT WOULD RENDER HIM, IN YOUR OPINION --

5    A.   THAT'S A POSSIBILITY, YES.

6    Q.   I'M ASKING YOU NOT AS A POSSIBILITY FOR TOMORROW, BUT

7    TODAY.

8    A.   AGAIN, WITHOUT INTERVIEWING HIM AND UNDERSTANDING HOW IT

9    IMPACTS THOSE PRONGS, YES, IT'S A POSSIBILITY.

10   Q.   OKAY.  BACK TO MAY, YOU CONCLUDED -- YOU ENTERED A

11   DIAGNOSIS ESSENTIALLY WHICH YOU FELT YOU HAD TO DO BECAUSE THE

12   COMPETENCY STATUTE REQUIRES THERE BE A MENTAL DISEASE OR

13   DEFECT THAT RENDERS HIM INCOMPETENT.

14   A.   WELL, IN ADDITION, THE 1437 STATUTE DICTATES THAT WE NEED

15   TO RENDER A DIAGNOSIS.

16   Q.   AND YOU RENDERED A DIAGNOSIS, AND WE'VE ALREADY TALKED

17   ABOUT SCHIZOPHRENIA, UNDIFFERENTIATED TYPE; RIGHT?

18   A.   YES.

19   Q.   YOU REJECTED AT THAT TIME, THOUGH, THE DIAGNOSIS OF

20   DISORGANIZED TYPE; RIGHT?

21   A.   YES.

22   Q.   AND YOU REJECTED IT, IF I READ YOUR REPORT CORRECTLY,

23   BECAUSE HE DIDN'T HAVE DISORGANIZED BEHAVIOR?

24   A.   CORRECT.

25   Q.   CAN YOU TELL US BRIEFLY WHAT DISORGANIZED BEHAVIOR IS.

1    A.   THE BEST -- I'LL PROVIDE AN EXAMPLE TO YOU THAT HAPPENED

2    RECENTLY.  I WENT TO INTERVIEW A PATIENT, AND HE HAD WHITE

3    STUFF ALL OVER HIS FACE.  AND THE CORRECTIONAL OFFICERS

4    INSTRUCTED HIM TO REMOVE IT.  I DON'T KNOW WHAT IT WAS, IF IT

5    WAS TOOTHPASTE, SOAP.  THEY INSTRUCTED HIM TO REMOVE IT SO

6    THAT HE COULD COME OUT OF HIS ROOM AND BE INTERVIEWED.  HE

7    WASN'T ABLE TO FOLLOW INSTRUCTIONS.  HIS BEHAVIOR WASN'T

8    ORGANIZED ENOUGH THAT HE WAS ABLE TO DO THAT.  SO THAT'S WHAT

9    I MEAN BY ORGANIZED BEHAVIOR.

10   Q.   DISORGANIZED BEHAVIOR.

11   A.   DISORGANIZED BEHAVIOR.

12        OR RECENTLY I HAD A PATIENT THAT OFFICERS INSTRUCTED

13   HIM TO PUT HIS JUMPSUIT ON SO THAT HE COULD COME OUT OF HIS

14   ROOM, AND HE WASN'T ABLE TO COMPREHEND -- ORGANIZE HIS

15   BEHAVIOR ENOUGH TO ACTUALLY GET THE JUMPSUIT ON.

16   Q.   SO YOU REJECTED THAT DIAGNOSIS?

17   A.   YES.

18   Q.   AND YOU ALSO REJECTED SCHIZOPHRENIA, PARANOID TYPE?

19   A.   YES.

20   Q.   BECAUSE WHY?

21   A.   WELL, IT WAS MY -- IF YOU LOOK AT HOW I EXPLAINED THE

22   PARANOID -- WHY I REJECTED IT, I FELT LIKE THE DISORGANIZED

23   THINKING AND THE -- IT FIT THE UNDIFFERENTIATED TYPE BETTER.

24   Q.   IN OTHER WORDS, YOU FOUND THAT THE DISORGANIZED THINKING

25   IS NOT A PART OF THE PARANOID TYPE SCHIZOPHRENIA?  IT IS A

1    SYMPTOM OF THE SCHIZOPHRENIA, BUT NOT THE PARANOID TYPE?

2    A.   CORRECT.

3    Q.   YOU THOUGHT THAT THE DISORGANIZED THINKING WAS PROMINENT

4    ENOUGH TO THROW HIM INTO UNDIFFERENTIATED?

5    A.   YES.

6    Q.   DR. SARRAZIN --

7            WHO IS THE PSYCHIATRIST ON THE TREATING TEAM; RIGHT?

8    A.   YES.

9    Q.   -- HAS REPEATEDLY DIAGNOSED MR. LOUGHNER WITH

10   SCHIZOPHRENIA, DISORGANIZED TYPE; RIGHT?

11   A.   I DON'T KNOW THAT.

12           MS. CLARKE:  LET'S PULL UP 2D, MARK.

13   BY MS. CLARKE:

14   Q.   I THINK THIS IS THE CLINICAL ENCOUNTER, AND THE DIAGNOSIS

15   I THINK IS ON THERE, IS IT NOT?

16   A.   YES.

17   Q.   THAT'S WHY HE'S PRESCRIBING RISPERDAL; RIGHT?

18   A.   YES.

19   Q.   HE'S SAYING "INDICATIONS," WHICH MEANS THE REASON FOR THE

20   MEDICATION?

21   A.   YES.

22   Q.   IT'S AXIS I SCHIZOPHRENIA, DISORGANIZED TYPE; RIGHT?

23   A.   CORRECT.

24   Q.   SO THAT'S BACK ON JULY THE 18TH WHEN THE SECOND ROUND OF

25   MEDICATION BEGAN; RIGHT?

1    A.    CORRECT.

2    Q.    SO DR. SARRAZIN HAD TO MAKE A DIAGNOSIS BEFORE HE COULD

3    PRESCRIBE ANTIPSYCHOTIC MEDICATION; RIGHT?

4              MS. FELDMEIER:  OBJECTION.

5              THE COURT:  GROUNDS?

6              MS. FELDMEIER:  THE DIAGNOSIS HE MADE.

7              THE COURT:  I'M JUST NOT SURE IT'S PARTICULARLY

8    RELEVANT AT THIS POINT EITHER.

9              THE LIMITED FOCUS HERE IS WHETHER AN EXTENSION IS

10   LIKELY -- SUBSTANTIALLY PROBABLE TO RESTORE HIM.  I'M WELL

11   FAMILIAR WITH ALL OF THE BACKGROUND REPORTS.  I'VE READ THEM

12   MYSELF.  YOU'LL HAVE THE OPPORTUNITY, OBVIOUSLY, AT SOME POINT

13   WHEN THAT'S RELEVANT TO GO OVER THOSE.  BUT THE QUESTIONS

14   SHOULD FOCUS ON GOING FORWARD.

15             SUSTAINED.

16             MS. CLARKE:  YOUR HONOR, LET ME JUST FINISH WITH THE

17   SIGNIFICANCE OF THIS.

18             THE COURT:  SURE.

19   BY MS. CLARKE:

20   Q.    THERE'S BEEN THREE DIFFERENT DIAGNOSES OF THE TYPES OF

21   SCHIZOPHRENIA.

22             YOURS IS UNDIFFERENTIATED; RIGHT?

23   A.    YES.

24   Q.    DR. SARRAZIN, WHO IS ACTUALLY PRESCRIBING THE MEDICATION,

25   SAYS DISORGANIZED; RIGHT?

1    A.   YES.

2    Q.   DR. CARROLL SAYS PARANOID; RIGHT?

3    A.   YES.

4    Q.   AND YOU HAVE THE UNDIFFERENTIATED?

5    A.   YES.

6    Q.   NOW, ARE ANY OF THOSE SUBTYPES MORE OR LESS RESISTANT TO

7    MEDICATION, IN YOUR OPINION?

8    A.   NOT IN MY OPINION.  THEY ARE NOT.

9    Q.   THEY'RE EQUALLY TREATABLE BY MEDICATION?

10   A.   YES.

11   Q.   IN MAY, YOU CONCLUDED MEDICATION WAS THE ONLY OPTION FOR

12   RESTORING MR. LOUGHNER TO COMPETENCY?

13   A.   YES.

14   Q.   YOU STILL BELIEVE THAT?

15   A.   YES.

16   Q.   IN MAY, YOU RECOGNIZED THE BEST PREDICTOR OF THE RESPONSE

17   TO MEDICATION IS THE PAST RESPONSE TO MEDICATION; RIGHT?

18   A.   YES.

19   Q.   WE HAVE NO HISTORY OF MEDICATIONS WITH MR. LOUGHNER;

20   RIGHT?

21   A.   CORRECT.

22   Q.   SO NO BEST PREDICTOR?

23   A.   THAT'S CORRECT.

24   Q.   AND YOU ACKNOWLEDGE THAT HIS PROGNOSIS WAS DIFFICULT TO

25   PREDICT?

1   A.   YES.

2   Q.   YOUR OPINION IN MAY WAS THAT IT'S DIFFICULT TO PREDICT

3   WHETHER HE'S GOING TO RESTORE TO COMPETENCY?

4   A.   YES.

5   Q.   AND DO YOU KNOW WHY THE BUREAU OF PRISONS DID NOT SEEK A

6   SELL HEARING?  DO YOU KNOW?

7   A.   YES.

8   Q.   WHY IS THAT?

9   A.   BECAUSE WE FOLLOWED OUR POLICY AND WE FOLLOWED CASE LAW.

10  AND WHEN SOMEONE IS REFERRED TO US FOR RESTORATION OF

11  COMPETENCY, WE START WITH A DUE PROCESS HEARING, WHICH IS WHAT

12  WE DID.  IN THE FIRST DUE PROCESS HEARING, WE BELIEVE HE MET

13  THE CRITERIA FOR DANGEROUSNESS, WHICH ALLOWS US TO MEDICATE

14  HIM.

15        THE SECOND HARPER HEARING WAS HELD AFTER WE MADE THE

16  DETERMINATION THAT HE WAS A DANGER TO HIMSELF AND NEEDED TO BE

17  EMERGENCY MEDICATED.  AND OUR POLICY AND ALSO OUR

18  UNDERSTANDING OF WASHINGTON VERSUS HARPER ALLOWS US TO

19  MEDICATE UNDER EITHER OF THOSE CONDITIONS.

20  Q.   YOU DIDN'T NEED TO SEEK THE AUTHORITY OF THE COURT

21  THROUGH A SELL HEARING BECAUSE YOU HAD INTERNAL POLICIES THAT

22  YOU FELT LIKE JUSTIFIED THE MEDICATION?

23  A.   IT'S ALSO A UNITED STATES SUPREME COURT DECISION IN

24  WASHINGTON VERSUS HARPER.

25  Q.   IT'S THE INTERNAL POLICY YOU FOLLOW IN THE BUREAU OF

142

1    PRISONS?

2    A.    YES.

3    Q.    NOW, EVEN TO THIS DAY, THE BUREAU OF PRISONS HAS NOT

4    REQUESTED A SELL HEARING ON MEDICATION FOR COMPETENCY

5    RESTORATION?

6    A.    WE HAVE NOT REQUESTED A JUDICIAL DECISION ON

7    INVOLUNTARILY MEDICATING HIM.

8    Q.    IS THAT BECAUSE YOU ARE MEDICATING HIM BECAUSE HE'S A

9    DANGER TO HIMSELF?

10   A.    YES.

11   Q.    AND IS IT YOUR OPINION THAT HE'S GOING TO REMAIN A DANGER

12   TO HIMSELF?

13   A.    IT'S MY OPINION THAT IF WE TAKE HIM OFF OF MEDICATION, HE

14   WILL DETERIORATE AND POTENTIALLY DIE IF HE DEVELOPS AN

15   INFECTION OR BECOMES SO SUICIDAL THAT HE ENDS UP COMMITTING

16   SUICIDE.  I THINK STOPPING THE MEDICATION IS A BAD IDEA AND

17   COULD POTENTIALLY HARM HIM.

18   Q.    AND THIS IS FOR THE REST OF HIS LIFE?

19   A.    I THINK HE NEEDS TO BE ON MEDICATION FOR THE REST OF HIS

20   LIFE, YES.

21   Q.    SO THAT HE'S NOT A DANGER TO HIMSELF OR OTHERS?

22   A.    YES.

23   Q.    YOU WROTE TWO REPORTS JUST RECENTLY, AUGUST 22ND AND

24   SEPTEMBER 7TH; RIGHT?

25   A.    YES.

1   Q.   AND DO YOU RECALL WRITING IN THAT REPORT A PARAGRAPH

2   LISTING WHAT MEDICATION HE WAS ON?

3   A.   YES.

4   Q.   COULD YOU QUICKLY LOOK AT THOSE TWO REPORTS AND TELL ME

5   IF THOSE PARAGRAPHS ARE IDENTICAL.

6   A.   (COMPLIES).

7        YES.

8   Q.   IN BOTH OF THOSE REPORTS, THE PARAGRAPH WITH MEDICATIONS

9   ARE THE SAME?

10  A.   YES.

11  Q.   NEITHER ONE OF THOSE REPORTS INDICATE THAT YOU WERE AWARE

12  THAT HE WAS ON -- I THINK YOU SAID KLONOPIN THIS MORNING?

13  A.   YES.

14  Q.   WHEN DID THAT HAPPEN?

15  A.   WITHOUT LOOKING AT THE RECORD, I DON'T KNOW.

16  Q.   YOU DIDN'T INCLUDE IT IN YOUR REPORT?

17  A.   I THINK IT WAS ADDED RECENTLY.

18  Q.   HOW ABOUT AUGUST THE 22ND?

19  A.   THAT COULD BE.  I DON'T KNOW.

20  Q.   SO THE DATE OF YOUR FIRST REPORT, A NEW DRUG WAS ADDED.

21       BY THE SECOND REPORT, YOU DIDN'T NOTE THAT A NEW

22  DRUG WAS ADDED?

23  A.   YES.

24  Q.   IS IT KLONOPIN OR CLONAZEPAM?

25  A.   THEY'RE BOTH THE SAME.

1   Q.   BUT IT'S NOW BEEN ADDED, AND YOUR SECOND REPORT WAS JUST

2   SIMPLY AN OMISSION?

3   A.   YES.

4   Q.   AND YOU ALSO --

5   A.   WELL, I SAY THAT.  I HAVEN'T LOOKED AT THE RECORDS.  YOU

6   INDICATED THAT IT WAS ADDED IN BETWEEN THE TWO REPORTS.  I

7   DON'T KNOW THAT.

8   Q.   YOU DON'T KNOW THAT IT WAS ADDED ON AUGUST THE 22ND?  DO

9   YOU WANT TO VERIFY THAT?

10  A.   I DON'T HAVE THE MEDICATION RECORDS.  I'M JUST SAYING I

11  KNOW THAT IT'S BEEN ADDED.  I DON'T KNOW THE EXACT DATE.

12  Q.   IF YOU THINK I'M WRONG, DURING THE NEXT BREAK IF YOU

13  WOULD CHECK AND LET US KNOW.

14       BUT YOUR SECOND REPORT, YOUR SEPTEMBER 7TH REPORT,

15  WOULD BE IN ERROR?

16  A.   YES.

17  Q.   NOW, WE CAN TALK QUICKLY -- YOU TALKED WITH THE

18  PROSECUTOR ABOUT THE SIDE EFFECTS OF THE DRUGS, AND YOU REALLY

19  DIDN'T BELIEVE YOU WERE SEEING ANY SIDE EFFECTS; RIGHT?

20  A.   CORRECT.

21  Q.   AND ARE YOU DOING ANY TESTING TO DETERMINE WHETHER THERE

22  ARE SIDE EFFECTS?

23  A.   DR. SARRAZIN WOULD BE RESPONSIBLE FOR THAT.  HE'S THE

24  PRESCRIBING PHYSICIAN.  HE MONITORS THAT.  IF I SEE SOMETHING

25  THAT I'M CONCERNED ABOUT, I SHARE THAT INFORMATION WITH HIM,

1    AND HE FOLLOWS UP AND VISITS HIM.

2    Q.   HAVE YOU SEEN ANYTHING?

3    A.   I ACTUALLY DIDN'T SEE THE THICKENING OF THE TONGUE.  THAT

4    MAY HAVE HAPPENED WHEN I WASN'T THERE.

5         AGAIN, I HAVE SEEN HIM PACING AND AGITATION.  I HAVE

6    SHARED THAT WITH DR. SARRAZIN.

7    Q.   DO YOU KNOW ABOUT THE ABDOMINAL PAIN?

8    A.   YES.

9    Q.   AND THAT'S A EFFECT OF THE MEDICATION?

10   A.   ARE YOU TALKING ABOUT RIGHT BEFORE LABOR DAY?

11   Q.   YES, THE VOMITING.

12   A.   YES.

13   Q.   THAT'S A SIDE EFFECT OF THE MEDICATION?

14   A.   IT'S MY UNDERSTANDING IN TALKING WITH THE CHIEF OF

15   MEDICINE AND DR. SARRAZIN THEY DID NOT CONCLUDE THAT THAT WAS

16   A SIDE EFFECT OF MEDICATION.

17   Q.   SO RIGHT NOW YOU HAVE THICK TONGUE, BUT YOU'RE NOT SURE

18   IF ABDOMINAL PAIN AND VOMITING WAS A SIDE EFFECT OF

19   MEDICATION?

20   A.   IT'S MY UNDERSTANDING BASED ON CONVERSATIONS WITH THEM

21   THAT THEY DID NOT BELIEVE THAT IT'S A SIDE EFFECT OF THE

22   MEDICATION.

23   Q.   DR. FREDERICK BELIEVES HE'S GOT AKATHISIA?

24   A.   YES, HE WROTE THAT IN HIS NOTE.

25   Q.   YOU DISAGREE WITH THAT?

1  A.  I DO DISAGREE WITH THAT.

2  Q.  AND CAN YOU TELL US WHAT AKATHISIA IS.

3  A.  MOVEMENT OF THE LEGS.  WHAT HE WAS RESPONDING TO WAS THE

4  PACING, THE CONSTANT MOVEMENT THAT HE WAS ENGAGING IN THAT WE

5  DESCRIBED AS PACING.

6  Q.  DR. SARRAZIN AND YOU HAD CONCLUDED THAT IT'S NOT RELATED

7  TO THE MEDICATION?

8  A.  DR. SARRAZIN HAS CONCLUDED THAT IT'S NOT A SIDE EFFECT OF

9  THE MEDICATION.  IT'S DUE TO AGITATION.

10  Q.  IT'S PART OF THE SCHIZOPHRENIA?

11  A.  I DON'T BELIEVE THAT'S PART OF THE SCHIZOPHRENIA.  I

12  THINK IT'S HIS DEPRESSION.  HE'S OBSESSING, RUMINATING ABOUT

13  THE EVENTS IN HIS LIFE, WHAT HE BELIEVES HIS LIFE IS GOING TO

14  BE, AND THAT'S CREATED THE ANXIETY FOR HIM.

15  Q.  HE'S HAD PACING A LONG TIME BEFORE THE EMERGENCY

16  MEDICATION; RIGHT?

17  A.  YES, BUT NOT TO THE EXTENT THAT WE DECIDED TO EMERGENCY

18  MEDICATE HIM.

19  Q.  THE FLAT AFFECT, COULD THAT BE A SIDE EFFECT OF THE

20  MEDICATION?

21  A.  I THINK WHAT WE'RE SEEING IS DEPRESSION.  SOME

22  INDIVIDUALS WOULD SAY THAT THE MEDICATIONS, PARTICULARLY THE

23  ATIVAN AND POTENTIALLY THE RISPERDAL, CAN CAUSE A SEDATION

24  EFFECT AND MIGHT GIVE THE APPEARANCE.  THAT'S WHY DR. SARRAZIN

25  HAS CHANGED THE MEDICATION.  HE'S TITRATING LONGER THE ATIVAN.

147

1    IT'S AN AS-NEEDED MEDICATION.  AND THE RISPERDAL, HE CHANGED

2    THE LARGER DOSE TO THE EVENING SO WE'RE NOT SEEING THE

3    SEDATIVE EFFECTS DURING THE DAY.

4    Q.   HAVE YOU NOTICED ANY TREMBLING WHEN HE HOLDS HIS HANDS

5    OUT?

6    A.   YOU ASKED ME THAT LAST NIGHT.  I ACTUALLY HAVEN'T.  I'VE

7    SAT ACROSS FROM HIM.  HE DOESN'T SIT IN HIS CHAIR WHEN HE

8    VISITS WITH ME.  HE SITS IN THE BED.  HE SOMETIMES IS PACING.

9    MORE RECENTLY, HE HAS NOT PACED HARDLY AT ALL.  SO I HAVEN'T

10   NOTICED THAT.

11   Q.   SO YOU'VE CONDUCTED NO PHYSICAL EXAMINATION ESSENTIALLY

12   TO DETERMINE SIDE AFFECTS?

13   A.   I'M NOT A PHYSICAL DOCTOR.  I WOULDN'T CONDUCT A MEDICAL

14   ASSESSMENT.

15   Q.   YOU LEAVE THAT INSTEAD TO DR. SARRAZIN?

16   A.   WHAT I DO IS IF I OBSERVE A CONCERN I HAVE, I SHARE THAT

17   WITH HIM, AS I DO WITH ALL THESE.  IF I HAVE A CONCERN ABOUT

18   ANYTHING HE'S DOING, I CONSULT WITH WHOEVER IT IS THAT'S

19   RESPONSIBLE FOR THAT PART OF HIS CARE.

20   Q.   NOW, MY READ OF THE RECORDS IS THAT DR. SARRAZIN --

21           AND I TAKE IT YOU GUYS TALK A LOT ABOUT

22   MR. LOUGHNER?

23   A.   WE DO.

24   Q.   BECAUSE THE TWO OF YOU ARE THE PRIMARY RESPONSIBLE ONES

25   FOR HIS TREATMENT?

1    A.    YES.

2    Q.    DR. SARRAZIN REPEATEDLY IN THE NOTES SAYS THAT HE

3    BELIEVES THAT THE RESTLESSNESS, THE PACING IS PART OF THE

4    ILLNESS.

5         SO HE MAKES IT PART OF THE SCHIZOPHRENIA; RIGHT?

6    A.    I THINK WHAT HE'S REFERRING TO IS ANXIETY AND DEPRESSION.

7    WE'VE TALKED ABOUT THAT.  WE TALKED ABOUT HOW HE'S GOING TO

8    TREAT THE PARTICULAR DEPRESSIVE DISORDER.

9    Q.    HE THINKS IT'S THE ILLNESS OF DEPRESSION OR THE ILLNESS

10   THAT HE'S DIAGNOSED OF SCHIZOPHRENIA, DISORGANIZED TYPE?

11   A.    WITHOUT ASKING HIM SPECIFICALLY, I DON'T KNOW WHAT HE'S

12   ACTUALLY REFERRING TO.  THE AGITATION, WE HAVE TALKED ABOUT

13   THAT.  AND WE BELIEVE THAT HIS PACING IS RUMINATING, IT'S

14   ANXIETY, AND IT'S DEPRESSION HE'S BEING CONSUMED WITH

15   CONSTANTLY THINKING ABOUT THE EVENTS.

16   Q.    IT'S NOT PART OF THE SIDE AFFECTS OF THE MEDICATION?

17   A.    IN DR. SARRAZIN'S OPINION THAT HE SHARED WITH ME, IT IS

18   NOT.

19   Q.    I'D LIKE TO GO ON TO THE AUGUST 22ND AND SEPTEMBER 7TH

20   REPORTS.  THERE IS A SECTION IN BOTH OF THEM ABOUT MENTAL

21   STATUS.

22   A.    AUGUST 22ND?

23   Q.    BOTH OF THEM.

24         MS. CLARKE:  WHICH IS 100, I BELIEVE, MARK.

25         THE WITNESS:  I DON'T HAVE THEM -- PAGE 5, AND THEN

1    PAGE 1?

2    BY MS. CLARKE:

3    Q.    SECTIONS ON MENTAL STATUS, CURRENT MENTAL STATUS.

4          CAN YOU LOOK AT THE SCREEN IN FRONT OF YOU.

5    A.    OKAY.

6    Q.    THE TOP IS THE PARAGRAPH FROM YOUR AUGUST 22ND REPORT --

7    A.    YES.

8    Q.    -- OF CURRENT MENTAL STATUS?

9    A.    YES.

10   Q.    THIS IS AUGUST 22ND; RIGHT?

11   A.    RIGHT.

12   Q.    "AT THE PRESENT TIME, MR. LOUGHNER REMAINS DEPRESSED AND

13   AT HIGH RISK FOR POTENTIAL SUICIDE.  ALTHOUGH HIS PSYCHOTIC

14   SYMPTOMS HAVE SLIGHTLY DIMINISHED, HE REMAINS PSYCHOTIC.  HE

15   NO LONGER APPEARS TO BE RESPONDING TO INTERNAL STIMULI.  HIS

16   THOUGHTS ARE MORE RATIONAL AND ORGANIZED.  HE MORE READILY

17   ESTABLISHES AND MAINTAINS EYE CONTACT FOR EXTENDED PERIODS OF

18   TIME.  HIS APPETITE REMAINS POOR.  AND ALTHOUGH IMPROVED, HE

19   CONTINUES TO EXHIBIT DIFFICULTY SLEEPING"; RIGHT?  THAT'S FROM

20   YOUR --

21   A.    YES.

22   Q.    THE PARAGRAPH BELOW IS FROM THE SEPTEMBER 7TH REPORT.

23   A.    OKAY.

24   Q.    I WANT YOU TO VERIFY THAT WHAT THE DOCUMENT SHOWS ARE

25   THE CHANGES THAT YOU HIGHLIGHT BETWEEN AUGUST 22ND AND

COMPUTER-AIDED TRANSCRIPTION

1    SEPTEMBER 7TH.

2             DID YOU MEAN TO NOTE "NEW CHANGES"?

3    A.   YES.  BECAUSE IN MY OPINION IN THAT WEEK, HE HAD MADE

4    CHANGES.

5    Q.   TWO WEEKS?

6    A.   CORRECT.

7    Q.   SO NOW, "AT THE PRESENT TIME, MR. LOUGHNER REMAINS

8    DEPRESSED AND AT RISK FOR SUICIDE"; RIGHT?  NOT AT HIGH RISK,

9    BUT AT RISK?

10   A.   YES.

11   Q.   SO WOULD YOU ELEVATE THAT BACK UP TO HIGH RISK NOW THAT

12   YOU'VE SEEN THE NOTE?

13   A.   YES.

14   Q.   SO THAT WOULD BE A CHANGE FOR WORSE TODAY COMPARED TO THE

15   7TH OF SEPTEMBER?

16   A.   YES.

17   Q.   "ALTHOUGH HIS PSYCHOTIC SYMPTOMS HAVE" -- AND YOU SAY IN

18   SEPTEMBER -- "SIGNIFICANTLY DIMINISHED, HE REMAINS PSYCHOTIC."

19            CAN YOU TELL US WHAT CHANGED BETWEEN AUGUST 22ND AND

20   SEPTEMBER 7TH TO GO FROM SLIGHTLY DIMINISHED TO SIGNIFICANTLY

21   DIMINISHED?

22   A.   I WOULD OFFER THAT HE'S EVEN CHANGED MORE TODAY.  THERE

23   HAVE BEEN MORE IMPROVEMENTS FROM THIS REPORT TODAY.

24            HE IS -- IN THE TWO WEEKS FROM AUGUST 22ND TO

25   SEPTEMBER 7TH, ALTHOUGH HE REMAINS DEPRESSED AND HE DOES

1   REMAIN ON SUICIDE WATCH, HE IS ABLE TO HAVE CONVERSATIONS WITH

2   ME.  HIS THINKING IS MORE ORGANIZED, AND IT CONTINUES TO BE

3   BETTER ORGANIZED EVEN IN THE PAST COUPLE OF WEEKS.  HE'S ABLE

4   TO -- I USED THE PHRASE HE STAYS IN THE CONVERSATION.

5        WHAT I MEAN BY THAT IS HE'S ABLE TO -- AS YOU'RE

6   CONVERSING WITH HIM, HE'S ABLE TO CONVERSE BACK.  HE'S ABLE TO

7   HAVE MORE LENGTHY CONVERSATIONS.

8   Q.   CAN YOU GIVE US AN EXAMPLE?

9   A.   WELL, THE EXAMPLE OF HIM ASKING ME ABOUT MY WRIST, AND WE

10  TALKED ABOUT THAT FOR SOME TIME.

11  Q.   WHEN WAS THAT?

12  A.   IT WOULD HAVE BEEN PROBABLY TWO WEEKS AGO, POSSIBLY,

13  AFTER THE DUE PROCESS HEARING.  IF YOU'LL RECALL, THE VERY

14  FIRST HARPER HEARING WE HAD WITH HIM, HE ACTUALLY WEDGED

15  HIMSELF IN BETWEEN THE BED AND THE WALL.  HE WOULDN'T TALK TO

16  DR. TOMELLERI AT ALL.

17        THE SECOND HARPER HEARING THAT WE HAD, HE WAS MORE

18  FORTHCOMING, BUT NOTHING COMPARED TO THE THIRD HARPER HEARING.

19  HE ACTUALLY SAT DOWN.  HE CONVERSED WITH US FOR QUITE SOME

20  TIME.  HE TALKED ABOUT -- I ACTUALLY PRESENTED THE CASE AND

21  SHARED WITH HIM AND DR. TOMELLERI MY CONCERN THAT HE'S AT RISK

22  OF HANGING HIMSELF.

23        AND YOU'LL RECALL FROM DR. TOMELLERI'S REPORT AND MY

24  NOTE HE SAID, "HOW DID YOU KNOW I WAS THINKING ABOUT HANGING

25  MYSELF?"  THAT'S WHAT I MEAN BY STAYING IN CONVERSATION.  THE

1    COMMENTS THAT HE MAKES BACK TO US IS RELEVANT TO WHAT WE'RE

2    DISCUSSING.

3          AND OVER THE LAST COUPLE OF WEEKS, HE CONTINUES TO

4    SHOW IMPROVEMENT IN THOSE AREAS.  FROM AUGUST THE 26TH TO

5    SEPTEMBER 7TH, HE SHOWED IMPROVEMENTS IN THOSE AREAS.

6    Q.    HOW MUCH MORE IMPROVEMENT WOULD YOU NEED?

7    A.    YOU ASKED ME THAT EARLIER.  I WISH I HAD A MAGIC WAND OR

8    SOME WAY I COULD PREDICT THAT.  I CAN'T.  I CAN'T TELL YOU HOW

9    LONG IT'S GOING TO TAKE BEFORE HE'S IMPROVED ENOUGH.

10   Q.    ARE YOU GOING TO LEAVE THAT TO THE JUDGE TO MAKE THAT

11   PREDICTION?

12   A.    I AM GOING TO LEAVE THAT TO THE JUDGE.  I CAN GIVE YOU

13   THE RESEARCH.  I CAN TELL YOU MY EXPERIENCE OVER THE LAST

14   21 YEARS HOW LONG IT TAKES.

15         IT'S TRUE FOR ANY ILLNESS.  IT'S NOT JUST MENTAL

16   ILLNESS.  IT'S TRUE FOR ANY MEDICAL ILLNESS.  WE CAN'T SAY

17   WITH ANY DEGREE OF CERTAINTY -- FOR EXAMPLE, I USE THE EXAMPLE

18   OF BREAST CANCER.  WE KNOW THAT CHEMOTHERAPY HELPS OR

19   RADIATION HELPS, BUT WE CAN'T SAY WITH ANY DEGREE OF CERTAINTY

20   THAT'S GOING TO CURE THE BREAST CANCER OR THAT'S GOING TO

21   CONTROL IT.  BUT WE WOULDN'T WITHHOLD THE TREATMENT REGIMEN

22   BECAUSE WE DON'T KNOW WITH ABSOLUTELY CERTAINTY.

23         I CAN'T TELL YOU HOW HE'S GOING TO RESPOND TO THE

24   MEDICATION OR HOW LONG IT'S GOING TO TAKE HIM TO RESPOND TO

25   MEDICATION.  ALL I CAN TELL YOU TODAY IS THAT HE'S BETTER

1    SINCE HE'S BEEN MEDICATED.

2    Q.   YOU CAN'T TELL US WHETHER HE'S AT FLATLINE NOW OR WILL

3    CONTINUE TO GET BETTER?

4    A.   I CAN'T.  HE MAY BE AT HIS OPTIMUM LEVEL.  I DON'T KNOW

5    THAT.  ALL I KNOW IS HE HAS IMPROVED.  IN THE DAYS THAT WE'VE

6    MEDICATED HIM, 60 PLUS DAYS, HE'S BETTER.

7    Q.   BACK TO YOUR SEPTEMBER 7TH ADDENDUM, YOU ADD INTO THAT

8    MENTAL STATUS PARAGRAPH THAT THERE HAVE BEEN MARKED CHANGES.

9            AND ARE THOSE THE CHANGES THAT YOU'VE TALKED

10   ABOUT?

11   A.   YES.

12   Q.   THEY'RE NOT THE ONES WHERE HE SAYS HE'S NO LONGER

13   RESPONDING TO INTERNAL STIMULI?  IS THAT A MARKED CHANGE?

14   A.   IT IS A CHANGE.

15   Q.   IS THAT ONE OF THE MARKED CHANGES YOU'RE REFERRING TO?

16   A.   IN THE LAST TWO WEEKS, FROM AUGUST 22ND TO SEPTEMBER 7TH,

17   IT IS A CHANGE.  BUT THAT'S NOT THE ONES THAT I WAS

18   REFERENCING.  IT'S THE ONE THAT I JUST MENTIONED.

19   Q.   WE KNOW THAT HE'S STILL RESPONDING TO INTERNAL STIMULI,

20   IT'S JUST NOT AS OBVIOUS; RIGHT?

21           MS. FELDMEIER:  ASKED AND ANSWERED, YOUR HONOR.

22   OBJECTION.

23           THE COURT:  I'LL ALLOW THE ANSWER.

24           THE WITNESS:  WHAT WE KNOW IS HE'S NOT OBVIOUSLY

25   ATTENDING TO INTERNAL STIMULI.  I HAVE ASKED HIM, "ARE YOU

1    STILL HEARING VOICES?"

2              AND HE SAYS, "NO."

3              HE HAS SAID, "I HAVE IMAGINARY FRIENDS."

4    BY MS. CLARKE:

5    Q.   HE MORE READILY ESTABLISHES AND MAINTAINS EYE CONTACT.

6              THAT'S THE SAME ON AUGUST 22ND AND ON

7    SEPTEMBER 7TH?

8    A.   YES.

9    Q.   HIS APPETITE ON SEPTEMBER 7TH HAS BEEN RESTORED;

10   CORRECT?

11   A.   YES.

12   Q.   HE SLEEPS EIGHT TO TEN HOURS A NIGHT?

13   A.   YES.

14   Q.   THAT IS DIFFERENT FROM AUGUST 22ND WHERE HIS APPETITE

15   REMAINED POOR, AND ALTHOUGH IMPROVED HE CONTINUES TO EXHIBIT

16   DIFFICULTY SLEEPING?

17   A.   YES.

18   Q.   THE HARPER REPORT ON THE 21ST OF SEPTEMBER WOULD DIFFER

19   WITH YOU ON APPETITE, WOULD IT NOT?

20   A.   IT WOULD.  I'LL JUST TELL THE COURT RIGHT NOW HIS

21   APPETITE HAS BEEN POOR OVER THE LAST COUPLE OF WEEKS, BUT IT'S

22   BEEN DIFFICULT TO MONITOR EXACTLY WHAT HE'S EATING AND NOT

23   EATING BECAUSE HE ALSO NOW HAS HIS COMMISSARY.  WHAT

24   COMMISSARY IS, BASICALLY HE'S ORDERING FROM THE STORE -- FROM

25   THE PRISON STORE.

1        SO WHAT I'VE ASKED OFFICERS TO DO IS DOCUMENT HOW

2   MUCH HE'S EATING OFF THE TRAY.  HE'S ALSO EATING, I THINK, A

3   FAIRLY SUBSTANTIAL AMOUNT OF HIS COMMISSARY ITEMS, WHICH ARE,

4   IN MY OPINION, JUNK FOOD.

5   Q.   SO BETWEEN AUGUST THE 22ND AND SEPTEMBER THE 7TH, YOU

6   THOUGHT HIS APPETITE HAD BEEN RESTORED, BUT FROM SEPTEMBER THE

7   7TH ON, YOU'RE THINKING IT HASN'T BEEN?

8   A.   I THINK -- IN MY OPINION, HIS APPETITE IN THE LAST COUPLE

9   OF WEEKS HAS WORSENED.  AGAIN, IT'S DIFFICULT TO GAUGE THAT

10  BECAUSE ON SEPTEMBER 7TH, I WROTE AN ORDER FOR HIM TO BE

11  ALLOWED HIS COMMISSARY ITEMS.  HE IS EATING A LARGE AMOUNT.

12       THE ONLY WAY I WOULD KNOW IF HE'S EATING ENOUGH

13  FOOD, HE GETS THREE TRAYS.  MOST INMATES GET TWO.  HE GETS AN

14  EXTRA TRAY, THREE TIMES A DAY.  HE GETS AN EXTRA TRAY.

15       THE ONLY WAY I WOULD KNOW WHAT PERCENTAGE HE WAS

16  EATING OF ALL THE FOOD GIVEN TO HIM IS IF I TOOK HIS

17  COMMISSARY ITEMS AWAY AND I DIDN'T ALLOW ANY OF HIS VISITORS

18  TO GIVE HIM FOOD.  THAT WAY WE COULD MONITOR HIS CALORIE

19  INTAKE.  I DON'T WANT TO TAKE HIS COMMISSARY ITEMS AWAY AND

20  PUT HIM UNDER A REGIMEN WHERE WE DICTATE EXACTLY WHAT HE EATS

21  AND WHAT HE DOESN'T EAT.

22  Q.   DID YOU SEE THE PLEADING THAT WE FILED IN REGARD TO

23  PROPOSING THE EXTENSION?

24  A.   I DID.  THE 28-PAGE, YES.

25  Q.   IN THAT BRIEF WAS CHART --

1    A.    WEIGHT CHART.

2    Q.    WE ALSO TOOK ON YOUR CONCLUSIONS ABOUT APPETITE, SLEEP,

3    AND EYE CONTACT?

4    A.    YES.

5    Q.    YOU READ THAT?

6    A.    YES.

7    Q.    WOULD IT BE FAIR TO SAY THAT HIS WEIGHT HAS GONE UP AND

8    DOWN?

9    A.    HIS WEIGHT HAS FLUCTUATED.  ABSOLUTELY, IT HAS.

10   Q.    THAT WOULD BE REFLECTIVE OF WHAT HE'S EATING; CORRECT?

11   A.    IT IS REFLECTIVE OF WHAT HE'S EATING.  IT'S ALSO

12   REFLECTIVE -- THERE WAS ONE DAY WHERE I THINK HE LOST FIVE

13   POUNDS OR GAINED FIVE POUNDS IN ONE DAY.  HE WAS ACTUALLY

14   WEIGHED ON A DAY, AND THE NEXT DAY THERE WAS A FIVE-POUND

15   DIFFERENCE IN HIS WEIGHT.  I DON'T HAVE AN EXPLANATION FOR

16   THAT.  I WOULD THINK THAT WHEN HE'S PACING MORE, HE'S PROBABLY

17   LOSING WEIGHT.

18   Q.    YOUR SENSE OF HIS APPETITE WAS ACTUALLY JUST OFF BY

19   SEPTEMBER 7TH?

20   A.    YES.

21   Q.    AND YOUR SENSE OF HIS SLEEP, DO YOU THINK THAT'S

22   ACCURATE?

23   A.    I DO THINK THAT'S ACCURATE.

24   Q.    DID YOU SEE IN OUR PLEADING THE DAY BEFORE HE RESTORED

25   HIS SLEEP, THAT YOU WROTE IN A NOTE, "MR. LOUGHNER WAS UNABLE

1    TO GET UP AND TALK TO ME.  HE WAS VERY TIRED.  CORRECTIONAL

2    STAFF NOTED HE DID NOT SLEEP DURING THE NIGHT.  HE WAS UP

3    PACING A FEW TIMES"?

4    A.   YES.

5    Q.   IS THAT A COMMON EXPERIENCE?

6    A.   HE SLEEPS A LOT MORE NOW.  WHAT MY REFERENCE WAS, I WAS

7    REFERENCING WHEN HE DIDN'T SLEEP FOR 50 HOURS THAT ONE TIME.

8    OTHER TIMES, HE DIDN'T SLEEP FOR SIGNIFICANT PERIODS OF TIME.

9    SLEEP HAS RETURNED TO WHAT'S NORMAL.

10          HOWEVER, THAT'S RELATIVE BECAUSE THERE'S TWO THINGS

11   THAT WE NEED TO CONSIDER:  ONE, HE HAS A LIGHT ON IN HIS ROOM

12   24 HOURS A DAY.  IT'S GOING TO CHANGE THE SLEEP HABITS.

13   SECOND, HE DOESN'T HAVE A LOT TO DO.  WHAT I'VE NOTICED WITH

14   INMATES THAT ARE INCARCERATED AND THEY'RE LOCKED IN THEIR

15   ROOMS FOR 24 HOURS A DAY, THEY SLEEP MORE THAN MOST PEOPLE.

16   THEY HAVE NOTHING ELSE TO DO.  HIS SLEEP FOR HIM IS RETURNING

17   TO NORMAL.

18   Q.   RETURNING TO NORMAL MEANING IN JUNE OF THIS YEAR?

19   A.   YES.

20   Q.   IT ALMOST SOUNDS LIKE, DR. PIETZ, THAT WHAT HAPPENED WAS

21   HE HAD A RAPID DECLINE AND THE MEDICATION STABILIZED THAT

22   DECLINE, BUT IT DIDN'T BRING HIM BACK UP TO ANY GOOD LEVEL?

23   A.   SO A RAPID DECLINE --

24   Q.   YOU FIXED THE SYMPTOMS THAT YOU WERE REPORTING IN JULY,

25   BUT NOTHING ELSE?

1    A.    I WOULD ARGUE THAT WE'RE FIXING THE SYMPTOMS.  THEY'RE

2    STILL IMPROVING.  THE RAPID DECLINE WAS FROM JULY 1ST WHEN YOU

3    STOPPED THE MEDICATION TO JULY 18TH.  AND THEN WHEN WE

4    EMERGENCY MEDICATED HIM ON JULY 18TH, HE HAS MADE IMPROVEMENTS

5    AND CONTINUES TO MAKE IMPROVEMENTS.

6    Q.    BACK TO THIS JULY 1ST STAY?

7    A.    THAT'S DIFFICULT TO ANSWER BECAUSE HOW HE WAS DURING THE

8    FIRST EVALUATION -- I'M TALKING ABOUT BACK IN MAY -- WAS SO

9    DIFFERENT FROM HOW HE WAS AFTER HE STOPPED THE MEDICATION.

10   HE'S DIFFERENT TODAY THAN HE WAS WHEN I FIRST EVALUATED HIM

11   BACK IN MAY.  HE'S CERTAINLY MADE IMPROVEMENTS SINCE JULY

12   18TH.

13            BECAUSE IF YOU LOOK FROM THIS PERSPECTIVE, HE HAD A

14   SEVERE INFECTION JULY 18TH.  HE DIDN'T IN MAY.  WHEN HE WAS

15   THERE DURING MAY, HE WOULD JUST GO TO BED FOR HOURS ON END,

16   WHEREAS AFTER -- BEFORE JULY 18TH WHEN WE STOPPED THE

17   MEDICATION, HE WOULD BE UP FOR SIGNIFICANT PERIODS OF TIME.

18   THOSE THINGS WEREN'T THERE THE FIRST TIME WE EVALUATED HIM.

19   Q.    LET ME SHOW A CHART OF THE RECORDS.  IT'S THE PACING

20   CHART.

21            THIS CHART WAS CREATED FROM THE RECORDS FROM JULY

22   THE 18TH THROUGH SEPTEMBER THE 18TH.  WE'RE LIMITED BY THE

23   SUICIDE LOG, RIGHT, BECAUSE THAT'S THE MOST ACCURATE REPORTING

24   OF LAYING IN BED, COVERED HIS HEAD; RIGHT?

25   A.    YES.

1      MS. FELDMEIER:  OBJECTION, YOUR HONOR; FOUNDATION

2  FOR THIS CHART.  THE WITNESS --

3      THE COURT:  YOU MAY TRY TO LAY A FOUNDATION,

4  MS. CLARKE.

5      MS. CLARKE:  WE FILED THE EXHIBIT YESTERDAY WITH AN

6  AFFIDAVIT AS TO THE BASIS FOR IT.

7      THE COURT:  YOU MAY INQUIRE ABOUT IT.

8  BY MS. CLARKE:

9  Q.   SO CAN YOU LOOK AT THE CHART AND SEE THAT WE HAVE CHARTED

10  IT FROM JULY 18TH TO SEPTEMBER 18TH.

11      CAN YOU SEE THAT?  I'M JUST ORIENTING YOU TO THE

12  CHART.

13  A.   YES.

14  Q.   AND THE BLUE IS IN-BED HOURS.  WHETHER IT'S SLEEP OR

15  WHETHER IT'S LAYING IN BED, IT'S HARD TO TELL FROM THE RECORDS

16  BECAUSE I DON'T KNOW WHETHER HE'S SLEEPING OR NOT.

17  A.   CORRECT.

18  Q.   WOULD THE BLUE AMOUNT OF THE TIME OF THE DAY BE

19  CONSISTENT WITH YOUR UNDERSTANDING OF HOW MUCH TIME HE IS

20  SPENDING LAYING IN BED?

21      MS. FELDMEIER:  OBJECTION; RELEVANCE.  THIS WITNESS

22  IS NOT GOING TO BE ABLE TO VERIFY IF THOSE NUMBERS ARE

23  ACCURATE OR WHAT'S CONTAINED IN THE RECORDS.

24      THE COURT:  AFTER LOOKING AT THE EXHIBIT AND

25  ASSUMING THAT THE AREA SHADED IN BLUE WITH THE PEAKS AND THE

1    HOURS REPRESENTS DIFFERENT PERIODS OF TIME THAT MR. LOUGHNER

2    WAS IN BED, CAN YOU ANSWER THE QUESTION?  DOES IT LOOK LIKE --

3    IT APPEARS TO ME AS I LOOK AT IT THAT IT WAS UP FOR A WHILE,

4    BUT IT BEGAN SUBSIDING, AND THEN IT WENT BACK UP TOWARD THE

5    END OF THE PERIOD INDICATED IN THE CHART.

6              DOES THAT COMPORT WITH YOUR RECOLLECTION AND

7    UNDERSTANDING OF HOW MR. LOUGHNER'S BEHAVED?

8              THE WITNESS:  I DON'T KNOW.

9              THE COURT:  THE OBJECTION IS SUSTAINED.  SHE'S NOT

10   ORIENTED AS TO THIS CHART.

11             MS. CLARKE:  WAS SHE TALKING ABOUT JUST THE BEDTIME

12   OR THE REMAINING PARTS OF THE --

13   BY MS. CLARKE:

14   Q.   LET ME JUST TRY TO ORIENT YOU ON --

15             THE COURT:  MAYBE YOU CAN ASK HER IF THIS CHART

16   COMPORTS WITH WHAT THE NOTES SHOW AND WHAT HER RECOLLECTION IS

17   AS TO WHEN HE WAS IN BED AND WHETHER THERE'S VARIABLES.

18             MS. CLARKE:  MAY I SHOW HER --

19             THE COURT:  SURE.

20   BY MS. CLARKE:

21   Q.   THE BLUE SPIKE IS THE AMOUNT OF TIME IN BED.  THE RED IS

22   THE AMOUNT OF TIME SPENT PACING.  YOU CAN SEE THE PACING DROPS

23   OFF.  AND THE GREEN IS THE AMOUNT OF TIME DOING SOMETHING

24   ELSE.

25             WOULD THAT BE ACCURATE WITH WHAT YOU THINK THE

1    RECORDS WOULD SHOW?

2    A.   WITHOUT LOOKING AT THE RECORDS, I DON'T KNOW.

3    Q.   YOU WERE THERE WITH HIM?

4    A.   I AM THERE WITH HIM.  AND I GUESS THE BEST WAY I CAN

5    ANSWER THIS IS SINCE HE'S BEEN MEDICATED, HE IS PACING LESS.

6    IT LOOKS LIKE THIS CHART SHOWS THAT.  IF YOU LOOK AT JULY 24TH

7    TO JULY 26TH -- THIS IS MY INTERPRETATION OF THIS GRAPH --

8    THERE'S A SIGNIFICANT AMOUNT OF PACING GOING ON.

9         NOW, YES, HE'S BEEN IN BED.  IT SAYS HOURS PER DAY.

10   HE'S IN BED, WHAT, 18 HOURS.  BUT I DON'T -- SO IT LOOKS AS

11   THOUGH -- IF YOU LOOK AT JULY 24TH, HE PACED FOR 14 HOURS?

12   THAT'S PRETTY SIGNIFICANT.  IF YOU GO TO THE END OF THE GRAPH

13   ON JULY 26TH, IT LOOKS AS THOUGH -- MAYBE THIS IS MY

14   INTERPRETATION -- THAT HE'S ONLY PACING FOR AN HOUR MAYBE.  SO

15   THAT WOULD SUGGEST TO ME THE MEDICATION'S BEEN EFFECTIVE.

16   Q.   I GUESS WHAT OUR PROBLEM IS IS YOU'RE NOT SURE IF THE

17   CHART IS ACCURATE?

18   A.   WELL, I'M JUST TELLING YOU BASED ON LOOKING AT THIS AND

19   WHAT YOU'RE TELLING ME, IT LOOKS TO ME LIKE THAT THE

20   MEDICATION HAS BEEN EFFECTIVE TOWARD REDUCING HIS PACING,

21   WHICH IS EXACTLY WHAT WE WANTED TO DO.

22   Q.   DOES IT LOOK LIKE IT GOES UP AND DOWN?

23   A.   I'M LOOKING FROM -- YOU CAN'T LOOK AT THIS FROM ONE DAY.

24   YOU HAVE TO LOOK AT IT OVER A PERIOD OF TIME.  THIS GRAPH

25   SHOWS JULY 18TH TO SEPTEMBER 18TH.  AROUND JULY 24TH -- AND

1    AGAIN, THIS IS MY INTERPRETATION OF THE RED -- IT LOOKS LIKE

2    HE WAS PACING A SIGNIFICANT AMOUNT OF TIME.

3          YES, HE WAS ALSO IN BED.  THAT'S WHETHER MEDICATION

4    WAS ABOUT KEEPING A BETTER EYE WAS REDUCING THE PACING.  WHEN

5    YOU GO OVER TO THIS LAST PART, WHICH IS SEPTEMBER 16TH, HE'S

6    PACING A VERY INSIGNIFICANT AMOUNT.

7    Q.   AND MORE TIME IN BED?

8    A.   YES.  THE MEDICATION WASN'T -- WE WEREN'T GIVING HIM

9    MEDICATION TO CHANGE BEING IN BED OR NOT BEING IN BED.  WE

10   WERE GIVING MEDICATION TO CHANGE THE PACING.

11   Q.   THE MEDICATION SEDATES; RIGHT?

12   A.   I CAN SEDATE, YES.

13   Q.   IT MADE HIM DROWSY; RIGHT?

14   A.   YES.

15   Q.   TO THE POINT WHERE DR. SARRAZIN SAID NOW MODIFY THE

16   MEDICATION TO DIFFERENT TIMES OF THE DAY, DIFFERENT LEVELS;

17   RIGHT?

18   A.   EXACTLY, WHICH IS WHY YOU MONITOR A PERSON ONCE YOU GIVE

19   THEM THIS MEDICATION OVER A PERIOD OF TIME.  DR. SARRAZIN

20   NEEDS TO ADJUST THE MEDICATION FOR THOSE PARTICULAR THINGS

21   LIKE SEDATION AND GET HIM ON A THERAPEUTIC LEVEL.

22   Q.   SO YOU ADDRESSED PACING OR AGITATION, HOWEVER YOU CALL

23   IT, WITH MEDICATION.  YOU GET THAT UNDER CONTROL.

24         NOW YOU HAVE TO MEDICATE TO GET HIM BACK OUT OF BED;

25   RIGHT?

1              MS. FELDMEIER:  OBJECTION, YOUR HONOR; RELEVANCE.

2              THE COURT:  SUSTAINED.  WE'RE LARGELY OFF TRACK AT

3    THIS POINT.  THE EXAMINATION HAS CONTINUED FOR A LONG TIME.

4    I'D ASK YOU TO FOCUS, MS. CLARKE, ON THE CONCLUSIONS THAT YOU

5    DISPUTE.

6    BY MS. CLARKE:

7    Q.   LET ME ASK ABOUT EYE CONTACT.

8              THAT'S ANOTHER SYMPTOM OF THE SCHIZOPHRENIA;

9    RIGHT?

10   A.   YES.

11   Q.   YOU SUGGESTED THAT THE EYE CONTACT HAS GOTTEN A LOT

12   BETTER?

13   A.   YES.

14   Q.   AND WE SUGGESTED IN OUR PLEADING THAT THAT WAS NOT TRUE.

15             DO YOU AGREE OR DISAGREE WITH THAT HAVING LOOKED

16   BACK?

17   A.   I DISAGREE.

18   Q.   YOU THINK THE EYE CONTACT HAS GOTTEN BETTER?

19   A.   YES, ABSOLUTELY.

20   Q.   DRAMATICALLY BETTER?

21   A.   YES.

22   Q.   YOU SAY THAT HE REMAINS PSYCHOTIC.

23             YOU'RE COMFORTABLE WITH THAT CONCLUSION?

24   A.   YES.

25   Q.   AND YOU HAVE ASKED THE COURT FOR EIGHT MORE MONTHS TO

1    RESTORE MR. LOUGHNER'S COMPETENCY; CORRECT?

2    A.   YES.

3    Q.   AND IN YOUR REPORT ON SEPTEMBER 7TH, YOU ASKED THE COURT

4    FOR FOUR MORE MONTHS TO RESTORE TO COMPETENCY; CORRECT?

5    A.   YES.

6    Q.   YOUR REPORT SAID, "HISTORICALLY, MOST PEOPLE RESTORE IN

7    EIGHT MONTHS FROM COMMITMENT"; RIGHT?

8    A.   DID IT SAY "COMMITMENT" OR DID IT SAY ONCE WE BEGIN

9    MEDICATION?

10   Q.   DO YOU HAVE --

11   A.   WAS IT THE ADDENDUM PROGRESS REPORT?

12   Q.   YES.

13   A.   THE SEPTEMBER 7TH?

14   Q.   YES.  PAGE 3 AT THE BOTTOM, "HISTORICALLY, MOST

15   DEFENDANTS REACH COMPETENCY WITHIN EIGHT MONTHS OF THEIR

16   COMMITMENT."

17   A.   YES, I DID SAY THAT.

18   Q.   DID YOU MEAN SOMETHING DIFFERENT?

19   A.   WELL, THIS IS THE DIFFICULTY:  WE HAVE INDIVIDUALS THAT

20   ARE COMMITTED TO OUR FACILITY THAT REMAIN ON MEDICATION FOR

21   MAYBE A YEAR.  SO THE EIGHT MONTHS GOES TO WHEN WE START TO

22   MEDICATE THEM.  AND BECAUSE OF SELL, WHEN I WRITE SELL

23   REPORTS, I ACTUALLY ASK THAT THE COMMITMENT PERIOD BEGIN THE

24   DAY THAT WE WERE ALLOWED TO MEDICATE THEM.  SO THAT'S WHAT I

25   MEAN BY "COMMITMENT."  SO IN MY OPINION, HIS COMMITMENT

1   STARTED JULY 18TH.  THAT'S WHEN WE STARTED MEDICATING HIM

2   CONSISTENTLY.

3   Q.   THAT JUST WASN'T VERY CLEARLY WRITTEN?

4   A.   I AGREE.  IT WASN'T CLEARLY WRITTEN.

5   Q.   WHAT YOU MEANT TO WRITE, "HISTORICALLY, MOST DEFENDANTS

6   REACH COMPETENCY WITHIN EIGHT MONTHS OF THEIR MEDICATION"?

7   A.   WHEN MEDICATION HAS STARTED, YES.

8   Q.   AND AT THE SAME TIME, THE NEXT SENTENCE YOU RECOMMENDED

9   AN EXTENSION OF FOUR MONTHS?

10   A.   YES.

11   Q.   IS THAT BECAUSE MR. LOUGHNER WAS ON MEDICATION FOR

12   TEN WEEKS BEFORE SEPTEMBER 7TH?

13   A.   NO.  IT'S BECAUSE THAT'S MY UNDERSTANDING OF THE STATUTE.

14   IT'S THE -- OVER THE YEARS WHEN WE HAVE REQUESTED EXTENSIONS,

15   WE'VE ALWAYS ASKED FOR FOUR MONTHS BECAUSE MOST COURTS HAVE

16   UNDERSTOOD THAT THEY CAN -- THE STATUTE 4D STATUTE READS THAT

17   THEY CAN ALLOW US AN EXTENSION OF FOUR MONTHS.  AND IF WE NEED

18   ANOTHER FOUR MONTHS, WE ASK FOR A SECOND EXTENSION.

19   Q.   WHERE DOES THE STATUTE SAY YOU CAN GET AN EXTENSION FOR

20   FOUR MONTHS?

21   A.   IT'S BASED ON INTERPRETATION.  IT'S BASED ON

22   INTERPRETATION BY VARIOUS COURTS, JUDGES.  I DON'T THINK THAT

23   IT SAYS THAT, BUT JUDGES THROUGHOUT THE UNITED STATES HAVE

24   UNDERSTOOD THAT.  THEY WILL GRANT UP TO FOUR MONTHS.  IF I

25   NEED A SECOND EXTENSION, I WILL ASK FOR A SECOND EXTENSION OF

1    UP TO FOUR MONTHS.

2    Q.    SO YOU WERE MISREADING THE STATUTE?

3    A.    I BELIEVE SO.  I WAS FOLLOWING A FEDERAL JUDGE'S ORDERS.

4    Q.    YOU'RE NOT FAMILIAR WITH THE IDEA THAT A JUDGE HAS TO

5    MAKE A DETERMINATION THAT WITHIN WHATEVER ADDITIONAL

6    REASONABLE PERIOD OF TIME, THERE WILL BE RESTORATION?

7    A.    I'M ACTUALLY VERY FAMILIAR WITH THAT.  MOST JUDGES GRANT

8    THE EXTENSION REQUEST AND SAY, "IF YOU NEED ANOTHER

9    FOUR MONTHS" -- I'M NOT EVEN GOING TO SAY MOST.  I WOULD SAY

10   ALL HAVE GRANTED MY EXTENSION REQUEST UP TO FOUR MONTHS.

11   Q.    ONCE?

12   A.    AND THEN THERE HAVE BEEN TIMES WHEN I ASKED FOR A SECOND

13   EXTENSION AND I ASKED FOR ANOTHER FOUR MONTHS.  THAT'S BEEN

14   GRANTED.

15   Q.    NOW, YOUR AUGUST 22ND REPORT CONTAINED NO REQUEST FOR

16   SPECIFIC TIME.

17   A.    WHICH -- AND THE REASON WHY I DID THAT IS BECAUSE THAT'S

18   HOW WE HAVE DONE EXTENSION REQUESTS.  WE DON'T ASK FOR A

19   CERTAIN AMOUNT OF TIME.  FEDERAL JUDGES HAVE UNDERSTOOD THAT

20   THEY CAN GRANT FOUR MONTHS.

21   Q.    AND NO MORE?

22   A.    THAT'S THEIR UNDERSTANDING.  IF I NEED ANOTHER EXTENSION,

23   I ASK FOR A SECOND EXTENSION.

24   Q.    IS THAT WRITTEN DOWN IN B.O.P. POLICY?

25   A.    NO.  IT'S JUST HOW FEDERAL JUDGES HAVE UNDERSTOOD IT.

1    AND I THINK WITH THE SELL DECISION, THERE HAVE BEEN DATES THAT

2    HAVE EVOLVED.  FOR EXAMPLE, WHEN I WRITE A SELL REPORT, I ASK

3    THAT DEFENDANTS ARE -- BECAUSE IT WAS VERY CONFUSING FOR A

4    COURT, IT WAS VERY CONFUSING FOR US TO ASK, "WHEN DOES THE

5    COMMITMENT START AND WHEN DOES IT END?"  SO I THINK THE SELL

6    DECISION WAS CREATED FOR US AS A FACILITY AND FOR FEDERAL

7    COURTS THROUGHOUT THE UNITED STATES.

8    Q.    BUT YOU'RE NOT IN A SELL SITUATION?

9    A.    I'M NOT.  BUT BECAUSE OF THAT, I'M SAYING THAT SELL HAS

10   EVOLVED.  I'VE BEEN DOING THIS FOR 21 YEARS.  THIS IS HOW

11   FEDERAL JUDGES HAVE UNDERSTOOD AN EXTENSION REQUEST.  THAT'S

12   THEIR INTERPRETATION.  I SIMPLY WRITE AND SAY, "I NEED AN

13   EXTENSION."  THEY GRANT WHATEVER TIME THEY UNDERSTAND THE

14   STATUTE TO MEAN.

15   Q.    THEN YOU WRITE AND SAY, "I NEED ANOTHER EXTENSION," AND

16   THEY GRANT WHATEVER ELSE YOU ASK FOR?

17   A.    THERE HAVE BEEN TIMES WHEN THEY HAVEN'T GRANTED THE

18   EXTENSION.  THERE HAVE BEEN TIMES WHEN THEY HAVE.

19   Q.    THE EIGHT MONTHS THAT YOU TELL JUDGE BURNS ABOUT IN YOUR

20   SEPTEMBER 7TH REPORT, YOU WERE ABOUT TO SAY A LITTLE WHILE AGO

21   THAT THERE ARE STUDIES YOU BASE THIS ON; CORRECT?

22   A.    YES.

23   Q.    YOU PROVIDED THE FIVE ARTICLES MS. FELDMEIER PROVIDED TO

24   ME; RIGHT?

25   A.    YES.

1   Q.   THOSE ARE THE STUDIES UPON WHICH YOU BASE YOUR

2   DETERMINATION THAT EIGHT MONTHS FROM MEDICATION IS WHAT IT

3   TAKES TO RESTORE MOST DEFENDANTS TO COMPETENCY?

4   A.   I ACTUALLY BASED THAT ON MY EXPERIENCE.  I HAVE OVER THE

5   YEARS BEEN RESPONSIBLE FOR RESTORING A NUMBER OF DEFENDANTS,

6   AND THERE'S A WIDE RANGE OF TIME THAT THEY'VE RESPONDED TO

7   MEDICATIONS.  SOME RESPOND QUICKLY; SOME IT TAKES UP TO

8   EIGHT MONTHS.  I'VE HAD SOME COLLEAGUES THAT IT'S TAKEN

9   12 MONTHS.

10          SO BASED ON MY EXPERIENCE AND BASED ON MY

11  COLLEAGUES' EXPERIENCE, I WAS ASKED SPECIFICALLY BY THIS COURT

12  TO PROVIDE SOME ARTICLES THAT PROVIDED A RATIONALE FOR MY

13  ARGUMENT.  I CHOSE THESE FIVE ARTICLES.

14          I ALSO RELY ON A BOOK CALLED PSYCHOLOGICAL

15  EVALUATIONS FOR THE COURT.  HE TALKS ABOUT COMPETENCY

16  RESTORATION.

17          I HAVE OTHER SOURCES THAT -- PATTY ZAPF WROTE A

18  CHAPTER.  SHE TALKS ABOUT COMPETENCE RESTORATION.  SHE'S

19  ACTUALLY ONE OF THE AUTHORS.

20          THIS COURT ASKED FOR SOME SPECIFIC SCHOLARLY

21  ARTICLES THAT ADDRESS HOW YOU COME UP WITH THAT AMOUNT OF

22  TIME.  I PROVIDED THAT TO THE COURT.  SO MY REQUEST FOR

23  EIGHT MONTHS IS BASED ON MY EXPERIENCE OF HOW LONG IT TAKES

24  SOMEONE.  IT'S ALSO BASED ON SCHOLARLY ARTICLES.  IT'S BASED

25  ON WHAT MOST CLINICIANS WOULD SAY.

1    Q.    WHO TOLD YOU THAT THE COURT ASKED FOR SCHOLARLY

2    ARTICLES?

3    A.    I THINK THE PROSECUTION INDICATED THAT I NEEDED AN

4    ARTICLE.  I THINK THERE WAS A REQUEST TO SEND AN ARTICLE

5    SUPPORTING MY OPINION OF EIGHT MONTHS.

6    Q.    I THINK THE REQUEST WAS BY THE DEFENSE FOR THE UNDERLYING

7    BASIS FOR YOUR OPINION.

8    A.    THAT'S PROBABLY WHERE THAT CAME FROM.

9    Q.    AND DID YOU GO BACK THROUGH YOUR RECORDS AND DO YOU KEEP

10   DATA ON HOW MANY PEOPLE YOU HAVE RESTORED AND WHO THEY ARE AND

11   WHAT THEIR DIAGNOSES WERE AND WHAT THEIR SYMPTOM PICTURE

12   WAS?

13   A.    I ACTUALLY HAVE A COLLEAGUE IN NORTH CAROLINA THAT HAS

14   REQUESTED THAT AND HAS AN ARTICLE THAT'S WRITTEN.  I CAN'T

15   REALLY SUBMIT BECAUSE THE BUREAU OF PRISONS HASN'T APPROVED IT

16   TO BE SUBMITTED FOR PUBLICATION WHERE HE ACTUALLY DOES HAVE

17   THAT DATA.  SOME OF THE CASES THAT HE INCLUDED IN HIS RESEARCH

18   WERE CASES THAT I ACTUALLY -- THEY WERE MY CASES.

19   Q.    DOES HE HAVE ALL OF THE DATA FROM WHICH YOU BASE YOUR

20   EXPERIENTIAL FIGURE OF EIGHT MONTHS?

21   A.    NO, I DO NOT.  I DO NOT HAVE THAT DATA IN MY HANDS WHERE

22   I CAN TELL YOU THAT I RESTORED THIS AMOUNT OF INDIVIDUALS OR

23   THIS DIAGNOSIS AND THEY WERE COMMITTED FOR THE SAME AMOUNT OF

24   TIME.  IT WOULD TAKE A LONG TIME TO PUT THAT INFORMATION

25   TOGETHER.

1  Q.   SO WE ESSENTIALLY RELY ON YOUR OPINION WHEN YOU SAY,

2  "THAT'S MY EXPERIENCE"?

3  A.   INTEGRITY MEANS MORE THAN JUST MY OPINION.

4  Q.   I WAS NOT DEMEANING YOU.  THAT'S WHAT WE'RE RELYING ON.

5  A.   YOU'RE RELYING ON MY PROFESSIONAL EXPERIENCE OF DOING

6  THIS FOR 21 YEARS.

7  Q.   WITHOUT BEING ABLE TO SEE WHAT DATA YOU WERE RELYING ON;

8  RIGHT?

9  A.   I DO NOT HAVE HARD DATA OF MY CASES THAT I CAN SHOW TO

10  YOU.

11  Q.   WOULD YOU AGREE THAT THERE ARE VARIABLES IN WHETHER OR

12  NOT INDIVIDUALS ARE LIKELY TO BE RESTORED TO COMPETENCY?

13  A.   ABSOLUTELY.

14  Q.   SOME OF THOSE VARIABLES ARE WHETHER THE PERSON SUFFERS

15  FROM A PSYCHOTIC DISORDER?

16  A.   YES.

17  Q.   SCHIZOPHRENIA?

18  A.   YES.

19  Q.   PEOPLE WITH PSYCHOTIC DISORDERS ARE LESS LIKELY TO

20  RESTORE THAN PEOPLE WITH NONPSYCHOTIC DISORDERS; CORRECT?

21  A.   NONPSYCHOTIC DISORDERS LIKE DEPRESSION?  IF YOU'RE

22  TALKING ABOUT MENTAL RETARDATION, THE RESEARCH SUGGESTS THAT

23  PERSONS WITH MENTAL RETARDATION -- SO WHAT'S A NONSPYCHOTIC

24  DISORDER?

25  Q.   PSYCHOTIC DISORDERS ARE LESS LIKELY TO RESTORE THAN

1    SOMEONE WHO IS NOT PSYCHOTIC, YES OR NO?

2    A.    THEY ARE --

3    Q.    LESS LIKELY?

4    A.    TO BE RESTORED TO COMPETENCY?  I DON'T KNOW THAT I WOULD

5    SAY THAT.  IF YOU LOOK AT THE DATA, THAT SUGGESTS THAT 70,

6    80 PERCENT OF INDIVIDUALS, REGARDLESS OF THEIR DIAGNOSIS, CAN

7    BE RESTORED TO COMPETENCY.

8    Q.    WHERE DO YOU GET THAT DATA?

9    A.    WELL, YOU CAN LOOK AT PATTY ZAPF'S ARTICLE.

10   Q.    WHY DON'T WE LOOK AT PATTY ZAPF'S ARTICLE.

11         THE ARTICLE THAT YOU PROVIDED BY PATTY ZAPF IS

12   CAPTIONED "FUTURE DIRECTIONS IN THE RESTORATION OF COMPETENCY

13   TO STAND TRIAL."

14         IS THAT THE ONE YOU'RE RELYING ON?

15   A.    "FUTURE DIRECTIONS AND RESTORATION OF COMPETENCY."

16   Q.    THAT'S THE ONE?

17   A.    ACTUALLY, I DON'T KNOW IF IT'S SPECIFIED IN HERE OR THE

18   CHAPTER THAT SHE WROTE IN THE BOOK I MENTIONED.

19         IF YOU LOOK AT PAGE -- I DON'T HAVE A PAGE NUMBER ON

20   MINE -- THE SECOND PAGE AND YOU LOOK AT THE FIRST FULL

21   PARAGRAPH, SHE SAYS, "THESE AUTHORS REPORTED THAT 72.3 PERCENT

22   OF ADMISSIONS OVER THE TIME PERIOD WERE RESTORED TO COMPETENCE

23   WITHIN SIX MONTHS AND 83.9 PERCENT WITHIN ONE YEAR."

24         SHE'S REFERENCING MORRIS AND PARKER --

25   Q.    I'M WITH YOU.

1    A.    -- WHICH IS ANOTHER ARTICLE THAT I ACTUALLY PROVIDED.

2    Q.    DO YOU WANT TO --

3    A.    HOWEVER YOU WANT TO DO IT.

4    Q.    LET'S LOOK AT PATTY ZAPF.

5              THE COPY OF THE ARTICLE I RECEIVED FROM THE

6    PROSECUTION HAD THREE PARAGRAPHS HIGHLIGHTED IN YELLOW.

7    A.    I DON'T HAVE THAT.

8    Q.    DID YOU DO THAT OR DID THE PROSECUTOR DO THAT?

9    A.    I DID NOT DO IT.

10   Q.    THE COPY THAT I RECEIVED BY EMAIL, WHICH WAS APPARENTLY

11   THE COPY THAT YOU PROVIDED TO THE PROSECUTION, HAD

12   THREE PARAGRAPHS HIGHLIGHTED IN YELLOW.

13             DID YOU DO THAT?

14   A.    IT'S POSSIBLE -- I ASKED PATTY TO SEND THIS DIRECTLY TO

15   ME.  IT'S POSSIBLE THAT SHE DID IT.

16   Q.    LET ME READ IT TO YOU.  THE FIRST PARAGRAPH THAT'S

17   HIGHLIGHTED IN YELLOW IN MY COPY SAYS, "THE VAST MAJORITY,

18   AROUND 75 PERCENT, OF INCOMPETENT DEFENDANTS WERE RETURNED TO

19   COURT AS COMPETENT WITHIN ABOUT SIX MONTHS."

20   A.    COULD YOU DIRECT ME TO WHERE YOU --

21   Q.    YES.  I'M SORRY.  THE FIRST PAGE.

22             DO YOU HAVE THAT?  RIGHT-HAND COLUMN.

23   A.    OKAY.  I'M THERE.

24   Q.    SEE IT?

25   A.    YES.

1   Q.   YOU DIDN'T HIGHLIGHT THAT?

2   A.   SHE MAY HAVE.  I DON'T KNOW.

3   Q.   YOU JUST READ TO US -- LOOK AT PAGE 2 OF THAT.

4   A.   YES.

5   Q.   YOU JUST READ TO US ANOTHER PARAGRAPH THAT'S HIGHLIGHTED.

6        "THESE AUTHORS," REFERRING TO MORRIS AND PARKER,

7   "REPORTED A 72.3 PERCENT OF THE ADMISSIONS OVER THIS TIME

8   PERIOD WERE RESTORED TO COMPETENCY WITHIN SIX MONTHS AND

9   83.9 PERCENT WITHIN ONE YEAR"?

10  A.   YES.

11  Q.   AND THE SENTENCE BELOW THAT THAT YOU DID NOT READ TO US

12  IS, "THOSE WITH MOOD DISORDERS WOULD MOST LIKELY BE RESTORED

13  AND WERE SIGNIFICANTLY MORE LIKELY TO BE RESTORED THAN THOSE

14  DIAGNOSED WITH PSYCHOTIC DISORDERS"; IS THAT CORRECT?

15  A.   YES.

16  Q.   THAT WAS THE QUESTION I ASKED YOU, "PSYCHOTIC DISORDERS

17  WERE LESS LIKELY TO BE RESTORED, CORRECT?" AND YOU AGREED?

18  A.   YES.

19  Q.   AND MR. LOUGHNER SUFFERS FROM A PSYCHOTIC DISORDER?

20  A.   YES.

21  Q.   IS IT DR. ZAPF, PATTY ZAPF?  IS SHE A DOCTOR?

22  A.   YES.

23  Q.   DR. ZAPF ALSO CRITIQUES SOME OTHER STUDY.

24       HER ARTICLE IS A SUMMARY STUDY; RIGHT?

25  A.   YES.

1    Q.   AND HER BOTTOM LINE WAS, "WE REALLY DON'T KNOW"; RIGHT?

2    A.   I DON'T KNOW.

3         WHERE DID SHE SAY THAT?

4    Q.   IF YOU READ THE ENTIRE ARTICLE, SHE SAID, "WE REALLY

5    DON'T KNOW.  WE CAN DRAW SOME CONCLUSIONS.  PSYCHOTIC

6    DISORDERS ARE LESS LIKELY TO BE RESTORED"?

7    A.   YES.

8    Q.   SHE FOUND THAT -- AND I'LL ASK YOU ABOUT THIS.  SHE FOUND

9    THAT -- HUBBARD, ZAPF & RONAN -- WHEN YOU LOOK ON PAGE 2.

10   THEY FOUND THAT THE TWO MOST IMPORTANT VARIABLES WERE CURRENT

11   VIOLENT CHARGE AND PREVIOUS CRIMINAL HISTORY --

12   A.   YES.

13   Q.   -- WERE THE TWO MOST SIGNIFICANT PREDICTORS OF

14   RESTORABILITY?

15   A.   YES.

16   Q.   SHE CONCLUDES THAT PERHAPS THAT'S BIASED BY THE

17   EVALUATORS?

18   A.   YES.

19   Q.   DO YOU AGREE THAT EVALUATORS HAVE BIAS?

20   A.   YES.

21   Q.   AND THAT IT CAN SKEW THE CONCLUSION THAT SOMEBODY WILL OR

22   WON'T RESTORE TO COMPETENCY?

23   A.   I DON'T KNOW WHAT PATTY WAS REFERENCING WHEN SHE SAID

24   THAT THEY COULD BE BIASED.  BUT ABSOLUTELY, THAT COULD IMPACT

25   THE DECISION THAT THE PERSON WILL BE RESTORED TO COMPETENCY.

1    Q.   THAT BIAS COULD ARISE FROM THE -- THEY POSTULATED IT

2    MIGHT BE THE RESULT OF POLITICAL PRESSURES TO HOLD ACCOUNTABLE

3    AND TO TAKE TO TRIAL THOSE INDIVIDUALS CHARGED WITH VIOLENT

4    CRIMES AND CRIMINAL HISTORIES; RIGHT?

5    A.   YES.

6    Q.   YOU AGREE THAT THAT CONCLUSION IS RIGHT?

7    A.   I AGREE THAT WHAT SHE SAID IN THIS ARTICLE IS -- WHAT YOU

8    JUST READ IS WHAT SHE SAID IN THIS ARTICLE?

9    Q.   YOU AGREE WITH THAT?

10   A.   I DON'T KNOW THAT I DO AGREE WITH THAT.

11   Q.   YOU DON'T?

12   A.   YOU'RE ASKING ME IF I FEEL POLITICAL PRESSURE TO FIND A

13   PERSON COMPETENT?

14   Q.   THAT SOME PEOPLE CAN FEEL POLITICAL PRESSURE TO FIND

15   SOMEBODY INCOMPETENT?

16   A.   IT'S POSSIBLE THEY DO.  I DON'T HAVE ANY COLLEAGUES THAT

17   DO.

18   Q.   PATTY ZAPF ALSO CONCLUDED THAT "RESEARCH" -- THE SECOND

19   PAGE, ABOUT TEN LINES DOWN.  "RESEARCH CONDUCTED SINCE THEN,"

20   AND IT'S REFERRING TO A STUDY OF 1980 --

21   A.   ARE YOU ON THE LEFT SIDE OR RIGHT SIDE?

22   Q.   YES.

23         "RESEARCH CONDUCTED SINCE THEN HAS CONFIRMED THAT

24   THE ABILITY TO PREDICT COMPETENCY RESTORATION IS POOR"; RIGHT?

25   A.   YES.

1    Q.    DO YOU AGREE WITH THAT CONCLUSION?

2    A.    I DON'T AGREE WITH THAT.

3    Q.    YOU DON'T AGREE?

4    A.    NOT WHEN THE STATISTICS SUGGEST THAT WE ARE ABLE TO

5    RESTORE 70 TO 80 PERCENT.  I UNDERSTAND THAT STATEMENT TO MEAN

6    WE CAN'T SAY WITH ABSOLUTE CERTAINTY THAT A PERSON IS GOING TO

7    BE RESTORED WITHIN THIS AMOUNT OF TIME.

8    Q.    THAT'S THE PROBLEM THAT SHE NOTES, IS THAT THERE'S A --

9    75 PERCENT OF THE PEOPLE ARE RETURNED TO COURTS RESTORED, AND

10   THE PREDICTION RATE IS 78 PERCENT.  SO IT MEANS THAT YOU CAN

11   GUESS AND BE MAYBE RIGHT.

12   A.    WELL, I UNDERSTAND THAT STATISTIC TO MEAN THAT IF YOU'RE

13   75 PERCENT CORRECT, YOU'RE 25 PERCENT INCORRECT.

14   Q.    THE PREDICTION RATE IS 78 PERCENT.

15         SO IT'S JUST LIKE GUESSING?

16   A.    I DON'T THINK IT'S 50-50.

17   Q.    IT MAY BE BETTER.

18         SHE CONCLUDES THAT THERE IS A HIGH BASE RATE

19   PROBLEM; RIGHT?

20   A.    YES.

21   Q.    SINCE MOST ARE RESTORED, YOU CAN'T REALLY SAY YOUR

22   PREDICTIONS ARE CORRECT.

23         DO YOU AGREE OR DISAGREE WITH HER CONCLUSION?

24   A.    I DON'T KNOW HOW YOU INTERPRET THAT OR WHAT YOU'RE

25   SAYING.  YOU'RE TALKING ABOUT THEIR PREDICTIONS THAT A PERSON

1    WOULD BE RESTORED TO COMPETENCY?

2    Q.   LET'S READ --

3              THE COURT:  MS. CLARKE, WE'LL TAKE AN AFTERNOON

4    BREAK.

5              THE COURT WILL BE RECESS FOR ANOTHER 15 MINUTES.  I

6    NOTE NOW THAT THE DEFENSE CROSS-EXAMINATION HAS GONE ON FOR

7    MORE THAN TWO HOURS, TWO AND A HALF HOURS.

8              MS. CLARKE:  WE'RE NEAR THE CONCLUSION.

9              THE COURT:  WELL, I'M GOING TO EXERCISE THE

10   AUTHORITY; THAT I HAVE UNDER RULE 61 TO CONTROL THE MODE OF

11   INTERROGATION AND THE TIME.  YOU'LL HAVE 15 MINUTES WHEN WE

12   COME BACK TO CONCLUDE QUESTIONS TO THIS WITNESS, AND THEN

13   WE'LL GET TO THE NEXT WITNESS.  WE'RE IN RECESS.

14             MS. CLARKE:  THANK YOU, YOUR HONOR.

15                         (RECESS)

16             THE COURT:  WE'RE BACK ON THE RECORD IN THE MATTER

17   OF UNITED STATES VERSUS LOUGHNER.  THE DEFENDANT IS PRESENT.

18   ALL COUNSEL ARE PRESENT.  DR. PIETZ IS STILL ON THE WITNESS

19   AND UNDER OATH.

20             MS. CLARKE, YOU MAY CONTINUE YOUR EXAMINATION.

21                **CROSS-EXAMINATION (CONTINUED)**

22   **BY MS. CLARKE:**

23   Q.   DR. PIETZ, RATHER THAN PAINFULLY GOING THROUGH ALL THESE

24   ARTICLES FOR YOU AND FOR ME, CAN I ASK YOU, ARE YOU RELYING ON

25   THOSE ARTICLES THAT YOU FORWARDED TO MS. FELDMEIER AS A BASIS

1    OF YOUR OPINION OR ARE YOU RELYING ON YOUR EXPERIENCE?

2    A.    I'M RELYING ON BOTH.

3    Q.    SO YOU'RE RELYING ON THE DATA IN THESE ARTICLES AS A

4    BASIS FOR YOUR OPINION THAT MOST DEFENDANTS RESTORE WITHIN

5    EIGHT MONTHS OF MEDICATION?

6    A.    MAY I ANSWER THAT?

7    Q.    PLEASE.

8    A.    I'M RELYING ON MY EXPERIENCE, MY COLLEAGUES' EXPERIENCE,

9    THE ARTICLES THAT I PROVIDED AND THE CHAPTERS THAT I

10   MENTIONED, BECAUSE THOSE ARE TWO BOOKS THAT I FREQUENTLY USE

11   AS A REFERENCE.

12   Q.    FOR YOUR EXPERIENCE, WE DON'T HAVE ANY DATA, WE HAVE YOUR

13   TESTIMONY; RIGHT?

14   A.    CORRECT.

15   Q.    FOR YOUR COLLEAGUES' EXPERIENCE, WE DON'T HAVE ANY DATA,

16   WE HAVE WHAT YOU TESTIFIED THEY HAVE TOLD YOU; CORRECT?

17   A.    CORRECT.

18   Q.    AND FOR THE DATA, WE HAVE THESE FIVES ARTICLES THAT YOU

19   SUBMITTED TO THE PROSECUTION; RIGHT?

20   A.    YES.

21   Q.    WHICH YOU BELIEVE STAND FOR THE PROPOSITION THAT I HAVE

22   REPEATED, THAT MOST DEFENDANTS RESTORE WITHIN EIGHT MONTHS OF

23   MEDICATION?

24   A.    YES.

25   Q.    I WOULD ASK YOU, RATHER THAN SPENDING TIME ON EXAMINING

1    THEM, IF YOU WOULD LOOK AT THOSE FIVE ARTICLES AND PROVIDE TO

2    US -- NOT RIGHT NOW BECAUSE THE JUDGE WANTS YOU OFF THE

3    STAND -- AND PROVIDE TO US, IF IT'S OKAY WITH THE COURT --

4    WHERE IN THOSE ARTICLES THAT ANY OF THOSE ARTICLES REACH THE

5    CONCLUSION THAT MOST DEFENDANTS RESTORE WITHIN EIGHT MONTHS OF

6    MEDICATION.  OKAY?  WOULD THAT BE ALL RIGHT?

7    A.   YES.

8         MS. CLARKE:  AND I HAVE ONE LAST EXHIBIT THAT I DID

9    FIND, YOUR HONOR, I'D LIKE TO SHOW IT.

10   BY MS. CLARKE:

11   Q.   WE'RE TALKING ABOUT INTERNAL STIMULI.

12        AND I BELIEVE THAT YOU'RE WITH ME THAT HE IS STILL

13   RESPONDING TO INTERNAL STIMULI, IT'S JUST NOT AS OBVIOUS?

14   A.   YES.

15   Q.   BECAUSE OF THE SEPTEMBER 15TH HEARING AT WHICH HE TALKED

16   ABOUT IMAGINARY FRIENDS; RIGHT?

17   A.   RIGHT.

18   Q.   WHICH YOU BELIEVE IS A VISUAL HALLUCINATION; RIGHT?

19   A.   I THINK THAT'S A POSSIBILITY, YES.

20        MS. CLARKE:  DOCUMENT 1717, MARK.  IT'S ONE OF THE

21   SUICIDE WATCH LOGS.

22   BY MS. CLARKE:

23   Q.   I'M GOING TO SHOW IT TO YOU.  LET'S LOOK AT THE DATE

24   FIRST.  I BELIEVE IT'S SEPTEMBER THE 4TH.

25   A.   YES.

1    Q.    DO YOU SEE THE DATE?

2    A.    YES.

3    Q.    AND THE LOG ITSELF AT 8:15 AND THEN AGAIN AT 8:45 SHOWS

4    SOME TALKING TO SELF AND THEN SAYING, "STOP, STOP, STOP"?

5    A.    I'VE SEEN THIS.

6    Q.    ARE THOSE SIGNS OF RESPONSE TO INTERNAL STIMULI?

7    A.    I THINK THAT'S A POSSIBILITY, YES.

8    Q.    YOU THINK IT'S MORE LIKELY THAT IT IS?

9    A.    YES.

10   Q.    AN OBSERVABLE SIGN?

11   A.    YES.

12           MS. CLARKE:  COULD I HAVE JUST ONE MOMENT, YOUR

13   HONOR?

14           THE COURT:  SURE.

15           MS. CLARKE:  OUT OF MY 15.

16           THE COURT:  I DON'T KNOW ABOUT THAT.

17                (PAUSE IN PROCEEDINGS)

18           MS. CLARKE:  THAT'S IT.  I RESERVE THE 15 MINUTES

19   FOR A FUTURE HEARING.

20           THE COURT:  THANK YOU, MS. CLARKE.

21           MR. FELDMEIER, DO YOU HAVE ANY REDIRECT?

22           MS. FELDMEIER:  YES, YOUR HONOR.

23           THE COURT:  I'M ASSUMING A BRIEF REDIRECT.

24           MS. FELDMEIER:  THREE MINUTES.

25   //

181

1                          <u>**REDIRECT EXAMINATION**</u>

2       **BY MS. FELDMEIER:**

3       Q.   AS TO YOUR UNDERSTANDING OF THIS HEARING, YOU CAME HERE

4       TODAY TO INFORM THE COURT'S DECISION ON WHETHER OR NOT

5       MR. LOUGHNER CAN PROBABLY BE RESTORED; IS THAT CORRECT?

6       A.   YES.

7       Q.   AND YOU'RE ALSO HERE TO INFORM THE COURT'S DECISION ON

8       HOW LONG THAT MIGHT TAKE IN MR. LOUGHNER'S CIRCUMSTANCES?

9       A.   YES.

10      Q.   SO BASED ON WHAT YOU HAVE SEEN PROGRESSWISE AFTER

11      MEDICATION HAS STARTED, HAS MR. LOUGHNER IMPROVED OVERALL, NOT

12      JUST TO THE POINT WHERE HE WAS BEFORE YOU EMERGENTLY MEDICATED

13      HIM, BUT HAS HE IMPROVED EVEN MORE THAN WHEN YOU FIRST MET

14      HIM?

15      A.   YES.

16      Q.   I'M NOT GOING TO GO BACK THROUGH ALL YOUR REASONS AND THE

17      THINGS THAT YOU'VE ALREADY PUT ON THE RECORD.

18              BUT BASED ON YOUR EXPERIENCE WORKING PERSONALLY WITH

19      MR. LOUGHNER, YOU'RE HIS TREATING PSYCHOLOGIST, AREN'T YOU?

20      A.   YES.

21      Q.   YOU'RE THE PERSON, THE PROFESSIONAL, WHO HAS THE MOST

22      CONTACT WITH THE DEFENDANT, AREN'T YOU?

23      A.   YES.

24      Q.   AND BASED UPON THAT, YOUR 21 YEARS OF EXPERIENCE, TALKING

25      TO OTHER COLLEAGUES, WORKING IN THE PRISON SETTING FOR

1    21 YEARS, IS IT YOUR OPINION THAT IT IS LIKELY THAT

2    MR. LOUGHNER CAN BE RESTORED WITH PROPER MEDICATION?

3    A.   YES.

4    Q.   AND IN YOUR OPINION, HOW MUCH TIME WOULD YOU LIKE TO ASK

5    THE COURT IN ORDER THE GET THAT JOB DONE?

6    A.   EIGHT MONTHS.

7             MS. FELDMEIER:  I HAVE NO OTHER QUESTIONS.

8             THE COURT:  SINCE JUNE OF THIS YEAR, DR. PIETZ --

9    YOU KNOW THE ANSWER TO THIS -- HAS ANYONE HAD MORE SUBSTANTIAL

10   FACE-TO-FACE CONTACT WITH THE DEFENDANT THAN YOU?

11            THE WITNESS:  PROBABLY NOT.

12            THE COURT:  THANK YOU, DR. PIETZ.  YOU MAY STAND

13   DOWN.  YOU'RE EXCUSED AS A WITNESS.

14            NEXT WITNESS.

15            MS. FELDMEIER:  AS TO DR. PIETZ, IF SHE COULD CATCH

16   A PLANE OUT, I DON'T --

17            THE COURT:  SHE'S EXCUSED AS A WITNESS.  SHE'S

18   AGREED TO SUPPLY A SUPPLEMENTAL LETTER IDENTIFYING FROM THE

19   SOURCES THAT SHE CITED WHAT PAGE NUMBERS AND WHAT SECTIONS OF

20   THOSE SOURCES SUPPORT THE CONCLUSION THAT THE RESTORABILITY IS

21   70 TO 80 PERCENT.

22            MS. FELDMEIER:  IT TURNS OUT SHE'S GOING TO MAKE A

23   FLIGHT.

24   //

25   //

1          **DR. JAMES BALLENGER**

2    WAS CALLED AS A WITNESS AND, AFTER HAVING BEEN DULY SWORN,

3    TESTIFIED AS FOLLOWS:

4          THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL

5    YOUR LAST NAME FOR THE RECORD.

6          THE WITNESS:  JAMES J-A-M-E-S, BALLENGER

7    B-A-L-L-E-N-G-E-R.

8                    **DIRECT EXAMINATION**

9    **BY MR. KLEINDIENST:**

10   Q.   DR. BALLENGER, COULD YOU TELL THE COURT WHAT YOU DO FOR A

11   LIVING AND WHERE DO YOU LIVE?

12   A.   I LIVE IN CHARLESTON, SOUTH CAROLINA AND HAVE FOR THE

13   LAST 25 YEARS.  FOR THE FIRST 18 OR 20 YEARS, I WAS THE CHAIR

14   OF PSYCHIATRY AT THE MEDICAL SCHOOL AND THE DIRECTOR OF THE

15   INSTITUTE OF PSYCHIATRY THERE.  I RETIRED FOR THE FIRST TIME

16   IN 2002, AND I HAVE A PRIVATE PRACTICE THAT I SPEND -- SEE

17   PATIENTS, AND I SPENT ABOUT TWO-THIRDS OF MY TIME DOING THAT.

18   ONE-THIRD, I DO FORENSIC WORK LIKE THIS.  I'VE DONE THIS FOR

19   25 YEARS.  BUT WHEN I WAS RUNNING A BIG DEPARTMENT, I DIDN'T

20   HAVE MUCH TIME.  NOW I HAVE MORE TIME TO DO IT.

21   Q.   YOU LIVE IN CHARLESTON, SOUTH CAROLINA?

22   A.   YES.

23   Q.   AND YOU'RE A DOCTOR OF MEDICINE?

24   A.   YES.

25   Q.   ARE YOU BOARD CERTIFIED?

1    A.   YES.

2    Q.   IN PSYCHIATRY?

3    A.   YES.

4    Q.   DO YOU HAVE A CLINICAL PRACTICE RIGHT NOW?

5    A.   YES.

6    Q.   PRIOR TO TODAY, DID YOU PROVIDE US A COPY OF YOUR

7    STATEMENT ADDRESSING THE ISSUES THAT ARE INVOLVED IN THIS

8    CASE?

9    A.   I DID.

10        MR. KLEINDIENST:  AND I BELIEVE FOR THE RECORD,

11   JUDGE, YOU MAY HAVE A COPY OF THAT.  THE COPY I WAS PROVIDED

12   WAS UNSIGNED.

13   BY MR. KLEINDIENST:

14   Q.   LET ME SHOW YOU WHAT'S BEEN NOW MARKED AS EXHIBIT

15   NO. 6.

16        MR. KLEINDIENST:  MAY I APPROACH THE WITNESS?

17        THE COURT:  YES.  ALL COUNSEL MAY APPROACH THE

18   WITNESS WITHOUT THE NECESSITY OF ASKING PERMISSION.

19   BY MR. KLEINDIENST:

20   Q.   I'LL SHOW YOU GOVERNMENT'S EXHIBIT NO. 6 FOR

21   IDENTIFICATION TODAY.

22        DO YOU SEE THAT?

23   A.   YES.

24   Q.   AND WHAT IS THAT?

25   A.   THIS IS A STATEMENT OR AFFIDAVIT THAT I PROVIDED YOU WITH

1    MY OPINIONS AND DATA ABOUT MANY OF THE ISSUES INVOLVED IN THIS

2    CASE.

3    Q.   NOW, THAT'S BEEN -- YOU'VE ACTUALLY SIGNED THAT; CORRECT?

4    A.   YES.

5    Q.   IT'S BEEN NOTARIZED BY A NOTARY PUBLIC?

6    A.   YES.

7    Q.   AS FAR AS YOU KNOW, THE STATEMENT THAT WAS ATTACHED TO

8    THE GOVERNMENT'S PLEADING IS IDENTICAL TO WHAT YOU HAVE,

9    EXCEPT FOR THE FACT YOU SIGNED EXHIBIT NO. 6 UNDER PENALTY OF

10   PERJURY; CORRECT?

11   A.   THAT'S MY UNDERSTANDING.

12            MR. KLEINDIENST:  I WOULD MOVE IT IN, YOUR HONOR, AS

13   EVIDENCE IN THIS CASE AS A SUBSTITUTE FOR THAT EXHIBIT THAT

14   THE GOVERNMENT ATTACHED TO ITS --

15            THE COURT:  DO YOU HAVE ANY OBJECTION TO 6?

16            MR. CAHN:  NO OBJECTION.

17            THE COURT:  EXHIBIT 6 IS RECEIVED.

18            (EXHIBIT NO. 6 RECEIVED INTO EVIDENCE)

19   BY MR. KLEINDIENST:

20   Q.   DO YOU WANT A COPY?

21   A.   I HAVE IT.

22   Q.   I'LL SHOW YOU EXHIBIT NO. 5 FOR IDENTIFICATION.

23            CAN YOU TELL THE COURT WHAT THAT IS.

24   A.   THIS IS MY CURRICULUM VITAE, WHICH IS A LOT OF THINGS

25   I'VE DONE OVER THE LAST FEW YEARS.

1    Q.   DOES THAT PRETTY FAIRLY WELL DESCRIBE YOUR WORK IN

2    PSYCHIATRY?

3    A.   YES.

4              MR. KLEINDIENST:  I WOULD MOVE THAT EXHIBIT INTO

5    EVIDENCE, YOUR HONOR.

6              THE COURT:  ANY OBJECTION TO 5?

7              MR. CAHN:  NO OBJECTION.

8              THE COURT:  FIVE IS ALSO RECEIVED.

9              (EXHIBIT NO. 5 RECEIVED INTO EVIDENCE)

10   BY MR. KLEINDIENST:

11   Q.   DR. BALLENGER, LET ME ASK YOU THIS: YOU'RE A PSYCHIATRIST

12   AND YOU'RE BOARD CERTIFIED.

13             HOW LONG HAVE YOU HAD EXPERIENCE WORKING WITH PEOPLE

14   WHO ARE SCHIZOPHRENIC?

15   A.   ESSENTIALLY, FORTY YEARS.

16   Q.   CAN YOU FOR THE COURT BRIEFLY DESCRIBE THAT EXPERIENCE,

17   WHAT EXPERIENCE YOU HAVE AND HOW THAT RELATES TO YOUR

18   TESTIMONY.

19   A.   IT STARTED WITH MY THREE YEARS IN PSYCHIATRY AT THE

20   MASSACHUSETTS GENERAL HOSPITAL AND THE HARVARD DEPARTMENT OF

21   PSYCHIATRY.

22             FROM THERE, I HAD A TWO-YEAR COMMITMENT IN THE NAVY.

23   IN THE NAVY, I RAN AN INPATIENT UNIT FOR ENLISTED MEN.  I WAS

24   THE ONLY DOCTOR FOR ALL OF THE PATIENTS.  WHEN THAT UNIT WAS

25   MINE, PROBABLY 80 PERCENT OF THEM HAD SCHIZOPHRENIA.

1          I SPENT THREE YEARS AT THE NATIONAL INSTITUTE OF

2   MENTAL HEALTH IN BETHESDA DOING RESEARCH ON SERIOUS MENTAL

3   ILLNESS.

4          I THEN SPENT FOUR YEARS AT THE UNIVERSITY OF

5   VIRGINIA AS DIRECTOR OF INPATIENT PSYCHIATRY AND DIRECTOR OF

6   RESEARCH.  IN THOSE FOUR YEARS, I RAN THE INPATIENT SERVICE,

7   AND PROBABLY HALF OF THE PATIENTS HAD SCHIZOPHRENIA.

8              AND I ALSO RAN THE -- ESSENTIALLY A SUBHOSPITAL AT

9   WESTERN STATE HOSPITAL.

10  Q.   WHERE WAS THAT.

11  A.   IT'S IN STANTON, VIRGINIA, 45-MINUTE DRIVE FROM

12  CHARLESTON.  WE, THE DEPARTMENT OF PSYCHIATRY STAFF AND THE

13  FACULTY, I SUPERVISED THE CLINICAL CARE AND THE RESEARCH.

14  Q.   HOW LONG DID THAT GO ON AT THE WESTERN STATE HOSPITAL?

15  A.   FOUR YEARS I WAS THERE, AND I RAN A SMALL HOSPITAL WHERE

16  THEY TRANSFERRED -- ESSENTIALLY ALL THE PATIENTS THAT I WORKED

17  WITH, THEY WERE SCHIZOPHRENIC AND HAD SEVERE, LONGSTANDING

18  ILLNESS.

19          FROM THAT POSITION, I WAS RECRUITED TO BECOME THE

20  NEW CHAIR OF PSYCHIATRY IN CHARLESTON.  IN '83, I STARTED

21  DOING THAT.  I WAS AN ATTENDING TO ONE OF THE INPATIENT

22  SERVICES.  AT THAT POINT, PROBABLY 40 PERCENT OF THE PATIENTS

23  WERE SCHIZOPHRENIC.

24          I THEN BUILT THE INSTITUTE OF PSYCHIATRY AND THE

25  INPATIENT HOSPITAL UNITS.  AND AGAIN, THAT HOSPITAL AT THIS

1    POINT IN TIME, 40 PERCENT OF THE PEOPLE ADMITTED TO THE

2    HOSPITAL SUFFER FROM SCHIZOPHRENIA.

3    Q.   WHEN YOU SAY YOU BUILT, WHAT DO YOU MEAN YOU BUILT THE

4    INSTITUTE?

5    A.   I BUILT IT WITH MY OWN HANDS.  IT FELT THAT WAY.  I

6    SUPERVISED THE BUILDING, AND IT TOOK THREE OR FOUR YEARS.

7    Q.   YOU WERE DOING MORE THAN JUST HAMMERING AND NAILING;

8    RIGHT?  YOU WERE ACTUALLY INVOLVED IN TREATING THERE?

9    A.   I BUILT IT AND RAN IT, AND THEN I WORKED IN THE INPATIENT

10   UNITS AND SUPERVISED ALL OF THAT.  AND THEN WE BUILT AN

11   EXTENSIVE OUTPATIENT SYSTEM THAT TOOK PATIENTS FROM OUR

12   HOSPITAL AND ELSEWHERE, AND I SUPERVISED AND FUNCTIONED AS A

13   PRACTICING CLINICIAN, WHICH I'VE DONE EVERY WEEK FOR THE LAST

14   40 YEARS, FUNCTIONED AS A CLINICIAN, EVEN WHEN I WAS CHAIR AND

15   DIRECTOR OF THE INSTITUTE.

16            I ALSO WORKED WITH THE MENTAL HEALTH CENTERS, AND

17   THEY -- WITH THE DEPARTMENT.  AND, OF COURSE, IT'S THEIR

18   RESPONSIBILITY TO TREAT SEVERE MENTALLY ILL.

19   Q.   DID I HEAR YOU ALSO SAY THAT EVERY WEEK IN YOUR 40-YEAR

20   CAREER, YOU'VE HAD CONTACT WITH SCHIZOPHRENICS?

21   A.   YES.  I STARTED TO SAY EVERY DAY.  I SAW PATIENTS

22   ESSENTIALLY EVERY WEEK ALMOST EVERY DAY.  NOT EVERY SINGLE DAY

23   WAS IT A PATIENT WITH SCHIZOPHRENIA, THOUGH.

24   Q.   HAVE YOU PUBLISHED IN THE ARTICLES IN THAT FIELD?

25   A.   I'VE PUBLISHED 400 ARTICLES.  ARGUABLY, A SIGNIFICANT

1    NUMBER OF THEM ARE INDIRECTLY ABOUT SCHIZOPHRENIA OR RELATED

2    SUBJECTS.

3    Q.   DO YOU HAVE ANY EXPERIENCE IN ADMINISTERING ANTIPSYCHOTIC

4    DRUGS FOR SCHIZOPHRENIA?

5    A.   FOR 40 YEARS.

6    Q.   CAN YOU ELABORATE ON THAT.

7    A.   I'M OLD ENOUGH THAT I WAS THERE WHEN THE FIRST-GENERATION

8    WERE ALMOST NEW.  AND IT'S A NICE EXPERIENCE, I'VE DISCOVERED,

9    TO HAVE SO MUCH EXPERIENCE WITH THE FIRST-GENERATION BECAUSE

10   THE SECOND-GENERATION HAVE LARGELY PUSHED THEM OFF, BUT

11   THEY'RE STILL VERY PERTINENT.

12   Q.   WHEN YOU SAY "FIRST-GENERATION," WHAT ARE YOU TALKING

13   ABOUT?

14   A.   WELL, THE FIRST WAS THORAZINE.  WHEN IT CAME OUT IN THE

15   '50S, IT LED TO AN ALMOST EMPTYING OF THE STATE HOSPITALS.  SO

16   MANY PEOPLE GOT BETTER FOR THE FIRST TIME THAT HOSPITALS WENT

17   FROM 5,000 TO 1,000 AND THEN 600 PATIENTS BECAUSE IT WORKED SO

18   WELL.

19   Q.   THESE ARE PEOPLE THAT HAD MENTAL DISEASES, SCHIZOPHRENIA

20   OR PSYCHOSIS?

21   A.   YES.  THE MAJORITY, SCHIZOPHRENIA.

22   Q.   AND THEN AFTER THORAZINE, THERE WAS A SERIES OF

23   MEDICINES, ELAVIL, STELAZINE.  AND THEN HALDOL WAS THE MOST

24   WIDELY USED OF THE FIRST-GENERATION.

25            IN THE '80'S, WE STARTED STUDYING SECOND-

1    GENERATION.

2    Q.    LET ME STOP YOU FOR A SECOND.

3          WITH RESPECT TO THE FIRST-GENERATION ANTIPSYCHOTICS,

4    DID THE MEDICAL FIELD FIND THAT THEY OFTEN HAD DEEP PHYSICAL

5    SIDE EFFECTS THAT CAUSED EGREGIOUS INJURY PERHAPS TO PATIENTS

6    OR OTHER KINDS OF PROBLEMS?

7    A.    WELL, THERE ARE SORT OF TWO THINGS:  THE SERIOUS SIDE

8    EFFECTS AND SYMPTOMS ON A DAILY BASIS, THORAZINE WAS AMAZINGLY

9    SEDATIVE.  HALDOL, 75, 85 OF THE TIME, CAUSED EXTRAPYRAMIDAL

10   SIDE AFFECTS.

11   Q.    IS THAT OFTENTIMES CALLED EPS?

12   A.    EPS.

13   Q.    WHAT DOES THAT REFER TO?

14   A.    IT LOOKS LIKE PARKINSON'S, IS ONE WAY TO THINK ABOUT IT.

15   PEOPLE HAVE A TREMOR.  THEY MAY HAVE MASK-LIKE FACES.  THEY

16   SHUFFLE.  THEY DON'T MOVE THEIR ARMS VERY MUCH.

17         DYSTONIC REACTIONS ARE A SPASM OF MUSCLES.  IT COULD

18   BE THE TONGUE.  IT COULD BE AN ARM.  IT COULD BE THE NECK.

19   THOSE WERE THE DAY-TO-DAY SYMPTOMS WHICH WE HAD TO DEAL WITH

20   AND HELP PATIENTS THROUGH BECAUSE THESE MEDICINES ARE SO

21   WONDERFUL, IT WAS THE FIRST TIME IN THE HISTORY OF THE WORLD

22   THAT WE WERE ACTUALLY ABLE TO DO SOMETHING LIKE CURE

23   SCHIZOPHRENIA.

24   Q.    WHAT DID THEY DO?  WHAT DID THEY CURE?

25   A.    IN SOME PEOPLE, THEY CURED THE ILLNESS.

1    Q.   WHAT IS THE ILLNESS OF SCHIZOPHRENIA?  WHAT ARE THE

2    CRITERIA, PERHAPS?

3    A.   IT'S BEEN BROUGHT OUT HERE TODAY.  THERE ARE POSITIVE

4    SYMPTOMS LIKE SORT OF THE EXPLOSIVE SYMPTOMS.

5    Q.   LET'S TALK ABOUT THE POSITIVE SYMPTOMS.

6    A.   THEY INCLUDE DELUSIONS, BEING CONTROLLED, THOUGHTS BEING

7    PUT INTO ONE'S MIND OR THAT THE FBI HAS BUGGED THE PERSON'S

8    HOUSE; HALLUCINATIONS, MOSTLY AUDITORY; HEARING VOICES FROM

9    ACROSS THE ROOM; VISUAL HALLUCINATIONS, LITERALLY SEEING

10   PEOPLE.

11        THERE ARE OTHERS, TOO.  BAD TASTES IN ONE'S MOUTH OR

12   SMELLS.  THEY ARE THE -- ASSOCIATED DISORGANIZATION AND

13   SOMETIMES VIOLENCE.  THAT IS WHAT THE GENERAL PUBLIC SEES AND

14   KNOWS IS WHAT ENDS UP GETTING PEOPLE INTO A HOSPITAL.  BUT, IN

15   FACT, AS WE'VE ALSO HEARD TODAY, THE NEGATIVE SYMPTOMS ARE

16   THINGS THAT ARE --

17   Q.   LET ME STOP YOU THERE.

18        WE'VE HEARD IN THIS CASE THAT MR. LOUGHNER HAS BEEN

19   DIAGNOSED EITHER AS SCHIZOPHRENIC, UNDIFFERENTIATED;

20   SCHIZOPHRENIA, PARANOID; OR SCHIZOPHRENIC, DISORGANIZED

21   THOUGHT.

22        ARE THOSE THREE TYPES OF ILLNESSES THAT

23   SCHIZOPHRENIA -- THREE TYPES OF CATEGORIES OF SYMPTOMS THAT

24   ARE CAUSED BY SCHIZOPHRENIA?

25   A.   THE IMPORTANT THING IS THE SCHIZOPHRENIA.  IT CLEARLY IS

1    THAT ILLNESS.  THE OTHERS ARE REALLY DESCRIPTORS.  IT'S LIKE

2    WHAT'S THE MOST COMMON.

3         IF ONE DOCTOR THINKS THE PARANOIA IS THE BIGGEST

4    PART, HE CALLS IT PARANOID SCHIZOPHRENIA.  IF ONE DOCTOR

5    THINKS IT'S DISORGANIZED, HE CALLS IT THAT.  IT REALLY DOESN'T

6    MATTER MUCH THAT DESCRIPTOR.  IT'S JUST A NAME DIAGNOSIS.

7    Q.   SO WITH RESPECT TO YOU'VE IDENTIFIED SOME POSITIVE

8    SYMPTOMS:  HALLUCINATIONS, DELUSIONS, THINGS OF THAT SORT.

9         WHAT ARE THE NEGATIVE SYMPTOMS OF SCHIZOPHRENIA?

10   A.   THERE ARE THINGS THAT SHOULD BE THERE THAT AREN'T.

11   THAT'S SORT OF THE IDEA OF NEGATIVE.  NOT TALKING, POVERTY OF

12   SPEECH, AS DR. PIETZ MENTIONED; NOT HAVING MOTIVATION TO DO

13   THINGS; NOT ENJOYING THINGS; NOT DOING THINGS.

14        SO PEOPLE PARTICULARLY WITH CHRONIC SCHIZOPHRENIA,

15   YOU OFTEN SEE PEOPLE JUST SITTING AND WATCHING TV AND NOT

16   TALKING, NOT SEEMING TO ENJOY MUCH.

17   Q.   SO LACK OF COMMUNICATION, WITHDRAWAL FROM SOCIAL

18   CONTACT?

19   A.   ALL OF THAT.

20   Q.   HOW ABOUT BLANK AFFECT?

21   A.   YES, THAT CAN BE CALLED -- THAT'S VERY COMMON.  FLAT

22   AFFECT IS A HALLMARK SYMPTOM OF SCHIZOPHRENIA.

23   Q.   WHAT DO YOU MEAN BY THAT?

24   A.   WELL, FLAT IS OFTEN CALLED INAPPROPRIATE AFFECT.  FLAT IS

25   REALLY JUST THAT, FLAT.  THERE'S NO NUANCES OF EXPRESSION OR

1    FEELING.  IT'S JUST ALMOST NOTHINGNESS.  THERE'S NO FUN.

2    THERE'S NO INTERACTION.  IT'S JUST FLAT.

3    Q.    EXISTENCE?

4    A.    THAT'S NOT A BAD WAY TO TALK ABOUT IT.

5              INAPPROPRIATE AFFECT IS ALSO VERY CHARACTERISTIC.

6    LAUGHING WHEN YOU'RE HAVING INTERNAL HALLUCINATIONS, AS WAS

7    MENTIONED EARLIER, CRYING AT INAPPROPRIATE TIMES.

8    Q.    DID THE FIRST-GENERATION ANTIPSYCHOTIC DRUGS TREAT BOTH

9    THE POSITIVE SYMPTOMS AND THE NEGATIVE SYMPTOMS?

10   A.    WELL, THEY DID, BUT DIDN'T TREAT THE NEGATIVE SYMPTOMS AS

11   WELL AS WE HAD HOPED, AS WELL AS THEY DID THE POSITIVE

12   SYMPTOMS.  IT DID LEAD TO IMPROVEMENT.

13   Q.    NOW, YOU'VE HEARD -- YOU'RE FAMILIAR WITH THE SIDE EFFECT

14   CALLED TARDIVE DYSKINESIA?

15   A.    YES.

16   Q.    WHAT IS THAT SIDE EFFECT?

17   A.    I MENTIONED EARLIER SORT OF DAY-TO-DAY THINGS THAT WE

18   HAVE TO DEAL WITH.  TARDIVE DYSKINESIA WAS SEEN WITH A LOT OF

19   THE FIRST-GENERATION ANTIPSYCHOTICS.  AND IT WAS THE TERRIBLE

20   FEAR OF ALL PATIENTS, FAMILIES, AND THE DOCTORS.  IT CAN BE A

21   SEMI-PERMANENT -- IT CAN REVERSE, AND I'LL COME BACK TO

22   THAT -- WRITHING OF THE MUSCLE GROUPS.

23              NOW, TARDIVE CAN GO IN AND OUT, BUT IT ALSO CAN

24   BE -- THIS KIND OF WRITHING IS HORRIBLE.  IF YOU SAW SOMEBODY,

25   YOU'D JUST BE VERY SHOCKED.  WHEN PEOPLE DEVELOPED IT AND WE

1    COULDN'T FIX IT, THEY WOULD OFTEN LEAD VERY WITHDRAWN LIVES,

2    FREQUENTLY IN THE HOSPITAL.

3         IF YOU -- WHEN THE FIRST SIGNS COME UP LIKE YOU SEE

4    ON SOMEBODY'S TONGUE, IF YOU STOP THE ANTIPSYCHOTICS,

5    ORDINARILY THE SYMPTOMS GO AWAY.  THE PROBLEM WAS THAT THE

6    PSYCHOSIS COMES BACK IF YOU STOP THE MEDICINE.  SO WE DIDN'T

7    HAVE ANY CHOICE.  WE'RE BETWEEN TWO REALLY HARD PLACES.

8         SO MANY TIMES WE WOULD CONTINUE -- GO BACK ON THE

9    FIRST-GENERATION, AND THE SYMPTOMS WOULD GO AWAY.  AND

10   THREE YEARS LATER, THAT SAME 20 MILLIGRAMS, THE WRITHING WOULD

11   START AGAIN, AND WE'D HAVE TO RAISE IT TO 25.  IT ESSENTIALLY

12   MADE IT WORSE, SO IT REALLY WAS A HORRIBLE DRUG.

13   Q.   CAN YOU TELL US APPROXIMATELY WHAT THE RATE OF INSTANCE

14   WOULD HAVE BEEN IN SOMEONE USING A FIRST-GENERATION

15   ANTIPSYCHOTIC TO HAVE THAT SYMPTOM?

16   A.   YEAH.  WE ACTUALLY HAVE A LOT OF DATA ON THAT.  IT WAS

17   DISTRESSINGLY COMMON.  IT REALLY RELATED TO HOW MUCH

18   CUMULATIVE DOSAGE SOMEBODY HAD.  USUALLY IT WAS IN THE FIRST,

19   SECOND, THIRD, FOURTH YEAR.  BUT IT WAS ABOUT FOUR OR

20   FIVE PERCENT A YEAR WITH HALDOL.  THE TOTAL LIFETIME OF 10 TO

21   15, SOME STUDIES SAID 20 TOTAL LIFETIME INCIDENTS.  IT WAS

22   DISTRESSINGLY COMMON.

23   Q.   HOW ABOUT THE SIDE EFFECT OF SOMETHING CALLED NEUROLEPTIC

24   MALIGNANT SYNDROME?

25   A.   NEUROLEPTIC, WHICH IS THE ANTIPSYCHOTIC DESIGNATION.

1    MALIGNANT SYNDROME, IT IS A RARE SYNDROME EVEN WITH THE

2    FIRST-GENERATION.  BUT IT'S A MARKED STIFFENING OF PEOPLE'S

3    MUSCLES THAT ARE FROZEN IN SPASM.

4            SO AMONG OTHER THINGS, THE TEMPERATURE GOES UP TO

5    105, 106.  THE MUSCLES START BREAKING DOWN.  THE BREAKDOWN

6    PRODUCTS HURT THE KIDNEYS.  SO IT WAS ONE OF THE WAYS THAT WAS

7    A FATAL -- RARELY, BUT POSSIBLE FATAL OUTCOME FROM THE

8    NEUROLEPTIC MALIGNANT SYNDROME IMPACTS.

9    Q.   WITH THE FIRST-GENERATION DRUGS?

10   A.   YES.

11   Q.   HOW ABOUT DYSTONIA?

12   A.   YEAH, D-Y-S-T-O-N-I-A.  DYSTONIA IS A SPASM.  IT'S AN

13   EPS.  IT'S LIKE A SPASM OF THE TONGUE, NECK, OR ARM MUSCLE.

14   Q.   AND HOW ABOUT AKATHISIA?  DID I PRONOUNCE THAT RIGHT?

15   A.   AKATHISIA (PRONOUNCING) IS THE WAY EVERYBODY SAYS IT.

16   SHE COULDN'T SPELL IT EARLIER, BUT IT IS A-K-A-T-H-I-S-I-A.

17   Q.   WAS THAT ALSO A SIDE EFFECT OF THE FIRST-GENERATION

18   DRUGS?

19   A.   IT'S AN EPS SYMPTOM.

20   Q.   WHAT HAPPENS?

21   A.   AKATHISIA IS AN INTERNAL RESTLESSNESS SOMETIMES DESCRIBED

22   AS ANTS IN ONE'S PANTS.  A PERSON FEELS LIKE THEY HAVE TO

23   MOVE, GENERALLY THEIR FEET AND LEGS.  SO THEY STAND UP AND

24   MOVE AROUND AND SIT BACK DOWN AND FEEL AGITATED AND STAND UP

25   AND SIT DOWN.  THERE'S ALSO A PSYCHOLOGICAL COMPONENT TO IT OF

1    A MENTAL RESTLESSNESS.

2    Q.   THOSE ARE FIVE SIDE EFFECTS THAT WE JUST DISCUSSED.

3         IS THAT PRETTY MUCH THE COMMON SIDE EFFECTS THAT ARE

4    EXPERIENCED BY THE FIRST-GENERATION DRUGS?

5    A.   YES.  THEY WERE THE PROBLEMATIC ONES.  THEY WERE

6    EXTREMELY RARE THAN OTHER THINGS.

7    Q.   NOW, YOU MENTIONED SECOND-GENERATION ANTIPSYCHOTICS OR

8    ATYPICAL ANTIPSYCHOTICS.

9         CAN YOU EXPLAIN THAT TO THE COURT.

10   A.   YES.

11        IN THE '80'S, WE STARTED RESEARCHING, AND IT WAS IN

12   MANY WAYS MIRACULOUS.  THE FIRST SECOND-GENERATION WAS CALLED

13   CLOZAPINE.  AND THERE WERE A GROUP OF PATIENTS WHO WERE

14   COMPLETELY TREATMENT RESISTANT TO FIRST-GENERATION.

15        THEY WOULD END UP STAYING IN THE HOSPITAL A LONG

16   TIME AND HAVE ONE AFTER ANOTHER AFTER ANOTHER.  THEY COULDN'T

17   GET WELL.

18        CLOZAPINE ASTOUNDINGLY WHEN IT CAME ON THE MARKET,

19   WE GAVE IT TO THOSE PEOPLE, AND 30 OF PERCENT OF THEM GOT

20   WELL.  IT WAS JUST ASTOUNDING.  THERE WAS A LOT OF EXCITEMENT,

21   AS YOU CAN IMAGINE, IN THE FIELD.

22        THE EXCITEMENT OF THE SECOND-GENERATION, BUT

23   RISPERIDONE CAME ALONG RIGHT AFTER IT.  THEY DID OLANZAPINE.

24   CLOZAPINE HAD A FRIGHTENING POTENTIAL SIDE EFFECT IN 1 OR

25   2 PERCENT OF PEOPLE THAT SUPPRESSED THE BONE MARROW.  SO IT

1    WAS A VERY SCARY THING.  PATIENTS HAD TO COME IN EVERY WEEK

2    AND HAVE THEIR BLOOD DRAWN.  WE HAD TO BE VERY CAREFUL ABOUT

3    THAT.

4            WE WANTED A SECOND-GENERATION THAT WORKED AS WELL AS

5    CLOZAPINE, DIDN'T DO THAT.  AND, IN FACT, THE SUBSEQUENT ONES

6    ARE THOSE.

7    Q.   HOW MANY SECOND-GENERATION DRUGS ARE ON THE MARKET?

8    A.   I THINK THERE'S SEVEN OF THEM.

9    Q.   YOU'RE FAMILIAR WITH RISPERIDONE?

10   A.   ABSOLUTELY.

11   Q.   DO YOU KNOW WHEN THAT WAS INTRODUCED?

12   A.   WE STARTED STUDYING IN THE LATE '80'S.  THEY HAD

13   REGISTRATION TRIALS FOR THE FDA, AND IT WAS APPROVED FOR THE

14   TREATMENT OF SCHIZOPHRENIA IN 1994.

15   Q.   IS IT A WIDELY PRESCRIBED SECOND-GENERATION DRUG?

16   A.   WITHIN TWO YEARS, IT BECAME THE MOST WIDELY PRESCRIBED

17   ANTIPSYCHOTIC.

18   Q.   WHY WAS IT SO POPULAR?

19   A.   BECAUSE OF THE ALMOST MIRACULOUS PROMISE OF

20   SECOND-GENERATION IS PEOPLE STILL GET WELL, BUT WITH MARKEDLY

21   LESS OF THE FIVE SIDE EFFECTS THAT YOU MENTIONED.

22   Q.   WHEN YOU MAY "MARKEDLY," HOW OFTEN IS TARDIVE DYSKINESIA

23   SEEN IN RISPERIDONE?

24   A.   A FIFTH OR ONE-TENTH OF WHAT IT WAS BEFORE.  10 PERCENT

25   OF THE FREQUENCY BEFORE.  OF COURSE, TARDIVE IS PARTICULARLY

1    RARE WITH SGA'S.  WE DON'T HAVE LONG-TERM DATA YET, BUT THE

2    DATA SUGGESTS THAT THE OCCURRENCE IS RARE AND IS LESS THAN

3    1 PERCENT A YEAR.  HALDOL WAS 4 OR 5 PERCENT.

4    Q.    DO THEY USE RISPERDAL TO TREAT PEOPLE WHO HAVE TARDIVE

5    DYSKINESIA?

6    A.    THAT'S ONE OF THE VERY INTERESTING THINGS.  IF SOMEBODY

7    HAS TARDIVE DYSKINESIA, TARDIVE DYSKINESIA WOULD JUST GO AWAY

8    AND KEEPING THEM FROM BEING PSYCHOTIC.  WE CAN DO THAT NOW

9    WITH SECOND-GENERATIONS.  SO WHEN THEY ACTUALLY GET TARDIVE

10   DYSKINESIA, WE CAN SHIFT THEM TO A SECOND-GENERATION.  AND THE

11   TARDIVE DYSKINESIA, EVEN IF IT'S BEEN ESTABLISHED, SAY, FOR

12   FIVE YEARS WITH THE FIRST-GENERATION, IT GETS BETTER ON THE

13   SECOND-GENERATION.

14   Q.    HOW ABOUT NEUROLEPTIC MALIGNANT SYNDROME USING, SAY,

15   RISPERIDONE?

16   A.    IT'S BECOME VANISHINGLY RARE.  AT THIS POINT, WE COULDN'T

17   EVEN PUT A PERCENTAGE.  IT'S JUST SORT OF A CASE SHOWS UP IN

18   JAPAN AND SOMEBODY WRITES IT UP AND ONE IN AUSTRALIA ONCE IN A

19   WHILE.  TEXTBOOK CALLS IT ANECDOTAL REPORTS AT THIS POINT.

20   Q.    AGAIN, WITH THE PARKINSON-LIKE DISORDERS, I THINK THEY'RE

21   CALLED EXTRAPYRAMIDAL SIDE EFFECTS?

22   A.    EXTRAPYRAMIDAL (PRONOUNCING), EPS.

23   Q.    WHAT'S THE INSTANT RATE OF THAT IN SECOND-GENERATION

24   DRUGS LIKE RISPERIDONE?

25   A.    DESPITE WHAT I'VE SAID ABOUT ALL SGA'S, THIS IS REALLY --

1    THE REDUCTION IN EPS IS REALLY WHAT MAKES THE

2    SECOND-GENERATION SUCH A HUGE ADVANTAGE.

3    Q.    HOW SO?

4    A.    WELL, FOR INSTANCE, THE INCIDENCE OF EPS WITH HALDOL IS

5    75 PERCENT.  YOU HAD TO PUT PEOPLE ON COGENTIN, EVERY SINGLE

6    ONE OF THEM.  THE INCIDENCE OF RISPERDAL IS THE SAME AS

7    PLACEBO.

8    Q.    WHAT DOES THAT MEAN?

9    A.    IT MEANS THAT IT OCCASIANALLY OCCURS IN THE GENERAL

10   PUBLIC, AND IT OCCURS AT THE SAME RATE WITH RISPERDAL.  IT

11   REALLY SAYS RISPERDAL DOESN'T CAUSE IT.

12   Q.    SO HALDOL CAUSED IT UP TO 75 PERCENT, AND RISPERDAL

13   ALMOST NEVER CAUSES IT?

14   A.    VERY RARELY.

15   Q.    HOW ABOUT DYSTONIA AKATHISIA?

16   A.    ALSO, WITH THE SECOND-GENERATION, DYSTONIC REACTIONS ARE

17   NOW SEEN IN SOMETHING LIKE 1.7 PERCENT OF CASES.  AKATHISIA IS

18   ALSO MARKEDLY LESS FREQUENT.

19   Q.    NOW, YOU'RE FAMILIAR WITH A CASE CALLED -- I THINK IT'S

20   WASHINGTON VERSUS HARPER?

21   A.    YES.

22   Q.    SUPREME COURT CASE.

23          YOU'RE FAMILIAR WITH THAT?

24          IN THAT CASE, THE DRUG THAT WAS THE SUBJECT OF

25   DISCUSSION WAS HALDOL; IS THAT CORRECT?

1    A.    I THINK THAT'S RIGHT.

2    Q.    HALDOL IS A FIRST-GENERATION?

3    A.    YES.

4    Q.    AND THEN ARE YOU FAMILIAR WITH THE CASE OF RIGGINS VERSUS

5    NEVADA?

6    A.    UM-HMM.

7    Q.    DID THAT CASE ALSO INVOLVE A FIRST-GENERATION?

8    A.    I THINK IT WAS -- THAT IS A FIRST-GENERATION.

9    Q.    SO THOSE CASES DEALT WITH USING DRUGS THAT HAD SIDE

10   EFFECTS THAT, AS YOU'VE TESTIFIED, AREN'T AS TROUBLING AS

11   USING A DRUG LIKE RISPERDAL?

12   A.    YES.

13   Q.    ARE THERE OTHER SIDE EFFECTS TO RISPERDAL THAT ARE

14   EXPERIENCED BY PATIENTS?

15   A.    YES.  I MENTIONED THE ONES WE USED TO SEE CALLED THE

16   FIRST-GENERATION.  THERE'S ONE WE ALSO USED TO SEE WITH THE

17   FIRST-GENERATION THAT ALSO OCCURS WITH RISPERDAL.

18           IF YOU BLOCK THE DOPAMINE SYSTEM -- YOU HAVE TO DO

19   THAT -- IF YOU DO THAT, YOUR PROLACTIN LEVELS GO UP.  IT DID

20   WITH HALDOL.  IT DOES WITH RISPERDAL.

21           IN SOME SMALL -- 10 PERCENT, 15 PERCENT OF PEOPLE OF

22   WHOM THE PROLACTIN GOES UP, OF THAT 10 TO 15 PERCENT, THEY

23   DEVELOP SYMPTOMS.

24   Q.    FROM AS LOW AS 5 PERCENT?

25   A.    THEY DEVELOP SYMPTOMS, AND THAT COULD BE GYNECOMASTIA.

1    GYNECOMASTIA IS THE LARGENING OF THE BREASTS, WHICH HAPPENS IN

2    MALES.  AND SOMETIMES GALACTORRHEA, G-A-L-A-C-T-O-R-R-E-A

3    (SIC).  THAT'S AN EXPRESSION OF MILK.  SO THAT DOES HAPPEN.

4            THERE ARE UNIQUE SIDE EFFECTS THAT WE SEE A WHOLE

5    LOT MORE WITH THE SECOND-GENERATION.  IT'S NOT THAT WE DIDN'T

6    SEE THEM WITH THE FIRST-GENERATION.  THEY JUST WEREN'T AS

7    PROMINENT.  MAYBE IT'S BECAUSE THERE WERE ALL THESE OTHER SIDE

8    EFFECTS THAT SEEMED MORE IMPORTANT AND PROMINENT.

9            THOSE SIDE EFFECTS HAVE TO DO WITH WEIGHT GAIN, WITH

10   SOME OF THE SECOND-GENERATION, CLOZAPINE AND ZYPREXA, CAN BE

11   CONSIDERABLE.  THEN THERE'S -- RISPERIDONE AND SEROQUEL, IT'S

12   INTERMEDIATE.

13           IN THE CATIE TRIAL, RISPERIDONE PATIENTS GAINED

14   .4 POUNDS A MONTH.  THEY DIDN'T GAIN WEIGHT ON AVERAGE.  SOME

15   DON'T GAIN WEIGHT; SOME DO.

16   Q.   THE CATIE TRIAL, THAT STANDS FOR C-A-T-I-E AS AN ACRONYM?

17   A.   IT IS.  IT WAS A BIG TRIAL.  I THINK IT COST $20 MILLION.

18   IT WAS SUBSIDIZED BY THE NATIONAL INSTITUTE OF MENTAL HEALTH.

19   IT WAS A REAL WORLD KIND OF SETTING, NOT JUST IN RESEARCH OR

20   HOSPITALS.  THEY REALLY STUDIED ALL OF THESE NEW

21   SECOND-GENERATION.

22           IN ADDITION TO THE WEIGHT GAIN, PROBABLY CAUSED BY

23   THE WEIGHT GAIN, PROBABLY, THERE'S SOME INCREASE IN BLOOD

24   SUGAR SEEN.  OF COURSE, IN AMERICA EVERYBODY IS GETTING

25   DIABETES.  PEOPLE WITH SCHIZOPHRENIA START OUT WITH 15 PERCENT

1    DIABETES, WHICH IS AT LEAST TWO OR THREE TIMES THE NORMAL

2    AMOUNT.

3            THEY'RE ALSO MORE VULNERABLE -- SOME OF THE

4    DEVELOPMENT OF DIABETES MAYBE CAUSE BY THE WEIGHT GAIN OR SOME

5    BLOCKING OF INSULIN.  BUT SOME PEOPLE EARLY ON WHEN WE FIRST

6    STARTED USING THEM, PEOPLE GOT REAL BAD INCREASES.  SOME

7    PEOPLE GOT VERY HIGH BLOOD SUGARS, LIKE 800, WENT INTO COMA,

8    SOME OF THEM, AND DIED.  THAT'S SORT OF GONE AWAY THESE DAYS,

9    BUT IT DID HAPPEN.

10   Q.   THOSE SEEM TO BE SYMPTOMS OF THE SECOND-GENERATION DRUGS

11   THAT COULD BE CONTROLLED AND MANAGED BY PEOPLE WITH

12   FIRST-GENERATION DRUGS.

13           IS THAT FAIR TO SAY?

14   A.   IT IS.  WE MANAGE THAT BY AMENDING PEOPLE'S WAYS TO THEIR

15   WEIGHT, AND WE CAN.  IN THE FIRST-GENERATION, WE WOULDN'T BE

16   ABLE TO GET AWAY FROM THE 75 PERCENT OF HALDOL HAD EPS AND 4

17   TO 5 PERCENT DEVELOPED TARDIVE DYSKINESIA.  WE COULDN'T GET

18   AWAY FROM THAT.

19   Q.   IT'S BEEN SAID BY THINGS FILED BY THE DEFENDANT IN THIS

20   COURT THAT SECOND-GENERATION DRUGS OR ANTIPSYCHOTIC DRUGS

21   CHANGE SOMEONE'S MIND, ALTER THEIR MIND, CHANGE THEIR BRAIN

22   CHEMISTRY.

23           CAN YOU RESPOND TO THOSE ACCUSATIONS?

24   A.   IN SOME WAYS THE ANSWER IS YES, OF COURSE, THEY CHANGE

25   PEOPLE.  WE WOULDN'T USE THEM IF THEY DIDN'T.  OF COURSE THEY

1    DO IT AT A BIOLOGICAL LEVEL.  YOU COULD SAY CHEMICALS.  IT'S

2    REALLY PROTEINS IN THE BRAIN THAT GET CHANGED.

3         WHAT THEY DO IS THEY TEND TO SOMEBODY WHO IS

4    TERRIBLY ILL WITH AN ILLNESS.  WHEN IT WORKS, WE TAKE THE

5    ILLNESS OFF AND YOU HAVE THE PERSON THERE.  AND IT TAKES THEM

6    FROM BEING AN ABNORMAL PERSON WHO'S HALLUCINATING,

7    DISORGANIZED, TAKES THAT OUT, AND YOU'RE LEFT WITH A PERSON

8    WITHOUT ILLNESS.

9         IT WOULD BE LIKE IF YOU HAD DIABETES AND I TREATED

10   IT, YOU'D BE BACK TO YOU, WHICH YOU DON'T HAVE DIABETES

11   ANYMORE OR A PROPENSITY TOWARD IT.

12   Q.   SO IT DOES OBVIOUSLY CHANGE A PERSON'S --

13   A.   IT DOES, BUT IT'S --

14   Q.   IN A POSITIVE WAY?

15   A.   IT'S ALL POSITIVE.

16   Q.   DO YOU KNOW OF ANY STUDIES THAT SHOW THAT SOMEONE ON

17   SECOND-GENERATION DRUG, IT AFFECTS HIS MIND -- ALTERS HIS MIND

18   IN A NEGATIVE WAY THAT HAS BEEN SUGGESTED?

19   A.   NO.  NOW, AN INTERESTING NONSPECIFIC CONCEPT, A LOT OF

20   THE THINGS WE'VE TALKED ABOUT, LIKE, FOR INSURANCE, COGNITION

21   IS PART OF THE MIND AND ABILITY TO REMEMBER OR MAKE DECISIONS

22   OR RELATE TO OTHER PEOPLE.  YES, IT CHANGES THOSE THINGS IN A

23   VERY POSITIVE DIRECTION.

24   Q.   WHAT ELSE DOES IT CHANGE?

25   A.   IT CHANGES THE POSITIVE SYMPTOMS; SO DELUSIONS GET

1    REDUCED OR DISAPPEAR, HALLUCINATIONS REDUCE OR DISAPPEAR.

2    Q.    DOES IT IMPROVE ONE'S COGNITIVE THINKING SKILLS?

3    A.    YES.

4    Q.    WHAT DOES THAT MEAN, "COGNITIVE THINKING SKILLS"?

5    A.    WHEN PEOPLE HAVE COGNITIVE DEFICITS, THEY MAY HAVE

6    TROUBLE WITH THEIR MEMORY, PROBLEM-SOLVING, PAYING ATTENTION,

7    CONCENTRATING ON THINGS, PROCESSING THINGS AT A NORMAL SPEED

8    INSTEAD OF THINKING REAL SLOWLY.  THOSE ARE THE

9    WELL-RECOGNIZED DEFICITS OF SCHIZOPHRENIA.  AND THEY ARE

10   IMPORTANT BECAUSE IF THEY DON'T GET BETTER, IT'S HARD TO HOLD

11   DOWN A JOB IF YOU'RE NOT THINKING, CAN'T REMEMBER, AND SO

12   FORTH.

13   Q.    DOES IT HAVE ANY EFFECT ON A PERSON'S ABILITY TO THINK IN

14   AN ORGANIZED FASHION?

15   A.    YES, ALL POSITIVE.  IT TAKES PEOPLE WHO CAN'T BE

16   ORGANIZED AND ALLOWS THEM TO BE ORGANIZED AND NOW PAY

17   ATTENTION AND CONCENTRATE.

18   Q.    YOU'VE HEARD DR. PIETZ, WHO WAS TESTIFYING TODAY, THAT

19   SHE FELT THAT HE HAD SUFFERED FROM DISORGANIZED THINKING

20   BECAUSE OF THE SCHIZOPHRENIA; CORRECT?

21   A.    YES.

22   Q.    AND THAT'S WHAT SHE WAS DESCRIBING, WHAT YOU'RE SAYING,

23   THAT A SECOND-GENERATION DRUG -- WHAT'S THE IMPACT ON THAT?

24   A.    IT ALLOWS -- ACTUALLY, ONE OF THE MOST DRAMATIC EARLY

25   EFFECTS IS PEOPLE GO FROM BEING ALL OVER THE PLACE, A TOTAL

1    MESS IN THEIR THINKING AND THEIR BEHAVIOR, AND THEY TIDY UP

2    AND GET ORGANIZED.  THEY GO BACK TO BEING ABLE TO BE NORMALLY

3    ORGANIZED IN THEIR THINKING AND ACTIONS.

4    Q.   HOW ABOUT DOES IT HAVE ANY IMPACT ON ONE'S ABILITY TO

5    CONVERSE WITH PEOPLE IN A RATIONAL WAY?

6    A.   COMPLETELY, YES.  I MEAN, INCLUDING YOU'RE NOT DELUSIONAL

7    ANYMORE, BEING OBSESSED WITH THAT.  IF YOU'RE ORGANIZED, YOU

8    CAN THINK AND HEAR WHAT SOMEBODY SAYS TO YOU AND RESPOND BACK

9    TO IT IN A LOGICAL WAY.  IF YOUR NEGATIVE SYMPTOM OF POVERTY

10   OF SPEECH HAS BEEN IMPROVED, THEN INSTEAD OF NOT TALKING, YOU

11   DO TALK.

12   Q.   DOES IT HAVE ANY EFFECT ON SOMEBODY'S ABILITY TO

13   CONCENTRATE ON WHAT'S IN FRONT OF THEM OR WHAT'S BEING ASKED

14   OF THEM?

15   A.   AGAIN, IT'S ALL POSITIVE.  YES, IT DOES IMPROVE THAT.  IT

16   MARKEDLY IMPROVES CONCENTRATION AND ATTENTION.

17   Q.   I TAKE IT, THEN, THAT THE POSITIVE RESULTS OF

18   SECOND-GENERATION DRUGS ARE IT ENABLES ONE TO BE ABLE TO

19   RATIONALLY CONVERSE AND COMMUNICATE WITH OTHER PEOPLE IN A

20   RATIONAL AND SANE WAY?

21   A.   YES.

22   Q.   AND TO UNDERSTAND CONCEPTS?

23   A.   YES.

24   Q.   TO UNDERSTAND CONCEPTS LIKE WHAT A LAWYER IS?

25   A.   YES.  IF YOU TAKE DELUSIONS OFF THE STAGE,

1    DISORGANIZATION OUT OF THERE, THEN IT'S JUST AN AVERAGE

2    ABILITY AT LEAST OF UNDERSTANDING OR BEING TAUGHT -- PART OF

3    THE COMPETENCY RESTORATION PROGRAMS INVOLVE CLASSES ABOUT WHAT

4    DOES A JUDGE DO?  WHAT'S PLEA BARGAINING?  A PERSON WHO'S

5    BETTER CAN NOW UNDERSTAND THAT.

6    Q.   JUST AS SOMEBODY WHO WASN'T AFFLICTED WITH SCHIZOPHRENIA

7    CAN BE TOLD THOSE THINGS BY THEIR LAWYER OR READ THEM,

8    SOMEBODY WHO HAS BEEN ON A SECOND-GENERATION DRUG AND HAS PUT

9    THE ILLNESS IN REMISSION HAS THAT SAME ABILITY?

10   A.   YES.

11   Q.   DOES IT DO ANYTHING WITH RESPECT TO THE BRAIN ITSELF,

12   THOUGH?

13   A.   YES.  WELL, THE SECOND-GENERATIONS DO.

14   Q.   WHAT'S THAT?

15   A.   WELL, SCHIZOPHRENIA, WE NOW HAVE MANY, MANY, MANY STUDIES

16   NOW THAT WE HAVE THESE NEW WAYS TO IMAGE THE BRAIN AND MRI'S

17   AND PET SCANS, WE ACTUALLY NOW CAN SEE IN REAL TIME AS IT GOES

18   ALONG THAT THE BRAIN ATROPHIES EVERY DAY, EVERY WEEK, EVERY

19   EPISODE OF SCHIZOPHRENIA.  NOW, WE KNEW BEFORE WE HAD ALL OF

20   THESE THAT WE WOULD DO POSTMORTEM AND THE BRAIN WOULD BE

21   SMALLER.

22   Q.   WHAT DOES ATROPHY MEAN?

23   A.   IT MEANS SHRINKAGE.  IT MEANS DEATH OF CELLS.  FEWER

24   CELLS IN THE BRAIN.  THE FIRST-GENERATION DON'T RETARD THAT.

25   SO IN MANY WAYS, THE FIRST DESCRIPTION OF DEMENTIA PRECOX WAS

1    THE FIRST DESCRIPTION OF SCHIZOPHRENIA.

2            NOW, TO ME THE BIGGEST PROBLEM OF THE

3    SECOND-GENERATION IS IT APPEARS IN THE STUDIES THAT HAVE BEEN

4    DONE THAT THEY BLOCK THAT PROCESS.  SO IF A PERSON IS GIVEN A

5    SECOND-GENERATION, THAT SHRINKAGE DOESN'T HAPPEN.

6            AND WE HAVE STUDIES OUT FOR A WHOLE YEAR AT THIS

7    POINT COMPARING OLANZAPINE AND ZYPREXA AND HALDOL.  AND THE

8    PATIENTS ON THE SECOND-GENERATION, THEIR BRAIN DOESN'T GET

9    SMALLER.  PATIENTS ON HALDOL, IT DOES.

10   Q.   I TAKE IT THAT THAT'S A GOOD THING, TO KEEP YOUR BRAIN

11   FROM SHRINKING?

12   A.   ABSOLUTELY.  AND THE REASON IT DOES SHRINK IS THE

13   CONNECTIONS ARE HEALTHY AND GROWING, AND SO YOU THINK BETTER.

14   THAT'S PROBABLY WHY YOU THINK BETTER.  BUT IT'S OBVIOUSLY VERY

15   HEALTHY FOR THE BRAIN.

16   Q.   IS THERE ANY DIFFERENCE IN TERMS OF SUCCESS WITH

17   TREATMENT WITH SOMEBODY WHO IS YOUNG AND HAS BEEN, SAY,

18   SCHIZOPHRENIC FOR ONLY A COUPLE OF YEARS VERSUS SOMEBODY WHO

19   HAS BE CHRONICALLY SCHIZOPHRENIC FOR MOST OF THEIR LIVES?

20   A.   A HUGE DIFFERENCE.  THAT'S WHY THE WHOLE LITERATURE ABOUT

21   TREATING FIRST-EPISODE SCHIZOPHRENIA.  AND THE LONG AND SHORT

22   OF IT IS FIRST-EPISODE PEOPLE WITH SCHIZOPHRENIA, THEY RESPOND

23   MUCH BETTER TO LOWER DOSES OF ANTIPSYCHOTICS.

24   Q.   WHEN YOU SAY FIRST EPISODE, WHAT DOES THAT MEAN?

25   A.   SOMEBODY WHO WAS GOING THROUGH THEIR LIFE AND DIDN'T HAVE

1    TROUBLE, BUT THEN STARTED DEVELOPING PSYCHOTIC SYMPTOMS AND

2    THEN PSYCHOSIS THE FIRST TIME AS OPPOSED TO IN MANY PEOPLE

3    WITH SCHIZOPHRENIA, IT'S A CHRONIC RELAPSING CONDITION.

4             SO IF SOMEBODY'S HAD TEN EPISODES AND TEN

5    HOSPITALIZATIONS OVER A 20-YEAR PERIOD AND THEY'VE LIVED IN

6    THE HOSPITAL THE LAST THREE YEARS, THEY'RE NOT GOING TO

7    RESPOND BECAUSE THEY'VE BEEN GIVEN EVERYTHING AND DIDN'T

8    RESPOND.  10 TO 20 PERCENT OF PEOPLE DON'T RESPOND.

9    Q.   YOU HAVE HAD A CHANCE TO BE GIVEN RECORDS PERTAINING TO

10   MR. LOUGHNER'S MEDICAL CONDITION, HAVEN'T YOU?

11   A.   YES.

12   Q.   HOW WOULD YOU DESCRIBE HIM?  WHERE IS HE ON THE CONTINUUM

13   OF FIRST EPISODE OR CHRONIC EPISODES?

14   A.   THIS IS FIRST EPISODE.

15   Q.   WHY DO YOU SAY THAT?

16   A.   UNTIL THREE YEARS AGO, THREE AND A HALF YEARS BEFORE,

17   THERE'S REALLY NO EVIDENCE THAT HE HAD ANY PSYCHOTIC SYMPTOMS

18   AT ALL.  SO AT LEAST BY 2008, HE STARTED DEVELOPING BIZARRE

19   THINKING PATTERNS AND BEHAVIOR, HEARING VOICES.  BUT THAT'S

20   THE FIRST TIME IN HIS LIFE.  SO A FIRST-EPISODE PERSON WITH

21   THE FIRST EPISODE OF SCHIZOPHRENIA.

22   Q.   YOUR TESTIMONY IS THEY RESPOND BETTER TO THE DRUGS THAN

23   SOMEBODY WHO'S HAD IT CHRONICALLY FOR A LONG TIME?

24   A.   YES.  HE HAD SEVERAL POSITIVE PROGNOSTIC SIGNS.  ONE OF

25   THEM IS HE'S YOUNG AS OPPOSED TO A FIRST EPISODE IN SOMEBODY

1    WHO'S 50.  THE PROGNOSIS IS NOT AS GOOD.

2    Q.   LET ME ASK YOU THIS:  YOU HAVE EXPERIENCE IN

3    ADMINISTERING SECOND-GENERATION DRUGS LIKE RISPERDAL TO

4    PATIENTS.

5             CAN YOU GIVE THE COURT AN IDEA OF HOW IT WORKS AND

6    HOW EFFECTIVE IT IS?

7    A.   YES.

8             WE THINK ALL OF EFFECTIVE ANTIPSYCHOTICS BLOCK

9    DOPAMINE SYSTEMS IN THE LIMBIC SYSTEM, WHICH APPEARS TO BE

10   WHAT THE STUDIES -- AND THERE REALLY ARE A LOT OF STUDIES WITH

11   SPECIFIC FIRST-EPISODE PATIENTS OVER THE LAST 17, 18 YEARS.

12            AND THE REASON WE STUDIED THEM SPECIFICALLY IS THAT

13   THERE'S A LOT OF EVIDENCE NOW THAT IF YOU INTERVENE QUICKLY,

14   PATIENTS DO MUCH BETTER.  SO IF YOU TREAT THE FIRST EPISODE

15   WITHIN WEEKS OF ITS ONSET, FIVE YEARS LATER YOU'RE DOING MUCH

16   BETTER.

17            WE'VE BEEN STUDYING FIRST EPISODES TO TRY AND FIGURE

18   THAT OUT AND HOW QUICKLY WE SHOULD BE TREATING.  WHAT WE FOUND

19   IS THAT PERTINENT TO THE RESPONSE AND SOME OF THE QUESTIONS IN

20   THIS CASE ARE THERE IS A RESPONSE.  ONE OF THE THINGS THAT

21   HAPPENS WHEN YOU GIVE THESE MEDICINES IS PEOPLE START

22   RESPONDING.  THE QUESTIONS ARE HOW MANY PEOPLE AND HOW FAST DO

23   THEY RESPOND?

24            AND THE STUDIES ABOUT THE INITIAL RESPONSE, LIKE A

25   20 PERCENT REDUCTION IN SYMPTOMS OR MAYBE A 40 PERCENT, THE

1    STUDIES VARY WHERE THEY'RE GETTING BETTER.  OBVIOUSLY, WITH

2    20 PERCENT, THERE'S STILL 80 PERCENT TO GO.  IT TAKES -- THE

3    MOST RAPID RESPONSE WAS IN A STUDY THAT WAS PART OF THE

4    DOCUMENTS INVOLVED IN THIS CASE IN THE SCHOOL WITH A BUNCH OF

5    COLLABORATORS.  WHAT SHE FOUND WAS THAT THE INITIAL RESPONSE

6    OF 20 PERCENT REDUCTION WAS SEEN ON AVERAGE -- NOT AVERAGE --

7    THE MEDIAN PERSON RESPONDED IN 26 DAYS.

8            "MEDIAN" MEANS IT'S THE ABSOLUTE MIDDLE PERSON.  IT

9    MEANS HALF THE PEOPLE RESPONDED IN 26 DAYS OR LESS.  HALF TOOK

10   27 DAYS OR MORE.  BUT IT'S THE INITIAL RESPONSE.

11           NOW, ALL OF THE OTHER STUDIES, AGAIN FIRST EPISODE,

12   SECOND-GENERATION ANTIPSYCHOTICS -- ALL THE OTHER STUDIES, THE

13   FIRST RESPONSE, IT TAKES LONGER THAN FOUR WEEKS.  IT TAKES

14   FIVE WEEKS, SIX WEEKS, EIGHT WEEKS, 12 WEEKS.  THE CLUSTER IN

15   THAT GROUP TO SEE INITIAL RESPONDING LIKE MR. LOUGHNER, AT

16   LEAST A 20 PERCENT, IF NOT MORE, RESPONSE, IN MY OPINION, FROM

17   WHAT I'VE READ AND SEEN.  IT TAKES THAT AMOUNT OF TIME.

18   Q.   WHEN YOU SAY "RESPONSE," IT DOESN'T MEAN REMISSION, DOES

19   IT?

20   A.   IT ABSOLUTELY DOESN'T.

21   Q.   WHAT DOES "REMISSION" MEAN?

22   A.   REMISSION IS GENERALLY DEFINED AS ALMOST NO SYMPTOMS

23   ANYMORE, ALMOST BACK TO YOUR OLD SELF.  ANOTHER THING THAT WE

24   USE IN THESE TRIALS A LOT IS IS THE PATIENT VERY MUCH IMPROVED

25   OR MUCH IMPROVED?  WE LOOK AT THAT GROUP OF PEOPLE WHO HAVE

1    DONE WELL.

2             THE TIME COURSE OF THESE OTHER RESPONSES, IN THE

3    BEST STUDY DONE, JEFF LIEBERMAN, THE TIME TO RESPOND WAS 11

4    WEEKS.  SO IN 11 WEEKS, THE MEDIAN PERSON WAS BETTER.

5    Q.    SHOWED SOME SIGN OF IMPROVEMENT?

6    A.    SOME SIGN.

7    Q.    MY QUESTION IS RESPONSE IS DIFFERENT FROM REMISSION?

8    A.    IS TOTALLY DIFFERENT.  RESPONSE IS 20 PERCENT REDUCTION

9    IN MEDICINES.  REMISSION IS 90, 95 PERCENT REDUCTION.

10            NOW, IN THAT BIG STUDY, IMPROVEMENT WAS AT 11 WEEKS

11   MEDIAN.  BUT THE MEDIAN, WHICH MEANS IF YOU AVERAGE THEM ALL,

12   THE MEDIAN WAS NOT MUCH.

13            SO OBVIOUSLY, IF 50 PERCENT ARE BETTER IN 11 WEEKS,

14   THE OTHER 50 PERCENT OBVIOUSLY TOOK A WHOLE LOT LONGER TO

15   DRIVE THE AVERAGE MEDIAN UP TO NINE MONTHS.

16            SO THE TIME IT TAKES TO RESPOND TO SECOND-GENERATION

17   ANTIPSYCHOTICS REALLY VARIES FROM TWO, THREE MONTHS TO EVEN

18   START GETTING BETTER.

19            THERE'S SOME STUDIES AND SOME TEXTBOOKS THAT SAY

20   IMPROVEMENT DOESN'T PLATEAU UNTIL SIX MONTHS.  THE MORE

21   MODERATE TRIALS SAY IT'S STILL IMPROVING AT 12 MONTHS.

22   Q.    IS THERE SOME TYPE OF QUANTIFIED SUCCESS RATE WHERE

23   SOMEBODY -- WHERE YOU CAN SAY THAT THIS PERCENTAGE OF PEOPLE

24   WHO TOOK RISPERDAL IN THE END BECAME COMPETENT AND THE

25   POSITIVE SYMPTOMS HAVE GONE AWAY?

1   A.   YES.   IN THE SHORT TERM, THREE-MONTH, THE STUDIES ALL

2   CLUSTER AROUND 60 AND 80 PERCENT OR AT LEAST IMPROVED.

3   SOMETIMES SOME OF THE STUDIES SAY 65 PERCENT ARE VERY MUCH

4   IMPROVED.   BUT MANY OF THE TRIALS WITH REMISSION, THAT'S

5   REACHED IN 6 TO 12 MONTHS.

6   Q.   REMISSION WHERE THE SYMPTOMS ARE ALL GONE?

7   A.   MORE OR LESS GONE.   THE OTHER IMPORTANT THING IS THAT IN

8   THAT TIME DIFFERENCE, THE PERCENTAGE OF PEOPLE WHO RESPOND AND

9   DO WELL GOES FROM 60 TO 70 PERCENT TO 85 TO 90 PERCENT DOING

10  REALLY WELL.   SO THERE IS JUST A GREAT DEAL OF IMPROVEMENT IN

11  THAT MONTH 3 TO MONTH 12.

12  Q.   ARE YOU FAMILIAR WITH THE PLEADING THAT THE DEFENSE FILED

13  IN THIS CASE WHERE THEY'RE TRYING TO DENY THE EXTENSION OF

14  MR. LOUGHNER'S COMMITMENT BY THE COURT?   THEY CITE TO AN

15  ARTICLE, AND IT'S AT PAGE 11 OF THEIR MOTION.   IT'S AN

16  ARTICLE -- THE FIRST NAME OF THE PERSON IS NINA SCHOOLER?

17  A.   YES.

18  Q.   AND THE ARTICLE IS "RISPERIDONE AND HALDOL IN

19  FIRST-EPISODE PSYCHOSIS, A LONG-TERM RANDOMIZED TRIAL."   IT

20  WAS PUBLISHED IN THE *AMERICAN JOURNAL OF PSYCHIATRY* IN 2005.

21           ARE YOU FAMILIAR WITH THAT ARTICLE?

22  A.   YES, I AM.

23  Q.   AND THEY SAY IN THEIR MOTION THAT -- THEY USE THAT TO

24  MAKE A STATEMENT THAT, "SCIENTIFIC LITERATURE INDICATES THAT

25  THE MEDIAN TIME TO CLINICAL IMPROVEMENT ON RISPERIDONE IS

1    26 DAYS FOR FIRST-EPISODE PATIENTS."

2                    IS THAT ACCURATE?

3    A.    NO.  I WAS ACTUALLY QUOTING HER WHEN I SAID THE FASTEST

4    MODERN TRIAL TO A MEDIAN-RESPONDING PATIENT IS THE 26 DAYS IN

5    THAT TRIAL.  TO MY READING OF THE LITERATURE, ALL THE OTHERS

6    ARE LONGER THAN THAT.  SO THAT'S ONE --

7    Q.    IT GOES ON TO SAY IN THE MOTION, AGAIN BASED ON AN

8    ARTICLE BY MS. SCHOOLER AND OTHERS, "THE SAME STUDY FOUND THAT

9    LESS THAN 2 PERCENT OF THESE PATIENTS BEING TREATED WITH

10   RISPERIDONE WHO DID NOT SHOW SIGNS OF IMPROVEMENT AFTER

11   THREE MONTHS MADE ANY PROGRESS EVEN WHEN TREATED WITH A DRUG

12   FOR TWO YEARS OR MORE."

13                   DO YOU REMEMBER READING THAT?

14   A.    I READ THAT IN THE BRIEF.

15   Q.    DID YOU READ THAT IN THE ARTICLE?

16   A.    I READ IT THREE, FOUR, FIVE TIMES TRYING TO FIND IT.

17   THEY EVEN CITE -- IT'S SUPPOSED TO BE ON PAGE 934, BUT IT'S

18   NOT.

19   Q.    BUT THAT STATEMENT, WHAT THEY IMPLY IS THAT -- WELL, YOU

20   COULDN'T FIND THAT IN THE ARTICLE?

21   A.    NO.  IT'S HOOKED TO -- THE BIGGEST MISUNDERSTANDING IN

22   THEIR BRIEF ABOUT DR. SCHOOLER'S ARTICLE, THEY SAY THAT HE'S

23   HAD MORE THAN 26 DAYS AND MAXIMUM IMPROVEMENT WAS REACHED AT

24   26 DAYS AND, THEREFORE, THERE SHOULDN'T BE ANY MORE TIME.

25                   WELL, THAT'S A COMPLETE MISREADING OF THE ARTICLE.

1    AT 26 DAYS, THE MEDIAN PATIENT HAD A 20 PERCENT IMPROVEMENT.

2    IT'S NOWHERE NEAR MAXIMUM.  THEY DIDN'T STUDY MAXIMUM EXCEPT

3    THEY DID CONTINUE IT ON FOR ONE TO SIX YEARS.  AND PART OF THE

4    DATA ARE THAT AT ONE YEAR, A WHOLE LOT MORE PEOPLE WERE BETTER

5    AND RISPERIDONE WAS EXCELLENT IN PREVENTING RELAPSE.

6    Q.   IS THERE SOME WAY TO QUANTIFY ROUGHLY THE PERCENTAGES OF

7    PEOPLE WHO BECOME COMPETENT IN THE SENSE OF BEING ABLE TO BE A

8    NORMAL PERSON AGAIN WHO CAN THINK, TALK RATIONALLY, THE

9    PERCENTAGE OF PEOPLE WHO TAKE A DRUG LIKE RISPERDAL, WHAT

10   PERCENTAGE USUALLY ATTAINED THAT LEVEL?

11   A.   YEAH.  LET ME TRY TO ANSWER THIS WAY:  THERE ARE STUDIES

12   NOW THAT SHOW THAT PEOPLE RESPOND, START RESPONDING ON DAY ONE

13   AND DAY TWO AND DAY THREE ON AN ANTIPSYCHOTIC.  THE CUMULATIVE

14   EVIDENCE SUGGESTS THAT THAT CONTINUES AT LEAST FOR A YEAR.

15          SO AFTER A YEAR OF APPROPRIATE ANTIPSYCHOTIC

16   TREATMENT, THE REMISSION RATE AT THAT POINT IN THE STUDIES

17   THAT HAVE DONE THAT IS ABOUT 85 PERCENT.  YOU HAVE TO BE FAIR

18   THAT THERE'S A LOT OF RELAPSE, PARTICULARLY IF YOU -- IF YOU

19   STOP THE ANTIPSYCHOTIC, THE WORD IN THE FIELD IS THE PATIENTS

20   "INEVITABLY" RELAPSE.  EVERYBODY RELAPSES IF YOU STOP IT.  IF

21   YOU CONTINUE IT, IT CUTS THE RELAPSE RATE DOWN TO THE

22   20 PERCENT.

23   Q.   DOES THAT MEAN THAT SOMEBODY LIKE MR. LOUGHNER WHO'S BEEN

24   DIAGNOSED AS A SCHIZOPHRENIC -- DOES HE HAVE TO TAKE SOME TYPE

25   OF ANTIPSYCHOTIC DRUG HIS ENTIRE LIFE TO REMAIN NORMAL?

1    A.    MAYBE.  THERE DO APPEAR TO BE SOME PEOPLE AFTER THEY'VE

2    BEEN WELL FOR A WHILE THAT CAN GET OFF OF IT.  BUT THE

3    MAJORITY, IT IS SIMPLY TRUE THAT THEY NEED TO STAY ON IT THE

4    REST OF THEIR LIVES.

5    Q.    WHAT IF HE WAS TAKEN OFF THE RISPERDAL TOMORROW?  WHAT DO

6    YOU THINK WOULD HAPPEN TO MR. LOUGHNER?

7    A.    I'M QUITE SURE WITHIN ONE TO TWO DAYS, HE WOULD BE VERY

8    SICK AGAIN.

9    Q.    SICK IN THE SENSE OF?

10   A.    HE WOULD RELAPSE.  HE WOULD LOSE THE IMPROVEMENT THAT HE

11   HAS GAINED AND LOSE ALL FUTURE IF HE DIDN'T GET BACK ON THE

12   MEDICINE.

13   Q.    WHAT IMPROVEMENT HAVE YOU SEEN IN HIM?

14   A.    AS I READ THE RECORD HERE AND AS DR. PIETZ TESTIFIED,

15   IT'S CLEAR THAT HE'S GOT SOMETHING LIKE A 20 TO 30, MAYBE

16   40 PERCENT.  HE'S QUIETER NOW.  HE'S ABLE TO SIT AND NOT PACE.

17   HE'S MORE LOGICAL AND ORGANIZED.  HE'S ABLE TO HAVE A

18   CONVERSATION THAT MAKES SENSE.  HE'S ABLE TO REMEMBER.  THAT

19   COGNITIVE THINKING IS BETTER.

20          SO HE CAN SAY -- SHE DESCRIBED, "REMEMBER WHAT WE

21   WERE TALKING ABOUT LAST WEEK?  I HAD SOME THOUGHTS ABOUT IT."

22   THAT SHOWS THAT HE'S REMEMBERING FROM THAT -- HE'S USING A

23   CALENDAR NOW.  HE SAYS, "I HAVE AN APPOINTMENT WITH MY

24   ATTORNEYS COMING UP.  I KNOW THAT."

25          HE'S BECOMING MORE HUMAN AGAIN.  I USED TO TEACH

1    STUDENTS -- I USED TO TEACH ALL THE SCHIZOPHRENIA COURSES.

2    ONE OF THE THINGS -- ONE OF THE SADDEST THINGS ABOUT ILLNESS

3    IS IT ROBS PEOPLE OF THEIR HUMANITY.  HIS HUMANITY IS COMING

4    BACK.  HE'S SAYING, "OH, YOUR WRIST IS BROKEN.  I HOPE THAT'S

5    OKAY."

6              HE'S NOW BECOMING MODEST, APPROPRIATELY MODEST,

7    ABOUT HIS SHOWERING.  I BELIEVE THAT'S A VERY IMPORTANT THING.

8    HE'S NOT HAVING THESE HORRIFIC 50 HOURS OF BEING AWAKE.  HE'S

9    STILL NOT SLEEPING WELL.  EVERYBODY WITH A SERIOUS PSYCHIATRIC

10   ILLNESS HAS SLEEP DISTURBANCE.  EVERYBODY.  EXCEPT THE PEOPLE

11   WHO GET ON SERAPRO BECAUSE THAT ACTUALLY FIXES IT.

12             BUT HE'S NOT HAVING THESE UP 50 HOURS.  HE'S NOT

13   PACING CONSTANTLY.  HE WOULD DO THINGS LIKE SPIN IN A CIRCLE

14   FOR TWO HOURS.  THAT DOESN'T HAPPEN.  HE'S NOT OBVIOUSLY

15   HALLUCINATING AT THIS POINT.  HE MAY NOT BE HAVING ANY

16   HALLUCINATIONS NOW.  IF SO, IT MAY BE DOWN -- AS DR. PIETZ

17   SAID, IT MAY BE DOWN TO THE POINT WHERE IT'S NOT CRITICAL.

18             A LOT OF PEOPLE WITH THIS ILLNESS CAN LIVE NORMAL

19   LIVES, EVEN PEOPLE IN WHOM WE HAVEN'T ABSOLUTELY ERADICATED

20   DELUSIONS OR HALLUCINATIONS.  BUT THEY DO FINALLY ASK THEM,

21   "HOW DO YOU DO THAT?"  THEY SAY, "WELL, I JUST DON'T PAY

22   ATTENTION TO THEM ANYMORE."  WHAT I WOULD HOPE FOR HIM IS THAT

23   THEY'RE GONE SOMETIME IN THE NEXT 2 TO 10 MONTHS.

24   Q.   YOU'VE HEARD TESTIMONY ABOUT HE SUFFERS OR AT LEAST

25   DR. PIETZ SAYS THAT HE'S DEPRESSED.

1          CAN YOU COMMENT ON THE SIGNIFICANCE OF THAT?

2     A.   YES.

3          THAT'S A VERY, VERY SIGNIFICANT PROBLEM CAUSING HIM

4     TO BE SUICIDAL.  ON THE OTHER HAND, IT'S VERY COMPLEX

5     PSYCHIATRICALLY WHY HE'S DEPRESSED.  THE MAJORITY OF PEOPLE

6     WITH SCHIZOPHRENIA ARE DEPRESSED.  THE MAJORITY END UP ON

7     ANTIDEPRESSANTS.

8     Q.   WHY IS THAT?

9     A.   IT'S PART OF THE ILLNESS.  IT'S ALSO PART OF THE

10    EXPERIENCE OF HAVING IT.  AS SHE DESCRIBED POIGNANTLY, HE NOW

11    REALIZES HE HAS AN ILLNESS.  THAT'S A VERY SAD THING TO COME

12    TO TERMS WITH, TO REALIZE SO MUCH HAS CHANGED.  IN HIS CASE,

13    HE ALSO HAS THE REMORSE OF WHAT HAPPENED.

14         SO IT'S SORT OF, IN SOME SENSE, LOGICAL THAT HE

15    WOULD BE DEPRESSED ABOUT WHAT HAS HAPPENED TO HIM IN HIS LIFE.

16    BUT HE ALSO PROBABLY HAS A DEPRESSIVE ILLNESS.

17         REMEMBER, HE SAW A DOCTOR SEVERAL YEARS BEFORE HIS

18    SCHIZOPHRENIA BECAME OBVIOUS, AND THE DOCTORS DIAGNOSED HIM

19    WITH DEPRESSION BECAUSE THAT'S ALL OF THE DIFFICULTIES HE WAS

20    HAVING.  SO THAT MAY BE COMING FORWARD.

21         AND NOW AS THE PSYCHOSIS IS BEING REDUCED, HOPEFULLY

22    TO BE REMOVED, IT APPEARS THAT THIS DEPRESSIVE THING IS HERE

23    UNDERNEATH AND THAT THAT'S GOING TO HAVE TO BE TREATED, TOO.

24         BUT THOSE ARE THE TWO REASONS: SCHIZOPHRENIA ITSELF.

25    IT'S CALLED POST-PSYCHOTIC DEPRESSION.  SCHIZOPHRENIA ITSELF.

1   AND THEN THE EXPERIENCE OF THE ILLNESS.

2   Q.   THE REMORSE WOULD BE THE REMORSE IN THIS CASE ABOUT

3   REALIZING WHAT HE HAD DONE IN JANUARY?

4   A.   YES.  IT'S NOT JUST CONJECTURE.  HE'S ACTUALLY SAID THAT

5   TO DR. PIETZ.

6   Q.   IS THE FACT OF THAT SELF-REALIZATION AN INDICATION THAT

7   THE MEDICATION IS HELPING?

8   A.   ABSOLUTELY.

9   Q.   WHY IS THAT?

10  A.   THAT MEANS HE'S BETTER.  IT MEANS HE'S REALITY-ORIENTED.

11  HE'S GONE FROM NOT THINKING, FROM ABSOLUTELY DELUSIONAL IN

12  THINKING SHE WAS STILL ALIVE, TO BEING REMORSEFUL ABOUT HAVING

13  DONE IT.  THAT IS A VERY STRONG INDICATION THAT HIS PSYCHOSIS

14  IS BETTER.

15  Q.   YOU'VE HEARD THE TESTIMONY OF THE DRUGS THAT HAVE BEEN

16  USED WITH MR. LOUGHNER, AND I BELIEVE THE EVIDENCE IS THAT AS

17  OF RIGHT NOW HE'S BEING GIVEN SIX MILLIGRAMS DAILY OF

18  RISPERIDONE, TWO MILLIGRAMS A DAY AND I THINK FOUR IN THE

19  EVENING.

20          IS THAT YOUR UNDERSTANDING?

21  A.   TWO IN THE MORNING, FOUR IN THE EVENING.  DR. SARRAZIN IS

22  TRYING TO GET AWAY FROM WHAT HE THOUGHT WAS SEDATION.

23  Q.   IN YOUR EXPERTISE AND EXPERIENCE, IS THAT AN APPROPRIATE

24  DRUG TO USE IN THIS CASE?

25  A.   HIGHLY APPROPRIATE.

1  Q.   IS IT AN APPROPRIATE DOSAGE TO USE IN THIS CASE?

2  A.   HIGHLY APPROPRIATE.  THE SCIENTIFIC LITERATURE IS CLEAR

3  AS FAR AS STUDIES WHERE IN DEVELOPING A MEDICINE, COMPARE TWO

4  TO FOUR MILLIGRAMS A DAY TO 16 MILLIGRAMS, THERE WAS NO

5  DIFFERENCE IN THE TWO GROUPS EXCEPT THERE WERE MORE SIDE

6  EFFECTS WITH THE 16 MILLIGRAMS.  SO TWO TO SIX MILLIGRAMS IS

7  REALLY THE RANGE THAT WE RECOMMEND.

8          NOW, IF HE DOESN'T RESPOND FULLY TO THAT, THEN GOING

9  HIGHER TO EIGHT MILLIGRAMS, MAYBE A LITTLE HIGHER, 10, 12,

10  WOULD BE ALSO A VERY APPROPRIATE STRATEGY.

11  Q.   YOU'VE ALSO HEARD TESTIMONY THAT HE'S BEEN PRESCRIBED THE

12  ANTIDEPRESSANT WELLBUTRIN; CORRECT?

13  A.   YES.

14  Q.   IS THAT AN APPROPRIATE DRUG TO TRY FOR DEPRESSION?

15  A.   ABSOLUTELY.  YOU COULD MAKE STRONG ARGUMENTS THAT IT'S

16  THE BEST ANTIDEPRESSANT.  I USE IT ALL THE TIME.

17  Q.   YOURSELF OR YOUR PATIENTS?

18  A.   MY PATIENTS.  MY ONLY TROUBLE IS LAWYERS.

19  Q.   THEY GIVE ME A HEADACHE, TOO.  BELIEVE ME, DOCTOR.

20          IS THE AMOUNT THAT THEY'RE PRESCRIBING FOR HIM AN

21  APPROPRIATE AMOUNT?

22  A.   IT IS.  FOR SOMEBODY AS SEVERELY DEPRESSED AS HE IS, IT'S

23  CERTAINLY APPROPRIATE TO START WITH.  I MEAN, AFTER A YEAR I

24  MIGHT HAVE HIM AT 1250 A DAY OR EVEN CONTINUE WITH THE

25  600 MILLIGRAMS, BUT 300 IS ABSOLUTELY RIGHT AT THIS POINT.

1    Q.    YOU'VE ALSO HEARD TESTIMONY THAT HE'S ALSO BEEN

2    PRESCRIBED ATIVAN.

3          WHAT KIND OF DRUG IS THAT?

4    A.    IT'S WHAT'S CALLED A MINOR TRANQUILIZER.    IT'S AN

5    ANTIANXIETY MEDICINE.    ALMOST EVERYBODY WITH SERIOUS

6    PSYCHIATRIC PROBLEMS INCLUDING SCHIZOPHRENIA IS PRESCRIBED ONE

7    OF THESE DRUGS FROM THIS CLASS.    KLONOPIN IS ALSO FROM THE

8    SAME CLASS.    AND IT REDUCES ANXIETY.    IT CONTRIBUTES TO

9    PRODUCING AGITATION.    IT ALSO -- DR. SARRAZIN, HE DOESN'T

10   THINK THIS IS AKATHISIA, AND I DON'T EITHER.    BUT IF IT WERE,

11   IN AN ABUNDANCE OF CAUTION, THE BENZODIAZEPINES ATIVAN AND

12   KLONOPIN, THAT WOULD HELP WITH THAT.

13   Q.    IS THAT LIKE XANAX?

14   A.    IT'S IN THE SAME CLASS.

15   Q.    AND IS THE AMOUNT THAT'S BEEN PRESCRIBED AN APPROPRIATE

16   STATEMENT IN YOUR MEDICAL OPINION?

17   A.    YES.    I COULD WELL IMAGINE USING MORE.    BUT APPARENTLY

18   ONE OF THE ISSUES HAS BEEN SEDATION.    RISPERDAL IS -- THAT'S

19   PROBABLY THE MOST COMMON SIDE EFFECT.    AND SO DR. SARRAZIN IS

20   TRYING TO STAY AWAY FROM HAVING HIM BE TOO SEDATED.    SO THAT'S

21   WHY HE SWITCHED AWAY FROM ATIVAN TO LOWER DOSES OF KLONOPIN

22   DURING THE DAY.

23   Q.    AND I THINK THERE'S ONE OTHER DRUG THAT'S BEEN DISCUSSED,

24   COGENTIN?

25   A.    YES.

221

1   Q.   WHAT IS THAT?

2   A.   IT'S A SO-CALLED ANTI-PARKINSON DRUG.  IT'S

3   ANTICHOLINERGIC.  WE USE IT TO TREAT EPS.  HE GOT ON THE

4   COGENTIN BECAUSE HE HAD A THICK TONGUE.  AND THE DOCTOR SAID,

5   "OH, MY GOSH, THIS IS AN EPS SYMPTOM."  AS IT TURNED OUT, A

6   DAY LATER HE HAD WHITE SPOTS ON HIS TONGUE AND WAS CLEARLY

7   DIAGNOSED WITH THRUSH.  IT WAS TREATED, AND IT WENT AWAY.

8           DR. SARRAZIN TOLD ME THAT HE'S STILL ON IT TO COVER

9   ANY POSSIBLE EPS.  AND AGAIN, THAT'S AN ABUNDANCE OF CAUTION

10  KIND OF STRATEGY.

11  Q.   THESE OTHER DRUGS THAT HE'S BEEN PRESCRIBED, THE DEFENSE

12  IS REFERRING TO THIS AS A COCKTAIL OF DRUGS.

13          DO THE OTHER DRUGS IN ADDITION TO THE RISPERDAL --

14  ARE THEY MIND-CHANGING?  DO THEY PRODUCE UNWANTED PHYSICAL OR

15  MENTAL COMPLICATIONS OF ANY SORT BECAUSE THEY'RE ALL BEING

16  GIVEN TOGETHER AT ONCE?

17  A.   NO.  THIS IS ABSOLUTELY THE LOGICAL ROUTINE.  ALMOST

18  EVERY PERSON WITH SCHIZOPHRENIA IS ON THIS SAME GROUP.  THERE

19  ARE THREE OR FOUR DIFFERENT CLASSES.  SO IT'S REALLY ROUTINE.

20          THEY HAVE SOME SIDE EFFECTS.  COGENTIN DRIES YOUR

21  MOUTH, LEADS TO SOMETIMES CONSTIPATION, AND SOME MAYBE MINOR

22  MEMORY PROBLEMS WE'VE DISCOVERED RECENTLY.

23  Q.   ANY OTHER SIDE EFFECTS FROM USING THESE DRUGS TOGETHER?

24  A.   NO.  NO PROBLEMS OF USING THEM TOGETHER.

25  Q.   HAVE YOU SEEN IN THE RECORD ANY INDICATION THAT

1   MR. LOUGHNER HAS EXHIBITED ANY ADVERSE PHYSICAL SIDE EFFECTS

2   ONCE HE WAS PUT ON RISPERDAL BACK ON JULY 18TH?

3   A.   NO.  APPARENTLY, SOME SEDATION.  THAT SEEMS TO BE IT.

4               MR. KLEINDIENST:  MAY I HAVE ONE MOMENT, YOUR HONOR?

5               THE COURT:  SURE.

6                     (PAUSE IN PROCEEDINGS)

7   BY MR. KLEINDIENST:

8   Q.   HAVE YOU HEARD THE TERM CALLED "TREATMENT RESISTANT"?

9   A.   YES.

10  Q.   WHAT DOES THAT MEAN, DOCTOR?

11  A.   THERE ARE SOME PEOPLE WITH THIS ILLNESS WHO DON'T RESPOND

12  WELL -- DON'T RESPOND AS WELL AS THE AVERAGE PATIENT.  IN

13  SCHIZOPHRENIA, IT'S ABOUT 10 TO 20 PERCENT OF THE POPULATION.

14            WE STUDY IT NOW BECAUSE WE REALLY DON'T WANT TO

15  LEAVE PEOPLE STUCK IN THIS ILLNESS.  WE DEFINE TREATMENT

16  RESISTANCE IN THE FIELD AS A PERSON HAS FAILED AN EIGHT-WEEK

17  TRIAL OF ONE OF THESE ANTIPSYCHOTICS AT APPROPRIATE DOSAGE.

18  IF THEY FAIL THAT AND THEN FAIL ANOTHER TRIAL WITH A DIFFERENT

19  ANTIPSYCHOTIC FROM A DIFFERENT CLASS -- SO YOU MIGHT GO

20  BACK TO A FIRST-GENERATION, FOR INSTANCE, FOR ANOTHER

21  EIGHT WEEKS -- IF THAT FAILS, THEN WE ENTER THEM INTO TRIALS

22  TO SEE WHAT WE CAN DO.  AND, FOR INSTANCE, CLOZAPINE WOULD

23  STILL CURE 30 PERCENT OF THAT GROUP.

24  Q.   IN THIS CASE, IS THERE ANY EVIDENCE THAT MR. LOUGHNER HAS

25  BEEN -- HAS REACTED IN A WAY THAT'S RESISTANT TO THE EFFECTS

1    THE DRUGS HAVE TENDED TO HAVE ON HIM?

2    A.   NO.  I ACTUALLY THINK HIS RESPONSE IS ABSOLUTELY ON PAR.

3    IT'S AVERAGE.  IT'S NOT FASTER AND IT'S NOT SLOWER THAN THE

4    AVERAGE FIRST-EPISODE PERSON WITH THIS ILLNESS.

5    Q.   IS THERE ANY OTHER DRUG OTHER THAN, IN THIS CASE, A

6    SECOND-GENERATION ANTI-PSYCHOTIC THAT CAN HAVE ANY SUCCESS IN

7    CURING SCHIZOPHRENIA?

8    A.   THE ANSWER REALLY IS NO.  AT THIS POINT, THE CONSENSUS IS

9    UNANIMOUS IN THE FIELD THAT YOU CAN'T TREAT SCHIZOPHRENIA

10   WITHOUT USING ONE OF THESE ANTIPSYCHOTIC DRUGS.

11   Q.   BASED UPON YOUR REVIEW OF THE RECORDS IN THIS CASE AND

12   WHAT DR. PIETZ TESTIFIED TO TODAY, DO YOU HAVE AN OPINION AS

13   TO THE LIKELIHOOD THAT JARED LOUGHNER WILL BECOME COMPETENT AT

14   SOME POINT IN TIME?

15   A.   I THINK IT'S HIGHLY LIKELY THAT HE WILL.

16   Q.   WHY DO YOU SAY THAT?

17   A.   IT'S HIGHLY LIKELY THAT HE'LL RESPOND AND GET CLINICALLY

18   BETTER AND GET TO A MUCH BETTER REMITTED KIND OF STATUS GIVEN

19   ENOUGH TIME TO DO THAT.  AGAIN, AS I SAID, I THINK THAT'S

20   TWO TO SIX, EIGHT MORE MONTHS.  AND WHEN HE GETS THE

21   SCHIZOPHRENIA MOVED OFF THE TABLE, HE'S OF AVERAGE

22   INTELLIGENCE AND SHOULD BE ABLE TO UNDERSTAND THESE ROLES.

23   AND ACTUALLY EVEN PSYCHOTIC, HE UNDERSTANDS A LOT OF THE KIND

24   OF ISSUES THAT ARE INVOLVED IN UNDERSTANDING HOW THE COURT

25   WORKS, AT LEAST FROM THE THINGS HE'S TOLD DR. PIETZ.

224

1          HE SHOWS THAT HE CAN LEARN THAT AFTER THE PSYCHOSIS

2     IS TAKEN CARE OF.  IT'S THE PSYCHOSIS THAT'S MAKING HIM

3     INCOMPETENT, NOT A KNOWLEDGE LACK OF HOW THE COURT SYSTEM

4     WORKS.

5          MR. KLEINDIENST:  THANK YOU, SIR.

6          THAT'S ALL I HAVE, YOUR HONOR.

7                          **CROSS-EXAMINATION**

8     **BY MR. CAHN:**

9     Q.   DOCTOR, I HEARD YOU TALK WITH GREAT EMOTION ABOUT YOUR

10    40 YEARS OF PRACTICE AND YOUR ENCOUNTERS WITH PEOPLE WITH

11    SCHIZOPHRENIA.

12         THAT'S AFFECTED YOUR VIEWS, HASN'T IT?

13    A.   YES.  I TEACH A LOT OF THE MEDICAL STUDENTS THAT IF THEY

14    DON'T CARE ABOUT PEOPLE THEY'RE TREATING, I WORRY ABOUT THEM.

15    Q.   AND YOU FEEL STRONGLY THAT THIS IS A DEVASTATING DISEASE

16    THAT AFFECTS THE SUFFERER?

17    A.   WITHOUT A SHADOW OF A DOUBT.

18    Q.   TORTURE OF THE HUMAN BEING?

19    A.   YES.

20    Q.   AND YOU FEEL STRONGLY THAT THESE MEDICATIONS BENEFIT

21    THESE PEOPLE?

22    A.   YES.

23    Q.   AND THAT THESE SUFFERER SHOULD BE MEDICATED, THEY SHOULD

24    RECEIVE THIS TREATMENT?

25    A.   I PERSONALLY THINK IT'S CRUEL NOT TO.

COMPUTER-AIDED TRANSCRIPTION

1    Q.   THAT'S THE VIEW WITH WHICH YOU COME TO YOUR TESTIMONY

2    TODAY?

3    A.   I THINK THAT'S PROBABLY FAIR TO SAY.

4    Q.   NOW, I'M GOING TO GET INTO YOUR PARTICULAR VIEWS IN A

5    LITTLE BIT, BUT I NEED TO ASK YOU A FEW QUESTIONS ABOUT YOUR

6    INVOLVEMENT WITH THIS CASE SINCE THIS IS THE FIRST TIME WE'VE

7    ENCOUNTERED YOU.

8             WHEN WERE YOU FIRST CONTACTED ABOUT THIS CASE?

9    A.   I DON'T KNOW EXACTLY.  IT WASN'T THAT LONG AGO.  COUPLE

10   MONTHS AGO, TWO AND A HALF PERHAPS.

11   Q.   BY WHOM WERE YOU CONTACTED?

12   A.   MR. KLEINDIENST.

13   Q.   WHAT WERE YOU ASKED TO DO?

14   A.   ASKED IF I COULD HELP THEM UNDERSTAND WHAT THE ISSUES

15   WERE IN TREATING SOMEONE WITH THIS ILLNESS, WHAT THE CORRECT

16   TREATMENTS WERE AND WHAT THE SIDE EFFECTS WERE OF THE

17   TREATMENTS.

18   Q.   AND YOU TALKED ABOUT REVIEWING RECORDS, RECORDS OF

19   MR. LOUGHNER; CORRECT?

20   A.   YES.  MR. KLEINDIENST REFERRED TO THAT, AND I'VE REVIEWED

21   SOME.

22   Q.   PLEASE TELL ME WHAT YOU'VE REVIEWED.

23   A.   WELL, I'VE REVIEWED THE EVALUATIONS.

24   Q.   CAN I HAND THIS TO YOU?  I'M TOLD THAT THIS IS WHAT YOU

25   REVIEWED.  MAYBE YOU CAN JUST SKIM IT AND LET US KNOW WHAT YOU

1    LOOKED AT.

2    A.    IN THIS PARTICULAR BINDER, THERE ARE TEN ITEMS:   THERE

3    ARE COMPETENCY REPORTS FROM DR. PIETZ AND DR. CARROLL, THE

4    BUREAU OF PRISONS PROGRESS NOTES, THE FIRST HARPER HEARING,

5    THE 7/1/11 ORDER HALTING MEDICATION, THE EMERGENCY MEDICATION

6    REPORT, AND THEN DR. PIETZ'S PROGRESS REPORT ON 8/22/11 AND

7    HER FOLLOW-UP ADDENDUM ON 9/7/11, THE ORIGINAL PENDING DEFENSE

8    MOTION, THE RECORDS FROM THE HARPER 2 HEARING.

9            AND I'VE READ THE PLEADINGS THAT THE TWO SIDES HAVE

10   SUBMITTED.

11   Q.    AS I UNDERSTAND IT, THEN, YOU HAVEN'T REVIEWED ANY OF

12   MR. LOUGHNER'S ACTUAL TREATMENT RECORDS; IS THAT CORRECT?

13   A.    I HAVEN'T REVIEWED A LOT OF THAT.   THAT IS TRUE.

14   Q.    YOU DIDN'T MENTION REVIEWING PROGRESS NOTES.

15   A.    THAT'S WHAT'S IN THIS BINDER.   THERE ARE PROGRESS NOTES

16   IN HERE.   I HAVE NOT DONE A COMPREHENSIVE REVIEW.

17   Q.    YOU HAVEN'T REVIEWED THE SUICIDE LOGS?

18   A.    NO.

19   Q.    OBVIOUSLY, YOU'RE NOT PRIVY TO ANY CLINICAL INTERVIEWS?

20   A.    WELL, I HEARD DR. PIETZ'S TESTIMONY.

21   Q.    DID YOU WATCH THE VIDEOTAPES OF THE INTERVIEWS THAT

22   DR. PIETZ PERFORMED WITH MR. LOUGHNER?

23   A.    NO, I HAVE NOT.   WHAT I WAS ASKED TO DO REALLY CENTERED

24   ON DEVELOPING THE AFFIDAVIT WHICH WE SUBMITTED.

25   Q.    IT'S NOT CRITICISM.   I'M JUST TRYING TO UNDERSTAND WHAT

1    UNDERLIES YOUR OPINION HERE TODAY.  THAT'S WHY I'M ASKING

2    THESE QUESTIONS.

3    A.   IF I'D BEEN BROUGHT IN AS THE FORENSIC PSYCHIATRIST, I

4    WOULD HAVE READ EVERYTHING.  I WASN'T.

5    Q.   SO WHAT YOU'VE READ, THOUGH, YOU TALKED ABOUT THE HARPER

6    REPORTS, THE COMPETENCY REPORTS, THE PROGRESS REPORTS WITH

7    REGARD TO THE REQUEST FOR AN EXTENSION OF THE COMMITMENT, AND

8    LEGAL PLEADINGS, ESSENTIALLY.

9         THAT'S IT, RIGHT?

10   A.   THAT'S AN ACCURATE REPRESENTATION.

11   Q.   THEN YOU MENTIONED AS WELL THAT YOU HAD SPOKEN TO

12   DR. SARRAZIN.

13   A.   YES.

14   Q.   WHEN DID YOU SPEAK TO DR. SARRAZIN?

15   A.   YESTERDAY.

16   Q.   YOU SPOKE TO DR. SARRAZIN ABOUT MR. LOUGHNER?

17   A.   YES.

18   Q.   WHEN YOU CALLED DR. SARRAZIN AND TALKED TO HIM ABOUT

19   MR. LOUGHNER, DID YOU EXPLAIN TO HIM THAT YOU WERE CALLING AS

20   AN EXPERT RETAINED BY THE GOVERNMENT?

21   A.   YES.

22   Q.   IN AN ADVERSARY PROCEEDING?

23   A.   I DIDN'T EXPLAIN EXCEPT THAT I WAS WORKING WITH THE

24   GOVERNMENT ON THIS CASE.

25   Q.   HE TALKED TO YOU ABOUT HIS TREATMENT OF MR. LOUGHNER?

1    A.    JUST AROUND THE TWO SPECIFIC QUESTIONS THAT I ASKED HIM.

2    Q.    WHAT WERE THOSE QUESTIONS?

3    A.    THEY WERE ABOUT THE THICK TONGUE ISSUE AND DID HE THINK

4    THAT WAS AN EPS SYMPTOM.  HE SAID, NO, IT WAS THRUSH.  AND

5    THEN ABOUT WHETHER OR NOT THERE WAS ANY CHANCE THAT AKATHISIA

6    WAS PART OF HIS PACING.  HE SAID NO.

7    Q.    THOSE WERE THE ISSUES THAT YOU WERE CONCERNED ABOUT JUST

8    IN WHAT YOU'VE READ?

9    A.    YEAH.  AGAIN, MY MISSION WAS TO TALK TO HIM AND FIGURE

10   OUT --

11   Q.    IT WAS DR. SARRAZIN'S OPINION THAT ALLAYED YOUR

12   CONCERNS?

13   A.    NO.  IT SUPPORTED MINE.  OBVIOUSLY, HE'S SEEN HIM AND I

14   HAVEN'T, BUT THAT WAS MY PRELIMINARY OPINION ANYWAY.

15   Q.    YOU'VE NEVER MET JARED LOUGHNER?

16   A.    THAT'S CORRECT.

17   Q.    NEVER EXAMINED JARED LOUGHNER?

18   A.    THAT'S CORRECT.

19   Q.    NEVER INTERVIEWED JARED LOUGHNER?

20   A.    NO.

21   Q.    PROBABLY NEVER SEEN HIM IN PERSON BEFORE TODAY?

22   A.    THAT'S TRUE.  IN PERSON, YES.

23   Q.    AS WE DISCUSSED, DR. SARRAZIN IS HIS, AS YOU UNDERSTAND

24   IT, HIS TREATING PSYCHIATRIST?

25   A.    YES.

1    Q.   THE INDIVIDUAL WHO IS RESPONSIBLE FOR HIS CARE, AT LEAST

2    PHARMACOLOGICALLY?

3    A.   ONE OF THE INDIVIDUALS AND THE ONE IN CHARGE OF HIS

4    PSYCHOPHARMACOLOGY.

5    Q.   HE'S THE ONE ACTUALLY PRESCRIBING?

6    A.   YES.

7    Q.   WHERE DID YOU REACH DR. SARRAZIN WHEN YOU SPOKE TO HIM

8    YESTERDAY?

9    A.   I DON'T UNDERSTAND THE QUESTION.

10   Q.   WHERE WAS DR. SARRAZIN WHEN YOU SPOKE TO HIM?  WAS HE IN

11   THE UNITED STATES?

12   A.   I DON'T KNOW.  HE ANSWERED.

13   Q.   WHAT NUMBER DID YOU CALL?  WAS IT A LOCAL AREA CODE?

14   A.   I DIDN'T DIAL IT.

15   Q.   WHO PUT YOU IN TOUCH WITH HIM?

16   A.   DR. PIETZ CALLED HIM.

17   Q.   DR. PIETZ CALLED HIM AND PUT HIM ON THE PHONE AND YOU

18   DON'T KNOW WHERE HE WAS?

19   A.   NO.

20   Q.   WE DON'T KNOW WHERE HE IS.

21        HE'S NOT HERE, AS FAR AS YOU KNOW?

22   A.   I DON'T THINK SO.  HE SEEMED VERY MUCH LIKE HE WAS AT

23   SOMEPLACE LIKE SPRINGFIELD.

24   Q.   WHICH IS IN THE UNITED STATES; RIGHT?

25   A.   LAST TIME I LOOKED.

1    Q.    COMMERCIAL FLIGHTS TO GET TO TUCSON?

2    A.    YES.

3    Q.    I WANT TO GO BACK TO THE STATEMENT THAT YOU WROTE, WHICH

4    YOU SAID WAS THE MAIN TASK THAT YOU WERE ASKED TO FULFILL.

5          THAT WAS A STATEMENT THAT WAS INTRODUCED IN EVIDENCE

6    HERE TODAY; RIGHT?

7    A.    YES.

8    Q.    AND I WANT TO TALK A BIT ABOUT WHAT THESE DRUGS DO AND

9    HOW THEY TREAT THE SYMPTOMS OF SCHIZOPHRENIA.

10         IN ORDER TO DO THAT, I'D LIKE TO TALK A LITTLE BIT

11   ABOUT WHAT YOU DESCRIBED AS THE HORRIFIC SYMPTOMS OF

12   SCHIZOPHRENIA.

13         MR. CAHN:  CAN YOU PULL UP 200A, PLEASE.

14   BY MR. CAHN:

15   Q.    YOU RAN THROUGH THESE.  I'M NOT GOING TO SPEND A HUGE

16   AMOUNT OF TIME ON THOSE, BUT I WANT TO DISCUSS THEM BRIEFLY SO

17   WE CAN UNDERSTAND A LITTLE BIT BETTER WHAT WE'RE TALKING

18   ABOUT.

19         YOU TALKED ABOUT HALLUCINATIONS; RIGHT?

20   A.    YES.

21   Q.    YOU DESCRIBED --

22         MR. CAHN:  ACTUALLY, PULL UP 20D FOR ME.

23   BY MR. CAHN:

24   Q.    YOU DESCRIBED AT OTHER TIMES HALLUCINATIONS AND WHAT IT'S

25   LIKE.

1   A.   YES.

2   Q.   THE VOICES TO THAT PERSON DON'T APPEAR TO BE INSIDE THEIR

3   HEAD?  IT'S NOT LIKE WHEN WE HAVE LOUD THOUGHTS, ARE THEY?

4   A.   THE MOST CHARACTERISTIC AND DIAGNOSTIC ARE THE PERSON

5   FEELS THAT THE VOICES ARE OUTSIDE ACROSS THE ROOM TALKING

6   ABOUT THEM.  THEY'RE THE MOST CHARACTERISTIC.

7          NOW, AT VARIOUS STAGES, PARTICULARLY WHEN PEOPLE GET

8   BETTER, THEY SOMETIMES SAY, "IT'S LIKE A VOICE IN MY HEAD."

9   AND THEN WHEN THEY'RE EVEN BETTER, THEY SAY, "IT'S LIKE MY OWN

10  THOUGHTS ARE BEING SPOKEN IN MY HEAD."

11  Q.   MOST CHARACTERISTIC AND WHAT YOU'D SEE PROBABLY IN ACUTE

12  PSYCHOSIS IS THIS IDEA, A SENSE THAT THERE ARE PEOPLE OUTSIDE

13  OF THEM TALKING ABOUT THEM?

14  A.   YES.

15  Q.   BUT IT'S NOT REAL?

16  A.   THE PEOPLE ARE NOT THERE.

17  Q.   THE PEOPLE ARE NOT THERE, THE VOICES AREN'T REAL.

18          AND THE THINGS THAT THE SUFFERER IS HEARING ARE

19  OFTEN VERY HATEFUL AND VERY PAINFUL?

20  A.   YES.

21  Q.   SOMETIMES IT'S SIMPLY A SINGLE RUNNING VOICE, A SINGLE

22  VOICE, TALKING, AND AGAIN OFTEN ABOUT THAT PERSON?

23  A.   YES.  IT CAN SOMETIMES BE TWO PEOPLE ARGUING, TWO PEOPLE

24  ABUSING.

25  Q.   SORT OF HATEFUL COMMENTS THAT WE TALKED ABOUT?

1    A.   YES.

2    Q.   AND THIS IS VERY DISTURBING TO THE INDIVIDUAL?

3    A.   IT CAN BE.

4    Q.   VERY PAINFUL?

5    A.   IT CAN BE.

6    Q.   BEYOND THAT, YOU TALKED ABOUT OTHER SORTS OF

7    HALLUCINATIONS, VISUAL HALLUCINATIONS.

8              THOSE OCCUR SOMETIMES?

9    A.   YES.

10   Q.   AND YOU HEARD DR. PIETZ SAY THAT SHE BELIEVES THAT THOSE

11   MAY HAVE OCCURRED WITH MR. LOUGHNER?

12   A.   YES.

13   Q.   THOSE ARE RARER THAN AUDITORY HALLUCINATIONS?

14   A.   THEY'RE LESS COMMON.  THEY'RE NOT RARE.

15   Q.   I SAID RARER, LESS COMMON.

16             HALLUCINATIONS, THINGS YOU TASTE OR SMELL THAT

17   AREN'T THERE?

18   A.   EVEN LESS COMMON.

19             MR. CAHN:  CAN YOU PULL UP 20 AND 20F.

20   BY MR. CAHN:

21   Q.   AMONGST THE TYPES OF HALLUCINATIONS THAT DO OCCUR ARE

22   THESE COMMAND HALLUCINATIONS WHERE AN INDIVIDUAL'S BEING

23   ORDERED TO DO SOMETHING BY VOICES OUTSIDE COMMANDING THE

24   INDIVIDUALS TO DO SOMETHING; IS THAT CORRECT?

25   A.   YES.

233

1    Q.   THOSE ARE OFTEN THE SORT OF HALLUCINATIONS THAT OCCUR

2    WHEN A SCHIZOPHRENIC INDIVIDUAL IS INVOLVED IN VIOLENCE?

3    A.   THE LAST PART OF WHAT YOU SAID IS WHEN THEY'RE INVOLVED

4    IN VIOLENCE?

5    Q.   VIOLENCE TO OTHERS AS OPPOSED TO THEMSELVES.

6    A.   I'M NOT SURE I'D AGREE WITH THAT WHOLE ASSERTION.  THEY

7    ARE INVOLVED NOT INFREQUENTLY WHEN PEOPLE DO DO SOMETHING TO

8    THEMSELVES OR OTHERS, YES.

9    Q.   IF YOU TOOK A LOOK AT THE SCREEN THAT YOU'VE GOT IN FRONT

10   OF YOU, TAKE A LOOK AT THE BEGINNING AT THE BOTTOM OF THE PAGE

11   ON THE LEFT ONTO THE PAGE ON THE RIGHT.

12          IT'S A STATEMENT YOU PREVIOUSLY MADE IN YOUR

13   TESTIMONY IN CASES IN SOUTH CAROLINA, ISN'T IT?

14   A.   I THINK THAT'S WHAT IT IS.

15   Q.   THAT WAS A CAPITAL CASE?

16   A.   YES.

17   Q.   THE INDIVIDUAL WAS SENTENCED TO DEATH?

18   A.   YES.

19   Q.   AND WHAT YOU SAID THERE IS, "IT CLASSICALLY HAPPENS IF IT

20   HAPPENS IN RESPONSE TO A SPECIFIC DELUSION AND/OR

21   HALLUCINATION COMMANDING THEM TO DO SOMETHING, A DIRECT

22   COMMAND."

23          IS THAT WHAT YOU SAID?

24   A.   WHAT'S YOUR QUESTION?

25   Q.   IS THAT WHAT YOU SAID THEN?

1   A.   I CAN'T FIND THE FIRST PART OF IT.

2   Q.   GO TO THE TOP OF THE PAGE ON THE RIGHT, PLEASE.

3   A.   THANK YOU.

4   Q.   MY EYES ARE GETTING WORSE AND WORSE YEAR BY YEAR, ALSO.

5   A.   I'M AT LEAST 20 YEARS AHEAD OF YOU.   MAYBE 10.

6        I DON'T KNOW WHAT PRECEDES THE "CLASSICALLY, WHAT

7   USUALLY HAPPENS."

8   Q.   WE'LL PULL UP THE BEGINNING OF THAT.

9        THAT'S THE BEGINNING OF THAT.

10       SO THAT WAS YOUR STATEMENT, THEN?

11  A.   YES.

12  Q.   THAT CLASSICALLY VIOLENCE IN SCHIZOPHRENICS IS OFTEN

13  MOTIVATED BY COMMAND HALLUCINATIONS?

14  A.   OR A SPECIFIC DELUSION.

15  Q.   YOU JUST MENTIONED DELUSIONS.

16       DELUSIONS ARE A FALSE, FIXED BELIEF; RIGHT?

17  A.   IT'S A FALSE BELIEF.   SOMETIMES THEY'RE FIXED.

18  Q.   SOME DELUSIONS CAN WANE AND WAX?

19  A.   YES.   THEY CAN CHANGE.

20  Q.   I THINK WE'RE ABOUT TO DRIVE EVA CRAZY STEPPING ON EACH

21  OTHER, SO I'M GOING TO START TO BE CAREFUL.

22       THE DELUSIONS ARE OFTEN IN SCHIZOPHRENICS ABOUT

23  BIZARRE IDEAS?

24  A.   YES.

25  Q.   I THINK IN THE PAST YOU'VE MENTIONED DELUSIONS, SOMEBODY

1    BELIEVES THAT ALL THEIR ORGANS HAVE BEEN TAKEN OUT AND

2    REPLACED BY SOMEONE ELSE'S?

3    A.    THE ONE I USE IN TEACHING THE STUDENTS FREQUENTLY IS THE

4    DELUSION THAT SOMEBODY FROM MARS HAS PUT A RADIO TRANSMITTER

5    IN THEIR TOOTH AND IT'S TRANSMITTING INFORMATION BACK TO MARS.

6    PART OF WHAT MAKES IT A DELUSION IS THAT IT IS A FANTASTIC,

7    NOT BELIEVABLE IDEA.

8    Q.    OFTEN THE DELUSIONS ARE PERSECUTORY?

9    A.    AGAIN, THESE CAN OFTEN BE VERY, VERY DIFFICULT, VERY

10   PAINFUL FOR THE SUBJECT.

11   Q.    DISORGANIZED BEHAVIOR IS ANOTHER THING YOU TALKED ABOUT.

12         RIGHT NOW WE'RE TALKING ABOUT POSITIVE SYMPTOMS OF

13   SCHIZOPHRENIA; RIGHT?

14   A.    YES.

15   Q.    DISORGANIZED BEHAVIOR IS OFTEN A POSITIVE SYMPTOM OF

16   SCHIZOPHRENIA; RIGHT?

17   A.    YES.

18   Q.    DISORGANIZED BEHAVIOR IS SOMETHING YOU'LL SEE -- I THINK

19   YOU'VE DESCRIBED IT IN THE PAST --

20         MR. CAHN:  CAN YOU PULL UP 20H FOR ME?

21   BY MR. CAHN:

22   Q.    -- HOMELESS PEOPLE OUT ON THE STREET.  AND THEY'RE

23   DRESSED IN MULTIPLE COATS AND HATS AND THEY DON'T BATHE, THEY

24   DON'T CLEAN THEMSELVES, THEY DON'T TAKE CARE OF THEMSELVES

25   BECAUSE THEY CAN'T ORGANIZE THEIR BEHAVIOR TO ACCOMPLISH

236

1    THAT?

2    A.   WE OFTEN LINK DISORGANIZED AND BIZARRE, SOMETIME THEY'LL

3    WEAR TWO SHOES AND FOUR COATS.

4             MR. CAHN:   CAN YOU PULL UP 4D FOR ME.

5    BY MR. CAHN:

6    Q.   CAN YOU HIGHLIGHT THE "DISORGANIZED BEHAVIOR" SECTION.

7             I WANT TO SEE IF YOU AGREE WITH THIS.   THIS IS FROM

8    THE BUREAU OF PRISONS GUIDE TO PHARMACOLOGICAL TREATMENT OF

9    SCHIZOPHRENIA.

10            "DISORGANIZED BEHAVIOR IS AN EXTERNAL SIGN OF

11   COGNITIVE IMPAIRMENT AND EXECUTIVE FUNCTIONING INCLUDING

12   PLANNING AND EXECUTING GOAL-ORIENTED BEHAVIORS."

13            THEY GO ON TO GIVE EXAMPLES.

14            "REPETITIVE IRRATIONAL BEHAVIORS, POOR OR BIZARRE

15   HYGIENE OR GROOMING, POSTURING, HYPERACTIVITY, AND OTHER

16   UNUSUAL BEHAVIORS."

17            DO YOU AGREE WITH THAT?

18   A.   I CERTAINLY AGREE WITH THE EXAMPLES.   THE FIRST IS A

19   HYPOTHESIS THAT IS AN EXTERNAL SIGN OF COGNITIVE IMPAIRMENT

20   AND EXECUTIVE FUNCTIONING BETWEEN PLANNING AND EXECUTING

21   GOAL-ORIENTED BEHAVIORS.

22            WE DON'T KNOW WHY PEOPLE DO THIS DISORGANIZED AND

23   BIZARRE BEHAVIOR.   IT MAY BE BECAUSE THEY CAN'T THINK IN A

24   LOGICAL FASHION, BUT IT MIGHT BE OTHER REASONS.

25   Q.   YOU BRING UP AN INTERESTING POINT.

237

1          THERE'S A TREMENDOUS AMOUNT WE JUST DON'T KNOW ABOUT

2    SCHIZOPHRENIA; ISN'T THAT RIGHT?

3    A.   THE SAME THING COULD BE SAID ABOUT EVERY ILLNESS.

4    Q.   MORE TRUE WITH SCHIZOPHRENIA.  THE BRAIN IS A LITTLE

5    HARDER TO STUDY THAN SOME OTHER PARTS OF THE BODY.

6    A.   MEDICINE CALLED IT TO BE THE GREATEST UNSOLVED MYSTERY IN

7    MANKIND.

8    Q.   WE STILL DON'T, IN ANY REAL WAY, KNOW THE CAUSE OF

9    SCHIZOPHRENIA OR THE CAUSES MORE PROPERLY?

10   A.   I WOULDN'T AGREE WITH THAT.  WE ABSOLUTELY KNOW IN

11   GENERAL THAT THERE'S A GENETIC PREDISPOSITION, THAT THERE ARE

12   OTHER THINGS THAT BRING THE VULNERABILITY INTO ACTUALITY, AND

13   THEY VARY FROM VIRAL EXPOSURES TO THE MOTHER WHEN SOMEONE'S IN

14   UTERO TO STRESS LATER ON.  UNFORTUNATELY, HEAVY DRUG USE.  ALL

15   OF THOSE SEEM TO BE FACTORS.

16   Q.   SO WE KNOW THERE'S A GENETIC PREDISPOSITION AND WE KNOW

17   THAT ENVIRONMENTAL INSULTS TO THE BRAIN AT CERTAIN TIMES CAN

18   CONTRIBUTE TO SCHIZOPHRENIA.

19          IS THAT FAIR TO SAY?

20   A.   YES.  GENES AREN'T EVERYTHING, BUT THEY SEEM TO BE A

21   VERY, VERY IMPORTANT PART.

22   Q.   NECESSARY, BUT NOT SUFFICIENT?

23   A.   YES.

24   Q.   NOW, SO FAR THOSE ARE THE MAIN CATEGORIES OF POSITIVE

25   SYMPTOMS; RIGHT?

238

1    A.   YES.

2    Q.   THOSE ARE THE NEGATIVE SYMPTOMS?

3    A.   THOSE ARE THE NEGATIVE SYMPTOMS, YES.

4    Q.   YOU TALKED ABOUT THOSE ON YOUR DIRECT TESTIMONY; RIGHT?

5    A.   YES.

6    Q.   AND YOUR DESCRIPTION WAS THINGS THAT SHOULD BE THERE THAT

7    AREN'T THERE; RIGHT?

8    A.   YES.

9    Q.   IN OTHER WORDS, THINGS THAT THE PERSON'S BRAIN SHOULD BE

10   ACCOMPLISHING, BUT ISN'T; RIGHT?

11   A.   YES.  THAT'S OUR COMMON WAY TO DESCRIBE IT.

12   Q.   AND THOSE THINGS ARE THINGS THAT, IN TERMS OF A PERSON'S

13   FUNCTIONING, CAN BE EXTRAORDINARILY DISABLING?

14   A.   YES.

15   Q.   POVERTY OF SPEECH, RIGHT, WE TALKED ABOUT THAT?  THAT'S

16   EITHER UNABLE TO SPEAK OR SPEAKS, BUT THERE'S LITTLE CONTENT;

17   CORRECT?

18   A.   YES.

19   Q.   AMOTIVATION, AVOLITION, THE PERSON'S INCAPABLE OF

20   DIRECTING THEIR BEHAVIOR?

21   A.   OF A MARKED DEFICIT.

22   Q.   DOESN'T HAVE TO BE A COMPLETE ABSENCE?

23   A.   RIGHT.

24         MR. CAHN:  NOW, CAN YOU PULL UP 4A FOR ME.

25         NOW, CAN YOU HIGHLIGHT THE SECOND PARAGRAPH THAT

1    SAYS "NEGATIVE SYMPTOMS."

2    BY MR. CAHN:

3    Q.    AGAIN, THIS IS FROM THE BUREAU OF PRISONS GUIDE TO

4    PSYCHOPHARMACOLOGICAL TREATMENT OF SCHIZOPHRENIA.

5            DO YOU SEE THE OBSERVATION THAT THESE ARE MORE

6    DIFFICULT TO DIAGNOSE AND FAR LESS RESPONSIVE TO MEDICATIONS?

7    DO YOU AGREE WITH THAT?

8    A.    NO.  I'D QUIBBLE A LITTLE BIT WITH THE FIRST, THAT

9    THEY'RE MORE DIFFICULT TO DIAGNOSE.  WHAT'S DIFFICULT TO SEE

10   ABOUT SOMEBODY WHO'S NOT TALKING.  THEY'RE OFTEN NOT

11   DIAGNOSED, BUT THAT WOULD BE WHAT I PUT IN THE SENTENCE.

12           I DISAGREE WITH THE DESCRIPTORS ABOUT THEIR RESPONSE

13   TO MEDICINE.  THEY ARE PROBABLY LESS RESPONSIVE THAN POSITIVE

14   SYMPTOMS, BUT TO CALL IT FAR LESS RESPONSIVE IS GOING TOO FAR,

15   IN MY OPINION, PARTICULARLY IN LIGHT OF THE SECOND-GENERATION

16   ANTIPSYCHOTICS.

17   Q.    ONE OF THE SOURCES YOU CITED TO IN SUPPORT OF THE

18   OBSERVATIONS YOU MADE IN YOUR STATEMENT WAS GILMAN AND

19   GOODMAN'S PHARMACOLOGY BOOK.

20   A.    THE OTHER WAY AROUND, GOODMAN AND GILMAN'S.

21   Q.    I'M SORRY.  I'M NOT AS FAMILIAR WITH IT.  IT'S

22   SOMETHING -- WE WEREN'T SUPPLIED WITH ALL THE MATERIALS THAT

23   YOU CITED TO, BUT WE GOT OUR HANDS ON IT WITH OVERNIGHT

24   DELIVERY.

25   A.    IF YOU'VE GOT ENOUGH MONEY.

1    Q.   IT WAS A BIT DEAR.

2         BUT YOU CONSIDER THAT AN AUTHORITATIVE TREATISE ON

3    THE PSYCHOPHARMACOLOGY?

4    A.   YES.  THAT'S PART OF WHY I CHOSE IT.  THIS IS THE

5    12TH EDITION OF GOODMAN AND GILMAN'S.  IT'S BEEN THE

6    PHARMACOLOGY TEXT FOR 40 YEARS.

7         MR. CAHN:  COULD YOU BRING UP 200A FOR ME, PLEASE.

8         COULD YOU HIGHLIGHT THE SECTION THAT BEGINS ABOUT

9    TWO-THIRDS OF THE WAY DOWN THE LEFT-HAND COLUMN THAT SAYS,

10   "COGNITIVE DYSFUNCTION."

11   BY MR. CAHN:

12   Q.   SO THIS IS FROM GOODMAN AND GILMAN OR GILMAN AND GOODMAN?

13   TELL ME, SIR.

14   A.   GOODMAN AND GILMAN'S.

15   Q.   AND THEIR OBSERVATION IN THAT SENTENCE IS "COGNITIVE

16   DYSFUNCTION IS THE STRONGEST PREDICTOR OF FUNCTIONAL

17   IMPAIRMENT OF SCHIZOPHRENIA PATIENTS, YET NEGATIVE SYMPTOMS

18   AND COGNITIVE DEFICITS SHOWED LIMITED IMPROVEMENT WITH

19   ANTIPSYCHOTIC TREATMENT."

20        THAT'S WHAT THEY SAY; RIGHT?

21   A.   THAT'S WHAT THEY SAY.

22   Q.   THIS IS A BOOK THAT YOU VIEW AS AUTHORITATIVE?

23   A.   I DO.  I MEAN, I DON'T EXACTLY AGREE WITH EVERYTHING THIS

24   SINGLE AUTHOR WROTE.  I CERTAINLY AGREE THAT THE LITERATURE

25   SUPPORTS THAT IT'S THE STRONGEST PREDICTOR OF FUNCTIONAL

241

1    PROBLEMS AND THAT NEGATIVE SYMPTOMS AND COGNITIVE DEFICITS

2    SHOW LESS, AS I SAID JUST A LITTLE BIT AGO.  NOT FAR LESS, BUT

3    LESS RESPONSE THAN THE EASIER-TO-TREAT POSITIVE SYMPTOMS.

4              NOW, YOU HAVE TO KNOW THAT THIS CHAPTER WAS WRITTEN,

5    I'M SURE, THREE, FOUR YEARS AGO.  I DO STUFF LIKE THAT.  IT

6    TAKES THAT LONG.

7              THERE HAVE BEEN SOME STUDIES, PARTICULARLY KEEFE

8    STUDIES, ABOUT RESPONSIVE COGNITIVE DEFICITS THAT HAVE GONE

9    BEYOND WHAT THIS REFLECTS.

10   Q.   CAN YOU TELL ME AGAIN THE AUTHOR OF THOSE STUDIES.  WE'LL

11   SEE IF WE CAN FIND THOSE.

12   A.   KEEFE.

13   Q.   KEEFE?

14   A.   YES.  AND I HAVE ONE ARTICLE I CAN GIVE YOU TODAY.

15   Q.   THAT WOULD BE VERY HELPFUL.

16             ACTUALLY -- WE'LL COME BACK TO THAT IN A MOMENT.

17             BUT LET'S TALK ABOUT COGNITIVE IMPAIRMENT.  THAT'S

18   THE THIRD AREA OF IMPAIRMENT TO THE SCHIZOPHRENIC INDIVIDUAL;

19   RIGHT?

20   A.   YES.  IT'S ANOTHER AREA.

21   Q.   THAT OBVIOUSLY INTERFERES WITH THEIR ABILITY TO BE

22   COMPETENT IN TERMS OF TRIAL COMPETENCE?

23   A.   IT CERTAINLY INTERFERES WITH VARIOUS FUNCTIONAL TASKS.

24   TRIAL COMPETENCE -- SOME OF THEM CERTAINLY CAN INTERFERE WITH

25   TRIAL COMPETENCE.

1    Q.   LET'S TALK ABOUT WHAT THEY ARE, AND THEN WE CAN TALK

2    ABOUT HOW IT MIGHT AFFECT COMPETENCE.

3         THEY INCLUDE IMPAIRMENTS TO ATTENTION?

4    A.   YES.

5    Q.   THE ABILITY TO ATTEND?

6    A.   AND CONCENTRATE.

7    Q.   AS IN THE ABILITY TO ATTEND TO WHAT'S GOING ON DURING A

8    TRIAL?

9    A.   YES.

10   Q.   THEIR ABILITY CAN BE SEVERELY IMPAIRED?

11   A.   IN SOME PATIENTS, IT IS.

12   Q.   MEMORY?

13   A.   YES.

14   Q.   JUDGMENT?

15   A.   YES.

16   Q.   PROBLEM-SOLVING, ABILITY TO SOLVE PROBLEMS?

17   A.   YES.

18   Q.   ABILITY TO -- INSIGHT INTO PROBLEMS; CORRECT?

19   A.   YES.

20   Q.   NOW, WOULD YOU AGREE WITH THE STATEMENT THAT IN THAT

21   GILMAN AND GOODMAN, THE COGNITIVE DYSFUNCTION IS THE STRONGEST

22   PREDICTOR OF FUNCTIONAL IMPAIRMENT AMONG SCHIZOPHRENIA

23   PATIENTS?

24   A.   YES.

25   Q.   ONE OF THE THINGS YOU SAID AT A CERTAIN POINT WAS YOU

1    WERE TALKING ABOUT YOUR VIEW OF MR. LOUGHNER'S FUNCTIONING.

2              AND I WANTED TO ASK YOU, ARE YOU AWARE OF ANY

3    NEUROPSYCHOLOGICAL TESTS THAT HAVE BEEN GIVEN TO MR. LOUGHNER?

4    A.   NO.

5    Q.   ARE YOU AWARE OF ANY TESTING?

6    A.   I SAW A REFERENCE THAT HE WASN'T ABLE TO DO SOME TESTS

7    AND THEY WERE ABANDONED.  BUT NO, BEYOND THAT I DON'T KNOW.

8    Q.   SO YOU DON'T HAVE ANY TESTING DATA AT ALL ON HIS

9    COGNITIVE IMPAIRMENTS?

10   A.   NO.

11   Q.   YOU DON'T KNOW IF ANY EXISTS?

12   A.   THAT'S TRUE.

13   Q.   YOU CERTAINLY HAVEN'T SEEN THEM; RIGHT?

14   A.   PARDON?

15   Q.   YOU HAVEN'T SEEN THEM IF THEY DO EXIST?

16   A.   THAT'S TRUE, TOO.

17   Q.   JUST SO WE CAN BE CLEAR, WE TALKED ABOUT THE GENETIC

18   PREDISPOSITION AND INSULTS TO THE BRAIN AND THE BIOLOGICAL

19   CHANGES IN THE BRAIN YOU TALKED ABOUT WITH MR. KLEINDIENST.

20             BUT THIS IS A REAL ILLNESS WITH A PHYSICAL

21   COMPONENT; RIGHT?

22   A.   OH, ABSOLUTELY.

23   Q.   THE SUFFERER CAN'T JUST CONTROL IT ON THEIR OWN, CAN

24   THEY?

25   A.   REPEAT THAT.

1    Q.    A SUFFERER OF SCHIZOPHRENIA CAN'T SIMPLY WILL IT AWAY?

2    A.    NO.

3    Q.    IN FACT, MOST OF THE TIME OR AT LEAST OFTEN A SUFFERER IS

4    UNAWARE OF THEIR ILLNESS INITIALLY?

5    A.    LACK OF INSIGHT TO THEIR ILL IS A COMMON SYMPTOM.

6    Q.    NOW, I WANT TO COME BACK TO YOUR STATEMENT THAT WAS

7    INTRODUCED INTO EVIDENCE AND ASK YOU SOME QUESTIONS ABOUT

8    THAT.

9              AT PARAGRAPH 13, YOU TALK ABOUT THE DAMAGE THAT

10   OCCURS TO THE BRAIN IN SCHIZOPHRENIA.

11             DO YOU HAVE THAT IN FRONT OF YOU?

12   A.    I DO.

13   Q.    AND YOU TALKED ABOUT THIS ALSO WITH MR. KLEINDIENST.

14             THE BRAIN OF A SCHIZOPHRENIC ACTUALLY SHRINKS OVER

15   TIME, IT ATROPHIES?

16   A.    IN GENERAL, THAT APPEARS TO BE TRUE.

17   Q.    YOU SAID IN THAT THAT EACH DAY -- IN YOUR STATEMENT, EACH

18   DAY A SCHIZOPHRENIC GOES UNTREATED, IT LIKELY CAUSES THAT

19   BRAIN DAMAGE, THAT DEATH OF BRAIN CELLS?

20   A.    THE DAY DOESN'T DO IT.  EACH DAY THAT PASSES THAT THAT

21   PROCESS IS UNCHECKED BY TREATMENT LIKE WITH SECOND-GENERATION

22   MIGHT -- THE EVIDENCE IS THAT IT STOPS IT.

23   Q.    IS THIS -- I'LL READ YOU THE SENTENCE YOU WROTE.

24             YOU DID WRITE THIS; RIGHT?

25   A.    YES.

1   Q.   YOU SIGNED IT?

2   A.   YES.

3   Q.   LINE 7 ON PAGE 5, "EVERY DAY THAT A PERSON INFLICTED WITH

4   SCHIZOPHRENIA FAILS TO RECEIVE TREATMENT WITHIN AN APPROPRIATE

5   ATYPICAL SGA," SECOND-GENERATION ANTIPSYCHOTIC, "IS ANOTHER

6   DAY THAT MOST LIKELY LEADS TO MORE IRREVERSIBLE BRAIN DAMAGE";

7   RIGHT?

8   A.   YES.

9   Q.   EACH AND EVERY DAY LIKELY LEADS TO MORE BRAIN DAMAGE.

10         THAT WAS YOUR STATEMENT?

11  A.   YES.

12  Q.   AND THAT THAT DAMAGE IS IRREVERSIBLE?

13  A.   IT'S LIKELY THAT IT DOES THAT AND IT'S LIKELY THAT IT'S

14  IRREVERSIBLE.

15  Q.   DID I READ THAT SENTENCE INACCURATELY?

16  A.   MAYBE I SHOULD HAVE ADDED ANOTHER PHRASE IN THERE.  FOR

17  INSTANCE, THERE WAS ONE RECENT STUDY THAT A YEAR'S TREATMENT

18  WITH OLANZAPINE MAKES SOME PARTS OF THE BRAIN BIGGER.  SO IT

19  MOST LIKELY LEADS TO IRREVERSIBLE BRAIN DAMAGE.  IT'S MOST

20  LIKELY IRREVERSIBLE.  THAT'S WHAT I MEAN.

21  Q.   AND SO EVERY DAY, EVERY WEEK, EVERY MONTH, EVERY YEAR

22  THAT THE INDIVIDUAL SUFFERS WITHOUT TREATMENT IS A SERIOUS

23  MATTER?

24  A.   ABSOLUTELY.

25  Q.   AND YOU HAVE SAID THAT PROMPT TREATMENT LEADS TO MUCH

1    BETTER FUNCTIONAL OUTCOMES, BETTER RESULTS?

2    A.   YEAH.  THAT'S WHAT THE LITERATURE SHOWS.

3    Q.   IT'S IMPROVED COGNITIVE OUTCOMES?

4    A.   RIGHT.

5    Q.   AND FUNCTIONAL OUTCOMES?

6    A.   YES.

7    Q.   DELAYED TREATMENT FOR LONG PERIODS OF TIME BETWEEN THE

8    ONSET OF DISEASE AND TREATMENT LEADS TO WORSE RESULTS?

9    A.   IN GENERAL.

10   Q.   THAT'S WHY -- WE'RE ONLY TALKING ABOUT -- EVERY

11   INDIVIDUAL IS DIFFERENT; RIGHT?

12   A.   YES.

13   Q.   SO WE'RE ONLY TALKING ABOUT AVERAGES, IN A SENSE;

14   RIGHT?

15   A.   YES.  ALL GROUP DATA.

16   Q.   ON AVERAGE, DELAY IN TREATMENT LEADS TO WORSE OUTCOMES?

17   A.   YES.

18   Q.   WORSE FUNCTIONAL OUTCOMES, WORSE COGNITIVE OUTCOMES?

19   A.   YES.

20   Q.   AND SO EVERY DAY THAT WE DELAY THIS TREATMENT -- THAT WE

21   HAVE DELAYED THIS TREATMENT MAKES A POSITIVE OUTCOME LESS

22   LIKELY?

23   A.   YES.  WE CAN'T QUANTIFY THAT.  BUT IN GENERAL, YES,

24   THAT'S MY OPINION.

25   Q.   YOU ALREADY TALKED ABOUT THIS, YOU DATED MR. LOUGHNER'S

1    SCHIZOPHRENIA TO AT LEAST 2008; RIGHT?

2    A.    YES.

3    Q.    AND, OF COURSE, DR. PIETZ HAS SAID THAT SHE BELIEVES

4    THAT'S THE BEGINNING, IT MAY HAVE BEEN EARLIER; CORRECT?

5    A.    YES.

6    Q.    AND YOU TALKED ABOUT INCIDENCES OF DEPRESSION AS EARLY AS

7    2006?

8    A.    YES.

9    Q.    DEPRESSION CAN BE A SYMPTOM OF SCHIZOPHRENIA?

10   A.    YES.

11   Q.    SO WE DON'T HAVE THE EVIDENCE ABOUT WHAT WAS GOING ON IN

12   2006; RIGHT?  WE DON'T KNOW EVERYTHING THAT WAS GOING ON WITH

13   MR. LOUGHNER, AND WE TRANSPORT OURSELVES BACK IN TIME AND

14   DIAGNOSE HIM; RIGHT?

15   A.    OF COURSE NOT.

16   Q.    SO FOR AT LEAST THREE YEARS, HE HAS BEEN SUFFERING FROM

17   FULL-BLOWN PSYCHOSIS?

18   A.    WE DON'T SAY FULL-BLOWN.

19   Q.    PSYCHOSIS.

20   A.    SIGNS OF PSYCHOSIS.

21   Q.    SCHIZOPHRENIA THAT WAS NOT TREATED?

22   A.    YES.

23   Q.    THOSE THREE YEARS CERTAINLY WORSENED THE LIKELY OUTCOME

24   FOR HIM?

25   A.    IN GENERAL, YES.  I WOULD HAVE PREFERRED IF HE HAD BEEN

1    TREATED AT LEAST BY '08.

2    Q.    I WANT TO ASK YOU A QUESTION ABOUT SOMETHING YOU SAID

3    EARLIER.

4              YOU TALKED ABOUT CURING SCHIZOPHRENIA.

5              DO YOU REMEMBER SAYING THAT?

6    A.    YES, I DID.

7    Q.    THERE IS NO CURE, AS SUCH, FOR SCHIZOPHRENIA; RIGHT?

8    A.    I THINK I QUALIFIED IT IN MY SUBSEQUENT TESTIMONY EVEN IN

9    THAT PHRASE WITH WHAT THAT MEANS TO ME IS THOSE INDIVIDUALS

10   WERE LUCKY NOT TO HAVE SYMPTOMS IF THEY STAY ON MEDICINES.

11   Q.    IF WE CATCH IT EARLY ENOUGH AND WE KNOCK DOWN THE

12   SYMPTOMS WITH MEDICINE, THAT'S WHAT WE CAN DO; RIGHT?

13   A.    YES, THAT'S WHAT WE CAN DO.  WE DON'T NECESSARILY HAVE TO

14   GET TO IT EARLY TO GET THAT KIND OF A CURE.  THOSE SYMPTOMS

15   WITH MEDICINE -- IT'S BETTER IF WE START EARLY.

16   Q.    BUT IT'S NOT LIKE A BACTERIAL INFECTION WHERE WE CAN KILL

17   THE INFECTION?

18             THE COURT:  HOLD ON JUST A SECOND.

19             MR. CAHN, I'M CONVINCED THAT WE'RE WAY OFF TRACK

20   HERE.  WE'RE WAY OFF TRACK ON THE SUBJECT MATTER.  I WANT TO

21   GIVE YOU LATITUDE.  I DIDN'T, FRANKLY, UNDERSTAND IT WHEN

22   MR. KLEINDIENST GOT INTO SIDE EFFECTS, WHICH IS NOT THE

23   SUBJECT OF THIS HEARING.

24             THE APPROPRIATENESS OF THE TREATMENT IS A MATTER FOR

25   A SELL HEARING OR SOME LATER HEARING.  IT'S NOT THE SUBJECT OF

1    THIS HEARING.  SO I DON'T MEAN TO SINGLE YOU OUT, BUT WE'RE

2    WAY OFF TRACK.

3           MR. CAHN:  THE RESTORATION DEPENDS UPON THE

4    TREATMENT THAT'S GOING TO BE GIVEN.

5           THE COURT:  THE QUESTION HERE IS WHETHER HE'S LIKELY

6    TO BE RESTORED WITH AN EXTENDED COMMITMENT TO SPRINGFIELD.

7    I'D LIKE BOTH SIDES TO KEEP FOCUSED ON THAT.  I HAVE A FEELING

8    THAT SOME OF THE QUESTIONS BEING ASKED ARE BEING ASKED TO SET

9    UP ANSWERS FOR ANOTHER DAY IN ANOTHER PROCEEDING.

10          I UNDERSTAND HOW THAT WORKS, BUT I WANT TO FOCUS ON

11   THE ISSUE OF THE DAY, WHICH IS WHETHER HE'S TO BE EXTENDED AND

12   WHETHER THE STANDARD OF PROOF IS MET BY THE EVIDENCE.

13          GO AHEAD.

14          MR. CAHN:  JUDGE, WITH YOUR ADMONITION, GIVE ME A

15   MOMENT TO REVIEW MY CROSS AND MAKE SURE I'M NOT GOING OFF

16   TRACK.

17          THE COURT:  OF COURSE.  I'M NOT TRYING TO CONSTRAIN

18   YOU AT ALL ON YOUR CROSS-EXAMINATION OF WHAT'S RELEVANT HERE.

19   BUT I DO FEEL BOTH SIDES ARE ASKING QUESTIONS FOR WHAT I

20   PERCEIVE MIGHT BE AN APPELLATE RECORD OR MIGHT BE A TRIAL

21   RECORD FOR CROSS-EXAMINATION.  THAT'S NOT THE PURPOSE OF OUR

22   HEARING.

23          MR. CAHN:  I ASSURE YOUR HONOR I'M NOT DOING THAT.

24   I'M TRYING TO COUNTER THE EVIDENCE THE GOVERNMENT HAS OFFERED

25   AND ADDRESS THE QUESTIONS.  LET ME EXAMINE MY

1    CROSS-EXAMINATION AND MAKE CERTAIN IT'S APPROPRIATE.

2              THE COURT:  SURE.

3                    (PAUSE IN PROCEEDINGS)

4    BY MR. CAHN:

5    Q.   LET ME ASK A LITTLE BIT ABOUT THE RATES OF PEOPLE WHO

6    ACTUALLY DO IMPROVE.  YOU SPENT SOME TIME TESTIFYING ABOUT

7    THAT.

8              DO YOU RECALL THAT?

9    A.   YES.

10   Q.   IN YOUR STATEMENT THAT WAS OFFERED IN EVIDENCE AT

11   PARAGRAPH 11, YOU TALK ABOUT RANGES UP TO 76.9 PERCENT OF

12   PEOPLE IMPROVE; CORRECT?

13   A.   YES, IN SHORT-TERM TREATMENT.

14   Q.   SO UP TO 77 PERCENT IMPROVE; RIGHT?

15   A.   YES.

16   Q.   AND UP TO 23 PERCENT DON'T IMPROVE?

17   A.   IN SHORT-TERM TREATMENT, 6 TO 12 WEEKS.

18   Q.   AND IT'S ACTUALLY SOMEWHERE BETWEEN 23 AND 46 PERCENT

19   DON'T IMPROVE IN THAT TREATMENT; CORRECT?

20   A.   THE WAY I PHRASED IT AS A RESPONSE RATE, WHICH OFTEN IS

21   DEFINED AS A CERTAIN PERCENTAGE OF IMPROVEMENT.  SO IT'S A

22   LITTLE HIGHER THAN JUST IMPROVING.

23   Q.   IT'S USUALLY A 20 PERCENT REDUCTION?

24   A.   OR 40.  SO SOME OF THESE RATES ARE 40 OR 50 PERCENT.

25   PEOPLE ARE CALLED A RESPONDER IF THEY DO THAT.  THE OTHER

1    THINGS IN THE SENTENCE ARE PEOPLE WHO DID WELL, LIKE NOT ILL

2    OR MILDLY ILL OR MUCH IMPROVED OR REMISSION.

3    Q.   BUT I'M ASKING YOU SPECIFICALLY ABOUT THOSE STATEMENTS,

4    DO YOU UNDERSTAND, ABOUT THE STATEMENTS YOU MAKE IN PARAGRAPH

5    11 ABOUT RESPONSE RATES AND SHORT-TERM TREATMENT?

6    A.   OF COURSE.

7    Q.   YOUR OPINION IS 54 AND 76.9 PERCENT IMPROVED, WHICH

8    LEAVES SOMEWHERE BETWEEN 23 AND 46 PERCENT WHO DON'T IMPROVE?

9    A.   IN SHORT-TERM TREATMENT.

10   Q.   WHO DON'T RESPOND TO THE MEDICATION?

11   A.   YES.

12   Q.   THESE STUDIES ARE PERFORMED ON PEOPLE WHO ARE TAKING

13   DRUGS VOLUNTARILY?

14   A.   YES.

15   Q.   SO THERE ARE NO BROAD-BASED STUDIES ON INDIVIDUALS WHO

16   HAVE BEEN FORCED TO TAKE DRUGS THAT THEY DON'T WANT TO TAKE?

17   A.   I WOULD AGREE WITH THE BROAD-BASED, YES.

18   Q.   AND AT PARAGRAPH 11, YOU DO NOTE THAT -- AGAIN THAT THE

19   MAJORITY OF RESPONSE TO RISPERIDONE IS SEEN BY WEEK 4?

20   A.   THAT'S IN THAT ONE SPECIFIC GOODMAN AND GILMAN'S --

21   Q.   I JUST WANTED TO RECAP SOME OF YOUR TESTIMONY.

22   A.   THE REST OF THE LITERATURE SUGGESTS THAT IT GOES ON

23   LONGER.

24   Q.   WELL, IT DID SUGGEST THAT THERE CAN BE CONTINUED

25   BENEFICIAL EFFECTS.

1                BUT CERTAINLY IN YOUR OWN STATEMENT, YOU SUGGESTED

2    THAT THE MAJORITY OF THE RESPONSE IS SEEN BY WEEK 4; RIGHT?

3    A.    YES.

4    Q.    WHICH MEANS AFTER WEEK 4, WE'RE ONLY GOING TO SEE A

5    LESSER RESPONSE?

6    A.    YES.

7    Q.    IF WE'VE SEEN A 20 PERCENT REDUCTION IN POSITIVE AND

8    NEGATIVE SYMPTOMS, WE'RE GOING SEE A LESSER RESPONSE AFTER

9    WEEK 4 ACCORDING TO THIS STATEMENT?

10   A.    THIS STUDY WAS MISLEADING.  I NEVER THOUGHT THAT

11   CONCLUSION COULD BE REACHED.  THE LONGER PEOPLE ARE ON IT,

12   MORE AND MORE PEOPLE GET WELL.  THE LITERATURE IS VERY CLEAR

13   ABOUT THAT.

14   Q.    ISN'T THE DATA THAT PEOPLE PLATEAU AT ABOUT SIX MONTHS OF

15   TREATMENT ON AVERAGE?

16   A.    ON AVERAGE, YES.

17   Q.    I WANT TO TALK A LITTLE ABOUT YOUR CONCLUSION THAT THE

18   EFFECTS OF THESE DRUGS ARE UNIVERSALLY POSITIVE.  AND YOU SET

19   THAT OUT AT PARAGRAPH 12 PRIMARILY.

20                AND YOU KNOW THAT TREATED WITH THESE DRUGS, IF THEY

21   WORK PROPERLY, A PERSON WON'T ATTEND TO HALLUCINATIONS?

22   A.    YES.

23   Q.    WON'T BE DELUSIONAL?

24   A.    YES.

25   Q.    WON'T HAVE PSYCHOTIC THINKING?

1    A.   YES.  THE FIRST PART OF THE SENTENCE WAS IF THEY RESPOND

2    WELL TO IT, THEN THEY WON'T HAVE THAT.

3    Q.   ASSUMING IT WORKS.  I'M ASSUMING EVERYTHING WORKS WELL.

4    A.   YES.

5    Q.   AND SO IF EVERYTHING WORKS WELL, THEIR SPEECH IS GOING TO

6    BE MORE LOGICAL?

7    A.   YES.

8    Q.   IT'S GOING TO BE MORE CLEAR?

9    A.   YES.

10   Q.   AND THEIR THINKING IS GOING TO BE MORE LOGICAL?

11   A.   YES.

12   Q.   AND WHAT YOU REFER TO AS A DETERIORATED OUTWARD

13   APPEARANCE IS GOING TO GET BETTER?

14   A.   YES.

15   Q.   WHICH MEANS THE PERSON IS GOING TO BE A VERY DIFFERENT

16   PERSON FROM -- APPEAR TO PRESENT AS A VERY DIFFERENT PERSON

17   FROM THE PERSON THEY WERE WHEN THEY WERE SEVERELY ILL AND

18   PSYCHOTIC?

19   A.   YES.

20   Q.   THAT'S THE POINT OF THE MEDICATION IN YOUR MIND?

21   A.   I WOULD AGREE.  IF I CAN REPHRASE IT, THAT IS -- THE MAIN

22   GOAL IS TO TAKE PEOPLE FROM BEING ILL TO HAVING THEM BE

23   HEALTHY.

24   Q.   AND SO TO TAKE THEM FROM THE POINT WHERE THEY PRESENT AS

25   ILL TO THE POINT WHERE THEY PRESENT FAR BETTER IS BECAUSE THEY

1    ARE BETTER?

2    A.    YES, SIR.

3    Q.    THAT'S THE PERSON A JURY WOULD SEE AFTER TREATMENT?

4    A.    YES, IF THEY'RE STILL IN TREATMENT.

5    Q.    YOU WOULD AGREE THAT THERE ARE TIMES WHEN ANTIPSYCHOTICS

6    CAN IMPAIR THE INDIVIDUAL'S ABILITY TO COMMUNICATE?

7    A.    YOU'D ALMOST HAVE TO GIVE ME AN EXAMPLE.

8            I MEAN, IF THEY'RE IN THE EARLY STAGE LIKE WITH

9    CHLORPROMAZINE OR THORAZINE AND IT MAKES THEM SORT OF SLEEPY,

10   YES, THEY MIGHT BE LESS ABLE TO --

11   Q.    LET'S GO BACK TO SEDATION.  LET ME GIVE YOU A PARTICULAR

12   EXAMPLE.

13            MR. CAHN:  CAN YOU PULL UP 20J FOR ME.

14   BY MR. CAHN:

15   Q.    THIS IS FROM YOUR TESTIMONY IN MR. ALLEN'S CASE.

16            ONE OF THE THINGS YOU SAID WAS, "ON THE OTHER HAND,

17   THERE'S ALSO A MOUNTAIN OF ANTIPSYCHOTIC MEDICINES AT THIS

18   POINT WHICH IS HARD TO TAKE AND BE VERY INTERACTIVE WITH THE

19   REST OF THE WORLD"; RIGHT?

20   A.    THE MOUNTAIN MUST HAVE BEEN PERTINENT IN THAT CASE.

21   Q.    SO CERTAINLY AT LEAST THERE ARE TIMES WHEN THE

22   ANTIPSYCHOTIC MEDICATIONS IMPAIR COMMUNICATION?

23   A.    YES.

24   Q.    INCLUDING DIRECT COMMUNICATION WITH AN INDIVIDUAL'S

25   LAWYERS?

1    A.    OCCASIONALLY, YES.

2    Q.    IN THIS CASE, MR. LOUGHNER IS ON QUITE A FEW

3    MEDICATIONS?

4    A.    DO YOU WANT ME TO AGREE WITH THAT?  BECAUSE I DON'T.

5    Q.    HE'S ON FOUR MEDICATIONS.

6          WE CAN AGREE ON THAT; RIGHT?  ACTUALLY, HE'S

7    PRESCRIBED FIVE MEDICATIONS CURRENTLY?

8    A.    YES.

9    Q.    DO YOU TAKE THEM ONE BY ONE?

10   A.    YES.

11   Q.    WELL, THE FIRST ANTIPSYCHOTIC RISPERDAL, YOU AGREE THAT

12   THAT CAN BE SEDATING?

13   A.    CAN BE, YES.

14   Q.    THAT'S WHY YOU TOLD US DR. SARRAZIN HAD MOVED HIS DOSAGES

15   SO THAT HE WAS RECEIVING THE DOSE IN THE EVENING?

16   A.    YES.

17   Q.    AND LESSER DOSE IN THE MORNING?

18   A.    YES.

19   Q.    BENZODIAZEPINES, OF COURSE, CAN BE SEDATING?

20   A.    THEY CAN, BUT FREQUENTLY ARE NOT.

21   Q.    THEY CAN BE SEDATING.

22          YOU AGREE WITH THAT?

23   A.    MILDLY SEDATING.

24   Q.    THEY'RE CALLED MINOR TRANQUILIZERS, YOU SAID?

25   A.    YES.

1  Q.   AND THEY CAN CAUSE COGNITIVE IMPAIRMENT EVEN WHEN THEY'RE

2  NOT SEDATING, EVEN WHEN SOMEBODY IS SHOWING NO EFFECT OF

3  SEDATION, NO VISUAL EFFECT OF SEDATION, THEY CAN BE IMPAIRED?

4  A.   VERY MILD EFFECT.  IT TOOK US 25 YEARS TO SEE ANY

5  INTERFERENCE WITH COGNITION.  SHORT-TERM MEMORY WITH SOME

6  PEOPLE ON SOME OF THE MINOR TRANQUILIZERS.

7  Q.   COGENTIN, THAT CAN ALSO BE SEDATING?

8  A.   NOT VERY.

9  Q.   THE ANTIHISTAMINE MOLECULE IN IT CAN SEDATE, CAN'T IT?

10  A.   YES.  IN CLINICAL PRACTICE WITH COGENTIN, IT'S NOT REALLY

11  SEDATING.

12  Q.   IT CAN ALSO CAUSE CONFUSION?

13  A.   IT CAN INTERFERE IN RELATIVELY MINOR WAYS LIKE WITH THE

14  BENZODIAZEPINES, YES.

15  Q.   WELLBUTRIN IS NOT SEDATING AT ALL?

16  A.   NOT USUALLY.

17  Q.   ON THE OTHER HAND, IT CAN CAUSE AGITATION?

18  A.   RARELY.

19  Q.   IT CAN CAUSE ANXIETY?

20  A.   RARELY.

21  Q.   LET ME GO BACK TO --

22       MR. CAHN:  CAN YOU PULL UP 200B FOR ME.

23  BY MR. CAHN:

24  Q.   AND THE BEGINNING OF THE FIRST SENTENCE -- I'LL FIND THAT

25  LATER.

1          YOU'VE OFFERED AN OPINION THAT MR. LOUGHNER IS

2     LIKELY TO BE RESTORED TO COMPETENCY.

3          SO I'D LIKE TO ASK A LITTLE BIT ABOUT YOUR EXPERTISE

4     IN THAT.

5          HOW MANY TIMES HAVE YOU BEEN INVOLVED IN RESTORATION

6     OF COMPETENCY?

7     A.    ALMOST NONE.  MY OPINION IS REALLY BASED ON THE ANALOGY

8     BETWEEN RECOVERY FROM SCHIZOPHRENIA AND THEN HOW THAT WOULD

9     AFFECT RESTORABILITY.

10    Q.    OFTEN YOU CONSIDER A POSITIVE FUNCTIONAL OUTCOME IN

11    SCHIZOPHRENIA THAT SOMEBODY CAN HOLD A JOB; RIGHT?  THAT CAN

12    BE ONE OF THE INDICATORS?

13    A.    YES.

14    Q.    AT LEAST SEMI-INDEPENDENTLY OF SOME SUPPORT?

15    A.    YES.  IT VARIES TREMENDOUSLY.

16    Q.    THAT WOULD BE CONSIDERED A SUCCESS IN SCHIZOPHRENIA

17    TREATMENT?

18    A.    FOR SOME PEOPLE, YES, IT'S A SUCCESS.

19    Q.    DO YOU KNOW WHAT THE LEGAL STANDARD IS FOR COMPETENCY AT

20    TRIAL?

21    A.    I THINK SO.

22    Q.    CAN YOU TELL US WHAT THAT IS SO WE'RE ON THE SAME PAGE?

23    A.    IT VARIES, BUT IT INCLUDES A RATIONAL AND FACTUAL

24    UNDERSTANDING OF THE CASE AND SHORTHAND ABILITY TO WORK WITH

25    ONE'S ATTORNEY.  OTHER CRITERIA THAT ARE IMPORTANT INCLUDE THE

1    ABILITY TO FOLLOW INTELLIGENTLY AS PART OF THE HELP -- SO YOU

2    CAN HELP YOUR ATTORNEY AND FOLLOW THE PROCEEDINGS.

3    Q.   AND YOUR OPINION ON RESTORATION, IS THAT GEARED

4    SPECIFICALLY TOWARDS THAT STANDARD?  I'M JUST TRYING TO

5    UNDERSTAND.

6    A.   IT'S SORT OF GEARED TOWARD ANY STANDARD THAT WOULD BE

7    UTILIZED, BUT CERTAINLY THAT STANDARD.

8    Q.   HAVE YOU RELIED ON ANY RESEARCH AT ALL IN OFFERING YOUR

9    OPINION ABOUT THE LIKELIHOOD OF RESTORATION OR THE TIME FOR

10   RESTORATION?

11   A.   YES.  PART OF WHY I BASE IT ON THE PROXY OF CLINICAL

12   RECOVERY IS THERE'S SO LITTLE RESEARCH ACTUALLY IN THE

13   RESTORABILITY AREA.  AS DR. PIETZ SAID EARLIER TODAY, 75 TO

14   85, IN SOME CASES 90 PERCENT OF PEOPLE WERE RESTORED.

15            BUT TO MY KNOWLEDGE, THERE ARE NOT ANY STUDIES THAT

16   TAKE FIRST-EPISODE PEOPLE WITH SCHIZOPHRENIA AND GIVE THEM A

17   REASONABLE PERIOD, ATTEMPT TO RESTORE THEM, AND THEN SAY,

18   "THIS PERCENTAGE RESPONDED AND WERE RESTORED."  ALMOST ALL OF

19   THE SAMPLES MIX APPLES AND ORANGES.

20   Q.   IS THE ANSWER TO THE QUESTION THAT THERE IS NO RESEARCH

21   UNDERLYING THE OPINION OR THERE IS RESEARCH?

22   A.   THERE IS A HUGE AMOUNT FOR A PROXY, WHICH IS, I THINK,

23   THE BEST WE CAN DO IN THE FIELD, IS THE PROXY OF GETTING WELL

24   PSYCHIATRICALLY.  AND THEN AFTER AN AVERAGE AND TANGENTIAL

25   PATTERN, THE ASSUMPTION IS THEY CAN LEARN THE COURT PROCEDURES

259

1    AND OTHER ASPECTS OF COMPETENCY.

2    Q.   OF COURSE, AGAIN, AS TO THE LAST PART, YOU DON'T HAVE ANY

3    TESTING DATA ON MR. LOUGHNER'S IMPAIRMENTS OR LACK THEREOF?

4    A.   NO.

5    Q.   LET ME GO TO ONE LAST AREA.  LET ME LOOK AT THIS FOR A

6    SECOND BEFORE I SAY THAT.

7              ONE OF THE STUDIES THAT YOU RELIED UPON IN TALKING

8    ABOUT BENEFITS OF ATYPICAL ANTIPSYCHOTICS IS THE CASE STUDY?

9    A.   YES.

10   Q.   YOU TALKED ABOUT THAT A LITTLE BIT WITH MR. KLEINDIENST.

11             IT'S A VERY BROAD-BASED STUDY; RIGHT?

12   A.   I'M NOT SURE WHAT YOU MEAN BY "BROAD-BASED."

13   Q.   IT'S GOT A LARGE NUMBER OF PARTICIPANTS?

14   A.   YES.

15   Q.   AND IT LASTED FOR 18 MONTHS FOR PHASE 1?

16   A.   YES.

17   Q.   AND IT'S NOT SPONSORED BY DRUG COMPANIES?

18   A.   NO.

19   Q.   IT'S SPONSORED BY THE NATIONAL INSTITUTE OF MENTAL

20   HEALTH?

21   A.   YES.

22   Q.   SO A HIGH-QUALITY STUDY?

23   A.   THERE'S A LOT OF MIXED OPINION ABOUT THAT.

24             JUST ONE ISSUE:  ALMOST ALL OF THE PATIENTS HAD BEEN

25   PREVIOUSLY TREATED AND WERE PARTIALLY TREATMENT-RESISTANT.  SO

1    THAT'S NOT GENERALIZABLE TO OTHER POPULATIONS AND IN

2    PARTICULAR MR. LOUGHNER.

3    Q.   IN SUPPORT OF YOUR AFFIDAVIT, YOU OFFERED AN ARTICLE BY

4    JEFFREY LIEBERMAN.  I THINK YOU MENTIONED IT AGAIN DURING YOUR

5    TESTIMONY ON DIRECT.

6             BASED ON THE CASE STUDY, IT'S CALLED "EFFECTIVENESS

7    OF ANTIPSYCHOTIC DRUGS IN PATIENTS WITH CHRONIC

8    SCHIZOPHRENIA"?

9    A.   IT'S CALLED PART OF THE CATIE STUDY.

10   Q.   YOU RECALL CITING THAT ARTICLE?

11   A.   YES.

12   Q.   AND YOU RECALL THAT THAT WAS SITED IN YOUR STATEMENT;

13   RIGHT?

14   A.   YES.

15             MR. CAHN:  AND CAN YOU PULL UP 38 FOR ME.

16   BY MR. CAHN:

17   Q.   WE WERE TALKING ABOUT RECOVERY RATES FROM RISPERIDONE AND

18   WHAT HAPPENS.

19             THERE'S ACTUALLY --

20             MR. CAHN:  YOU CAN ZOOM IN ON THAT TOP LINE --

21   COUPLE LINES.

22   BY MR. CAHN:

23   Q.   THERE ARE ACTUALLY A SIGNIFICANT NUMBER OF PATIENTS IN

24   THIS STUDY THAT YOU CITED TO WHOSE SCHIZOPHRENIA IS

25   EXACERBATED WHEN THEY'RE ON RISPERIDONE; CORRECT?

1    A.    CAN YOU SHOW IT TO ME.

2    Q.    WE'RE GOING TO BRING THAT BACK UP.  IT JUST DISAPPEARED.

3    THE WONDERS OF TECHNOLOGY.

4          TAKE A LOOK AT THAT TOP LINE.  RISPERIDONE IS THE

5    THIRD DRUG.

6    A.    I CAN'T SEE THE TOP.

7    Q.    THE TOP ONE IS RISPERIDONE.  THE THIRD DRUG OVER IS

8    RISPERIDONE.

9          AND NEARLY 15 PERCENT OF THE PATIENTS IN THAT STUDY,

10   THEIR CONDITION WORSENED SUFFICIENTLY THAT THEY HAD TO BE

11   HOSPITALIZED AGAIN; ISN'T THAT CORRECT?

12   A.    I THINK THAT IS CORRECT.  I THINK THIS IS -- IF THIS IS

13   IN THE ADVERSE EVENT TABLE, WHICH I'M ASSUMING THAT IT

14   PROBABLY IS, WHERE THEY'RE SAYING, "15 PERCENT OF PEOPLE ON

15   RISPERIDONE RELAPSED DURING THE STUDY AND HAD TO BE

16   HOSPITALIZED," AND THAT IS THE NEXT-TO-LOWEST PERCENTAGE OF

17   THE OTHER FIVE DRUGS.

18         IT MEANS THAT THE WAY THE STUDY WAS DONE, PEOPLE

19   WERE BROUGHT IN POORLY RESPONSIVE TO PREVIOUS TREATMENTS.

20   Q.    THAT WASN'T A CRITERIA THAT THEY RECORDED; RIGHT?

21         THE COURT:  GO AHEAD AND FINISH YOUR ANSWER,

22   DOCTOR.

23         THE WITNESS:  LET ME FINISH.

24         THEY WERE ALL-COMERS, AND THEY TURNED OUT TO BE

25   PEOPLE WHO HAD RESPONDED POORLY IN THE PAST.  WHAT THEY WERE

1    THEN OFFERED WAS, "TAKE YOUR CHOICE.  WHICH MEDICINE WOULD YOU

2    LIKE TO BE ON?  AND WHENEVER YOU WANT TO CHANGE, YOU CAN

3    CHANGE AGAIN."

4              THAT LED TO CHAOS IN THE STUDY.  BUT DURING THAT

5    TIME OF THE STUDY, MAYBE WHEN PEOPLE WERE SWITCHING BETWEEN

6    DRUGS, MAYBE NOT, THEY WERE SWITCHED OVER TO A DRUG THAT

7    DIDN'T WORK FOR THEM, THEY DID POORLY AND HAD TO BE

8    HOSPITALIZED.  AS YOU CAN SEE, THAT WAS THE CASE WITH ALL OF

9    THE DRUGS APPROXIMATELY THE SAME AMOUNT BETWEEN 11 AND

10   20 PERCENT.

11   Q.   THAT'S ANOTHER INTERESTING QUESTION.

12             APPROXIMATELY 70 PERCENT OF THE PEOPLE DISCONTINUED

13   THEIR MEDICATION OVER THE COURSE OF THE STUDY; CORRECT?

14   A.   YES.

15   Q.   ABOUT HALF OF THOSE DISCONTINUED IT EITHER BECAUSE THE

16   MEDICATIONS DIDN'T WORK OR THE SIDE EFFECTS WERE

17   INTOLERABLE?

18   A.   THAT WAS THEIR OPINION.

19   Q.   WELL, THERE'S A THIRD CATEGORY WHICH THEY ALLOWED WHICH

20   WAS SIMPLY DROPPED OUT FOR PATIENT DECISION; RIGHT?

21   A.   YES.

22   Q.   THOSE OTHER TWO CATEGORIES ARE A LITTLE DIFFERENT THAN

23   JUST THE PERSON DECIDED TO QUIT?

24   A.   BUT THEY ARE STILL PATIENT-DETERMINED.

25   Q.   THE PATIENT'S VIEW WAS IT WASN'T WORKING OR THE SIDE

1    EFFECTS WERE INTOLERABLE?

2    A.   YES.   THEY ALLOWED THEM TO GO TO A DIFFERENT ONE.

3    Q.   AND THOSE PERCENTAGES WERE THE SAME, MORE OR LESS, FOR

4    RISPERIDONE AS FOR ALL THE OTHER DRUGS?

5    A.   IT WAS THE BEST TOLERATED MEDICINE IN THE ENTIRE CATIE

6    TRIALS.

7    Q.   YOU SAID THAT IN YOUR STATEMENT.

8         ISN'T IS TRUE THAT THE ARTICLE STATES, "OLANZAPINE

9    WAS THE MOST EFFECTIVE IN TERMS OF RATES OF DISCONTINUATION.

10   THE EFFICACY OF THE CONVENTIONAL ANTIPSYCHOTIC AGENT

11   PERPHENAZINE APPEARED SIMILAR TO THAT OF THE OTHER THREE"?

12   WASN'T THAT THE CONCLUSION OF THE ARTICLE?

13   A.   YES.

14   Q.   SO WHEN YOU SAY BEST TOLERATED, PEOPLE STAYED ON

15   OLANZAPINE AT A HIGHER RATE LONGER?

16   A.   YOU'RE MIXING APPLES AND ORANGES.   "EFFICACY" MEANS HOW

17   WELL THEY RESPONDED WITH REDUCTION OF THEIR PSYCHOTIC

18   SYMPTOMS.   PART OF THE PROBLEM WITH THE DESIGN OF THIS STUDY,

19   THE PEOPLE ON OLANZAPINE HAD TWO TO THREE TIMES THE DOSE OF

20   ALL THE OTHER MEDICINES.   SO OF COURSE THEY RESPONDED BETTER.

21   Q.   THAT'S NOT WHAT I READ TO YOU.   WHAT I READ TO YOU IS

22   OLANZAPINE WAS THE MOST EFFECTIVE IN TERMS OF THE RATES OF

23   DISCONTINUATION.

24        DOESN'T THAT MEAN THAT IT WAS THE MOST EFFECTIVE IN

25   TERMS OF THE LEAST NUMBER OF PEOPLE DISCONTINUED?

1    A.    PEOPLE DISCONTINUED FOR ALL SORTS OF REASONS, INCLUDING

2    THAT IT WORKED OR DIDN'T WORK.  THE OTHER PROBLEM IS

3    52 PERCENT OF THE PEOPLE WHO CAME INTO THE TRIAL WERE DOING

4    WELL ON OLANZAPINE.  AND WHEN THEY STAYED ON IT, OF COURSE

5    THEY CONTINUED TO DO WELL BECAUSE THERE WERE ALREADY DOING

6    WELL ON IT.

7          WHAT'S IN MY STATEMENT IS FROM THE TEXTBOOK THAT

8    SAYS -- ONE OF THE TWO TEXTBOOKS, I THINK THE *TEXTBOOK OF*

9    *PSYCHOPHARMACOLOGY*.  THAT WAS A QUOTE FROM THEIR ANALYSIS.

10   Q.    I'VE GOT CHAPTER 16 HERE.  I DIDN'T SEE THAT STATEMENT IN

11   IT.

12         WOULD YOU LIKE TO TELL ME WHERE IT IS?  DO YOU HAVE

13   IT WITH YOU?

14   A.    I CAN POTENTIALLY DO THAT.  LET ME MAKE SURE THERE'S NOT

15   AN EASIER WAY TO DO IT.

16   Q.    YOU'RE TALKING ABOUT DIFFERENT DRUGS.

17         THE COURT:  ALLOW HIM TO ANSWER THE QUESTION, AND

18   THEN WE'LL MOVE ON TO THE FINAL AREA.

19         THE WITNESS:  IT IS FROM THE AMERICAN PSYCHIATRIC

20   ASSOCIATION, THE *TEXTBOOK OF PSYCHOPHARMACOLOGY*.  I DIDN'T

21   CITE THE PAGE NUMBER, BUT IT'S IN THAT CHAPTER.

22   BY MR. CAHN:

23   Q.    BUT YOU'LL GET THAT FOR US LATER?

24   A.    IF YOU ASK, YES.

25   Q.    I'M ASKING.  THAT'S A REQUEST.

1          MR. CAHN:  MAY I HAVE A MOMENT, JUDGE?

2          THE COURT:  SURE.

3                  (PAUSE IN PROCEEDINGS)

4          MR. CAHN:  IN A SECOND REVIEW OF MY NOTES, I THINK

5   I'M DONE.  NOTHING FURTHER.

6          THE COURT:  MR. KLEINDIENST, ANYTHING MORE?

7          MR. KLEINDIENST:  NO.

8          THE COURT:  THANK YOU.  I APPRECIATE YOUR PATIENCE.

9   YOU MAY STAND DOWN.  YOU'RE EXCUSED AS A WITNESS.

10          ANY ADDITIONAL WITNESSES ON BEHALF OF THE UNITED

11   STATES?

12          MR. KLEINDIENST:  NO, YOUR HONOR.

13          THE COURT:  MS. CLARKE, ANY WITNESSES ON BEHALF OF

14   THE DEFENSE?

15          MS. CLARKE:  WE ALREADY ALERTED THE COURT WE DID NOT

16   HAVE ANY WITNESSES.  WE HAVE FILED SOME EXHIBITS THAT WE WANT

17   THE COURT TO CONSIDER.

18          THE COURT:  SURE.

19          MS. CLARKE:  THEY WERE FILED LAST NIGHT IN

20   CONNECTION WITH OUR MOTION.  I CAN GIVE THE COURT HARD COPIES.

21   THEY'RE CHARTS AND THEY'RE REPRESENTATIVE OF WHAT THE RECORDS

22   ESTABLISHED.

23          THE COURT:  I GOT YOUR BRIEFING ON THAT WITH THE

24   DISCREPANCIES BETWEEN THE CONCLUSIONS, FOR EXAMPLE, IN

25   DR. PIETZ'S REPORT AND THEN WHAT THE --

266

1          MS. CLARKE:  EXACTLY.  THAT HAS EXHIBIT D ATTACHED,

2     WHICH IS A LOT OF THE RECORDS.

3          THE COURT:  IT WAS RECEIVED AND REVIEWED ALREADY.  I

4     WENT OVER EVERYTHING AGAIN LAST NIGHT.

5          MS. CLARKE:  YOUR HONOR, LET ME GIVE YOU --

6          THE COURT:  I DO HAVE THAT, MS. CLARKE.  I GOT IT

7     BEFORE I LEFT.

8          THIS INCLUDED THE CHART THAT DR. PIETZ WAS HAVING

9     DIFFICULTY --

10          MS. CLARKE:  RIGHT, BECAUSE I DIDN'T READ THE LOGS

11     TO DR. PIETZ.  THE DECLARATION OF JANET TUNG EXPLAINS ALL THE

12     CHARTS.  WE'VE GOT FIVE, EYE CONTACT, HYGIENE, AFFECT, MOOD,

13     AND ACTIVITIES, WHICH WE THINK SUPPORTS THE -- UNDERMINES THE

14     FACTUAL CONCLUSION.

15          THE COURT:  I'VE SEEN THAT.  THAT MAY BE PART OF THE

16     RECORD.

17          YOU'VE SEEN THE DECLARATION, MR. KLEINDIENST?

18          MR. KLEINDIENST:  LAST NIGHT FOR THE FIRST TIME.

19          HERE'S MY PROBLEM, JUDGE:  I HAVE NO WAY OF

20     CROSS-EXAMINING THAT DOCUMENT.  THERE'S NO WAY TO KNOW IF THAT

21     IS -- THAT THEY ACTUALLY LOOKED AT EACH PROGRESS NOTE.

22     THERE'S NO WAY TO TEST THAT.  NUMBER TWO --

23          THE COURT:  HOLD ON THE FIRST POINT.

24          YOU HAVE THE MEANS TO VERIFY IT BECAUSE THERE ARE

25     REFERENCES TO THE RECORD, EVIDENCE THAT THEY SAY CONTRADICTS

1    THE STATEMENTS THAT ARE BEING MADE.  THAT'S WHAT I READ WHEN I

2    READ THROUGH IT.

3          MR. KLEINDIENST:  ON THE DIFFERENT PIE CHARTS?

4          THE COURT:  NOT THE PIE CHARTS, BUT THE

5    FIVE SECTIONS MS. CLARKE ALLUDED TO.

6          MR. KLEINDIENST:  I THOUGHT YOU MEANT THE PIE

7    CHARTS.

8          THE COURT:  NO.  I'M ASSUMING THAT AS OFFICERS OF

9    THE COURT, WHEN THEY PREPARED THE CHART, IT SHOWED THE AMOUNT

10   OF TIME HE WAS IN BED, THE AMOUNT OF TIME HE WAS PACING, OTHER

11   TIMES, THE BLUE AND THE RED CHART THAT THEY FOLLOWED DATA THAT

12   THEY RECEIVED FROM YOU.  THEY DIDN'T MAKE THAT OUT OF

13   WHOLECLOTH.  I ACCEPT IT AT FACE VALUE.

14         MR. KLEINDIENST:  WE DON'T KNOW WHO THE INITIAL

15   REPORTER WAS.

16         WAS IT A GUARD?  WAS IT A NURSE?

17         THE COURT:  IT COULD HAVE BEEN ANY OF THOSE FOLKS

18   BECAUSE THEY WERE GETTING MULTIPLE REPORTS FROM DIFFERENT

19   PERSONS OUT THERE.  THE POINT IS IT CAME FROM DATA THAT THE

20   GOVERNMENT HAS SUPPLIED IN DISCOVERY.

21         THAT'S YOUR PROFFER, ISN'T IT?

22         MS. CLARKE:  THAT'S RIGHT.

23         MR. KLEINDIENST:  I UNDERSTAND.  I'M JUST SAYING

24   THAT THERE'S NO WAY TO TEST REALLY WITHOUT GOING THROUGH WEEKS

25   PRIOR AS TO WHO WAS IT THAT MADE THAT OBSERVATION THAT DAY AT

1    THAT TIME.  THAT'S THE DIFFICULTY WHEN THEY DO IT BY

2    AFFIDAVIT.  THERE'S NOT WAY TO REALLY CHALLENGE THOSE

3    CHARTS.

4            THE COURT:  I DON'T WANT TO BELABOR THIS.  IT COULD

5    HAVE BEEN IN THE FORM OF A LEGAL ARGUMENT OF REBUTTAL TO THE

6    GOVERNMENT'S PETITION AND TO THE AFFIDAVITS THAT WERE SUPPLIED

7    WITH DECLARATIONS THAT WERE SUPPLIED.

8            DR. PIETZ SUPPLIED TWO DECLARATIONS:  ONE IN AUGUST,

9    ONE IN SEPTEMBER.  AND THIS WAS A SPECIFIC CONTRADICTION OF

10   OPINION THAT SHE GAVE AND SAID, "HOLD ON A SECOND.  THERE'S

11   EVIDENCE IN THE RECORD THAT BELIES WHAT'S BEING SAID HERE

12   ABOUT WEIGHT, FOR EXAMPLE, THE WEIGHT GAIN BEING A POSITIVE

13   SIGN, THE SUICIDAL IDEATION," A NUMBER OF THE OTHER THINGS

14   THAT THEY WENT THROUGH.

15           SO THAT IT COMES IN THE DECLARATION FROM MS. TUNG

16   JUST TO DAY, I THINK, "I'VE LOOKED AT OTHER DATA, AND IT

17   CONTRADICTS SOME OF WHAT'S BEING SAID.  WE WANT YOU TO

18   CONSIDER THAT WHEN YOU CONSIDER THE ISSUE OF WHETHER AN

19   EXTENSION IS APPROPRIATE HERE."

20           HAVE I GOT THAT RIGHT?

21           MS. CLARKE:  YOU'VE GOT THAT RIGHT.

22           THE COURT:  SO I DON'T REALLY TAKE NOTE OF THAT.

23   THEY'RE ENDEAVORING TO CONTRADICT INFORMATION THAT THE

24   GOVERNMENT HAS PUT FORTH TO ME IN SUPPORT OF THE MOTION TO

25   EXTEND THE TIME.

1        MR. KLEINDIENST:  THEY HAD THEIR RECORDS TO ADVANCE

2    THE BALL, AND WE GOT THIS LAST NIGHT.  THERE'S NO WAY FOR ME

3    TO VERIFY THEY'RE ACCURATE.

4        THE COURT:  MR. KLEINDIENST, THE PROBLEM I HAVE WITH

5    THAT IS IT'S THE SAME DATA THAT WAS AVAILABLE TO YOU EVEN

6    BEFORE -- SIMULTANEOUSLY WITH WHEN THE DEFENSE GOT IT.  YOU

7    COULD HAVE LOOKED AT IT AND SAID, "WELL, LET ME CHECK THIS OUT

8    AND MAKE SURE THIS SQUARES WITH THE INFORMATION THAT I HAVE

9    FROM OTHER SOURCES OF INFORMATION AT THE PRISON."  THAT'S WHAT

10   THEY DID IN THIS CASE.

11       IF MS. CLARKE WANTED TO SPRING IT ON YOU, SHE COULD

12   STAND UP NOW AND SAY, "JUDGE, I WANT TO READ YOU SOME OTHER

13   THINGS THAT I'VE GOTTEN IN DISCOVERY TO CONTRADICT WHAT'S

14   BEING SAID HERE TODAY."

15       I DON'T SEE ANY PREJUDICE TO THE GOVERNMENT THAT

16   THEY'VE GONE THROUGH AND LOOKED AT EVERYTHING VERY CLOSELY AND

17   SAID THERE'S SOME CONTRADICTIONS HERE BETWEEN WHAT'S BEING

18   OFFERED AND WHAT THE EVIDENCE IS.  I DON'T SEE ANY PREJUDICE

19   TO THE GOVERNMENT.  THIS IS THE GIVE-AND-TAKE OF AN

20   ADVERSARIAL PROCEEDING.

21       SO THOSE THINGS SAID, NO FURTHER EVIDENCE?  I HAVE

22   REVIEWED THAT.  I'M FAMILIAR WITH THE CONTRADICTIONS THAT THE

23   DEFENSE HAS POINTED OUT AND RELIED UPON.

24       MS. CLARKE:  THAT'S IT, YOUR HONOR.

25       THE COURT:  ANY ARGUMENT ON THIS POINT?

1          MR. KLEINDIENST:  ON THE PRECISE POINT OF THE

2     CHARGE?

3          THE COURT:  NO.  ON THE PRECISE POINT OF WHETHER THE

4     REQUEST FOR EXTENSION SHOULD BE GRANTED.

5          MS. FELDMEIER:  JUST SHORTLY, YOUR HONOR.

6          THE COURT:  OKAY.  I DO HAVE IN MIND ALL THE

7     PLEADINGS, ALL THE EVIDENCE IN THE CASE.

8          MS. FELDMEIER:  THEN THAT BEING IN MIND, YOUR HONOR,

9     I THINK THAT THE MAIN ISSUE HERE WAS THE BURDEN OF PROOF AND

10    WHETHER THE GOVERNMENT NEEDS TO SHOW THIS BY A SUBSTANTIAL

11    PROBABILITY.

12         THE COURT:  LET ME TELL YOU ON THAT TENTATIVELY I

13    HAVE READ THE CASES.  I UNDERSTAND IN THE WESTON CASE, THE

14    JUDGE ASSUMED IT WAS PROOF BY CLEAR AND CONVINCING.  I

15    DISAGREE WITH THAT.  I THINK THERE ARE DISTINCTIONS BETWEEN

16    THIS CASE AND WESTON.

17         FIRST OF ALL, THERE'S NO REASONED OPINION DISCUSSING

18    BURDEN OF PROOF IN WESTON.  THE JUDGE JUST RELIED ON THAT.  IT

19    WAS A VERY DIFFERENT CASE.  THE SELL HEARING HAD ALREADY BEEN

20    HEARD AND DECIDED, AND THE DEFENDANT WAS RECEIVING MEDICATION

21    INVOLUNTARILY ON AN ORDER OF THE COURT, WHICH DOES REQUIRE

22    PROOF BY CLEAR AND CONVINCING EVIDENCE IF THAT'S APPROPRIATE.

23         AND I CAN'T SPEAK FOR WHAT JUDGE SULLIVAN DID IN

24    WESTON, BUT HE MADE THE DETERMINATION IN THAT CASE THAT AN

25    EXTENSION HAD TO BE SUPPORTED BY THAT STANDARD OF PROOF.

1          I'M ALSO FAMILIAR WITH THE CASE FROM THE DISTRICT OF

2   MEXICO, THE RODRIGUEZ-LOPEZ CASE, WHERE JUDGE BROWNING HAD

3   CONCLUDED THAT THE STANDARD OF PROOF IS PREPONDERANCE.

4          FRANKLY, MY INSTINCT IS THIS:  THE STANDARD OF PROOF

5   HERE IS AS IS SPECIFIED IN THE STATUTE, SUBSTANTIAL

6   PROBABILITY.  IT'S CLEAR TO ME FROM REVIEWING ALL OF THE

7   ADJACENT SECTIONS THAT 4241 THAT COME FROM CHAPTER 13, THAT

8   CONGRESS WAS VERY PRECISE ABOUT SPECIFYING STANDARD OF PROOF

9   IN ALL THOSE SECTIONS.

10         WHERE THEY WANTED CLEAR AND CONVINCING EVIDENCE,

11  THEY SPECIFIED IT.  WHERE THEY WANTED PREPONDERANCE OF THE

12  EVIDENCE, THEY SPECIFIED IT.  HERE THEY SPECIFIED A

13  SUBSTANTIAL PROBABILITY.

14         I KNOW JUDGE BROWNING TOOK THE POSITION THAT THAT'S

15  WHAT HAS TO BE PROVED, NOT THE NATURE OF IT.  I DISAGREE WITH

16  THAT.  WHAT HAS TO BE PROVED IS THE LIKELIHOOD OF RESTORATION,

17  AND IT HAS TO BE PROVED BY A SUBSTANTIAL PROBABILITY.

18         SO I BELIEVE THAT THAT'S THE STANDARD.  SUBSTANTIAL

19  PROBABILITY IS THE STANDARD THAT ATTENDS THIS DETERMINATION.

20         THE NEXT QUESTION IS WHAT DOES THAT MEAN?  A

21  "PROBABILITY" IS IT'S A NEUTRAL CONCEPT.  THEY HAVE A 1

22  PERCENT PROBABILITY, AN 80 PERCENT PROBABILITY.  BUT IT'S

23  MODIFIED BY SUBSTANTIAL, AND I HAVE RECEIVED SOME GUIDANCE

24  FROM JUDGE REINHARDT'S OPINION IN THE RIVIERA-HERRERA CASE,

25  WHICH IS OUT OF THE SOUTHERN DISTRICT OF CALIFORNIA FROM

1    SEVERAL YEARS AGO.

2              JUDGE REINHARDT IN THAT OPINION CITES TO A SIXTH

3    CIRCUIT CASE, UNITED STATES VERSUS BAKER, AT 807 FED. 2D 1315,

4    PAGE 1320, SIXTH CIRCUIT, 1986.  HE MAKES THE STATEMENT

5    CHARACTERIZING THE STATE OF THE LAW AND THE STANDARD OF PROOF

6    FOR AN EXTENSION.

7              COURTS HAVE GENERALLY CONSTRUED THIS SUBSECTION,

8    REFERRING TO 1441, TO ALLOW EXTENSIONS FOR A REASONABLE PERIOD

9    OF TIME ONLY WHEN, QUOTE, "THE INDIVIDUAL IS LIKELY TO ATTAIN

10   COMPETENCE WITHIN A REASONABLE PERIOD OF TIME."

11             SO I THINK THAT'S WHAT SUBSTANTIAL PROBABILITY MEANS

12   IN THE CONTEXT OF THIS.  IT IS "LIKELIHOOD."  I THINK THE WORD

13   "SUBSTANTIAL" MODIFIES THE NEUTRAL PROBABILITY.  I DON'T THINK

14   I NEED TO LAYER ANOTHER STANDARD OF PROOF ON TOP SUCH AS

15   PREPONDERANCE OF THE EVIDENCE AND CLEAR AND CONVINCING

16   EVIDENCE, ALTHOUGH I AM PREPARED TO MAKE ALTERNATIVE FINDINGS

17   AS TO BOTH OF THOSE STANDARDS.

18             MS. FELDMEIER:  I HAVE NO FURTHER ARGUMENT ON

19   THAT.

20             THE COURT:  MS. CLARKE.

21             MS. CLARKE:  YOUR HONOR, WE BRIEFED THE ISSUE.  THE

22   COURT HAS READ THE BRIEFING.  WE'LL STAND ON THAT UNLESS THE

23   COURT HAS QUESTIONS.

24             THE COURT:  I DON'T.

25             MS. CLARKE:  THANK YOU, YOUR HONOR.

1          MS. FELDMEIER:  SO IT LOOKS LIKE OUR NEXT ISSUE --

2          THE COURT:  LET ME MAKE A RULING ON THIS.

3          THIS MATTER IS SUBMITTED.  WE DO HAVE OTHER MOTIONS.

4    LET ME MAKE A RULING ON THE --

5          MS. FELDMEIER:  ONE OTHER POINT I WANTED TO MAKE,

6    YOUR HONOR, IS UNDER U.S. V. JACKSON, IT TALKS ABOUT -- I

7    THINK IT'S A VERY HELPFUL THING FOR THE COURT WHEN YOU'RE

8    TALKING ABOUT RESTORATION.  IT TALKS ABOUT -- THE SUPREME

9    COURT SAYS THEY HAVE TO SHOW A PREPONDERANCE TOWARD THE GOAL,

10   IS THE QUOTE.

11         AND I THINK THAT'S VERY HELPFUL IN SHOWING WHETHER

12   OR NOT THERE'S A SUBSTANTIAL PROBABILITY IN THIS CASE, BUT WE

13   HAVE NO FURTHER ARGUMENT.

14         THE COURT:  SOME BACKGROUND IS IN ORDER FOR THE

15   COURT'S RULING.  I FOUND MR. LOUGHNER NOT COMPETENT TO STAND

16   TRIAL ON MAY 25TH, AND HE WAS COMMITTED INITIALLY FOR A

17   FOUR-MONTH PERIOD TO THE FEDERAL MEDICAL CENTER IN SPRINGFIELD

18   FOR A DETERMINATION OF WHETHER THERE WAS A SUBSTANTIAL

19   PROBABILITY IN THE FORESEEABLE FUTURE TO ATTAIN CAPACITY TO

20   PERMIT THE PROCEEDINGS TO GO FORWARD.  THAT'S THE STANDARD

21   THAT I'M DEALING WITH.

22         I SET A STATUS CONFERENCE INITIALLY ON THAT DATE,

23   SEPTEMBER 21ST.  WE MOVED IT AT THE REQUEST OF THE GOVERNMENT

24   AND TO ACCOMMODATE SOME OF THE VICTIMS AND VICTIM ADVOCATES IN

25   THE CASE.  SO IT'S TAKING PLACE TODAY.  I SPOKE TO THE ISSUE

1    OF WHETHER IT WAS TIMELY.  I HAVE RULED ON THAT ALREADY.

2         SO THE QUESTION BEFORE ME TODAY IS DOES THE EVIDENCE

3    MAKE OUT A SUBSTANTIAL PROBABILITY THAT IN THE FORESEEABLE

4    FUTURE MR. LOUGHNER WILL BE RESTORED TO COMPETENCY.

5         THE COURT FINDS THAT THE ANSWER TO THAT IS YES.  I

6    HAVE LISTENED CAREFULLY TO THE TESTIMONY OF BOTH DR. PIETZ AND

7    ALSO TO THAT OF DR. BALLENGER.  I'VE READ EVERYTHING THAT HAS

8    BEEN SUBMITTED IN THIS CASE.  I'VE TAKEN INTO CONSIDERATION IN

9    PARTICULAR THE CONTRARY EVIDENCE THAT I HAVE ALLUDED TO AND

10   I'M WELL FAMILIAR WITH, AND I CONCEDE THAT THERE IS SOME

11   EVIDENCE THAT CUTS IN THE OPPOSITE DIRECTION.  THERE'S SOME

12   EVIDENCE OF FITS AND STARTS, SO TO SPEAK.

13        I'M NOT SURE WHAT TO ATTRIBUTE THAT TO.  IT DOES

14   APPEAR TO ME THAT THE UNRAVELING OF MR. LOUGHNER'S CONDITION

15   IN EARLY JULY CORRESPONDED WITH THE ORDER OF THE COURT OF

16   APPEALS TO STOP MEDICATING HIM, AND HE'S MADE PROGRESS AGAIN.

17        THE POINT WAS MADE IN THE HEARING TODAY, WELL, DID

18   HE GET PAST SOME THRESHOLD THAT HE'D BEEN AT BEFORE?  HE'D

19   ONLY BEEN ON THE DRUGS FOR NINE DAYS OR TEN DAYS BEFORE THAT

20   ORDER CAME IN.

21        AND SO THE FOCUS OF MY ATTENTION AND WHAT I REALLY

22   HONED IN ON DURING THE TESTIMONY WAS WHAT HAS HAPPENED SINCE

23   THE RESTORATION OF THE MEDICATION ON JULY 18TH.

24        THE TESTIMONY CONVINCES ME AND I FIND IT TO BE

25   CREDIBLE, EVEN THOUGH I DO ACKNOWLEDGE THAT THERE MAY BE SOME

1    BIAS TOWARD THE RESTORATION.  I THINK THAT'S QUITE NATURAL.  I

2    THINK THAT THAT'S ASPIRATIONAL FOR BOTH DR. PIETZ AND

3    DR. BALLENGER.  THEY'RE DOCTORS.  THEY WANT TO HELP AND HEAL

4    PEOPLE.  SO I HAVE THAT IN MIND.

5           EVEN WITH THAT OBJECTIVE IN MIND, THE COURT FINDS

6    THAT MEASURABLE PROGRESS TOWARD RESTORATION HAS BEEN MADE.  I

7    AM PARTICULARLY INFLUENCED BY THE TESTIMONY OF DR. PIETZ.  I

8    FIND THAT SHE'S CREDIBLE.  I FIND THAT SHE'S EXPERIENCED.  I

9    FIND THAT SHE'S QUALIFIED TO MAKE THE VERY JUDGMENT THAT THE

10   COURT MUST PASS ON TODAY.  AND HER TESTIMONY WAS HELPFUL IN

11   INFORMING ME OF THE OUTCOME IN THIS CASE.

12          THE LAST QUESTION I PUT TO DR. PIETZ WAS, "HAS

13   ANYONE HAD MORE SUBSTANTIAL CONTACT WITH MR. LOUGHNER IN THE

14   LAST FOUR MONTHS THAN YOU?"

15          SHE THOUGHT ABOUT IT FOR A MINUTE AND ANSWERED

16   DISTINCTIVELY, "NO, I DON'T THINK SO.  I THINK I'VE HAD MORE

17   CONTACT WITH HIM THAN ANYONE ELSE."

18          I CREDIT THAT PERSONAL DAY-TO-DAY CONTACT THAT SHE'S

19   HAD WITH HIM.  HER BAROMETER ON WHETHER HE'S MADE PROGRESS,

20   WHETHER HE'LL CONTINUE TO MAKE MARKED PROGRESS IS THE BEST

21   SIGN THAT I HAVE AND THE BEST EVIDENCE THAT I HAVE OF THE

22   LIKELIHOOD OF HIS RECOVERY IN THIS CASE.

23          I THINK TO A LARGE EXTENT THE OPTIMISTIC VIEWPOINT

24   AND PROGNOSIS IS CORROBORATED BY THE EXPERIENCE OF

25   DR. BALLENGER.  I GET IT THAT DR. BALLENGER IS NOT IN THE

1    BUSINESS TYPICALLY OF TESTIFYING IN RESTORATION HEARINGS.  HE

2    BRINGS ANECDOTAL EXPERIENCE IN TREATMENT GENERALLY OF

3    SCHIZOPHRENIA AND WHAT HAPPENS TO PEOPLE.

4          I AGREE WITH HIM THAT THAT IS A PROXY, THAT IS A

5    PARALLEL OF WHAT'S GOING ON HERE.  RESTORATION IN THE CASE OF

6    SOMEONE IN A CLINICAL SETTING, FOR ALL INTENTS AND PURPOSES,

7    IS THE SAME GOAL THAT WE HAVE IN THIS CASE, WHICH IS TO GET

8    SOMEBODY FUNCTIONING AGAIN AS A HUMAN BEING WHO UNDERSTANDS,

9    APPRECIATES, AND ASSISTS IN THE CONTEXT OF THE CRIMINAL CASE

10   WITH THE DEFENSE OF HIS CASE.

11         I KNOW IN THE WESTON CASE -- AND I DON'T PUT GREAT

12   STOCK IN THIS BECAUSE I'M NOT A DOCTOR.  BUT I KNOW IN THE

13   WESTON CASE, JUDGE SULLIVAN DREW ON HIS OWN EXPERIENCES WITH

14   THE DEFENDANT IN THAT CASE.  HE HAD BEEN IN TOUCH WITH THE

15   DEFENDANT AT SEVERAL HEARINGS, AND HE MADE HIS OWN

16   OBSERVATIONS IN THE CASE.

17         AGAIN, THIS IS A MINOR PART OF MY CONSIDERATION, BUT

18   I WATCHED MR. LOUGHNER TODAY AS I HAVE IN THE OTHER

19   PROCEEDINGS.  HIS DEMEANOR, WHILE ALL THE CHARACTERIZATIONS

20   ARE CORRECT ABOUT FLAT AFFECT AND ALL, HAS BEEN DISTINCTLY

21   DIFFERENT THAN IN OTHER PROCEEDINGS.  HE'S DIFFERENT IN THE

22   WAYS THAT HAVE BEEN IDENTIFIED BY DR. PIETZ.

23         THE SMIRK, WHAT WE REFERRED TO AS AFFECT, IS GONE.

24   HE'S APPEARED TO PAY ATTENTION TO THE PROCEEDINGS TODAY.  IN

25   EARLIER PROCEEDINGS, THE COURT NOTES THAT HE WASN'T

1    PARTICULARLY PAYING ATTENTION.  HE WAS LOOKING DOWN, LOOKING

2    AWAY, DIDN'T SEEM CONNECTED AT ALL.  TODAY, IN MY LAY VIEW, HE

3    DOES APPEAR TO BE MORE CONNECTED TO THE PROCEEDINGS, APPEARS

4    TO BE PAYING ATTENTION TO WHAT'S GOING ON.

5         I THINK MY OWN OBSERVATIONS CORROBORATE THE

6    STATEMENTS THAT HE MADE IN PREPARATION FOR TODAY'S MEETING, AT

7    LEAST GETTING TO THIS HEARING, THAT HE WANTED TO BE HERE

8    HIMSELF, IT WAS ABOUT HIM, IT WAS ABOUT HIS INTEREST, AND HE

9    WANTED TO PERSONALLY PARTICIPATE.  I SEE THAT MANIFEST IN HIS

10   DEMEANOR HERE TODAY.

11        NOW, AGAIN, I'M NOT A PHYSICIAN.  I EMPHASIZE THAT.

12   BUT I HAVE 57 YEARS OF DEALING WITH HUMAN NATURE AND OBSERVING

13   PEOPLE, AND EVERYTHING I OBSERVE ABOUT HIM SEEMS TO CONNECT

14   WITH THE EXPERT TESTIMONY THAT I'VE HEARD; THAT THERE IS

15   REASON TO BE OPTIMISTIC, THAT HE WILL RECOVER AND BE ABLE TO

16   ASSIST HIS LAWYERS IN DEFENDING HIM AGAINST THIS CASE.

17        THE QUESTION CAME OUT ABOUT WHAT'S A REASONABLE

18   PERIOD OF TIME FOR THE EXTENSION.  THE REQUEST AT THE PRESENT

19   TIME IS FOR EIGHT MONTHS.  AND MS. CLARKE, YOU CROSS-EXAMINED

20   DR. PIETZ ABOUT THE EIGHT-MONTH -- DISCREPANCY IN FIRST ASKING

21   FOR FOUR MONTHS, NOW ASKING FOR EIGHT.

22        SHE SAID, "WELL, I THINK THE COURTS HAVE SAID THAT.

23   THE COURTS HAVE FOCUSED ON THIS."

24        AND I REMEMBER READING THAT.  I LOOKED BACK AT WHAT

25   JUDGE BROWNING SAID IN THE RODRIGUEZ-LOPEZ CASE.  AND AT PAGE

1    8, HE MAKES THIS STATEMENT, WHICH MAY HAVE BEEN THE BASIS FOR

2    HER STATEMENTS AND BELIEF.

3            AT PAGE 8 IN THAT DISTRICT COURT CASE, THE COURT

4    CITES SECTION 4241.  IT SAYS, "THE SECTION PROVIDES INSIGHT

5    INTO THE MEASURE OF WHAT IS A REASONABLE ADDITIONAL PERIOD OF

6    TIME BY ESTABLISHING THAT AN INITIAL REASONABLE PERIOD OF TIME

7    IS NOT TO EXCEED FOUR MONTHS.  THE STATUTE APPEARS TO

8    CONTEMPLATE ONE FOUR-MONTH TERM FOLLOWED BY ANOTHER FOUR-MONTH

9    TERM."

10           SO I THINK THAT UNDERSCORES THE UNDERSTANDING THAT

11   DR. PIETZ HAD AND MAY HAVE BEEN THE SOURCE OF THE CONFUSION.

12   IT'S FOR ME TO DETERMINE WHAT IS A REASONABLE PERIOD OF TIME.

13   THE REQUEST HERE IS FOR EIGHT MONTHS.  THE DATA THAT I'VE

14   HEARD AND THAT I UNDERSTAND VARIES ON A CASE-TO-CASE BASIS, I

15   DON'T THINK I CAN PREDICT AT THIS POINT THAT IT WOULD BE FOUR

16   MONTHS OR EIGHT MONTHS.

17           IT WAS ESTABLISHED, I THINK, THAT IF DR. PIETZ OR

18   THE PHYSICIANS AT FEDERAL MEDICAL CENTER IN SPRINGFIELD COME

19   TO THE CONCLUSION THAT HE'S RESTORED BEFORE THAT, THEY WOULD

20   CERTAINLY NOTIFY US.

21           I THINK THE BEST THING FOR ME TO DO IS FOLLOW THE

22   CONVENTION THAT JUDGE BROWNING ACKNOWLEDGES IN THE STATUTE AND

23   SET A FOUR-MONTH PERIOD.  DR. PIETZ ASKED THAT THAT BEGIN FROM

24   THE TIME THAT THE DRUGS HAVE STARTED.  I'M GOING TO SET IT AS

25   OF TODAY.

1        AND WE'LL HAVE A PROGRESS REPORT PROCEEDING AT THE

2   NEXT HEARING.  WHAT I WOULD WANT TO SEE AND WHAT I WOULD

3   REQUIRE BEFORE I WOULD EXTEND IT AGAIN WOULD BE MEASURABLE

4   PROGRESS, MORE SO THAN WHAT WE'VE SEEN HERE.

5        DR. PIETZ HAS SAID SHE'D LIKE TO HAVE EIGHT MONTHS

6   IDEALLY.  THE RECORD AT THIS POINT IS THAT MR. LOUGHNER HAS

7   BEEN TAKING THE MEDICATION PURSUANT TO THE PRISON'S HARPER

8   AUTHORITY AND THAT THAT HAS BEEN ONGOING NOW FOR APPROXIMATELY

9   60 DAYS, MAYBE A LITTLE BIT LONGER.  ANOTHER FOUR MONTHS WITH

10  THE 60 DAYS WOULD BE IN THE MIDDLE OF THE PERIOD THAT --

11  BETWEEN THE FOUR MONTHS AND THE EIGHT MONTHS THAT WAS

12  REQUESTED.

13       THAT WAS NOT MY INTENTION, TO SPLIT THE BABY

14  SOLOMON-LIKE.  IT JUST SEEMS TO ME THAT THAT SEEMS RIGHT IN

15  LIGHT OF ALL THE EVIDENCE I'VE HEARD AND THE PROGRESS.  AND

16  THEN THE PARTICULAR HISTORY OF THIS CASE, THE DISRUPTION OF

17  MEDICATION AND REINSTATEMENT OF MEDICATION, THAT SEEMS TO BE A

18  REASONABLE PERIOD OF TIME IN LIGHT OF ALL OF THOSE

19  CIRCUMSTANCES.

20       SO THE COURT TO CONCLUDE FINDS THERE IS A

21  SUBSTANTIAL PROBABILITY THAT WITHIN A REASONABLE PERIOD OF

22  TIME, BASED ON THE ONGOING TREATMENT AT THE FEDERAL MEDICAL

23  CENTER IN SPRINGFIELD, MR. LOUGHNER CAN BE RESTORED TO

24  COMPETENCY.

25       I MENTIONED TO YOU THAT I'D MAKE ALTERNATIVE

1    FINDINGS BASED ON THE ARGUMENTS MADE.  I DON'T FIND CLEAR AND

2    CONVINCING PROOF IS REQUIRED IN THIS CASE.  IF I'M WRONG THAT

3    THE STANDARD IS SUBSTANTIAL PROBABILITY, THEN MY FALLBACK

4    READING OF THE CASES WOULD BE THAT IT'S BY A PREPONDERANCE OF

5    EVIDENCE, MORE LIKELY THAN NOT.

6         FRANKLY, WE CAN ARGUE ABOUT THE TEXT AND WHAT WORDS

7    MEAN AND WHETHER SUBSTANTIALLY PROBABLE IS THE HIGHER STANDARD

8    THAN PREPONDERANCE.  I, FRANKLY, THINK IT IS.  I THINK

9    LIKELIHOOD IS PROBABLY STRONGER THAN 51 PERCENT.  SO I BELIEVE

10   I'VE RULED UNDER A HIGHER STANDARD THAN PREPONDERANCE OF THE

11   EVIDENCE BY APPLYING THE SUBSTANTIAL PROBABILITY STANDARD.

12        IF I'M WRONG ABOUT THIS, IF I AM TO LAYER A STANDARD

13   OF PROOF ON TOP OF WHAT I THINK IS THE STATED STANDARD OF

14   PROOF UNDER THE SECTION, IT WOULD BE PREPONDERANCE OF THE

15   EVIDENCE.

16        AND TO BE EXPLICIT ABOUT THIS, I FIND BY A

17   PREPONDERANCE OF EVIDENCE, ALSO, THAT IT'S VERY LIKELY THAT IN

18   THE REASONABLE FORESEEABLE FUTURE, MR. LOUGHNER CAN BE

19   RESTORED.

20        NOW, THIS SEGUES, MR. KLEINDIENST AND MS. CLARKE,

21   INTO ANOTHER ISSUE THAT I RAISED AND I CONTINUE TO HAVE

22   CONCERNS ABOUT.

23        THE DEFENSE HAS TAKEN THE POSITION WITH ME AND WITH

24   THE COURT OF APPEALS THAT THE HARPER HEARING PROVIDES KIND OF

25   A CONVENIENT END AROUND THE DUE PROCESS HEARING THAT SELL

1    IMPLICATES.  THIS IS A SIGNIFICANT CHANGE, I THINK, IN AT

2    LEAST THE LEGAL STATUS OF THE DEFENDANT.

3            I'M NOW COMMITTING HIM FOR THE PURPOSE OF

4    RESTORATION.  NO MORE EVALUATION.  IT CHANGES TODAY WITH THIS

5    RULING.  HE'S BEING COMMITTED FOR ANOTHER FOUR MONTHS FOR THE

6    PURPOSE OF RESTORATION.

7            I'M COMMITTING HIM AT A TIME THAT I KNOW THAT

8    THEY'RE CONTINUING TO TREAT HIM WITH MEDICATION THAT HE

9    DECLINES TO TAKE.  HE'S PASSIVELY RESISTING, WHICH MEANS THEY

10   TELL HIM "EITHER YOU HAVE TO DO THIS OR WE'LL GIVE YOU A SHOT

11   AND FORCIBLY INJECT YOU."  IN THE FACE OF THAT, HE COMES AND

12   TAKES THE MEDICINE.

13           I THINK THIS IS A VERY DIFFERENT SITUATION FROM WHAT

14   HAS EXISTED TO THIS POINT.  I'M NOW TELLING THEM TO CONTINUE

15   TO RESTORE HIM.  I THINK WE'RE RIGHT UP AGAINST SELL.  AND THE

16   REASON I ASKED THE PARTIES TO BE READY TO SPEAK TO THIS IS I

17   THINK SOME FORM OF A SELL HEARING OR AN ACKNOWLEDGEMENT NEEDS

18   TO TAKE PLACE HERE.

19           WHAT THE PARAMETERS OF THAT HEARING ARE I'M LESS

20   CLEAR ABOUT.  AS I READ SELL, YOU LOOK FIRST AT WHETHER HE'D

21   BE MEDICATED ON ANOTHER BASIS.  IF THE ANSWER IS YES, PERHAPS,

22   THAT'S THE END OF THE INQUIRY.  MAYBE NOT.  MAYBE THE COURT IS

23   ALSO TO BE CONCERNED WITH THE OTHER FACTORS UNDER SELL.

24           I'M NOT PREPARED TO CONDUCT THAT HEARING TODAY,

25   OBVIOUSLY, GIVEN THE LATENESS OF THE HOUR.  I WANTED TO ALERT

1    BOTH SIDES.  I READ THE GOVERNMENT'S BRIEFING ON THIS.  I

2    DON'T THINK WITHOUT EITHER A FURTHER ORDER OR HEARING I CAN

3    SIMPLY RELY ON A HARPER JUSTIFICATION AT THIS POINT.

4          I WANT TO BE SURE IN MY MIND AT LEAST THAT ASSUMING

5    I CAN POINT TO HARPER AS THE REASON HE'S BEING MEDICATED THAT

6    I HAVE GOOD CAUSE TO BELIEVE THAT THE HARPER JUSTIFICATION

7    HOLDS.

8          I THINK IT DOES.  I THINK IT DOES BASED ON WHAT'S

9    BEEN SAID TODAY.  EVERY INDICATION FROM DR. PIETZ IS THAT IF

10   WE TAKE HIM OFF OF THIS, HE'LL DETERIORATE AS HE DID BEFORE

11   AND BE A DANGER TO HIMSELF AND OTHERS.

12        IT LEAVES OPEN IN MY MIND THE QUESTION OF WHAT

13   CONSIDERATION OUGHT TO BE GIVEN TO OTHER FACTORS THAT ARE

14   OUTLINED IN SELL.  MR. KLEINDIENST, MS. CLARKE HAS REPEATEDLY

15   ASKED ME TO CONSIDER AND TAKE ON AS A JUDICIAL DETERMINATION,

16   RATHER THAN A MEDICAL DETERMINATION THAT IS COMMITTED TO THE

17   BUREAU OF PRISONS.  SO I LEAVE THAT ISSUE OPEN.

18        LET ME MAKE ONE OTHER STATEMENT ABOUT THE RULING

19   THAT I'VE JUST MADE.

20        NOTHING IN THE RULING THAT I HAVE MADE FORECLOSES

21   THE DEFENSE FROM COMING BACK TO ME -- AT SUCH POINT IT HAPPENS

22   THAT THE DOCTORS AT SPRINGFIELD DETERMINE THAT MR. LOUGHNER

23   HAS REGAINED COMPETENCY, NOTHING IN THE RULING THAT I MADE

24   FORECLOSES THE DEFENSE FROM SAYING, "HOLD ON.  ALL OF THIS

25   MEDICATION HAS CREATED SIDE EFFECTS THAT MAKE HIM STILL UNFIT

1    TO STAND TRIAL AT THIS POINT."

2            SO THAT REMAINS OPEN, AND I'M NOT RULING ON THAT AT

3    THIS POINT.  WE MIGHT HAVE TO HAVE ANOTHER HEARING.

4    CERTAINLY, THE QUESTIONING TODAY HAS BROUGHT OUT THE

5    POSSIBILITY OF SIDE EFFECTS THAT COULD BE DEBILITATING, COULD

6    PREVENT HIM FROM GOING TO TRIAL.  MAYBE HE HAS A FACTUAL

7    UNDERSTANDING.

8            OBVIOUSLY, JUSTICE KENNEDY'S OPINION MAKES IT CLEAR

9    THAT THAT'S ONE OF THE CONCERNS IN A JUDICIAL PROCEEDING.  SO

10   THAT IS STILL ON THE TABLE.  I WANT TO ASSURE BOTH SIDES OF

11   THAT.  IF YOU THINK THERE'S SIDE EFFECTS THAT WOULD CAUSE

12   MR. LOUGHNER, FOR EXAMPLE, IN TRIAL TO APPEAR LETHARGIC OR

13   TIRED OR NOT BE FULLY ENGAGED IN THE PROCEEDING, THEN THAT CAN

14   BE URGED AT THE APPROPRIATE TIME AS A REASON NOT TO GO FORWARD

15   WITH THE TRIAL THEN.

16           I WILL NOTE TODAY THAT IN MY OBSERVATIONS OF HIS

17   DEMEANOR, FROM TIME TO TIME HE DID APPEAR TO BE TIRED AND HE

18   DID APPEAR TO CLOSE HIS EYES FROM TIME TO TIME TODAY AND MAYBE

19   A LITTLE SLEEPY OR NOD OFF.  SO I WANT TO MAKE THAT PART OF

20   THE RECORD, TOO.  THAT REMAINS VERY MUCH, I THINK, AT ISSUE

21   AND SUBJECT TO FURTHER PROCEEDINGS IN FRONT OF THIS COURT

22   ABOUT LONG-TERM EFFECTS OF THE MEDICATION.

23           SO THAT'S MY RULING ON THE EXTENSION.  I'M GOING TO

24   GRANT IT FOR ANOTHER FOUR MONTHS GOING FORWARD FROM TODAY.

25   DR. PIETZ, I'M GOING TO ASK IF YOU TWO WEEKS BEFORE THAT

284

1    FOUR-MONTH DEADLINE WILL WRITE US ANOTHER REPORT.  YOU CAN

2    CONTINUE TO PRODUCE THE PROGRESS NOTES, BUT I'D LIKE ANOTHER

3    REPORT THAT SPECIFICALLY ADDRESSES WHAT MEASURABLE PROGRESS

4    HAS BEEN MADE BETWEEN THIS DAY AND THAT DAY FOUR MONTHS OUT

5    AND WHETHER YOU CONTINUE TO BELIEVE IF MR. LOUGHNER IS NOT

6    RESTORED, THAT THERE WOULD BE A LIKELIHOOD OF RESTORATION.

7    WE'LL HAVE ANOTHER HEARING IF THAT'S CONTESTED AT THE TIME.

8            THOSE ARE MY FINDINGS WITH RESPECT TO THE

9    RESTORATION ISSUE.

10            MS. CLARKE, ON THE ISSUE OF DISCOVERY, I THINK NOW

11    IT'S BEEN RESOLVED.  SHE'S GIVEN YOU THE NOTES, AND I THINK

12    SHE WAS -- TYPICALLY, RAW NOTES ARE NOT PART OF WHAT'S

13    DISCOVERY AS LONG AS THE RAW NOTES MAKE THEIR WAY INTO SOME

14    FORM OF REPORT.

15            I DIDN'T, FRANKLY, RECALL THE CONVERSATION.  I HAVE

16    A VAGUE RECOLLECTION, AND SHE RECALLED IT.  BUT I'M SURE SHE'S

17    RIGHT IN RECOUNTING IT.  BUT IT SOUNDS LIKE YOU'VE GOTTEN

18    NOTES NOW.

19            ARE THERE OTHER DISCOVERY ISSUES THAT I NEED TO

20    RESOLVE?

21            MS. CLARKE:  YES, YOUR HONOR, THERE ARE.  DR. PIETZ

22    IS LABORING UNDER THE IMPRESSION THAT THE COURT HAS BY SOME

23    ORDER INDICATED THAT SHE SHOULD NOT INCLUDE INFORMATION IN HER

24    PROGRESS NOTES AND INSTEAD WITHHOLD THAT AND PROVIDE IT TO THE

25    COURT IN A REPORT.

1          IF WE COULD CLARIFY THAT, I THINK THAT THAT WOULD BE

2     APPROPRIATE TO DO.  WE'D ALSO LIKE TO KNOW IF THERE IS

3     INFORMATION WHICH DR. PIETZ SEEMED TO REPEATEDLY SAY THIS

4     SHOULD BE MEMORIALIZED.

5          THE COURT:  DOCTOR, LOOK, I'M NOT BLAMING YOU.  I

6     THINK MS. CLARKE IS IN A LITTLE BIT OF A BIND BECAUSE I ISSUED

7     AN ORDER SAYING THAT COMINGS AND GOINGS OF THE DEFENSE TEAM

8     SHOULD NOT BE REVEALED TO THE GOVERNMENT.

9          THAT'S TO PROTECT THE DEFENDANT'S INTERESTS.  THE

10    DEFENDANT HAS NO OBLIGATION TO TELL THE GOVERNMENT HOW HE'S

11    GOING TO DEFEND HIMSELF IN A CASE, AS YOU KNOW.  SO THAT WAS

12    TO TRY TO FACILITATE THAT PURPOSE.  IT WASN'T MEANT TO KEEP

13    FROM THE DEFENSE ANYTHING THAT'S RELEVANT OR THAT PERTAINS TO

14    ANY ISSUES TO BE DETERMINED HERE ON GUILT OR ANY OF THE

15    PROCEDURAL ISSUES LEADING UP TO THE DETERMINATION OF GUILT.

16         DR. PIETZ:  CAN I CLARIFY?

17         THE COURT:  SURE.

18         DR. PIETZ:  IF HE GOES TO AN ATTORNEY VISIT AND

19    COMES BACK AND TALKS ABOUT AND SAYS IT WAS A GOOD VISIT OR I

20    DRANK MOUNTAIN DEW, CAN I DOCUMENT THAT?

21         THE COURT:  YES.  THE ANSWER IS YES.  MS. CLARKE HAS

22    ACKNOWLEDGED AND I HAD RULED EARLIER THAT THE THINGS SAID

23    DURING THESE PROCEEDINGS ARE NOT ADMISSIBLE AGAINST HIM IN AN

24    AFFIRMATIVE WAY BY THE GOVERNMENT AT ANY POINT.  THEY'RE NOT.

25    THEY WON'T SEE THE LIGHT OF DAY.

1           THE STATUTE SPECIFIES THAT THE RECOGNITION OF THOSE

2    STATEMENTS CAN BE BROUGHT UP, BUT IT'S NOT AFFIRMATIVE.  I

3    RULED ON THAT.  SO YES, IF IT INFORMS YOUR OPINION ABOUT THE

4    ISSUES THAT YOU'RE CHARGED WITH MAKING RECOMMENDATIONS ON AND

5    REPORTING TO THE COURT ON, THEN YES.

6           THE POINT IS I WANT YOU TO GIVE EVERYTHING OVER TO

7    BOTH SIDES THAT YOU HAVE.  NOTHING SHOULD BE HELD BACK THAT

8    PERTAINS TO THESE ISSUES.

9           DOES THAT DO IT, MS. CLARKE, IN YOUR JUDGMENT?

10           MS. CLARKE:  I HOPE SO.  ONE OF THE THINGS THAT THE

11    BUREAU OF PRISONS COULD DO WITH REGARD TO A SPECIFIC DEFENSE

12    TEAM IS REDACT WHAT THE GOVERNMENT GETS.  CERTAINLY, THE GOAL

13    WASN'T TO DEPRIVE THE DEFENSE OF THE INFORMATION.  IF THE

14    INFORMATION SHOULD COME OUT, THEN THAT'S OKAY.  I THINK IT IS

15    PROTECTED NOT FROM AFFIRMATIVE USE, BUT FOR ANY USE.

16           THE COURT:  WE'LL CROSS THAT BRIDGE WHEN WE COME TO

17    IT.  AT THE PRESENT TIME, THE COMBINATION OF THE COURT'S

18    EARLIER PROTECTIVE ORDER AND THE CLARIFICATION TODAY DOES

19    THAT.

20           WHAT CAME UP IN THE HEARING TODAY WAS JUST HOW HIS

21    WILLINGNESS, FOR EXAMPLE, TO MEET WITH HIS LAWYERS IMPACTED ON

22    WHETHER SHE THOUGHT HE WAS MAKING PROGRESS.  SO IT WASN'T

23    SUBSTANTIVE AT ALL.  IT WASN'T ANYTHING THAT GOES TO ANY OF

24    THE CHARGES.  I FIND IT DOESN'T PREJUDICE MR. LOUGHNER IN ANY

25    WAY.  IT IS SOMETHING THAT IN REASON AND LOGIC ONE WOULD TAKE

1    INTO CONSIDERATION IN MAKING A DETERMINATION LIKE THE ONE THAT

2    WAS BEFORE THE COURT.

3         MS. CLARKE:  I THOUGHT SO, TOO.

4         THE COURT:  SO WE'LL LEAVE IT AT THAT.  IF YOU HAVE

5    SPECIFIC OBJECTIONS AT ANY POINT, THEN YOU CAN RAISE THOSE.

6    THIS IS WITHOUT PREJUDICE.

7         MS. CLARKE:  THANK YOU, YOUR HONOR.

8         THE COURT:  MS. FELDMEIER.

9         MS. FELDMEIER:  THE ONLY THING I'D LIKE TO CLARIFY,

10   YOUR HONOR, IS WHETHER DEFENSE COUNSEL IS EXPECTING VERBATIM

11   PROGRESS NOTES HERE.  AS DR. PIETZ INDICATED, SHE TALKS TO HIM

12   FOR AN HOUR SOMETIMES.

13        THE COURT:  LET ME BE CLEAR ABOUT THAT.  I'M NOT

14   DIRECTING THAT YOU DO ANYTHING DIFFERENT FROM WHAT YOU'VE DONE

15   OTHER THAN IF YOU HAVE DOCUMENTED SOMETHING IN A NOTE OR IN A

16   REPORT, THAT IN THE ORDINARY COURSE THAT SHOULD BE TURNED

17   OVER.  SO I'M NOT TELLING YOU TO CHANGE YOUR REGIMEN OR YOUR

18   SCHEDULE OR YOUR WAY OF THINKING ABOUT WHAT YOU WANT TO WRITE

19   DOWN, WHAT YOU OUGHT NOT WRITE DOWN, I WOULDN'T BE SO

20   PRESUMPTUOUS AS TO DO THAT.

21        IF THINGS ARE WRITTEN, THERE'S NOTHING IN THE

22   PROTECTIVE ORDER THAT I ISSUED NINE MONTHS AGO THAT PREVENTS

23   YOU FROM GIVING THAT INFORMATION OVER TO BOTH SIDES.  WE'LL

24   LEAVE IT TO THE LAWYERS TO DECIDE WHETHER THERE OUGHT TO BE

25   ADDITIONAL RESTRAINTS.

1          MS. FELDMEIER:  LASTLY, YOUR HONOR, THE QUESTION

2     OF ONE OF THE THINGS SHE TESTIFIED TO ON THE 19TH WAS, "I

3     PURPOSELY DIDN'T PUT THAT IN MY NOTE BECAUSE I KNEW YOU WERE

4     GOING TO GET IT."

5          WHAT SHE MEANT WAS "I DISCUSSED THE FACT THAT I WAS

6     GOING TO RECOMMEND TO YOU, MR. LOUGHNER, THAT I WAS GOING TO

7     EXTEND YOUR STAY HERE."  FROM A DOCTOR'S POINT OF VIEW, WE'RE

8     GETTING REALTIME NOTES, YOUR HONOR.  THIS IS VERY UNUSUAL.

9     WHAT THIS IS PUTTING THE DOCTOR IN A BIND, I FEEL, IS THAT I

10    THINK SHE SHOULD BE ABLE TO KEEP SOME STUFF UNTIL HER REPORT

11    COMES OUT.

12         SO, FOR EXAMPLE, SHE'S TAKING PERSONAL NOTES DURING

13    THAT -- LET'S SAY WE'VE GOT A COMPETENCY HEARING COMING UP.

14    SHE HAS TO EVALUATE HIM FOR A WEEK AND A HALF.  SHE'S TAKING

15    PERSONAL NOTES.  SHE SHOULD NOT HAVE TO BE SHOOTING THOSE TO

16    US.

17         THE COURT:  MS. FELDMEIER, I AGREE GENERALLY WITH

18    WHAT YOU'RE SAYING.  IF THE NOTES ARE GOING TO EVENTUALLY MAKE

19    THEIR WAY INTO A REPORT, THEN AT SUCH TIME AS THE REPORT IS

20    REVEALED AND DR. PIETZ HAS NO REASON TO HOLD BACK THE NOTES,

21    THEN THE NOTES SHOULD GO INTO THE REPORT.

22         I'M NOT TRYING TO ALTER THE SCHEDULE OF PRODUCTION

23    HERE THAT'S BEEN AGREED TO BY ALL THE PARTIES AND HAS WORKED

24    UP TO THIS POINT.  I DID WANT TO CLARIFY THAT BY MY ORDER, I'M

25    NOT RESTRICTING YOU FROM GIVING ANYTHING OVER THAT'S

1   PERTINENT.

2           MS. CLARKE:  THAT'S THE POINT, YOUR HONOR, IS THAT

3   DR. PIETZ BELIEVES THAT THE COURT'S ORDER CHANGED THE PRACTICE

4   THAT SHE MIGHT FOLLOW, AND THAT SHE IS RECORDING WHAT SHE'S

5   TALKING TO MR. LOUGHNER ABOUT AND THAT HE'S TALKING TO HER

6   ABOUT.

7           THE COURT:  YOU DID THAT AS OF TODAY, RIGHT, TO THE

8   EXTENT THAT THERE WAS THAT MISCONCEPTION CAUSED BY MY ORDER?

9           DR. PIETZ:  YES.

10          THE COURT:  SO I THINK YOU'LL GET EVERYTHING.

11          LOOK, THE PREMISE THAT I'VE BEEN OPERATING ON IS ONE

12  THAT WAS GUARANTEED EARLY ON BY MR. KLEINDIENST, WHICH WAS

13  THIS IS AN IMPORTANT CASE.  IT'S A CASE OF CONSEQUENCE.  HE'S

14  GOING TO GIVE EVERYTHING OVER.  HE'S NOT GOING TO HOLD THINGS

15  BACK.  I'M PROCEEDING ON THAT ASSUMPTION.  AND SO FAR I DON'T

16  THINK I'VE BEEN WRONG.  THE ONE MISCONCEPTION HERE, WE FIXED

17  IT.

18          MS. CLARKE:  I HOPE THAT MR. KLEINDIENST HAS NOTHING

19  TO DO WITH THE B.O.P. RECORDS.

20          THE COURT:  NO.

21          MS. CLARKE:  I UNDERSTAND --

22          THE COURT:  HE MEANT IT AS PART OF THE PROSECUTION

23  TEAM.  I THINK HE'S GOING TO ADHERE TO THAT.

24          MS. CLARKE:  I UNDERSTAND.

25          IS THE COURT GOING TO SET A SELL HEARING?

1          THE COURT:  WELL, I WANT A BRIEFING ON THAT.  THE

2     GOVERNMENT'S TAKING THE POSITION THAT I DON'T HAVE TO DO

3     ANYTHING MORE.  I'M NOT COMPLETELY COMFORTABLE WITH THAT.  I

4     THINK THERE OUGHT TO BE SOME ACKNOWLEDGMENT NOW THAT HE HAS

5     BEEN COMMITTED FOR RESTORATION.  TO MY KNOWLEDGE, THAT HE'S

6     BEING INVOLUNTARILY MEDICATED.

7          WHAT THE PARAMETERS ARE, MS. CLARKE, I'LL DECIDE

8     AFTER I GET FURTHER BRIEFING.  I'M TO LOOK FIRST IF THERE'S

9     SOME OTHER BASIS FOR THE MEDICATION.  I HAVE FOUND THAT, AND I

10    REPEATEDLY SAID THERE IS.  THE BUREAU OF PRISONS BELIEVES THAT

11    HE'S A DANGER TO HIMSELF AT THIS POINT, AND THEY'RE MEDICATING

12    HIM FOR THAT REASON.

13         IS THAT THE END OF THE INQUIRY OR DO I GIVE SOME

14    FURTHER CONSIDERATION TO THE OTHER SELL FACTORS?

15         I THINK THE PARTIES DISAGREE ON WHERE WE GO FROM

16    THERE.  FRANKLY, I'LL HAVE TO STUDY IT A LITTLE BIT MORE

17    BEFORE I MAKE THAT DETERMINATION.

18         SO WHAT I'D LIKE IS SOME BRIEFING THAT RECOGNIZES

19    NOW THE DIFFERENT POSTURE PROCEDURALLY THAT HE'S IN.  THE

20    CLAIM THAT WE ARE IGNORING PROCEDURAL RIGHTS THAT HE OTHERWISE

21    HAS RESONATES WITH ME TO A GREATER EXTENT NOW THAT I'M

22    INVOLVED IN SENDING HIM BACK TO A PLACE WHERE I KNOW HE'S

23    GOING TO INVOLUNTARILY MEDICATED.

24         UP TO THE POINT OF TODAY'S DECISION, THE DECISION TO

25    INVOLUNTARILY MEDICATE WAS MADE BY DOCTORS AT THE BUREAU OF

1    PRISONS.  I HAD NOTHING TO DO WITH THAT.  I DIDN'T STOP IT

2    BECAUSE MY READING OF THE CASE LAW SUGGESTS THAT THE SUPREME

3    COURT HAS DETERMINED THAT IF IT'S ON THE GROUNDS OF

4    DANGEROUSNESS, IT'S A DETERMINATION THAT SHOULD BE MADE BY

5    MEDICAL DOCTORS AT THAT FACILITY.

6         BUT, AS I SAID, THINGS HAVE CHANGED TODAY BECAUSE

7    I'M NOW SENDING HIM BACK FOR THE PURPOSE OF RESTORATION

8    KNOWING THAT HE'S GOING TO BE INVOLUNTARILY MEDICATED.  I

9    WONDER IF THAT IMPLICATES ANY OTHER SELL FACTORS.

10        MS. CLARKE:  THAT NARROW QUESTION -- WE BRIEFED

11   QUITE A LOT ABOUT OUR REQUEST FOR A JUDICIAL HEARING ON THE

12   MEDICATION ISSUES.

13        THE COURT:  MAYBE WHAT OUGHT TO HAPPEN IS YOU CAN

14   RESPOND TO THE GOVERNMENT'S POSITION.  THEY SAY, "JUDGE, LOOK

15   YOU'VE ALREADY RULED ON HARPER.  THAT'S THE END OF IT."

16        MS. CLARKE:  BUT YOU HAVEN'T RULED ON HARPER.  YOU

17   DEFERRED TO THE BUREAU OF PRISONS.

18        THE COURT:  WHAT I'VE SAID IS THAT THERE IS A

19   ANOTHER BASIS FOR HIM BEING MEDICATED THAT HAS NOTHING TO DO

20   WITH ME.  IT HAS TO DO WITH DANGEROUSNESS.  SO SOME

21   SUPPLEMENTAL BRIEFING.  AND BELIEVE ME, I'VE READ EVERYTHING

22   UNTIL MY EYES WERE BLURRY.  I COULD USE SOME ADDITIONAL

23   DIRECTION FROM THE PARTIES ON THIS ISSUE ABOUT WHETHER

24   ANYTHING ELSE HAS TO BE DONE REGARDING HIS SELL RIGHTS.

25        MS. FELDMEIER:  CAN WE SET A BRIEFING SCHEDULE, YOUR

1    HONOR?

2              THE COURT:  SURE.

3              MS. FELDMEIER:  JUST TO MAKE SURE WE'RE NOT MISSING

4    SOMETHING.

5              THE COURT:  NO, NO.  I THINK IT OUGHT TO BE DONE

6    FAIRLY QUICKLY.

7              HOW SOON CAN YOU GET YOUR PAPERS IN?

8              MS. KLEINDIENST:  I'VE ALREADY STATED THE

9    GOVERNMENT'S POSITION ON THIS.

10             MS. FELDMEIER:  HE DID.  IT'S EVEN SIMPLER THAN

11   THAT.  IT'S THE POSITION THAT IF YOU THINK YOU'D LIKE TO HOLD

12   A SELL HEARING, HOLD THE SELL HEARING AND STOP AT FACTOR 1.

13   IF YOU HOLD IT NOW -- IF THE DEFENDANT -- THIS IS THE ACTUAL

14   CAVEAT.  IF THE DEFENDANT HAS NOT CHALLENGED HARPER, YOU CAN

15   ACCEPT HARPER.

16             THE COURT:  THEY'RE NOT CHALLENGING HARPER?

17             MS. FELDMEIER:  NO.  THEY ARE.  I GUESS WHAT I'M

18   SAYING TO KEEP THE CASE LAW CLEAR, WHICH IS A JUDGE THEN GOES

19   TO A SELL HEARING.  THE JUDGE SAYS AFTER THE SELL HEARING, "I

20   FOUND THAT HE'S BEING PROPERLY MEDICATED UNDER HARPER."  SOME

21   DEFENDANTS SAY, "THAT'S FINE.  I'M DONE."

22             THE COURT:  THAT'S NOT GOING TO HAPPEN IN THIS CASE.

23             MS. FELDMEIER:  IT HAPPENS.  BUT THEN THAT'S A

24   SEPARATE HEARING.  THAT'S THE HARPER REVIEW HEARING.  SO WE

25   WANT TO KEEP THOSE THINGS SEPARATE, AND THAT'S OUR POSITION.

1          THE COURT:  THEY HAVE A DIFFERENT LEGAL POSITION ON

2     THAT.  THEY'VE SAID ALL ALONG THAT THEY BELIEVE THAT THERE ARE

3     ELEMENTS OF DUE PROCESS AT THIS POINT.  AND MAYBE WITH THE

4     COURT'S IMPRIMATUR, THEY CAN NOW FACTOR THIS INTO THE PURPOSE

5     OF RESTORATION.  I HAVEN'T ORDERED -- IT DIDN'T COME FROM ME

6     THAT HE NEEDS TO BE INVOLUNTARILY MEDICATED.

7          BUT I'M SENDING HIM BACK NOW.  I KNOW THAT HE IS

8     BEING INVOLUNTARILY MEDICATED.  I'M SAYING THAT RAISES A

9     QUESTION IN MY MIND.  IT'S A GAP BETWEEN THE TWO CASES THAT

10    I'D LIKE THE BENEFIT OF BRIEFING ON BEFORE I MAKE A FINAL

11    DECISION ABOUT THAT, THAT IT'S IN PLAY.

12         SO HOW LONG BEFORE YOU CAN GIVE ME A BRIEF AND I'LL

13    HAVE THE DEFENSE RESPOND?

14         MS. FELDMEIER:  DO YOU WANT HER TO RESPOND AND ME TO

15    REPLY?

16         THE COURT:  MS. CLARKE, WHAT DO YOU THINK?  THEY'VE

17    KIND OF STAKED OUT THEIR POSITION.  DO YOU WANT TO FILE A

18    BRIEF IN RESPONSE?  I KNOW I HAVE SOMETHING FROM THE DEFENSE

19    ON THIS ISSUE, BUT I'M NOT SURE IT EXACTLY TRACKS WHERE WE ARE

20    AT AS OF TODAY.  COULDN'T HAVE KNOWN, FOR EXAMPLE, WHAT THE

21    RULING WOULD BE TODAY.

22         MS. CLARKE:  RIGHT.  I MEAN, OTHER THAN THE FACT

23    THAT WE REPEATEDLY ASKED FOR A JUDICIAL HEARING AND LAID OUT

24    THE GROUNDS FOR IT.

25         THE COURT:  YES.

1      MS. CLARKE:  I GUESS WE'LL REPLY QUICKLY, BY NEXT

2  WEEK.

3          THE COURT:  TODAY IS THE 28TH.

4      MS. CLARKE:  WE'LL FILE IT AS QUICKLY AS WE CAN.

5          THE COURT:  THEN I'LL SEND OUT A SCHEDULING ORDER

6  BASED ON THAT.

7      MS. CLARKE:  JUDGE, WE DO HAVE ANOTHER INVOLUNTARY

8  MEDICATION MOTION PENDING NOW.

9          THE COURT:  I'VE REVIEWED THAT AS WELL.

10          MS. CLARKE:  THE GOVERNMENT HAS RESPONDED TO THAT.

11          THE COURT:  YES.  IT HAS TO DO WITH WHAT WE CALL THE

12  THIRD HARPER HEARING, WHAT'S BEEN REFERRED TO AS THE THIRD

13  HARPER HEARING?

14          MS. CLARKE:  RIGHT.

15          THE COURT:  HERE'S MY POSITION ON HARPER.  HERE IS

16  MY POSITION ON THAT.  AND I EMPHASIZE I'M NOT BEING STUBBORN,

17  BUT I LOOKED AT THE CASES, AND I UNDERSTAND THAT THE MOTIONS

18  PANEL DISAGREED WITH WHAT I SEE AS THE ISSUE.

19          THERE WASN'T ANYTHING TODAY?

20          MS. CLARKE:  I DON'T KNOW.  YOU'VE KEPT IT IN THIS

21  COURTROOM FOR QUITE A WHILE.

22          THE COURT:  SOMEBODY HAS KEPT SOMEBODY HERE.

23          MY VIEW IS THIS:  MR. CAHN RAISED A PROCEDURAL

24  PROBLEM WITH THIS SO-CALLED SECOND HARPER HEARING.  I THINK

25  THAT IS MOOTED NOW BECAUSE THE WARDEN SAW THE SAME PROBLEM

1    WITH IT, AND HE ORDERED A NEW HEARING.

2          MY UNDERSTANDING BASED ON THE BRIEFING IS THAT THE

3    NEW HEARING WENT FORWARD WITH THE STATEMENT MS. CHAPMAN MADE

4    BEING PART OF THE HEARING RATHER THAN AFTER THE FACT.  IT WAS

5    CONSIDERED.  AND INVOLUNTARY MEDICATION ON THE GROUND THAT HE

6    WAS DANGEROUS TO OTHERS AS WELL AS DANGEROUS TO HIMSELF WAS

7    AUTHORIZED AGAIN.

8          I BELIEVE THAT THE STATE OF THINGS IS THE WARDEN HAS

9    UPHELD THAT DETERMINATION AT THIS POINT.  MY VIEW CONTINUES TO

10   BE, MS. CLARKE, THAT BECAUSE IT'S PREDICATED ON THE GROUND OF

11   DANGEROUSNESS AND REALLY HAS NOTHING TO DO WITH HIS COMPETENCY

12   TO STAND TRIAL, THAT THAT'S AN ISSUE WITH THE BUREAU OF

13   PRISONS AND THE PHYSICIANS THERE, AND FOR GOOD REASON.

14         IF NOTHING MORE, I THINK THE HEARING TODAY HAS

15   STRENGTHENED MY VIEW THAT PEOPLE LIKE DR. PIETZ, WHO HAVE

16   MEDICAL TRAINING, WHO HAVE EXPERIENCE, WHO HAVE INTERACTION

17   WITH MR. LOUGHNER ON A DAILY BASIS ARE IN THE BEST POSITION TO

18   ASSESS WHETHER HE'S A DANGER TO HIMSELF AND TO ASSESS HIS

19   INSTITUTIONAL NEEDS.

20         I KNEW NOTHING, FOR EXAMPLE, ABOUT THE SUICIDE NOTE.

21   YOU FOLKS ARE GETTING COPIES OF THE PROGRESS REPORTS.  I ONLY

22   GET WHAT YOU FILE WITH ME.  SO I KNEW NOTHING ABOUT THIS.  I

23   SAY THAT TO ILLUSTRATE THE POINT THAT I'M ILL-EQUIPPED TO MAKE

24   A DETERMINATION ABOUT HIS DANGEROUSNESS ON AN ONGOING BASIS.

25         I BELIEVE UNDER HARPER, IRRESPECTIVE OF HIS STATION

1    IN THE CRIMINAL JUSTICE PROCESS, WHETHER CONVICTED OR A

2    PRETRIAL DETAINEE, THAT THE SUPREME COURT HAS COMMITTED THAT

3    DETERMINATION TO THE BUREAU OF PRISONS AND ITS DOCTORS.

4         I THINK THERE'S ACKNOWLEDGEMENT OF THAT IN THE CASE

5    LAW.  THE OPINION THAT I CITED EARLIER WITH JUDGE REINHARDT,

6    SAID, LOOK, HARPER IS MORE OBJECTIVE BECAUSE IT DEALS WITH

7    DANGEROUSNESS RATHER THAN ALL THE OTHER CONSIDERATIONS THAT

8    ARE IMPLICATED BY A SELL HEARING.

9         SO I SEE A DICHOTOMY BETWEEN THE REASON A DEFENDANT

10   MIGHT BE INVOLUNTARILY MEDICATED.  IF MY UNDERSTANDING IS HE

11   IS TO BE INVOLUNTARILY MEDICATED SO HE CAN BE RESTORED AND

12   STAND TRIAL, THEN THAT IMPLICATES THE TRIAL PROCESS ITSELF,

13   HIS DEMEANOR, HIS ABILITY TO ASSIST YOU, ALL THINGS THAT OUGHT

14   TO BE COMMITTED TO A JUDGE FOR A DETERMINATION.

15        IN CONTRAST, WHETHER HE'S DANGEROUS IN THE

16   INSTITUTION TO HIMSELF OR OTHERS IS PECULIARLY A DECISION FOR

17   THE JAILERS AND THE MEDICAL PROFESSIONALS HERE, NOT ME.

18   THERE'S NOTHING IN MY PORTFOLIO THAT QUALIFIES ME TO MAKE THAT

19   KIND OF DETERMINATION.

20        NOW, I'VE TAKEN THE POSITION THAT WHETHER THE CFR

21   WAS FOLLOWED, WHETHER THE DETERMINATION WAS ARBITRARY, THAT'S

22   THE REVIEW THAT FOLLOWS FROM A HARPER HEARING, AS FAR AS I'M

23   CONCERNED.  I'M FOLLOWING MORGAN, THE FOURTH CIRCUIT CASE ON

24   THAT.  IF YOU THINK THAT THERE WAS SOME PROCEDURAL DEFECT IN

25   THE THIRD HARPER HEARING, THEN YOU COME BACK TO ME.  IF YOU

1    THINK THE FINDINGS WERE ARBITRARY --

2              MS. CLARKE:  WE FILED ON THAT.  THAT'S BRIEFED AND

3    BEFORE THE COURT.

4              THE COURT:  I HAVE LOOKED THAT OVER.  I DON'T SEE

5    ANYTHING.  IN THE THIRD PROCEDURE, I AGREE WITH MR. CAHN BASED

6    ON THE PROFFER.  AND AS IT TURNED OUT, THE PROCEDURES REQUIRE

7    THAT IF HE WANTS TO HAVE A WITNESS, THAT WITNESS SHOULD BE

8    HEARD BEFORE THE DETERMINATION IS MADE.  SO IF THEY MADE THE

9    DETERMINATION AND THEN CALLED HIS WITNESS, THEN YOU MAY HAVE

10   INPUT.  THAT'S NO HEARING AT ALL.

11             I'M LESS CONVINCED THAT THE COURT, IN LOOKING INTO,

12   FOR EXAMPLE, THE ADEQUACY OF HIS REPRESENTATION THERE, HE

13   SAYS, YEAH, REMEMBER, I KNOW THAT THERE'S SOME LITIGATION ON

14   WHO SHOULD REPRESENT HIM.

15             THE PERSON THAT REPRESENTS HIM IS A SOCIAL WORKER

16   WHICH THE SUPREME COURT HAS APPEARED TO GIVE ITS BLESSING TO A

17   PERSON WITH THAT BACKGROUND BEING THE REPRESENTATIVE.  I DON'T

18   THINK HE HAS A RIGHT TO CHALLENGE THE ADEQUACY OF THE

19   REPRESENTATION IN THAT HEARING IN FRONT OF ME.  THAT'S A

20   MATTER FOR THE BUREAU OF PRISONS.

21             WITH ALL RESPECT AND UNDERSTANDING THE VIGOROUS

22   DISAGREEMENT WITH IT, THE DEFENSE HAS MY TAKE ON THINGS.  I

23   FIND THERE'S NO ARBITRARINESS IN THE THIRD HARPER HEARING AND

24   THAT THE MEDICATION GOING FORWARD, AT LEAST OF TODAY, IS

25   AUTHORIZED PURSUANT TO THE HARPER CASE.

1          MS. CABANILLAS:  YOUR HONOR, I AM SORRY.  I JUST

2     WANT TO SEE IF I COULD HAVE A MOMENT TO MAKE A COUPLE OF

3     COMMENTS TO AUGMENT THE RECORD.

4          THE COURT:  SURE.

5          MS. CABANILLAS:  I JUST WANTED TO ADD -- I HAVEN'T

6     READ THE PLEADINGS, BUT ONE THING THAT WASN'T ADDRESSED IS I

7     REMEMBER THAT THE DEFENDANT IS ALSO ASKING FOR A STAY OF

8     MEDICATION.  YOU REMEMBER THERE'S A STANDARD THAT APPLIES

9     THERE.  AND THE NINTH CIRCUIT HAD APPLIED THAT IN THAT MOTION.

10    THE MOTIONS PANEL APPLIED THAT WHEN THEY GRANTED THE STAY

11    BEFORE.

12         I WANTED TO JUST DISCUSS THE STANDARDS FOR A STAY IN

13    THE EVENT THAT THE DEFENSE IS TO ARGUE LATER TO THE NINTH

14    CIRCUIT THAT YOU ABUSED YOUR DISCRETION IF YOU WERE TO DENY

15    THE STAY.

16         THE COURT:  IT CONTINUES TO BE PERPLEXING TO ME.  I

17    DON'T KNOW HOW I CAN ABUSE MY DISCRETION ON AN INJUNCTION WHEN

18    I REACHED THE MERITS.  THE WHOLE PURPOSE OF THE INJUNCTION IS

19    TO HOLD EVERYTHING TO THE STATUS QUO SO THE COURT CAN CONSIDER

20    THE MERITS.  IN EACH INSTANCE NOW, I'VE GOTTEN TO THE MERITS.

21         AND SO THERE'S NO REASON -- THEY MAY SAY, "LOOK, WE

22    DISAGREE.  THIS IS A WEIGHTIER ISSUE THAN JUDGE BURNS THOUGHT.

23    SO WE'RE GOING TO GRANT THE STAY."  BUT ABUSE OF DISCRETION?

24         MS. CABANILLAS:  I JUST WANTED TO MENTION A FEW OF

25    THESE FACTORS JUST SO THE RECORD'S CLEAR THAT THE COURT

1    CONSIDERED THEM IN THE EVENT THE DEFENDANT ARGUES THAT YOU

2    ABUSED YOUR DISCRETION IN DENYING THE STAY.

3         FIRST HE HAS TO SHOW SUCCESS ON THE MERITS.  AGAIN,

4    IT'S THE PLAINTIFF, THE PERSON ASKING FOR A STOPPING OF THE

5    MEDICATION, WHO BEARS THIS BURDEN.

6         THE SECOND THING IS HE HAS TO SHOW THAT HE IS LIKELY

7    TO SUFFER IRREPARABLE HARM.  I MEAN, I THINK THAT'S BEEN BLOWN

8    OUT OF THE WATER TODAY.  FRANKLY, IT WOULD BE THE OPPOSITE;

9    THAT IF THEY WERE TO STOP THE MEDICATION, IT WOULD HARM HIM IN

10   RETURNING HIM TO THE DANGER TO HIMSELF STATE THAT HE EXISTED

11   IN BEFORE THEY MEDICATED HIM ON JULY 18TH AS THE COURT MAY

12   RECALL.

13        THAT FIRST QUESTION, WHETHER HE'S LIKELY TO SUCCEED

14   ON THE MERITS, I WOULD AGREE WITH YOUR HONOR THAT THE

15   CHALLENGES THAT THEY HAVE MADE TO THE HARPER 3 PROCEEDING HERE

16   WOULD NOT SUCCEED ON THE MERITS.

17        THE WHOLE QUESTION OF A JUDICIAL HEARING, OBVIOUSLY,

18   IS WITH THE NINTH RIGHT NOW.  WE WOULD SUBMIT THE COURT HAS

19   CONTINUALLY CORRECTLY RULED THAT THE BUREAU OF PRISONS DOES

20   NOT HAVE TO RECEIVE THE JUDICIAL BLESSING --

21        THE COURT:  WE'LL SEE.  THEY'RE GOING TO TELL US I

22   HOPE FAIRLY SOON.

23        MS. CABANILLAS:  SO AGAIN, WE WOULD SUBMIT THE COURT

24   HAS BEEN CORRECT JUST AS WE ARGUED AT THE NINTH CIRCUIT AND

25   WE'RE HOPEFUL THAT THEY'LL DEFER TO THIS COURT ON THAT ISSUE.

1          SO IN TERMS OF THE LIKELIHOOD HE'LL SUFFER

2     IRREPARABLE HARM, NOT ONLY DID WE HEAR THAT STOPPING THE

3     MEDICATION WOULD ACTUALLY BE DETRIMENTAL TO MR. LOUGHNER, BUT

4     WE ALSO HEARD -- AND THIS GETS TO WHY MR. KLEINDIENST WAS

5     ASKING THOSE QUESTIONS OF DR. BALLENGER.  THE SIDE EFFECTS

6     THAT WERE CITED IN THOSE CASES OF RIGGINS AND HARPER, THOSE

7     WERE FIRST-GENERATION MEDICATIONS.

8          SO WHEN THE NINTH CIRCUIT IN ITS ORDER AT PAGE 3 IS

9     TALKING ABOUT THE SIDE EFFECTS, WE WOULD SUBMIT THAT THAT IS

10    NOT ON POINT.

11         THE COURT:  I SAW THAT IN THE AMERICAN PSYCHIATRIC

12    ASSOCIATION IN THEIR AMICUS BRIEF, THEY TOOK ISSUE WITH THAT,

13    TOO, AND SAID THAT'S INCORRECT.  IT'S AN INCORRECT

14    UNDERSTANDING OF THE STATE OF MEDICINE AT THIS POINT.

15         SO I GET ALL THAT.  SUFFICE IT TO SAY, AT THIS POINT

16    I JUST REACHED THE MERITS.  I DIDN'T CONSIDER THE OTHER

17    EVIDENCE ABOUT IRREPARABLE HARM.  I AGREED WITH YOU.  I FEAR

18    WHAT WOULD HAPPEN TO MR. LOUGHNER IF HE WILL BE TAKEN OFF THE

19    MEDICATION AGAIN.

20         I THINK ONE OF THE DOCTORS, DR. BALLENGER, DESCRIBED

21    IT AS INHUMANE.  I READ SOME OF THE ACCOUNTS OF WHAT HE WAS

22    GOING THROUGH -- MR. LOUGHNER WAS GOING THROUGH ONCE THE

23    MEDICATION WAS STOPPED, AND ANY HUMAN BEING WOULD WANT TO

24    REACH OUT AND TRY TO HELP HIM, RELIEVE HIM OF THOSE SYMPTOMS.

25         I THINK YOU'VE GOT A SUBSTANTIAL RECORD HERE ON THAT

1    POINT.  I DON'T NEED TO MAKE A FINDING ON THAT GIVEN THAT I

2    DIDN'T FIND ANY MERITS.

3            MS. CABANILLAS:  I THINK WHAT YOU JUST SAID ALSO

4    SUPPORTS THAT HE IS NOT LIKELY, THEREFORE, TO SUFFER

5    IRREPARABLE HARM.

6            AND THE EQUITIES, THEN, IS THE LAST PART.  I THINK

7    THE EQUITIES ARE IN FAVOR OF CONTINUING THE MEDICATION.

8            THE COURT:  I'VE CONSIDERED THOSE WINTER FACTORS

9    AGAIN.  LIKE I SAID, I CUT TO THE CHASE BY GETTING TO THE

10   MERITS OF THE FINDING.  IN MY VIEW, AT THIS POINT AT LEAST,

11   THERE IS A DICHOTOMY THAT I DISCUSSED WITH MS. CLARKE, AND

12   IT'S ON THAT BASIS THAT I DECLINE TO STOP THE MEDICATION

13   AGAIN.

14           MS. CLARKE, YOU MADE ANOTHER ARGUMENT IN THE PAPERS

15   THAT I DIDN'T ADDRESS THAT I SHOULD ADDRESS, WHICH IS THAT

16   THIS VIOLATES THE STAY THAT THE NINTH CIRCUIT BOTH PUT IN

17   EFFECT AND KEPT IN EFFECT PENDING AN APPEAL.

18           I THINK IT'S DIFFERENT NOW.  THERE WERE ISSUES ABOUT

19   PROTECTION OF PROPERTY, DANGEROUSNESS TO OTHERS, AND ALL THOSE

20   THINGS WERE BUNDLED UP IN THE FIRST HARPER DETERMINATION.

21           NOW THEY'VE CHECKED THE APPROPRIATE BOXES HAVING TO

22   DO WITH DANGER TO SELF.  AND REALLY, THAT WAS THE PREDICATE

23   FOR THE EMERGENCY MEDICATION THAT THEY DID WHICH I UNDERSTAND

24   THE DEFENSE CHALLENGED IN THE NINTH CIRCUIT AND THE NINTH

25   CIRCUIT DECLINED TO GET INVOLVED, AND THE ORDERED THE BUREAU

1    OF PRISON, FOR EXAMPLE, OR THE GOVERNMENT TO SHOW CAUSE WHY

2    THEY WERE MEDICATING HIM WHEN THERE WAS A STAY IN EFFECT.

3           SO I DON'T KNOW WHAT TO MAKE OF THAT OTHER THAN THE

4    NINTH CIRCUIT APPARENTLY DIDN'T THINK THAT THE EMERGENCY

5    MEDICATION WAS UNAUTHORIZED UNDER THE STAY.  AND THERE'S A

6    DIFFERENT BASIS FOR THE MEDICATION AT THIS POINT, VERY

7    DIFFERENT.

8           I KNOW THAT THIS OCCUPIED SOME OF THE TIME IN ORAL

9    ARGUMENT BECAUSE I LISTENED TO THE TRANSCRIPT OF ORAL

10   ARGUMENT.  I KNOW THAT JUDGE BERZON TALKED WITH MR. CAHN

11   EXTENSIVELY ABOUT WHETHER THE WHOLE THING HAD BEEN MOOTED BY

12   THE THIRD HARPER DETERMINATION.

13          THE POINT IS THAT HE'S BEING MEDICATED NOW ON A

14   BASIS DIFFERENT FROM THE BASIS THAT WAS CHALLENGED BEFORE THE

15   NINTH CIRCUIT MOTIONS PANEL AND THAT IT LED TO THE ISSUE OF

16   THE STAY.  SO I DON'T THINK IT'S CONTROLLED BY THAT ORDER.

17          THAT'S MY RULING ON THAT.

18          MS. CABANILLAS:  AND YOUR HONOR'S RULING IS

19   SUPPORTED BY PAGE 4 OF THE NINTH CIRCUIT'S ORDER, WHICH

20   ACTUALLY SAYS, "AND THE RECORD SHOWS THAT LOUGHNER IS NOT A

21   DANGER TO HIMSELF."  THAT'S WHAT THEY FOUND ON JULY 12TH.  OF

22   COURSE, NOW THAT'S CHANGED, AND HE IS.

23          THE COURT:  THESE ARE DIFFICULT ISSUES.  LIKE I

24   SAID, I CONTINUE TO READ IT, GO OVER IT.  I'M NOT FIXED IN A

25   POSITION.  EVERY TIME I READ IT, I COME BACK TO THE SAME

1    CONCLUSION.  SO I'M TRYING NOT TO BE STUBBORN.  I'M BEING

2    MINDFUL THAT JUDGES ON A MOTION PANEL, APPARENTLY IT GAVE THEM

3    MORE PAUSE THAN IT DID ME AFTER I CONSIDERED THE WHOLE THING.

4    BUT I CONTINUE TO READ HARPER AND SELL.

5              SO THE MOTION TO STOP THE MEDICATION IS DENIED.

6              MS. CABANILLAS:  THANK YOU, YOUR HONOR.

7              MS. FELDMEIER:  JUST ONE HOUSEKEEPING MATTER.

8              ON THE BRIEF THAT COUNSEL IS GOING TO FILE NEXT

9    WEEK, WE'D ASK FOR AN OPPORTUNITY TO REPLY TO THAT.

10             THE COURT:  TWO DAYS AFTER IT'S RECEIVED.

11             LET'S SEE.  TODAY'S WEDNESDAY; RIGHT?  YOU HAVE YOUR

12   BRIEF TO ME BY NEXT WEDNESDAY, AND THE GOVERNMENT CAN RESPOND

13   BY FRIDAY CLOSE OF BUSINESS.  AND I'LL HAVE A SCHEDULING ORDER

14   OUT BY THE FOLLOWING WEEK, I HOPE MONDAY, MAYBE TUESDAY.

15             MS. CLARKE:  IF WE CAN BEAT THAT, THEY'LL GET

16   TWO DAYS.

17             THE COURT:  THAT'S RIGHT.  AND THEN I'LL MOVE THINGS

18   ALONG QUICKER.

19             I WANT TO EMPHASIZE TIME IS OF THE ESSENCE ON THIS

20   BECAUSE I THINK MORE CLOSELY IMPLICATED ARE THE ARGUMENTS THAT

21   I HAVE REJECTED SO FAR ABOUT THE DEFENDANT'S DUE PROCESS

22   RIGHTS NOW THAT I'M PART OF THE EQUATION THAT'S COMMITTING HIM

23   TO A PLACE WHERE HE'S BEING INVOLUNTARILY MEDICATED.

24             MS. CLARKE:  WE WILL FILE AS SOON AS WE CAN.  THE

25   GOVERNMENT WILL HAVE TWO DAYS AFTER OUR FILING.

1          THE COURT:  THAT'S RIGHT.

2          I'LL GET A SCHEDULING ORDER OUT AS SOON AS POSSIBLE.

3          IS THERE ANYTHING ELSE THAT'S STILL ON THE TABLE

4     TODAY?

5          MR. KLEINDIENST:  I'D JUST MOVE IN DR. BALLENGER'S

6     CURRICULUM VITAE AND HIS AFFIDAVIT.

7          THE COURT:  I THINK THE AFFIDAVIT WAS EXHIBIT 6,

8     WHICH HAS BEEN RECEIVED.  NO OBJECTION TO 5.

9          MR. KLEINDIENST:  I THINK YOU MOVED BOTH OF THEM IN.

10          THE COURT:  THEY'RE BOTH IN.

11          LADIES AND GENTLEMEN, I WOULD LIKE TO THANK YOU.  I

12     KNOW THAT WE MOVED AT AN EXPEDITIOUS PACE TODAY.  I APPRECIATE

13     THAT YOU MISSED LUNCH TODAY AND WORKED HARD ALL AFTERNOON.  I

14     APPRECIATE YOUR ACCOMMODATING THE COURT'S SCHEDULE.

15          LET ME SAY SOMETHING.  I'M IN NO PARTICULAR HURRY

16     HERE, BUT I HAVE A FULL CASELOAD IN THE SOUTHERN DISTRICT OF

17     CALIFORNIA.  I DIDN'T GIVE UP ANY PORTION OF MY CASELOAD.  I'M

18     SITTING WITH THE NINTH CIRCUIT NEXT WEEK, SO I HAVE A FULL

19     PLATE.  IT WAS IMPORTANT TO ME TO FINISH THIS HEARING TODAY IF

20     THAT COULD POSSIBLY BE DONE.

21          SO IF I APPEARED TO BE IMPATIENT, I APOLOGIZE FOR

22     THAT.  I WANTED TO MOVE THIS ALONG AND KEEP FOCUSED ON WHAT

23     THE ISSUES WERE TODAY.  I APPRECIATE YOUR PROFESSIONALISM.

24          WE'RE IN RECESS.

25                         --OOO--

305

1

2

3

4          I HEREBY CERTIFY THAT THE TESTIMONY

5          ADDUCED IN THE FOREGOING MATTER IS

6          A TRUE RECORD OF SAID PROCEEDINGS.

7

8          S/EVA OEMICK            10-5-2011

9          EVA OEMICK                    DATE

10         OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION