# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br>vs.<br><br>Jared Lee Loughner,<br><br>　　　　　Defendant. | CASE NO. 11cr0187 TUC LAB<br><br>**ORDER ON *SELL* HEARING** |

## I.　Introduction

Following a hearing in Tucson on September 28, 2011, the Court extended the defendant's commitment to FMC Springfield for a period of four months. (Dkt. No. 343.) Before that date, the formal purpose of his commitment to FMC Springfield was *evaluative*. Specifically, the purpose was "to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward." 18 U.S.C. § 4241(d)(1). Now, however, the purpose of the defendant's commitment is officially *restorative*. Rather than just *evaluate* the defendant's mental condition, the FMC Springfield staff has been directed by the Court to treat the defendant with the aim of restoring him to competency to stand trial. 18 U.S.C. § 4241(d)(2)(A).

Because the FMC Springfield medical staff has decided that the defendant's mental illness poses a danger to himself and others, they have been medicating him involuntarily with antipsychotic drugs in compliance with *Washington v. Harper*, 494 U.S. 210 (1990). The decisions to medicate the defendant — there have been three *Harper* hearings so far, and

one emergency hearing — were made administratively pursuant to 28 C.F.R. § 549.46. Consistent with *Harper* and the federal regulations implementing that decision, the Court was neither consulted nor asked to approve the staff's decisions to medicate the defendant. Nevertheless, the defense has repeatedly requested that the Court conduct a hearing on the merits of the medication decisions pursuant to *Sell v. United States*, 539 U.S. 166 (2003). The defense has argued that the Government must establish that the medication regimen complies with the *Sell* requirements: (1) that important governmental interests are at stake; (2) that involuntary medication is substantially likely to render a defendant competent without having side effects that will interfere significantly with his ability to assist his counsel; (3) that involuntary medication is necessary to restore the defendant to competency, and that alternative, less intrusive treatments are inadequate; and (4) that the drugs administered are medically appropriate. *Id*. at 180–181.

This Court has previously determined that *Sell* does not apply when, as here, the decision to involuntarily medicate a defendant is made by prison doctors to abate that defendant's dangerousness. Instead, the Court has relied on *Harper* and *United States v. Morgan*, 193 F.3d 252 (4th Cir. 1999), both of which suggest a clear distinction between involuntarily medicating a defendant because he is dangerous on the one hand, and involuntarily medicating him to restore his competency to stand trial on the other. Following *Morgan*, the Court has reviewed the FMC staff's decision to medicate the defendant for arbitrariness. (*See* Dkt. Nos. 252, 306 at 2–3, 343 at 4–5.) With respect to the latest decision to medicate the defendant, which was made by FMC doctors on September 15, 2011 and upheld by the Associate Warden on September 21, 2011, the Court found that FMC personnel complied with the proper procedural protocol and that their decision had some basis in fact. It was therefore not arbitrary.

However, having extended the defendant's commitment to FMC Springfield for the express purpose of restoring him to trial competency, the Court has reconsidered whether the defendant is now entitled to some form of a *Sell* hearing. More specifically, the Court has considered whether shifting the aim of the defendant's commitment from evaluation to

restoration also justifies shifting the procedural protocol for involuntarily medicating him with antipsychotic drugs. The Court explained its concerns at the conclusion of the September 28 hearing in Tucson:

> This is a significant change, I think, in at least the legal status of the defendant.
>
> I'm now committing him for the purpose of restoration. No more evaluation. It changes today with this ruling. He's being committed for another four months for the purpose of restoration.
>
> I'm committing him at a time that I know that they're continuing to treat him with medication that he declines to take. He's passively resisting, which means they tell him "Either you have to do this or we'll give you a shot and forcibly inject you." In the face of that, he comes and takes the medicine.
>
> I think this is a very different situation from what has existed to this point. I'm now telling them to continue to restore him. I think we're right up against *Sell*. And the reason I asked the parties to be ready to speak to this is I think some form of a *Sell* hearing or an acknowledgment needs to take place here.
>
> What the parameters of that hearing are I'm less clear about. As I read *Sell*, you look first at whether he'd be medicated on another basis. If the answer is yes, perhaps, that's the end of the inquiry. Maybe not. Maybe the Court is also to be concerned with the other factors under *Sell*.

(Dkt. No. 354 at 281.) The Court asked the parties on September 28 to brief the issue, which they have now done.[1]  (Dkt. Nos. 355, 357.)

---

[1] In its motion to stay the defendant's return to Springfield, the defense implied that the Court initially favored a prompt *Sell* hearing before extending the defendant's commitment, and subsequently "took a different turn" and "suggested that it could simply authorize the extension first and address the legal problems later (by holding what it termed a '*Sell*' hearing)." (Dkt. No. 345 at 3–7.) This misrepresents what the Court said and what the Court wrote in its orders.

In its September 1 order, the Court set a hearing on the question of whether to extend the defendant's commitment to FMC Springfield. In the order, the Court said, "The parties should be prepared at the hearing to state their positions regarding the necessity of scheduling a *Sell* hearing if the BOP contemplates accomplishing restoration of the defendant's competency by involuntarily medicating him." (Dkt. No. 309 at 3.) The order further suggested the Court would "reset a future date for a *Sell* hearing, *if necessary*, and for determining whether the defendant has been restored to competency." (*Id.* (emphasis added).) In context, the clear implication of the Court's statement was that a *Sell* hearing may be unnecessary in the first place, or very limited in scope, considering that the defendant is now being medicated, legitimately in the Court's view, pursuant to *Harper*.

The defense claims that in the September 19 order "the Court again expressed its concerns about extending commitment without addressing the concerns required under *Sell*

**II.     Discussion**

The Government's position is that no *Sell* hearing is required because the defendant is now being medicated pursuant to *Harper* and its implementing regulation, 28 C.F.R. § 549.46, on the ground that he is dangerous to himself and gravely disabled. (*See* Dkt. No. 324.) *Sell*, itself, appears to support the Government's argument. That decision, which imposes a heightened, four-part standard for involuntary medication orders, is limited to medication *solely* intended to render an incompetent defendant competent. *Sell*, 539 U.S. at 185.[2] Indeed, *Sell* explicitly instructs courts to first determine whether the involuntary medication of an incompetent defendant may be warranted on other grounds, such as dangerousness under *Harper*:

---

*v. United States*—which would include consideration of . . . fair trial rights and medication for competency purposes pursuant to a treatment plan . . . ." (Dkt. No. 345 at 5.) That's inaccurate, and in fact the defense supports such a misleading synopsis of the Court's September 19 order only by omitting the following critical paragraphs from the excerpt it quoted:

> The next question is what's the nature of the *Sell* hearing. And this is where I need some additional guidance, I think, from the parties. *Sell* indicates that the first step among the considerations is to determine whether involuntary medication is justified on some other basis, for example, *Harper*. I found that it is.
> So the question is do we go any farther than that if we reiterate my finding that . . . he can be involuntarily medicated because of dangerousness, either to himself or others.

(Dkt. No. 320 at 6–7.) In contemplating a *Sell*-type hearing, then, the Court in no way suggested that it would require the Government to actually satisfy the *Sell* factors to justify the defendant's ongoing involuntary medication. Nor did the Court say that it would take those factors into account in any way in extending the defendant's commitment to FMC Springfield. The Court reiterated its uncertainty about the actual relevance of *Sell* during the September 28 hearing. (*See* Dkt. No. 354 at 281.)

The defense also wrongly ascribes to the Court the view "that it could postpone undertaking *Sell*-type considerations until *after* authorizing such a commitment." (Dkt. No. 345 at 6.) The Court never suggested that "*Sell*-type considerations" would necessarily be addressed going forward. Rather, as the full, undistorted passages from the record demonstrate, the Court's question for the parties was whether there needed to be a *Sell* hearing at all, and if so, what the scope of that hearing should be considering that the defendant is being medicated on dangerousness grounds under *Harper*.

[2] BOP regulations also reflect the view that a *Sell* hearing is appropriate only when the sole justification for medicating an incompetent defendant is to restore him to competency to stand trial. *See* 28 C.F.R. § 549.46(b)(2) ("Only a Federal court of competent jurisdiction may order the involuntary administration of psychiatric medication for the sole purpose of restoring a person's competency to stand trial.").

> We emphasize that the court applying these standards is seeking to determine whether involuntary administration of drugs is necessary significantly to further a particular government interest, namely, the interest in rendering the defendant *competent to stand trial. A court need not consider whether to allow forced medication for that kind of purpose, if forced medication is warranted for a different purpose, such as the purpose set out in Harper related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk.* There are often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative grounds *before* turning to the trial competence question . . . .
>
> *If a court authorizes medication on these alternative grounds, the need to consider authorization on trial competence grounds will likely disappear* . . . . We consequently believe that a court, asked to approve forced medication of drugs for purposes of rendering a defendant competent to stand trial, should ordinarily determine whether the Government seeks, or has first sought, permission for forced administration of drugs on these other *Harper*-type grounds; and if not, why not.

*Id.* at 181–83 (emphasis added). The Ninth Circuit has acknowledged the distinction that *Sell* draws between involuntary medicating a defendant on grounds of dangerousness and medicating a defendant for the purpose of restoring competency, and it has emphasized that "*Sell* orders are disfavored" and that the Supreme Court "clearly intends courts to explore other procedures, such as *Harper* hearings (which are to be employed in the case of dangerousness) before considering involuntary medication orders under *Sell*." *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1137 (9th Cir. 2005); *see also United States v. Hernandez-Vasquez*, 513 F.3d 908, 914 (9th Cir. 2008) ("Accordingly, prior to undertaking the *Sell* inquiry, a district court should make a specific determination on the record that no other basis for forcibly administering medication is reasonably available.").

Here, the defense concedes it "never requested a *Sell* hearing as such–that is, a hearing seeking permission for the government to forcibly medicate Mr. Loughner for the purpose of competency restoration." (Dkt. No. 345 at 6 n.8.). But it has repeatedly advanced the argument that, because the defendant is a pretrial detainee, the four *Sell* factors must be applied as a matter of due process. It argues, now, that the factors must be grafted onto the question of the legitimacy of the defendant's ongoing medication pursuant to *Harper*, and

even onto the decision whether to extend his commitment to FMC Springfield:

> To be clear, the defense position is that to justify the twin invasions of Mr. Loughner's liberty — forcible medication and recommitment for purposes of restoration of competency — the court must make several findings: First, the court must find that there exists a substantial probability that Mr. Loughner will be restored to competency within a reasonable period of time; second, that it is substantially unlikely that the means employed will deprive him of a fair trial; third, that the means employed will either advance a substantial government interest or, considering less intrusive means, are essential to the safety of Mr. Loughner or others; and fourth, that the means employed are medically appropriate.

(Dkt. No. 355 at 2.) However, no case directly supports the defense's contentions, and in fact *Harper* and *Sell* require different levels of due process protection because they deal with very different interests on the part of the government in involuntary medicating an inmate.

In *Harper*, the Supreme Court recognized that individuals have a constitutionally protected liberty interest in "avoiding the unwanted administration of antipsychotic drugs." 494 U.S. at 221. It also recognized, at the same time, a prison's significant interest "in providing appropriate medical treatment to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others." *Id.* at 236. The *administrative* process the Supreme Court found a dangerous inmate is due in *Harper* — and that is now codified in 28 C.F.R. § 549.46 — is best viewed as an accommodation of these interests. Moreover, nowhere in the *Harper* decision is it suggested that this accommodation turns on where in the criminal justice process a defendant finds himself, *i.e.*, whether he is a pretrial detainee, or is awaiting sentencing, or is serving a sentence. And sensibly so: a mentally ill inmate can pose a danger to himself, to others, and to the prison environment regardless of the stage of his case. The inmate's interest in avoiding involuntary medication and the prison's interest in inmate health and safety are constants.[3]

---

[3] The defense's rebuttal to this point has always been that the FMC's staff's dangerousness determinations under *Harper* are compromised by its concomitant directive to restore the defendant to competency under 18 U.S.C. § 4241(d). The Court has never found any evidence that the FMC staff is medicating the defendant under *Harper* just to avoid a more stringent *Sell* hearing, and it rejects the defense's unsupported accusation that this is going on. The FMC staff has no *obligation* to restore the defendant to competency, and indeed, the staff is free to report to the Court that the defendant cannot be restored or has not been restored within the time allowed.

In contrast to *Harper*, the inmate in *Sell* was assumed not to be dangerous. *Sell*, 539 U.S. at 185. When that is the case, the prison's interest in maintaining inmate health and safety drops out, leaving only the state's generic interest "in bringing to trial an individual accused of a serious crime." *Id.* at 180. That changes the due process calculus significantly. When the state's only interest in medicating a mentally ill inmate is to restore him to trial competency, the inmate's liberty interest in not being involuntary medicated dominates, and the four *Sell* factors must be considered. *Id.* at 179. But *Sell* didn't undercut the *Harper* formula for dealing with dangerous inmates in any way, and in fact, the Supreme Court held explicitly that the four factors needn't be considered "if forced medication is warranted for a *different* purpose, such as the purposes set out in *Harper* related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his own health gravely at risk." *Id.* at 181–82.

The defense has ignored this critical point in its repeated attempts to graft *Sell* onto the circumstances of this case, and to infuse the *Sell* factors into every intermediate stage of the competency restoration process. If the defense is right, and *Harper* has no application to pretrial detainees, then what is to be made of the explicit instruction in *Sell* that courts must first consider whether an inmate is being medicated pursuant to *Harper* before proceeding to consider the *Sell* factors? The clear implication of that directive is that the Supreme Court, in *Sell*, contemplated that a pretrial detainee could be incidentally restored to trial competency by being medicated on dangerousness grounds under *Harper*.

This Court has reconsidered *Harper, Sell*, *Rivera-Guerrero*, and *Hernandez-Vasqeuz*, and finds that this case fits into the category of cases in which there is no need for a full-blown *Sell* hearing because the defendant is already being medicated for other legitimate reasons. He is now being medicated, and indeed, was originally medicated, following a *Harper* hearing on the ground of dangerousness. The most recent *Harper* hearing, which took place on September 15, and which is now the operative justification for his medication, found him to be dangerous to himself on the related grounds that he is gravely disabled, i.e., unable to attend to his own basic needs, *and* actively engaging or likely to engage in conduct

that may result in physical harm to himself. The Court reviewed that determination for arbitrariness and found none. (Dkt. No. 343 at 4–7.)

While the Court has reconsidered the arguments advanced by the defense, the Court finds that the protocol for involuntarily medicating a dangerous inmate set out in *Harper* is operative here. Because doctors have made a *medical* determination in this case justifying the need for medicating Mr. Loughner under *Harper*, which the Court has reviewed and has concluded was not arbitrary, the defendant has received all of the process that he is due at this point. He is not entitled to have the Court give fuller consideration to other *Sell* factors, or make additional findings pursuant to *Sell*, at this time. Moreover, as the Court has already pointed out, there is, in all respects, an overlap between the findings the defense would have the Court make and the factors *Sell* requires courts to consider before ordering a non-dangerous defendant be involuntarily medicated to restore his competency to stand trial. Regardless, *Sell* is clear that if the Court finds that involuntary medication is currently justified on *Harper* grounds, it is not required to make further findings that take into account the additional *Sell* factors.

Although not required by *Harper*, the Court has nonetheless twice addressed the defense's concern that the antipsychotic medications the defendant is receiving will deny him a fair trial by compromising his awareness at trial and his ability to assist his lawyers. (*See* Dkt. Nos. 343 at 2 n.1, 347 at 2.) A defendant who "is unable to understand the nature and consequences of the proceedings against him," or cannot "assist properly in his defense," is not competent to stand trial. 18 U.S.C. § 4241(d). The Court has assured defense counsel that any lingering concerns about the defendant's appearance at trial or capacity to stand trial will be fully addressed if there is a future competency hearing.[4] The Court

---

[4] The Court has previously noted that *Sell* itself folds the side effects of medication into the competency analysis. *See Sell*, 539 U.S. at 185 ("Whether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence."); *see also id.* at 181 (blending question of whether drugs will render a defendant competent to stand trial with the question whether drugs will have side effects that interfere with defendant's ability to assist in his defense).
 Now, it may be that there are side effects of medication that, while they don't render

explained as much when it denied the defense's motion to stay the defendant's return to FMC Springfield:

> To be perfectly clear, the Court would not have found that the defendant can be restored to competency if it entertained any serious concern that the medication prescribed to restore him would be debilitating at trial. Implicit in the Court's oral recital of its finding that the defendant can be restored to competency was the recognition that the defendant must be — *and must appear to be* — able to grasp the proceedings and to assist his counsel in his defense.

(Dkt. No. 347 at 2–3.) The Court reiterates that it will consider the defense's concerns anew if and when there is an adversarial competency hearing in this case. (*See also* Dkt. No. 354 at 282–83.) Contrary to the defense's argument, 18 U.S.C. § 4241(d)(2)(A) does not require the Court to make a determinative, predictive finding *now* about what, if any, the *future* side effects of the defendant's medication will be. It is enough that the Court finds no clear cause for concern at the present time about deleterious side effects of the defendant's medication[5],

---

a defendant technically incompetent, nonetheless disadvantage him at trial and implicate his fair trial rights as well as the integrity of the trial process. *See Riggins v. Nevada*, 504 U.S. 127, 141–45 (1992) (Kennedy, J., concurring) (distinguishing between "some bare level of functional competence" and "competence to stand trial"). In his *Riggins* concurrence, Justice Kennedy expressed concern about antipsychotic drugs prejudicing a defendant "(1) by altering his demeanor in a manner that will prejudice his reactions and presentation in the courtroom, and (2) by rendering him unable or unwilling to assist counsel." *Id.* at 142. He reasoned that "the documented probability of side effects seems . . . to render involuntary administration of the drugs . . . unacceptable absent a showing by the State that the side effects will not alter the defendant's reactions or diminish his capacity to assist counsel." *Id.* at 143.
  The Court takes these concerns seriously — and notwithstanding the fact that *Riggins* was decided almost two decades ago, and that Justice Kennedy tempered his concerns with the acknowledgment that "[t]he state of our knowledge of antipsychotic drugs and their side effects is evolving and may one day produce effective drugs that have only minimal side effects." *Id.* at 145. But even then, the defense fails to explain why they shouldn't simply be folded into the prevailing competency standard and addressed at the time there is an adversarial competency hearing in this case. Its only argument is that the language of 18 U.S.C. § 4241(d)(2)(A) — particularly the words "the capacity to permit the proceedings to go forward" — requires that the Court make a predictive determination of what, if any, the side effects of the defendant's medication will be. (Dkt. No. 345 at 14.) That argument, however, can only succeed by reading *Sell* into § 4241(d) and the ongoing battle over the defendant's medication, which the Court has consistently and emphatically refused to do.

  [5] In its motion to stay the defendant's return to FMC Springfield, the defense alleged that its cross examination of the Government's witnesses on the subject of side effects was blocked by the Court. (Dkt. No. 345 at 7 n.10, 15.) This is, at best, overstatement.
  Dr. Pietz testified on direct examination that the defendant's daily dosage of

*and* that the Court will give fresh and full consideration to the defense's concerns before it makes any definitive finding that the defendant has been restored to competency. To the extent the defense argues that *Sell requires* the Court to engage in a predictive analysis of side effects, the Court reiterates its position that *Harper*, not *Sell*, is the operative case here.[6]

## III.   Conclusion

  Accepting the legitimacy of the doctors' conclusion that the defendant must be

---

Risperidone is timed to reduce the sedative side effects of the drug, that he is receiving Cogentin to reduce the side effects of the Risperidone, and that he is not exhibiting any side effects from his medication. (Dkt. No. 354 at 36–38.) On cross examination, Dr. Pietz testified that in the view of the defendant's treating psychiatrist a bout of abdominal pain and vomiting the defendant suffered was not a side effect of his medication. (*Id.* at 145.) Dr. Pietz said the same of the defendant's constant pacing, or akathisia, which the psychiatrist attributed to agitation and the defendant's underlying mental illness. (*Id.* at 146–48.) Finally, Dr. Pietz speculated that the defendant's flat affect was not a side effect of his medication, but rather is attributable to his depression, itself an indication of improved cognitive functioning. (*Id.* at 146.)

  The Government's second witness, Dr. Ballenger, testified extensively on direct examination about the reduced side effects of second versus first generation anti-psychotic drugs. (*Id.* at 190–201.) The only adverse side effect he identified in the defendant's medical records was "some sedation." (*Id.* at 222.) The Court suggested the defense's cross examination of Dr. Ballenger was "off track" not when it focused on side effects, but when it focused on whether schizophrenia can be cured or merely managed over time. (Dkt. No. 354 at 248.) The Court did say, at the time, "I didn't, frankly, understand it when Mr. Kleindienst got into side effects, which is not the subject of this hearing." But the fact is that the Court allowed testimony on side effects and did not prevent the defense from asking the Government's witnesses, in particular, about any side effects suffered by the defendant. After the Court interrupted the defense's cross examination of Dr. Ballenger, cross examination went on to address the sedative and cognitive side effects of the drugs being administered to the defendant. (*Id.* at 254–56.) The defense also asked Dr. Ballenger about the role of side effects in the subjects of a clinical study discontinuing their treatment with antipsychotic drugs, and the Court allowed the questioning. (*Id.* at 262.)

  [6] Moreover, the second *Sell* factor, which requires consideration of side effects, requires courts to "find that administration of the drugs is substantially unlikely to have side effects that will interfere with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Sell*, 539 U.S. at 181. Notably, *Sell* does not require courts to consider *other* side effects, such as those contemplated by Justice Kennedy in *Riggins* that may not render a defendant incompetent but may nonetheless disadvantage him at trial. It requires consideration of side effects only insofar as they may inform the competency issue.

  This makes sense. The defendant is presently incompetent to stand trial. There is no guarantee that he will become competent in the future. By asking the Court, now, to make a predictive — and potentially case-dispositive — finding about the manner in which the defendant's medication will impact his demeanor at some future time, the defense is seeking, prematurely, to terminate this case and extinguish the Government's interest in having the charges against the defendant resolved by a trial. While the Court takes seriously the defense's concerns about the defendant's appearance and capacity at trial, the time to address those concerns will come if and when the Government contends that the defendant's competency has been restored and he is fit to stand trial.

medicated to control his dangerousness, the Court asked the parties for guidance on whether it must nevertheless conduct a *Sell* hearing at this stage in the case, and if so, what the nature or extent of that hearing should be.  The Court sought this guidance based on the changed directive it had given to FMC Springfield to attempt to restore the defendant to competency.  Having now fully considered the matter, the Court concludes that there is no need for a full-blown *Sell* hearing to consider the merits of the medication decision.  Involuntary medication of the defendant in this case is justified under *Harper*, and *Sell* itself recognizes that this finding obviates the need for further inquiry.

The defense hasn't asked for a *Sell* hearing in the formal sense.  Instead, it again advances the argument that *Sell* principles must be grafted onto the pending issues in this case, namely the legitimacy of the defendant's ongoing medication pursuant to *Harper* and the bases for extending his commitment to FMC Springfield. The Court declines to blend *Sell* requirements into what, in the first instance, was, and continues to be a *Harper*-based determination.  The defense has cited no case, and the Court conceives of no persuasive argument, in support of the proposition that *Sell* factors control the determination of whether to extend the defendant's commitment to FMC Springfield.

To the contrary, the Court finds the case law clear that no *Sell* order is required if a defendant is being legitimately medicated on dangerousness grounds pursuant to *Harper*. These are the defendant's circumstances.  Accordingly, no additional *Sell* hearing need be held at this time.

**IT IS SO ORDERED.**

DATED: October 25, 2011

*[signature: Larry A. Burns]*

**HONORABLE LARRY ALAN BURNS**
United States District Judge