UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
U.S. MEDICAL CENTER FOR FEDERAL PRISONERS
SPRINGFIELD, MISSOURI

## FORENSIC UPDATE

| | |
|---|---|
| LOUGHNER, Jared Lee | Reg. No. 15213-196 |
| Court Order Number: | 11cr0187 TUC LAB |
| Date of Birth: | September 10, 1988 |
| Dates of Evaluation: | January 25 to April 24, 2012 |
| Date of Report: | April 24, 2012 |

### IDENTIFICATION AND REASON FOR REFERRAL

Jared Lee Loughner is a twenty-three-year-old, Caucasian male, who was referred to the United States Medical Center for Federal Prisoners (USMCFP) by Order of the Honorable Larry Alan Burns, United States District Judge for the District of Arizona. Following a judicial finding that he was not competent to proceed in his legal case, he was referred to this facility for the present evaluation, under the provisions of Title 18, U.S. Code, Section 4241(d). The purpose of this commitment was hospitalization for mental health treatment to be restored to competency. Mr. Loughner has been charged with Attempted Assassination of a Member of Congress (Count 1), Attempted Murder of a Federal Employee (Counts 3, 11, 13), Use, Carry, Brandish and Discharge of a Firearm in Relation to a Crime of Violence (Counts 2, 4, 6, 12, 14, 16, 19, 22, 25, 28, 31, 33, 35, 37, 39, 41, 43, 45, 47, 49), Murder of a Federal Employee (Counts 5, 8), Causing Death Through Use of a Firearm (7, 10, 17, 20, 23, 26, 29) Causing Death to Participants at a Federally Provided Activity (Counts 15, 18, 21, 24, 27), and Injuring Participants at a Federally Provided Activity (Counts 30, 32, 34, 36, 38, 40, 42, 44, 46, 48).

Prior to beginning the initial interview, Mr. Loughner was informed that the usual doctor/patient relationship did not exist, and that the information obtained from this evaluation was not confidential. He was also informed that a report would be prepared, submitted to the referring Court, and would be distributed to both the prosecuting and defense attorneys. In addition, Mr. Loughner was informed that formal clinical interviews would not be recorded via videotaping as they had been done during the previous evaluation. He was also told that should this change, he would be notified prior to

F.O.I EXEMPT

videotaping. He was told that my opinion was intended to assist the judge in determining if he had been restored to competency but that I could be called to testify at any of his future court proceedings regarding mental health issues. Mr. Loughner stated that he understood the conditions of the study. As the evaluation progressed, Mr. Loughner was routinely reminded of the conditions of this evaluation.

## SOURCES OF INFORMATION

The sources of information were documented in my reported dated January 25, 2012.

## BACKGROUND AND HISTORY ACCORDING TO THE DEFENDANT

The court has in it's possession my forensic report dated January 25, 2012, which includes information about Mr. Loughner's background. For the purposes of this report, that information will not be reiterated. The reader is referred to the background and history section in my report dated January 25, 2012.

## HOSPITAL COURSE FROM JANUARY 25 TO APRIL 24, 2012

Mr. Loughner was observed on the Mental Health Evaluation Unit of the U.S. Medical Center for Federal Prisoners for approximately twelve weeks. He was housed in the same area as he was during his previous evaluation. Because of the notoriety of Mr. Loughner's case, he was housed in a separate area within the facility and special procedures were implemented to manage him. He was placed in a double room that prevented other patients/inmates at this facility from interacting with him. One side of his room had a writing desk, bed, and shower. Although Mr. Loughner was on suicide watch for the entirety of this evaluation, most personal items were allowed in his room, i.e., plastic chair, television, pen, toothpaste, toothbrush, shampoo, towel etc. He was never allowed to have a shower curtain because it obstructed staff's view of him. No other inmates/patients at this facility had access to this shower. The other room was an inside recreation area; a stationary bike was placed in this room. Mr. Loughner was allowed to recreate in the inside recreation area at the officer's discretion. During the past twelve weeks, Mr. Loughner rarely recreated in this room.

Although Mr. Loughner had an outside recreation yard directly behind his room, he was never allowed in this area because there were a few sections of the outside recreation area where staff could not fully observe him. To circumvent this problem, we implemented a procedure that allowed him to recreate outside. Over the past twelve weeks, Mr. Loughner has gone outside several times. Other patients/inmates were present on the recreation yard while Mr. Loughner was using it. However, they were not recreating in close proximity to Mr. Loughner; each was in an individual area separated

by wire mesh. They could see each other and verbally interact with each other, but were separated physically. The area next to Mr. Loughner was always empty. Typically, there have been two to four patients recreating at the same time Mr. Loughner recreated.

Because Mr. Loughner was "a high profile" patient, he was monitored twenty-four hours a day. In addition, Mr. Loughner was maintained on suicide watch for the entire twelve weeks. A correctional officer maintained visual surveillance of him twenty-four hours a day. Every 15 minutes, the officer noted his activities in a suicide watch log.

As noted in my January 25 report, I made concerted efforts, given the limitations of his housing status, to involve him in activities that would target mental health treatment. For example, on October 13, 2011, he began attending group therapy. The group is a process group for severely mentally ill inmates who are living on a locked unit. Mr. Loughner was included in the group because it was conducted in close proximity to his living area. The group is considered a process group because participants are encouraged to generate topics and simply process them. The group leader keeps them on track. During each group, there were only four participants; this was because there were only four secure but separated areas for the participants. Each participant was placed in an individualized secure area. Although participants were able to verbally interact with one another, they were restricted from physical contact. Over the past twelve weeks, Mr. Loughner attended this group every other week. The group leader noted that he enjoyed attending the group but rarely spontaneously contributed to the discussions. He answered questions when prompted, and she noted that his contributions were relevant to the topic being discussed. He attended to the discussions and appeared to understand.

Mr. Loughner also began attending recreational therapy on November 9, 2011. The purpose of recreational therapy was to improve social skills and cognitive thinking. Most weeks, Mr. Loughner attended the recreational therapy group.

On February 2, 2012, Mr. Loughner began attending a competency restoration group. By April 24, 2012, he had attended nine sessions. The competency group is for defendants who have been adjudicated as incompetent to proceed. Because Mr. Loughner was housed in a separate area within the facility, and there was no possibility he would be moved to an open unit during this evaluation, he was unable to attend the competency restoration group routinely held for unlocked defendants. Thus, a competency restoration group was created for individuals who are currently housed on locked living units and unable to attend the traditional competency restoration group for unlocked defendants. The group was held in the indoor recreation area across from his living unit (this was the same area where Mr. Loughner attends his process and recreational therapy group). There were four participants, and each was in an individual

area separated by wire mesh. They could see each other and verbally interact with each other, but were separated physically.

As noted, Mr. Loughner attended nine competency restoration sessions. Each session addressed a different topic. During most sessions, Mr. Loughner was an active participant. He often spontaneously answered questions correctly and sometimes provided sophisticated responses. He appropriately asked questions when he did not understand the material. During sessions two though nine, the group leader reviewed materials from the previous session. Mr. Loughner's responses suggested he had attended to the group discussion, retained the information, and understood it. During the fifth session, the group leader reviewed material discussed during the fourth session, the meanings of four pleas. Mr. Loughner was "able to identify two constitutional rights that are waived when one accepts a plea agreement, prior to either right being discussed. The two he mentioned were "Fifth Amendment," and right to a trial. He had some trouble articulating what he meant by "Fifth Amendment," but appeared to grasp the underlying concept that related to avoiding self-incrimination." During the sixth session, he told the group leader that defendants often accept plea arrangements to receive a less severe penalty. He also indicated an understanding that accepting a plea arrangement meant forfeiting one's right to a jury trial.

In early March, Mr. Loughner indicated a desire to be assigned a job. Many patients at this facility work to earn money for commissary items. On March 30, Mr. Loughner was assigned two jobs. His job responsibilities included rolling towels and stamping returned addresses on blank envelopes. Most mornings Mr. Loughner was placed in the indoor recreation area across from his living unit and provided the necessary materials to complete his jobs.

At the writing of this report, Mr. Loughner's condition had significantly improved. During most interviews, he sat in a chair for long periods and talked. Although there were times that he would pace during group sessions, he rarely paced during my interviews with him. He was able to stay focused and attend to our conversations. There were a few times that he refused to talk to me. He continued to exhibit a healthy interest in his hygiene. He was able to recall information from previous conversations.

## MENTAL STATUS

Mr. Loughner was alert and oriented as to person, place, time, and situation. His speech was logical, linear, and coherent. He displayed the ability to be organized and goal-directed in his thinking. He was able to make eye contact and hold eye contact for long periods of time. There were also times that he chose to look down or away. Psychomotor movements were within normal limits; a few times he was observed pacing but much less frequently. He was cooperative during most interviews. However, there were also a few times that he refused to talk to staff. He rarely became tearful but

sometimes reported feeling depressed about his current situation. However, he reported feeling depressed much less frequently over the past twelve weeks. His eating and sleeping habits have improved. His thought content was more rational and organized during my interviews with him. He denied suicidal or homicidal ideation or intent; however his denial of suicidal thoughts was not always considered credible. He denied experiencing auditory hallucinations; there were a few times that staff suspected he was attending to internal stimuli because he would moan while pacing in his room. He denied experiencing visual hallucinations, and he was never observed attending to visual hallucinations. His hygiene and grooming were good, having substantially improved over the past months. There was no evidence he was consumed by paranoia or delusional beliefs. His psychotic symptoms seem controlled with medication.

## MEDICAL ISSUES

During this evaluation, Mr. Loughner met with a psychiatrist, Dr. Robert Sarrazin and was prescribed an antipsychotic and antidepressant medication. On January 18, 2012, Mr. Loughner was prescribed 8 mg of risperidone. This was increased to 3mg in the morning and 6mg in the evening on March 9, 2012. He also takes 450 mg Buproprion and 0.5 mg of Clonazepam in the morning and 2mg of Clonazepam in the evening.

## CLINICAL FORMULATION

As noted in my previous correspondences with the court, Mr. Loughner meets the diagnostic and exclusionary criteria for a diagnosis of Schizophrenia. Based on my clinical contacts with Mr. Loughner, information from his parents, information from Dr. Carroll's report dated May 9, 2011, and information from collateral sources, it remains my opinion that Mr. Loughner meets the diagnostic criteria for Schizophrenia, Undifferentiated Type.

The diagnosis of Undifferentiated Type is based on the following. The essential feature of the Paranoid Type of Schizophrenia is the prominence of delusions or hallucinations. Two criteria must be met: A) Preoccupation with one or more delusions or frequent auditory hallucinations, and B) none of the following is prominent: disorganized speech, disorganized or catatonic behavior, or flat or inappropriate affect. Prior to being medicated, Mr. Loughner displayed delusional thinking and attended to auditory hallucinations. However, he also exhibited disorganized speech and inappropriate affect. Consequently, the Paranoid Type should be excluded. The following three criteria must be met for Disorganized Type: 1) disorganized speech, 2) disorganized behavior, (lack of goal orientation...showering, dressing, preparing meals) and 3) flat or inappropriate affect. Mr. Loughner exhibited disorganized speech and inappropriate affect. However, he never exhibited disorganized behavior. Thus, the Disorganized Type should be excluded. Undifferentiated is a type of Schizophrenia in which criterion A are present, which was true for Mr. Loughner, but the criterion are not met for the

Paranoid, Disorganized, or Catatonic Types. Mr. Loughner's symptomatology and presentation are best explained by the Undifferentiated Type.

### DIAGNOSTIC IMPRESSION

According to the criteria set forth in the *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision, Mr. Loughner's diagnosis were as follows:

Axis I:   Schizophrenia, Undifferentiated Type

Axis II:  None

Axis III: None

### DISCUSSION REGARDING COMPETENCE TO PROCEED

Pursuant to Title 18, USC 4241, a defendant must meet two criteria in order to be found incompetent to proceed. First, they must be suffering from a mental disease or defect. Second, the mental disease or defect must either prevent the defendant from being able to understand the nature and consequences of the legal proceedings, or it must prevent the defendant from assisting properly in his defense. In developing an opinion regarding Mr. Loughner's competency, I made efforts to determine which of these criteria apply in his case.

**Does the defendant suffer from a mental disease or defect?**

It is my opinion that Mr. Loughner does currently suffer from a major mental illness, and is diagnosed with undifferentiated schizophrenia. However, many of the previously observed psychotic symptoms are now controlled with medication.

**Does the defendant's mental illness prevent a factual understanding of the charges against him or the legal process?**

Over the past twelve weeks, I have completed several structured competency interviews to assess Mr. Loughner's understanding of his legal situation. During these interviews, he was asked straightforward questions about specific aspects of the legal system, and, he provided rational and coherent answers. Mr. Loughner understood what he was charged with and was aware of the possible penalties. He reported his understanding of pleas. When asked if he would testify in his case, Mr. Loughner stated it was in his best interest not to testify on his own behalf. In regard to courtroom behavior, Mr. Loughner said he understood how he was required to present himself in the courtroom. He said he should not be disrespectful and he should not talk out of turn. Mr. Loughner understood the roles of the judge, jury, prosecution, and defense.

Forensic Report page 7
LOUGHNER, Jared Lee Reg. No. 15213-196
April 24, 2012

Mr. Loughner demonstrated adequate knowledge of the legal system. He displayed an appreciation of the nature of his charges and potential consequences. He was aware of, and amenable to discussing the likely outcomes for his case with his attorneys. Mr. Loughner also evidenced the ability to control his behavior to avoid trial disruptions and interact appropriately with his attorneys. He indicated a desire for a favorable outcome but acknowledged he would most likely be sentenced to life in prison. Mr. Loughner demonstrated he had a factual understanding of his legal charges and legal proceedings.

**Does the defendant's mental illness prevent a rational understanding of the charges against him or the legal process?**

Rational understanding refers to the defendant's capability of comprehending and weighing relevant information in the course of making decisions and his ability to grasp the factual understanding within the bigger picture. In addition, does he have a reasonable grasp of what outcomes are realistic? In my opinion, Mr. Loughner has a rational understanding of the charges against him and a rational understanding of the legal process. There were times I was concerned about his explanation of events which I will delineate below.

Throughout this evaluation, Mr. Loughner has made comments suggesting he believes Representative Giffords is deceased and her death was "faked." In July 2011, Mr. Loughner made comments suggesting he acknowledged Representative Giffords was alive. When he returned to this facility on October 12, 2011, he again began calling her death "fake." On January 9, 2012, I questioned him about these inconsistencies and he said "I was fucking with you before. I just wanted to see what you would say." When I questioned him about this comment he exclaimed, "Well, she's dead to me." On January 18, 2012, I again challenged these inconsistencies, and he talked openly about his disappointment that Representative Giffords could be alive. When I asked what this meant he stated, "That I failed. I'm not an assassin. That I ruined my life for nothing. I think differently now." Later in the interview he said, "It's another failure if she's alive. Jared Loughner failed again. He's a failure. So all of this would be for nothing."

On January 23, 2012, Mr. Loughner spontaneously said to me, "I saw her on TV yesterday. I saw her do the pledge." We then talked about her resignation and he said, "Thank you for telling me that." He never voiced disbelief or suggested it was a "fake" person. On January 24, 2012, he said "I saw her on TV last night. I saw Christina Green. I saw Mrs. Hileman. I saw the guy that held me down. I saw her walk into her office for the last time. She's going to the state of the union address. I swear to you that's not the woman I shot. The woman I shot in the head died instantly. No one could survive that gunshot wound to the head."



**SENSITIVE BUT UNCLASSIFIED**

Since January 24, there have been times, that he acknowledges she is alive. However, more recently, when I asked him about the status of Representative Giffords he simply states "I don't want to talk to you about that."

As noted in my January 25 report, there are several explanations for these inconsistencies. Mr. Loughner could continue to be exhibiting such disorganized thinking that he cannot comprehend such a devastating shot to the head would not result in death. It is also possible that his thinking is a result of him viewing himself as a failure if she is alive. When asked what it meant if she was alive he said, "That I failed. I'm not an assassin. That I ruined my life for nothing." He may also share with some of the public an assumption that catastrophic head injuries are always lethal. Several times, I have challenged Mr. Loughner's thinking regarding his belief that Representative Giffords is deceased. He has consistently made comments such as "It's another failure if she's alive. Jared Loughner failed again. He's a failure. So all of this would be for nothing." In my opinion, Mr. Loughner maintains this belief to vindicate himself and not because he is delusional.

As noted in my January 25 report, I also had a concern that Mr. Loughner considered approximately ten seconds of the Safeway (the shooting incident) footage as "fake." He mentioned this during one of the competency restoration groups, and he has mentioned this to some of my colleagues during their conversations with him. Although he continues to dispute a few things in the video, he considers the majority of the video footage as consistent with his recollection of the day in question. I maintain that the inconsistencies he mentions are not representative of delusional thinking but more suggestive that Mr. Loughner's vantage point is different from the events in question. It is also not unreasonable for his recall of what took place to not be entirely accurate.

As I noted in my January 25 report, the most important question here goes to how these discrepancies impact Mr. Loughner's overall competency. The defendant's assessment and understanding of the event must be based on reality, and his ability to comprehend and consider relevant information in the course of making decisions must be based on reality. Despite his belief that Representative Giffords may be deceased or that 10 seconds of the video footage is "fake", in my opinion, his assessment, understanding, and ability to make decisions about this case is based on reality. Just because he believes the death is "fake" or that he was holding a gun in a certain way does not necessarily compromise these abilities.

**Does the defendant's mental illness prevent him from being able to work with an attorney to prepare a reasonable defense?**

Mr. Loughner understood his charges, he knew who his attorneys were, and understood he needed to inform his attorney of any information that could help in preparing his defense. He named all of the attorneys representing him and two mediators that work with the defense team. Since January 25, 2012, someone from Mr. Loughner's defense

F.O.I EXEMPT
**SENSITIVE BUT UNCLASSIFIED**

team has visited with him several times a week; he has attended every meeting. Since January 25, 2012, there have been significant improvements in his overall thinking and ability to rationally discuss issues pertinent to his current circumstances which would positively impact his ability to work with his attorneys toward preparing a reasonable defense.

Mr. Loughner's attorneys continue to be concerned that Mr. Loughner will decompensate during a long, stressful trial. This concern is understandable. Following most meetings with his attorneys, Mr. Loughner was exhausted. He rarely talked to staff following these meetings and often immediately went to sleep. Because of Mr. Loughner's cognitive limitations resulting from his psychotic illness, working with him might be more difficult. It may take longer to review the evidence with Mr. Loughner and prepare him for trial. He may find the evidence especially distressing, as do some defendants that are not mentally ill, and struggle to maintain his composure or motivation. In some areas, his attitude appears to have remained more rigid than would be optimal, for example, he still appears irritated, or even angry, when reminded that Representative Giffords survived, and he also bitterly contests how some of the videotape from the Safeway incident is different from what he remembers.

Presently, Mr. Loughner's psychotic symptoms are controlled with medication, and he is capable of working with his attorney to prepare a reasonable defense. As noted, there were times that Mr. Loughner refused to talk to me or other staff. In most of these instances, his behavior was purely volitional. Nevertheless, it may be difficult to be sure that psychotic symptoms remain completely absent over the course of Mr. Loughner's legal proceedings. Mr. Loughner may continue to have some psychotic symptoms; however, at a minimum, they are controlled enough that he is able to talk about his case and better able to refrain from bringing up any remaining delusional beliefs he may have. Mr. Loughner believes he can work with his attorney and wants to have further discussions with his attorney about his case and the likelihood of various outcomes.

When Mr. Loughner first arrived to this facility, (March 2011), he was allowed to attend his attorney visits unrestrained. In other words, once he arrived to the visiting room, all of the full escorting restraints i.e., belly chain, handcuffs, and leg irons, were removed. However, after he spat on his attorney and lunged at her, this practice was discontinued; he was required to wear full escorting restraints for all attorney visits. In February 2012, correctional staff slowly began removing the escorting restraints. For example, during one visit, the leg irons were removed, eventually the belly chain was removed, and then the handcuffs were removed. By the writing of this report, Mr. Loughner was attending all of his attorney visits without any form of restraints.



**SENSITIVE BUT UNCLASSIFIED**

## COMPETENCE TO ENTER A PLEA BARGAIN

Mr. Loughner's attorneys indicated a desire to negotiate a plea bargain with the prosecuting attorneys. During competency restoration group and during my interviews with Mr. Loughner, he was able to provide a rational description of a plea bargain and how it might be applied in his case. During the competency restoration group, Mr. Loughner was "able to identify two constitutional rights that are waived when one accepts a plea agreement, prior to either right being discussed. The two he mentioned were "Fifth Amendment," and right to a trial. He also told the group leader that defendants often accept plea arrangements to receive a less severe penalty. He understood that accepting a plea arrangement meant forfeiting one's right to a jury trial. In my opinion, Mr. Loughner is competent to enter a plea bargain.

## OPINION REGARDING COMPETENCE TO PROCEED

Based on the above considerations, there was sufficient evidence to conclude Mr. Loughner possessed the capacity to understand the nature and potential consequences of the charges against him, and he has the ability to effectively assist his attorney in his defense. He has a rational understanding of the charges and legal process. Mr. Loughner is competent to proceed.

## SPECIAL CONCERNS

Mr. Loughner's attorneys remained concerned about Mr. Loughner's ability to withstand a lengthy and stressful trial, adequately participate in consultations following a stressful day in court, and his ability to assist them in preparing a defense. Their concerns were based on recent interactions with him. Many patients with schizophrenia, even when doing well, will have difficulty remaining lucid during lengthy interviews and stressful situations. His attorneys may have to take frequent breaks or use one of their mitigation specialists to assist them with interviewing him. There will be times when his attorneys encounter variations (e.g. desire to talk) in his mood and attitude about his situation, just as would be the case with anyone in circumstances this grave.

Mr. Loughner does suffer from a severe mental illness, and his condition may wax and wane. Consequently, the possibility exists that he may decompensate during the criminal process. As noted, there are two mitigation specialists on the defense team with an established relationship with Mr. Loughner; either could be provided opportunities to offer mental health support to him as needed during criminal proceedings. The court could also accommodate these concerns by scheduling shorter days and providing frequent breaks, at which time his defense team could review developments with him and reassure themselves that he is keeping up.

Mr. Loughner suffers from a chronic mental illness that has been difficult to treat. Consequently, I have two recommendations. First, until the court is ready to proceed, I

recommend Mr. Loughner remain at the United States Medical Center; we are familiar with Mr. Loughner's medical and mental health needs. In addition, given the limitations of his housing status, a number of activities were created to target his mental health treatment. Currently, he participates in two groups, works at two jobs, and is provided opportunities to recreate outside with other patients on a locked unit. Such provisions would be much more challenging, and possibly impractical, to provide at nonhospital prison facilities. Second, because Mr. Loughner's condition may wax and wane, I recommend the court expeditiously address issues related to his situation. Mr. Loughner is currently competent to proceed. However, because of his fragile mental state, there is no guarantee he will remain competent for an extended time.

Last, individuals suffering from a chronic mental illness can respond negatively and decompensate during stressful times, (e.g. participation in court proceedings, changes in the living situation). It is imperative that Mr. Loughner's medication not be changed without a compelling reason, and then only by a psychiatrist. If the court decides to hold the trial in either Tucson or San Diego, Mr. Loughner could be housed in a Bureau of Prisons' facility and monitored via teleconferencing by his current treating psychologist and psychiatrist. This would also provide opportunities to continue monitoring his competency and response to a stressful trial.

Christina A. Pietz, Ph.D., ABPP
Psychologist
Board Certified in Forensic Psychology

F.O.I EXEMP

**SENSITIVE BUT UNCLASSIFIED**